UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In Re:

                                              Case No.: 22-12790-EPK

EXCELL AUTO GROUP, INC.               Chapter 7

       Debtor.
_____/
NICOLE TESTA MEHDIPOUR,
as Chapter 7 Trustee for Excell Auto Group, Inc.

              Plaintiff,

                                    Adv. Pro. No. 22-_____-EPK

v.

HI BAR CAPITAL, LLC, a New York limited liability
company, SPIN CAPITAL LLC a/k/a Spin Capital,
a New Jersey limited liability company,
SPFL, an unknown entity, YISROEL HERBST, an individual,
MORDI HERBST, an individual, and
JOSHUA LUBIN, an individual

              Defendant(s).
 _____/

**COMPLAINT**

     Nicole Testa Mehdipour, the Chapter 7 Trustee (the "Trustee") for the estate (the "Estate")

of Excell Auto Group, Inc. (the "Debtor"), by and through undersigned counsel, sues Hi Bar

Capital, LLC ("Hi Bar"), Spin Capital, LLC a/k/a Spin Capital ("Spin"), SPFL, Yisroel Herbst,

Mordi Herbst, and Joshua Lubin and states as follows:

1

## I.    PARTIES, JURISDICTION AND VENUE

### A.  <u>Parties</u>

1.    Plaintiff is the duly authorized Chapter 7 Trustee of the Debtor's estate created pursuant to Section 541 of title 11 of the United States Code (the "**Bankruptcy Code**").

2.    Defendant, Hi Bar is a New York limited liability company with its principal place of business in New York and regularly conducts business in Florida.

3.    Defendant, Spin, is a New Jersey Limited Liability Company having a principal place of business in Lakewood, New Jersey.  Spin Capital conducted business in Florida with the Debtor.  Spin is registered to conduct business in New York.  The choice of law provision in agreements with Spin is New York.

4.    Defendant, Yisroel Herbst is an individual and is the sole member of Hi Bar and was engaged in the management and control of Hi Bar.

5.    Defendant Mordi Herbst is the Chief Operating Officer of Hi Bar.  Mordi Herbst was, at all times relevant, exercising management and control of Hi Bar.

6.    Defendant Josh Lubin is an individual and was president of Spin.  In his capacity as president Lubin exercised management and control of Spin.

7.    Based upon information and belief, Joshua Lubin was the owner of Spin.

8.    Josh Lubin exercised management and control of Hi Bar in that Josh Lubin negotiated one or more Contracts between the Debtor and Hi Bar, negotiated one or more settlement agreements between the Debtor and Hi Bar, directed outside counsel of Hi Bar in its dealings with the Debtor, and was engaged in managing the collection activities for Hi Bar regarding the Debtor.

9.     The Debtor is a Florida corporation with its principal business in Boca Raton, Florida.

10.     Prior to the filing of the bankruptcy, and at all times relevant, the Debtor was in the luxury used car sale business.

11.      Scott Zankl was the president of the Debtor.  At no time relevant was Scott Zankl a shareholder of the Debtor.

12.     At all relevant times Edward Brown was a stockholder and did not know of, approve of, or participate in any of the transactions described in this Complaint.

**B.  Jurisdiction and Venue**

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1334(b).

14.     This action involves core and non-core cause of action pursuant to 28 U.S.C. § 157 (b)(2)(A) and (O).

15.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961–68 ("**RICO**").

16.     The Court has subject-matter jurisdiction over Plaintiffs' state-law claims because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

17.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

18.     The Plaintiff consents to the entry of a final judgment by this Court on all counts in this Complaint.

## GENERAL FACTUAL ALLEGATIONS

### A. Spin and Hi Bar are Predatory Merchant Cash Advance Lenders

19.     In this case, Spin and Hi Bar attempt to shield themselves from state usury laws by categorizing their agreements as "purchases of future receivables" or "future revenues."

20.     In their contracts, Spin and Hi Bar, promote a fiction that, rather than making loans to merchants, they are actually purchasing, at a discount, a fixed amount of the merchant's future receivables or future revenues, to be repaid through a fixed weekly payment that purportedly represents a percentage of the Debtor's  weekly receipts.

21.     Spin and Hi Bar represented to courts that they, not the merchant (Debtor), assume the risk that the Debtor will fail to generate receivables.

22.     These claims are completely contrary to the real relationship between Spin and the Debtor and Hi Bar and the Debtor. In fact, by operation of their agreements, including, but not limited to, default rights and remedies, Spin and Hi Bar exert complete control over the relationship and were able to compel the Debtor to make the fixed weekly payments or suffer the consequences.

23.     Accordingly, Spin and Hi Bar never assumed the risk consistent with an actual purchase, rather, the obligation was absolutely repayable and constituted loans to the Debtor.

### B. The Debtor and its Business

24.     The Debtor was formed in 2009.  The Debtor was a purveyor of high-end, luxury automobiles.  Most of its business was sales to end-user consumers through early 2021 when Excell stopped selling vehicles to end-users.

25.     At all times relevant, Kristen Zankl was a shareholder of the Debtor.  Although Kristen Zankl has testified that she authorized Scott Zankl to operate the business, including signing her electronic signature to certain documents, based upon information and belief, Kristen

Zankl did not know about, and did not specifically authorize, the transactions referenced in this Complaint.

26.      At all times relevant, Scott Zankl operated and controlled the Debtor.

27.      At all times relevant, Ed Brown was a shareholder of the Debtor.  Ed Brown had no knowledge, did not participate, did not authorize, and did not benefit, from the loans and transactions described within this Complaint.

C.  **A Summary of Transactions Set Forth in this Complaint**

28.      As described below, Spin and the Debtor entered into three Revenue Purchase Agreements which were, in fact, loans.  Between June 1, 2021 through October 27, 2021, Spin actually loaned the Debtor $2,564,437.50 between the First Spin Contract, the Second Spin Contract and the Third Spin Contract.  During this time period, the Debtor actually paid Spin $2,421,625.00 towards these loans.    On October 27, 2021, when the remaining balance was refinanced by the First Hi Bar Contract, Spin asserted there was a remaining balance of $2,114,312.50.

29.      A schedule of payments between Spin and the Debtor is attached as **Exhibit A.** At all times material, the transactions between Debtor and Spin and Hi Bar were loans in which usurious amounts of interest are charged and collected.

30.      However, Spin and Hi Bar, in their respective agreements below, attempt to disguise the true nature of transactions between them and the Debtor. For instance, the term "Purchase Price" is actually a principal loan balance less the amounts withheld as origination and

other fees. The term "Purchased Amount" is the loan balance plus interest.  The "Revenue Purchase Agreement" is actually a loan agreement.[1]

      31.    As described below, on October 27, 2021, Hi Bar and the Debtor entered into a First Hi Bar Contract which was a refinancing of alleged remaining balances of the Spin Contracts.  The balance of $2,114,312.50 was increased to $2,120,000.00.  The refinancing of the $2,120,000.00 was through Hi Bar.  In exchange for Hi Bar refinancing the $2,120,000.00 claims by Spin as the amount being owed, Hi Bar and the Debtor entered into the Frist Hi Bar Contract which shows a "Purchased Amount" of $3,177,880.00 being owed by the Debtor to Hi Bar.  Hi Bar paid $0.00 to the Debtor.  A copy of the schedule of payments between Hi Bar and the Debtor is attached as **Exhibit B**.

      32.    Because of an alleged default, the First Settlement Agreement was entered into on December 19, 2021, between Hi Bar and the Debtor.  Although the Debtor paid $500,000.00, the Hi Bar First Settlement Agreement stated that the unpaid balance was $2,677,880.00 plus attorneys' fees and costs.  However, the Debtor was required to repay Hi Bar $4,016.820.00.

      33.    Because of another alleged default, the Second Settlement Agreement was entered into on February 1, 2022, between the Debtor and Hi Bar.  Although the Debtor paid an additional $400,000.00 to Hi Bar, the Second Settlement Agreement required the Debtor to pay Hi Bar $3,800,000.00.

      34.    After February 1, 2022, the Debtor paid Hi Bar an additional $1,300,000.00, Hi Bar filed suit alleging a balance owed of $2,500,000.00 plus an additional $625,000.00 in attorneys' fees and additional costs.

---

[1] For ease of reference, in the Complaint Plaintiff refers to terms as they actually appear in the operative documents. These terms are, however, a fiction as more fully described herein.

35.    Therefore, even though Hi Bar transferred no funds to the Debtor, Hi Bar received $2,200,000.00 from the Debtor and filed suit claiming an additional $2,500,000.00 plus an additional $625,000.00 in attorneys' fees and additional costs.

36.    $1,700,000.00 of the payments made to Hi Bar were made within the 90 days prior to the filing of the bankruptcy.

**D.  The First Spin Contract**

37.    Spin and the Debtor entered a "Revenue Purchase Agreement" (the "**First Spin Contract**").  The Trustee is not in possession of the First Spin Contract. Based upon information and belief, the First Spin Contract was entered on or about June 1, 2021.

38.    On June 1, 2021, the Debtor received from Spin a wire transfer of $950,000.00.

39.    On August 23, 2021, Josh Lubin sent an email to Scott Zankl which contained a spreadsheet titled "Excel Auto Group June 1, 2021 $1000000" and showed a balance on June 8, 2021 of $1,405,312.50 after a payment of $93,687.50 was paid.  On August 17, 2021, after receiving twelve payments of $93,687.50 (or $1,124,250), Lubin stated that there was a remaining balance owed of $468,427.50.  A copy of the August 23, 2021, email string with attachments is **Exhibit C**.

40.    Upon information and belief, the First Spin Contract had a "Purchase Amount" of $1,499,000.00.

41.    Based upon the email, the First Spin Contract required the Debtor to pay a weekly remittance of $93,687.50. On August 13, 2021, Spin issued a Balance letter to the Debtor in which the outstanding balance on the First Spin Contract was increased to $562,125.00.  A copy of the August 13, 2021 Spin Capital Balance Letter is attached as **Exhibit D**.

42.     Based upon information and belief, other than the principal amount of the loan, the number of payments, the payment amount and the percentage amount, the terms and conditions of the First Spin Contract are identical, or substantially similar, to the Second Spin Contract.

43.     Spin designed the First Spin Contract to avoid New York criminal usury statutes but it was nothing more than a disguised loan in which the interest rate was more than twice the amount of the 25% criminal usury rate under New York law.  *N.Y. Penal Law § 190.40*.

**E.  <u>The Second Spin Contract</u>**

44.     In the end of June of 2021, Josh Lubin reached out to Scott Zankl inquiring whether any additional funding was needed.  Thereafter, Josh Lubin and Scott Zankl began negotiating a second agreement.

45.     On July 8, 2021, Josh Lubin texted Scott Zankl stating, "I'll fund $500k without any login or statements…."

46.     On July 9, 2021, Spin, on the one hand, and the Debtor along with 13 non-debtor entities in which Scott and Kristen Zankl had an ownership interest, on the other hand, entered a "Revenue Purchase Agreement," including Addendum to the Future Receivables Sale and Purchase Agreement and Guaranty, Merchant Agreement Terms and Conditions, Security Agreement and Guaranty of Performance, Guaranty of Performance, Authorization Agreement for Direct Deposit (ACH Credit), Direct Payments (ACH Debits), and Check Debit, Appendix A – The Fee Structure, and Bank Login Information.  Collectively, these documents shall be known as the "**Second Spin Contract**" and are attached as **Composite Exhibit E**.

47.     The Purchase Price is listed as $500,000 with the Purchased Percentage being 20% and the Purchased Amount is $749,500.00.  The weekly payment remittance was $40,000.00, to

be debited daily by Spin. See Ex. E. p. 1.  On July 9, 2021, the Debtor received a wire transfer from Spin Capital in the amount of $475,000.00.

48.     Based upon the weekly ACH withdrawal of $40,000.00, the loan would be paid off in just 18.77 weeks, which translates to an annual interest rate of more than twice the amount of the 25% criminal usury rate under New York law.  *N.Y. Penal Law § 190.40*.

49.     Spin designed the Second Spin Contract to avoid New York criminal usury statutes but was nothing more than a disguised loan.

**C.  The Third Spin Contract**

50.     On August 31, 2021, Spin issued a Balance Transfer Agreement letter. A copy of the 8/31/2021 Balance Transfer Agreement letter is attached as **Exhibit F**.  As of August 31, 2021, Spin represented that the Debtor owed $281,062.50 on account of the First Spin Contract and $469,500.00 on account of the Second Spin Contract.  The Debtor and Spin agreed to deduct these outstanding balances from a "new Merchant Agreement."

51.     On August 31, 2021, Spin, on the one hand, and the Debtor, including Scott and Kristen Zankl and a list of their other non-debtor entities in which the Zankl's had an ownership interest, on the other hand, entered into another "Revenue Purchase Agreement."  The Revenue Purchase Agreement dated August 31, 2021 along with Addendum to the Future Receivables Sale and Purchase Agreement and Guaranty, Merchant Agreement Terms and Conditions, Security Agreement and Guaranty of Performance, Guaranty of Performance, Authorization Agreement for Direct Deposit (ACH Credit), Direct Payments (ACH Debits), and Check Debit, Appendix A – The Fee Structure, and Bank Login Information are attached as **Composite Exhibit G**. Collectively, these documents are the "**Third Spin Contract**."

52.    The Purchase Price is listed as $2,000,000 with the Purchased Percentage being 20% and the Purchased Amount is $2,998,000.00.   The weekly payment remittance was $150,000.00, to be debited weekly by Spin. Composite Ex. G, p. 1.

53.     On September 2, 2021, the Debtor received a wire transfer in the sum of $1,099,437.50 via wire transfer from Spin Capital.  On September 3, 2021, the Debtor received the sum of $40,000.00 via wire transfer from Spin Capital.

54.    Therefore, in exchange for entering into the Third Spin Contract the Debtor was obligated to pay Spin Capital a minimum of $2,998,000 in exchange for the Debtor receiving consideration of $1,890,000 which includes the aforementioned wire transfers and the refinance of the two prior loans.

55.    Based upon the weekly ACH withdrawal of $150,000.00, the loan would be paid off in just 19.98 weeks which translates to an annual interest rate of more than twice the amount of the 25% criminal usury rate under New York law.  *N.Y. Penal Law § 190.40*.

56.    Spin designed the Third Spin Contract to avoid New York criminal usury statutes but was nothing more than a disguised loan.

57.    Collectively, the First Spin Contract, Second Spin Contract, and Third Spin Contract shall be referred to as the "**Spin Contracts**."

### D.  The Spin Contracts were all Loans Disguised as Revenue Purchase Agreements and Designed to Minimize the Risk to the Lender with Illusory Reconciliation and Other Provisions

58.    The Spin Contracts contained false, misleading, and illusory provisions to disguise the fact that the Spin Contracts are in fact loans subject to applicable usury laws.  Some of the false, misleading, or illusory provisions are: (i) that the Purchased Amount was based upon good faith estimates of the receipts purchased; (ii) no interest was being charged; (iii) that the Merchant

and Guarantors are only guaranteeing their performance and not payment; (iv) the Remittance amount was subject to changes through a reconciliation provision.

59.     In fact, the Spin Contracts were sophisticated documents designed to disguise Spin's ability to minimize any potential loss to Spin while attempting to avoid applicable usury laws.

60.     As a proximate result of the terms and conditions of each of the First Spin Contract, the Second Spin Contract and the Third Spin Contract, the Debtor was damaged as it was charged and paid more than twice the legal rate of interest permitted under New York law.

### i.     Not Based upon Good Faith Estimates

61.     Spin was purportedly "purchasing" future receipts from the Debtor and non-debtor entities through the First Spin Contract, the Second Spin Contract and the Third Spin Contract.

62.     These Spin Contracts all falsely state that "[t]he Remittance is a good faith estimate of [Spin's] share of the future revenue stream." The weekly remittance amount is purportedly 20% of the Debtor's weekly revenue, based on a "good faith estimate" of the Debtor's weekly revenue calculated by Spin. However, based upon the calculations in each of the Spin Contracts, the Debtor's weekly revenue fluctuated by hundreds of thousands of dollars per week between June 1, 2021 and August 31, 2021.

63.     The First Spin Contract calculated the Debtor's weekly revenue to be $468,437.50 ($93,687.50/.2) and 38-days later the Second Spin Contract calculated $200,000.00 in weekly revenue by the Debtor ($40,000.00/.2). Notwithstanding a purported drop in weekly revenue of $268,437.50, or a 57.3% drop in revenue, Spin continued to collect the $93,687.50 per week from the Debtor and began collecting the additional $40,000.00 per week under the Second Spin Contract.

64.    53 days later, the Third Spin Contract calculates the Debtor's weekly revenues to be $750,000.00 ($150,000.00/.2), which reflects Debtor increasing its revenues by a multiple of 3.75.

65.    A review of the Debtor's books and records for the three months prior to entering the First Spin Contract demonstrates that there was insufficient revenue being generated by the Debtor to support the good faith estimate under the terms of the First Spin Contract.

66.    For the three months prior to entering the First Spin Contract, most of the deposits coming into the Debtor's accounts were from lenders, including private lenders, floor planning lenders, and other Merchant Cash Advance lenders, not revenues.

67.    For the Second Spin Contract, Spin did not look at the Debtor's revenues and stated that the Second Spin Contract would be approved without review of bank statements or access to the Debtor's accounts.

68.    Even if Spin had reviewed the Debtor's books and records prior to entering the Second Spin Contract, the books and records reveal that the Debtor was not generating sufficient revenues to support the good faith estimate under the terms of the Second Spin Contract.

69.    The Third Spin Contract was, in part, a refinance of the balances due under the First Spin Contract and the Second Spin Contract. As stated above, in exchange for entering the Third Spin Contract the Debtor was obligated to pay Spin Capital a minimum of $2,998,000 in exchange for the Debtor receiving consideration of $1,890,000 in cash and the refinance of loans due under the First Spin Contract and the Second Spin Contract.

70.    The Third Spin Contract was, in fact, a loan consisting partially of money lent and partially a disguised loan refinance.

12

### ii.    <u>The Obligation by the Debtor for Repayment was for a Definite Term</u>

71.    Although purporting not to have a definite term of repayment, each of the Spin Contracts required repayment under a definite term.

72.    The term for repayment is determined by taking the Purchase Amount and dividing the weekly remittance amount.

73.    Spin creates a reconciliation provision, which is illusory, to create a false and misleading impression that the Debtor and the non-debtor entities could reduce the Remittance amount thereby extending the length of repayment.

74.    Pursuant to the plain terms of the Spin Contracts, the Debtor and the non-debtor entities were never eligible for reconciliation.

75.    At the time that each of the Spin Contracts were entered into, Spin knew or should have known, that the Debtor and the non-debtor entities could never be eligible for reconciliation.

### iii.    <u>The Reconciliation Provision in the Spin Contracts was Illusory.</u>

76.    Each of the Spin Contracts had the same "Reconciliation" provision:

Reconciliation. **As long as an Event of Default, or breach of this agreement, has not occurred**, Merchant may request a retroactive reconciliation of the total Remittance Amount. All requests hereunder must be in writing to Reconciliations@spincapital.com.   Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding if applicable, from the date of this Agreement through and including the date the request is made. [Spin] retains the right the request additional reasonable documentation including without limitation bank login or access to view Merchant's accounts using third party software, and Merchant's refusal to provide access shall be a breach of this Agreement and [Spin] shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by [Spin] within two (2) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by [Spin] shall equal the Specific Percentage of the Future Receipts that Merchant collected during the requested month. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with [Spin]'s right and ability to debit Merchant's Account while

> the request is pending or to unilaterally modify the Remittance Amount, in any method other than the ones listed in this Agreement.

Ex. Nos. E and G. (Emphasis added).

77.    The Debtor and the non-debtor entities are precluded, based upon the plain language of the Spin Contracts from seeking reconciliation if the Debtor and the non-debtor entities had an Event of Default or were otherwise in breach of the agreement.

78.    Each Spin Contract contains the same provisions for "Event of Default" which states, in part, as follows:

> (a) Paragraph (h) **Merchant shall use multiple depository accounts without the prior written consent of SPC or takes any other action that intentionally interferes with or prevents SPC from receiving the Purchased Amount in accordance with the terms of this Agreement.**
>
> (b)  Paragraph (i) Merchant shall enter into any financing **agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party.**
>
> (c) Paragraph (m) **Merchant or any Owner/Guarantor(s), directly or indirectly, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, which operates a business similar to or competitive with that of Merchant.**
>
> (d) Paragraph (n) **Merchant shall default under any of the terms, covenants and conditions of any other agreement with SPC.**

Ex. Nos. E and G.

79.    The Debtor and the Non-Debtor entities are included in the definition of "Merchant" or "Seller."  The Non-Debtor entities are separate businesses each with their own bank accounts.  Spin knew or should have known that the Debtor and non-debtor entities each had one or more separate bank accounts prior to entering each of the Spin Contracts.  Pursuant to the plain terms of the Spin Contracts, the Debtor and non-debtor entities' maintenance of these separate accounts constituted an Event of Default.

14

80. Prior to entering each of the Spin Contracts, Spin knew or should have known that the Debtor had entered into multiple loan agreements with other lenders, including Merchant Cash Advance Lenders, Private Lenders, floor planning lenders and other lenders.

81. In part, Spin's knowledge is based upon the review of the Debtor's bank statements and communication between Scott Zankl and Josh Lubin.

82. Based upon the broad definitions of Merchants and Owners\Guarantors along with the expansive prohibition of borrowing that would increase the amounts due to any other party, created an immediate Event of Default.

83. The Debtor and some of the non-debtor entities were in the business of selling new and used vehicles, including on consignment and through the use of floor plan financing agreements. Any transaction by the Debtor and/or the non-debtor entities would constitute an Event of Default.

84. Further, under the plain reading of the Spin Contracts, the normal use of a credit card by the Debtor or the non-debtor entities is an Event of Default because there is an increase in the debt owed to a third party.

85. Pursuant to the Spin Contracts, the Debtor and the non-debtor entities had to represent that they had "good, complete, unencumbered and marketable title to all Receipts and all collateral in which Spin has been granted a security interest under the Security Agreement, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever other than in favor of Spin or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of Spin."

86.     At the time that the Spin Contracts were being entered, Spin knew that the Debtor and the non-debtor entities had other Merchant Cash Advance Agreements, security agreements with floor plan lenders, and other lenders.

87.     Spin knew that the Debtor and the non-debtor entities would immediately be in default under the terms of the Spin Contracts and the Events of Default.

### iv.    The Adjustment to the Remittance Provision in the Spin Contracts were Illusory

88.     The Spin Contracts have a provision for Adjustments to the Remittance amount. The pre-conditions to obtain an adjustment to the weekly Remittance amount were substantially similar to the requirements to obtain a reconciliation.

89.     The Spin Contracts provide, in part, "[t]he Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipt by the Purchased Percentage divided by the number of business days in the previously (2) calendar weeks." The weekly remittance amount could only be reduced for 2 weeks, then the process would need to start all over or the Remittance Amount reverts back to the original Remittance amount without consideration of the Debtor's financial position.

90.     The ability of the Debtor and the non-debtor entities to successfully obtain a reduction to the weekly remittance amount was illusory.

### v.     The Spin Contracts were Designed to Minimize Any Potential Risk of Loss to Spin

91.     The Spin Contracts were designed to minimize any potential risk of loss to Spin in the event the Debtor and the non-debtor entities had a business failure or reduction in revenue.

92.     As a result of the protections built into the Spin Contracts to protect Spin from loss, the Spin Contracts were, in fact, loans.

93.     If there is an Event of Default, the Debtor and non-debtor entities were required to pay 100% of their revenues until all amounts, including any penalties, attorneys' fees, and other were paid in full.

94.     To further minimize the risk of any potential loss, the Contracts contain the following protections:

**Protection 1**. The full uncollected Purchased Amount plus all fees (including attorney's fees and costs of collection in the amount of 30% of the Purchased Amount then outstanding due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2**. [Spin] may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).

**Protection 3**. Merchant hereby authorizes [Spin] to execute in the name of the Merchant a Confession of Judgment in favor of [Spin] pursuant to the terms of the Confession of Judgment.

Upon an Event of Default, [Spin] may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

**Protection 4**. [Spin] may enforce its security interest in the Collateral including sending demand letters to account debtors and credit card processors.

**Protection 5**. [Spin] may exercise any and all rights and remedies of a secured party under Uniform Commercial Code Article 9

**Protection 6.** [Spin] may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if [Spin] recovers a Judgment against Merchant, Merchant shall be liable for all of [Spin's] costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to [Spin]. Upon breach of any provision in this Agreement, [Spin] may exercise its rights under this Assignment of Lease without prior Notice to Merchant.

**Protection 8.** [Spin] may debit Merchant's depository accounts wherever situated in such amounts as determined by [Spin] in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Amount and other amounts owed by Merchant to [Spin] by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to [Spin].

Exhibits E and G.

95.     The Spin Contracts contain a Security Agreement under the Uniform Commercial Code.  The Security Agreement creates a lien on the assets of the Merchant under Article 9 of the UCC; requires the Merchant to pledge additional assets as security and allows the allows the (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s)(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s)(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to Spin under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "*Spin Secured Assets*").

96.     The Spin Contracts were intended to be – and in fact are - usurious loans for which the interest rate was charged more than 2 times the criminal rate of usury under New York law.

**E.   Hi Bar's Refinancing of Spin Obligations**

97.     In or around October of 2021, the Debtor entered negotiations with Franklin Capital Funding, LLC d/b/a Wing Lake Capital Partners ("**Wing Lake**") for a $6,000,000.00 loan.  As part of the loan from Wing Lake, the Debtor represented that it had no undisclosed Merchant Cash Advance agreements.

98.     In or around October of 2021, Spin and Wing Lake, as part of the negotiations with the Debtor and the related Non-Debtor entities, began negotiating an agreement whereby Spin would assign its rights under the then existing Spin Contracts to Wing Lake.

18

99.     Spin knew that as a condition of the Debtor obtaining a loan with Wing Lake, the Debtor needed to show Wing Lake all amounts owed to Spin were paid off.

100.     The balance owed to Spin was transferred to Hi Bar.  The transfer of this balance resulted in the Debtor owing a greatly increased balance and allowed Spin and Hi Bar to continue to collect on their unlawful debt.

101.     The loan documents between Wing Lake and the Debtor, including the assignment by Spin to Wing Lake, dated November 3, 2021, are attached to Wing Lake's proof of claim. (POC # 43).

102.     On October 27, 2021, electronic signatures of Kristen Zankl and Scott Zankl are affixed to a Hi Bar Capital Balance Transfer Agreement prepared by Hi Bar Capital.   A copy of the "October 27. 2021 Hi Bar Capital Balance Transfer Agreement" is attached as **Exhibit H**. Pursuant to the Hi Bar Capital Balance Transfer Agreement, the Debtor agreed that the Debtor had an outstanding balance owed to Spin the amount of $2,114,31.50 on account of the Third Spin Contract dated August 31, 2021.

103.     The Debtor agreed to allow Hi Bar to deduct $2,114,312.50 from a new Merchant Cash Advance agreement that was going to be entered with Hi Bar Capital.

104.     On October 27, 2021, Hi Bar, on the one hand, and, on the other hand, the Debtor, along with 14 non-debtor entities, which are the same 13 non-debtor entities included in the Spin contracts with Karma of Palm Beach being duplicated, entered a "Revenue Purchase Agreement." The Revenue Purchase Agreement dated 10/27/2021 along with Merchant Agreement Terms and Conditions, Security Agreement and Guaranty of Performance, Guaranty of Performance, Authorization Agreement for Direct Deposit (ACH Credit), Direct Payments (ACH Debits), and Check Debit, Appendix A – The Fee Structure, Bank Login Information, and Addendum to the

Future Receivables Sale and Purchase Agreement and Guaranty are attached as **Composite Exhibit I.** Collectively, these documents are the "**First Hi Bar Contract**."

105.    The Purchase Price is listed as $2,120,000.00 with the Purchased Percentage being 20% and the Purchased Amount is $3,177,880.00.   The Purchase Price is only $5,687.50 ($2,120,000.00-2,114,312.50) more than the "transferred balance" from Spin.

106.    Hi Bar did not transfer any funds to the Debtor on account of the First Hi Bar Contract.

107.    A review of the Debtor's books and records for the three months prior to entering into the First Hi Bar Contract demonstrates that there was an insufficient amount of deposits going into the Debtor's account from revenue to support the good faith estimate under the terms of the First Hi Bar Contract.

108.    A review of the Debtor's bank statements demonstrates that most of the deposits coming into the Debtor's accounts were from lenders, including private lenders, floor planning lenders and Merchant Cash Advance lenders.

109.    The weekly payment remittance was $150,000.00, to be debited by Hi Bar. **Composite Ex. I, p. 1**.  Based upon the weekly ACH withdrawal of $150,000.00, the loan would be paid off in just 21.19 weeks which translates to an annual interest rate of more than twice the amount of the 25% criminal usury rate under New York law.  *N.Y. Penal Law* § 190.40.

> **i.    The First Hi Bar Contract was a Loan Disguised as Revenue Purchase Agreements and Designed to Minimize the Risk to the Lender with Illusory Reconciliation and Other Provisions**

110.    The First Hi Bar Contract contained false, misleading, and illusory provisions to disguise the fact that the First Hi Bar Contract was in fact, a loan subject to applicable usury laws. Some of the false, misleading, or illusory provisions are: (i) that the Purchased Amount was based upon good faith estimates of the receipts purchased; (ii) no interest was being charged; (iii) that

the Merchant and Guarantors are only guaranteeing their performance and not payment; (iv) the Remittance amount was subject to changes through a reconciliation provision.

111.    The First Hi Bar Contract was substantially similar to the Spin Contracts.

112.    For the First Hi Bar Contract, the receivables are not based upon good faith estimates; the obligations for repayment are for a definite term; the reconciliation provision is illusory; the adjustment to the remittance provision is illusory; and the First Hi Bar Contract is crafted to minimize the risk of loss to Hi Bar.

113.    The "Specified Percentage" and the "Reconciliation Provision" falsely represent to courts that their agreements are not absolutely repayable, usurious loans with fixed repayments and fixed terms, but are rather purchases of accounts receivables, with varying daily or weekly terms and repayment based on the merchant's actual generation and collection of accounts receivable, with the Enterprise assuming the risk that the merchant will fail to generate or collect the same.

### ii.    Not Based upon Good Faith Estimates

114.    Pursuant to the First Hi Bar Contract, the Debtor and 14 non-debtor entities were defined as the Merchant.  The Merchant agreed to sell, assign, and transfer the Purchased Percentage, defined as 20%, of all of Merchant's payments, receipts, settlements and funds paid to or received by or for the account of the Merchant from time to time on and after the date hereof in payment or settlement of Merchant's existing and futures accounts, payment intangibles, credit, debit and/or stored value card transactions, contract rights, and other entitlements arising from or relating to the payment of monies from Merchant's customers and/or other payors or obligors (the "Future Receipts" defined as all payments made by cash, check, clearing house settlement, electronic transfer or other form of monetary payment) of the payments to Merchant as a result of

Merchant's sale of goods and/or services (the "Transactions") until the Purchased amount has been delivered by or on behalf of Merchant to [Hi Bar]"

115.    The funds taken by Hi Bar came, primarily, from funds the Debtor was borrowing from other MCAs, private lenders, and other third-party lenders and were not "proceeds" from the Debtor's sale of goods or services as contemplated in the First Hi Bar Contract.

116.    In or around April 2021, the Debtor generally ceased engaging in the sale of vehicles and other goods and services.  The Debtor had little to no Future Receipts.

117.    Further, the First Hi Bar Contract falsely state that "[t]he Remittance is a good faith estimate of [Hi Bar's] share of the future revenue stream."  The weekly remittance amount is purportedly 20% of the Debtor's weekly revenue, based calculated on a "good faith estimate" of the Debtor's weekly revenue calculated by Hi Bar.

118.    The First Hi Bar Contract calculated the Debtor's weekly revenue to be $750,000.00.  The Debtor did not have Future Receipts equaling $750,000.00 per week for 21.19 weeks.    Notwithstanding, Hi Bar insisted on payment of the $150,000.00 per week.

119.    A review of the Debtor's books and records for the three months prior to entering the First Hi Bar Contract demonstrates that there was insufficient revenue being generated by the Debtor to support the good faith estimate under the terms of the First Hi Bar Contract.

120.    For the three months prior to entering the First Hi Bar Contract, most of the deposits coming into the Debtor's accounts were from lenders, including private lenders, floor planning lenders, and other Merchant Cash Advance lenders not revenues.

121.    The First Hi Bar Contract was, in part, a refinance of the balances due under the Third Spin Contract.  The First Hi Bar Contract was negotiated between Scott Zankl and Josh Lubin.  Of the $2,120,000.00 purported Purchase Price, $2,114,312.50 was the refinancing of

the Third Spin Contract.   In consideration, the Debtor agreed to pay $3,177,880.00 at the rate of

$150,000.00 per week.  The Purchase Price is only $5,687.50 ($2,120,000.00-2,114,312.50)

more than the "transferred balance" from Spin.

122.    The First Hi Bar Contract was, in fact, a loan consisting partially of money lent

and partially a disguised loan refinance.

### iii.    The Obligation by the Debtor for Repayment was for a Definite Term

123.    Although purporting not to have a definite term of repayment each of the First Hi

Bar Contract requires repayment under a definite term.

124.    The term for repayment is determined by taking the Purchase Amount and dividing

the weekly remittance amount or 21.19 weeks.

125.    The First Hi Bar Contract creates a reconciliation provision, which is illusory, to

create a false and misleading impression that the Debtor and the non-debtor entities could reduce

the Remittance amount thereby extending the length of repayment.

126.    Pursuant to the plain terms of the First Hi Bar Contract, the Debtor and the non-

debtor entities were never eligible for reconciliation.

127.    At the time that each of the First Hi Bar Contract was entered into, Hi Bar knew or

should have known, that the Debtor and the non-debtor entities could never be eligible for

reconciliation.

### iv.    The Reconciliation Provision in the Hi Bar was Illusory.

128.    The Hi Bar Contract had a "Reconciliation" provision:

> Reconciliation. **As long as an Event of Default, or breach of this
> agreement, has not occurred**, Merchant may request a retroactive
> reconciliation of the total Remittance Amount. All requests hereunder must
> be in writing to  Reconciliations@hibarcapital.com.  Said request must
> include copies of all of Merchant's bank account statements, credit card
> processing statements, and accounts receivable report outstanding if
> applicable, from the date of this Agreement through and including the date

23

the request is made. [Hi Bar] retains the right the request additional reasonable documentation including without limitation bank login or access to view Merchant's accounts using third party software, and Merchant's refusal to provide access shall be a breach of this Agreement and [Hi Bar] shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by [Hi Bar] within two (2) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by [Hi Bar] shall equal the Specific Percentage of the Future Receipts that Merchant collected during the requested month. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with [Hi Bar]'s right and ability to debit Merchant's Account while the request is pending or to unilaterally modify the Remittance Amount, in any method other than the ones listed in this Agreement.

Ex. No. I p. 2. (Emphasis added).

129.   The Debtor and the non-debtor entities are precluded, based upon the plain language of the First Hi Bar Contract from seeking reconciliation if the Debtor and the non-debtor entities had an Event of Default or were otherwise in breach of the agreement.

130.   The First Hi Bar Contract contains the following provision for "Event of Default" which states, in part, as follows:

> (a) Paragraph (h) **Merchant shall use multiple depository accounts without the prior written consent of HBC or takes any other action that intentionally interferes with or prevents HBC from receiving the Purchased Amount in accordance with the terms of this Agreement.**
>
> (b)  Paragraph (i) Merchant shall enter into any financing **agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party.**
>
> (c) Paragraph (m) **Merchant or any Owner/Guarantor(s), directly or indirectly, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, which operates a business similar to or competitive with that of Merchant.**
>
> (d) Paragraph (n) **Merchant shall default under any of the terms, covenants and conditions of any other agreement with HBC.**

Ex. I, First Hi Bar Contract  §3(a)-(n).

131.    The Debtor and the Non-Debtor entities are included in the definition of "Merchant" or "Seller."  The Non-Debtor entities are separate businesses each with their own bank accounts.   Hi Bar knew or should have known that the Debtor and non-debtor entities each had one or more separate bank accounts prior to entering each of the First Hi Bar Contract.   Pursuant to the plain terms of the First Hi Bar Contract, the Debtor and non-debtor entities' maintenance of these separate accounts constituted an Event of Default.

132.    Prior to entering the First Hi Bar Contract, Hi Bar knew or should have known that the Debtor had entered into multiple loan agreements with other lenders, including Merchant Cash Advance Lenders, Private Lenders, floor planning lenders and other lenders.

133.    In part, Hi Bar's knowledge is based upon the review of the Debtor's bank statements and communication between Scott Zankl and Josh Lubin.

134.    Based upon the broad definitions of Merchants and Owners\Guarantors along with the expansive prohibition of borrowing that would increase the amounts due to any other party, created an immediate Event of Default.

135.    The Debtor and some of the non-debtor entities were in the business of selling new and used vehicles, including on consignment and through the use of floor plan financing agreements. Any transaction by the Debtor and/or the non-debtor entities would constitute an Event of Default.

136.    Further, under the plain reading of the First Hi Bar Contract, the normal use of a credit card by the Debtor or the non-debtor entities is an Event of Default because there is an increase in the debt owed to a third party.

137.    Pursuant to the First Hi Bar Contract, the Debtor and the non-debtor entities had to represent that they had "good, complete, unencumbered and marketable title to all Receipts and all

collateral in which Spin has been granted a security interest under the Security Agreement, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever other than in favor of Spin or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of Hi Bar."

138.    At the time that the First Hi Bar Contract was being entered, Hi Bar knew that the Debtor and the non-debtor entities had other Merchant Cash Advance Agreements, security agreements with floor plan lenders, and other lenders.

139.    Spin knew that the Debtor and the non-debtor entities would immediately be in default under the terms of the First Hi Bar Contract and the Events of Default.

**v.      The Adjustment to the Remittance Provision in the First Hi Bar Contract was Illusory**

140.    The First Hi Bar Contract has a provision for Adjustments to the Remittance amount.  The pre-conditions to obtain an adjustment to the weekly Remittance amount were substantially similar to the requirements to obtain a reconciliation.

141.    The First Hi Bar Contract provides, in part, "[t]he Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipt by the Purchased Percentage divided by the number of business days in the previously (2) calendar weeks."  The weekly remittance amount could only be reduced for 2 weeks, then the process would need to start all over or the Remittance Amount reverts back to the original Remittance amount without consideration of the Debtor's financial position.

142.    The ability of the Debtor and the non-debtor entities to successfully obtain a reduction to the weekly remittance amount was illusory.

**vi.      The First Hi Bar Contract was Designed to Minimize Any Potential Risk of Loss to Hi Bar**

143.    The First Hi Bar Contract was designed to minimize any potential risk of loss to Hi Bar in the event the Debtor and the non-debtor entities had a business failure or reduction in revenue.

144.    As a result of the protections built into the First Hi Bar Contract to protect Hi Bar from loss, the First Hi Bar Contracts were, in fact, loans.

145.    If there is an Event of Default, the Debtor and non-debtor entities were required to pay 100% of their revenues until all amounts, including any penalties, attorneys' fees, and other were paid in full.

146.    To further minimize the risk of any potential loss, the Contracts contain the following protections:

> **Protection 1**. The full uncollected Purchased Amount plus all fees (including attorney's fees and costs of collection in the amount of 30% of the Purchased Amount then outstanding due under this Agreement and the attached Security Agreement become due and payable in full immediately.
> **Protection 2**. [Hi Bar] may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).
> **Protection 3**. Merchant hereby authorizes [Hi Bar] to execute in the name of the Merchant a Confession of Judgment in favor of [Hi Bar] pursuant to the terms of the Confession of Judgment.
> Upon an Event of Default, [Hi Bar] may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.
> **Protection 4**. [Hi Bar] may enforce its security interest in the Collateral including sending demand letters to account debtors and credit card processors.
> **Protection 5**. [Hi Bar] may exercise any and all rights and remedies of a secured party under Uniform Commercial Code Article 9
> **Protection 6.** [Hi Bar] may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if [Hi Bar] recovers a Judgment against Merchant, Merchant shall be liable for all of [Hi Bars] costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.
> **Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to [Hi Bar]. Upon breach of any provision in this Agreement, [Hi

Bar] may exercise its rights under this Assignment of Lease without prior Notice to Merchant.

**Protection 8.** [Hi Bar] may debit Merchant's depository accounts wherever situated in such amounts as determined by [Hi Bar] in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Amount and other amounts owed by Merchant to [Hi Bar] by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to [Hi Bar].

Ex. I p. 3.

147.     The First Hi Bar Contract contains a Security Agreement under the Uniform Commercial Code.  The Security Agreement creates a lien on the assets of the Merchant under Article 9 of the UCC; requires the Merchant to pledge additional assets as security and allows the allows the (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s)(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s)(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to Hi Bar under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "***Hi Bar Secured Assets***").

148.     The First Hi Bar Contract was intended to be First Spin Contract, the Second Spin Contract and the Third Spin Contract a loan for which the interest rate was charged more than 2 times the criminal rate of usury under New York law.

### F.  The Debtor Purportedly Defaulted Under the First Hi Bar Contract which Led to the Debtor and Hi Bar Entering a Settlement Agreement

149.     In mid-December 2021, the Debtor had an outstanding balance of $2,677,880, according to Hi Bar.

28

150.    At this time, Hi Bar, through its counsel, contacted Scott Zankl and advised Zankl that the Debtor was in "default" under the First Hi Bar Contract.

151.    On or around December 15, 2021 and December 16, 2021, Josh Lubin sent a series of text messages indicating that the Debtor was in default, demanding Scott call Josh, and texting a picture of a lawsuit prepared by Hi Bar's attorneys against the Debtor and the non-debtor entities.

152.    Hi Bar sent Zankl, a "Settlement Agreement" which Hi Bar through its counsel stated Scott Zankl must sign or Hi Bar would proceed to file a lawsuit against the Debtor, Scott Zankl, Kristen Zankl and the non-debtor entities.

153.    On December 19, 2021, after threatening litigation, Hi Bar, on the one hand, and the Debtor and 14 non-debtor entities, on the other hand, entered a "Settlement Agreement."  A copy of the Settlement Agreement dated December 19, 2021, is attached as **Exhibit J** (the "**First Settlement Agreement**").

154.    The First Settlement Agreement alleges that the Debtor owes $2,677,880.00 under the First Hi Bar Contract. The First Settlement Agreement provides for a repayment of 150% of that amount, or $4,016,820, which shall be paid back at $200,000 per week over 20 weeks.  *See* Ex. J p. 1.

155.    The First Settlement Agreement is not a Merchant Cash Advance, but a settlement agreement of amounts allegedly previously owed to Hi Bar.  This transaction is subject to the criminal usury laws in New York.

156.    The Settlement Agreement contains an integration clause that states, in pertinent part:

> Entire Agreement. This Agreement embodies the entire agreement between Seller and Purchaser and supersedes all prior agreements and understandings relating to the subject matter hereof.

Ex. J. ¶22.

29

157. The First Settlement Agreement constitutes a criminally usurious loan with an interest rate of more than twice the amount of the 25% criminal usury rate under New York law. *N.Y. Penal Law* § 190.40.

158. The First Settlement Agreement required the Debtor and related non-debtor entities to give complete releases for the entry of the First Settlement Agreement other than Hi Bar's obligations under the First Settlement Agreement. Further, the First Settlement Agreement required personal guarantees from Scott and Kristen Zankl and set forth Hi Bar's rights as a secured creditor.

159. Notably by December 19, 2021, the Debtor had paid Spin the sum of $2,421,625.00 and had paid Hi Bar the sum of $500,000.00. Therefore, the Debtor had paid back $2,921,625.00 at the time of the entry of the First Settlement Agreement with the Debtor purportedly still owing approximately $4,016,820.

### G. Debtor Purportedly Defaults Under the First Settlement Agreement and Hi Bar Files Suit Resulting in the Parties Entering a Second Settlement Agreement in February 2022

160. Between January 4, 2022 and the beginning of February of 2022, Josh Lubin is engaged in various collection activities regarding the Hi Bar agreements. Josh Lubin's activities include sending various text messages to Scott Zankl demanding payment, threatening a lawsuit when payment was not made and negotiating a subsequent settlement with Hi Bar.

161. On January 13, 2022, Scott Zankl proposed to pay $600,000.00 over the course of one week. Lubin rejected the proposal on the same day.

162. On January 18, 2022, Lubin threatened that a complaint was being drafted.

163. On January 20, 2022, Lubin stated... "$675K wire . . . you will hear from my attorney shortly."

164.    On January 25, 2022, Lubin demanded that Scott Zankl call him.  Scott stated that he had a wire for $300,000.00 sending the next day.   Lubin indicated that the lawsuit would be filed by 1 pm.

165.    Scott was left with the impression that Hi Bar was going to hold off on the lawsuit based upon statements made by Josh Lubin.  Relying upon the statements made by Josh Lubin to Scott Zankl, Scott Zankl repeated the representation to Wing Lake.  Lubin further represented to Scott Zankl that the issues between Excell and Hi Bar could potentially be worked out.

166.    On January 28, 2022, however, Hi Bar through its counsel filed a lawsuit in the Supreme Court of New York, Kings County against the Debtor, non-debtor co-obligors, and guarantors.

167.    Between December 20, 2021 and February 1, 2021, the Debtor paid an additional $400,000 to Hi Bar.

168.    On or about February 1, 2022, a "Stipulation of Settlement Pursuant to CPLR 3215(i)" was signed by Hi Bar, the Debtor and 13 non-debtor entities, and Scott Zankl and Kristen Zankl as guarantors.  A copy of the Stipulation for Settlement dated February 1, 2022, is attached as **Exhibit K** (the "**Second Settlement Agreement**").  Hi Bar references a lawsuit filed in Kings County Supreme Court on account of the breach of the First Settlement Agreement.   Under the terms of the Second Settlement Agreement dated February 1, 2022, the Debtor was obligated to pay Hi Bar $3,800,000.00 between February 7, 2022, and ending on February 16, 2022.

169.    The Debtor actually paid Hi Bar an additional $1,300,000.00.  In its lawsuit, Hi Bar alleged that $2,500,000.00 remained due and owing plus an additional $625,000.00 in attorneys' fees and additional costs.

170.    The Second Settlement Agreement was an extension of credit as it was a settlement of amounts allegedly owed to Hi Bar.  The Second Settlement Agreement loan for which the interest rate was charged more than 2 times the criminal rate of usury under New York law.

**COUNT I**
**CIVIL RICO: 18 U.S.C. § 1962**
(As to the First, Second and Third Spin Contracts as to Josh Lubin)

171.    Plaintiff realleges paragraphs 1 through 170 above and incorporates those allegations by reference.

172.    This is a Civil RICO action brought under the federal Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 et seq.,

173.    Pursuant to 18 U.S.C. §1962(c), it is unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's collection of unlawful debt.

174.    Josh Lubin is a "person" within the meaning of 18 U.S.C. §1961(3) as he is a natural person capable of owning property.

175.    Josh Lubin is a distinct person from Spin each being a legally different entity with different rights and responsibilities due to their different legal statuses.

176.    For the purposes of 11 U.S.C. §1961(4), Spin is an "enterprise" as it is a corporation.

177.    The collection of the debt under the First, Second and Third Spin Contracts was unlawful, pursuant to 18 U.S.C. §1961(6) as Lubin through the Spin enterprise collected, and sought to collect, unlawful debts on in which the interest charged, or sought to be charged, was at least twice the enforceable rate in New York.

178.    Josh Lubin is a culpable person liable under 18 U.S.C. §1962(c)

179.   Commencing in or around 2021 and continuing through and including the filing of this action, the Defendants violated, and continue to violate 11 U.S.C. §1962.

180.   By virtue of the violations of 18 U.S.C. §1962(c), the Debtor sustained injury to both its business and property, including but not limited to paying the unlawful debt and incurring additional debt to pay the unlawful debt.

181.   The collection of the unlawful debt was the proximate cause of the Debtor's damages, which would not have occurred without the Defendants' conduct, to wit: funds of the Debtor were transferred to the Enterprise for the purposes of paying on the unlawful debt.   In addition, the acts and violations were the direct, natural and proximate cause of the damage to the Debtor, including, but not limited to, the loss of the Debtor's funds.  Josh Lubin, through Spin, profited from their RICO acts and used at least some proceeds to further their RICO enterprise.

182.   All parties were engaging in interstate commerce in the entering into the Spin Contracts and the collection of the unlawful debt.

WHEREFORE, the Plaintiff requests that this Court enter judgement against the Defendants, pursuant to 18 U.S.C. § 1964(c), an amount of damages equal to the amount of unlawful debt collected by the Defendants from the Debtor plus treble damages, costs and attorneys' fees.

**COUNT II**
**CIVIL RICO: 18 U.S.C. § 1962(c)**
(As to the Third Spin Contracts, the First Hi Bar Contract, the First Hi Bar Settlement Agreement and the Second Hi Bar Settlement Agreement as to Josh Lubin, Yisroel Herbst and Mordi Herbst, Spin and Hi Bar)

183.   Plaintiff realleges paragraphs 1 through 170 above and incorporates those allegations by reference.

184.   This is a Civil RICO action brought under the federal Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 et seq.,

185.   Pursuant to 18 U.S.C. §1962(c), it is unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's collection of unlawful debt.

186.   Josh Lubin is a "person" within the meaning of 18 U.S.C. §1961(3) as he is a natural person capable of owning property.

187.   Yisroel Herbst is a "person" within the meaning of 18 U.S.C. §1961(3) as he is a natural person capable of owning property.

188.   Mordi Herbst is a "person" within the meaning of 18 U.S.C. §1961(3) as he is a natural person capable of owning property.

189.   Hi Bar is a "person" within the meaning of 18 U.S.C. §1961(3) as it is a corporation capable of owning property.

190.   Spin is a "person" within the meaning of 18 U.S.C. §1961(3) as it is a corporation capable of owning property.

191.   Hi Bar and Spin are two separate companies that come together for the purpose of doing financing deals and transactions both related to, and unrelated to, those mentioned in the complaint.  Hi Bar and Spin created an association in fact enterprise as defined under 11 U.S.C. §1961(4).  Specifically, the association in fact enterprise of Hi Bar and Spin, at all relevant times, engaged in, and continue to engage in a relationship through which the association in fact enterprise of Hi Bar and Spin find potential borrowers, fund criminally usurious loans and collect upon these unlawful loans, including engaging in litigation.

192.    Defendant Lubin is a distinct person from the association in fact enterprise of Hi and Bar-Spin.  Defendant Lubin was in management and control of the association in fact enterprise of Hi Bar-Spin in that he had the authority, and used such authority, to negotiate, approve the entering of the Third Spin Contract, the First Hi Bar Contract, the First Hi Bar Settlement Agreement and the Second Hi Bar Settlement Agreement.

193.    Defendant Spin is a distinct person from the association in fact enterprise of Hi Bar -Spin.  Spin entered into the Third Spin Contract which was an agreement for the charging and collection of an unlawful debt. Further, Spin transferred its purported balance owed to Hi Bar to continue the charging and collection of the unlawful debt from the Third Spin Contract.

194.    Defendant Hi Bar is a distinct person from the association in fact enterprise of Hi Bar-Spin.  Hi Bar entered into the First Hi Bar Contract, the First Hi Bar Settlement Agreement and the Second Hi Bar Settlement Agreement in furtherance of the collection of the unlawful debt charged by Spin and engaged in the further charging and collection of unlawful debt arising from the First Hi Bar Contract, the First Hi Bar Settlement Agreement and the Second Hi Bar Settlement Agreement.  Hi Bar continues to attempt to collect the unlawful debt in furtherance of the association in fact enterprise of Hi Bar Spin.

195.    Defendant Yisroel Herbst is a distinct person from the association in fact enterprise of Hi Bar-Spin. Yisroel Herbst, at all times relevant, was in management and control of the association in fact enterprise of Hi Bar-Spin through the approval and funding of the First Hi Bar Contract, the First Hi Bar Settlement Agreement and the Second Hi Bar Settlement Agreement, including to further the Hi Bar-Spin's objectives of collecting on the unlawful debt.

196.    Defendant Mordi Herbst is a distinct person from the association in fact enterprise of Hi Bar-Spin. Mordi Herbst, at all times relevant, was in management and control of the

association in fact enterprise of Hi Bar-Spin through the approval and funding of the First Hi Bar Contract, the First Hi Bar Settlement Agreement and the Second Hi Bar Settlement Agreement, including to further the Hi Bar-Spin's objectives of collecting on the unlawful debt.

197.   Defendants, Spin, Lubin, Hi Bar, Yisroel Herbst and Mordi Herbst, used the association in fact enterprise of Hi Bar-Spin to charge and collect from the Debtor an unlawful debt as set forth in the Third Spin Contract, the First Hi Bar Contract, the First Hi Bar Settlement Agreement and the Second Hi Bar Settlement Agreement.  Defendants, Lubin, Hi Bar, Yisroel Herbst and Mordi Herbst continue to use the association in fact enterprise of Hi-Bar Spin to collect the unlawful debt through the filing of lawsuits in New York and through the filing of claims and litigation in the Auto Wholesale of Boca bankruptcy seeking collection of the unlawful debt.

198.   Defendants Spin, Lubin, Hi Bar, Yisroel Herbst and Mordi Herbst continuously concealed and promoted the activities of the association in fact enterprise of Hi Bar-Spin which was the collection of an unlawful debt against the Debtor in which the interest charged was more than two times the legal rate of interest in New York.

199.   The purpose of the collection of the unlawful debt was to financially benefit Defendants Spin, Lubin, Hi Bar, Yisroel Herbst and Mordi Herbst.

200.   As a direct and proximate cause of the unlawful actions of Defendants Spin, Lubin, Hi Bar, Yisroel Herbst and Mordi Herbst, which was a violation of 18 U.S.C. §1962(c), the Debtor sustained injury to both its business and property, including but not limited to paying the unlawful debt and incurring additional debt to pay the unlawful debt.  The Defendants Spin, Lubin, Hi Bar, Yisroel Herbst and Mordi Herbst profited from their violations of 18 U.S.C. §1962(c).

WHEREFORE, the Plaintiff requests that this Court enter judgement against the Defendants, pursuant to 18 U.S.C. § 1964(c), an amount of damages equal to the amount of

unlawful debt collected by the Defendants from the Debtor plus treble damages, costs and attorneys' fees.

## COUNT III

### CONSPIRACY UNDER 18 U.S.C. § 1962(d)

(Conspiracy under 18 U.S.C. §1962(d) as to Defendants Lubin, Spin, Hi Bar, Yisroel Herbst and Mordi Herbst)

201.    The allegations of paragraphs 1 through 170 are incorporated herein by reference.

202.    This Count seeks relief against Josh Lubin, Spin Capital and Hi Bar, Yisroel Herbst and Mordi Herbst for violation of 18 U.S.C. §1962(d).

203.    In violation of 18 U.S.C. §1962(d), Defendants agreed and conspired to violate 18 U.S.C. §1962(c) to: 1) use or invest income that is derived from the collection of an unlawful debt in the association in fact enterprise of Hi-Bar-Spin, 2) acquire or maintain interests in the association in fact enterprise of Hi Bar-Spin to collect unlawful debt against the Debtor; or (3) conduct and participate in the conduct of the affairs of the association in fact enterprise of Hi Bar-Spin through the collection of unlawful debt from the Debtor.

204.    Defendants Lubin, Spin, Hi Bar, Yisroel Herbst and Mordi Herbst have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from the collection of unlawful debt in an interstate association in fact enterprise of Hi Bar-Spin and conduct and participate in the conduct of the affairs of the association in fact enterprise of Hi Bar-Spin  through the collection of unlawful debt from the Debtor and agreed to the commission of those acts to further activities to collect an unlawful debt as described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. §1962(a)(b) and (c) in violation of 18 U.S.C. §1962(d).

205.    As a direct and proximate result of Defendants' Lubin, Spin, Hi Bar, Yisroel Herbst and Mordi Herbst, conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. §1962(d), the Debtor was injured and, in its business, and property in that it paid the unlawful debt.

WHEREFORE, the Plaintiff requests that this Court enter judgement against the Count III Defendants, pursuant to 18 U.S.C. § 1962(d), an amount of damages equal to the amount of unlawful debt collected by the Defendants from the Debtor plus treble damages, costs and attorneys' fees.

## COUNT IV
## DECLARATORY RELIEF – SPIN CONTRACTS

206.    Plaintiff realleges paragraphs 1 through ___ above and incorporates those allegations by reference.

207.    28 U.S.C. § 2201 authorizes this Court to issue declaratory relief.

208.    Plaintiff seeks declaratory relief that each of the First Spin Contract, Second Spin Contract and Third Spin Contract each constitute a loan and not a purchase of receipts by Spin.

209.    Declaration of the amount of interest charged under each of the First Spin Contract, Second Spin Contract and Third Spin Contract.

210.    That each of the First Spin Contract, Second Spin Contract, and Third Spin Contract charged interest above the criminal usury rate under New York Law.

211.    That each of the First Spin Contract, Second Spin Contract, and Third Spin Contract are void or voidable under New York Law as each of these agreements are loans that seek to charge, or actually charged, interest that exceeded the maximum amount of lawful interest allowed to be charged to a corporation under New York Law.

212.     To the extent that the First Spin Contract, Second Spin Contract, and Third Spin Contract are voidable under New York Law, the Trustee seeks to void each of the agreements.

WHEREFORE, the Plaintiff respectfully requests entry of a final judgment in favor of the Plaintiff and against Hi Bar:

a) Each of the First Spin Contract, Second Spin Contract, and Third Spin Contract, constitute loans;

b) The amount of interest charged under each of the First Spin Contract, Second Spin Contract, and Third Spin Contract; and

c) Each of the First Spin Contract, Second Spin Contract, and Third Spin Contract charge interest in excess of the criminal usurious rate set under New York Law.

d) Each of the First Spin Contract, Second Spin Contract, and Third Spin Contract should be declared to be void or voidable and enforceable.

## COUNT V
## DECLARATORY RELIEF – HI BAR CONTRACTS

213.     Plaintiff realleges paragraphs 1 through ___ above and incorporates those allegations by reference.

214.     28 U.S.C. § 2201 authorizes this Court to issue declaratory relief.

215.     Plaintiff seeks declaratory relief that each of the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement each constitutes a loan and not a purchase of receipts by Hi Bar.

216.     Declaration of the amount of interest charged under each of the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement.

217.     That each of the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement charged interest above the criminal usury rate under New York Law.

218.   That each of the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement are void or voidable under New York Law as each of these agreements are loans that seek to charge, or actually charged, interest that exceeded the maximum amount of lawful interest allowed to be charged to a corporation under New York Law.

219.   To the extent that the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement are voidable under New York Law, the Trustee seeks to void each of the agreements.

WHEREFORE, the Plaintiff respectfully requests entry of a final judgment in favor of the Plaintiff and against Hi Bar finding

a)   Each of the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement constitute loans;

b)   The amount of interest charged under each of the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement; and

c)   Each of the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement charge interest in excess of the criminal usurious rate set under New York Law.

d)   Each of the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement should be declared to be void and enforceable.

**COUNT VI**
**DECLARATORY RELIEF -SPIN CONTRACTS**

220.   Plaintiff realleges paragraphs 1 through 96 above and incorporates those allegations by reference.

221.   28 U.S.C. § 2201 authorizes this Court to issue declaratory relief.

222.     The First Spin Contract, Second Spin Contract, and Third Spin Contract contain numerous knowingly false statements. Among these knowingly false statements are that: (1) the transaction is not a loan, (2) the daily payment is a good faith estimate of the merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring Lender to charge an exorbitant ACH Program Fee or Origination Fee.

223.     The First Spin Contract, Second Spin Contract, and Third Spin Contract are unconscionable because they are designed to fail.  Among other things, the First Spin Contract, Second Spin Contract, and  Third Spin Contract  are designed to result in a default in the event that the merchant's business suffers any downturn in sales by preventing the merchant from obtaining other financing and requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant.

224.     The First Spin Contract, Second Spin Contract, and Third Spin Contract also contain numerous improper penalties that violate New York's strong public policy. Among these improper penalties, the First Spin Contract, Second Spin Contract, and Third Spin Contract: (1) entitle the Lenders to attorneys' fees, (2) accelerate the entire debt upon an Event of Default, and (3) require that any Event of Default increases the "Purchased Percentage to 100%."

225.     The First Spin Contract, Second Spin Contract and Third Spin Contract should be declared void under New York law as being unconscionable.

226.     To the extent that the First Spin Contract, Second Spin Contract Spin Contract are void, the Trustee seeks to have each of these agreements declared void and unenforceable.

WHEREFORE, the Plaintiff respectfully requests entry of a final judgment in favor of the Plaintiff and against Spin finding:

a)  Each of the First Spin Contract, Second Spin Contract and Third Spin Contract is substantively and procedurally unconscionable under New York Law and should be deemed void and unenforceable.

## COUNT VII
## DECLARATORY RELIEF – HI BAR CONTRACT AND SETTLEMENT AGREEMENTS

227.    Plaintiff realleges paragraphs 1 through 170 above and incorporates those allegations by reference.

228.    28 U.S.C. § 2201 authorizes this Court to issue declaratory relief.

229.    The First Hi Bar Contract was a refinance of the amounts owed under one or more of the First Spin Contract, Second Spin Contract, and Third Spin Contract.  The First Hi Bar Contract was done to induce Franklin Capital to loan funds to the Debtor.  Hi Bar, through its agent, Josh Lubin, knew and participated in obtaining the refinance so that a payoff letter would be issued by Spin to Franklin Capital knowing that the loan was not paid off but refinanced by Hi Bar.

230.    The First Settlement Agreement entered by the Debtor and Hi Bar was done under the threat of litigation from Hi Bar for an alleged "event of default" under the First Hi Bar Contract notwithstanding that the First Hi Bar Contract is a criminally usurious loan and void *ab initio*.

231.    The Debtor entered into the First Settlement Agreement to avoid being dragged into litigation along with the Guarantors and their family members.

232.    The First Settlement Agreement requires 150% of the purported amount outstanding under the First Hi Bar Contract, which is due and payable within 20 weeks. The First

Settlement Agreement calls for an effective annual interest rate in excess of the maximum amount allowed to be charged to a corporation under New York law. The Debtor was required to pay $200,000 per week to Hi Bar, which is $50,000 more per week than Debtor was obligated to pay under the First Hi Bar Contract, which Debtor was unable to maintain.

233.    The Plaintiff seeks declaratory relief that the First Hi Bar Contract, First Settlement Agreement and Second Settlement Agreement are unconscionable under New York law.

234.    As a result of a purported breach of the First Settlement Agreement, Hi Bar filed suit against the Debtor and non-debtor entities.

235.    Hi Bar and the Debtor then entered into the Second Settlement Agreement, which required payment of $3.8 million in full within 14 days.

236.    First Hi Bar Contract, the First Settlement Agreement and Second Settlement Agreement should be declared void under New York law as being unconscionable.

237.    To the extent that the First Hi Bar Contract, the First Settlement Agreement and Second Settlement Agreement are voidable, the Trustee seeks to have each of these agreements declared void and unenforceable.

WHEREFORE, the Plaintiff respectfully requests entry of a final judgment in favor of the Plaintiff and against Hi Bar finding:

a)    Each of First Hi Bar Contract, the First Settlement Agreement and Second Settlement Agreement are substantively and procedurally unconscionable under New York Law and should be deemed void and unenforceable.

## COUNT VIII
## AVOIDANCE OF FRAUDULENT TRANSFER OF PROPERTY
## PURSUANT TO 11 USC § 544 AND SECTION 726.105(1)(a), FLA. STAT.

(Against Defendant Spin)

238.    The Plaintiff realleges paragraphs 1 through 96 and Count VI above and incorporates those allegations by reference.

239.    The cash payments set forth in Exhibit A attached hereto were transfers of the Debtor's interests in property to Spin.

240.    The Debtor made the Spin Transfers to Spin within the four-year period prior to the Petition Date.

241.    The Debtor made the Spin Transfers to Spin with actual intent to hinder, delay, or defraud entities to which the Debtor was or became, on or after the date of the transfer, indebted.

242.    American Express Travel Related Services Co., Inc. is a holder of a claim that is allowable against the Debtor which would have standing to assert a claim for relief under Section 726.105(1)(a) of the Florida Statutes.  The Spin Transfers are avoidable under Section 544 of the Bankruptcy Code and Section 726.105(1)(a) of the Florida Statutes.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment against Spin:

a)    Finding the Spin Transfers to have been fraudulent transfers pursuant to Section 726.105(1)(a) of the Florida Statutes;

b)    Avoiding the Spin Transfers pursuant to Section 544 of the Bankruptcy Code and Section 726.105(1)(a) of the Florida Statutes and avoiding all other transfers by the Debtor to Spin in addition to those specifically referred to in this Complaint, if any, which are avoidable under Section 726.105(1)(a) of the Florida Statutes; and

c)       Granting such other and further relief as the Court deems proper.

## COUNT IX
## AVOIDANCE OF FRAUDULENT TRANSFER OF PROPERTY
## PURSUANT TO 11 USC § 544 AND SECTION 726.106(1), FLA. STAT.
(*As to Defendant Spin*)

243.    The Plaintiff realleges paragraphs 1 through 96 and Count VI above and incorporates those allegations by reference.

244.    The Spin Transfers in Exhibit A were transfers of the Debtor's interests in property to Spin.

245.    The Debtor made the Spin Transfers to Spin within the four-year period prior to the Petition Date.

246.    The Debtor received less than reasonably equivalent value in exchange for making the Spin Transfers.

247.    At the time of the Spin Transfers the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transactions.

248.    Alternatively, at the time of the Spin Transfers, the Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur debts beyond its ability to pay its debts as they became due.

249.    American Express Travel Related Services Co., Inc. is a holder of a claim that is allowable against the Debtor which would have standing to assert a claim for relief under Section 726.106(1) of the Florida Statutes.  The Transfers are avoidable under Section 726.106(1) of the Florida Statutes.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment against Spin:

a)      Finding the Spin Transfers to have been fraudulent transfers pursuant to Section 726.106(1) of the Florida Statutes;

b)      Avoiding the Spin Transfers pursuant to Section 544 of the Bankruptcy Code and Section 726.106(1) of the Florida Statutes and avoiding all other transfers by the Debtor to Spin in addition to those specifically referred to in this Complaint, if any, which are avoidable under Section 544 of the Bankruptcy Code and Section 726.106(1) of the Florida Statutes; and

c)      Granting such other and further relief as the Court deems proper.

**COUNT X**
**Avoidance of Fraudulent Transfer of Property**
**Pursuant to 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(b)**
**(As to Defendant Spin)**

250.    The Plaintiff realleges paragraphs 1 through 96 and Count VI above and incorporates those allegations by reference.

251.    The Spin Transfers in Exhibit A were transfers of the Debtor's interests in property.

252.    The Debtor made the Spin Transfers within the four-year period prior to the Petition Date.

253.    The Debtor received less than reasonably equivalent value in exchange for making the Spin Transfers, and the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction; or the Debtor believed or reasonably should have believed that Debtor would incur, debts beyond the Debtor's ability to pay as they became due.

254.    American Express Travel Related Services Co., Inc. is a holder of a claim that is allowable against the Debtor which would have standing to assert a claim for relief under Section 726.105(1)(b) of the Florida Statutes.  The Spin Transfers are avoidable under § 544 of the Bankruptcy Code and § 726.105(1)(b) of the Florida Statutes.

**WHEREFORE**, the Trustee respectfully requests this Court enter a judgment against Spin:

a)      Finding the Spin Transfers to have been fraudulent transfers pursuant to § 726.105(1)(b) of the Florida Statutes;

b)      Avoiding the Spin Transfers pursuant to § 544 of the Bankruptcy Code and § 726.105(1)(b) of the Florida Statutes and avoiding all transfers by the Debtor to Spin in addition to those specifically referred to in this Complaint, if any, which are avoidable under § 726.105(1)(b) of the Florida Statutes;

c)      Disallowing all claims by or in favor of Spin, or any amounts owed to Spin according to the Debtor's schedules, pursuant to Section 502(d) of the Bankruptcy Code unless and until Spin has returned to the Debtor's estate the amount for which Spin is liable; and

d)      Granting such other and further relief as the Court deems proper.

### COUNT XI
### AVOIDANCE OF FRAUDULENT TRANSFER OF PROPERTY
### PURSUANT TO 11 USC § 544 AND SECTION 726.105(1)(a), FLA. STAT.
### (As to Defendant Hi Bar)

255.    The Plaintiff realleges paragraphs 1 through 170 and  Count VII above and incorporates those allegations by reference.

256.    The cash payments set forth in Exhibit B attached hereto were transfers of the Debtor's interests in property to Hi Bar.

257.    The Debtor also granted general releases to Hi Bar in the First Settlement Agreement and Second Settlement Agreement between the parties, each of which constitute a transfer of the Debtor's interest in property.  Collectively, the cash payments in Exhibit B and the general releases in the First Settlement Agreement and Second Settlement Agreement are the "**Hi Bar Transfers**."

47

258.    The Debtor made the Hi Bar Transfers to Hi Bar within the four-year period prior to the Petition Date.

259.    The Debtor made the Hi Bar Transfers to Hi Bar with actual intent to hinder, delay, or defraud entities to which the Debtor was or became, on or after the date of the transfer, indebted.

260.    American Express Travel Related Services Co., Inc. is a holder of a claim that is allowable against the Debtor which would have standing to assert a claim for relief under Section 726.105(1)(a) of the Florida Statutes.  The Hi Bar Transfers are avoidable under Section 544 of the Bankruptcy Code and Section 726.105(1)(a) of the Florida Statutes.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment against Hi Bar:

a)    Finding the Hi Bar Transfers to have been fraudulent transfers pursuant to Section 726.105(1)(a) of the Florida Statutes;

b)    Avoiding the Hi Bar Transfers pursuant to Section 544 of the Bankruptcy Code and Section 726.105(1)(a) of the Florida Statutes and avoiding all other transfers by the Debtor to Hi Bar in addition to those specifically referred to in this Complaint, if any, which are avoidable under Section 726.105(1)(a) of the Florida Statutes; and

c)    Granting such other and further relief as the Court deems proper.

## COUNT XII
## AVOIDANCE OF FRAUDULENT TRANSFER OF PROPERTY
## PURSUANT TO 11 USC § 544 AND SECTION 726.106(1), FLA. STAT.
### (As to Defendant Hi Bar)

261.    The Plaintiff realleges paragraphs 1 through 170 and Count VII above and incorporates those allegations by reference.

262.     The Hi Bar Transfers were transfers of the Debtor's interests in property to Hi Bar. The Debtor made the Hi Bar Transfers to Hi Bar within the four-year period prior to the Petition Date.

263.     The Debtor received less than reasonably equivalent value in exchange for making the Hi Bar Transfers.

264.     At the time of the Hi Bar Transfers the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transactions.

265.     Alternatively, at the time of the Hi Bar Transfers, the Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur debts beyond its ability to pay its debts as they became due.

266.     American Express Travel Related Services Co., Inc. is a holder of a claim that is allowable against the Debtor which would have standing to assert a claim for relief under Section 726.106(1) of the Florida Statutes.  The Hi Bar Transfers are avoidable under Section 726.106(1) of the Florida Statutes.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment against Hi Bar:

a)      Finding the Hi Bar Transfers to have been fraudulent transfers pursuant to Section 726.106(1) of the Florida Statutes;

b)      Avoiding the Hi Bar Transfers pursuant to Section 544 of the Bankruptcy Code and Section 726.106(1) of the Florida Statutes and avoiding all other transfers by the Debtor to Defendant(s) in addition to those specifically referred to in this Complaint, if any, which are avoidable under Section 544 of the Bankruptcy Code and Section 726.106(1) of the Florida

Statutes; and

    c)      Granting such other and further relief as the Court deems proper.

## COUNT XIII
## AVOIDANCE OF FRAUDULENT TRANSFER OF PROPERTY
## PURSUANT TO 11 USC § 544 AND SECTION 726.105(1)(b), FLA. STAT.

### (As to Defendant Hi Bar)

267.    The Plaintiff realleges paragraphs 1 through 170 and Count VII above and incorporates those allegations by reference.

268.    The Hi Bar Transfers were transfers of the Debtor's interests in property to Hi Bar.

269.    The Debtor made the Hi Bar Transfers to Hi Bar within the four-year period prior to the Petition Date.

270.    The Debtor made the Hi Bar Transfers without receiving reasonably equivalent value and the Debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur or believed or reasonably should have believed that Debtor would incur, debts beyond Debtor's ability to pay as they became due.

271.    For Section 726.105(1)(b) of the Florida Statutes, American Express Travel Related Services Co., Inc. is a holder of a claim that is allowable against the Debtor which would have standing to assert a claim for relief.  The Transfers are avoidable under Section 726.105(1)(b) of the Florida Statutes.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment against Hi Bar:

    a)      Finding the Hi Bar Transfers to have been fraudulent transfers pursuant to Section 726.105(1)(b) of the Florida Statutes;

b)       Avoiding the Hi Bar Transfers pursuant to Section 544 of the Bankruptcy Code and Section 726.105(1)(b) of the Florida Statutes and avoiding all transfers by the Debtor to Defendant in addition to those specifically referred to in this Complaint, if any, which are avoidable under Section 544 of the Bankruptcy Code and Section 726.105(1)(b) of the Florida Statutes; and

c)       Granting such other and further relief as the Court deems proper.

**COUNT XIV**
**AVOIDANCE OF FRAUDULENT TRANSFER OF**
**PROPERTY PURSUANT TO 11 U.S.C. § 548(a)(1)**
**(As to Defendant Spin)**

272.     The Plaintiff realleges paragraphs 1 through 96 and Count VI above and incorporates those allegations by reference.

273.     The Spin Transfers were transfers of the Debtor's interests in property to Spin.

274.     The Debtor made the Spin Transfers to Spin within the two-year period prior to the Petition Date.

275.     The Debtor made Spin Transfers with actual intent to hinder, delay or defraud entities to which the Debtor was or became, on or after the date of the transfer, indebted.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment against Spin:

a)       Finding the Spin Transfers to have been fraudulent transfers pursuant to Section 548(a)(1) of the Bankruptcy Code;

b)       Avoiding the Spin Transfers pursuant to Section 548 of the Bankruptcy Code and avoiding all transfers by the Debtor to Spin in addition to those specifically referred to in this Complaint, if any, which are avoidable under Section 548 of the Bankruptcy Code; and

c)       Granting such other and further relief as the Court deems proper.

**COUNT XV**
**AVOIDANCE OF FRAUDULENT TRANSFER OF**
**PROPERTY PURSUANT TO 11 U.S.C. § 548(a)(2)**
**(As to Defendant Spin)**

276.    The Plaintiff realleges paragraphs 1 through 96 and Count VI above and incorporates those allegations by reference.

277.    The Spin Transfers were transfers of the Debtor's interests in property to Spin.

278.    The Debtor made the Spin Transfers to Spin within the two-year period prior to the Petition Date.

279.    The Debtor received less than reasonably equivalent value in exchange for making the Spin Transfers, and the Debtor (i) was insolvent on the date that the Spin Transfers were made, or became insolvent as a result of the transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; (iii) intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured; as a result of the Spin Transfers.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment against Spin:

a)    Finding the Spin Transfers to have been fraudulent transfers pursuant to Section 548 of the Bankruptcy Code;

b)    Avoiding the Spin Transfers pursuant to Section 548(a)(2) of the Bankruptcy Code and avoiding all transfers by the Debtor to Defendant(s) in addition to those specifically referred to in this Complaint, if any, which are avoidable under Section 548 of the Bankruptcy Code; and

c)    Granting such other and further relief as the Court deems proper.

## COUNT XVI
## AVOIDANCE OF FRAUDULENT TRANSFER OF
## PROPERTY PURSUANT TO 11 U.S.C. § 548(a)(1)
## (As to Defendant Hi Bar)

280.    The Plaintiff realleges paragraphs 1 through 170 and Count VII above and incorporates those allegations by reference.

281.    The Hi Bar Transfers were transfers of the Debtor's interests in property to Hi Bar.

282.    The Debtor made the Hi Bar Transfers to Hi Bar within the two-year period prior to the Petition Date.

283.    The Debtor made Hi Bar Transfers with actual intent to hinder, delay or defraud entities to which the Debtor was or became, on or after the date of the transfer, indebted.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment against Hi Bar:

a)    Finding the Hi Bar Transfers to have been fraudulent transfers pursuant to Section 548 of the Bankruptcy Code;

b)    Avoiding the Hi Bar Transfers pursuant to Section 548(a)(1) of the Bankruptcy Code and avoiding all transfers by the Debtor to Defendant in addition to those specifically referred to in this Complaint, if any, which are avoidable under Section 548 of the Bankruptcy Code; and

c)    Granting such other and further relief as the Court deems proper.

## COUNT XVII
## AVOIDANCE OF FRAUDULENT TRANSFER OF
## PROPERTY PURSUANT TO 11 U.S.C. § 548(a)(2)
## (As to Defendant Hi Bar)

284.    The Plaintiff realleges paragraphs 1 through 170 and Count VII above and incorporates those allegations by reference.

285.    The Hi Bar Transfers were transfers of the Debtor's interests in property to Hi Bar.

286.    The Debtor made the Hi Bar Transfers to Hi Bar within the two-year period prior to the Petition Date.

287.    The Debtor received less than reasonably equivalent value in exchange for making the Hi Bar Transfers, and the Debtor (i) was insolvent on the date that the Hi Bar Transfers were made, or became insolvent as a result of the Hi Bar Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; (iii) intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured; as a result of the Hi Bar Transfers.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment against Hi Bar:

a)    Finding the Hi Bar Transfers to have been fraudulent transfers pursuant to Section 548 of the Bankruptcy Code;

b)    Avoiding the Hi Bar Transfers pursuant to Section 548 of the Bankruptcy Code and avoiding all transfers by the Debtor to Defendant(s) in addition to those specifically referred to in this Complaint, if any, which are avoidable under Section 548 of the Bankruptcy Code; and

c)    Granting such other and further relief as the Court deems proper.

**COUNT XVIII**
**RECOVERY OF AVOIDED TRANSFERS PURSUANT TO 11 U.S.C. § 550**
**(As to Defendant Spin)**

288.    The Plaintiff realleges paragraphs 1 through 96 and Counts VIII, IX, X, XIV, and XV above and incorporates those allegations by reference.

289.    To the extent the Spin Transfers avoided pursuant to Section 544 of the Bankruptcy Code and Sections 726.105(1)(a), 726.105(1)(b), and/or 726.106(1) of the Florida Statutes, or

pursuant to section 548 of the Bankruptcy Code, the Spin Transfers or value thereof are recoverable by the Plaintiff from Spin pursuant to Section 550(a) of the Bankruptcy Code.

290.    Spin is the initial or subsequent transferee of the Spin Transfers and/or the person for whose benefit the Spin Transfers were made.

291.    To the extent Spin is deemed to be mediate or immediate transferees, the Spin Transfers are recoverable because Spin provided no value in exchange for the Spin Transfers, Spin did not receive the Spin Transfers in good faith, and Spin had knowledge of the voidability of the Spin Transfers.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment:

a)    Finding Spin to be the initial transferees of the Spin Transfers and/or the person for whose benefit the Spin Transfers were made;

b)    In the alternative finding Spin to be the immediate or mediate transferee of the Spin Transfers;

c)    Ordering Spin to turn over to the Plaintiff the Spin Transfers or avoided as fraudulent transfers or entering a money judgment in an amount equal to the value of the Spin Transfers, plus interest at the applicable federal statutory rate and costs and expenses permissible by applicable law; and

d)    Granting such other and further relief as the Court deems proper.

**COUNT XIX**
**RECOVERY OF AVOIDED TRANSFERS PURSUANT TO 11 U.S.C. § 550**
(As to Defendant Hi Bar)

292.    The Plaintiff realleges paragraphs 1 through 170 and Counts XI, XII, XIII, XVI, and XVII above and incorporates those allegations by reference.

293.     The Hi Bar Transfers avoided pursuant to Section 544 of the Bankruptcy Code and Sections 726.105(1)(a), 726.105(1)(b), and/or 726.106(1) of the Florida Statutes, or section 548 of the Bankruptcy Code are recoverable by the Plaintiff pursuant to Section 550 of the Bankruptcy Code.

294.     Hi Bar is the initial or subsequent transferee of the Hi Bar Transfers and/or the person for whose benefit the Hi Bar Transfers were made.

295.     To the extent the Hi Bar is deemed to be a mediate or immediate transferee the Hi Bar Transfers are recoverable because Hi Bar provided no value in exchange for the Hi Bar Transfers, the Hi Bar Transfers were not received in good faith, and Hi Bar had knowledge of the voidability of the Hi Bar Transfers.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment:

e)       Finding Hi Bar to be the initial transferee of the Hi Bar Transfers and/or the person for whose benefit the Hi Bar Transfers were made;

f)       In the alternative, finding Hi Bar to be the immediate or mediate transferee of the Hi Bar Transfers;

g)       Ordering Hi Bar to turn over to the Plaintiff the Hi Bar Transfers avoided as fraudulent transfers or entering a money judgment against Hi Bar for the value of the avoided Hi Bar Transfers, plus interest at the applicable federal statutory rate and costs and expenses permissible by applicable law; and

h)       Granting such other and further relief as the Court deems proper.

## COUNT XX
## AVOIDANCE OF PREFERENCE PAYMENTS PURSUANT TO 11 U.S.C. § 547
(Alternative Relief as to Defendant Hi Bar)

296.    The Plaintiff realleges paragraphs 1 through 170 and Count VII above and incorporates those allegations by reference.

297.    Of the Hi Bar Transfers set forth in Exhibit B, $1,300,000 were paid by the Debtor to or for the benefit of Hi Bar, through Hi Bar's counsel Steven Zakharyayev ("**Hi Bar Preference Payments**").

298.    The Hi Bar Preference Payments were made within 90 days of the Petition Date and were transfers of the Debtor's interest in property.

299.    The Debtor was insolvent at the time of the Hi Bar Preference Payments were made.

300.    The Hi Bar Preference Payments were not made in the ordinary course of the Debtor's business affairs.

301.    To the extent the Second Settlement Agreement is an enforceable debt, the Hi Bar Preference Payments were made on account of an antecedent debt and enabled Hi Bar to receive more than Hi Bar would receive in this Chapter 7 bankruptcy case, if the Hi Bar Preference Payments had not been made and Hi Bar was receiving payment on a claim in this bankruptcy case.

302.    In seeking this relief, the Plaintiff has performed reasonable due diligence in the circumstances of the case and taken into account Hi Bar's known or reasonably knowable affirmative defenses under 11 U.S.C. § 547(c).

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court enter a final judgment in favor of the Plaintiff and against Hi Bar:

(a)    Avoiding the Hi Bar Preference Payments under 11 U.S.C. § 547(b); and

57

(b)     Granting such other and further relief as this Court deems just and proper.

**COUNT XXI**
**RECOVERY OF THE AVOIDED HI BAR PREFERENCE**
**PAYMENTS PURSUANT TO 11 U.S.C. § 550(a)**
(Alternative Relief against Hi Bar)

303.    The Plaintiff realleges paragraphs 1 through 170 and Count XX above and incorporates those allegations by reference.

304.    The Hi Bar Preference Payments avoided pursuant to Section 547 of the Bankruptcy Code are recoverable by the Plaintiff pursuant to Section 550 of the Bankruptcy Code.

305.    Within the 90 days prior to the bankruptcy filing, the Debtor made $1,500,000.00 payments to Hi Bar as reflected on Exhibit B.

306.    Hi Bar is the initial or subsequent transferee of the Hi Bar Preference Payments and/or the person for whose benefit the Hi Bar Preference Payments were made.

307.    To the extent the Hi Bar is deemed to be a mediate or immediate transferee the Hi Bar Transfers are recoverable because Hi Bar provided no value in exchange for the Hi Bar Payments, the Hi Bar Preference Payments were not received in good faith, and Hi Bar had knowledge of the voidability of the Hi Bar Preference Payments.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment:

a)      Finding Hi Bar to be the initial transferee of the Hi Bar Preference Payments and/or the person for whose benefit the Hi Bar Preference Payments were made;

b)      In the alternative, finding Hi Bar to be the immediate or mediate transferee of the Hi Bar Preference Payments;

c)      Ordering Hi Bar to turn over to the Plaintiff the Hi Bar Preference Payments avoided as preferences or entering a money judgment against Hi Bar, in the amount of $1,500,000.00, for the value of the avoided Hi Bar Preference Payments, plus interest at the

applicable federal statutory rate and costs and expenses permissible by applicable law; and

Granting such other and further relief as the Court deems proper.

Respectfully submitted this 30th day of June 2023.

FURR AND COHEN, P.A.
*Special Counsel for Trustee*
2255 Glades Road, Suite 419A
Boca Raton, FL 33431
Telephone: (561) 395-0500
Facsimile: (561) 338-7532

BY:___ */s/ Alan R. Crane*
    Alan R. Crane, Esq.
    Florida Bar No.: 0963836
    E-mail: acrane@furrcohen.com
    Jason S. Rigoli, Esq.
    Florida Bar No.: 91990
    E-mail: jrigoli@furrcohen.com

-and-

LAW OFFICE OF
NICOLE TESTA MEHDIPOUR, P.A.
*Counsel for Chapter 7 Trustee*
6278 N. Federal Highway, Suite 408
Fort Lauderdale, FL 33308
Tel: (954) 858-5880 Fax: (954) 208-0888

By: */s/ Nicole Testa Mehdipour*
    Nicole Testa Mehdipour
    Florida Bar No. 177271
    Nicole.Mehdipour@ntmlawfirm.com

# EXHIBIT A

**Excell Auto Group, Inc.**

**Case No.: 22-12790-EPK**

**Detail Transfer Schedule - Spin Capital LLC**

| Bank ID | Entity | Date | Analysis Period (BR) | Check # | Payee/Payor | Credit (Receipts) | Debit (Disbursements) |
|---------|--------|------|---------------------|---------|-------------|------------------:|----------------------:|
| Chase 3181 | EXCELL AUTO GROUP, INC | 06/01/21 | 1 Year | | SPIN CAPITAL LLC | $    950,000.00 | $            - |
| Chase 3181 | EXCELL AUTO GROUP, INC | 06/08/21 | 1 Year | | SPIN CAPITAL LLC | - | 93,687.50 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 06/15/21 | 1 Year | | SPIN CAPITAL LLC | - | 93,687.50 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 06/22/21 | 1 Year | | SPIN CAPITAL LLC | - | 93,687.50 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 06/30/21 | 1 Year | | SPIN CAPITAL LLC | - | 93,687.50 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 07/06/21 | 1 Year | | SPIN CAPITAL LLC | - | 93,687.50 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 07/09/21 | 1 Year | | SPIN CAPITAL LLC | 475,000.00 | |
| Chase 3181 | EXCELL AUTO GROUP, INC | 07/13/21 | 1 Year | | SPIN CAPITAL LLC | - | 93,687.50 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 07/14/21 | 1 Year | | SPIN CAPITAL LLC | - | 40,000.00 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 07/21/21 | 1 Year | | SPIN CAPITAL LLC | - | 40,000.00 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 07/27/21 | 1 Year | | SPIN CAPITAL LLC | - | 93,687.50 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 07/28/21 | 1 Year | | SPIN CAPITAL LLC | - | 40,000.00 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 08/03/21 | 1 Year | | SPIN CAPITAL LLC | - | 93,687.50 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 08/04/21 | 1 Year | | SPIN CAPITAL LLC | - | 40,000.00 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 08/10/21 | 1 Year | | SPIN CAPITAL LLC | - | 93,687.50 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 08/12/21 | 1 Year | | SPIN CAPITAL LLC | - | 40,000.00 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 08/17/21 | 1 Year | | SPIN CAPITAL LLC | - | 93,687.50 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 08/25/21 | 1 Year | | SPIN CAPITAL LLC | - | 93,687.50 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 08/25/21 | 1 Year | | SPIN CAPITAL LLC | - | 40,000.00 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 08/31/21 | 1 Year | | SPIN CAPITAL LLC | - | 93,687.50 |
| Chase 3199 | EXCELL AUTO GROUP, INC | 08/31/21 | 1 Year | | SPIN CAPITAL LLC | - | 40,000.00 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 09/01/21 | 1 Year | | SPIN CAPITAL LLC | - | 40,000.00 |
| Chase 3199 | EXCELL AUTO GROUP, INC | 09/02/21 | 1 Year | | SPIN CAPITAL LLC | 1,099,437.50 | - |
| Chase 3181 | EXCELL AUTO GROUP, INC | 09/03/21 | 1 Year | | SPIN CAPITAL LLC | 40,000.00 | - |
| Chase 3181 | EXCELL AUTO GROUP, INC | 09/07/21 | 1 Year | | SPIN CAPITAL LLC | - | 93,687.50 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 09/08/21 | 1 Year | | SPIN CAPITAL LLC | - | 40,000.00 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 09/16/21 | 1 Year | | SPIN CAPITAL LLC | - | 150,000.00 |
| Chase 3199 | EXCELL AUTO GROUP, INC | 10/06/21 | 1 Year | | SPIN CAPITAL LLC | - | 150,000.00 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 10/13/21 | 1 Year | | SPIN CAPITAL LLC | - | 150,000.00 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 10/14/21 | 1 Year | | SPIN CAPITAL LLC | - | 150,000.00 |
| Chase 3199 | EXCELL AUTO GROUP, INC | 10/20/21 | 1 Year | | SPIN CAPITAL LLC | - | 150,000.00 |
| | | | | | **Subtotal - 1 Year** | **2,564,437.50** | **2,421,625.00** |
| | | | | | **Grand Total** | **$  2,564,437.50** | **$  2,421,625.00** |

**Net Receipts/(Disbursements)**    **$      142,812.50**

# EXHIBIT B

**Excell Auto Group, Inc.**

**Case No.: 22-12790-EPK**
**Detail Transfer Schedule - Hi Bar Capital**

| Bank ID | Entity | Date | Analysis Period (BR) | Check # | Payee/Payor | Credit (Receipts) | Debit (Disbursements) |
|---|---|---|---|---|---|---|---|
| Chase 6901 | EXCELL AUTO GROUP, INC | 11/15/21 | 1 Year | | HI BAR CAPITAL | $ - | $ 300,000 00 |
| Chase 6901 | EXCELL AUTO GROUP, INC | 12/17/21 | 1 Year | | HI BAR CAPITAL | - | 200,000 00 |
| Chase 6901 | EXCELL AUTO GROUP, INC | 12/20/21 | 1 Year | | HI BAR CAPITAL | - | 200,000 00 |
| | | | | | **Subtotal - Hi Bar Capital - 1 Year** | **-** | **700,000.00** |
| Chase 6901 | EXCELL AUTO GROUP, INC | 01/10/22 | 90 Day | | HI BAR CAPITAL | - | 100,000 00 |
| Chase 6901 | EXCELL AUTO GROUP, INC | 01/12/22 | 90 Day | | HI BAR CAPITAL | - | 100,000 00 |
| | | | | | **Subtotal - Hi Bar Capital - 90 Day** | **-** | **200,000.00** |
| | | | | | **Subtotal - Hi Bar Capital - ALL ACTIVITY** | **-** | **900,000.00** |
| Chase 3199 | EXCELL AUTO GROUP, INC | 02/09/22 | 90 Day | | LAW OFFICES OF STEVEN ZAKHARYAYEV | - | 450,000 00 |
| Chase 3199 | EXCELL AUTO GROUP, INC | 02/08/22 | 90 Day | | LAW OFFICES OF STEVEN ZAKHARYAYEV | - | 600,000 00 |
| Chase 3181 | EXCELL AUTO GROUP, INC | 02/07/22 | 90 Day | | LAW OFFICES OF STEVEN ZAKHARYAYEV | - | 250,000 00 |
| | | | | | **Subtotal - Steven Zakharyayev - 90 Day** | **-** | **1,300,000.00** |
| | | | | | **Subtotal - Steven Zakharyayev - ALL ACTIVITY** | **-** | **1,300,000.00** |
| | | | | | **Grand Total - All Parties** | **$ -** | **$ 2,200,000.00** |

# EXHIBIT C

| | |
|---|---|
| **From:** | Josh Lubin |
| **To:** | Scott Zankl |
| **Subject:** | RE: |
| **Date:** | Monday, August 23, 2021 10:44:24 AM |
| **Attachments:** | EXCELL AUTO GROUP - July 08, 2021 $500,000.xlsx |
| | EXCELL AUTO GROUP - June 01, 2021 $1,000,000.xlsx |

Scott,

Payment history attached.

Let me know when you need a payoff letter, I will include discount on the July 8th deal.

From: Scott Zankl <scott@excellauto.com>
Sent: Friday, August 13, 2021 12:34 PM
To: Josh Lubin <josh@spincapital.com>
Subject: Re:

josh

can you email me payment history

breakdown

need it for my accountant as well

Sent from my iPhone

On Aug 13, 2021, at 11:15 AM, Josh Lubin <josh@spincapital.com <mailto:josh@spincapital.com> > wrote:

July 9th deal did not include Wednesday payment. Its still pending…

From: Josh Lubin
Sent: Friday, August 13, 2021 11:13 AM

To: Scott Zankl <scott@excellauto.com <mailto:scott@excellauto.com> >
Subject: RE:


Payoff letters attached.


From: Scott Zankl <scott@excellauto.com <mailto:scott@excellauto.com> >
Sent: Friday, August 13, 2021 9:43 AM
To: Josh Lubin <josh@spincapital.com <mailto:josh@spincapital.com> >
Subject: Re:


no


next friday

Sent from my iPhone


On Aug 13, 2021, at 9:42 AM, Josh Lubin <josh@spincapital.com <mailto:josh@spincapital.com> >
wrote:

 Will send shortly.  You sending wire today?


Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android <https://aka.ms/AAb9ysg>

---

From: Scott Zankl <scott@excellauto.com <mailto:scott@excellauto.com> >
Sent: Friday, August 13, 2021 9:25:49 AM
To: Josh Lubin <josh@spincapital.com <mailto:josh@spincapital.com> >
Subject:


Josh

could you please provide me with
a payoff

Sent from my iPhone

Merchant Payback History

| Amount | | Due On | Paid On | Remaining | |
|---|---|---|---|---|---|
| $ | 93,687.50 | 17-Aug-21 | 8/17/2021 | $ | 468,437.50 |
| $ | 93,687.50 | 10-Aug-21 | 8/10/2021 | $ | 562,125.00 |
| $ | 93,687.50 | 3-Aug-21 | 8/3/2021 | $ | 655,812.50 |
| $ | 93,687.50 | 27-Jul-21 | 7/27/2021 | $ | 749,500.00 |
| $ | 93,687.50 | 27-Jul-21 | 7/27/2021 | $ | 843,187.50 |
| $ | (93,687.50) | 22-Jul-21 | 7/22/2021 | $ | 936,875.00 |
| $ | 93,687.50 | 20-Jul-21 | 7/20/2021 | $ | 843,187.50 |
| $ | 93,687.50 | 13-Jul-21 | 7/13/2021 | $ | 936,875.00 |
| $ | 93,687.50 | 6-Jul-21 | 7/6/2021 | $ | 1,030,562.50 |
| $ | 93,687.50 | 29-Jun-21 | 6/29/2021 | $ | 1,124,250.00 |
| $ | 93,687.50 | 22-Jun-21 | 6/22/2021 | $ | 1,217,937.50 |
| $ | 93,687.50 | 15-Jun-21 | 6/15/2021 | $ | 1,311,625.00 |
| $ | 93,687.50 | 8-Jun-21 | 6/8/2021 | $ | 1,405,312.50 |

Merchant Payback History

| Amount | | Due On | Paid On | Remaining | |
|---|---|---|---|---|---|
| $ | 40,000.00 | 18-Aug-21 | 18-Aug-21 | $ | 509,500.00 |
| $ | 40,000.00 | 11-Aug-21 | 11-Aug-21 | $ | 549,500.00 |
| $ | 40,000.00 | 4-Aug-21 | 4-Aug-21 | $ | 589,500.00 |
| $ | 40,000.00 | 28-Jul-21 | 28-Jul-21 | $ | 629,500.00 |
| $ | 40,000.00 | 21-Jul-21 | 21-Jul-21 | $ | 669,500.00 |
| $ | 40,000.00 | 14-Jul-21 | 14-Jul-21 | $ | 709,500.00 |

# EXHIBIT D

# *SPIN CAPITAL*
## *BALANCE LETTER*

08/13/2021

KRISTEN ZANKL,

This letter is to confirm that the merchant KRISTEN ZANKL owner of EXCELL AUTO GROUP, INC. has a balance of $562,125.00 with SPIN CAPITAL in reference to the merchant Agreement entered into on or about 06/01/2021.

Receipt of final payment will conclude the Agreement and SPIN CAPITAL security interest in EXCELL AUTO GROUP, INCwill be released.

Thank you for counting on SPIN CAPITAL to help your business succeed!

Regards,

*SPIN CAPITAL*

*Wire Instruction*

| | |
|---|---|
| *Bank Name* | *TD BANK* |
| *Bank Address* | *6000 ATRIUM WAY MOUNT LAUREL NJ 08054* |
| *Beneficiary Name* | *SPIN CAPITAL LLC* |
| *Beneficiary Address* | *1460 ARBORETUM PKWY LAKEWOOD NJ 08701* |
| *Account Routing #* | ████ |
| *Account #* | ████ |

# EXHIBIT E

## REVENUE PURCHASE AGREEMENT

This Revenue Purchase Agreement and Security Agreement and Guaranty of Performance ("**Agreement**") dated 07/09/2021 between **SPIN CAPITAL** ("**SPC**") the Merchant(s) listed below ("**Merchant**") and the Individual(s) listed below ("**Guarantor**")

### MERCHANT INFORMATION

Merchant's Legal Name: EXCELL AUTO GROUP, INC. AND ALL ENTITIES LISTED ON THE " EXHIBIT A"

D/B/A: EXCELL AUTO GROUP AND ALL ENTITIES LISTED ON THE " EXHIBIT A"

State of Incorporation / Organization: FL

Type of Entity: INC

Physical Address: 1001 CLINT MOORE ROAD #101

City: BOCA RATON        State: FL        Zip: 33487        Business Phone:

Guarantor(s) Name: KRISTEN ZANKL        Cellphone Number:        Email Address:

Mailing Address: 1001 CLINT MOORE ROAD #101        City: BOCA RATON        State: FL        Zip: 33487

Purchase Price: $ 500,000.00        Purchased Percent 20        %        Purchased Amount: $ 749,500.00

Payment Frequency: WEEKLY        Remittance $ 40,000.00

In consideration of payment by SPC to Merchant of the Purchase Price set forth above, Merchant hereby sells, assigns and transfers to SPC (making SPC the absolute owner) the Purchased Percentage of all of Merchant's payments, receipts, settlements and funds paid to or received by or for the account of Merchant from time to time on and after the date hereof in payment or settlement of Merchant's existing and future accounts, payment intangibles, credit, debit and/or stored value card transactions, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other payors or obligors (the "Future Receipts" defined as all payments made by cash, check, clearinghouse settlement, electronic transfer or other form of monetary payment), for the payments to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the Purchased Amount has been delivered by or on behalf of Merchant to SPC.

Merchant is selling a portion of a future revenue stream to SPC at a discount, and is not borrowing money from SPC, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by SPC. The Remittance is a good faith estimate of SPC's share of the future revenue stream. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. SPC is entering this Agreement knowing the risks that Merchant's business may not perform as expected or fail, and SPC assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give SPC a reasonable and fair opportunity to receive the benefit of its bargain. SPC acknowledges that it may never receive the Purchased Amount if the Merchant does not generate sufficient revenue. Merchant and Guarantor(s)(s) are only guaranteeing their performance of the terms of this Revenue Purchase Agreement and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4 and Paragraph 1.5.

SPC will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, SPC (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as SPC receives payment in full of the Purchased Amount. Merchant hereby authorizes SPC to ACH debit the agreed Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. Merchant agrees not to make or cause debits to the Account (other than in favor of SPC) at any time that would cause the balance therein on any business day to be insufficient to fund payment in full of the agreed Remittance. The Account may not be used for any personal, family or household purposes. Merchant will provide SPC with all required access codes and monthly bank statements regarding the Account so that SPC may monitor the Account. SPC payment of the Purchase Price shall be deemed the acceptance and performance by SPC of this Agreement. Merchant understands that it is responsible for ensuring that the agreed Remittance to be debited by SPC remains in the Account and will be held responsible for any fees incurred by SPC resulting from a rejected ACH attempt or an Event of Default. SPC is not responsible for any overdrafts or rejected transactions that may result from SPC's ACH debiting the agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between SPC and Merchant, upon the occurrence of an Event of Default of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

**THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

FOR THE MERCHANT (#1) By: KRISTEN ZANKL
_____
(Print Name and Title)        DocuSigned by: 6CEA230F51E247A (Signature)

FOR THE MERCHANT (#2) By: SCOTT THOMAS ZANKL
_____
(Print Name and Title)        DocuSigned by: Scott Thomas Zankl 763D464660D2410 (Signature)

BY GUARANTOR(S) (#1) By: KRISTEN ZANKL
_____
(Print Name and Title)        DocuSigned by: 6CEA230F51E24 (Signature)

BY GUARANTOR(S) (#2) By: SCOTT THOMAS ZANKL
_____
(Print Name and Title)        DocuSigned by: Scott Thomas Zankl 763D464660D2410 (Signature)

PROPERTY OF SPIN CAPITAL

**EXHIBIT A**

**ADDENDUM TO**
**THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT AND GUARANTY**
This **ADDENDUM TO THE FUTURE RECEIVABLES SALE AND PURCHASE**
**AGREEMENT and GUARANTY (this "ADDENDUM")**, dated 07/09/2021 is entered into by
and among **PROPERTY OF SPIN CAPITAL** ("BUYER") and **Business Legal Name:**
**EXCELL AUTO GROUP, INC** D/B/A: EXCELL AUTO GROUP

Business Legal Name: LEGAL/CORPORATE NAME: KARMA OF PALM
BEACH INC
DBA: KARMA OF PALM BEACH
**Form of Business Entity:**

**EIN #:**
 ("Seller #1"); and

**Business Legal Name:** AUTOMOTIVE SERVICE
SYSTEMS, INC.
**Form of Business Entity:**

**EIN #:**
("Seller #2"); and

**Business Legal Name:** KZ CONSULTANTS, INC.
**Form of Business Entity:**

**EIN #:**
("Seller #3"); and

**Business Legal Name:** MISS KRIS, LLC
**Form of Business Entity:**

**EIN #:**
("Seller #4"); and

**Business Legal Name:** EXCELL AUTO LEASING INC
**Form of Business Entity:**

**EIN #:**
("Seller #5"); and

**Business Legal Name:** EXCELL AUTO WHOLESALE
INC.
**Form of Business Entity:**

**EIN #:**
("Seller #6"); and

**Business Legal Name:** DEALER SOUQ USA LLC
**Form of Business Entity:**

**EIN #:**
("Seller #7"); and

**Business Legal Name:** EAG WHOLESALE LLC
**Form of Business Entity:**

**EIN #:**
("Seller #8"); and

**Business Legal Name:** KARMA OF BROWARD, INC.
**Form of Business Entity:**

**EIN #:**
("Seller #9"); and

**Business Legal Name:** LAVISH HERO FUND INC
**Form of Business Entity:**

**EIN #:**
("Seller #10"); and

**Business Legal Name:** KARMA OF PALM BEACH,
INC.
**Form of Business Entity:**

**EIN #:**
("Seller #11"); and

**Business Legal Name:** APPLE 3 INVESTMENTS, INC.
**Form of Business Entity:**

**EIN #:**
("Seller #12"); and

**Business Legal Name:** KZ CONSULTANTS INC

**Form of Business Entity:**

**EIN #:**

("Seller #13").

**Signature:**

**Name: KRISTEN ZANKL**
**SSN:** ▮▮▮▮▮
**Title: OWNER**

**Signature:**
**Name: SCOTT THOMAS ZANKL**
**SSN:** ▮▮▮▮▮
**Title: OWNER  2**

Hereinafter: (i) Seller # 1 is referred to as the "Original Seller"; and (ii) Seller # 2, Seller # 3 and Seller # 4 are referred to, individually and collectively, jointly and severally, as the "Additional Seller"; and (iii) the Original Seller and the Additional Seller are referred to, individually and collectively, jointly and severally, as the "Seller."

Hereinafter, Guarantor # 1 is referred to as the "Original Guarantor."

**W-I-T-N-E-S-S-E-T-H**

**WHEREAS**, BUYER, the Original Seller and the Original Guarantor entered into that certain FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT, dated 07/09/2021      (the "Agreement"); and

**WHEREAS**, the obligations of the Original Seller under the Agreement are further guaranteed by the Original Guarantor pursuant to the Personal Guaranty of Performance set forth as Exhibit
A to the Agreement (the "Guaranty"); and

**WHEREAS**, the parties hereto desire to amend and restate the Agreement by adding the name(s) of the Additional Seller as the parties to the Agreement, as if the Additional Seller were the signatories to the Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged, the parties to this Addendum hereby agree to the foregoing and as follows:

Guarantor #1 Initials: ____    Guarantor #2 Initials: ____

PROPERTY OF SPIN CAPITAL

**MERCHANT AGREEMENT TERMS AND CONDITIONS**

**1    TERMS OF ENROLLMENT IN PROGRAM**

**1.1    Merchant Deposit Agreement and Processor.** Merchant shall (A) execute an agreement acceptable to SPC with a Bank acceptable to SPC to obtain fund transfer services for the Account. Merchant shall (B) if applicable, execute an agreement acceptable to SPC with a credit and debit card processor (the "Processor") instructing electronic Processor to deposit all Receipts into the Account. Merchant shall provide SPC and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes SPC and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to SPC for the receipts as specified herein and to pay such amounts to SPC. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre- approved by SPC or not. This additional authorization is not a waiver of SPC's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which SPC did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of SPC.

**1.2    Term of Agreement.** This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by SPC as per the terms of this Agreement.

**1.3    Reconciliation.** As long as an Event of Default, or breach of this agreement, has not occurred, Merchant may request a retroactive reconciliation of the total Remittance Amount. All requests hereunder must be in writing to Reconciliations@spincapital.com Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding if applicable, from the date of this Agreement through and including the date the request is made. SPC retains the right request additional reasonable documentation including without limitation bank login or access to view Merchant's accounts using third party software, and Merchant's refusal to provide access shall be a breach of this Agreement and SPC shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by SPC within two (2) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by SPC shall equal the Specific Percentage of the Future Receipts that Merchant collected during the requested month. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with SPC's right and ability to debit Merchant's Account while the request is pending or to unilaterally modify the Remittance Amount, in any method other than the ones listed in this Agreement.

**1.4    Adjustments to the Remittance.** As long an Event of Default, or breach of this agreement, has not occurred, Merchant may give notice to SPC to request a decrease in the Remittance, should they experience a decrease in its Future Receipts. All requests hereunder must be in writing to Reconciliations@spincapital com and must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding from the date of this Agreement through and including the date the request is made. SPC retains the right request additional reasonable documentation including without limitation bank login or 3rd party software access to view Merchant's accounts, refusal to provide access shall be a breach of this Agreement and SPC shall have no obligation to reconcile. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Merchant shall provide SPC with viewing access to their bank account as well as all information reasonably requested by SPC to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

**1.5    Financial Condition.** Merchant and Guarantor(s)(s) (as hereinafter defined and limited) authorize SPC and its agents to investigate their financial responsibility and history, and will provide to SPC any authorizations, bank or financial statements, tax returns, etc , as SPC requests in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. SPC is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

**1.6    Transactional History.** Merchant authorizes all of its banks, brokers and processor to provide SPC with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide SPC with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from SPC.

**1.7    Indemnification.** Merchant and Guarantor(s)(s) hereby jointly and severally indemnify and hold harmless SPC and each Processor, their respective officers, directors, agents and representatives, and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any such indemnitee as a direct or indirect result of (a) claims asserted by SPC for monies owed to SPC from Merchant and (b) actions taken by indemnitee in reliance upon any fraudulent, misleading or deceptive information or instructions provided by SPC.

**1.8    No Liability.** In no event will SPC be liable for any claims asserted by Merchant or Guarantor(s) under any legal or equitable theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s)(s). In the event these claims are nonetheless raised, Merchant and Guarantor(s)(s) will be jointly liable for all of SPC's attorney's fees and expenses resulting therefrom.

**1.9    Reliance on Terms.** Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, SPC, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action.

**1.10    Sale of Receipts.** Merchant and SPC agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from SPC to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. SPC has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Merchant acknowledges that SPC's share of Receipts collected are being held by Merchant in trust and are the sole property of SPC until they are remitted to SPC. Payments made to SPC in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. By this Agreement, Merchant transfers to SPC full and complete ownership of the Purchased Amount and Merchant retains no legal or equitable interest therein. SPC hereby appoints Merchant, and Merchant accepts appointment, as servicer for and on behalf of SPC for the purpose of collecting and delivering Receipts to SPC as required by this Agreement until SPC has received the Receipts Purchased Amount, and Merchant agrees that all such Receipts shall be received and held in trust for the benefit of SPFL for purposes of carrying out the terms of this Agreement. Merchant agrees that it will treat the amounts received and the Purchased Receipts delivered to SPC under this Agreement in a manner consistent with a sale in its accounting records and tax returns. Merchant agrees that SPC is entitled to audit Merchant's accounting records upon reasonable notice in order to verify compliance. Merchant waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Merchant asserts that this transaction is anything other than a sale of future receipts. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that SPC has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and SPC shall promptly refund to Merchant any interest received by SPC in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that SPC not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.11    Power of Attorney.** Merchant irrevocably appoints SPC and its agents and representatives, as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to SPC from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to SPC; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s)(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which SPC may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by merchant.

**1.12    Protections against Default.** The following Protections 1 through 8 may be invoked by SPC immediately and without notice to Merchant in the event:(a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the SPC electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to SPC; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts or ceases the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of SPC, and (ii) the written agreement of any SPC or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to SPC; (e) Merchant takes any action, fails

to take any action, or offers any incentive—economic or otherwise—the result of which being to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; (f) Merchant fails to provide SPC with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from SPC, or (g) Merchant breaches any terms of this Agreement, including but not limited any of the Events of Default contained in Section 3.1 herein. These protections are in addition to any other remedies available to SPC at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchased Amount plus all fees (including attorney's fees and costs of collection in the amount of 30% of the Purchased Amount then outstanding due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** SPC may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant hereby authorizes SPC to execute in the name of the Merchant a Confession of Judgment in favor of SPC pursuant to the terms of the Confession of Judgment. Upon an Event of Default, SPC may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

**Protection 4.** SPC may enforce its security interest in the Collateral including sending demand letters to account debtors and credit card processors.

**Protection 5.** SPC may exercise any and all rights and remedies of a secured party under Uniform Commercial Code Article 9

**Protection 6.** SPC may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if SPC recovers a Judgment against Merchant, Merchant shall be liable for all of SPC's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to SPC. Upon breach of any provision in this Agreement, SPC may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. SPC may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to SPC.

**Protection 8.** SPC may debit Merchant's depository accounts wherever situated in such amounts as determined by SPC in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Amount and other amounts owed by Merchant to SPC by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to SPC.

**1.13 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor(s), in respect of himself or herself personally, authorizes SPC to disclose information concerning Merchant's and each Owner's and each Guarantor(s)'s credit standing (including credit bureau reports that SPC obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor(s) hereby and each waives to the maximum extent permitted by law any claim for damages against SPC or any of its affiliates relating to any (i)investigation undertaken by or on behalf of SPC as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.14 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by SPC, including this Agreement and any other SPC documents (collectively, "Confidential Information") are proprietary and confidential information of SPC. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of SPC to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles SPC to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or security.

**1.15 Publicity.** Merchant and each of Merchant's Owners and all Guarantor(s)s hereto all hereby authorizes SPC to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.16 D/B/A's.** Merchant hereby acknowledges and agrees that SPC may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between SPC and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**2       REPRESENTATIONS, WARRANTIES AND COVENANTS**
Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

**2.1       Financial Condition and Financial Information.** Merchant's and Guarantor(s)s' bank and financial statements, copies of which have been furnished to SPC, and future statements which will be furnished hereafter at the discretion of SPC, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantor(s)s have a continuing, affirmative obligation to advise SPC of any material adverse change in their financial condition, operation or ownership. SPC may request statements at any time during the performance of this Agreement and the Merchant and Guarantor(s)s shall provide them to SPC within five business days after request from SPC. Merchant's or Guarantor(s)s' failure to do so is a material breach of this Agreement.

**2.2       Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3       Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4       Use of Funds.** Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes.

**2.5       Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without SPC's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6       Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and SPC, nor shall Merchant change any of its places of business without prior written consent by SPC.

**2.7       Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis if applicable.

**2.8       Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from SPC to Merchant, execute, acknowledge and deliver to SPC and/or to any other person, firm or corporation specified by SPC, a statement certifying that this  Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9       No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection pursuant to the United States Bankruptcy Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10       Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Receipts and all collateral in which SPC has been granted a security interest under the Security Agreement, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever other than in favor of SPC or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of SPC.

**2.11       Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.12       Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.13       Good Faith.** Merchant and Guarantor(s)s hereby affirm that Merchant is receiving the Purchase Price and selling SPC the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business

**3       EVENTS OF DEFAULT AND REMEDIES**
**3.1       Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder:
(a)       Merchant or Guarantor(s) shall violate any term or covenant in this Agreement;
(b)       Any representation or warranty by Merchant or Guarantor(s) in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;
(c)       the sending of notice of termination by Merchant or verbally notifying DDF of its intent to breach this Agreement;
(d)       the Merchant fails to give DDF 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored

by Merchant's bank, the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;

(e)    Merchant fails to provide its bank statements, and/or month to date bank activity, and/or accounts receivable reports, and/or bank login information within two (2) business days of a request by SPC,

(f)    Merchant shall voluntarily transfer or sell all or substantially all its assets.

(g)    Merchant shall make or send notice of any intended bulk sale or transfer by Merchant.

(h)    Merchant shall use multiple depository accounts without the prior written consent of SPC or takes any other action that intentionally interferes with or prevents SPC from receiving the Purchased Amount in accordance with the terms of this Agreement.

(i)    Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party.

(j)    Merchant shall change its depositing account without the prior written consent of SPC; or

(k)    Merchant shall close its depositing account used for ACH debits without the prior written consent of SPC

(l)    Merchant's bank returns a code other than NSF cutting SPC from its collections

(m)    Merchant or any Owner/Guarantor(s), directly or indirectly, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, which operates a business similar to or competitive with that of Merchant.

(n)    Merchant shall default under any of the terms, covenants and conditions of any other agreement with SPC.

3.2    **Limited Personal Guaranty** Upon the occurrence of an Event of Default, SPC will enforce its rights against the Guarantor(s) of this transaction. Said Guarantor(s) will be

jointly and severally liable to SPC for all of SPC's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

3.3    **Remedies.** Upon the occurrence of an Event of Default occurs and is not waived pursuant to Section 4.4. hereof, SPC may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy, including but not limited to filing the Confession of Judgment and executing thereon, and enforcing the Security Agreement contained herein. All rights, powers and remedies of SPC in connection with this Agreement may be exercised at any time by SPC after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.4    **Attorney's Fees.** Upon the occurrence of an Event of Default, and SPC retains an attorney or law firm to enforce this Agreement, Merchant and Guarantor(s) agree that a fee equal to 30% of the Remaining Balance (purchased amount less amount remitted by Merchant) ("Attorney's Fees") shall be immediately assessed Merchant and Guarantor(s) agree that the calculation for Attorney's Fees is reasonable.

3.5    **Costs.** Merchant shall pay to SPC all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and (c) the enforcement of SPC's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

3.6    **Required Notifications.** Merchant is required to give SPC written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give SPC seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

**4    MISCELLANEOUS**

4.1    **Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by SPC.

4.2    **Assignment.** SPC may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

4.3    **Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties

to this Agreement at the addresses set forth in this Agreement. Notices to SPC shall become effective only upon receipt by SPC. Notices to Merchant shall become effective three days after mailing.

4.4    **Waiver Remedies.** No failure on the part of SPC to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

4.5    **Binding Effect; Governing Law, Venue and Jurisdiction**. This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums attachments, exhibits, and other documents relating to this Agreement in any way, shall be binding upon and inure to the benefit of Merchant and Guarantor(s) on the one hand, and SPC and their respective successors and assigns, except that Merchant and Guarantor(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of SPC which consent may be withheld in SPC's sole discretion. SPC reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums, attachments, exhibits, and other documents relating to this Agreement in any way, shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if SPC so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). All Parties to this Agreement, including but not limited to, Merchant, Guarantor(s), Corporate Guarantor(s) Merchant and Guarantor(s) that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant and Guarantor(s) waives any right to oppose any motion or application made by SPC to transfer such proceeding to an Acceptable Forum. **Merchant and Guarantor(s) hereby agree that the mailing of any Summons and Complaint in any proceeding commenced by SPC by certified or registered mail, return receipt requested to the Mailing Address listed on this Agreement, or via email to the Email Address listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.**

4.6    **Survival of Representation**, etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

4.7    **Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

4.8    **Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

4.9    **Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant Guarantor(s) and Corporate Guarantor(s)s and SPC and supersede all prior agreements and understandings relating to the subject matter hereof.

4.10    **JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THEENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND    ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

4.11    **CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

4.12    **Facsimile & Digital Acceptance.** Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.

4.13    **Heter Iska.** All of our business are done in accordance to the "HI-BP" which can be reviewed at the following link "shorturl.at/djBIR"

## SECURITY AGREEMENT AND GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY OF PEFORMANCE. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

Merchant's Legal Name: EXCELL AUTO GROUP, INC. AND ALL ENTITIES LISTED ON THE " EXHIBIT A"

D/B/A: EXCELL AUTO GROUP AND ALL ENTITIES LISTED ON THE " EXHIBIT A"      Federal ID#: 80-0344450

Physical Address: 1001 CLINT MOORE ROAD #101      City: BOCA RATON      State: FL      Zip: 33487

### SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. To secure Merchant's obligations under the Revenue Purchase Agreement to make available or deliver Purchased Amount to SPC and SPC's right to realize the Purchased Amount, as and to the extent required by the terms of the Revenue Purchase Agreement, and performance of and compliance by Merchant with its other undertakings and agreements herein, Merchant and Guarantor(s)(s) grants to SPC a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s)(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s)(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to SPC under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to SPC upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover SPC's entitlements under this Agreement, SPC is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of SPC's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, SPC or an affiliate of SPC is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

In the event Merchant, any of its officers or directors or any Owner/Guarantor(s), during the term of the Revenue Purchase Agreement or while Merchant remains liable to SPC for any obligations under the Revenue Purchase Agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due SPC under the Revenue Purchase Agreement. With respect to any such entity, SPC shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC Financing Statement and to have it filed with any and all appropriate UCC filing offices. SPC shall be held harmless by Merchant and each Owner/Guarantor(s) and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. SPC shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of SPC's rights, including without limitation, SPC's right to collect all accounts, and to notify any payment card processor or creditor of such entity that SPC has such rights in such entity's assets. Merchant also agrees that, at the SPC's discretion, SPC may choose to amend any existing financing statement to include any such newly formed entity as debtor.

This security interest may be exercised by SPC without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. SPC shall have the right to notify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, SPC has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, SPC will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from SPC written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor(s) (s) agree(s) that this is a contract of recoupment and SPC is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by SPC. Merchant and Guarantor(s)(s) agree(s) to execute and deliver to SPC such instruments and documents SPC may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. SPC is authorized to execute all such instruments and documents in Merchant's and Guarantor(s)(s) name.

Merchant and Guarantor(s)(s) each acknowledge and agree that any security interest granted to SPC under any other agreement between Merchant or Guarantor(s)(s) and SPC (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s)(s) each agrees to execute any documents or take any action in connection with this Agreement as SPC deems necessary to perfect or maintain SPC's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s)(s) each hereby authorizes SPC to file any financing statements deemed necessary by SPC to perfect or maintain SPC's security interest. Merchant and Guarantor(s)(s) shall be liable for, and SPC may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by SPC in protecting, preserving and enforcing SPC's security interest and rights.

**Negative Pledge.** Merchant and Guarantor(s)(s) each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease.** SPC shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, SPC may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that SPC may enter into an agreement with Merchant's landlord giving SPC the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

**Remedies.** Upon any Event of Default, SPC may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to SPC, whether by acceleration or otherwise.

PROPERTY OF SPIN CAPITAL

Initial(1) _____    Initial(2): _____


## GUARANTY OF PERFORMANCE

As an additional inducement for SPC to enter into the Revenue Purchase Agreement, the undersigned Guarantor(s)(s) hereby provides SPC with this Guaranty. Guarantor(s)(s) will not be personally liable for any amount due under the Revenue Purchase Agreement unless Merchant commits an Event of Default pursuant to Paragraph 3.1 of the Revenue Purchase Agreement. Each Guarantor(s) shall be jointly and severally liable for all amounts owed to SPC in the Event of Default. Guarantor(s)(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement including the Merchant's full and timely delivery of the Purchased Amount pursuant to (and limited by) the Revenue Purchase Agreement, in each case as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor(s)'s obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor(s) Waivers.** In the event of a breach of the above, SPC may seek recovery from Guarantor(s)s for all of SPC's losses and damages by enforcement of SPC's rights under this Agreement without first seeking to obtain payment from Merchant, any other Guarantor(s), or any Collateral or Additional Collateral SPC may hold pursuant to this Agreement or any other guaranty. In addition, Section 4.5, 4.10 and 4.11 are expressly reiterated in the Security Agreement and Guaranty herein. SPC is not required to notify Guarantor(s) of any of the following events and Guarantor(s) will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) SPC's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to SPC. In addition, SPC may take any of the following actions without releasing Guarantor(s) from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to SPC; (ii) release Merchant from its obligations to SPC; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor(s) to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to SPC under the Merchant Agreement and this Agreement are paid in full, Guarantor(s) shall not seek reimbursement from Merchant or any other Guarantor(s) for any amounts paid by it under this Agreement. Guarantor(s) permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other Guarantor(s), or any collateral provided by Merchant or any other Guarantor(s), for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that SPC must return any amount paid by Merchant or any other Guarantor(s) of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor(s)'s obligations under this Agreement shall include that amount.

Guarantor(s) Acknowledgement. Guarantor(s) acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (iii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iv) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

This Security Agreement and Guaranty and Guaranty of Performance shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if SPC so elects, be instituted in any court  sitting in New York, (the "Acceptable Forums"). Merchant, Guarantor and Corporate Guarantors agree that the Acceptable  Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant, Guarantor and Corporate Guarantors waives any right to oppose any motion or application made by SPC to transfer such proceeding to an Acceptable Forum.

The Merchant Guarantor(s) and Corporate Guarantor(s)  acknowledge that they have read Paragraph 4.5 of this Agreement in its entirety and understand that they are waiving their right to Service of Process by traditional manners and will accept process of any Summons and Complaint or other legal process by certified mail return receipt requested to the Mailing Address on Page 1 of this Agreement.

**FOR ALL MERCHANT(S) (#1)** By: KRISTEN ZANKL
                    (Print Name and Title)                    (Signature)

SSN# ▮▮▮▮▮▮

**FOR ALL MERCHANT(S) (#2)** By: SCOTT THOMAS ZANKL
                    (Print Name and Title)                    Scott Thomas Zankl    (Signature)

SSN# ▮▮▮▮▮▮

**GUARANTOR(S) (#1)** By: KRISTEN ZANKL
                    (Print Name and Title)                    (Signature)

SSN# ▮▮▮▮▮▮

**GUARANTOR(S) (#2)** By: SCOTT THOMAS ZANKL
                    (Print Name and Title)                    Scott Thomas Zankl    (Signature)

SSN ▮▮▮▮▮▮

6

## AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT), DIRECT PAYMENTS (ACH DEBITS), AND CHECK DEBIT

Merchant: ___EXCELL AUTO GROUP, INC. AND ALL ENTITIES LISTED ON THE " EXHIBIT A"___

(Merchant's Legal Name)

Merchant Agreement: Merchant Agreement between SPC and Merchant, dated as of: 07/09/2021

Designated Checking Account:

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Authorization Agreement for Direct Deposit (ACH Credit), Direct Payments (ACH Debits), and Check Debit is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep a copy of this important legal document for Merchant's records.**

**DISBURSEMENT OF ADVANCE PROCEEDS.** By signing below, Merchant authorizes SPC to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Merchant also authorizes SPC to collect amounts due from Merchant under the Merchant Agreement by initiating ACH debits or to initiate a Check Debit to the Designated Checking Account, as follows:**

Bank Name: CHASE                                                         Branch:_____

Federal ID#: 80-0344450

ABA: Routing: ███████████                                     DDA: Account: ███████████

Bank Name:_____              Branch:_____

Federal ID#:_____

ABA: Routing:_____          DDA: Account:_____

In the Amount of: $ 40,000.00

(Or) Percentage of each Banking Deposit: 20            %

On the Following Days: _____

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Merchant's financial institution for any reason, including without limitation insufficient funds, Merchant understands that SPC may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Merchant also authorizes SPC to initiate ACH entries to correct any erroneous payment transaction.

**MISCELLANEOUS.**    SPC is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this Authorization Agreement. The origination   of ACH debits and credits to the Designated   Checking Account must comply with applicable   provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association).  This Authorization Agreement is to remain in full force and effect until SPC has received written notification from Merchant at the address set forth below at least 5 banking days prior of its termination to afford SPC a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Checking Account. Merchant will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant requests the financial institution that holds the Designated Checking Account to honor all  ACH entries initiated in accordance with this Authorization Agreement.

Merchant agrees to be bound by the ACH Rules as defined by the National ACH Association (NACHA). Merchant understands that this authorization is to remain in full force and effect until SPC has received written notification from me of its termination at least five (5) business days prior to the payment due date. Merchant further understands that canceling  their  ACH  authorization  does  not  relieve  them  of  the  responsibility  of  paying  account  in  full, and that if Merchant cancels or revokes this authorization before any remaining debt is paid in full, the SPC may take additional actions including legal actions to secure the debt.

EXCELL AUTO GROUP, INC. AND ALL ENTITIES LISTED ON THE " EXHIBIT A"

Merchant:_____

(Merchant's Legal Name)

Print Name: KRISTEN ZANKL                                    Print Name: SCOTT THOMAS ZANKL

x _____                         x _Scott Thomas Zankl_____

(Signature)                                                  (Signature) 64660D2410...

_____                            _____

(Title)                                                     (Title)

Date: 07/09/2021                                             Date: 07/09/2021

(Month) (Day) (Year)                                        (Month) (Day) (Year)

PROPERTY OF SPIN CAPITAL

# APPENDIX A - THE FEE STRUCTURE:

**A.**  **Underwriting Fee**: $ 25,000.00 to cover Underwriting and relates expenses.

**B.**  **UCC Filing Fee**: $499.00 and are not an automated process, requiring us to charge this fee to cover costs.

**C.**  **NSF Fee Standard**: $50.00 (each) up to TWO TIMES ONLY before a default is declared.

**D.**  **Bank Change Fee**: $50.00 When Merchant requires a change of Bank Account to be debited, requiring us to adjust our system.

**E.**  **Blocked ACH Payment**: $5,000.00 This fee is applied when Merchant directs the bank to BLOCK our ACH Debits. Blocking ACH Debits will place Merchant's account in default.

**F.**  **Default Fee**: Shall be applied to Merchant's account in the event that Merchant defaults under the terms of the Merchant Agreement.

**G.**  **ACH Processing Fee**: $249.00 (or 10% of the contract amount, depending on size of advance) ACH's are labor intensive

**H.**  **Account Management Fee:** At the end of each month, Merchant will pay to SPC an Account Management Fee. This fee will not be applied towards the reduction of the Purchased Amount. This monthly fee will equal the average of all the payments received as a Specified percentage of the Merchants settlement amount for that Month.

**I.**  **Miscellaneous Service Fee:** Merchant shall pay certain fees for services related to the origination and maintenance of Accounts. Each Merchant shall receive their funding electronically to their designated bank account and will be charged $30.00 for a Fed Wire or 0.00 for a bank ACH. The current charge for the underwriting and origination of each Merchant

**J.**  **Working Capital Funding**: A fee of $5,000.00 or 10% shall be applied every time Merchant enters into any arrangement, agreement, or commitment that relates to or involves the Receipts, whether in the form of a purchase of, a loan against, collateral against or the sale or purchase of credits against, Receipts or future check sales with any party other than SPC

**K.**  **Contract Service Fee:** Commencing at date funded (the "Start Date"), merchant shall pay a fee of $499.00 per month (the "Monthly Fee") the monthly fee is payable each month during the term of this agreement, at a minimum of three months.

**L.**  **Attorney's Fee:** Up to 30% of remaining balance (purchased amount less amount remitted by Merchant) shall be immediately assessed Merchant and Guarantor(s) agree that the calculation for Attorney's Fees is reasonable. When a merchant breaches any term of this Agreement and SPC is required to retain counsel to enforce, defend or collect any term of this Agreement.

[ALL FEES ARE SUBJECT TO CHANGE]

**FOR THE MERCHANT (#1)** By: KRISTEN ZANKL

(Print Name and Title)                                    (Signature)

**FOR THE MERCHANT (#2)** By: SCOTT THOMAS ZANKL

(Print Name and Title)                                    (Signature)

PROPERTY OF SPIN CAPITAL

**Bank Login Information**

Dear Merchant,

Thank you for accepting this offer from SPC. We look forward to being your funding partner for as long as you need.

**Daily ACH Program:**

SPC will require viewing access s to your bank account, each business day, in order to verify the amount of your daily payment. Please be assured that we carefully safeguard your confidential information, and only essential personnel will have access to it.

SPC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

* Be sure to indicate capital or lower-case letters.

Name of Bank: _____

Bank portal website:

Username: _____

Password: _____

Security Question / Answer 1: _____

Security Question /Answer 2: _____

Security Question / Answer 3: _____

Any other information necessary to access your account:

_____

**KRISTEN ZANKL** _____    07/09/2021 _____

FOR THE MERCHANT (#1) By:                               Date

 **SCOTT THOMAS ZANKL** _____    07/09/2021 _____

FOR THE MERCHANT (#2) By:                               Date

9

# EXHIBIT F

DocuSign Envelope ID: C16C035F-7A18-421D-9A7D-839575CA7BC3

# *SPIN CAPITAL*
### *BALANCE TRANSFER AGREEMENT*

08/31/2021

*RE: EXCELL AUTO GROUP, INC*

Dear KRISTEN ZANKL & SCOTT THOMAS ZANKL,

This letter is to confirm that you, KRISTEN ZANKL & SCOTT THOMAS ZANKL, as principal/owner/manager of EXCELL AUTO GROUP, INC, agrees to pay off the remaining RTR of $281,062.50 which currently exists on the previous Merchant Agreement with SPIN CAPITAL entered into on or about 06/01/2021 and agrees to pay off the remaining RTR of $469,500.00 which currently exists on the previous Merchant Agreement with SPIN CAPITAL entered into on or about 07/09/2021 from funds you are receiving from your new Merchant Agreement with SPIN CAPITAL 08/31/2021.

By signing this Agreement, you are authorizing SPIN CAPITAL to deduct $281,062.50 and $469,500.00 out of the new Merchant Agreement.

*AGREED AND ACCEPTED BY:*

| | |
|---|---|
| KRISTEN ZANKL | 8/31/2021 |
| | DATE |
| *individually and on behalf of* | |
| EXCELL AUTO GROUP, INC | |
| SCOTT THOMAS ZANKL | 9/2/2021 |
| | DATE |
| *individually and on behalf of* | |
| EXCELL AUTO GROUP, INC | |

# EXHIBIT G

## REVENUE PURCHASE AGREEMENT

This Revenue Purchase Agreement and Security Agreement and Guaranty of Performance (**"Agreement"**) dated 08/31/2021 between **SPIN CAPITAL** (**"SPC"**) the Merchant(s) listed below (**"Merchant"**) and the Individual(s) listed below (**"Guarantor"**)

### MERCHANT INFORMATION

Merchant's Legal Name: EXCELL AUTO GROUP, INC. AND ALL ENTITIES LISTED ON THE " EXHIBIT A"

D/B/A: EXCELL AUTO GROUP AND ALL ENTITIES LISTED ON THE " EXHIBIT A"

State of Incorporation / Organization: FL

Type of Entity: INC

Physical Address: 1001 CLINT MOORE ROAD #101

City: BOCA RATON                State: FL                Zip: 33487      Business Phone:

Guarantor(s) Name: KRISTEN ZANKL          Cellphone Number:                    Email Address:

Mailing Address: 1001 CLINT MOORE ROAD #101       City: BOCA RATON       State: FL       Zip: 33487

Purchase Price: $ 2,000,000.00      Purchased Percent 20      %      Purchased Amount: $ 2,998,000.00

Payment Frequency: WEEKLY                Remittance $ 150,000.00

In consideration of payment by SPC to Merchant of the Purchase Price set forth above, Merchant hereby sells, assigns and transfers to SPC (making SPC the absolute owner) the Purchased Percentage of all of Merchant's payments, receipts, settlements and funds paid to or received by or for the account of Merchant from time to time on and after the date hereof in payment or settlement of Merchant's existing and future accounts, payment intangibles, credit, debit and/or stored value card transactions, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other payors or obligors (the "Future Receipts" defined as all payments made by cash, check, clearinghouse settlement, electronic transfer or other form of monetary payment), for the payments to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the Purchased Amount has been delivered by or on behalf of Merchant to SPC.

Merchant is selling a portion of a future revenue stream to SPC at a discount, and is not borrowing money from SPC, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by SPC. The Remittance is a good faith estimate of SPC's share of the future revenue stream. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. SPC is entering this Agreement knowing the risks that Merchant's business may not perform as expected or fail, and SPC assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give SPC a reasonable and fair opportunity to receive the benefit of its bargain. SPC acknowledges that it may never receive the Purchased Amount if the Merchant does not generate sufficient revenue. Merchant and Guarantor(s)(s) are only guaranteeing their performance of the terms of this Revenue Purchase Agreement and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4 and Paragraph 1.5.

SPC will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, SPC (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as SPC receives payment in full of the Purchased Amount. Merchant hereby authorizes SPC to ACH debit the agreed Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. Merchant agrees not to make or cause debits to the Account (other than in favor of SPC) at any time that would cause the balance therein on any business day to be insufficient to fund payment in full of the agreed Remittance. The Account may not be used for any personal, family or household purposes. Merchant will provide SPC with all required access codes and monthly bank statements regarding the Account so that SPC may monitor the Account. SPC payment of the Purchase Price shall be deemed the acceptance and performance by SPC of this Agreement. Merchant understands that it is responsible for ensuring that the agreed Remittance to be debited by SPC remains in the Account and will be held responsible for any fees incurred by SPC resulting from a rejected ACH attempt or an Event of Default. SPC is not responsible for any overdrafts or rejected transactions that may result from SPC's ACH debiting the agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between SPC and Merchant, upon the occurrence of an Event of Default of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

**THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

FOR THE MERCHANT (#1) By: KRISTEN ZANKL

(Print Name and Title)                            8CEA230F51E247A... (Signature)

FOR THE MERCHANT (#2) By: SCOTT THOMAS ZANKL

(Print Name and Title)                            763D464660D24... (Signature)

BY GUARANTOR(S) (#1) By: KRISTEN ZANKL

(Print Name and Title)                            6CEA230F51E247A... (Signature)

BY GUARANTOR(S) (#2) By: SCOTT THOMAS ZANKL

(Print Name and Title)                            763D464660D2410... (Signature)

1

**EXHIBIT A**

**ADDENDUM TO**
**THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT AND GUARANTY**
This **ADDENDUM TO THE FUTURE RECEIVABLES SALE AND PURCHASE**
**AGREEMENT and GUARANTY (this "Addendum")**, dated 08/31/2021 is entered into
by and among **PROPERTY OF SPIN CAPITAL**   ("BUYER") and **Business Legal Name:**
**EXCELL AUTO GROUP, INC** D/B/A: EXCELL AUTO GROUP

| | |
|---|---|
| Business Legal Name: LEGAL/CORPORATE NAME: KARMA OF PALM BEACH INC<br>DBA: KARMA OF PALM BEACH<br>**Form of Business Entity:** | **EIN #:**<br> ("Seller #1"); and |
| **Business Legal Name:** AUTOMOTIVE SERVICE SYSTEMS, INC.<br>**Form of Business Entity:** | **EIN #:**<br>("Seller #2"); and |
| **Business Legal Name:** KZ CONSULTANTS, INC.<br>**Form of Business Entity:** | **EIN #:**<br>("Seller #3"); and |
| **Business Legal Name:** MISS KRIS, LLC<br>**Form of Business Entity:** | **EIN #:**<br>("Seller #4"); and |
| **Business Legal Name:** EXCELL AUTO LEASING INC<br>**Form of Business Entity:** | **EIN #:**<br>("Seller #5"); and |
| **Business Legal Name:** EXCELL AUTO WHOLESALE INC.<br>**Form of Business Entity:** | **EIN #:**<br>("Seller #6"); and |
| **Business Legal Name:** DEALER SOUQ USA LLC<br>**Form of Business Entity:** | **EIN #:**<br>("Seller #7"); and |
| **Business Legal Name:** EAG WHOLESALE LLC<br>**Form of Business Entity:** | **EIN #:**<br>("Seller #8"); and |
| **Business Legal Name:** KARMA OF BROWARD, INC.<br>**Form of Business Entity:** | **EIN #:**<br>("Seller #9"); and |
| **Business Legal Name:** LAVISH HERO FUND INC<br>**Form of Business Entity:** | **EIN #:**<br>("Seller #10"); and |
| **Business Legal Name:** KARMA OF PALM BEACH, INC.<br>**Form of Business Entity:** | **EIN #:**<br>("Seller #11"); and |
| **Business Legal Name:** APPLE 3 INVESTMENTS, INC.<br>**Form of Business Entity:** | **EIN #:**<br>("Seller #12"); and |

**Business Legal Name:** KZ CONSULTANTS INC

**Form of Business Entity:**

EIN #:

("Seller #13").

Signature:

**Name: KRISTEN ZANKL**

**SSN:** ▮▮▮▮▮▮

**Title: OWNER**

Signature:

**Name: SCOTT THOMAS ZANKL**

**SSN:** ▮▮▮▮▮▮

**Title: OWNER  2**

Hereinafter: (i) Seller # 1 is referred to as the "Original Seller"; and (ii) Seller # 2, Seller # 3 and Seller # 4 are referred to, individually and collectively, jointly and severally, as the "Additional Seller"; and (iii) the Original Seller and the Additional Seller are referred to, individually and collectively, jointly and severally, as the "Seller."

Hereinafter, Guarantor # 1 is referred to as the "Original Guarantor."

**W-I-T-N-E-S-S-E-T-H**

**WHEREAS**, BUYER, the Original Seller and the Original Guarantor entered into that certain FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT, dated 08/31/2021     (the "Agreement"); and

**WHEREAS**, the obligations of the Original Seller under the Agreement are further guaranteed by the Original Guarantor pursuant to the Personal Guaranty of Performance set forth as Exhibit

A to the Agreement (the "Guaranty"); and

**WHEREAS**, the parties hereto desire to amend and restate the Agreement by adding the name(s) of the Additional Seller as the parties to the Agreement, as if the Additional Seller were the signatories to the Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged, the parties to this Addendum hereby agree to the foregoing and as follows:

Guarantor #1 Initials: [ STZ ]    Guarantor #2 Initials: [ ]

PROPERTY OF SPIN CAPITAL

## MERCHANT AGREEMENT TERMS AND CONDITIONS

**1      TERMS OF ENROLLMENT IN PROGRAM**

**1.1**      **Merchant Deposit Agreement and Processor.** Merchant shall (A) execute an agreement acceptable to SPC with a Bank acceptable to SPC to obtain fund transfer services for the Account. Merchant shall, and (B) if applicable, execute an agreement acceptable to SPC with a credit and debit card processor (the "Processor") instructing electronic Processor to deposit all Receipts into the Account. Merchant shall provide SPC and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes SPC and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to SPC for the receipts as specified herein and to pay such amounts to SPC. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre- approved by SPC or not. This additional authorization is not a waiver of SPC's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which SPC did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of SPC.

**1.2**      **Term of Agreement.** This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by SPC as per the terms of this Agreement.

**1.3**      **Reconciliation.** As long as an Event of Default, or breach of this agreement, has not occurred, Merchant may request a retroactive reconciliation of the total Remittance Amount. All requests hereunder must be in writing to Reconciliations@spincapital.com Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding if applicable, from the date of this Agreement through and including the date the request is made. SPC retains the right the request additional reasonable documentation including without limitation bank login or access to view Merchant's accounts using third party software, and Merchant's refusal to provide access shall be a breach of this Agreement and SPC shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by SPC within two (2) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by SPC shall equal the Specific Percentage of the Future Receipts that Merchant collected during the requested month. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with SPC's right and ability to debit Merchant's Account while the request is pending or to unilaterally modify the Remittance Amount, in any method other than the ones listed in this Agreement.

**1.4**      **Adjustments to the Remittance.** As long an Event of Default, or breach of this agreement, has not occurred, Merchant may give notice to SPC to request a decrease in the Remittance, should they experience a decrease in its Future Receipts. All requests hereunder must be in writing to Reconciliations@spincapital com and must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding from the date of this Agreement through and including the date the request is made. SPC retains the right the request additional reasonable documentation including without limitation bank login or 3rd party software access to view Merchant's accounts, refusal to provide access shall be a breach of this Agreement and SPC shall have no obligation to reconcile. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Merchant shall provide SPC with viewing access to their bank account as well as all information reasonably requested by SPC to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

**1.5**      **Financial Condition.** Merchant and Guarantor(s)(s) (as hereinafter defined and limited) authorize SPC and its agents to investigate their financial responsibility and history, and will provide to SPC any authorizations, bank or financial statements, tax returns, etc , as SPC requests in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. SPC is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

**1.6**      **Transactional History.** Merchant authorizes all of its banks, brokers and processor to provide SPC with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide SPC with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from SPC.

**1.7**      **Indemnification.** Merchant and Guarantor(s)(s) hereby jointly and severally indemnify and hold harmless SPC and each Processor, their respective officers, directors, agents and representatives, and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any such indemnitee as a direct or indirect result of (a) claims asserted by SPC for monies owed to SPC from Merchant and (b) actions taken by indemnitee in reliance upon any fraudulent, misleading or deceptive information or instructions provided by SPC.

**1.8**      **No Liability.** In no event will SPC be liable for any claims asserted by Merchant or Guarantor(s) under any legal or equitable theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s)(s). In the event these claims are nonetheless raised, Merchant and Guarantor(s)(s) will be jointly liable for all of SPC's attorney's fees and expenses resulting therefrom.

**1.9**      **Reliance on Terms.** Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, SPC, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action.

**1.10**      **Sale of Receipts.** Merchant and SPC agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from SPC to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. SPC has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Merchant acknowledges that SPC's share of Receipts collected are being held by Merchant in trust and are the sole property of SPC until they are remitted to SPC. Payments made to SPC in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. By this Agreement, Merchant transfers to SPC full and complete ownership of the Purchased Amount and Merchant retains no legal or equitable interest therein. SPC hereby appoints Merchant, and Merchant accepts appointment, as servicer for and on behalf of SPC for the purpose of collecting and delivering Receipts to SPC as required by this Agreement until SPC has received the Receipts Purchased Amount, and Merchant agrees that all such Receipts shall be received and held in trust for the benefit of SPFL for purposes of carrying out the terms of this Agreement. Merchant agrees that it will treat the amounts received and the Purchased Receipts delivered to SPC under this Agreement in a manner consistent with a sale in its accounting records and tax returns. Merchant agrees that SPC is entitled to audit Merchant's accounting records upon reasonable notice in order to verify compliance. Merchant waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Merchant asserts that this transaction is anything other than a sale of future receipts. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that SPC has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and SPC shall promptly refund to Merchant any interest received by SPC in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that SPC not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.11**      **Power of Attorney.** Merchant irrevocably appoints SPC and its agents and representatives, as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to SPC from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to SPC; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s)(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which SPC may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by merchant.

**1.12**      **Protections against Default.** The following Protections 1 through 8 may be invoked by SPC immediately and without notice to Merchant in the event:(a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the SPC electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to SPC; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts or ceases the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of SPC, and (ii) the written agreement of any SPC or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to SPC; (e) Merchant takes any action, fails

to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; (f) Merchant fails to provide SPC with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from SPC, or (g) Merchant breaches any terms of this Agreement, including but not limited any of the Events of Default contained in Section 3.1 herein. These protections are in addition to any other remedies available to SPC at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchased Amount plus all fees (including attorney's fees and costs of collection in the amount of 30% of the Purchased Amount then outstanding due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** SPC may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant hereby authorizes SPC to execute in the name of the Merchant a Confession of Judgment in favor of SPC pursuant to the terms of the Confession of Judgment. Upon an Event of Default, SPC may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

**Protection 4.** SPC may enforce its security interest in the Collateral including sending demand letters to account debtors and credit card processors.

**Protection 5.** SPC may exercise any and all rights and remedies of a secured party under Uniform Commercial Code Article 9

**Protection 6.** SPC may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if SPC recovers a Judgment against Merchant, Merchant shall be liable for all of SPC's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to SPC. Upon breach of any provision in this Agreement, SPC may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. SPC may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to SPC.

**Protection 8.** SPC may debit Merchant's depository accounts wherever situated in such amounts as determined by SPC in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Amount and other amounts owed by Merchant to SPC by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to SPC.

**1.13 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor(s), in respect of himself or herself personally, authorizes SPC to disclose information concerning Merchant's and each Owner and each Guarantor(s)'s credit standing (including credit bureau reports that SPC obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor(s) hereby and each waives to the maximum extent permitted by law any claim for damages against SPC or any of its affiliates relating to any (i)investigation undertaken by or on behalf of SPC as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.14 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by SPC, including this Agreement and any other SPC documents (collectively, "Confidential Information") are proprietary and confidential information of SPC. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of SPC to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles SPC to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or security.

**1.15 Publicity.** Merchant and each of Merchant's Owners and all Guarantor(s)s hereto all hereby authorizes SPC to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.16 D/B/A's.** Merchant hereby acknowledges and agrees that SPC may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between SPC and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**2        REPRESENTATIONS, WARRANTIES AND COVENANTS**

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

**2.1        Financial Condition and Financial Information.** Merchant and Guarantor(s)s' bank and financial statements, copies of which have been furnished to SPC, and future statements which will be furnished hereafter at the discretion of SPC, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantor(s)s have a continuing, affirmative obligation to advise SPC of any material adverse change in their financial condition, operation or ownership. SPC may request statements at any time during the performance of this Agreement and the Merchant and Guarantor(s)s shall provide them to SPC within five business days after request from SPC. Merchant's or Guarantor(s)s' failure to do so is a material breach of this Agreement.

**2.2        Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3        Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4        Use of Funds.** Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes.

**2.5        Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without SPC's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6        Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and SPC, nor shall Merchant change any of its places of business without prior written consent by SPC.

**2.7        Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis if applicable.

**2.8        Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from SPC to Merchant, execute, acknowledge and deliver to SPC and/or to any other person, firm or corporation specified by SPC, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchase Amount or any portion thereof has been repaid.

**2.9        No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection pursuant to the United States Bankruptcy Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10        Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Receipts and all collateral in which SPC has been granted a security interest under the Security Agreement, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever other than in favor of SPC or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of SPC.

**2.11        Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.12        Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.13        Good Faith.** Merchant and Guarantor(s)s hereby affirm that Merchant is receiving the Purchase Price and selling SPC the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business

**3        EVENTS OF DEFAULT AND REMEDIES**

**3.1        Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

(a)        Merchant or Guarantor(s) shall violate any term or covenant in this Agreement;

(b)        Any representation or warranty by Merchant or Guarantor(s) in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;

(c)        the sending of notice of termination by Merchant or verbally notifying DDF of its intent to breach this Agreement;

(d)        the Merchant fails to give DDF 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored

Initial(1) _____    Initial(2) _____

by Merchant's bank, the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;

(e)    Merchant fails to provide its bank statements, and/or month to date bank activity, and/or accounts receivable reports, and/or bank login information within two (2) business days of a request by SPC,

(f)    Merchant shall voluntarily transfer or sell all or substantially all its assets.

(g)    Merchant shall make or send notice of any intended bulk sale or transfer by Merchant.

(h)    Merchant shall use multiple depository accounts without the prior written consent of SPC or takes any other action that intentionally interferes with or prevents SPC from receiving the Purchased Amount in accordance with the terms of this Agreement.

(i)    Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party.

(j)    Merchant shall change its depositing account without the prior written consent of SPC; or

(k)    Merchant shall close its depositing account used for ACH debits without the prior written consent of SPC

(l)    Merchant's bank returns a code other than NSF cutting SPC from its collections

(m)    Merchant or any Owner/Guarantor(s), directly or indirectly, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, which operates a business similar to or competitive with that of Merchant.

(n)    Merchant shall default under any of the terms, covenants and conditions of any other agreement with SPC.

3.2    **Limited Personal Guaranty** Upon the occurrence of an Event of Default, SPC will enforce its rights against the Guarantor(s) of this transaction. Said Guarantor(s) will be

jointly and severally liable to SPC for all of SPC's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

3.3    **Remedies.** Upon the occurrence of an Event of Default occurs and is not waived pursuant to Section 4.4. hereof, SPC may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy, including but not limited to filing the Confession of Judgment and executing thereon, and enforcing the Security Agreement contained herein. All rights, powers and remedies of SPC in connection with this Agreement may be exercised at any time by SPC after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.4    **Attorney's Fees.** Upon the occurrence of an Event of Default, and SPC retains an attorney or law firm to enforce this Agreement, Merchant and Guarantor(s) agree that a fee equal to 30% of the Remaining Balance (purchased amount less amount remitted by Merchant) ("Attorney's Fees") shall be immediately assessed Merchant and Guarantor(s) agree that the calculation for Attorney's Fees is reasonable.

3.5    **Costs.** Merchant shall pay to SPC all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and (c) the enforcement of SPC's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

3.6    **Required Notifications.** Merchant is required to give SPC written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give SPC seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

4    **MISCELLANEOUS**

4.1    **Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by SPC.

4.2    **Assignment.** SPC may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

4.3    **Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties

to this Agreement at the addresses set forth in this Agreement. Notices to SPC shall become effective only upon receipt by SPC. Notices to Merchant shall become effective three days after mailing.

4.4    **Waiver Remedies.** No failure on the part of SPC to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

4.5    **Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums attachments, exhibits, and other documents relating to this Agreement in any way, shall be binding upon and inure to the benefit of Merchant and Guarantor(s) on the one hand, and SPC and their respective successors and assigns, except that Merchant and Guarantor(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of SPC which consent may be withheld in SPC's sole discretion. SPC reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums, attachments, exhibits, and other documents relating to this Agreement in any way, shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if SPC so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). All Parties to this Agreement, including but not limited to, Merchant, Guarantor(s), Corporate Guarantor(s) Merchant and Guarantor(s) that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant and Guarantor(s) waives any right to oppose any motion or application made by SPC to transfer such proceeding to an Acceptable Forum. **Merchant and Guarantor(s) hereby agree that the mailing of any Summons and Complaint in any proceeding commenced by SPC by certified or registered mail, return receipt requested to the Mailing Address listed on this Agreement, or via email to the Email Address listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.**

4.6    **Survival of Representation,** etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

4.7    **Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

4.8    **Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

4.9    **Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant Guarantor(s) and Corporate Guarantor(s) and SPC and supersede all prior agreements and understandings relating to the subject matter hereof.

4.10    **JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THEENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND    ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

4.11    **CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

4.12    **Facsimile & Digital Acceptance.** Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.

4.13    **Heter Iska.** All of our business are done in accordance to the "HI-BP" which can be reviewed at the following link "shorturl.at/djBIR"

## SECURITY AGREEMENT AND GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY OF PEFORMANCE. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

Merchant's Legal Name: EXCELL AUTO GROUP, INC. AND ALL ENTITIES LISTED ON THE " EXHIBIT A"

D/B/A: EXCELL AUTO GROUP AND ALL ENTITIES LISTED ON THE " EXHIBIT A"        Federal ID#: 80-0344450

Physical Address: 1001 CLINT MOORE ROAD #101        City: BOCA RATON        State: FL        Zip: 33487

### SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. To secure Merchant's obligations under the Revenue Purchase Agreement to make available or deliver Purchased Amount to SPC and SPC's right to realize the Purchased Amount, as and to the extent required by the terms of the Revenue Purchase Agreement, and performance of and compliance by Merchant with its other undertakings and agreements herein, Merchant and Guarantor(s)(s) grants to SPC a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s)(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s)(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to SPC under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to SPC upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover SPC's entitlements under this Agreement, SPC is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of SPC's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, SPC or an affiliate of SPC is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

In the event Merchant, any of its officers or directors or any Owner/Guarantor(s), during the term of the Revenue Purchase Agreement or while Merchant remains liable to SPC for any obligations under the Revenue Purchase Agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due SPC under the Revenue Purchase Agreement. With respect to any such entity, SPC shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC Financing Statement and to have it filed with any and all appropriate UCC filing offices. SPC shall be held harmless by Merchant and each Owner/Guarantor(s) and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. SPC shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of SPC's rights, including without limitation, SPC's right to collect all accounts, and to notify any payment card processor or creditor of such entity that SPC has such rights in such entity's assets. Merchant also agrees that, at the SPC's discretion, SPC may choose to amend any existing financing statement to include any such newly formed entity as debtor.

This security interest may be exercised by SPC without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. SPC shall have the right to notify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, SPC has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, SPC will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from SPC written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor(s) (s) agree(s) that this is a contract of recoupment and SPC is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by SPC. Merchant and Guarantor(s)(s) agree(s) to execute and deliver to SPC such instruments and documents SPC may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. SPC is authorized to execute all such instruments and documents in Merchant's and Guarantor(s)(s) name.

Merchant and Guarantor(s)(s) each acknowledge and agree that any security interest granted to SPC under any other agreement between Merchant or Guarantor(s)(s) and SPC (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s)(s) each agrees to execute any documents or take any action in connection with this Agreement as SPC deems necessary to perfect or maintain SPC's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s)(s) each hereby authorizes SPC to file any financing statements deemed necessary by SPC to perfect or maintain SPC's security interest. Merchant and Guarantor(s)(s) shall be liable for, and SPC may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by SPC in protecting, preserving and enforcing SPC's security interest and rights.

**Negative Pledge.** Merchant and Guarantor(s)(s) each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease.** SPC shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, SPC may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that SPC may enter into an agreement with Merchant's landlord giving SPC the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

**Remedies.** Upon any Event of Default, SPC may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to SPC, whether by acceleration or otherwise.



Initial(1) _____    Initial(2) _____

## GUARANTY OF PERFORMANCE

As an additional inducement for SPC to enter into the Revenue Purchase Agreement, the undersigned Guarantor(s)(s) hereby provides SPC with this Guaranty. Guarantor(s)(s) will not be personally liable for any amount due under the Revenue Purchase Agreement unless Merchant commits an Event of Default pursuant to Paragraph 3.1 of the Revenue Purchase Agreement. Each Guarantor(s) shall be jointly and severally liable for all amounts owed to SPC in the Event of Default. Guarantor(s)(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement including the Merchant's full and timely delivery of the Purchased Amount pursuant to (and limited by) the Revenue Purchase Agreement, in each case as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor(s)'s obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor(s) Waivers.** In the event of a breach of the above, SPC may seek recovery from Guarantor(s)s for all of SPC's losses and damages by enforcement of SPC's rights under this Agreement without first seeking to obtain payment from Merchant, any other Guarantor(s), or any Collateral or Additional Collateral SPC may hold pursuant to this Agreement or any other guaranty. In addition, Section 4.5, 4.10 and 4.11 are expressly reiterated in the Security Agreement and Guaranty herein. SPC is not required to notify Guarantor(s) of any of the following events and Guarantor(s) will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) SPC's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to SPC. In addition, SPC may take any of the following actions without releasing Guarantor(s) from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to SPC; (ii) release Merchant from its obligations to SPC; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor(s) to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to SPC under the Merchant Agreement and this Agreement are paid in full, Guarantor(s) shall not seek reimbursement from Merchant or any other Guarantor(s) for any amounts paid by it under this Agreement. Guarantor(s) permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other Guarantor(s), or any collateral provided by Merchant or any other Guarantor(s), for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that SPC must return any amount paid by Merchant or any other Guarantor(s) of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor(s)'s obligations under this Agreement shall include that amount.

Guarantor(s) Acknowledgement. Guarantor(s) acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (iii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iv) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

This Security Agreement and Guaranty and Guaranty of Performance shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if SPC so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant, Guarantor and Corporate Guarantors waives any right to oppose any motion or application made by SPC to transfer such proceeding to an Acceptable Forum.

The Merchant Guarantor(s) and Corporate Guarantor(s) acknowledge that they have read Paragraph 4.5 of this Agreement in its entirety and understand that they are waiving their right to Service of Process by traditional manners and will accept process of any Summons and Complaint or other legal process by certified mail return receipt requested to the Mailing Address on Page 1 of this Agreement.

FOR ALL MERCHANT(S) (#1)By: KRISTEN ZANKL
(Print Name and Title)                                    (Signature)
SSN# ██████

FOR ALL MERCHANT(S) (#2)By: SCOTT THOMAS ZANKL
(Print Name and Title)                                    (Signature)
SSN# ██████

GUARANTOR(S) (#1)By: KRISTEN ZANKL
(Print Name and Title)                                    (Signature)
SSN# ██████

GUARANTOR(S) (#2)By: SCOTT THOMAS ZANKL
(Print Name and Title)                                    (Signature)
SSN# ██████

6

## AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT), DIRECT PAYMENTS (ACH DEBITS), AND CHECK DEBIT

**Merchant:** EXCELL AUTO GROUP, INC. AND ALL ENTITIES LISTED ON THE " EXHIBIT A"

(Merchant's Legal Name)

**Merchant Agreement:** Merchant Agreement between SPC and Merchant, dated as of: 08/31/2021

**Designated Checking Account:**

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Authorization Agreement for Direct Deposit (ACH Credit), Direct Payments (ACH Debits), and Check Debit is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep a copy of this important legal document for Merchant's records.**

**DISBURSEMENT OF ADVANCE PROCEEDS.** By signing below, Merchant authorizes SPC to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Merchant also authorizes SPC to collect amounts due from Merchant under the Merchant Agreement by initiating ACH debits or to initiate a Check Debit to the Designated Checking Account, as follows:**

**Bank Name:** CHASE      **Branch:** _____

**Federal ID#:** 80-0344450

**ABA: Routing:** ▮▮▮▮▮      **DDA: Account:** ▮▮▮▮▮

**Bank Name:** _____      **Branch:** _____

**Federal ID#:** _____

**ABA: Routing:** _____      **DDA: Account:** _____

In the Amount of: $ 150,000.00

(Or) Percentage of each Banking Deposit: 20   %

On the Following Days: _____

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Merchant's financial institution for any reason, including without limitation insufficient funds, Merchant understands that SPC may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Merchant also authorizes SPC to initiate ACH entries to correct any erroneous payment transaction.

**MISCELLANEOUS.** SPC is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association). This Authorization Agreement is to remain in full force and effect until SPC has received written notification from Merchant at the address set forth below at least 5 banking days prior of its termination to afford SPC a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Checking Account. Merchant will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

Merchant agrees to be bound by the ACH Rules as defined by the National ACH Association (NACHA). Merchant understands that this authorization is to remain in full force and effect until SPC has received written notification from me of its termination at least five (5) business days prior to the payment due date. Merchant further understands that canceling their ACH authorization does not relieve them of the responsibility of paying account in full, and that if Merchant cancels or revokes this authorization before any remaining debt is paid in full, the SPC may take additional actions including legal actions to secure the debt.

EXCELL AUTO GROUP, INC. AND ALL ENTITIES LISTED ON THE " EXHIBIT A"

Merchant: _____

(Merchant's Legal Name)

Print Name: KRISTEN ZANKL

x _____
(Signature)

(Title) _____

Date: 08/31/2021
(Month) (Day) (Year)

Print Name: SCOTT THOMAS ZANKL

x Scott Thomas Zankl
(Signature)

(Title) _____

Date: 08/31/2021
(Month) (Day) (Year)

PROPERTY OF SPIN CAPITAL

# APPENDIX A - THE FEE STRUCTURE:

**A.** **Underwriting Fee:** $ 25,000.00 to cover Underwriting and relates expenses.

**B.** **UCC Filing Fee:** $499.00 and are not an automated process, requiring us to charge this fee to cover costs.

**C.** **NSF Fee Standard:** $50.00 (each) up to TWO TIMES ONLY before a default is declared.

**D.** **Bank Change Fee:** $50.00 When Merchant requires a change of Bank Account to be debited, requiring us to adjust our system.

**E.** **Blocked ACH Payment:** $5,000.00 This fee is applied when Merchant directs the bank to BLOCK our ACH Debits. Blocking ACH Debits will place Merchant's account in default.

**F.** **Default Fee:** Shall be applied to Merchant's account in the event that Merchant defaults under the terms of the Merchant Agreement.

**G.** **ACH Processing Fee:** $249.00 (or 10% of the contract amount, depending on size of advance) ACH's are labor intensive

**H.** **Account Management Fee:** At the end of each month, Merchant will pay to SPC an Account Management Fee. This fee will not be applied towards the reduction of the Purchased Amount. This monthly fee will equal the average of all the payments received as a Specified percentage of the Merchants settlement amount for that Month.

**I.** **Miscellaneous Service Fee:** Merchant shall pay certain fees for services related to the origination and maintenance of Accounts. Each Merchant shall receive their funding electronically to their designated bank account and will be charged $30.00 for a Fed Wire or 0.00 for a bank ACH. The current charge for the underwriting and origination of each Merchant

**J.** **Working Capital Funding:** A fee of $5,000.00 or 10% shall be applied every time Merchant enters into any arrangement, agreement, or commitment that relates to or involves the Receipts, whether in the form of a purchase of, a loan against, collateral against or the sale or purchase of credits against, Receipts or future check sales with any party other than SPC

**K.** **Contract Service Fee:** Commencing at date funded (the "Start Date"), merchant shall pay a fee of $499.00 per month (the "Monthly Fee") the monthly fee is payable each month during the term of this agreement, at a minimum of three months.

**L.** **Attorney's Fee:** Up to 30% of remaining balance (purchased amount less amount remitted by Merchant) shall be immediately assessed Merchant and Guarantor(s) agree that the calculation for Attorney's Fees is reasonable. When a merchant breaches any term of this Agreement and SPC is required to retain counsel to enforce, defend or collect any term of this Agreement.

[ALL FEES ARE SUBJECT TO CHANGE]

**FOR THE MERCHANT (#1)** By: KRISTEN ZANKL

(Print Name and Title)

DocuSigned by:

6CEA230F51E247A... (Signature)

**FOR THE MERCHANT (#2)** By: SCOTT THOMAS ZANKL

(Print Name and Title)

DocuSigned by:
Scott Thomas Zankl
763D464660D2410... (Signature)

PROPERTY OF SPIN CAPITAL

**Bank Login Information**

Dear Merchant,

Thank you for accepting this offer from SPC. We look forward to being your funding partner for as long as you need.

**Daily ACH Program:**

SPC will require viewing access s to your bank account, each business day, in order to verify the amount of your daily payment. Please be assured that we carefully safeguard your confidential information, and only essential personnel will have access to it.

SPC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

* Be sure to indicate capital or lower-case letters.

Name of Bank: _____

Bank portal website:

Username: _____

Password: _____

Security Question / Answer 1: _____

Security Question /Answer 2: _____

Security Question / Answer 3: _____

Any other information necessary to access your account:

_____

KRISTEN ZANKL                                                    08/31/2021

FOR THE MERCHANT (#1) By:                                        Date

SCOTT THOMAS ZANKL                                               08/31/2021

FOR THE MERCHANT (#2) By:                                        Date

9

# *SPIN CAPITAL*
### *BALANCE TRANSFER AGREEMENT*

08/31/2021

*RE: EXCELL AUTO GROUP, INC*

Dear KRISTEN ZANKL & SCOTT THOMAS ZANKL,

This letter is to confirm that you, KRISTEN ZANKL & SCOTT THOMAS ZANKL, as principal/owner/manager of EXCELL AUTO GROUP, INC, agrees to pay off the remaining RTR of $281,062.50 which currently exists on the previous Merchant Agreement with SPIN CAPITAL entered into on or about 06/01/2021 and agrees to pay off the remaining RTR of $469,500.00 which currently exists on the previous Merchant Agreement with SPIN CAPITAL entered into on or about 07/09/2021 from funds you are receiving from your new Merchant Agreement with SPIN CAPITAL 08/31/2021.

By signing this Agreement, you are authorizing SPIN CAPITAL to deduct $281,062.50 and $469,500.00 out of the new Merchant Agreement.

*AGREED AND ACCEPTED BY:*

---

8/31/2021

**KRISTEN ZANKL**                                    **DATE**

*individually and on behalf of*

**EXCELL AUTO GROUP, INC**

9/2/2021

**SCOTT THOMAS ZANKL**                               **DATE**

*individually and on behalf of*

**EXCELL AUTO GROUP, INC**

# SPIN CAPITAL
## PREPAYMENT DISCOUNT ADDENDUM

This is an addendum for your contract dated **08/31/2021** for **EXCELL AUTO GROUP, INC..** This addendum stipulates the following:

-If merchant pays within 45 Calendar days, payback will be adjusted to $2,400,000.

This addendum will only be considered if the following conditions are met:

- No Missed Payment
- No additional Positions are added.
-

Merchant Signature: KRISTEN ZANKL

DocuSigned by:

_____
6C5A230F51E247A...

Title: _____

Date: _____


Merchant Signature: SCOTT THOMAS ZANKL

DocuSigned by:

Scott Thomas Zankl
766D464660D2410...

Title: _____

Date: _____


**Note**
**SPIN CAPITAL** Approval is good if funded within 10 days.


Thanks

# SPIN CAPITAL
## ADDENDUM

This is an addendum for your contract dated **08/31/2021** for
**EXCELL AUTO GROUP, INC..** This addendum stipulates the following:

- This letter is to confirm scheduled payments these up coming dates below.

The first payment will be of the amount of **$93,687.50** on 09/07/2021 and
The second payment will be of the amount of **$40,000.00** on 09/08/2021,
the following payment will be on Thursday 09/16/2021 for the amount of
**$150,000.00**

Merchant Signature: KRISTEN ZANKL

_____

Title: _____
Date: _____

Merchant Signature: SCOTT THOMAS ZANKL

DocuSigned by:

*Scott Thomas Zankl*

763D464660D2410...

Title: _____
Date: _____

**Note**
**SPIN CAPITAL** Approval is good if funded within 10 days.

Thanks

# EXHIBIT H

Exhibit 3

# *HI BAR CAPITAL*
### *BALANCE TRANSFER AGREEMENT*

10/27/2021

*RE: EXCELL AUTO GROUP, INC.*

Dear KRISTEN ZANKL,

This letter is to confirm that you, KRISTEN ZANKL, as principal/owner/manager of EXCELL AUTO GROUP, INC., agrees to pay off the remaining RTR of $2,114,312.50 which currently exists on the previous Merchant Agreement with SPIN CAPITAL entered into on or about 08/31/2021 from funds you are receiving from your new Merchant Agreement with HI BAR CAPITAL dated 10/27/2021.

By signing this Agreement, you are authorizing HI BAR CAPITAL to deduct $2,114,312.50 out of the new Merchant Agreement.

*AGREED AND ACCEPTED BY:*

DocuSigned by:

6CEA230F51E247A...

10/28/2021

**KRISTEN ZANKL**                                        **DATE**
*individually and on behalf of*
 **EXCELL AUTO GROUP, INC.**

DocuSigned by:
Scott Thomas Zankl
783D464660D2410...

11/1/2021

**SCOTT THOMAS ZANKL**                                   **DATE**
*individually and on behalf of*
 **EXCELL AUTO GROUP, INC.**

# EXHIBIT I

# HI BAR CAPITAL

### REVENUE PURCHASE AGREEMENT

This Revenue Purchase Agreement and Security Agreement and Guaranty of Performance ("Agreement") dated 10/27/2021 between HI BAR CAPITAL ("HBC") the Merchant(s) listed below ("Merchant") and the Individual(s) listed below ("Guarantor")

### MERCHANT INFORMATION

Merchant's Legal Name: EXCELL AUTO GROUP, INC. AND ALL ENTITIES LISTED ON THE "EXHIBIT A"

D/B/A: EXCELL AUTO GROUP, INC. AND ALL ENTITIES LISTED ON THE "EXHIBIT A"

State of Incorporation / Organization: FL

Type of Entity INC

Physical Address: 1001 CLINT MOORE ROAD #101

City: BOCA RATON    State: FL    Zip: 33487    Business Phone:

Guarantor(s) Name: KRISTEN ZANKL    Cellphone Number:    Email Address:

Mailing Address: 1001 CLINT MOORE ROAD #101    City: BOCA RATON    State: FL    Zip: 33487

Purchase Price: $ 2,120,000.00    Purchased Percent 20    %    Purchased Amount: $ 3,177,880.00

Payment Frequency: WEEKLY    Remittance $ 150,000.00

In consideration of payment by HBC to Merchant of the Purchase Price set forth above, Merchant hereby sells, assigns and transfers to HBC (making HBC the absolute owner) the Purchased Percentage of all of Merchant's payments, receipts, settlements and funds paid to or received by or for the account of Merchant from time to time on and after the date hereof in payment or settlement of Merchant's existing and future accounts, payment intangibles, credit, debit and/or stored value card transactions, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other payors or obligors (the "Future Receipts" defined as all payments made by cash, check, clearinghouse settlement, electronic transfer or other form of monetary payment), for the payments to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the Purchased Amount has been delivered by or on behalf of Merchant to HBC.

Merchant is selling a portion of a future revenue stream to HBC at a discount, and is not borrowing money from HBC, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by HBC. The Remittance is a good faith estimate of HBC's share of the future revenue stream going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. HBC is entering this Agreement knowing the risks that Merchant's business may not perform as expected or fail, and HBC assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give HBC a reasonable and fair opportunity to receive the benefit of its bargain. HBC acknowledges that it may never receive the Purchased Amount if the Merchant does not generate sufficient revenue. Merchant and Guarantor(s)(s) are only guaranteeing their performance of the terms of this Revenue Purchase Agreement and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4 and Paragraph 1.5.

HBC will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, HBC (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as HBC receives payment in full of the Purchased Amount. Merchant hereby authorizes HBC to ACH debit the agreed Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. Merchant agrees not to make or cause debits to the Account (other than in favor of HBC) at any time that would cause the balance therein on any business day to be insufficient to fund payment in full of the agreed Remittance. The Account may not be used for any personal, family or household purposes. Merchant will provide HBC with all required access codes and monthly bank statements regarding the Account so that HBC may monitor the Account. HBC payment of the Purchase Price shall be deemed the acceptance and performance by HBC of this Agreement. Merchant understands that it is responsible for ensuring that the agreed Remittance to be debited by HBC remains in the Account and will be held responsible for any fees incurred by HBC resulting from a rejected ACH attempt or an Event of Default. HBC is not responsible for any overdrafts or rejected transactions that may result from HBC's ACH debiting the agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between HBC and Merchant, upon the occurrence of an Event of Default of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.

FOR THE MERCHANT (#1) By: KRISTEN ZANKL
(Print Name and Title)

FOR THE MERCHANT (#2) By: SCOTT THOMAS ZANKL
(Print Name and Title)

BY GUARANTOR(S) (#1) By: KRISTEN ZANKL
(Print Name and Title)

BY GUARANTOR(S) (#2) By: SCOTT THOMAS ZANKL
(Print Name and Title)

DocuSigned by:
Scott Thomas Zankl
(Signature)

Scott Thomas Zankl
(Signature)

1    TERMS OF ENROLLMENT IN PROGRAM

1.1    **Merchant Deposit Agreement and Processor.** Merchant shall (A) execute an agreement acceptable to hbc with a Bank acceptable to hbc to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to HBC with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide HBC and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes HBC and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to HBC for the receipts as specified herein and to pay such amounts to HBC. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre- approved by HBC or not. This additional authorization is not a waiver of HBC's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which HBC did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of HBC.

1.2    **Term of Agreement.** This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by HBC as per the terms of this Agreement.

1.3    **Reconciliation.** As long as an Event of Default, or breach of this agreement, has not occurred, Merchant may request a retroactive reconciliation of the total Remittance Amount. All requests hereunder must be in writing to Reconciliations@hibrcapital.com Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding if applicable, from the date of this Agreement through and including the date the request is made. HBC retains the right the request additional reasonable documentation including without limitation bank login or access to view Merchant's accounts using third party software, and Merchant's refusal to provide access shall be a breach of this Agreement and HBC shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by HBC within two (2) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by HBC shall equal the Specific Percentage of the Future Receipts that Merchant collected during the requested month. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with HBC's right and ability to debit Merchant's Account while the request is pending or to unilaterally modify the Remittance Amount, in any method other than the ones listed in this Agreement.

1.4    **Adjustments to the Remittance.** As long an Event of Default, or breach of this agreement, has not occurred, Merchant may give notice to HBC to request a decrease in the Remittance, should they experience a decrease in its Future Receipts. All requests hereunder must be in writing to Reconciliations@hibercapital.com and must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding from the date of this Agreement through and including the date the request is made. HBC retains the right the request additional reasonable documentation including without limitation bank login or 3rd party software access to view Merchant's accounts, refusal to provide access shall be a breach of this Agreement and HBC shall have no obligation to reconcile. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Merchant shall provide HBC with viewing access to their bank account as well as all information reasonably requested by HBC to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

1.5    **Financial Condition.** Merchant and Guarantor(s)(s) (as hereinafter defined and limited) authorize HBC and its agents to investigate their financial responsibility and history, and will provide to HBC any authorizations, bank or financial statements, tax returns, etc., as HBC requests in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. HBC is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

1.6    **Transactional History.** Merchant authorizes all of its banks, brokers and processor to provide HBC with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide HBC with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from HBC.

1.7    **Indemnification.** Merchant and Guarantor(s)(s) hereby jointly and severally indemnify and hold harmless HBC and each Processor, their respective officers, directors, agents and representatives, and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any such indemnitee as a direct or indirect result of (a) claims asserted by HBC for monies owed to HBC from Merchant and (b) actions taken by indemnitee in reliance upon any fraudulent, misleading or deceptive information or instructions provided by HBC.

1.8    **No Liability.** In no event will HBC be liable for any claims asserted by Merchant or Guarantor(s)s under any legal or equitable theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s)(s). In the event these claims are nonetheless raised, Merchant and Guarantor(s)s will be jointly liable for all of HBC's attorney's fees and expenses resulting therefrom.

1.9    **Reliance on Terms.** Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, HBC, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action. 1.10    **Sale of Receipts.** Merchant and HBC agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from HBC to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. HBC has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Merchant acknowledges that HBC's share of Receipts collected are being held by Merchant in trust and are the sole property of HBC until they are remitted to HBC. Payments made to HBC in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. By this Agreement, Merchant transfers to HBC full and complete ownership of the Purchased Amount and Merchant retains no legal or equitable interest therein. HBC hereby appoints Merchant, and Merchant accepts appointment, as servicer for and on behalf of HBC for the purpose of collecting and delivering Receipts to HBC as required by this Agreement until HBC has received the Receipts Purchased Amount, and Merchant agrees that all such Receipts shall be received and held in trust for the benefit of SPFL for purposes of carrying out the terms of this Agreement. Merchant agrees that it will treat the amounts received and the Purchased Receipts delivered to HBC under this Agreement in a manner consistent with a sale in its accounting records and tax returns. Merchant agrees that HBC is entitled to audit Merchant's accounting records upon reasonable notice in order to verify compliance. Merchant waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Merchant asserts that this transaction is anything other than a sale of future receipts. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that HBC has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and HBC shall promptly refund to Merchant any interest received by HBC in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that HBC not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

1.11    **Power of Attorney.** Merchant irrevocably appoints HBC and its agents and representatives, as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to HBC from Processor, or in the case of a violation by Merchant of Section 1 or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to HBC; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s)(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which HBC may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by merchant

1.12    **Protections against Default.** The following Protections 1 through 8 may be invoked by HBC immediately and without notice to Merchant in the event: (a)

Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the HBC electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to HBC; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts or ceases the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of HBC, and (ii) the written agreement of any HBC or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to HBC; (e) Merchant takes any action; fails

PROPERTY OF HI BAR CAPITAL

Initial(1)_____    Initial(2)_____

2

to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; (f) Merchant fails to provide HBC with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from HBC; or (g) Merchant breaches any terms of this Agreement, including but not limited any of the Events of Default contained in Section 3.1 herein. These protections are in addition to any other remedies available to HBC at law, in equity or otherwise pursuant to this

Agreement.

**Protection 1.** The full uncollected Purchased Amount plus all fees (including attorney's fees and costs of collection in the amount of 30% of the Purchased Amount then outstanding due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** HBC may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant hereby authorizes HBC to execute in the name of the Merchant a Confession of Judgment in favor of HBC pursuant to the terms of the Confession of Judgment. Upon an Event of Default, HBC may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

**Protection 4.** HBC may enforce its security interest in the Collateral including sending demand letters to account debtors and credit card processors.

**Protection 5.** HBC may exercise any and all rights and remedies of a secured party under Uniform Commercial Code Article 9

**Protection 6.** HBC may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if HBC recovers a Judgment against Merchant, Merchant shall be liable for all of HBC's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to HBC. Upon breach of any provision in this Agreement, HBC may exercise its rights under this Assignment of Lease without prior Notice to Merchant. **Protection 8.** HBC may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to HBC. **Protection 8.** HBC may debit Merchant's depository accounts wherever situated in such amounts as determined by HBC in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Amount and other amounts owed by Merchant to HBC by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to HBC.

**1.13 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor(s), in respect of himself or herself personally, authorizes HBC to disclose information concerning Merchant's and each Owner's and each Guarantor(s)'s credit standing (including credit bureau reports that HBC obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor(s) hereby and each waives to the maximum extent permitted by law any claim for damages against HBC or any of its affiliates relating to any (i)investigation undertaken by or on behalf of HBC as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.14 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by HBC, including this Agreement and any other HBC documents (collectively, "Confidential Information") are proprietary and confidential information of HBC. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of HBC to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles HBC to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.15 Publicity.** Merchant and each of Merchant's Owners and all Guarantor(s)s hereto all hereby authorizes HBC to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.16 D/B/A's.** Merchant hereby acknowledges and agrees that HBC may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between HBC and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**2**              **REPRESENTATIONS, WARRANTIES AND COVENANTS**

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

**2.1**              **Financial Condition and Financial Information.** Merchant's and Guarantor(s)' bank and financial statements, copies of which have been furnished to HBC, and future statements which will be furnished hereafter at the discretion of HBC, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantor(s)s have a continuing, affirmative obligation to advise HBC of any material adverse change in their financial condition, operation or ownership. HBC may request statements at any time during the performance of this Agreement and the Merchant and Guarantor(s)s shall provide them to HBC within five business days after request from HBC. Merchant's or Guarantor(s)s' failure to do so is a material breach of this Agreement.

**2.2**              **Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3**              **Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4**              **Use of Funds.** Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes.

**2.5**              **Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without HBC's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6**              **Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and HBC, nor shall Merchant change any of its places of business without prior written consent by HBC.

**2.7**              **Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis if applicable.

**2.8**              **Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from HBC to Merchant, execute, acknowledge and deliver to HBC and/or to any other person, firm or corporation specified by HBC, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9**              **No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection pursuant to the United States Bankruptcy Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10**              **Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Receipts and all collateral in which HBC has been granted a security interest under the Security Agreement, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever other than in favor of HBC or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of HBC.

**2.11**              **Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.12**              **Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity

**2.13**              **Good Faith.** Merchant and Guarantor(s)s hereby affirm that Merchant is receiving the Purchase Price and selling HBC the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business

**3**              **EVENTS OF DEFAULT AND REMEDIES**

**(a)**      Merchant or Guarantor(s) shall violate any term or covenant in this Agreement.

**(b)**      Any representation or warranty by Merchant or Guarantor(s) in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;

**(c)**      the sending of notice of termination by Merchant or verbally notifying HBC of its intent to breach this Agreement.

**(d)**      the Merchant fails to give HBC 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored

3

Initial(1): _____  Initial(2): _____

by Merchant's bank, the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;

(e)     Merchant fails to provide its bank statements, and/or month to date bank activity, and/or accounts receivable reports, and/or login information within two (2) business days of a request by HBC.

(f)     Merchant shall voluntarily transfer or sell all or substantially all its assets.

(g)     Merchant shall make or send notice of any intended bulk sale or transfer by Merchant.

(h)     Merchant shall use multiple depository accounts without the prior written consent of HBC or takes any other action that intentionally interferes with or prevents HBC from receiving the Purchased Amount in accordance with the terms of this Agreement.

(i)     Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party.

(j)     Merchant shall change its depositing account without the prior written consent of HBC; or

(k)     Merchant shall close its depositing account used for ACH debits without the prior written consent of HBC

(l)     Merchant's bank returns a code other than NSF cutting HBC from its collections

(m)     Merchant or any Owner/Guarantor(s), directly or indirectly, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, which operates a business similar to or competitive with that of Merchant.

(n)     Merchant shall default under any of the terms, covenants and conditions of any other agreement with HBC.

3.2     Limited Personal Guaranty. Upon the occurrence of an Event of Default, HBC will enforce its rights against the Guarantor(s) of this transaction. Said Guarantor(s)s will jointly and severally liable to HBC for all of HBC's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

3.3     Remedies. Upon the occurrence of an Event of Default occurs and is not waived pursuant to Section 4.4 hereof, HBC may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy, including but not limited to filing the Confession of Judgment and executing thereon, and enforcing the Security Agreement contained herein. All rights, powers and remedies of HBC in connection with this Agreement may be exercised at any time by HBC after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.4     Attorney's Fees. Upon the occurrence of an Event of Default, and HBC retains an attorney or law firm to enforce this Agreement, Merchant and Guarantor(s) agree that a fee equal to 30% of the Remaining Balance (purchased amount less amount remitted by Merchant) ("Attorney's Fees") shall be immediately assessed Merchant and Guarantor(s) agree that the calculation for Attorney's Fees is reasonable.

3.5     Costs. Merchant shall pay to HBC all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof; and(c) the enforcement of HBC's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

3.6     Required Notifications. Merchant is required to give HBC written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give HBC seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

**4     MISCELLANEOUS**

4.1     Modifications; Agreements. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by HBC.

4.2     Assignment. HBC may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part

4.3     Notices. All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to HBC shall become effective only upon receipt by HBC. Notices to Merchant shall become effective three days after mailing.

4.4     Waiver Remedies. No failure on the part of HBC to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

4.5     Binding Effect; Governing Law, Venue and Jurisdiction. This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums attachments, exhibits, and other documents relating to this Agreement in any way, shall be binding upon and inure to the benefit of Merchant and Guarantor(s) on the one hand, and HBC and their respective successors and assigns, except that Merchant and Guarantor(s) shall nor have the right to assign its rights hereunder or any interest herein without the prior written consent of HBC which consent may be withheld in HBC's sole discretion. HBC reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums, attachments, exhibits, and other documents relating to this Agreement in any way, shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if HBC so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). All Parties to this Agreement, including but not limited to, Merchant, Guarantor(s), Corporate Guarantor(s) Merchant and Guarantor(s) that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant and Guarantor(s) waives any right to oppose any motion or application made by HBC to transfer such proceeding to an Acceptable Forum. Merchant and Guarantor(s) hereby agree that the mailing of any Summons and Complaint in any proceeding commenced by HBC by certified or registered mail, return receipt requested to the Mailing Address listed on this Agreement, or via email to the Email Address listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invaliditing service performed in accordance with such other provisions.

4.6     Survival of Representation, etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

4.7     Interpretation. All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

4.8     Severability. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

4.9     Entire Agreement. Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant Guarantor(s) and Corporate Guarantor(s)s and HBC and supersede all prior agreements and understandings relating to the subject matter hereof.

4.10     JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THEENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND     ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

4.11     CLASS ACTION WAIVER. THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

4.12     Facsimile & Digital Acceptance. Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.

Initial(1)                Initial(2)

**FILED: KINGS COUNTY CLERK 08/10/2022 06:58 PM**
INDEX NO. 502846/2022

NYSCEF DOC. NO. 100    Case 23-01132-EPK    Doc 1    Filed 06/30/23    Page 108 of 132    RECEIVED NYSCEF: 08/10/2022

**FILED: KINGS COUNTY CLERK 01/28/2022 05:08 PM**
INDEX NO. 502846/2022

NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 01/28/2022

## SECURITY AGREEMENT AND GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY OF PEFORMANCE. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS

Merchant's Legal Name: EXCELL AUTO GROUP, INC. AND ALL ENTITIES LISTED ON THE " EXHIBIT A"

D/B/A: EXCELL AUTO GROUP, INC. AND ALL ENTITIES LISTED ON THE " EXHIBIT A"    Federal ID#:

Physical Address: 1001 CLINT MOORE ROAD #101    City: BOCA RATON    State: FL    Zip: 33487

### SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. To secure Merchant's obligations under the Revenue Purchase Agreement to make available or deliver Purchased Amount to HBC and HBC's right to realize the Purchased Amount, as and to the extent required by the terms of the Revenue Purchase Agreement, and performance and compliance by Merchant with its other undertakings and agreements herein, Merchant and Guarantor(s)(s) grants to HBC a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s)(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s)(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to HBC under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to HBC upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover HBC's entitlements under this Agreement, HBC is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of HBC's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, HBC or an affiliate of HBC is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

In the event Merchant, any of its officers or directors or any Owner/Guarantor(s), during the term of the Revenue Purchase Agreement or while Merchant remains liable to HBC for any obligations under the Revenue Purchase Agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due HBC under the Revenue Purchase Agreement. With respect to any such entity, HBC shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. HBC shall be held harmless by Merchant and each Owner/Guarantor(s) and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. HBC shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of HBC's rights, including without limitation, HBC's right to collect all accounts, and to notify any payment card processor or creditor of such entity that HBC has such rights in such entity's assets. Merchant also agrees that, at the HBC's discretion, HBC may choose to amend any existing financing statement to include any such newly formed entity as debtor.

This security interest may be exercised by HBC without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. HBC shall have the right to notify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, HBC has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, HBC will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from HBC written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor(s) (s) agree(s) that this is a contract of recoupment and HBC is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s)(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by HBC. Merchant and Guarantor(s)(s) agree(s) to execute and deliver to HBC such instruments and documents HBC may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. HBC is authorized to execute all such instruments and documents in Merchant's and Guarantor(s)(s) name.

Merchant and Guarantor(s)(s) each acknowledge and agree that any security interest granted to HBC under any other agreement between Merchant or Guarantor(s)(s) and HBC (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s)(s) each agrees to execute any documents or take any action in connection with this Agreement as HBC deems necessary to perfect or maintain HBC's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s)(s) each hereby authorizes HBC to file any financing statements deemed necessary by HBC to perfect or maintain HBC's security interest. Merchant and Guarantor(s)(s) shall be liable for, and HBC may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by HBC in protecting, preserving and enforcing HBC's security interest and rights.

**Negative Pledge.** Merchant and Guarantor(s)(s) each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease.** HBC shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, HBC may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that HBC may enter into an agreement with Merchant's landlord giving HBC the right. (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

**Remedies.** Upon any Event of Default. HBC may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to HBC, whether by acceleration or otherwise


Initial(1)    Initial(2)

## GUARANTY OF PERFORMANCE

As an additional inducement for HBC to enter into the Revenue Purchase Agreement, the undersigned Guarantor(s)(s) hereby provides HBC with this Guaranty. Guarantor(s)(s) will not be personally liable for any amount due under the Revenue Purchase Agreement unless Merchant commits an Event of Default pursuant to Paragraph 3.1 of the Revenue Purchase Agreement. Each Guarantor(s) shall be jointly and severally liable for all amounts owed to HBC in the Event of Default. Guarantor(s)(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement including the Merchant's full and timely delivery of the Purchased Amount pursuant to (and limited by) the Revenue Purchase Agreement, in each case as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor(s)'s obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

Guarantor(s) Waivers. In the event of a breach of the above, HBC may seek recovery from Guarantor(s)s for all of HBC's losses and damages by enforcement of HBC's rights under this Agreement without first seeking to obtain payment from Merchant, any other Guarantor(s), or any Collateral or Additional Collateral HBC may hold pursuant to this Agreement or any other guaranty. In addition, Section 4.5, 4.10 and 4.11 are expressly reiterated in the Security Agreement and Guaranty herein. HBC is not required to notify Guarantor(s) of any of the following events and Guarantor(s) will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) HBC's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to HBC. In addition, HBC may take any of the following actions without releasing Guarantor(s) from any of its obligations under this Agreement. (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to HBC; (ii) release Merchant from its obligations to HBC;

(iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor(s) to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to HBC under the Merchant Agreement and this Agreement are paid in full, Guarantor(s) shall not seek reimbursement from Merchant or any other Guarantor(s) for any amounts paid by it under this Agreement. Guarantor(s) permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other Guarantor(s), or any collateral provided by Merchant or any other Guarantor(s), for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation, (ii) reimbursement, (iii) performance; (iv) indemnification; or (v) contribution. In the event that HBC must return any amount paid by Merchant or any other Guarantor(s) of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor(s)'s obligations under this Agreement shall include that amount.

Guarantor(s) Acknowledgement. Guarantor(s) acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iv) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

This Security Agreement and Guaranty and Guaranty of Performance shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if HBC so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant, Guarantor and Corporate Guarantors waives any right to oppose any motion or application made by HBC to transfer such proceeding to an Acceptable Forum.

The Merchant Guarantor(s) and Corporate Guarantor(s) acknowledge that they have read Paragraph 4.5 of this Agreement in its entirety and understand that they are waiving their right to Service of Process by traditional manners and will accept process of any Summons and Complaint or other legal process by certified mail, return receipt requested to the Mailing Address on Page 1 of this Agreement.

**FOR ALL MERCHANT(S) (#1)** By: KRISTEN ZANKL

(Print Name and Title) _____ (Signature)

----

DocuSigned by:

Scott Thomas Zankl

**FOR ALL MERCHANT(S) (#2)** By: SCOTT THOMAS ZANKL

(Print Name and Title) _____ (Signature)

----

DocuSigned by:

**GUARANTOR(S) (#1)** By: KRISTEN ZANKL

(Print Name and Title) _____ (Signature)

----

DocuSigned by:

Scott Thomas Zankl

**GUARANTOR(S) (#2)** By: SCOTT THOMAS ZANKL

(Print Name and Title) _____ (Signature)

SSN

PROPERTY OF HI BAR CAPITAL

## AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT), DIRECT PAYMENTS (ACH DEBITS), AND CHECK DEBIT

Merchant: EXCELL AUTO GROUP, INC. AND ALL ENTITIES LISTED ON THE " EXHIBIT A"

(Merchant's Legal Name)

Merchant Agreement: Merchant Agreement between HBC and Merchant, dated as of: 10/27/2021

Designated Checking Account:

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. This Authorization Agreement for Direct Deposit (ACH Credit), Direct Payments (ACH Debits), and Check Debit is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep a copy of this important legal document for Merchant's records.

DISBURSEMENT OF ADVANCE PROCEEDS. By signing below, Merchant authorizes HBC to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. By signing below, Merchant also authorizes HBC to collect amounts due from Merchant under the Merchant Agreement by initiating ACH debits or to initiate a Check Debit to the Designated Checking Account, as follows:

Bank Name: _____ Branch: _____

Federal ID#: _____

ABA: Routing: _____ DDA: Account: _____

In the Amount of: $ 150,000.00

(Or) Percentage of each Banking Deposit: 20 %

On the Following Days: MONDAY-FRIDAY

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Merchant's financial institution for any reason, including without limitation insufficient funds, Merchant understands that HBC may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Merchant also authorizes HBC to initiate ACH entries to correct any erroneous payment transaction.

MISCELLANEOUS. HBC is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association). This Authorization Agreement is to remain in full force and effect until HBC has received written notification from Merchant at the address set forth below at least 5 banking days prior of its termination to afford HBC a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Checking Account. Merchant will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

Merchant agrees to be bound by the ACH Rules as defined by the National ACH Association (NACHA). Merchant understands that this authorization is to remain in full force and effect until HBC has received written notification from me of its termination at least five (5) business days prior to the payment due date. Merchant further understands that canceling their ACH authorization does not relieve them of the responsibility of paying account in full, and that if Merchant cancels or revokes this authorization before any remaining debt is paid in full, the HBC may take additional actions including legal actions to secure the debt.

EXCELL AUTO GROUP, INC. AND ALL ENTITIES LISTED ON THE " EXHIBIT A"

Merchant: _____

(Merchant's Legal Name)

Print Name: KRISTEN ZANKL DocuSigned by:

X _____
(Signature)      Kristen

(Title) _____

Date: 10/27/2021
(Month) (Day) (Year)

Print Name: SCOTT THOMAS ZANKL

Scott Thomas Zankl

X _____
(Signature)      scott zankl

(Title) _____

Date: 10/27/2021
(Month) (Day) (Year)

7

## APPENDIX A - THE FEE STRUCTURE:

A. **Underwriting Fee**: $ 5,687.50 to cover Underwriting and relates expenses.

B. **UCC Filing Fee**: $499.00 and are not an automated process, requiring us to charge this fee to cover costs.

C. **NSF Fee Standard**: $50.00 (each) up to TWO TIMES ONLY before a default is declared.

D. **Bank Change Fee**: $50.00 When Merchant requires a change of Bank Account to be debited, requiring us to adjust our system.

E. **Blocked ACH Payment**: $5,000.00 This fee is applied when Merchant directs the bank to BLOCK our ACH Debits. Blocking ACH Debits will place Merchant's account in default.

F. **Default Fee**: Shall be applied to Merchant's account in the event that Merchant defaults under the terms of the Merchant Agreement.

G. **ACH Processing Fee**: $249.00 (or 10% of the contract amount, depending on size of advance) ACH's are labor intensive

H. **Account Management Fee**: At the end of each month, Merchant will pay to HBC an Account Management Fee. This fee will not be applied towards the reduction of the Purchased Amount. This monthly fee will equal the average of all the payments received as a Specified percentage of the Merchants settlement amount for that Month.

I. **Miscellaneous Service Fee**: Merchant shall pay certain fees for services related to the origination and maintenance of Accounts. Each Merchant shall receive their funding electronically to their designated bank account and will be charged $30.00 for a Fed Wire or 0.00 for a bank ACH. The current charge for the underwriting and origination of each Merchant

J. **Working Capital Funding**: A fee of $5,000.00 or 10% shall be applied every time Merchant enters into any arrangement, agreement, or commitment that relates to or involves the Receipts, whether in the form of a purchase of, a loan against, collateral against or the sale or purchase of credits against, Receipts or future check sales with any party other than HBC

K. **Contract Service Fee**: Commencing at date funded (the "Start Date"), merchant shall pay a fee of $499.00 per month (the "Monthly Fee") the monthly fee is payable each month during the term of this agreement, at a minimum of three months.

L. **Attorney's Fee**: $10,000. When merchant breaches any term of this Agreement and HBC is required to retain counsel to enforce, defend or collect any term of this Agreement

[ALL FEES ARE SUBJECT TO CHANGE]

FOR THE MERCHANT (#1) By: KRISTEN ZANKL

(Print Name and Title)

DocuSigned by:

(Signature)

FOR THE MERCHANT (#2) By: SCOTT THOMAS ZANKL

(Print Name and Title)

DocuSigned by:

Scott Thomas Zankl

(Signature)

PROPERTY OF HI BAR CAPITAL

FILED: KINGS COUNTY CLERK 08/10/2022 06:58 PM
INDEX NO. 502846/2022
NYSCEF DOC. NO. 100
Case 23-01132-EPK   Doc 1   Filed 06/30/23   Page 112 of 132
RECEIVED NYSCEF: 08/10/2022
FILED: KINGS COUNTY CLERK 01/28/2022 05:08 PM
INDEX NO. 502846/2022
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 01/28/2022

## EXHIBIT A

## ADDENDUM TO
### THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT AND GUARANTY
This **ADDENDUM TO THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT and GUARANTY (this "Addendum"),** dated 10/27/2021 is entered into by and among **PROPERTY OF HI BAR CAPITAL** ("BUYER") and **Business Legal Name: EXCELL AUTO GROUP, INC** D/B/A: EXCELL AUTO GROUP

Business Legal Name: LEGAL/CORPORATE NAME: KARMA OF PALM BEACH INC
DBA: KARMA OF PALM BEACH
**Form of Business Entity:**

**EIN #:**
("Seller #1"); and

**Business Legal Name:** AUTOMOTIVE SERVICE SYSTEMS, INC.
**Form of Business Entity:**

**EIN #:**
("Seller #2"); and

**Business Legal Name:** KZ CONSULTANTS, INC.
**Form of Business Entity:**

**EIN #:**
("Seller #3"); and

**Business Legal Name:** MISS KRIS, LLC
**Form of Business Entity:**

**EIN #:**
("Seller #4"); and

**Business Legal Name:** EXCELL AUTO LEASING INC
**Form of Business Entity:**

**EIN #:**
("Seller #5"); and

**Business Legal Name:** EXCELL AUTO WHOLESALE INC.
**Form of Business Entity:**

**EIN #:**
("Seller #6"); and

**Business Legal Name:** DEALER SOUQ USA LLC
**Form of Business Entity:**

**EIN #:**
("Seller #7"); and

**Business Legal Name:** EAG WHOLESALE LLC
**Form of Business Entity:**

**EIN #:**
("Seller #8"); and

**Business Legal Name:** KARMA OF BROWARD, INC.
**Form of Business Entity:**

**EIN #:**
("Seller #9"); and

**Business Legal Name:** LAVISH HERO FUND INC
**Form of Business Entity:**

**EIN #:**
("Seller #10"); and

**Business Legal Name:** KARMA OF PALM BEACH, INC.
**Form of Business Entity:**

**EIN #:**
("Seller #11"); and

**Business Legal Name:** APPLE 3 INVESTMENTS, INC.
**Form of Business Entity:**

**EIN #:**
("Seller #12"); and

FILED: KINGS COUNTY CLERK 01/28/2022 05:08 PM    INDEX NO. 502846/2022
NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 01/28/2022

**Business Legal Name:** KZ CONSULTANTS INC

**Form of Business Entity:**

EIN #:

("Seller #13"); and

**Business Legal Name: EXCELL AUTO SPORT AND SERVICE, INC**

EIN #:

("Seller #14").

**Signature:** [DocuSigned by signature]

Name: **KRISTEN ZANKL**

**Title: OWNER**

**Signature:** [DocuSigned by: Scott Thomas Zankl]

**Name: SCOTT THOMAS**

**Title: OWNER 2**

Hereinafter: (i) Seller # 1 is referred to as the "Original Seller"; and (ii) Seller # 2, Seller # 3 and Seller # 4 are referred to, individually and collectively, jointly and severally, as the "Additional Seller"; and (iii) the Original Seller and the Additional Seller are referred to, individually and collectively, jointly and severally, as the "Seller."

Hereinafter, Guarantor # 1 is referred to as the "Original Guarantor."

**W-I-T-N-E-S-S-E-T-H**

**WHEREAS,** BUYER, the Original Seller and the Original Guarantor entered into that certain FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT, dated 10/27/2021    (the "Agreement"); and

**WHEREAS,** the obligations of the Original Seller under the Agreement are further guaranteed by the Original Guarantor pursuant to the Personal Guaranty of Performance set forth as Exhibit

A to the Agreement (the "Guaranty"); and

**WHEREAS,** the parties hereto desire to amend and restate the Agreement by adding the name(s) of the Additional Seller as the parties to the Agreement, as if the Additional Seller were the signatories to the Agreement.

**NOW, THEREFORE,** for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged, the parties to this Addendum hereby agree to the foregoing and as follows:

Guarantor #1 Initials: [signature]    Guarantor #2 Initials: STZ

PROPERTY OF HI BAR CAPITAL

**Bank Login Information**

Dear Merchant,

Thank you for accepting this offer from HBC. We look forward to being your funding partner for as long as you need.

**Daily ACH Program:**

HBC will require viewing access s to your bank account, each business day, in order to verify the amount of your daily payment. Please be assured that  e w carefully safeguard your confidential information, and only essential personnel will have access to it.

HBC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

* Be sure to indicate capital or lower-case letters.

Name of Bank: _____

Bank portal website:

Username: _____

Password: _____

Security Question / Answer 1: _____

Security Question /Answer 2: _____

Security Question / Answer 3: _____

Any other information necessary to access your account:


_____        DocuSigned by:
                                    [signature]
**KRISTEN ZANKL**                                           10/27/2021

FOR THE MERCHANT (#1) By:           DocuSigned by:           Date
                                    Scott Thomas Zankl
**SCOTT THOMAS ZANKL**                                      10/27/2021

FOR THE MERCHANT (#2) By:                                   Date

PROPERTY OF HI BAR CAPITAL

# EXHIBIT J

# EXHIBIT B

# SETTLEMENT AGREEMENT

# EXHIBIT A

### SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "SETTLEMENT AGREEMENT" or "Agreement") is entered into by and between **EXCELL AUTO GROUP, INC.; KARMA OF PALM BEACH INC; AUTOMOTIVE SERVICE SYSTEMS, INC.; KZ CONSULTANTS, INC.; MISS KRIS, LLC; EXCELL AUTO LEASING INC; EXCELL AUTO WHOLESALE INC.; DEALER SOUQ USA LLC; EAG WHOLESALE LLC; KARMA OF BROWARD, INC.; LAVISH HERO FUND; KARMA OF PALM BEACH, INC.; APPLE 3 INVESTMENTS, INC.; KZ CONSULTANTS INC.; EXCELL AUTO SPORT AND SERVICE, INC.** (collectively the "Seller" or "Sellers"), **KRISTIN ZANKL and SCOTT THOMAS ZANKL** (collectively the "Guarantors,"), and referred to herein together with Seller collectively and individually as (the "Sellers"), and **HI BAR CAPITAL, LLC** ("Purchaser,") and referred to herein collectively with the Sellers as (the "Parties") on this **December 19, 2021** (the "Effective Date").

WHEREAS, the Parties entered into a receivables purchase agreement on **October 27, 2021**; (collectively the "Purchase Agreement")

WHEREAS, on NOVEMBER 16, 2021, the Sellers defaulted on the Purchase Agreement. ("Default Date")

WHEREAS, the Sellers are indebted to Purchaser in the amount of **$2,677,880.00** plus fees and costs.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED BETWEEN THE PARTIES AS FOLLOWS:

Sellers shall pay to Purchaser the agreed amount of **$2,677,880.00** at a 1.50 factor rate for a total payback amount of $4,016,820 ("Settlement Amount") as follows:

1. Payments
   a. Seller shall make payments of **$200,000.00** per week until the balance plus factor rate is paid in full. See attached Payment Schedule attached hereto as **Exhibit "B"**.
   b. First payment shall be due on Monday, December 20, 2021 and shall continue each week until paid in full.
2. Early Payoff Discount.
   a. Within 30 days of execution of this Settlement Agreement, Seller may payoff the Settlement Amount at a discounted factor rate of **1.10** for a total payback amount of **$2,945,668.00**.
   b. If Seller does not exercise this early payoff option, payments shall continue at the agreed payment schedule as listed in Exhibit "B".
3. Payments shall be made by Wire or ACH each week on the scheduled payment dates.

I. **SECURITY AGREEMENT**:
   Sellers and Guarantor agree to provide security interest in the following collateral:

   a. Security Interest in Vehicle
      i. Sellers shall provide an unencumbered security interest in the **2017 Pagani (VIN #ZA9H12UA5HSF76013)**. (the "Vehicle") A copy of the Vehicle's Title is attached

hereto as **Exhibit "A"**.

ii. Sellers shall execute a security interest and any other documents necessary to effectuate this security interest and perfect the lien against the Vehicle.

iii. Sellers shall deliver an original title to the Vehicle to be held in escrow until the Settlement Amount is paid in full.

b. Additional Security

i. As additional security for the prompt and complete payment and performance of any and all liabilities, obligations, covenants or agreements of Seller under this Settlement Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the "Obligations"), Sellers hereby pledge, assign and hypothecate to Purchaser (collectively, "Pledge") and grants to Purchaser a continuing, perfected and first priority lien upon and security interest in, to and under all of Sellers' right, title and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

1. all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Sellers; and all of Sellers' proceeds, as such term is defined by Article 9 of the UCC.

c. REPRESENTATIONS AND WARRANTIES. Sellers warrant and covenant that:

i. No other creditors has a security interest in the Collateral Sellers is the owner of the Collateral free from any adverse lien or encumbrance except this lien and the others described in this Agreement.

ii. Sellers will defend the Collateral against all claims of other persons.

iii. Sellers will immediately notify the Purchaser in writing of any change in name or address.

iv. Sellers will do all such things as Purchaser at any time or from time to time may reasonably request to establish and maintain a perfected security interest in the Collateral.

v. Sellers will pay the cost of filing this agreement in all public offices where recording is deemed by Purchaser to be necessary or desirable. A photographic or other reproduction of this agreement is sufficient as a financing statement.

vi. Sellers will not transfer or encumber the Collateral without the prior written consent of Purchaser.

vii. Sellers will keep the Collateral insured against risk of loss or damage upon such terms as Purchaser may reasonably require.

viii. Sellers will keep the Collateral free from any adverse lien and in good repair, will not waste or destroy the Collateral, and will not use the Collateral in violation of any law or policy of insurance. Purchaser may examine and inspect the Collateral at any reasonable time.

ix. Sellers will pay promptly when due all taxes and assessments upon the Collateral or for its use or operation or upon this Agreement or upon any note evidencing the Obligations.

d. Representations with Respect to Collateral. Sellers hereby represents and warrants to Purchaser that the execution, delivery and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any

action of, or filing with, any governmental authority or other third party to authorize same (other than the filing of the UCC-1s); and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Sellers are a party or by which any of Sellers' assets (including, without limitation, the Collateral) are bound.

e.  Further Assurances. Upon the request of Purchaser, Sellers, at Sellers' sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as Purchaser may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

f.  Attorney-in-Fact. Sellers hereby authorize Purchaser at any time to take any action and to execute any instrument, including without limitation to file one or more financing statements and/or continuation statements, to evidence and perfect the security interest created hereby and irrevocably appoints Purchaser as its true and lawful attorney-in-fact, which power of attorney shall be coupled with an interest, with full authority in the place and stead of Sellers and in the name of Seller or otherwise, from time to time, in Purchaser's sole and absolute discretion, including without limitation (a) for the purpose of executing such statements in the name of and on behalf of Sellers, and thereafter filing any such financing and/or continuation statements, and

to receive, endorse and collect all instruments made payable to Sellers.

2.  There shall be no cure period. If any payment is not received on the aforementioned dates, Purchaser shall have leave to enforce the full balance due less any payments made hereunder.

3.  Purchaser hereby covenants not to sue and forever releases, acquits, and discharges Sellers and any of their guarantors, agents, employees, officers, partners, principals, insurers, representatives, successors, transferees or assigns, from any and all liability, claims, damages or demands Purchaser has now or may have in connection with said Purchase Agreement, unless there is a breach of this Settlement Agreement.

4.  Upon Sellers' fulfillment of its obligations hereunder and the clearance of all payments in accordance with the terms of this Settlement Agreement, Sellers and any applicable guarantor of the sums due under the Receivables Purchase Agreement shall be relieved of any such further liability.

5.  Within five (5) business days after Sellers' fulfillment of its obligations hereunder and the clearance of all payments in accordance with the terms of this Settlement Agreement, Purchaser terminate any/all UCC filings and liens previously filed by Purchaser against Sellers, and release any/all of Sellers' obligations to Purchaser pursuant to the Receivables Purchase Agreement, and Purchaser will so notify Sellers' attorney in writing.

6.  Waiver of Purchaser's Liability. Upon the Effective Date, the Sellers for itself and on behalf of all parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns, hereby releases and forever discharges Purchaser and its respective parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns of and from any and all claims, counterclaims, demands, damages, debts, liabilities, accounts, actions, causes of action and suits, known or unknown, liquidated or contingent, arising from, which may arise in the future from, or which are related in any manner to the Action or the underlying Agreement, including any claims that were or could have been asserted,

FILED: KINGS COUNTY CLERK 03/07/2022 04:19 PM INDEX NO. 502846/2022
NYSCEF DOC. NO. 20 Case 23-01132-EPK Doc 1 Filed 06/30/23 Page 120 of 132 RECEIVED NYSCEF: 03/07/2022

other than Purchaser's obligations under this Settlement Agreement.

7. Withdraw Claims and Consent to Judgment. Seller and Guarantor hereby withdraw any defenses arising from the Purchase Agreement or any pending actions filed by the Purchaser. Sellers and Guarantors further agree to waive all defenses, claims, or counterclaims that may arise from this Agreement or the Purchase Agreement. In the event of default of this Agreement, Purchaser may, without further notice, file a claim for the total indebtedness plus accrued fees and costs less payments received.

8. CONSENT TO JURISDICTION. This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regards to any applicable principles of conflicts of law. Sellers and Guarantors irrevocably submits to the exclusive jurisdiction of any New York county Supreme Court or any federal court sitting within the State of New York over any suit, action or proceeding arising out of or relating to this Agreement. Seller and Guarantor irrevocably waive, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. Seller and Guarantor agree that final judgment in any such suit, action or proceeding brought in such a court shall be enforced in any court of proper jurisdiction by a suit upon such judgment, provided that service of process in such action, suit or proceeding shall have been effected upon the Seller and Guarantor in a manner permitted by law.

9. WAIVER OF SERVICE OF PROCESS. The parties further agree to waive personal service of process and to accept mail by electronic mail or by mailing by certified or registered mail, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

10. Alter Egos. Seller may not own, operate, or affiliate with any entities in the same or similar industry without Purchaser's express consent.

11. Personal Guaranty ("Guaranty"). as an inducement for Purchaser to enter into the Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantors hereby agree as follows:

    a. Defined Terms. All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

    b. Guaranty of Obligations. Guarantors hereby irrevocably, absolutely and unconditionally guarantees to Purchaser prompt, full, faithful and complete performance and observance of all of Sellers' obligations in this Agreement; and Guarantors unconditionally covenants to Purchaser that if default or breach shall at any time be made by Sellers, Guarantors shall well and truly pay or perform (or cause to be paid or performed) the all obligations under this Agreement and pay all damages and other amounts stipulated in the Agreement with respect to the non-performance of the Obligations, or any of them.

    c. Guarantors' Other Agreements. Guarantors will not dispose, convey, sell or otherwise transfer, or cause Sellers to dispose, convey, sell or otherwise transfer, any material business assets of Seller outside of the ordinary course of Sellers' business without the prior written consent of Purchaser, which consent may be withheld for any reason, until receipt of the entire Settlement Amount. Guarantors shall pay to Purchaser upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) of, or incidental to, or relating to the enforcement or protection of Purchaser's rights hereunder or Purchaser's rights under the Agreement. This Guaranty is binding upon Guarantors and Guarantors' heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors and assigns of Purchaser. If there is more than one

FILED: KINGS COUNTY CLERK 03/07/2022 04:19 PM INDEX NO. 502846/2022
NYSCEF DOC. NO. 20    Case 23-01132-EPK   Doc 1   Filed 06/30/23   Page 121 of 132   RECEIVED NYSCEF: 03/07/2022

Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantors shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Sellers and Purchaser, or the existence of any defense, setoff or counterclaim, which Seller may assert. Purchaser is hereby authorized, without notice or demand and without affecting the liability of Guarantors hereunder, to at any time renew or extend Sellers' obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement.

12. **Seller's Obligations Upon Default**. Upon occurrence of an Event of Default due to Seller's breach of its obligations under this Agreement, Seller shall immediately deliver to Purchaser the entire unpaid portion of the Settlement Amount plus fees, penalties, and costs. In addition, Seller shall also pay to Purchaser, as additional damages, any reasonable expenses incurred by Purchaser in connection with recovering the monies due to Purchaser from Seller pursuant to this Agreement, including without limitation the costs of retaining collection firms and reasonable attorneys' fees in the amount 33% of the undelivered portion of the Settlement Amount (collectively, "Reasonable Damages"). The parties agree that Purchaser shall not be required to itemize or prove its Reasonable Damages and that the fair value of the Reasonable Damages, not including attorneys' fees or collections fees, shall be calculated as twenty-five percent (25%) of the undelivered portion of the Settlement Amount upon the occurrence of an event of default.

13. **Remedies Upon Default**. Upon Seller's default, Purchaser may immediately proceed to protect and enforce its rights under this Agreement and/or Guaranty by:
    a. Enforcing its rights as a secured creditor under the Uniform Commercial Code including, without limitation, notifying any account debtor(s) of Seller as the term is defined below, of Purchaser's security interest;
    b. Enforcing the provisions of the personal guaranty against the personal guarantors named herein without first seeking recourse from Seller for the full balance owed at the time of default plus applicable fees and costs;
    c. Commencing a suit in law and/or equity, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Seller's obligations hereunder (including the Personal Guarantee) or any other legal or equitable right or remedy including without limitation Purchaser's rights of a secured party under the UCC.

14. **Remedies are not Exclusive**. All rights, powers and remedies of Purchaser in connection with this Agreement set forth herein may be exercised at any time after the occurrence of any Event of Default, are cumulative and not exclusive and shall be in addition to any other rights, powers or remedies provided to Purchaser by law or equity.

15. Modifications; Agreements. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

16. Assignment. Purchaser may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Sellers. Sellers shall not assign its rights or obligations under this Agreement without first obtaining Purchaser's written consent.

17. Notices. Unless different means of delivering notices are set forth elsewhere in this Agreement, all notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement and shall become effective as of the date of receipt or declined receipt.

18. Waiver Remedies. No failure on the part of Purchaser to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

19. Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties and their

respective successors and permitted assigns.

20. JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

21. Severability. In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

22. Entire Agreement. This Agreement embodies the entire agreement between Seller and Purchaser and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s) and Riders to this Agreement are part of this Agreement.

THE UNDERSIGNED REPRESENT AND WARRANT THAT THEY HAVE READ THIS STIPULATED SETTLEMENT AGREEMENT IN ITS ENTIRETY AND HAVE THE FULL CAPACITY, POWER, AND AUTHORITY TO MAKE THIS AGREEMENT AS SET FORTH ABOVE, AND THAT NO OTHER REPRESENTATIONS OR INDUCEMENTS APART FROM THIS STIPULATED SETTLEMENT AGREEMENT, EITHER WRITTEN OR ORAL, HAVE BEEN MADE.

IN WITNESS WHEREOF, Sellers and Purchaser have hereunder set their hands and seals on **December 19, 2021**.

[SIGNATURES ON FOLLOWING PAGE]

| "SELLERS" | "GUARANTORS" |
|---|---|
| **EXCELL AUTO GROUP, INC.; KARMA OF PALM BEACH INC; AUTOMOTIVE SERVICE SYSTEMS, INC.; KZ CONSULTANTS, INC.; MISS KRIS, LLC; EXCELL AUTO LEASING INC; EXCELL AUTO WHOLESALE INC.; DEALER SOUQ USA LLC; EAG WHOLESALE LLC; KARMA OF BROWARD, INC.; LAVISH HERO FUND; KARMA OF PALM BEACH, INC.; APPLE 3 INVESTMENTS, INC.; KZ CONSULTANTS INC.; EXCELL AUTO SPORT AND SERVICE, INC.** (collectively the "Sellers") | **SCOTT THOMAS ZANKL** "GUARANTOR" |

"SELLERS"

**EXCELL AUTO GROUP, INC.;**
**KARMA OF PALM BEACH INC;**
**AUTOMOTIVE SERVICE SYSTEMS, INC.;**
**KZ CONSULTANTS, INC.; MISS KRIS, LLC;**
**EXCELL AUTO LEASING INC;**
**EXCELL AUTO WHOLESALE INC.;**
**DEALER SOUQ USA LLC;**
**EAG WHOLESALE LLC; KARMA OF BROWARD, INC.;**
**LAVISH HERO FUND; KARMA OF PALM BEACH, INC.;**
**APPLE 3 INVESTMENTS, INC.; KZ CONSULTANTS INC.; EXCELL AUTO SPORT AND SERVICE, INC.** (collectively the "Sellers")

DocuSigned by:

X  _kristin Zankl_

Name: **KRISTIN ZANKL**, individually and as authorized signor on behalf of the Sellers

**EXCELL AUTO GROUP, INC.;**
**KARMA OF PALM BEACH INC;**
**AUTOMOTIVE SERVICE SYSTEMS, INC.;**
**KZ CONSULTANTS, INC.; MISS KRIS, LLC;**
**EXCELL AUTO LEASING INC;**
**EXCELL AUTO WHOLESALE INC.;**
**DEALER SOUQ USA LLC;**
**EAG WHOLESALE LLC; KARMA OF BROWARD, INC.;**
**LAVISH HERO FUND; KARMA OF PALM BEACH, INC.;**
**APPLE 3 INVESTMENTS, INC.; KZ CONSULTANTS INC.; EXCELL AUTO SPORT AND SERVICE, INC.** (collectively the "Sellers")

DocuSigned by:

X  _Scott Thomas Zankl_

Name: **SCOTT THOMAS ZANKL, individually and as authorized signor on behalf of the Sellers**

---

**GUARANTORS**

**SCOTT THOMAS ZANKL**
"GUARANTOR"

DocuSigned by:

X  _Scott Thomas Zankl_

**SCOTT THOMAS ZANKL,**
Individually

**KRISTIN ZANKL**
"GUARANTOR"

DocuSigned by:

X  _kristin Zankl_

**KRISTIN ZANKL,**
Individually

---

"PURCHASER"
HI BAR CAPITAL, LLC

DocuSigned by:

X  _Steven Zakharyayev_

Name: Steven Zakharyayev
Title: Attorney for Purchaser, Hi Bar Capital

# EXHIBIT A



# EXHIBIT B

## PAYMENT SCHEDULE

| Weeks | Payment Due Date | Payments |
|-------|------------------|----------|
| 1 | 12/20/21 | $200,000.00 |
| 2 | 12/27/21 | $200,000.00 |
| 3 | 01/03/22 | $200,000.00 |
| 4 | 01/10/22 | $200,000.00 |
| 5 | 01/17/22 | $200,000.00 |
| 6 | 01/24/22 | $200,000.00 |
| 7 | 01/31/22 | $200,000.00 |
| 8 | 02/07/22 | $200,000.00 |
| 9 | 02/14/22 | $200,000.00 |
| 10 | 02/21/22 | $200,000.00 |
| 11 | 02/28/22 | $200,000.00 |
| 12 | 03/07/22 | $200,000.00 |
| 13 | 03/14/22 | $200,000.00 |
| 14 | 03/21/22 | $200,000.00 |
| 15 | 03/28/22 | $200,000.00 |
| 16 | 04/04/22 | $200,000.00 |
| 17 | 04/11/22 | $200,000.00 |
| 18 | 04/18/22 | $200,000.00 |
| 19 | 04/25/22 | $200,000.00 |
| 20 | 05/02/22 | $216,820.00 |

# EXHIBIT K

# EXHIBIT C

# STIPULATION

## STIPULATION OF SETTLEMENT PURSUANT TO CPLR 3215(i)

THIS STIPULATION OF SETTLMENT (the "STIPULATION OF SETTLEMENT") is entered into by and between **EXCELL AUTO GROUP, INC.; KARMA OF PALM BEACH INC; AUTOMOTIVE SERVICE SYSTEMS, INC.; KZ CONSULTANTS, INC.; MISS KRIS, LLC; EXCELL AUTO LEASING INC; EXCELL AUTO WHOLESALE INC.; DEALER SOUQ USA LLC; EAG WHOLESALE LLC; KARMA OF BROWARD, INC.; LAVISH HERO FUND; KARMA OF PALM BEACH, INC.; APPLE 3 INVESTMENTS, INC.; KZ CONSULTANTS INC.; EXCELL AUTO SPORT AND SERVICE, INC.** (individually and collectively the "Merchant"), **KRISTIN ZANKL and SCOTT THOMAS ZANKL** (collectively the "Guarantors" and together with the Merchant, the "Obligated Parties") and **HI BAR CAPITAL, LLC** ("Purchaser,") and referred to herein collectively with the Obligated Parties as (the "Parties") on this **February 1, 2022** (the "Effective Date").

**WHEREAS**, the Parties entered into a receivables purchase agreement on **October 27, 2021** pursuant to which the Purchase purchased a specified percentage of the Merchant's total future accounts receivable up to a specified amount in exchange for an upfront purchase price (the "Purchase Agreement");

**WHEREAS**, the Guarantors guaranteed the Merchant's obligations to Purchase pursuant to the Purchase Agreement pursuant to a Guaranty agreement that was contained in the Purchase Agreement (the "Guaranty" and together with the Purchase Agreement, the "Agreements");

**WHEREAS**, on NOVEMBER 16, 2021 (the "Default Date"), the Obligated Parties defaulted on their obligations to Purchaser under the Agreements.

**WHEREAS**, on December 19, 2021, the Parties entered into a settlement agreement (the "Settlement Agreement") pursuant to which the Parties settled the dispute between them arising from the Obligated Parties' breaches of the Agreements. A copy of the Settlement Agreement is attached as **Exhibit A**.

**WHEREAS**, on December 27, 2021, the Obligated Parties defaulted on the Settlement Agreement.

**WHEREAS**, on January 28, 2022, Purchaser filed an action against the Obligated Parties for breach of the Settlement Agreement in Kings County Supreme Court, Index No. **502846/2022** (the "Action").

**WHEREAS**, the parties seek to resolve the claims asserted in the Action pursuant to the terms of this Stipulation of Settlement.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED BETWEEN THE PARTIES AS FOLLOWS:

Obligated Parties shall pay to Purchaser the sum of **$3,800,000.00 ("Settlement Amount")** as follows:

1. Payments
   a. $1,300,000 by February 7, 2022
   b. $1,300,000 by February 11, 2022
   c. $600,000 by February 16, 2022

Settlement Agreement and Release - Page 1 of 5

d. $600,000 by February 21, 2022

Payments shall be made by wire transfer to Purchaser's attorney each week on the scheduled payment date to the following account:

**Law Offices of Steven Zakharyayev, PLLC**
**10 W. 37th St, #602, New York, NY 10018**
**JP Morgan Chase Bank N.A.**
**Routing Number: 021 000 021**
**Account Number: 317 527 817**

1. **SETTLEMENT AGREEMENT**: Notwithstanding the terms herein, all terms agreed upon in the Settlement Agreement dated December 19, 2021 shall remain enforceable against the Parties. Any conflicts between the terms of the Settlement Agreement and this Stipulation of Settlement shall be resolved in favor of this Stipulation of Settlement.

2. REPRESENTATIONS AND WARRANTIES AND INDEMNITY.

   a. Obligated Parties warrant and covenant that any payments to Purchaser pursuant to this Stipulation of Settlement shall be made from unencumbered assets free of any liens or superior interests to Purchaser.

   b. In the event any payments made to Purchaser are subject to a levy or a party claiming to hold a superior interest in any assets of the Merchant to Purchaser, Obligated Parties agree to indemnify, defend, and hold Purchaser and any employees, agents, partners, or affiliates harmless from any and all claims, demands, costs, liabilities, losses, expenses and damages (including reasonable attorneys' fees, costs, and expert witnesses' fees) arising out of or in connection with any claim brought by a third party against Purchaser.

3. **Default Judgment pursuant to CPLR 3215(i)**. There shall be no cure period for the settlement payments set forth above. In the event that a settlement payment is not made, the Obligated Parties hereby acknowledge, consent and agree that the Purchaser may file an application for a default judgment to the Kings County Clerk in the Action pursuant to CPLR 3215(i) for the full Settlement Amount ($3,800,000) less payments made pursuant to this Agreement, plus the sum of 25% of the amount due at the time of default for attorneys' fees (based upon standard contingency fee rates), plus interest at the rate of 16% per annum from the date of default to the date of entry of judgment. The Parties agree that it shall be sufficient for the entry of such default judgment for the Purchaser's attorney of record to submit an affirmation stating the amount paid pursuant to this Stipulation of Settlement, the date of the default hereunder, the amount outstanding, and an amount for attorneys' fees to be included in the default judgment calculated as 25% of the Settlement Amount less payments made pursuant to this Stipulation of Settlement. The Parties agree that the application to the Kings County Clerk for a default judgment may be made without notice to the Obligated Parties and that this Stipulation of Settlement shall not be required to be filed in the Action unless and until there is a default hereunder.

4. Upon the Obligated Parties' full performance of the their obligations pursuant to this Stipulation of Settlement including, without limitation, the full payment of the Settlement Amount, Purchaser hereby covenants not to sue and forever releases, acquits, and discharges the Obligated Parties and any of their guarantors, agents, employees, officers, partners, principals, insurers, representatives, successors, transferees or assigns, from any and all liability, claims, damages or demands Purchaser has now or may have in connection with said Purchase Agreement. For avoidance of doubt, this release shall be null and void in the event of a breach of this Stipulation

of Settlement by the Obligated Parties.

5.      Within five (5) business days after Obligated Parties' fulfillment of their obligations hereunder and the clearance of all payments in accordance with the terms of this Stipulation of Settlement, Purchaser terminate any/all UCC filings and liens previously filed by Purchaser against Merchant, and release any/all of Obligated Parties' obligations to Purchaser pursuant to the Agreements, and Purchaser will so notify the Obligated Parties' attorney in writing. Purchaser further agrees to file a discontinuance of the Action.

6.      Waiver of Purchaser's Liability. Upon the Effective Date, the Obligated Parties for themselves and on behalf of all parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns, hereby releases and forever discharges Purchaser and its respective parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns of and from any and all claims, counterclaims, demands, damages, debts, liabilities, accounts, actions, causes of action and suits, known or unknown, liquidated or contingent, arising from, which may arise in the future from, or which are related in any manner to the Action or the underlying Agreement, including any claims that were or could have been asserted, other than Purchaser's obligations under this Settlement Agreement.

7.      Withdraw Claims and Consent to Judgment. Merchant and Guarantors hereby withdraw any defenses they may have to the claims asserted in the Action.

8.      CONSENT TO JURISDICTION. This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regards to any applicable principles of conflicts of law. Merchant and Guarantors irrevocably submits to the exclusive jurisdiction of any New York Supreme Court or any federal court sitting within the State of New York over any suit, action or proceeding arising out of or relating to this Agreement. Merchant and Guarantors irrevocably waive, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. Merchant and Guarantors agree that final judgment in any such suit, action or proceeding brought in such a court shall be enforced in any court of proper jurisdiction by a suit upon such judgment, provided that service of process in such action, suit or proceeding shall have been effected upon the Merchant and Guarantors in a manner permitted by law.

9.      WAIVER OF SERVICE OF PROCESS. The Parties further agree to waive personal service of process and to accept mail by electronic mail or by mailing by certified or registered mail, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

10.     Alter Egos. Merchant may not own, operate, or affiliate with any entities in the same or similar industry without Purchaser's express consent.

11. Modifications; Agreements. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all Parties.
12. Assignment. Purchaser may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Sellers. Sellers shall not assign its rights or obligations under this Agreement without first obtaining Purchaser's written consent.
13. Notices. Unless different means of delivering notices are set forth elsewhere in this Agreement, all notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement and shall become effective as of the date of receipt or declined receipt.

14. Waiver Remedies. No failure on the part of Purchaser to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

15. Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

16. JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

17. Severability. In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

18. Entire Agreement. This Agreement embodies the entire agreement between Seller and Purchaser and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s) and Riders to this Agreement are part of this Agreement.

THE UNDERSIGNED REPRESENT AND WARRANT THAT THEY HAVE READ THIS STIPULATED SETTLEMENT AGREEMENT IN ITS ENTIRETY AND HAVE THE FULL CAPACITY, POWER, AND AUTHORITY TO MAKE THIS AGREEMENT AS SET FORTH ABOVE, AND THAT NO OTHER REPRESENTATIONS OR INDUCEMENTS APART FROM THIS STIPULATED SETTLEMENT AGREEMENT, EITHER WRITTEN OR ORAL, HAVE BEEN MADE.

IN WITNESS WHEREOF, Sellers and Purchaser have hereunder set their hands and seals on **February 1, 2022**.

| "MERCHANT" | "GUARANTORS" |
|---|---|
| **EXCELL AUTO GROUP, INC.;** **KARMA OF PALM BEACH INC;** **AUTOMOTIVE SERVICE SYSTEMS, INC.;** **KZ CONSULTANTS, INC.; MISS KRIS, LLC;** **EXCELL AUTO LEASING INC;** **EXCELL AUTO WHOLESALE INC.;** **DEALER SOUQ USA LLC;** **EAG WHOLESALE LLC; KARMA OF BROWARD, INC.;** **LAVISH HERO FUND; KARMA OF PALM BEACH, INC.;** **APPLE 3 INVESTMENTS, INC.; KZ CONSULTANTS INC.; EXCELL AUTO SPORT AND SERVICE, INC.** (collectively the "Merchants") | **SCOTT THOMAS ZANKL** "GUARANTOR" |

**"GUARANTORS"**

**SCOTT THOMAS ZANKL**
"GUARANTOR"

> DocuSigned by:
> *Scott Thomas Zankl*
X _____
763D464660D2410...
**SCOTT THOMAS ZANKL,**
Individually

**KRISTIN ZANKL**
"GUARANTOR"

> DocuSigned by:
> *[signature]*
X _____
KRISTIN ZANKL,
Individually

---

**"MERCHANT"**

**EXCELL AUTO GROUP, INC.;**
**KARMA OF PALM BEACH INC;**
**AUTOMOTIVE SERVICE SYSTEMS, INC.;**
**KZ CONSULTANTS, INC.; MISS KRIS, LLC;**
**EXCELL AUTO LEASING INC;**
**EXCELL AUTO WHOLESALE INC.;**
**DEALER SOUQ USA LLC;**
**EAG WHOLESALE LLC; KARMA OF BROWARD, INC.;**
**LAVISH HERO FUND; KARMA OF PALM BEACH, INC.;**
**APPLE 3 INVESTMENTS, INC.; KZ CONSULTANTS INC.; EXCELL AUTO SPORT AND SERVICE, INC.** (collectively the "Merchants")

> DocuSigned by:
> *[signature]*
X _____
Name: **KRISTIN ZANKL**, individually and as
authorized signor on behalf of the Merchants
referenced above

**EXCELL AUTO GROUP, INC.;**
**KARMA OF PALM BEACH INC;**
**AUTOMOTIVE SERVICE SYSTEMS, INC.;**
**KZ CONSULTANTS, INC.; MISS KRIS, LLC;**
**EXCELL AUTO LEASING INC;**
**EXCELL AUTO WHOLESALE INC.;**
**DEALER SOUQ USA LLC;**
**EAG WHOLESALE LLC; KARMA OF BROWARD, INC.;**
**LAVISH HERO FUND; KARMA OF PALM BEACH, INC.;**
**APPLE 3 INVESTMENTS, INC.; KZ CONSULTANTS INC.; EXCELL AUTO SPORT AND SERVICE, INC.** (collectively the "Merchants")

> DocuSigned by:
> *Scott Thomas Zankl*
X _____
Name: **SCOTT THOMAS ZANKL, individually**
and as authorized signor on behalf of the
**Merchants**

**"PURCHASER"**
HI BAR CAPITAL, LLC

> DocuSigned by:
> *Steven Zakharyayen*
X _____
Name: Steven Zakharyayev
Title: Attorney for Purchaser, Hi Bar Capital