# EXHIBIT F

7817882.1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

------------------------------------------------------------------X

HI BAR CAPITAL, LLC,

      Plaintiff-Counterclaim Defendant,

    - against -

EXCELL AUTO GROUP, INC.; KARMA OF
PALM BEACH, INC.; AUTOMOTIVE SERVICE
SYSTEMS, INC.; KZ CONSULTANTS, INC.;
MISS KRISS, LLC; EXCELL AUTO LEASING
INC.; EXCELL AUTO WHOLESALE INC.;
DEALER SOUQ USA LLC; EAG WHOLESALE
LLC; KARMA OF BROWARD, INC.; LAVISH
HERO FUND; APPLE 3 INVESTMENTS, INC.;
KZ CONSULTANTS INC.; EXCELL AUTO
SPORT AND SERVICE, INC.; KRISTIN ZANKL
and SCOTT THOMAS ZANKL,

      Defendants-Counterclaim Plaintiffs.

------------------------------------------------------------------X

Index No.: 502846/2022

**AMENDED
ANSWER AND
COUNTERCLAIMS**

Defendants Excell Auto Group, Inc. ("Excell"), Karma of Palm Beach, Inc.,

Automotive Service Systems, Inc., KZ Consultants, Inc., Miss Kriss, LLC, Excell Auto

Leasing, Inc., Excell Auto Wholesale, Inc., Dealer Souq USA LLC, EAG Wholesale LLC,

Karma of Broward, Inc., Lavish Hero Fund, Inc., Apple 3 Investments, Inc., KZ Consultants,

Inc. , Excell Auto Sport and Service, Inc., Kristin Zankl, and Scott Thomas Zankl ("Zankl")

(collectively, "Defendants"), by and through their attorneys Sichenzia Ross Ference LLP,

amend by right pursuant to CPLR 3025(a) their February 28, 2022 Answer to the Plaintiff Hi

Bar Capital, LLC's ("Hi Bar" or "Plaintiff") Complaint, dated January 27, 2022 (the

"Complaint"), as follows:

## PARTIES

    1.    Deny knowledge and information sufficient to form a belief as to the truth of the

allegations contained in paragraph 1 of the Complaint.

1

Case 23-01132-EPK    Doc 27-6    Filed 10/16/23    Page 3 of 23

2.    Admit the allegations contained in paragraph 2 of the Complaint.

3.    Admit the allegations contained in paragraph 3 of the Complaint.

4.    Deny the allegations contained in paragraph 4 of the Complaint.

5.    Deny the allegations contained in paragraph 5 of the Complaint.

6.    Deny the allegations contained in paragraph 6 of the Complaint.

7.    Admit the allegations contained in paragraph 7 of the Complaint.

8.    Deny the allegations contained in paragraph 8 of the Complaint.

9.    Deny the allegations contained in paragraph 9 of the Complaint.

10.    Deny the allegations contained in paragraph 10 of the Complaint.

11.    Admit the allegations contained in paragraph 11 of the Complaint.

12.    Admit the allegations contained in paragraph 12 of the Complaint.

13.    Repeat and reiterate the previously stated response to the allegations contained in paragraph 3 of the Complaint, which is the identical allegation set forth in paragraph 13 of the Complaint. To the extent the allegations contained in paragraph 13 of the Complaint are deemed to be non-identical to the allegations contained in paragraph 3, Defendants admit the allegations contained in paragraph 13 of the Complaint.

14.    Admit the allegations contained in paragraph 14 of the Complaint.

15.    Repeat and reiterate the previously stated response to the allegations contained in paragraph 5 of the Complaint, which is the identical allegation set forth in paragraph 5 of the Complaint. To the extent the allegations contained in paragraph 15 of the Complaint are deemed to be non-identical to the allegations contained in paragraph 5, Defendants admit the allegations contained in paragraph 15 of the Complaint.

2

16. Paragraph 16 of the Complaint does not contain any allegations that can be admitted or denied.

17. Deny knowledge and information as to the allegations of Paragraph 18 of the Complaint, except admit that the individual resides in Florida.

18. Admit the allegations contained in paragraph 18 of the Complaint, except deny that Zankl is a principal of Defendants Automotive Service Systems, Inc., Miss Kriss, LLC, KZ Consultants, Inc., Excell Auto Wholesale, Inc., Dealer Souq USA LLC, and EAG Wholesale LLC.

## JURISDICTION AND VENUE

19. Aver that the allegations contained in paragraph 19 of the Complaint call for conclusions of law, to which no response is required. To the extent a response is deemed to be required, Defendants deny the allegations contained in paragraph 19 of the Complaint.

20. Aver that the allegations contained in paragraph 20 of the Complaint call for conclusions of law, to which no response is required. To the extent a response is deemed to be required, Defendants deny the allegations contained in paragraph 20 of the Complaint.

## FACTS

21. Aver that the allegations contained in paragraph 21 of the Complaint call for conclusions of law, to which no response is required, and to the extent the allegations seek to characterize a document, then the Court is referred to the actual document for a complete recitation of its terms. To the extent a response is deemed to be required, Defendants deny the allegations contained in paragraph 21 of the Complaint.

22. Aver that the allegations contained in paragraph 22 of the Complaint call for conclusions of law, to which no response is required, and to the extent the allegations seek to characterize a document, then the Court is referred to the actual document for a complete recitation

3

of its terms. To the extent a response is deemed to be required, Defendants deny the allegations contained in paragraph 22 of the Complaint.

23.    Deny the allegations contained in paragraph 23 of the Complaint, except admit Defendant Excell made payments to Plaintiff.

### AS FOR AN ANSWER TO THE FIRST CAUSE OF ACTION
#### (Breach of Settlement Agreement)

24.    Defendants repeat and reallege each and every admission and denial contained in the above paragraphs as if set forth fully herein.

25.    Aver that the allegations contained in paragraph 25 of the Complaint call for conclusions of law, to which no response is required, and to the extent the allegations seek to characterize a document, then the Court is referred to the actual document for a complete recitation of its terms. To the extent a response is deemed to be required, Defendants deny the allegations contained in paragraph 25 of the Complaint.

26.    Aver that the allegations contained in paragraph 26 of the Complaint call for conclusions of law, to which no response is required, and to the extent the allegations seek to characterize a document, then the Court is referred to the actual document for a complete recitation of its terms. To the extent a response is deemed to be required, Defendants deny the allegations contained in paragraph 26 of the Complaint.

### AFFIRMATIVE DEFENSES

### As and For a First Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted.

### As and For a Second Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted against Defendants Automotive Service Systems, Inc., KZ Consultants, Inc., Miss Kris, LLC, Excell Auto Wholesale,

4

Inc., Dealer Souq USA LLC, EAG Wholesale LLC, because those corporate entities were dissolved prior to any of the relevant acts and allegations in this matter; therefore, those corporate entities are mis-joined to this action.

### As and For a Third Affirmative Defense

The Complaint must be dismissed for lack of personal jurisdiction.

### As and For a Fourth Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted because the contract underlying the purported settlement agreement is void ab initio because it was procured by fraud in the execution.

### As and For a Fifth Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted because the contract underlying the purported settlement agreement is void ab initio because it is the product of criminal usury.

### As and For a Sixth Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted because the contract underlying the purported settlement agreement is void ab initio because it is the product of mutual mistake.

### As and For a Seventh Affirmative Defense

Plaintiff's claims are barred because Defendants fully-performed under any agreements.

### As and For an Eighth Affirmative Defense

The Complaint is barred by documentary evidence in this matter.

### As and For a Ninth Affirmative Defense

This action cannot proceed in the absence of necessary and indispensable parties;

5

specifically, Spin Capital.

### As and For a Tenth Affirmative Defense

If Defendants had a contractual relationship with Plaintiff, Defendants did not breach any contract with Plaintiff.

### As and For an Eleventh Affirmative Defense

If Defendants breached any contract with Plaintiff, the breach was neither a substantial nor a material breach.

### As and For a Twelfth Affirmative Defense

Plaintiff suffered no damages as a result of the alleged actions or inactions of Defendants.

### As and For a Thirteenth Affirmative Defense

If Plaintiff suffered damages as a result of the alleged actions or inactions of Defendants, then Plaintiff failed to mitigate those damages.

### As and For a Fourteenth Affirmative Defense

Plaintiff's alleged damages were caused or contributed to by its own conduct. As a result, Plaintiff is responsible for any and all losses.

### As and For a Fifteenth Affirmative Defense

Plaintiff's claims are barred by the doctrines of estoppel and/or waiver. Plaintiff accepted all payments from Defendant Excell without objection, and, therefore, has waived any claim(s) with regard to the amount of such payments and/or is estopped from challenging same.

### As and For a Sixteenth Affirmative Defense

Plaintiff's claims are barred because Plaintiff breached any agreement between the parties.

### As and For a Seventeenth Affirmative Defense

Plaintiff's claims are barred by its own unclean hands and culpable conduct.

6

### As and For an Eighteenth Affirmative Defense

Plaintiff failed to perform its obligations under any agreements. Accordingly, Plaintiff is not entitled to recovery for any sums sought herein.

### As and For a Nineteenth Affirmative Defense

Plaintiff's claim is barred by the doctrine of impossibility of performance.

### As and For a Twentieth Affirmative Defense

There is no enforceable agreement as between the parties because there is a lack of consideration.

### As and For a Twenty-First Affirmative Defense

The underlying agreement(s) cannot be performed as Excell does not and has never had any receivables; therefore, the Complaint must be dismissed.

### As and For A Twenty-Second Affirmative Defense

The Complaint must be dismissed because certain Defendants were neither signatories nor did they execute, the operative agreement(s).

### As and For a Twenty-Third Affirmative Defense

Any damages alleged herein were caused by Plaintiff's own wrongful conduct

### As and For a Twenty-Fourth Affirmative Defense

Defendants reserve the right to reply on such other affirmative defenses as may be supported by facts to be determined through full and complete discovery, and to amend this Answer to assert such additional affirmative defenses and/or counterclaims and/or third-party claims.

7

## COUNTERCLAIMS

Defendants-Counterclaim Plaintiffs Excell Auto Group, Inc. ("Excell"), Scott Zankl ("Zankl"), and Kristin Zankl ("K Zankl"), as well as Karma of Palm Beach, Inc., Excell Auto Leasing, Inc., Karma of Broward, Inc., Lavish Hero Fund, Apple 3 Investments, Inc., and Excell Auto Sport and Service, Inc., (Karma of Palm Beach, Inc., Excell Auto Leasing, Inc., Karma of Broward, Inc., Lavish Hero Fund, Apple 3 Investments, Inc., and Excell Auto Sport and Service, Inc. are referred to together as the "Additional Contracting Parties") (all collectively, the "Counterclaim Plaintiffs"), by and through their attorneys, Sichenzia Ross Ference LLP, allege as and for their Counterclaims against Plaintiff-Counterclaim Defendant Hi Bar Capital, LLC ("Hi Bar" or "Counterclaim Defendant"), as follows:

### Parties

1.      Counterclaim Plaintiff Excell is a Florida domestic corporation with its principal place of business located at 1001 Clint Moore Road, Suite 101, Boca Raton, Florida 33487.

2.      Counterclaim Plaintiff Zankl is an individual, a resident of the State of Florida, and a principal of Excell.

3.      Counterclaim Plaintiff K Zankl is Zankl's spouse, and is a resident of the State of Florida.  K Zankl is the President of Excel.

4.      The Additional Contracting Parties are Florida corporations having their principal places of business in the State of Florida. Zankl and/or K Zankl are principals of the Additional Contracting Parties.

5.      Counterclaim Defendant Hi Bar is, upon information and belief, a New York limited liability company.

### Facts Common to All Counterclaims

6.      Excell is in the used car sales business, and was in need of additional financing in

8

Case 23-01132-EPK    Doc 27-6    Filed 10/16/23    Page 10 of 23

order to refurbish and re-supply various parts of its showroom.

7.      In June 2021, , a representative of Spin Capital LLC ("Spin") "cold-called" Zankl regarding financing opportunities available through Spin. In or about June and July of 2021, Excell engaged in two financing transactions with Spin, and had partially paid off those transactions, leaving approximately $750,562.50 due and owing to Spin.

8.      On or about August 31, 2021, Excell entered into a "Revenue Purchase Agreement" (the "First Agreement") with non-party Spin (Exhibit "1"). Under the First Agreement, Excell borrowed additional money, which combined with its prior unpaid financings, amounted to a total amount due of $2,000,000 from Spin.  The First Agreement was couched as a sale of receivables by Excell to Spin, which would entitle Spin to 20% of Excell's future receivables.  In exchange, Excell agreed to re-pay $2,998,000 to Spin as a function of the amount of receivables it collected from its business (the "Purchased Amount").

9.      The First Agreement specifically provided:

> [Excell] hereby sells, assigns and transfers to [Spin] (making [Spin] the absolute owner) the Purchased Percentage of all of [Excell's] payments, receipts, settlements and funds paid to or received by for the account of [Excell] from time to time on and after the date hereof in payment or settlement of [Excell's] existing and future accounts, payment intangibles, credit, debit, and/or stored value card transactions, contract rights and other entitlements arising from or relating to the payment of monies from [Excell's] customers and/or other payors or obligors … until the Purchased Amount has been delivered by or on behalf of [Excell] to [Spin].

10.     In the First Agreement, Spin goes to great lengths to explicitly state that it is purchasing a percentage of future receipts of Excell and is not loaning money to Excell.  The agreement provides:

> [Excell] is selling a portion a future revenue stream to [Spin] at a discount, and is not borrowing money from [Spin], therefore there is no interest rate or payment schedule and no time period during

9

which the Purchased Amount must be collected by [Spin].

11.     Contrary to the above, the First Agreement sets a weekly remittance of $150,000.00; however, the agreement specifically states that the "Remittance is a good faith estimate of [Spin's] share of future revenue stream …. [Excell] going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, *in and of itself, does not constitute a breach of this Agreement*." (Emphasis added.)

12.     In order to repay the Purchased Amount, Spin and Excell were to debit one bank approved account under which Spin would be entitled to debit an acceptable remittance amount.

13.     As noted above, the First Agreement provided that Excell would pay EITHER $150,000 per month, or 20% of its receivables. It did not specify one method of payment over another, nor did it provide for some monetary or temporal threshold whereby Excell would be in default.

14.     Moreover, although the First Agreement, and subsequent agreements, were couched as "receivables financing agreements", Excell, as a used car sales business, has no accounts receivable. There is no consistent "billing cycle" associated with the used car business.

15.     Evidencing Spin's clear understanding of this fact, Spin did not request any accounting, breakdown, or explanation of the nature of Excell's receivables (or even make an attempt to confirm whether or not Excell *had* any receivables) from Excell in making its determination as to whether to lend Excell the money under the First Agreement. Instead, Spin only examined Excell's bank statements for the past ninety days. Given the lack of receivables, Excell was not eligible to enter into the First Agreement.

16.     Thus, for all practical purposes, since the payments were not governed under any time period, and did not depend on the amount of receivables (or receipts) acquired by Excell, each agreement into which Excell entered was, at its essence, a business loan with interest.

10

17.     Ultimately, as set forth below, the loan balance would be significantly increased through Hi Bar's unconscionable and usurious practices, either through a new revenue purchase agreement or onerous and unconscionable settlement agreements.

18.     After entering into the First Agreement, Excell made payments to Spin in the amount of $717,375,00.

19.     On or about October 18, 2021, Spin issued K Zankl a balance letter (Exhibit "2") stating that Excell had a balance of $2,264,312.50 remaining under the First Agreement.

20.     In late October 2021, Excell secured financing for other, unrelated transactions, which required Excell to demonstrate in writing that the First Agreement had been fully paid off.

21.     In consequence, Excell, through Zankl, communicated its concerns to Spin. By telephone, Spin's representative, upon information and belief, an individual named Josh Lubin ("Lubin") offered to transfer Excell's balance to another lender, Hi Bar, in which Lubin stated he had an interest, and to issue a payoff letter to assuage the concerns of the lender in the unrelated transaction.

22.     Lubin, acting on behalf of both Spin and Hi Bar, understanding Excell's need to quickly assuage the other lender, and knowingly seeking to deceive Zankl in order to induce him to enter into a new and more onerous agreement on Excell's behalf, misrepresented to Zankl that the terms of the balance transfer agreement were what was termed a "no-net re-fi," which would result in a contractual amount substantially identical to the First Agreement. If Lubin's representations had been true, they would have meant that Excell, in essence, would be paying off the same or similar balance owed to Spin to Hi Bar on the same terms as under the First Agreement.

23.     However, Lubin's statements were false. Spin and Hi Bar's representatives knew at all times that they were really offering Zankl and, by extension, Excell, a much more onerous

11

loan agreement with substantial additional principal owed to the lender without providing any additional benefit to Excell.

24. In order to close the deal, Lubin exerted pressure on Zankl, and by extension, Excell, to immediately accept the agreement or the payoff letter would not issue, ruining the unrelated transaction. Unfortunately, Zankl was out of the office at the time of these discussions, communicating with Lubin exclusively by telephone, and had no opportunity to review the proposed agreement or consult with legal or financial counsel. Instead, he believed Lubin's oral misrepresentations that he was simply making a balance transfer between Spin and Hi Bar in order to obtain a payoff letter.

25. In order to ensure the unrelated transaction would close, Zankl accepted Lubin's false and misleading offer and authorized his electronic signature on two new agreements with Hi Bar (the "Balance Transfer" and the "Second Agreement") (Exhibits "3" and "4") both dated October 27, 2021.

26. Prior to entering into the Balance Transfer and Second Agreement, Hi Bar did not request any accounting, breakdown, or explanation of the nature of Excell's receivables (or even make an attempt to confirm whether or not Excell *had* any receivables) from Excell.

27. Under the Balance Transfer, Hi Bar paid off the Spin loan and issued a payoff letter. However, under the Second Agreement, Hi Bar did not credit Excell for the approximately $880,000 it had already paid under the First Agreement. Instead, Zankl belatedly discovered that Excell now owed $3,177,880 under the Second Agreement, to be paid in weekly installments of $150,000.

28. The Second Agreement provided no additional funds to Excell.

29. Like Spin, Hi Bar did not arrange for an approved bank account to be secured, reviewed or analyzed Excell's "receivables" or lack thereof. In essence, the Second Agreement

12

was a duplicate of the First Agreement with Hi Bar replaced as the lending party, an increase of over $1 million of repayment obligations without providing any consideration to Excell.

30. Moreover, at this time, Excell did not have receivables and should not have been eligible to enter into the Second Agreement.

31. Excell made subsequent payments to Hi Bar under the Second Agreement.

32. In mid-December 2021, Excell, according to Hi Bar, had an outstanding balance of $2,677,880.

33. At this time, Hi Bar contacted Zankl through its counsel ("Hi Bar Counsel"), and, inexplicably, advised Zankl that Excell was in "default" under the Second Agreement.

34. Hi Bar never defined this event of "default".

35. Despite the fact that the Second Agreement, like the First Agreement, contained provisions that confirm that there is no specific repayment period, and that the repayment was tied to the amount of receivables, Hi Bar Counsel refused to provide Excell with additional time. Further, a lack of payment due to, among other things, a "slowdown in business" is explicitly deemed "NOT" an event of default.

36. Despite the lack of default, Hi Bar Counsel sent Zankl a "Settlement Agreement", which he stated Zankl must sign or Hi Bar would proceed to file a lawsuit against Excell, Zankl, K Zankl, and the Additional Contracting Parties.

37. Faced with the threat of legal action, Zankl agreed to the terms of the "Settlement Agreement", which in reality was a third loan agreement (the "Third Agreement", Exhibit "5").

38. As with the Second Agreement, the Third Agreement provided no additional consideration or monies to Zankl; rather, it only increased the balance owed, now to $4,016,820 at a "1.5 factor rate"—over $1,000,000 more than the original principal in the First Agreement with Spin.

13

INDEX NO. 502846/2022
RECEIVED NYSCEF: 03/18/2022

Case 23-01132-EPK   Doc 27-6   Filed 10/16/23   Page 15 of 23

39.     Notably, Excell by this time had paid over $1,200,000 towards the First and Second Agreements.

40.     Thereafter, Excell made two additional payments of $200,000 under the Third Agreement.

41.     In January, 2022, Excell had additional cash flow issues and Zankl again requested more time from Hi Bar for Excell to make its payments under the Third Agreement.

42.     Hi Bar, through Hi Bar Counsel, again refused, and Hi Bar Counsel sent Zankl a second "Stipulation of Settlement"—even though, again, there was no lawsuit pending between the parties.  Under this fourth loan agreement, which none of the Counterclaim Plaintiffs executed, Hi Bar sought a principal of $3,800,000 (the "Unsigned Stipulation", Exhibit "6").

43.     Excell, in a good-faith effort to pay off its remaining debts to Hi-Bar under the Third Agreement, paid Hi Bar an additional $1,300,000, bringing the total amount paid by Excell to $3,083,687.50.

44.     On January 28, 2022, however, Hi Bar Counsel, purporting to act on behalf of Hi Bar, filed a lawsuit in the Supreme Court of New York, New York County, Index No. 502846/2022 against all of the Counterclaim Plaintiffs (See, Summons and Complaint (the "Complaint"), NYSCEF Doc. No. 1).

45.     Hi Bar claims to have served Zankl, on behalf of Excell, in Florida, which would have given the Counterclaim Plaintiffs 30 days from service on January 31, 2022 to answer the Complaint (NYSCEF Doc. Nos. 3-4).

46.     However, on February 17, 2022, prior to Counterclaim Plaintiffs' deadline to respond to the Complaint, Hi Bar Counsel also sought, without proper application, a Clerk's Default Judgment against the Counterclaim Plaintiffs, crediting only the $1,300,000 payment, and claiming to be entitled to judgment under the Unsigned Stipulation in the amount of

14

Case 23-01132-EPK    Doc 27-6    Filed 10/16/23    Page 16 of 23

$2,500,000. The Clerk's judgment also sought $625,000 in attorney's fees, and additional costs and disbursements (NYSCEF Doc Nos. 5 and 6, the latter of which the Clerk returned to Hi Bar Counsel's office for correction).

47. Thereafter, Counterclaim Plaintiffs appeared by the undersigned counsel on February 24, 2022 and February 28, 2022 (NYSCEF Doc. Nos. 10-13), and timely filed an Answer and Affirmative Defenses to the Complaint on February 28, 2022 (NYSCEF Doc. No. 14).

48. On or about March 1, 2022, the Court, *sua sponte*, rejected Hi Bar's application for a Clerk's Default Judgment and returned it to Hi Bar Counsel for correction.

49. On or about March 7, 2022, Hi Bar filed a motion to strike Defendants' answer and enter default judgment.

50. The return date on that motion has been adjourned to August 17, 2022 by the Court as a result of its full docket until that time.

**AS FOR A FIRST COUNTERCLAIM**
(Breach of Contract – Lack of Consideration)

51. Counterclaim Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs as if set forth fully herein.

52. Counterclaim Plaintiffs entered into the First Agreement to borrow funds from Spin.

53. However, in entering into the Second Agreement with Hi Bar, which was understood to be a balance transfer only, no new consideration was provided; rather, Counterclaim Plaintiffs' prior payments were unacknowledged and Hi Bar increased the "balance" Counterclaim Plaintiffs now "owed".

54. A contract is not enforceable if there is no consideration given for the promised

15

performance.

55.    Counterclaim Plaintiffs fully-performed their obligations under the First Agreement, but following the balance transfer and increased principal balance, Hi Bar did not provide Counterclaim Plaintiffs with any additional consideration, such as additional cash, a lower interest rate, or additional time to pay off the greater amount owed.

56.    Hi Bar also did not provide additional consideration for Counterclaim Plaintiffs to perform under the Third Agreement, or any subsequent alleged agreement.

57.    Hi Bar improperly, and without contractual basis, called for a default under the agreements.

58.    Spin and Hi Bar attempted to mask their loan agreements as Revenue Purchase Agreements.  However, neither Spin nor Hi Bar conducted themselves in accordance with the agreements.  Specifically, neither Spin nor Hi Bar (i) investigated or analyzed Excell's lack of receivables; (ii) maintained bank accounts that would allow for the transfer of 20% of future receipts to repay the Purchased Amount; and (iii) properly declared an event of default and instead declared an event of default based upon lack of payment of the loan, which was not permitted under the agreements.

59.    As a result, the First Agreement and Second Agreements were not proper Revenue Purchase Agreements, and thus were in effect loans.  Therefore, the so-called "Settlement Agreements" were built upon usurious and unconscionable agreements, and have no force and effect.  Thus, any waiver of any defenses are without basis in law and fact.

60.    Accordingly, the Second Agreement, Third Agreement, and any alleged subsequent agreement or stipulation as between Counterclaim Plaintiffs and Hi Bar are unenforceable for lack of consideration.

61.    As a result, Counterclaim Plaintiffs have been damaged in an amount to be

16

determined at trial, but estimated to be in excess of $1,000,000.00.

## AS FOR A SECOND COUNTERCLAIM
(Fraud In The Execution and Inducement)

62. Counterclaim Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs as if set forth fully herein.

63. Spin referred Counterclaim Plaintiffs to Hi Bar in order to execute a no-net refinance of Counterclaim Plaintiffs' loan from Spin; that is to say, to transfer the balance to Hi Bar on the same terms as the First Agreement and to pay off the sum owed under the First Agreement.

64. Hi Bar falsely represented to Counterclaim Plaintiffs that the transaction would be a no-net refinance.

65. In fact, Hi Bar intended to increase, and did increase, Counterclaim Plaintiffs' principal balance well in excess of the amount Counterclaim Plaintiffs had borrowed from Spin, in transferring the balance due under the First Agreement.

66. Hi Bar had full knowledge of its misrepresentations to Counterclaim Plaintiffs, but also knew that Counterclaim Plaintiffs were in a time-sensitive unrelated financing that depended on their being able to demonstrate a payoff of the First Agreement. Hi Bar intended to induce Plaintiffs to enter into the Second Agreement through its misrepresentations.

67. Therefore, Hi Bar preyed upon Counterclaim Plaintiffs' lack of knowledge and induced them to agree to enter into the Second Agreement while Counterclaim Plaintiffs were out of the office and had no access to the Second Agreement or opportunity to review it other than over the telephone with Lubin. Lubin presented the Second Agreement as a take-it-or-leave-it proposition.

68. As a result of Hi Bar's knowing misrepresentations, high pressure tactics, and

17

Case 23-01132-EPK   Doc 27-6   Filed 10/16/23   Page 19 of 23

inducements, Zankl, on behalf of Excell, authorized Counterclaim Plaintiffs to enter into the Second Agreement by telephone and authorized his signature to be electronically input on same.

69.     As a result, the Second Agreement, and any subsequent alleged agreements as between Hi Bar and Counterclaim Plaintiffs, were and are void ab initio as a matter of law.

70.     Counterclaim Plaintiffs then made payments to Hi Bar under the fraudulently executed and induced Second Agreement and subsequent alleged agreements between Hi Bar and the Counterclaim Plaintiffs.

71.     Hi Bar received and retained these payments as a result of its fraudulent conduct.

72.     Spin and Hi Bar attempted to mask their loan agreements as Revenue Purchase Agreements. However, neither Spin nor Hi Bar conducted themselves in accordance with the agreements. Specifically, neither Spin nor Hi Bar (i) investigated or analyzed Excell's lack of receivables; (ii) maintained bank accounts that would allow for the transfer of 20% of future receipts to repay the Purchased Amount; and (iii) properly declared an event of default and instead declared an event of default based upon lack of payment of the loan, which was not permitted under the agreements.

73.     As a result, the First Agreement and Second Agreements were not proper Revenue Purchase Agreements, and thus were in effect loans. Therefore, the so-called "Settlement Agreements" were built upon usurious and unconscionable agreements, and have no force and effect. Thus, any waiver of any defenses are without basis in law and fact.

74.     As a result, Counterclaim Plaintiffs have been damaged in an amount to be determined at trial, but estimated to be in excess of $1,000,000.00.

## AS FOR A THIRD COUNTERCLAIM
(Criminal Usury)

75.     Counterclaim Plaintiffs repeat and reallege each and every allegation contained in

18

the above paragraphs as if set forth fully herein.

76.     NY Penal Law §190.40 provides that a party is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, "he knowingly charges, takes, or receives any money or other property as interest on the loan or forbearance or any money or other property, as a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period". The act of criminal usury is a Class E felony.

77.     Counterclaim Plaintiffs entered into the First Agreement, a loan agreement, with Spin Capital to borrower $2,000,000 and repay Spin $2,998,000..

78.     Counterclaim Plaintiffs paid approximately $883,687.50 of this balance.

79.     However, after fraudulently inducing Counterclaim Plaintiffs to enter into the Second Agreement in October 2021 disguised as a "balance transfer", Hi Bar increased the principal balance from the $2,114,312.50 Counterclaim Plaintiffs had owed to Spin to $3,177,880, a 50.3% increase in the loan charges.

80.     From the inception of the First Agreement until this time, Excell had already made payments of $1,383,687.50.

81.     Subsequently, by intimidating Counterclaim Plaintiffs into executing the Third Agreement, Hi Bar increased the loan charges another 50% to $4,016,820.

82.     Each of these increases in the loan charges was well in excess of the permissible 25% maximum permitted under New York law.

83.     Hi Bar is guilty of criminal usury.

84.     Spin and Hi Bar attempted to mask their loan agreements as Revenue Purchase Agreements. However, neither Spin nor Hi Bar conducted themselves in accordance with the agreements. Specifically, neither Spin nor Hi Bar (i) investigated or analyzed Excell's lack of receivables; (ii) maintained bank accounts that would allow for the transfer of 20% of future

19

receipts to repay the Purchased Amount; and (iii) properly declared an event of default and instead declared an event of default based upon lack of payment of the loan, which was not permitted under the agreements.

85.     As a result, the First Agreement and Second Agreements were not proper Revenue Purchase Agreements, and thus were in effect loans.  Therefore, the so-called "Settlement Agreements" were built upon usurious and unconscionable agreements, and have no force and effect.  Thus, any prohibitions against the defense of Usury or waiver of any defenses are without basis in law and fact.

86.     As a direct result of Hi Bar's criminally usurious actions, Counterclaim Plaintiffs have been damaged in an amount to be determined at trial, but estimated to be in excess of $1,000,000.

## AS AND FOR A FOURTH COUNTERCLAIM
(Unjust Enrichment)

87.     Counterclaim Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs as if set forth fully herein.

88.     Hi Bar has unlawfully retained Counterclaim Plaintiffs' payments, which are well in excess of the amounts due under the loan terms of the First Agreement.

89.     Further, Hi Bar obtained such payments by preying upon Counterclaim Plaintiffs' financial vulnerability, failing to provide consideration for their agreements with Counterclaim Plaintiffs, committing fraud in the execution and fraud in the inducement, and committing criminal usury, on multiple occasions.

90.     It is therefore against equity and good conscience for Hi Bar to retain its ill-gotten payments from Counterclaim Plaintiffs, and such payments were and are to Counterclaim Plaintiffs' detriment.

91.     Equity requires that Hi Bar disgorge its ill-gotten payments from Counterclaim

20

Case 23-01132-EPK   Doc 27-6   Filed 10/16/23   Page 22 of 23

Plaintiffs.

92. Spin and Hi Bar attempted to mask their loan agreements as Revenue Purchase Agreements. However, neither Spin nor Hi Bar conducted themselves in accordance with the agreements. Specifically, neither Spin nor Hi Bar (i) investigated or analyzed Excell's lack of receivables; (ii) maintained bank accounts that would allow for the transfer of 20% of future receipts to repay the Purchased Amount; and (iii) properly declared an event of default and instead declared an event of default based upon lack of payment of the loan, which was not permitted under the agreements.

93. As a result, the First Agreement and Second Agreements were not proper Revenue Purchase Agreements, and thus were in effect loans. Therefore, the so-called "Settlement Agreements" were built upon usurious and unconscionable agreements, and have no force and effect. Thus, any waiver of any defenses are without basis in law and fact.

94. As a result of the foregoing, Hi Bar has been unjustly enriched, and Counterclaim Plaintiffs have been damaged in an amount to be determined at trial, but estimated to be in excess of $1,000,000.00.

**WHEREFORE**, Defendants demand judgment as follows:

(a) Dismissing the Complaint in its entirety;

(b) On the First Counterclaim, in favor of Counterclaim Plaintiffs and against the Counterclaim Defendant Hi Bar Capital LLC in an amount to be determined at trial, estimated to be in excess of $1,000,000.00, together with interest thereon;

(c) On the Second Counterclaim, in favor of Counterclaim Plaintiffs and against the Counterclaim Defendant Hi Bar Capital LLC in an amount to be determined at trial, estimated to be in excess of $1,000,000.00, together with

21

Case 23-01132-EPK    Doc 27-6    Filed 10/16/23    Page 23 of 23

interest thereon;

(d)     On the Third Counterclaim, in favor of Counterclaim Plaintiffs and against the Counterclaim Defendant Hi Bar Capital LLC in an amount to be determined at trial, estimated to be in excess of $1,000,000.00, together with interest thereon;;

(e)     On the Fourth Counterclaim, in favor of Counterclaim Plaintiffs and against the Counterclaim Defendant Hi Bar Capital LLC in an amount to be determined at trial, estimated to be in excess of $1,000,000.00, together with interest thereon;;

(f)     For Punitive Damages resulting from Hi Bar's criminally usurious, unconscionable, and felonious conduct;

(g)     For costs and disbursements in this action, including attorneys' fees; and

(h)     For such other and further relief as the court deems just, equitable and proper.

Dated: New York, New York
       March 16, 2022

SICHENZIA ROSS FERENCE LLP

By: _____
       Michael H. Ference, Esq.
       Sameer Rastogi, Esq.
       Owen A. Kloter, Esq.
       1185 Avenue of the Americas, 31st Floor
       New York, New York 10036
       (212) 930-9700

*Attorneys for Defendants-Counterclaim Plaintiffs*

22