# EXHIBIT G

7817882.1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

---------------------------------------------------------------x

HI BAR CAPITAL, LLC,                              :

      Plaintiff-Counterclaim Defendant,          :

           - against -                      :

EXCELL AUTO GROUP, INC.; KARMA OF                 :
PALM BEACH, INC.; AUTOMOTIVE SERVICE              :
SYSTEMS, INC.; KZ CONSULTANTS, INC.;              :
MISS KRISS, LLC; EXCELL AUTO LEASING              :
INC.; EXCELL AUTO WHOLESALE INC.;                 :
DEALER SOUQ USA LLC; EAG WHOLESALE                :
LLC; KARMA OF BROWARD, INC.; LAVISH               :
HERO FUND; APPLE 3 INVESTMENTS, INC.;             :
KZ CONSULTANTS INC.; EXCELL AUTO                  :
SPORT AND SERVICE, INC.; KRISTIN ZANKL            :
and SCOTT THOMAS ZANKL,                           :

      Defendants-Counterclaim Plaintiffs.        :

---------------------------------------------------------------x

EXCELL AUTO GROUP, INC.,                          :

      Third-Party Plaintiff            ,          :

           - against -                      :

SPIN CAPITAL LLC a/k/a SPIN CAPITAL,              :

      Third-Party Defendant                      :

---------------------------------------------------------------x

Index No.: 502846/2022

**THIRD-PARTY SUMMONS**

Defendants and Third-Party Plaintiffs Designate Kings County as the place of trial pursuant to CPLR 501.

**To The Above Named Third-Party Defendants**:

    YOU ARE HEREBY SUMMONED TO answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on defendants' and third-party plaintiffs' attorneys within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded herein.

Third Party Defendant's Address
Spin Capital LLC
c/o The LLC
1460 Arboretum Parkway
Lakewood, New Jersey 08701


Dated:  New York, New York
        March 18, 2022


        Respectfully submitted,

        SICHENZIA ROSS FERENCE LLP

        By:_____
            Michael H. Ference, Esq.
            Sameer Rastogi, Esq.
            Owen A. Kloter, Esq.
        1185 Avenue of the Americas, 31st Floor
        New York, New York 10036
        Tel. No. (212) 930-9700

        *Attorneys for Third-Party Plaintiff Excell Auto Group, Inc.*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

-----------------------------------------------------------------X

HI BAR CAPITAL, LLC,                              :

    Plaintiff-Third-Party Defendant,          :    Index No.: 502846/2022

        - against -                           :    **VERIFIED**
                                              :    **THIRD-PARTY COMPLAINT**

EXCELL AUTO GROUP, INC.; KARMA OF                 :
PALM BEACH, INC.; AUTOMOTIVE SERVICE  :
SYSTEMS, INC.; KZ CONSULTANTS, INC.;              :
MISS KRISS, LLC; EXCELL AUTO LEASING  :
INC.; EXCELL AUTO WHOLESALE INC.;                 :
DEALER SOUQ USA LLC; EAG WHOLESALE  :
LLC; KARMA OF BROWARD, INC.; LAVISH   :
HERO FUND; APPLE 3 INVESTMENTS, INC.;  :
KZ CONSULTANTS INC.; EXCELL AUTO                  :
SPORT AND SERVICE, INC.; KRISTIN ZANKL :
and SCOTT THOMAS ZANKL,                           :
                                              :
    Defendants-Third-Party Plaintiffs.        :

-----------------------------------------------------------------X

EXCELL AUTO GROUP, INC.,                          :

    Third-Party Plaintiff        ,              :

        - against -                           :

SPIN CAPITAL LLC a/k/a SPIN CAPITAL,              :

    Third-Party Defendant                     :

-----------------------------------------------------------------X

Defendant/Third-Party Plaintiff EXCELL AUTO GROUP, INC. by and through its

attorneys, Sichenzia Ross Ference LLP, by way of Third-Party Complaint against Third-Party

Defendant SPIN CAPITAL LLC a/k/a SPIN CAPITAL, allege as follows:

## PARTIES

1. Third-Party Plaintiff Excell Auto Group, Inc. ("Excell" or "Third-Party

Plaintiff") is a Florida corporation having a principal place of business in Boca Raton, Florida.

- 1 -

Excell is in the used car sales business. Scott Zankl ( "Zankl") is a Defendant and Third-Party Plaintiff in this action and a principal of Excell.

2.      Third-Party Defendant Spin Capital LLC, a/k/a Spin Capital ("Spin" or "Third-Party Defendant"), is a New Jersey Limited Liability Company having a principal place of business in Lakewood, New Jersey. Spin Capital is, upon information and belief, in the business of commercial lending.

## Jurisdiction And Venue

3.      The Agreement between Spin and Excell is governed by the law of New York Pursuant to the terms thereof, specifically, Section 4.5. That same section also calls for adjudication of any suit, action, or proceeding arising thereunder to take place in any court sitting in New York. Therefore, jurisdiction and venue are appropriate to Kings County, New York, where the underlying action is also pending.

## FACTUAL BACKGROUND

1.      Excell is in the used car sales business, and was in need of additional financing in order to refurbish and re-supply various parts of its showroom.

2.      In June 2021, a representative of Spin Capital LLC ("Spin") "cold-called" Zankl regarding financing opportunities available through Spin. In or about June and July of 2021, Excell engaged in two financing transactions with Spin, and had partially paid off those transactions, leaving approximately $750,562.50 due and owing to Spin.

3.      On or about August 31, 2021, Excell entered into a "Revenue Purchase Agreement" (the "First Agreement") with Spin (Exhibit "1"). Under the First Agreement, Excell borrowed additional money, which combined with its prior unpaid financings, amounted to a total amount due of $2,000,000 from Spin. The First Agreement was couched as a sale of

receivables by Excell to Spin, which would entitle Spin to 20% of Excell's future receivables. In exchange, Excell agreed to re-pay $2,998,000 to Spin as a function of the amount of receivables it collected from its business (the "Purchased Amount").

4.      The First Agreement specifically provided:

> [Excell] hereby sells, assigns and transfers to [Spin] (making [Spin] the absolute owner) the Purchased Percentage of all of [Excell's] payments, receipts, settlements and funds paid to or received by for the account of [Excell] from time to time on and after the date hereof in payment or settlement of [Excell's] existing and future accounts, payment intangibles, credit, debit, and/or stored value card transactions, contract rights and other entitlements arising from or relating to the payment of monies from [Excell's] customers and/or other payors or obligors … until the Purchased Amount has been delivered by or on behalf of [Excell] to [Spin].

5.      In the First Agreement, Spin goes to great lengths to explicitly state that it is purchasing a percentage of future receipts of Excell and is not loaning money to Excell. The agreement provides:

> [Excell] is selling a portion a future revenue stream to [Spin] at a discount, and is not borrowing money from [Spin], therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by [Spin].

6.      Contrary to the above, the First Agreement sets a weekly remittance of $150,000.00; however, the agreement specifically states that the "Remittance is a good faith estimate of [Spin's] share of future revenue stream …. [Excell] going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, *in and of itself, does not constitute a breach of this Agreement.*" (Emphasis added.)

7.      In order to repay the Purchased Amount, Spin and Excell were to debit one bank approved account under which Spin would be entitled to debit an acceptable remittance

- 3 -

amount.

8.      As noted above, the First Agreement provided that Excell would pay EITHER $150,000 per month, or 20% of its receivables.  It did not specify one method of payment over another, nor did it provide for some monetary or temporal threshold whereby Excell would be in default.

9.      Moreover, although the First Agreement, and subsequent agreements, were couched as "receivables financing agreements", Excell, as a used car sales business, has no accounts receivable.  There is no consistent "billing cycle" associated with the used car business.

10.      Evidencing Spin's clear understanding of this fact, Spin did not request any accounting, breakdown, or explanation of the nature of Excell's receivables (or even make an attempt to confirm whether or not Excell *had* any receivables) from Excell in making its determination as to whether to lend Excell the money under the First Agreement.  Instead, Spin only examined Excell's bank statements for the past ninety days.  Given the lack of receivables, Excell was not eligible to enter into the First Agreement.

11.      Thus, for all practical purposes, since the payments were not governed under any time period, and did not depend on the amount of receivables (or receipts) acquired by Excell, each agreement into which Excell entered was, at its essence, a business loan with interest.

12.      Ultimately, as set forth below, the loan balance would be significantly increased through Hi Bar's unconscionable and usurious practices, either through a new revenue purchase agreement or onerous and unconscionable settlement agreements.

13.      After entering into the First Agreement, Excell made payments to Spin in the

- 4 -

amount of $717,375.00.

14. On or about October 18, 2021, Spin issued K Zankl a balance letter (Exhibit "2") stating that Excell had a balance of $2,264,312.50 remaining under the First Agreement.

15. In late October 2021, Excell secured financing for other, unrelated transactions, which required Excell to demonstrate in writing that the First Agreement had been fully paid off.

16. In consequence, Excell, through Zankl, communicated its concerns to Spin. By telephone, Spin's representative, upon information and belief, an individual named Josh Lubin ("Lubin") offered to transfer Excell's balance to another lender, Hi Bar, in which Lubin stated he had an interest, and to issue a payoff letter to assuage the concerns of the lender in the unrelated transaction.

17. Lubin, acting on behalf of both Spin and Hi Bar, understanding Excell's need to quickly assuage the other lender, and knowingly seeking to deceive Zankl in order to induce him to enter into a new and more onerous agreement on Excell's behalf, misrepresented to Zankl that the terms of the balance transfer agreement were what was termed a "no-net re-fi," which would result in a contractual amount substantially identical to the First Agreement. If Lubin's representations had been true, they would have meant that Excell, in essence, would be paying off the same or similar balance owed to Spin to Hi Bar on the same terms as under the First Agreement.

18. However, Lubin's statements were false. Spin and Hi Bar's representatives knew at all times that they were really offering Zankl and, by extension, Excell, a much more onerous loan agreement with substantial additional principal owed to the lender without providing any additional benefit to Excell.

19. In order to close the deal, Lubin exerted pressure on Zankl, and by extension, Excell, to immediately accept the agreement or the payoff letter would not issue, ruining the unrelated transaction. Unfortunately, Zankl was out of the office at the time of these discussions, communicating with Lubin exclusively by telephone, and had no opportunity to review the proposed agreement or consult with legal or financial counsel. Instead, he believed Lubin's oral misrepresentations that he was simply making a balance transfer between Spin and Hi Bar in order to obtain a payoff letter.

20. In order to ensure the unrelated transaction would close, Zankl accepted Lubin's false and misleading offer and authorized his electronic signature on two new agreements with Hi Bar (the "Balance Transfer" and the "Second Agreement") (Exhibits "3" and "4") both dated October 27, 2021.

21. Prior to entering into the Balance Transfer and Second Agreement, Hi Bar did not request any accounting, breakdown, or explanation of the nature of Excell's receivables (or even make an attempt to confirm whether or not Excell *had* any receivables) from Excell.

22. Under the Balance Transfer, Hi Bar paid off the Spin loan and issued a payoff letter. However, under the Second Agreement, Hi Bar did not credit Excell for the approximately $880,000 it had already paid under the First Agreement. Instead, Zankl belatedly discovered that Excell now owed $3,177,880 under the Second Agreement, to be paid in weekly installments of $150,000.

23. The Second Agreement provided no additional funds to Excell.

24. Like Spin, Hi Bar did not arrange for an approved bank account to be secured, reviewed or analyzed Excell's "receivables" or lack thereof. In essence, the Second Agreement was a duplicate of the First Agreement with Hi Bar replaced as the lending party,

- 6 -

an increase of over $1 million of repayment obligations without providing any consideration to Excell.

25.      Moreover, at this time, Excell did not have receivables and should not have been eligible to enter into the Second Agreement.

26.      Excell made subsequent payments to Hi Bar under the Second Agreement.

27.      In mid-December 2021, Excell, according to Hi Bar, had an outstanding balance of $2,677,880.

28.      At this time, Hi Bar contacted Zankl through its counsel ("Hi Bar Counsel"), and, inexplicably, advised Zankl that Excell was in "default" under the Second Agreement.

29.      Hi Bar never defined this event of "default".

30.      Despite the fact that the Second Agreement, like the First Agreement, contained provisions that confirm that there is no specific repayment period, and that the repayment was tied to the amount of receivables, Hi Bar Counsel refused to provide Excell with additional time.  Further, a lack of payment due to, among other things, a "slowdown in business" is explicitly deemed "NOT" an event of default.

31.      Despite the lack of default, Hi Bar Counsel sent Zankl a "Settlement Agreement", which he stated Zankl must sign or Hi Bar would proceed to file a lawsuit against Excell, Zankl, K Zankl, and the Additional Contracting Parties.

32.      Faced with the threat of legal action, Zankl agreed to the terms of the "Settlement Agreement", which in reality was a third loan agreement (the "Third Agreement", Exhibit "5").

33.      As with the Second Agreement, the Third Agreement provided no additional consideration or monies to Zankl; rather, it only increased the balance owed, now to

- 7 -

Case 23-01132-EPK    Doc 27-7    Filed 10/16/23    Page 11 of 19

$4,016,820 at a "1.5 factor rate"—over $1,000,000 more than the original principal in the First Agreement with Spin.

34.      Notably, Excell by this time had paid over $1,200,000 towards the First and Second Agreements.

35.      Thereafter, Excell made two additional payments of $200,000 under the Third Agreement.

36.      In January, 2022, Excell had additional cash flow issues and Zankl again requested more time from Hi Bar for Excell to make its payments under the Third Agreement.

37.      Hi Bar, through Hi Bar Counsel, again refused, and Hi Bar Counsel sent Zankl a second "Stipulation of Settlement"—even though, again, there was no lawsuit pending between the parties.  Under this fourth loan agreement, which none of the Third-Party Plaintiffs executed, Hi Bar sought a principal of $3,800,000 (the "Unsigned Stipulation", Exhibit "6").

38.      Excell, in a good-faith effort to pay off its remaining debts to Hi-Bar under the Third Agreement, paid Hi Bar an additional $1,300,000, bringing the total amount paid by Excell to $3,083,687.50.

39.      On January 28, 2022, however, Hi Bar Counsel, purporting to act on behalf of Hi Bar, filed a lawsuit in the Supreme Court of New York, New York County, Index No. 502846/2022 against all of the Third-Party Plaintiffs (See, Summons and Complaint (the "Complaint"), NYSCEF Doc. No. 1).

40.      Hi Bar claims to have served Zankl, on behalf of Excell, in Florida, which would have given the Third-Party Plaintiffs 30 days from service on January 31, 2022 to answer the Complaint (NYSCEF Doc. Nos. 3-4).

41.      However, on February 17, 2022, prior to Third-Party Plaintiffs' deadline to

respond to the Complaint, Hi Bar Counsel also sought, without proper application, a Clerk's Default Judgment against Third-Party Plaintiffs, crediting only the $1,300,000 payment, and claiming to be entitled to judgment under the Unsigned Stipulation in the amount of $2,500,000. The Clerk's judgment also sought $625,000 in attorney's fees, and additional costs and disbursements (NYSCEF Doc Nos. 5 and 6, the latter of which the Clerk returned to Hi Bar Counsel's office for correction).

42. Thereafter, Third-Party Plaintiffs appeared by the undersigned counsel on February 24, 2022 and February 28, 2022 (NYSCEF Doc. Nos. 10-13), and timely filed an Answer and Affirmative Defenses to the Complaint on February 28, 2022 (NYSCEF Doc. No. 14).

43. On or about March 1, 2022, the Court, *sua sponte*, rejected Hi Bar's application for a Clerk's Default Judgment and returned it to Hi Bar Counsel for correction.

44. On or about March 7, 2022, Hi Bar filed a motion to strike the answer and enter default judgment.

45. The return date on that motion has been adjourned to August 17, 2022 by the Court as a result of its full docket until that time.

### AS FOR A FIRST CAUSE OF ACTION
(Fraud In The Execution and Inducement)

46. Third-Party Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs as if set forth fully herein.

47. Spin referred Third-Party Plaintiffs to Hi Bar in order to execute a no-net refinance of Third-Party Plaintiffs' loan from Spin; that is to say, to transfer the balance to Hi Bar on the same terms as the First Agreement and to pay off the sum owed under the First Agreement.

48.     Spin falsely represented to Third-Party Plaintiffs that the transaction would be a no-net refinance.

49.     In fact, Hi Bar intended to increase, and did increase, Third-Party Plaintiffs' principal balance well in excess of the amount Third-Party Plaintiffs had borrowed from Spin, in transferring the balance due under the First Agreement.

50.     Spin had full knowledge of its misrepresentations to Third-Party Plaintiffs, but also knew that Third-Party Plaintiffs were in a time-sensitive unrelated financing that depended on their being able to demonstrate a payoff of the First Agreement. Spin intended to induce Plaintiffs to enter into the Second Agreement through its misrepresentations.

51.     Therefore, Spin preyed upon Third-Party Plaintiffs' lack of knowledge and induced them to agree to enter into the Second Agreement while Third-Party Plaintiffs were out of the office and had no access to the Second Agreement or opportunity to review it other than over the telephone with Lubin. Lubin presented the Second Agreement as a take-it-or-leave-it proposition.

52.     As a result of Spin's knowing misrepresentations, high pressure tactics, and inducements, Zankl, on behalf of Excell, authorized Third-Party Plaintiffs to enter into the Second Agreement by telephone and authorized his signature to be electronically input on same.

53.     As a result, the Second Agreement, and any subsequent alleged agreements as between Hi Bar and Third-Party Plaintiffs, were and are void ab initio as a matter of law.

54.     Third-Party Plaintiffs then made payments to Hi Bar under the fraudulently executed and induced Second Agreement and subsequent alleged agreements between Hi Bar and the Third-Party Plaintiffs.

- 10 -

55.     Hi Bar received and retained these payments as a result of its, and Spin's, fraudulent conduct.

56.     Spin and Hi Bar attempted to mask their loan agreements as Revenue Purchase Agreements.  However, neither Spin nor Hi Bar conducted themselves in accordance with the agreements.  Specifically, neither Spin nor Hi Bar (i) investigated or analyzed Excell's lack of receivables; (ii) maintained bank accounts that would allow for the transfer of 20% of future receipts to repay the Purchased Amount; and (iii) properly declared an event of default and instead declared an event of default based upon lack of payment of the loan, which was not permitted under the agreements.

57.     As a result, the First Agreement and Second Agreements were not proper Revenue Purchase Agreements, and thus were in effect loans.  Therefore, the so-called "Settlement Agreements" were built upon usurious and unconscionable agreements, and have no force and effect.  Thus, any waiver of any defenses are without basis in law and fact.

58.     As a result, Third-Party Plaintiffs have been damaged in an amount to be determined at trial, but estimated to be in excess of $1,000,000.00.

## AS FOR A SECOND CAUSE OF ACTION
(Criminal Usury)

59.     Third-Party Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs as if set forth fully herein.

60.     NY Penal Law §190.40 provides that a party is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, "he knowingly charges, takes, or receives any money or other property as interest on the loan or forbearance or any money or other property, as a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period".  The act of criminal usury is a Class E felony.

61.    Third-Party Plaintiffs entered into the First Agreement, a loan agreement, with Spin Capital to borrower $2,000,000 and repay Spin $2,998,000.

62.    Third-Party Plaintiffs paid approximately $883,687.50 of this balance.

63.    However, after fraudulently inducing Third-Party Plaintiffs to enter into the Second Agreement in October 2021 disguised as a "balance transfer", Spin, in concert with Hi Bar increased the principal balance from the $2,114,312.50 Third-Party Plaintiffs had owed to Spin to $3,177,880, a 50.3% increase in the loan charges.

64.    From the inception of the First Agreement until this time, Excell had already made payments of $1,383,687.50.

65.    Subsequently, by intimidating Third-Party Plaintiffs into executing the Third Agreement, Hi Bar increased the loan charges another 50% to $4,016,820.

66.    Each of these increases in the loan charges was well in excess of the permissible 25% maximum permitted under New York law.

67.    Spin, by working in concert with Hi Bar in combining the First, Second, and Third Agreements is guilty of criminal usury because the First, Second, and Third Agreements were one integrated transaction which is usurious as to both Spin and Hi Bar.

68.    Spin and Hi Bar attempted to mask their loan agreements as Revenue Purchase Agreements. However, neither Spin nor Hi Bar conducted themselves in accordance with the agreements. Specifically, neither Spin nor Hi Bar (i) investigated or analyzed Excell's lack of receivables; (ii) maintained bank accounts that would allow for the transfer of 20% of future receipts to repay the Purchased Amount; and (iii) properly declared an event of default and instead declared an event of default based upon lack of payment of the loan, which was not permitted under the agreements.

- 12 -

69.    As a result, the First Agreement and Second Agreements were not proper Revenue Purchase Agreements, and thus were in effect loans. Therefore, the so-called "Settlement Agreements" were built upon usurious and unconscionable agreements, and have no force and effect. Thus, any prohibitions against the defense of Usury or waiver of any defenses are without basis in law and fact.

70.    As a direct result of Spin's criminally usurious actions, Third-Party Plaintiffs have been damaged in an amount to be determined at trial, but estimated to be in excess of $1,000,000.

**AS AND FOR A THIRD CAUSE OF ACTION**
(Unjust Enrichment)

71.    Third-Party Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs as if set forth fully herein.

72.    Spin has unlawfully retained Third-Party Plaintiffs' payments, which are well in excess of the amounts due under the loan terms of the First Agreement.

73.    Further, Spin obtained such payments by preying upon Third-Party Plaintiffs' financial vulnerability, failing to provide consideration for their agreements with Third-Party Plaintiffs, committing fraud in the execution and fraud in the inducement, and committing criminal usury, on multiple occasions.

74.    It is therefore against equity and good conscience for Spin to retain its ill-gotten payments from Third-Party Plaintiffs, and such payments were and are to Third-Party Plaintiffs' detriment.

75.    Equity requires that Spin disgorge its ill-gotten payments from Third-Party Plaintiffs.

76.    Spin and Hi Bar attempted to mask their loan agreements as Revenue Purchase

Agreements. However, neither Spin nor Hi Bar conducted themselves in accordance with the agreements. Specifically, neither Spin nor Hi Bar (i) investigated or analyzed Excell's lack of receivables; (ii) maintained bank accounts that would allow for the transfer of 20% of future receipts to repay the Purchased Amount; and (iii) properly declared an event of default and instead declared an event of default based upon lack of payment of the loan, which was not permitted under the agreements.

77.     As a result, the First Agreement and Second Agreements were not proper Revenue Purchase Agreements, and thus were in effect loans. Therefore, the so-called "Settlement Agreements" were built upon usurious and unconscionable agreements, and have no force and effect. Thus, any waiver of any defenses are without basis in law and fact.

78.     As a result of the foregoing, Spin has been unjustly enriched, and Third-Party Plaintiffs have been damaged in an amount to be determined at trial, but estimated to be in excess of $1,000,000.00.

WHEREFORE, Third-Party Plaintiffs demand judgment as follows:

(a)     Dismissing the Complaint in its entirety;

(b)     On the First Cause of Action, in favor of Third-Party Plaintiffs and against the Third-Party Defendant Spin Capital LLC in an amount to be determined at trial, estimated to be in excess of $1,000,000.00, together with interest thereon;

(c)     On the Second Cause of Action, in favor of Third-Party Plaintiffs and against the Third-Party Defendant Spin Capital LLC in an amount to be determined at trial, estimated to be in excess of $1,000,000.00, together with interest thereon;

(d)     On the Third Cause of Action, in favor of Third-Party

Plaintiffs and against the Third-Party Defendant Spin Capital LLC in an

amount to be determined at trial, estimated to be in excess of $1,000,000.00,

together with interest thereon;;

(e)     For Punitive Damages resulting from Spin Capital LLC's

criminally usurious, unconscionable, and felonious conduct;

(f)     For costs and disbursements in this action, including attorneys'
fees; and

(g)     For such other and further relief as the court deems just, equitable
and proper.

Dated: New York, New York
March 18, 2022

SICHENZIA ROSS FERENCE LLP

By: _____
Michael H. Ference, Esq.
Sameer Rastogi, Esq.
Owen A. Kloter, Esq.
1185 Avenue of the Americas, 31st Floor
New York, New York 10036
(212) 930-9700

*Attorneys for Third-Party Plaintiffs*

- 15 -

FILED: KINGS COUNTY CLERK 03/18/2022 03:57 PM
NYSCEF DOC. NO. 37
INDEX NO. 502846/2022
RECEIVED NYSCEF: 03/18/2022

## VERIFICATION

STATE OF NEW YORK )
                    ) ss.: Manhattan
COUNTY OF NEW YORK )

1.      The undersigned attorney for Third-Party Plaintiffs, admitted to practice in the Courts of the State of New York, affirms that he has read the foregoing Verified Third-Party Complaint, and knows the contents thereof, that the same is true to his own knowledge, except as to matters therein stated to be alleged upon information and belief, and, as to those matters, he believes them to be true.

2.      This Verification is made by me because Third-Party Plaintiffs' residences and/or principal places of business are not in the County where Sichenzia Ross Ference LLP has its office.

3.      The source of my belief as to all matters not stated upon knowledge is information provided by Third-Party Plaintiffs.

4.      The undersigned affirms that all of the foregoing statements are true under penalty of perjury.

Dated: New York, New York
       March 18, 2022

Owen A. Kloter, Esq.