UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:

              EXCELL AUTO GROUP, INC.

          Debtor.

Case No.: 22-12790-EPK
Chapter 7

--------------------------------------------------------------------- /
NICOLE TESTA MEHDIPOUR, as Chapter 7 Trustee for
Excell Auto Group, Inc.

          Plaintiff.

       -v-

HI BAR CAPITAL, LLC, SPIN CAPITAL LLC,
YISROEL HERBST, MORDECHAI DOV BER
HERBST a/k/a MORDI HERBST, AVRUMI LUBIN
a/k/a JOSH LUBIN, FRANKLIN CAPITAL FUNDING,
LLC and FRANKLIN CAPITAL GROUP, LLC d/b/a
WING LAKE CAPITAL,

          Defendants.

Adv. Pro. No. 23-01132-EPK

--------------------------------------------------------------------- /

## HI-BAR CAPITAL, LLC, MORDECHAI HERBST, AND YISROEL HERBST'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

Defendants, Hi-Bar Capital, LLC ("Hi-Bar"), Mordechai Herbst, and Yisroel Herbst, (collectively, "Hi-Bar Defendants"), file the following Motion to Dismiss Plaintiff's First Amended Complaint, and state the following in support thereof:

## INTRODUCTION

As this Court is aware, when considering a motion to dismiss, all facts alleged in the complaint, to the extent they are not contradicted by the attached documents, are deemed true. In its Corrected First Amended Complaint ("FAC"), Plaintiff alleges eighteen causes of action against the Hi-Bar Defendants. In general, Plaintiff seeks to unwind and void a merchant cash advance agreement and subsequent settlement agreements entered between the Debtor and Hi-Bar. Moreover, Plaintiff seeks damages from Hi-Bar, its agents, and other entities based on allegations that they engaged in conduct violating Federal RICO statutes. However, as described below,

1

Plaintiff's claims, which are largely based on the unsupported allegation that the Hi-Bar Agreements are usurious loan agreements, should be dismissed for failing to state a cause of action.[1] Moreover, even if the Agreements were, in fact, loans and usurious (which they are not), the Debtor fully released the Hi-Bar defendants from any claims that could have been asserted on this basis. As such, the majority of Plaintiff's claims should be dismissed.

## ARGUMENT

I.   **The Claims Asserted Against the Hi-Bar Defendants are Barred by the Releases in the Debtor's Two Settlement Agreements**

The First and Second Settlement Agreements entered between Hi Bar and the Debtor require dismissal of the claims asserted in the FAC. Under New York law, which the Settlement Agreements must be interprerted under, "a valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011). Where the release is broadly worded and releases such persons as, for example, "agents" of the signatories, all claims between a party to the release and the agents of the other party are barred. *Ctr. Lane Partners III, L.P. v. Nature's Bounty Co.*, 193 A.D.3d 498, 498 (1st Dept. 2021). Notably, a release bars claims of criminal usury under New York law provided that the settlement agreement itself is not usurious. *OriginClear Inc. v. GTR Source, LLC,* 2021 WL 5907878 (W.D.N.Y. Dec. 14, 2021).

The FAC alleges that Hi Bar entered into the First and Second Settlement Agreements with the Debtor and Debtor Affiliates, which contained releases for Hi Bar and its "directors," "officers," "agents," and "employees." As alleged in the FAC, Mordechai and Yisroel Herbst fall squarely within the aforementioned definitions. *See* FAC at ¶¶ 4 -5. Specifically, on December 19, 2023, Hi Bar and the Debtor entered the First Settlement Agreement, with a total settlement amount of $4,016,820.00. FAC ¶ ¶ 166, Exh. J.[2] Paragraph 6 states:

> Upon the Effective Date [December 19, 2021], the Sellers …. Discharges Purchaser and its respective parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers and assigns of an from any and all claims … arising from … the

---

[1] The Hi-Bar Defendants are not moving to dismiss Counts XXVI and XXVII, which allege claims for avoidance of preferential payments to Hi-Bar. While Defendants dispute the merits of those claims, they are adequately pled. However, Defendants respectfully request an enlargement of time to respond to those claims pending resolution of this Motion to Dismiss, especially since many of the allegations that are subject to attack in this Motion are incorporated into those two counts.

[2] The Exhibits referenced throughout this motion are exhibits to the FAC.

Action or the underlying Agreement, including any claims that were or could have been asserted, other than Purchaser's obligations under this Settlement Agreement.

*Id.* (emphasis supplied); *see* FAC ¶ 171 ("[t]he First Settlement Agreement required the Debtor and related non-debtor entities to give complete releases for the entry of the First Settlement Agreement other than Hi Bar's obligations under the First Settlement Agreement."). Next, paragraph 7 of the First Settlement Agreement states, "[Debtor] and Guarantor further agree to waive all defenses, claims, or counterclaims that may arise from this Agreement or the Purchase Agreement." *See* Exh. J.

Second, the FAC admits that on February 1, 2022, Hi Bar and the Debtor entered the Second Settlement Agreement, with a total settlement amount of $3,800,000.00. FAC ¶ 181, Exh. K. Paragraph 6 contains a nearly identical release provision to the First Settlement Agreement, and paragraph 7 provides, "Merchant and Guarantors hereby withdraw any defenses they may have to the claims asserted in the [New York] Action." *Id.*

"[A]bsent fraud, duress, illegality, mutual mistake or other cause sufficient to invalidate a contract, the signing of a release that contains clear and unambiguous language is a jural act binding on the parties." *Stevens v. Town of Chenango (Forks)*, 167 A.D.3d 1105, 1106 (3d Dept. 2018). "[A] signed release shifts the burden of going forward to the plaintiff to show that there has been fraud, duress or some other fact which will be sufficient to void the release." *Centro Empresarial Cempresa*, 17 N.Y.3d at 276. Here, there are no allegations that the Settlement Agreements were the product of fraud, duress, illegality or mutual mistake upon or concerning the Debtor (let alone allegations pled with specificity). While Plaintiff asserts the settlements were "done under the threat of litigation" on a usurious contract and are therefore "unconscionable" (FAC ¶¶ 357, 363), settlement agreements are typically entered between parties when litigation is contemplated and as set forth below, there is nothing usurious about the First Hi Bar Contract. *See e.g. Cooper Dev. Co. v. Friedman*, 1994 WL 62846, at *4 (S.D.N.Y. Feb. 22, 1994), *aff'd sub nom. Cooper Dev. v. Friedman*, 43 F.3d 1458 (2d Cir. 1994)("Under New York law, threats to enforce a party's legal rights under a contract—or even that party's interpretation of its rights—cannot constitute a wrongful threat sufficient to establish a claim of economic duress.")

Finally, contrary to Plaintiff's allegations that the First and Second Settlement Agreements were subject to New York criminal usury law (FAC ¶¶ 211, 213), they are exempt as a matter of law because the face value of each agreement exceeds $2.5 million. N.Y. Gen. Oblig. Law § 5-501(6)(b) ("No law regulating the maximum rate of interest which may be charged, taken or

received, including section 190.40 and section 190.42 of the penal law [the criminal usury statutes], shall apply to any loan or forbearance in the amount of two million five hundred thousand dollars or more."); *72nd Ninth LLC v. 753 Ninth Ave Realty LLC*, 168 A.D.3d 597, 598 (1st Dept. 2019) ("the usury statute does not apply to loans, like the one at issue in this case, that are for amounts greater than $2.5 million."). New York law focuses solely at the face amount of the loan document in determining whether it meets the $2.5 million cap on the criminal usury law, not to the actual amount advanced. *Star Funding, Inc. v. Vault Minerals, LLC*, 2018 WL 158685, *3 (S.D.N.Y. Mar. 28, 2018) ("courts consider the amount agreed upon between corporations, not the actual loan amount, in determining the applicability of criminal usury laws. … the relevant 'loan' amount in this case was the amount agreed to by the parties as set forth in the Agreement, not the actual loan amount") (citing *Tides Edge Corp. v. Cent. Fed. Sav., F.S.B.*, 151 A.D.2d 741, 741-42 (2d Dept. 1989)); *Spin Capital, LLC v. Golden Foothill Ins. Servs., LLC*, 2023 WL 2265717 (N.Y. Co. Sup. Ct. Feb. 28, 2023) (loan not subject to criminal usury where "the face amount of the Loan … is $2.7 million and this amount exceeds the $2.5 million threshold to which New York's usury laws apply" even through "[t]he Loan included [only] $1,307,403 in new money" and "$1,162,597 to satisfy the defendants' obligations under" prior obligations to the lender).

Indeed, while *res judicata* does not apply to the Hi-Bar defendants, a New York court has previously determined that the First and Second Settlement Agreements were not usurious as a matter of law since they have face values of $4,016,820.00 and $3,800,000.00 respectively. *See e.g. Hi Bar Capital, LLC v. Excell Auto Group, Inc.*, 2023 N.Y. Slip Op. 31593(U), 3, 2023 WL 3431299, at *4 (N.Y.Sup.) ("the Purchase Agreement, Settlement Agreement and Stipulation— concern amounts greater than $2.5 million. As such, defendants' defense of criminal usury fails as a matter of law."). Therefore, Counts III, VI, VII, VIII, XVII, XVIII, XIX, XX, XXI, XXII, XVIII, XXXIV, XXV, and XXVIII should be dismissed because they are barred by the release language contained in the First and Second Settlement Agreements.

## II.    The Hi Bar Contract are Not Loans or Subject to New York Usury Laws

A number of the counts alleged against the Hi-Bar Defendants (Counts III, V, VI, VII, VIII, XVII, XVIII, XIX, XX) are predicated on the erroneous assertion that the Hi Bar Contracts constitute loans that charge interest in excess of the 25% limit under New York's criminal usury statute, N.Y. Penal L. § 190.40. However, because the Hi Bar Contracts are not loans subject to New York usury laws, each of these counts must be dismissed.

Two well-established principles of New York law preclude a finding of usury in this case, First, there is a strong presumption *against* usury, and second, a transaction cannot be usurious if it is not a loan.  Given the fact that a strong presumption exists against a finding of usury, a party claiming usury bears the heavy burden of proving it by clear and convincing evidence. *Giventer v. Arnow*, 37 N.Y.2d 305, 309 (1975); *Roopchand v. Mohammed*, 154 A.D.3d 986, 988 (2d Dept. 2017).  Further, "[i]f the transaction is not a loan, there can be no usury, *however unconscionable the contract may be*." *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 665 (2d Dept. 2020) (emphasis supplied). Under New York law, "[t]o constitute a loan, the agreement must provide for repayment absolutely and at all events or that the principal in some way be secured as distinguished from being put in hazard." *Cash4Cases, Inc. v. Brunetti*, 167 A.D.3d 448, 449 (1st Dept. 2018). "Ordinarily, a loan consists of a face value, repayable (with interest) over a finite period DEFINED in the transaction documents." *Pirs Capital, LLC v. D & M Truck, Tire & Trailer Repair Inc.*, 69 Misc. 3d 457, 463 (N.Y. Sup. Ct. 2020)(emphasis in original). "If a transaction instead has a non-finite term, that suggests that the transaction is instead a purchase of future receivables." *Id.*

Further, under New York law, an MCA agreement is not considered a loan because it is a purchase of receivables. *Principis Capital, LLC v. I Do, Inc.*, 201 A.D.3d 752, 754-55 (2d Dept. 2022). In reviewing whether an MCA agreement is a true purchase of receivables, New York courts apply a three-factor test:

> The court must examine whether the plaintiff is absolutely entitled to repayment under all circumstances. Unless a principal sum advanced is repayable absolutely, the transaction is not a loan. Usually, courts weigh three factors when determining whether repayment is absolute or contingent: (1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy.

*Principis Capital*, 201 A.D.3d at 754. Where all three factors are present, an agreement is an MCA agreement not subject to usury laws. *Principis Capital*, 201 A.D.3d at 754 (granting summary judgment to funder). The Southern District of New York, in a RICO action, recently endorsed the *Principis* test when determining whether an MCA agreement is a loan transaction or purchase of receivables. *US Info. Group LLC v. EBF Holdings, LLC,* 2023 WL 6198803, at *11 (S.D.N.Y. Sept. 22, 2023) (dismissing RICO action where agreement complied with three factors).

Applying the *Principis* three-factor test, New York courts have rejected challenges to the type of agreement used in the Spin Contracts and First Hi Bar Contract. *See, e.g. Samson MCA*

*LLC v. Joseph A. Russo M.D. P.C./IV Therapeutics PLLC,* 219 A.D.3d 1126, 1128 (N.Y. App. Div. 2023).[3] The Hi-Bar contract provides that the parties intended the purchases of receivables, not loans:

> **Sale of Receipts.** Merchant and [Hi-Bar Capital] agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from HBC to Merchant. Merchant agrees the Purchase Price is in exchange for the Receipts pursuant to this Agreement and that it equals the fair market value of such Receipts… Payments made to HBC in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers.

Exh. I at ¶ 1.10. On the first page of the contract, the parties stipulated, "Merchant is selling a portion of a future revenue stream to HBC at a discount, *and is not borrowing money from HBC,* therefore there *is no interest rate or payment schedule and no time period during which the Purchase Amount must be collected by HBC*." Exh. I (emphasis supplied); *see Colonial Funding Network, Inc. v. Davincitek Corp.*, 2021 WL 39591 (N.Y. Co. Sup. Ct. 2021) (finding MCA was not loan, in part where the parties expressly agreed "that they are entering into a purchase and sale of future receivables.") The FACs ignores the three-factor test and, instead merely asserts conclusory allegations to the contrary.

### 1.     The Hi Bar Contract Contains a Mandatory Reconciliation and Adjustment Provisions

An MCA agreement is not a loan even if it contains a fixed daily remittance as an estimate of a specified percentage of daily receivables where "the Agreement provided no liability in the event that the seller's business failed because it could not generate sufficient revenue to continue operating." *IBIS Capital Group, LLC v. Four Paws Orlando LLC,* 2017 WL 1065071 (Sup.Ct. Nassau Co. March 10, 2017). The fixed amount can be adjusted through a reconciliation provision, which allows the merchant to request a reduction of the remittance amounts to reflect diminutions of its receivables. *Quicksilver Capital LLC v. Obioha*, 2020 WL 2332754, (N.Y. Co. Sup. Ct. May 11, 2020) ("[t]he agreement contains a reconciliation provision … provid[ing] that plaintiff is to collect future receivables based on amounts collected by defendant during a particular calendar

---

[3] *Accord Spin Capital, LLC v. Golden Foothill Ins. Servs., LLC*, 2023 N.Y. Slip Op. 30594(U) (N.Y. Co. Sup. Ct. Feb. 28, 2023); *Spin Capital v. Tex. Med. Ctr. Supply, LLC*, 2022 N.Y. Slip Op. 32914(U) (Ontario Co. Sup. Ct. Aug. 29, 2022); *Excell Auto Grp.*, 2023 N.Y. Slip Op. 31593(U) at *3-4; *see also Barrier Grp.*, 2023 N.Y. Misc. LEXIS 1032, at *19-21; *BMF Advance, LLC v. Litig. Practice Grp. PC*, 2023 N.Y. Misc. LEXIS 993, at *6 (Kings Co. Sup. Ct. Feb. 24, 2023).

month. If defendant is not in default, she may once each calendar month request that plaintiff reconcile the [monthly amount to be paid by defendant] to more closely reflect defendant's actual future receipts times the purchased percentage.").

The First Hi Bar Contract contains a mandatory reconciliation (*i.e.*, to true up total payments with receivables generated for the prior period) and adjustment (*i.e.,* to make the regular remittance more closely reflect the receivables) provisions:

> 1.3 <u>Reconciliation</u>. As long as an Event of Default, or breach of this agreement, has not occurred, Merchant may request a **retroactive reconciliation** of the total Remittance Amount. All requests hereunder must be in writing to reconciliations@hibarcapital.com. Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding if applicable, from the date of this Agreement through and including the date the request is made. … Such reconciliation, if applicable, **shall be performed** by HBC within two (2) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by HBC shall equal the Specific Percentage of the Future Receipts that Merchant collected during the requested month. …

> 1.4 <u>Adjustments to the Remittance</u>. As long an Event of Default, or breach of this agreement, has not occurred, Merchant may give notice **to HBC to request a decrease in the Remittance, should they experience a decrease in its Future Receipts**. All requests hereunder must be in writing to reconciliations@hibarcapital.com and must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding from the date of this Agreement through and including the date the request is made. … The Remittance **shall be modified** to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. …

Exh. I (emphases supplied). "A reconciliation and an adjustment provision help ensure that, on a retrospective basis, the merchant has not paid an amount that is disproportionate to the receivables that the funder has actually acquired, and going forward, where the merchant has experienced a steady decrease in its Daily Receipts, the merchant has the right to request a modification of the amount of the fixed daily payment." *Lateral Recovery, LLC v. Capital Merch. Services, LLC,* 632 F. Supp. 3d 402, 458 (S.D.N.Y. 2022*)* (determining form agreements that contain these provisions are "are agreements for the purchase of receivables when viewed in their totality"). The above referenced provisions are not an illusory reconciliation provisions, rather mandatory ones, since they use the term "shall." *Streamlined Consultants, Inc. v. EBF Holdings LLC,* 2022 WL 4368114,

7

at *1 *(S.D.N.Y. Sept. 20, 2022)* ("*Streamlined I*") ("the Funding Agreement includes a reconciliation provision, which—contrary to Plaintiffs' baseless argument in opposition— provides that reconciliation is mandatory if requested by Streamlined Consultants[,]" since it provided … Within four business days … [funder] *shall* reconcile …");[4] *US Info. Group LLC v. EBF Holdings, LLC,* 2023 WL 6198803, at *10 (S.D.N.Y. Sept. 22, 2023) ("shall" in reconciliation provision makes it mandatory).  As such, Hi-Bar satisfies this factor.

### 2. *The Hi-Bar Contract Has No Fixed Duration*

"Ordinarily, a loan consists of a face value, repayable (with interest) over a finite period DEFINED in the transaction documents." *Pirs Capital, LLC v. D & M Truck, Tire & Trailer Repair Inc.*, 69 Misc. 3d 457, 463 (N.Y. Sup. Ct. 2020)(emphasis in original). "If a transaction instead has a non-finite term, that suggests that the transaction is instead a purchase of future receivables." *Id.; see also Streamlined Consultants, Inc. v. EBF Holdings LLC*, 2022 WL 4368114, at *5 (S.D.N.Y. Sept. 20, 2022). Here, the Hi Bar Contract has indefinite terms since it expressly provides that it is "in full force an effect until the entire Purchased Amount and any other amounts due are received by HBC as per the terms of this Agreement." Exh. I ¶ 1.2. It also explicitly provides on the first page for "no interest rate or payment schedule and no time period during which the Purchase Amount must be collected by HBC." Exh. I. Moreover, the contract is subject to extension over an indefinite duration because it is subject to regular adjustments under the reconciliation provision. *Principis Capital*, 201 A.D.3d at 754 ("Concomitantly, as the amount of the monthly payments could change, the term of the agreement was not finite."). The durations are "contingent upon [the merchant's] actually generating sales and those sales actually resulting in the collection of revenue." ." *IBIS Capital Group, LLC v. Four Paws Orlando LLC,* 2017 WL 1065071, *2 (Sup.Ct. Nassau Co. March 10, 2017). "The existence of this uncertainty in the length of the Agreement is an express recognition by the parties of the wholly contingent nature of this Agreement." *Id.* at * 3. As such, Hi-Bar satisfies this factor.

### 3. *Bankruptcy Is Not an Event of Default*

An MCA is not a loan where, like here, there is "no contractual provision existed establishing that a declaration of bankruptcy would constitute an event of default." *Principis Capital, LLC v. I Do, Inc*., 201 A.D.3d 752, 754, (2022); *see also Streamlined Consultants, Inc. v.*

---

[4] *Streamlined I*, a federal district court decision, was cited with approval by the New York Appellate Division in *Samson MCA*, 2023 N.Y. Slip Op. 04271, at ¶ 2.

*EBF Holdings LLC,* 2022 WL 4368114, at \*5 (S.D.N.Y. Sept. 20, 2022). Not only is bankruptcy not listed as an "Event of Default" under ¶ 3.1 of the Hi Bar Contract, but it specifically provides on their front pages, "Merchant going bankrupt or going of business…in and of itself, does not constitute a breach of this Agreement." As such, Hi-Bar satisfies this factor.

### 4.        *Plaintiff's Other Contentions that Hi Bar Contracts Are Loans Fail*

Notwithstanding that the unambiguous language of the Hi Bar Contract demonstrates it is a legitimate purchase of receivables in accordance with the *Principis* test, Plaintiff alleges:

> Furthermore, the First Hi Bar Contract contained false, misleading, and illusory provisions to disguise the fact that the First Hi Bar Contract  was in fact, a loan subject to applicable usury laws. Some of the false, misleading, or illusory provisions are: (i) that the Purchased Amount was based upon good faith estimates of the receipts purchased; (ii) no interest was being charged; (iii) that the Merchant and Guarantors are only guaranteeing their performance and not payment; (iv) the Remittance amount was subject to changes through a reconciliation provision.

FAC ¶ 124. These allegations not only seek to improperly expand the factors beyond the *Principis* test, but also fail on their own.

First, the parties mutually agreed on the daily remittances as good faith estimates of the receipts purchases not only from Debtor, but also from the Debtor Affiliates. Thus, "even if there were misstatements [about the value of the receivables], which there were not, the misstatements were made by the seller-defendants of the accounts receivable not the purchasers-Counterclaim Defendants." *Spin Capital, LLC v. Golden Foothill Ins. Services, LLC,* 2023 N.Y. Slip Op. 30594(U), 8, 2023 WL 2265717, at \*3 (N.Y.Sup.)(rejecting claim by merchant that the initial daily payment was not a good faith estimate of the receivables). Even if there were fluctuations in the estimates of receivables, as alleged in FAC ¶¶ 128-131, those estimates were agreed to and acknowledged by the Debtor and Debtor's Affiliates.[5]

Second, as a matter of law, no interest was charged under the Hi-Bar Contract.  Because the express terms of the Hi Bar Contract demonstrate a purchase of receivables and the amount to be remitted was subject to reconciliation and adjustment, no interest was being charged. Exh. I ¶ 1.9. Plaintiff does not, because she cannot, allege that if the Debtor took longer to remit the total

---

[5] To the extent Plaintiff argues, "[a] review of the Debtor's books and records for the three months prior to entering the First Hi Bar Contract demonstrates that there was insufficient revenue being generated by the Debtor to support the good faith estimate under the terms of the First Hi Bar Contract" (FAC ¶ 131), Plaintiff's allegations fail because they do not take into consideration revenues generated by the Debtor's Affiliates. Indeed, Plaintiff acknowledges elsewhere, "[t]he Debtor and the Non-Debtor entities are included in the definition of 'Merchant' or 'Seller.'  The Non-Debtor entities are separate businesses each with their own bank accounts." *Id.* ¶ 143.

purchased amounts of receivables, it would have ever had to pay any amount beyond the agreed purchase amounts. The amounts due do not increase with the passage of time.

Third, the Hi Bar MCA specifically provides for the Zankls' "Guaranty of *Performance*" (*i.e.*, that the Debtor and Debtor Affiliates comply with their obligations to remit and not divert receivables), not payment. *See id.* at p. 6 (Zankls "will not be personally liable for any amount due under the Revenue Purchase Agreement unless Merchant commits an Event of Default …"). A guaranty of performance, which makes the guarantor liable where there is an underlying default by the merchant, does not convert an MCA agreement into a loan. *E.g.*, *OriginClear Inc. v. GTR Source, LLC,* 2021 WL 5907878 (W.D.N.Y. Dec. 14, 2021) (not a loan where "the personal guaranty is no broader than the obligations under the agreements and the requirement of payment by [guarantor] is no greater than that of [merchant].") (alterations and citation omitted); *Womack v. Capital Stack, LLC,* 2019 WL 4142740, at *6 (S.D.N.Y. Aug. 30, 2019) ("Womack's Guaranty merely guaranteed 'prompt and complete performance of all of Seller's obligations under the Purchase Agreement.' Thus, Womack's obligations under the Guaranty were no broader than OTC's obligations under the Agreement … .)(citation omitted). Here, there is no provision that makes the Zankls obligated to make payment in the event Debtor and Debtor Affiliates had a business slowdown.

Fourth, Plaintiff cannot challenge whether the reconciliation or adjustment provisions were effective because there is no allegation the Debtor ever sought to exercise such rights and was denied. *See Streamlined Consultants, Inc. v. EBF Holdings LLC*, 2022 WL 4368114, at *4 (S.D.N.Y. Sept. 20, 2022)("This counsels against a finding that the Funding Agreement is a usurious loan, particularly where Plaintiffs have not alleged that reconciliation did not in actuality function as agreed (or, indeed, that Plaintiffs ever even requested reconciliation)."); *Pirs Capital, LLC v. D & M Truck, Tire & Trailer Repair Inc.*, 69 Misc. 3d 457, 462 (N.Y. Co. Sup. Ct. 2020) (rejecting argument that reconciliation was a sham were seller never ""equested an adjustment of the amounts being collected in order to account for the actual amount of its daily receivables.")

Finally, despite Plaintiff's allegations that the Hi-Bar MCA contained provisions to reduce risks (FAC ¶ 155), under New York law, an MCA agreement containing provisions reducing risk to the funder or that seem disadvantageous to the merchant do not itself render the MCA a loan. *See Fox Capital Group, Inc. v. Relik Realty, LLC,* 2023 WL 4712421, at *7 (N.Y.Sup.)("Most fundamentally, the Court considers that the Agreement requires plaintiff to bear some risk that the

Purchased Amount will not be paid in full, notwithstanding the excess of terms and conditions provided for its protection.").

### III.   <u>Count XVII For Declaratory Judgment Setting Aside the Hi-Bar Contract and Settlement Agreements Should Be Dismissed</u>

Count XVII seeks a declaration that the Hi-Bar Contract, the First Settlement Agreement, and Second Settlement Agreement are "void and unenforecable" because they are "unconsionable" under New York Law. *See* Count XVII, *genereally.* While the FAC doesn't state how the First and Second Settlement Agreement are "unconcionable," the Plaintiff alleges, once again, that the Hi-Bar Contract is a "criminally usurious loan" and "[t]o the extent that the First Hi-Bar Contract, the First Settlement Agreement and Second Settlement Agreement are voidable, the Trustee seeks to have each of these agreements declared void and unenforceable." FAC ¶ 364. This Count should be dismissed because under New York law, criminal usury is only an affirmative defense and cannot be the basis of a declaratory judgment cause of action, including seeking to declare void an MCA agreement. *Paycation Travel v. Glob. Merch. Cash*, 192 A.D.3d 1040, 1041 (2d Dept. 2021) ("General Obligations Law § 5-521 bars a corporation such as the plaintiff from asserting usury in any action, except in the case of criminal usury as defined in Penal Law § 190.40, *and then only as a defense to an action to recover repayment of a loan, and not as the basis for a cause of action asserted by the corporation for affirmative relief.*") (citations omitted; emphasis supplied); *Colonial Funding Network, Inc. for TVT Capital, LLC v. Epazz, Inc.,* 252 F. Supp. 3d 274, 279 (S.D.N.Y. 2017)("New York law [] [only] allows a corporation to assert criminal usury as a defense, but not as a claim for affirmative relief.") Clearly, there is no basis for a declaratory judgment that the Hi-Bar Contract is criminally usurious.

Furthermore, as to the claim that the Settlement Agreements should be declared void as being "unconscionable," New York law provides:

> A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made -- i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.

*Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 10 (1988); *Command Components Corp. v. HWJ Eng'g & Surveying, PLLC*, 189 A.D.3d 990, 992 (2d Dept. 2020).[6] Here, the FAC claims the Hi

---

[6] "The doctrine of unconscionability *rarely applies in a commercial setting*, where the parties are presumed to have equal bargaining power."  *Id.* A party to a financing agreement "is bound by the terms of his contract as made and cannot be relieved from his default, if one exists, in the absence of oppressive or unconscionable conduct on the latter's

Bar Settlements Agreements are substantively unconscionable, but contains no allegations that the Debtor entered these contracts with "an absence of meaningful choice," subject to oppressive conduct, or without the commercial sophistication to understand what it agreed to. *Dabriel, Inc. v. First Paradise Theaters Corp.*, 99 A.D.3d 517, 521 (1st Dept. 2012) ("All told, plaintiffs failed to plead anything regarding an alleged lack of meaningful choice … and it is noteworthy that plaintiffs were free to walk away from the lease negotiations at any time and rent space elsewhere.") (citation and quotation marks omitted).   As such, this Count should be dismissed.

## IV.   Counts I, II and XXVIII Concerning the Franklin Assignment and Balance Transfer Agreement Should Be Dismissed

Count I seeks a declaration that the Franklin Assignment is effective, and that (i) the total amount due from the Debtor to Spin as of October 21, 2021, was $1.00, which amount was satisfied," and (ii) "the First Spin Contract, Second Spin Contract, and Third Spin Contract and all other obligations owed by the Debtor or Claims against the Debtor or Third Parties arising from the Spin Contracts were assigned to Wing Lake."  FAC at pp. 35-45.

This count should be dismissed because it contradicts the clear and unambiguous language of the Franklin Assignment and principles of contract interpretation.  Under Michigan law (which governs the Franklin Assignment), interpretation of aassignments is governed by general principles of contract law. *Perkins v. Suburban Mobility Auth.*, 2022 Mich. App. LEXIS 5256, at *4-5 (Mich. App. Ct. Sept. 1, 2022). When an assignment contains broad/general language followed by more specific language, or a list of specific property/rights to be assigned, courts will generally interpret the assignment as limited to what is contained in the enumeration of property or rights.  *Price v. Haynes*, 37 Mich. 487, 489 (1877) ("The construction of [assignments] has been that they transferred only what was enumerated in the schedule if one was actually attached."). Only if there is no limiting language in an assignment will Michigan courts find broad assignments of *all* rights or property. *Coots v. Chamberlain*, 39 Mich. 565, 569 (1878).

Here, the Assignment—drafted by Franklin, a sophisticated lender with the means to perform due diligence—purports to sell:

> all outstanding obligations ("Obligations") of Excell Auto Group, Inc. and each of
> its affiliates (collectively, "Company") owing to Assignor under **each of (i) the
> Revenue Purchase Agreement, dated as of June 1, 2021, by and between**

---

part." *FGH Contracting Co. v. Weiss*, 185 A.D.2d 969, 971 (2d Dept. 1992) (citation, quotation and alterations omitted).

**Assignor and Company, and (ii) the Revenue Purchase Agreement, dated as of July 9, 2021, by and between Assignor and Company (collectively, the "Merchant Agreements")** and all rights of Assignor under **any similar or related documents (including without limitation, any guaranties, security agreements, forbearance agreements, settlement agreements and judgments)**, including with respect to all collateral securing the obligations of Company under the Merchant Agreements or securing any guaranties in respect thereof (the documents, including the Merchant Agreements, are defined collectively as the **"Merchant Documents")**, for a purchase price of $1.00 (the "Purchase Price").

FAC, Exh. L (emphases supplied). In other words, the broad definition of "Obligations" is specifically limited to the *enumerated First and Second Spin Contracts* (with *absolutely no mention of the Third Spin Contract* entered in August 2021). While Obligations is expanded to include "similar or related agreements," that does not cover the Third Spin Contract, since the general description "similar or related agreement" is given specific definition to include "any guaranties, security agreements, forbearance agreements, settlement agreements and judgments." *Id.* There is no indication from the text or context that it was intended to include an entirely different species of document, the deal documents for an entirely separate transaction, the Third Spin Contract. If there are ambiguities, they must be construed against Franklin, as drafter.

Since the Franklin Assignment limited "Obligations" to those under the First and Second Spin Contract (the "Merchant Documents"), and excluded the Third Spin Contract, the representations under paragraph 4 concerning "Obligations, the Merchant Documents and the Third Party" referenced in FAC ¶¶ 190-191, cannot be construed to cover or contain any representations concerning the balance under the Third Spin Contract, let alone demonstrate any rights therein had been assigned over to Franklin.

Consequently, Count II must also be dismissed, since that claim seeking to set aside the Balance Transfer Agreement dated October 27, 2023 (four days before the Franklin Assignment), is based upon the contention that Spin allegedly sold its interests in, and balance of $2,114,312.50 under, the Third Spin Contract to Franklin. FAC ¶¶ 200-203, Exh. H. Specifically, Plaintiff wrongly alleges, "Spin sold and assigned all outstanding Obligations and Merchant Documents of the Debtor and any claims against the Debtor or Third-Parties *which included the Third Spin Contract*, prior to the Hi Bar Transfer Agreement." *Id.* ¶ 202. But the Franklin Assignment said nothing about the Third Spin Contract, let alone a representation that there was no balance thereunder. Nor did it need to, since by that point Spin already executed the Balance Transfer

13

Agreement to Hi Bar, and Hi Bar entered the First Hi Bar Agreement with the Debtor Parties. *Id.*
¶¶ 113.

Finally, the Court should dismiss Count XXVIII for promissory estoppel, which Plaintiff
alleges is made "under New York law" (rather than Michigan law, which governs the Franklin
Assignment). FAC ¶ 481. "To prevail on such a cause of action, the party advancing it must
demonstrate that the opposing party made a clear and unambiguous promise, upon which the
former reasonably relied, to its detriment." *Wilson v. Dantas*, 29 N.Y.3d 1051, 1062 (2017). But
any "promises" made by Spin under the Franklin Assignment were made to Franklin, *not to the
Debtor* in whose shoes Plaintiff stands, which was not a party to the Franklin Assignment. *See
MatlinPatterson ATA Holdings LLC v. Federal Express Corp.*, 87 A.D.3d 836 (1st Dept. 2011)
(dismissing promissory estoppel claim where only alleged promise was contained in a letter
agreement between two other parties). Nor is it alleged Spin ever sent the Franklin Assignment to
the Debtor or communicated with the Debtor about it.  Furthermore, not only did the Debtor **not**
"reasonably rel[y] on the representation that the balance of the Obligations owed by the Debtor to
Wing Lake were zero and were all otherwise transferred to Wing Lake[,]" as falsely alleged by
Plaintiff (FAC ¶ 491), but Plaintiff actually alleged the Debtor knew that such alleged "promise"
was not correct at the time the Franklin Assignment:

> The Hi Bar Transfer Agreement was purportedly signed by Kristen Zankl on
> October 28, 2021, and signed by Scott Zankl on November 1, 2021. Despite the
> representations and warranties made by Spin and Josh Lubin to Wing Lake in the
> Wing Lake Assignment Document, the Debtor agreed that there was still a balance
> due and owing on the Third Spin Contract in the amount of $2,114,312.50.

*Id.* ¶ 109; *see Prospect St. Ventures I, LLC v. Eclipsys Sols. Corp.*, 23 A.D.3d 213, 214 (1st Dept.
2005) ("the deficiency [in the promissory estoppel claim] is not in the completeness of the
allegations, but in their contradiction."). Moreover, there is no "clear and unequivocal promise" in
the Franklin Assignment concerning the Third Spin Contract since it is not mentioned at all, and
the Court cannot imply promises into the promissory estoppel claim that fail under a contract
theory. *See id.* ("The legal insufficiency of the contract cause of action requires the dismissal of
the promissory estoppel claim as well …").

## V.    The Fraudulent Conveyance Counts Should Be Dismissed Because Plaintiff Admits that Hi-Bar Provided Adequate Consideration to the Debtor

Counts XVIII, XIX, XX, XXI, XXII, XXIII, XXXIV, and XXV, assert various fraudulent
conveyance claims against Hi-Bar under federal bankruptcy and Florida state law, but all fail

because Plaintiff admits that Hi-Bar provided actual value to the Debtor. 11 U.S.C. § 548(a)(1)(B)(i) & (ii)(I) (avoidance if the debtor "received less than a reasonably equivalent value in exchange for such transfer" and the debtor was insolvent at the time of transfer); Fla. Stat. §§ 726.105(1)(b) & 106(1) (avoidance where debtor does not receive "a reasonably equivalent value in exchange for the transfer or obligation").  "Courts generally construe the term 'value' broadly for purposes of the Bankruptcy Code. … the test that courts have applied to determine 'reasonably equivalent value' is whether the transfer confers an economic benefit upon the debtor, either directly or indirectly[.]" *PSN Liquidating Tr. v. Intelsat Corp. (In re PSN USA, Inc.)*, 615 F. App'x 925, 930 (11th Cir. 2015) (citations and quotation marks omitted).  Furthermore:

> [T]he concept of reasonably equivalent value does not require a dollar-for-dollar transaction. The value received needs only be 'reasonably equivalent' in value to what was transferred. … [T]he fact the Debtor ultimately landed in bankruptcy does not preclude a finding that value was not given, even if the value increased the debtor's insolvency.  A determination of whether value was given … should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise.  And the question of whether reasonably equivalent value is given has to be analyzed from the perspective of whether and when value was created and exchanged.

*Id.* at 932 (citations, quotation marks and alterations omitted).

In the FAC, Plaintiff alleges that Spin and Hi-Bar "negotiated a secret assignment of the Third Spin Contract to Hi-Bar." FAC ¶ 105. Although characterized as a "secret assignment," Plaintiff attaches a "Balance Transfer Agreement" *signed by* Kristin and Scott Zankl making the allegation of a "secret" agreement somewhat confusing. *See* Exh. H. In any event, that Balance Transfer Agreement provides for the payment of the "remaining RTR" to Spin through funds received from Hi-Bar. While the FAC states that "Hi-Bar did not transfer any funds to the Debtor on account of the First Hi-Bar Contract (FAC ¶ 116), that statement is misleading because the Balance Transfer Agreement "authorized [Hi-Bar] to deduct $2,114,312,50 out of the New Merchant Agreement." *See* Exh H. Moreover, the precise difference between the amount used to pay Spin and the purchase price of the Hi-Bar Contract ($5,687.50) was expressly defined as payment for Underwriting Fees. *See* Exh. I at pg. 8. As such, the Debtor cannot plausibly allege a lack of reasonably equivalent value against Hi-Bar requiring dismissal of the aforementioned fraudulent transfer counts.

Counts XVII and XXIII also fail for the independent reason that those Counts do not contain any facts supporting the assertion that the transfers were made with the intent to hinder,

15

delay or defraud.  Instead, Plaintiff merely recites the elements of a fraudulent transfer claim.  *See e.g. In re Pillowtex Corp.*, 427 B.R. 301, 311 (Bankr. D. Del. 2010) (dismissing claim that "merely recites the statutory language of § 548(a) of the Bankruptcy Code and completely lacks any factual allegations to support a fraudulent transfer claim.")

Finally, to the extent Plaintiff stated a claim based on the allegations contained in the FAC and attached documents, the fraudulent conveyance claims against Hi-Bar should be limited to any amounts received back that exceed the amounts paid. As the Eleventh Circuit held:

> In the case of Ponzi schemes, the general rule is that a defrauded investor gives "value" to the Debtor in exchange for a return of the principal amount of the investment, but not as to any payments in excess of principal.  Courts have recognized that defrauded investors have a claim for fraud against the debtor arising as of the time of the initial investment.  Thus, any transfer up to the amount of the principal investment satisfies the investors' fraud claim (an antecedent debt) and is made for "value" in the form of the investor's surrender of his or her tort claim.  Such payments are not subject to recovery by the debtor's trustee.  Any transfers over and above the amount of the principal — *i.e*., for fictitious profits — are not made for "value" because they exceed the scope of the investors' fraud claim and may be subject to recovery by a plan trustee.

*Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011) (citations omitted). As set forth in the First Amended Complaint, the Hi-Bar Balance Transfer Agreement reflects that Hi-Bar paid Spin $2,114,312.50 and incurred additional costs of $5,687.50. *See* Exh. I. However, the FAC also alleges that Hi-Bar only received back $2,200,000, or $80,000.00 more than it paid. As such, assuming Plaintiff can prove its case on the merits, the difference should be the ceiling for any fraudulent transfer claim.

## CONCLUSION

Based on the forgoing, Hi-Bar respectfully requests this Court grant its Motion to Dismiss and award all other such relief deemed necessary and proper.

Respectfully submitted,

LETO LAW FIRM
201 S. Biscayne Blvd.
Suite 2700
Miami, Florida 33131
Tel.     305-341-3155
Fax:    305-397-1168

*/s/ Matthew P. Leto*
MATTHEW P. LETO
Florida Bar No.: 014504
mleto@letolawfirm.com
kzelaya@letolawfirm.com
pleadings@letolawfirm.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 18, 2023, we electronically filed the foregoing

document with the Clerk of the Court and provided service to all counsel of record using CM/ECF.

*/s/ Matthew P. Leto*
MATTHEW P. LETO

17