UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:

EXCELL AUTO GROUP, INC.

        Debtor.

_____/

NICOLE TESTA MEHDIPOUR,
as Chapter 7 Trustee for Excell Auto Group, Inc.

        Plaintiff,

v.

HI BAR CAPITAL, LLC, et al.,

        Defendant(s).

_____/

Case No.: 22-12790-EPK
Chapter 7

Adv. Pro. No. 23-01132-EPK

**TRUSTEE'S RESPONSE TO MOTION TO DISMISS CORRECTED FIRST AMENDED COMPLAINT FILED BY SPIN CAPTIAL LLC AND AVRUMI LUBIN**

Nicole Testa Mehdipour, chapter 7 trustee and plaintiff in this adversary proceeding files

this response to *Motion to Dismiss Corrected First Amended Complaint filed by Spin Capital LLC

and Avrumi Lubin* [ECF No. 27][1] and states as follows:

**Preliminary Statement**

1.      For the reasons set forth herein, the Spin MTD should be denied.  In the alternative,

the Trustee should be given leave to amend the Corrected First Amended Complaint ("FAC")[2].

**A. The Spin Defendants Fail to Establish the Elements Necessary for Application of *Res
Judicata* and Collateral Estoppel**

---

[1] "ECF No. __" refers to documents filed in the above captioned adversary proceeding.  "Main ECF No. __" refers to documents filed in the main bankruptcy case, 22-12790-EPK.

[2] Trustee/Plaintiff incorporates by reference all arguments made in *Trustee's Response to Motion to Dismiss Corrected First Amended Complaint Filed by Spin Capital, LLC and Avrumi Lubin* as many of the arguments are the similar but not identical and some parts may be more thoroughly addressed therein.

1

2.      The Trustee's claims against the Spin Defendants are not barred by Res Judicata or Collateral Estoppel under New York law.  The Third-Party Complaint filed by Debtor against Spin remains stayed and pending in the New York Case; the Trustee is not in "privity" with the non-debtor defendants; and there is no identity in the issues in FAC and the New York Case. Most of the arguments in Section I of the Spin MTD are devoted to *res judicata*, with the exception of the opening sentence and a footnote referencing collateral estoppel. ECF No. 27, p. 15[3] and p. 19, fn. 8 (*citing Funderburk v. Snyder*, 2023 U.S. Dist. LEXIS 51717, at *12-13 (S.D. Fla. Mar. 27, 2023) (discussing Florida collateral estoppel at summary judgment stage)).

**(i)      Under New York Law *Res Judicata* and Collateral Estoppel are Inapplicable to this Adversary Proceeding** [4]

**(a) *Res Judicata* under New York Law**

3.      Applying New York law, generally under *res judicata* or claim preclusion, once a claim is brought to a final conclusion through a valid final judgment, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy.  *Landau, P.C. v. LaRossa, Mitchell & Ross*, 11 N.Y.3d 8, 12 (N.Y. 2008) (internal citation and quotation marks omitted).  *Accord City of New York v. Welsbach Elec. Corp.*, 9 N.Y. 3d 124, 127 (N.Y. 2007).  Courts must not, however, apply these concepts to deprive a plaintiff of one day in court.  *Landau, P.C.*, at 14 (internal citations and quotation marks omitted). The Trustee has not had her day in court and Spin's arguments would improperly take away that right.

**(b) Collateral Estoppel Under New York Law**

---

[3] All page numbers refer to the CM/ECF page numbers stamped at the top of the Spin MTD.

[4] Because most of the elements overlap, the Trustee will address collateral estoppel jointly.

4.    Under New York law, the "essential ingredients" of collateral estoppel are: "[f]irst, the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and second, the party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination[.]" *Juan C. v. Cortines*, 89 N.Y. 2d. 659 (N.Y. 1997) (internal citations and quotation marks omitted).

5.    "The equitable doctrine of collateral estoppel is 'intended to reduce litigation and conserve the resources of the court and litigants and it is based upon the general notion that it is not fair to permit a party to relitigate an issue that has already been decided against it' and should not be rigidly or mechanically applied[.]" *Id*. (citations omitted).

**(ii)    <u>There was No Final Judgment Entered Against the Debtor</u>**

6.    As the Spin Defendants acknowledge, there was no judgment entered against the Debtor. *See* ECF No. 27-12.  The Debtor did file a third-party complaint against Spin in the New York Action, but that matter was stayed by the New York Court and remains pending [ECF No. 27, p. 14 and Exhibit I (ECF No. 27-9, p. 7)].

**(iii)    <u>Application of *Res Judicata* or Collateral Estoppel Will Not Reduce Litigation or Conserve the Resources of the Court and Litigants</u>**

7.    Spin initially lent the Debtor funds under the First, Second, and Third Spin Contracts. The alleged balance owed under the Third Spin Contract was the purported consideration for the Hi Bar Transfer Agreement and the First Hi Bar Contract leading to the First and Second Hi Bar Settlement Agreement and all payments made by the Debtor to Hi Bar.  The Trustee alleges that Josh Lubin, on behalf of Spin, and on behalf of both Spin and Hi Bar engaged in the unlawful collection of debt.  Further, the Trustee seeks to avoid all the transactions, obligations, and payments made or incurred by the Debtor against both Spin and Hi Bar.

8.      The Hi Bar Defendants and Trustee entered into a settlement agreement [Main ECF No. 291] which this Court approved by an order [Main ECF No. 298], which incorporated the settlement agreement by reference, *id.* at p. 2, ¶ 1. The settlement agreement clearly stated that the Hi Bar Defendants "expressly and affirmatively waive any right to assert estoppel, whether offensively or defensively, against Excell Trustee or the Debtor Estate on account of any determination made in any final judgment entered in the New York Litigation or appeal therefrom." [Main ECF No. 298, p. 2, ¶ 3].   These same representations and acknowledgments were included in the *Stipulation to Discontinue Action without Prejudice* filed in the New York Action. [ECF No. 27-8].

9.      This Court will have to litigate all the issues against the Hi Bar Defendants, most of which involve the Spin Defendants.  Accordingly, there is no conservation of judicial or legal resources by applying *res judicata* or collateral estoppel to the Spin Defendants only.

**(iv)    There is No Privity Between the Trustee of the Excell Estate and the Non-Debtor Entities or the Zankls in the New York Action**

10.     The Spin Defendants position fails for lack of privity because Hi Bar's action was discontinued against Debtor [ECF No. 27-8] and Hi Bar's judgment in the New York action is against non-debtor parties [ECF No. 27-12].

11.     Despite acknowledging that state law applies, the Spin MTD cites federal opinions applying federal law with respect to the privity analysis.  Instead, *Juan C. v. Cortines*, 89 N.Y. 2d. 659 (N.Y. 1997), sets forth the correct analysis under applicable New York law:

> In general, "a nonparty to a prior litigation may be collaterally estopped by a determination in that litigation by having a relationship with a party to the prior litigation such that his own rights or obligations in the subsequent proceeding are conditioned in one way or another on, or derivative of, the rights of the party to the prior litigation" ( *D'Arata v New York Cent. Mut. Fire Ins. Co.*, *supra*, 76 NY2d, at 664; *see also, People v Roselle*, 84 NY2d 350). This constitutes a form of privity; however, "the term privity does not have a technical and well-defined meaning" ( *Watts v Swiss Bank Corp.*, 27

NY2d 270, 277). Rather, it "is an amorphous concept not easy of application" ( *D'Arata v New York Cent. Mut. Fire Ins. Co., supra*, at 664), and "includes those who are successors to a property interest, those who control an action although not formal parties to it, those whose interests are represented by a party to the action, and possibly coparties to a prior action" ( *Watts v Swiss Bank Corp., supra*, 27 NY2d, at 277). Importantly, "**all the circumstances must be considered** from which one may infer whether or not there was participation amounting to a sharing in control of the litigation" (*id*.).

*Id*. at 667-668 (emphasis added)

12.    The Spin Defendants ignore or misapprehend the distinction between the Trustee, the Debtor, non-debtor entities, and the Zankls.  This distinction is critical to the analysis of the privity element.

13.    Upon the filing of the petition, a separate entity was created, an estate, consisting of all Debtor's legal and equitable interests in property. *See In re Worldcom, Inc.*, 401 B.R. 637, 645 (Bankr. S.D.N.Y. 2009) (*citing* 11 U.S.C. § 541).  The Trustee represents the bankruptcy estate and the interests of all creditors of Excell's bankruptcy estate. *See* 11 U.S.C. § 323(a).  Upon the filing of the petition in this case the Zankls had no control or authority to act on behalf of the Excell estate.  11 U.S.C. §§ 323(a) and 541(a); *Jones v. Harrell*, 858 F.2d 667, 669 (11th Cir. 1988) (only the trustee has authority to pursue, settle, or release claims and a release by the wrong person is never effective).

14.    Neither the Zankls, the other non-debtor entities, nor their counsel obtained authority to act on behalf of the Trustee or Excell Estate; the Trustee did not control the New York litigation on behalf of the non-debtor defendants; and the filings in the New York Case evidence that the Trustee was not in privity with the non-debtor defendants.  Therefore, the Spin Defendants' arguments fails.  *See* ECF Nos. 27-8 and 27-12 and Main ECF Nos. 291 and 298.

(v)    **There is No Identity of Action Between the Claims in the FAC and the New York Action**

5

15.     The Excell estate includes both pre-petition claims of the Debtor and statutory causes of action which arise only upon a bankruptcy filing – such claims belong to the Trustee and not the Debtor.  *See Worldcom, Inc.,* 401 B.R. at 645. See also 11 U.S.C. §§ 547, 548, 549, and 551.  Further, avoidance claims under 11 U.S.C. § 544(b) would be a question under Florida law. *In re Rollaguard Security*, LLC, 570 B.R. 859, 861-62 (Bankr. S.D. Fla. 2017).  The avoidance claims, including those of the Settlement Agreements and included releases, thus could not have been adjudicated in the New York Action as (a) none of the parties had standing to bring them (*Harrell*, 858 F.2d at 669) and (b) only the Trustee has standing and this Court has exclusive jurisdiction over property of the estate.  28 U.S.C. § 1334(e).  The New York Court could not and did not adjudicate any cause of action as to the Trustee.

**(vi)     The Trustee Did Not Have a Full and Fair Opportunity to Contest the Prior Determination in the New York Action**

16.     Finally, the Trustee clearly did not have a "full and fair opportunity to contest the prior determination."  The Trustee was not a party to the New York Action; Hi Bar discontinued its claim against the Debtor; and the New York Court recognized the stay as to pre-petition Third Party Complaint filed by Debtor against Spin.  See ECF Nos. 27-8 and 27-12 and Main ECF Nos. 291 and 298]. *See also Landau, P.C.*, 11 N.Y. 3d at 13 ("a dismissal 'without prejudice' lacks a necessary element of res judicata--by its terms such a judgment is not a final determination on the merits.") (citation omitted).

17.     The Spin Defendants cannot satisfy any of the elements necessary for the application of *res judicata* or collateral estoppel against the Trustee.  *See* Fed. R. Civ. P. 8(c) (identifying res judicata and collateral estoppel as affirmative defenses).

**B. The Trustee Has Standing Because the FAC Sufficiently Alleges Damages Suffered by the Excell Estate**

18.     The Trustee has standing to assert the claims in the FAC.

19.     The Spin Defendants received not only the funds set forth in Exhibit A to the FAC (direct payments by the Debtor), but all purportedly received another $2,114,312.50[5] from Hi Bar on account of the Third Spin Contract, which funds were deducted from the First Hi Bar Contract and upon which Debtor paid $2,200,000.00. *See* Exhibits B, H, and I.  The Trustee pled alternative theories for relief, which is her right to do, Fed. R. Civ. P. 8(d), and leaves it up to this Court to determine the liability between the Spin Defendants, Hi Bar Defendants, or all of them under the Civil RICO causes of action brought in the FAC.  Therefore, the Spin Defendant's standing argument fails.

**C.  The Hi Bar Settlement Agreements are Transfers Subject to Avoidance by the Trustee and Provide No Defense to the Spin Defendants**

20.     The Trustee seeks to avoid the First Hi Bar Settlement Agreement, Second Hi Bar Settlement Agreement and the releases contained therein under various constructive and actual fraudulent causes of action under 11 U.S.C. § 544 and Florida Statutes §§ 726.105(1)(a) and (b) and 726.106(1), and 11 U.S.C. §548(a)(1) or (2).  *See* FAC, Counts X, XI, XII, XIII, XIV, XV, and XVI.

21.     The balance of the Spin arguments are substantially the same as the arguments in Hi Bar MTD and for all the same reasons fail.  The Spin Defendants therefore cannot rely on the releases in the First or Second Settlement Agreement to form the basis of dismissal of the FAC, and the Spin MTD should be denied.

**D.  The MCA Agreements are Loans and are Subject to New York or Florida Usury Laws**

---

[5] This set of transactions is raised by the Hi Bar Defendants in their Motion to Dismiss [ECF No. 29, p. 15].

22. The First, Second, and Third Spin Contracts are virtually identical to the First Hi Bar Contract, the Trustee incorporates by reference as if fully set forth herein the arguments made on this issue in her Response to the Hi Bar Defendants Motion to Dismiss.

23. In summary, the Trustee has sufficiently asserted facts that would allow this Court to find that the First, Second, and Third Spin Contracts amount to criminally usurious loans under New York law and are void with the principal and interest being uncollectable and the defense of criminally usury is available to a corporation. *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y. 3d 320, 333 (N.Y. 2021). The New York Court of Appeals has never addressed the issue of whether an MCA agreement is a usurious loan or is otherwise excluded from New York's usury law. *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247 (S.D.N.Y. 2022). There are several Appellate Division cases and numerous trial court cases on the issue, whose outcomes are decided based upon the facts in each case and results vary greatly, and the Appellate Divisions have yet to settle on any specific framework for classifying MCA agreements. *Id.* 247-248.

24. Under long established New York law, "substance-not form-controls." in determining whether a transaction is a loan, *Adar Bays, LLC v. GeneSYS ID, Inc.*, at 621-22 (*citing Dry Dock Bank v. American Life Ins. & Trust Co.*, 3 N.Y. 344, 354 (N.Y. 1850)). When usurious intent does not appear on the face of the document, usurious intent, an essential element of usury is a question of fact. *Haymount* at 247 (*citing Adar Bays* at 336). Nowhere in any case law or statute are MCA agreements excluded from this analysis, substance controls.

25. The primary focus for the New York Court of Appeals for determining whether a transaction is a loan is focused on the allocation of risk between the parties. *Haymount* at 247. If the economic analysis reveals that "the lender's risk is derivative or secondary, that is, the borrower

remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to [pay]," then there has not been a bona fide purchase of receivables and the transaction is, in substance, a loan." *Id*. *See also Adar Bays*, 37 N.Y.3d at 334 ("[P]arties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders."). This is the true analysis to be conducted by the Court.

26. Despite New York having binding case law requiring courts to engage in a substance over form analysis, the Spin Defendant's assert that the mere presence of words in the agreement that follow the *Principis* factors are enough to end all inquiries on whether the Spin Contracts are loans or true purchases [ECF No. 27, p. 27]. However, even in cases cited by the Spin Defendants, this narrow approach was rejected. *Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC*, No. 22-1885-cv, 2023 U.S. App. LEXIS 14241, at *3-4 (2d Cir. June 8, 2023)(Affirming district court's decision that substance over form of the MCA was a loan and not sale of receivables rejecting the defendants' argument that analysis was limited to language in the MCA stating that the transaction "is not intended to be, nor shall it be construed as a loan Under New York law"). At most, New York Courts will review the three factors only as a guide, but the court must still to the totality of the circumstances of both the words on the paper and the mechanics of the agreement itself. *Haymount*, 609 F. Supp. 3d at 247-248 (internal citations omitted). The *Haymount* court also noted that "[the 1st] department[] ha[s] analyzed MCA contracts without applying these three factors." *Id*. (*citing Davis v. Richmond Capital Group LLC*, 194 A.D.3d 516, 517, 150 N.Y.S.3d 2 (1st Dep't 2021)). *See also LG Funding, LLC v. United Senior Props. of Olathe*, LLC, 181 A.D.3d 664, 665-66, 122 N.Y.S.3d 309, 312 (2nd Dep't 2020) (noting that an MCA "must be 'considered in its totality and judged by its real character, rather

than by the name, color, or form which the parties have seen fit to give it' and determine whether the MCA company is absolutely entitled to repayment under all circumstances").

27.     In summary, under New York law a court will usually begin looking at the *Principis* factors, if the MCA fails any one of those factors, then the MCA is a loan.  However, even with the presence of *Principis* factors, this Court still must look to the totality of the circumstances in deciding whether an MCA is a loan –substance controls over form, not vice versa.  *HI Bar Cap. LLC v. Parkway Dental Servs., LLC*, 2022 N.Y. Misc. LEXIS 5814 (Sup Ct. Aug., 25, 2022); *In Fleetwood Servs.*, and *Haymount* at 247 (S.D.N.Y. 2022).

28.     In this case, the totality of the circumstances, including the *Principis* factors lead to no conclusion other than the Spin Contracts were loans subject to applicable criminal usury laws. This conclusion is borne out by the opinion in *Hi Bar Capital LLC v. Parkway Dental Servs., LLC*, wherein on a motion to reargue, the Court considered the identical contracts before the Court in this adversary and after applying *Principis*, *Adar*, and other case law found that "there are surely questions raised whether the agreement comports with the requirements necessary to be considered a genuine cash advance agreement." 2022 N.Y. Misc. LEXIS 5814 at *14-15.

**(i)     The Spin Defendants' Sole Risk is Non-Payment by Debtor, Not Predicated on the Performance of any Account Debtors or Customers**

29.     It is clear from the plain language of the Spin Contracts that Debtor always remained liable for the full "purchase amount" and remittance amounts. *See* FAC, Exs. E and G, p. 107 and 121, and ECF No. 27-13, p. 2 ("[Debtor] remains responsible for ensuring that the agreed Remittance to be debited by [Spin] remains in the Account and will be held responsible for any fees incurred by [Spin] resulting from a rejected ACH attempt or an Event of Default."). *Compare* FAC, Exs. E and G, pp. 110 and 124, and ECF No. 27-13, p. 5, ¶ 1.10 (purportedly making Debtor servicer for "collecting and delivering Receipts to [Spin]…").   The Spin

Defendants' risk is always "derivative or secondary" in that the Spin Defendants' risk is not based upon the performance of account debtors or customers, but only risk that the "account debtor's" non-payment will leave Debtor unable to pay. *See Haymount*, at 247. *Accord Adar Bays*, 37 N.Y. 3d at 334.

### (ii)    Each of the Spin Contracts was for Definite Time

30.    As clearly stated in the FAC, each of the Spin Contracts were for a definite time period, which is calculated by dividing the "Purchase Amount" divided by the predetermined "Remittance" amount.  FAC pp. 6-7, ¶¶ 37-38; p. 8, ¶¶ 44-45; and p.11, ¶¶ 61-64.  The Spin Defendants point to the "Reconciliation Provision" to refute this point, however, as is demonstrated in the FAC and detailed below, the "Reconciliation Provision" in each are illusory. In *People v. Richmond Capital Group, LLC*, Index No. 451368/2020, 2023 NYLJ LEXIS 2487 at *6-7 (N.Y. Sup. Ct. Sept. 15, 2023), in finding that the MCAs were criminally usurious loans, and the MCA company to be a predatory lender under NY law, the court, looked in part, at whether the payments were of fixed term.  In this case, like *Richmond Capital Group*, the daily payment sweeps of the Borrower's bank accounts reflected fixed constant repayments over a fixed term, rather than based on any purported number of receivables purchased.  In this case, the Spin Contracts had fixed weekly remittances of: (i) 93,687.50; (ii)$40,000, and (iii) 150,000. *See* ECF No. 27-13 (Ex. M), p. 2 and FAC Ex. E, p. 107 and Ex. G, p. 121. The payments were not based upon actual income collected.  FAC, pp. 9-10, ¶ 51-60.

### (iii)    The Reconciliation Provision is Illusory

31.    The reconciliation provision in each of the Spin Contracts is styled as a mechanism requiring Spin to adjust the remittance amount upon the Debtor's application for reconciliation however, the actual structure of the provision makes it impossible to use and leaves Spin with substantial discretion to prevent adjustment. *See Haymount* at 248.  In the Spin Contracts, the

ability to request reconciliation can only happen retroactively provided that the Debtor is not in default. FAC, Exs. E and G, pp. 110 and 124, ¶¶ 1.3 and 1.4 and ECF No. 27-13, p. 5 ¶¶ 1.3 and 1.4. Debtor, along with 14 non-debtor entities, are parties to the Spin Contracts. FAC Exs. E and G, and ECF No. 27-13. An event of default includes Debtor or any one or more of the 14 non-debtor entities having any other loans, including credit cards. FAC Exs. E and G, pp. 112 and 126, ¶ 3.1(i) and ECF No. 27-13, p. 7, ¶ 3.1(i). Hi Bar knew that the Debtor and non-debtor entities had other loans, therefore, the Debtor was immediately in default under the terms of the Agreement, and the Debtor never qualified for reconciliation. FAC, p. 11-14, ¶¶ 65-77.

32. The reconciliation provision in the Spin Contracts, while purporting to be "mandatory," is structured to vest substantial discretion in Spin to deny reconciliation. The reconciliation provision requires the Debtor and all 14 non-debtor entities to "include copies of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding, if applicable, from the date of this Agreement through and including the date the request is made." FAC, Exs. E and G, pp. 110 and 124, ¶¶ 1.3 and 1.4 and ECF No. 27-13, p. 5 ¶¶ 1.3 and 1.4. Further, "[Spin] retains the right to request additional reasonable documentation including without limitation bank login or access to view Merchant's accounts using third party software, and Merchant's refusal to provide access shall be a breach of this Agreement and [Spin] shall have no obligation to reconcile." *Id*. As stated in *Haymount*, "[i]t is readily apparent how the lender could use this contractual right to obtain from the merchant further documentation as a procedural pretext for denying reconciliation." *Id*. at 248-248.

33. In *Haymount*, the court found it significant that the reconciliation provision was drafted in such manner that if there was a "decline in revenues [such decline] would lead a merchant to have insufficient cash to fund its high daily remittance, [and] its inability to even apply

for reconciliation could lead its account to return an insufficient funds message to the lender, which would trigger a default under the contract and entitle the lender to immediately seek the whole uncollected amount due from the merchant's principal, via the personal guaranty." *Id*. at 248-249. Similarly, in the Spin Contracts, the ability to reconcile an account only happens retroactively provided the Debtor is not in default.  FAC, Exs. E and G, pp. 110 and 124, ¶¶ 1.3 and 1.4 and ECF No. 27-13, p. 5 ¶¶ 1.3 and 1.4.   Therefore, based upon the mechanics of the reconciliation provision, if the Debtor's revenues declined leaving insufficient cash to fund its high weekly remittance, it rendered Debtor unable to even apply for reconciliation. In addition, the return of an insufficient funds message to Spin without 24 hours' notice is an event of default, but even if there was 24 hours' notice provided Debtor was only entitled to two NSFs then Debtor was in default Spin was entitled to call the entire balance due and exercise all rights under the spin contracts, including security agreement and guarantee. FAC Exs. E and G, pp. 116 and 130, ¶ C and ECF No. 27-13, p. 11, ¶ C ("NSF Fee Standard: $50.00 (each) up to TWO TIMES ONLY before a default is declared."). *See Haymount*, 609 F. Supp. 3d. at 248 -249.

34.     The second *Prinicipis* factor weighs in favor of finding the Spin Contracts constitute loans.

### (iv)     The Spin Contracts Provide for Recourse in the Event of Bankruptcy and Result in Events of Default Even Where the Spin Contracts Attempt to Disclaim

35.     While the words on the paper say that "bankruptcy" is not specifically listed as an event of default and the language "Merchant going bankrupt or going [out] of business…in and of itself, does not constitute a breach of this Agreement[,]" but an "event of default" is different from "recourse."  To ensure that Spin will be paid in full if there is a bankruptcy filing, a bankruptcy:

    a.   triggers other events of default, including but not limited to ¶ 3.1(a), (d), (f), (h), (j), (k), (l), and (n), and Appendix A, ¶ C, *see* [FAC Exs. E and G, pp. 111-112 and 125-126, ¶ 3.1 and pp. 116 and 130, ¶ C and ECF No. 27-13, pp. 6-7, ¶3.1 and p. 11, ¶ C];

13

b.   triggers all the "Protections Against Default," *see* FAC Exs. E and G, pp. 110-111 and 124-125, ¶ 1.12, and ECF No. 27-13, pp. 5-6, ¶1.12 (identifying 8 protections Spin can invoke "immediately and without notice" upon one of the events in (a) through (g) occur and which do occur when a bankruptcy is filed); and

c.   in the security agreement, securing the obligation against all of Debtor's assets, Spin addresses its recourse in the event of a bankruptcy, stating:

> Merchant and Guarantor(s) (s) agree(s) that this is a contract of recoupment and [Spin] is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s)(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by [Spin]. Merchant and Guarantor(s)(s) agree(s) to execute and deliver to [Spin] such instruments and documents [Spin] may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. [Spin] is authorized to execute all such instruments and documents in Merchant's and Guarantor(s)(s) name.

FAC Exs. E and G, pp. 113 and 127, ¶ 3 (unnumbered) and ECF No. 27-13, p. 8, ¶ 3 (unnumbered)].

36.    In *Richmond Capital Group*, the court found the provision that non-payment caused by a bankruptcy was not an event of default was likewise a sham, because the MCA lender required the borrower to be in immediate default by making misrepresentation of no other loans, the MCA lender knew to be false. 2023 NYLJ LEXIS 2487 at *6-7.  Accordingly, the Spin Defendants have ample recourse upon the filing of a bankruptcy and the third *Principis* factor weighs in favor of the finding these transactions are loans.

37.    Accordingly, the Spin Defendants have ample recourse upon the filing of a bankruptcy and the third *Principis* factor weighs in favor of the finding these transactions are loans.

(v)    **Additional Factors Supporting a Finding of a Criminally Usurious Loan**

38.    The weekly remittance amounts described in the Spin Contracts allege to have been negotiated are fixed dollar amounts, and the FAC alleges that these amounts appear not to be good

14

faith estimates of Debtor's receipts. FAC p. 9 ¶ 51-60.  *See Haymount*, at 249 (*citing Davis v. Richmond Capital Group, LLC*, 194 A.D.3d 516, 517 (1st Dep't 2021).

39.     As in *Haymount*, the repayment and remedy terms of the First Hi Bar Contract operate in "a manner more akin to a standard, high interest-rate loan than to a genuine transfer of the risks associated with specified receivables." *Id* at 249.    For instance, a merchant defaults on the MCA agreement if its bank rejects the automated debit for one of those remittances without the merchant having provided prior notice. This default then entitles the lender to immediate repayment of the full amount of the transaction outstanding. *See Id.* (citations omitted) and FAC Exs. E and G, pp. 111-112, ¶ 3.1(d) and 125-126, ¶ 3.1(d) and ECF No. 27-13, p. 11, ¶ C ("NSF Fee Standard: $50.00 (each) up to TWO TIMES ONLY before a default is declared.").  Further, cancelling out the "prior notice" savings clause for the Debtor, two events of insufficient funds in the account results in a default.  FAC, Exs. E and G, pp. 116 and 130, ¶ C and ECF No. 27-13, pp. 6-7, ¶ 3.1(d).

40.     One of the protections in the Spin Contracts provides: "[Spin] may debit Merchant' depository accounts wherever situated in such amounts as determined by [Spin] in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Amount and other amount owed by Merchant to [Spin] by means of ACH debit or facsimile signature on a computer generated check drawn on Merchant's bank account or otherwise for all sums due to [Spin]." FAC Exs. E and G, pp. 111 and 125, ¶ 1.12 (Protection 8), and ECF No. 27-13, p. 6, ¶1.12 (protection 8).

41.     Consequently, should a merchant default and the lender be unable to recover the outstanding balance from the merchant's bank accounts, the Spin Contract entitles Spin to obtain full repayment from the Debtor, non-debtors, and the Debtor's principals, via the personal

guaranty. *See Haymount*, 609 F. Supp. 3d at 249; *Rubenstein v Small*, 273 App Div 102, 104, 75 NYS2d 483 (1st Dept 1947) ("For a true loan it is essential to provide for repayment absolutely and at all events **or** that the principal in some way be secured as distinguished from being put in hazard." (emphasis added)).

42. The Spin Contracts' "Events of Default" and Protections are more consistent with a loan than a purchase of accounts or receivables as its onerous provisions are more directed at the Debtor as opposed to only looking for collection against the account debtors. These provisions include: the Power of Attorney provision allowing Spin to sign the name of the Debtor to receive, endorse and collect on any checks, notes and to contact banks and financial institutions using Merchant and Guarantors personal information [FAC Exs. E and G, pp. 110 and 124, ¶ 1.11 and ECF No. 27-13, p. 5, ¶ 1.11)]; Protections 1-8, allowing enforcement against Debtor and Guarantors through confessions of judgment, allowing Spin the right to enter and take over the Debtor's leased business premises, along with other of Spin's rights and remedies Revenue Purchase Agreement, Security Agreement, and Guaranty of Performance. *See generally* FAC Exs. E and G, and ECF No. 27-13. Together, "[t]hese provisions suggest that the plaintiff did not assume the risk that [merchants] would have less-than-expected or no revenues." *Haymount*, at 249-250 (citations omitted).

43. The Trustee has pled sufficient factual allegations to support plausible claims that the Spin Contracts function as loans and are criminally usurious. *Id*. Likewise, the Spin Defendants do not dispute that the implied interest rates on these transactions far exceed 50% per annum (twice the New York State criminal usury rate and the Florida criminal usury rate), therefore, the Trustee has adequately pled that the debt created by the Spin Contracts is an unenforceable, "unlawful debt" under the RICO statute. *Id*. at 250.

16

44.     Other courts that have reached the same or similar conclusion are *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 665-66, 122 N.Y.S.3d 309, 312 (2nd Dep't. 2020) (a court must examine whether the MCA lender "is absolutely entitled to repayment under all circumstances"); *accord Funding Metrics, LLC v. NRO Boston, LLC*, 2019 N.Y. Misc. LEXIS 4878, 2019 WL 4376780, at *4 (Sup. Ct. N.Y. Cnty. Aug. 28, 2019) ("Denominating loan documents by another name…does not shield it from the judicial determination that it contemplates a criminally usurious transaction, which is void ab initio as a matter of law."); *Hi Bar Cap. LLC v. Parkway Dental Servs., LLC* 2022 N.Y. Misc. LEXIS 5814 at *10-15 (in granting a motion for reconsideration and vacating a default judgment, stated that the *Principis* factors are only a starting point and not an exhaustive list for the analysis and looked to federal court opinions which were "engag[ing] in a more thorough and exacting scrutiny of merchant cash advance agreements, looking at the agreements in, a holistic and comprehensive manner and the conclusions they have reached are compelling."); *Lateral Recovery*, 2022 U.S. Dist. LEXIS 129032, at *3-4 (the court noted that failing to notify the funder of an impending rejection or two rejected attempts to withdraw the daily amount really means there is no risk to the funder). *See* FAC Exs. E and G, pp. 111 and 125, ¶¶ 3.1(d) and 3.3 ("Remedies. Upon the occurrence of an Event of Default…") and p. 116 and 130, ¶ C (two rejected attempts results in default) and ECF No. 27-13, p. 11 ¶ C. *See also People v. Richmond Capital Group LLC*, 2023 NYLJ LEXIS 2487 at (finding the MCA Company, using substantially similar contracts as Hi Bar, was a predatory lender, that the transactions were criminally usurious loans, both procedurally and substantively unconscionable and void).

E.   **The Trustee Is Entitled to a Declaratory Judgment as Set Forth in Counts IV and IX**

45.     As to Counts IV and IX, in which the Trustee seeks declaratory relief under 28 U.S.C. §2201, the Trustee will amend seeking a determination that if the Court finds the First,

Second and Third Spin Contracts void under New York law, that a determination be made that Florida law applies under New York's center of gravity test.

46.     In the event that the Court determines that the First Spin, Second Spin and Third Spin Contract are loans, then the Court must determine which state's law applies.  *Haymount Urgent Care PC v. GoFund Advance, LLC*, No. 22-cv-1245 (JSR), 2023 U.S. Dist. LEXIS 6914, at *10-11 (S.D.N.Y. Jan. 13, 2023).  Thereafter, the Court will need to apply New York's "center-of-gravity test" to determine which state's interests are the most implicated by it.  *Haymount* citing *United States v. Moseley*, 980 F.3d 9, 23 (2d Cir. 2020) (applying New York's "center of gravity" test to determine which state's usury laws applied to a RICO prosecution brought based on the collection on unlawful debt in New York).

47.     In this case, the Trustee asserts that the center of gravity test would favor an application of Florida law rather than New York law.

48.     Accordingly, the Trustee agrees that amendments need to be made to Counts IV and IX.

**F.  The Trustee has Pled Sufficient Facts to Support Declaratory Relief in Counts I and II concerning the Franklin Assignment and Hi Bar Transfer Agreement**

49.     The Trustee had pled sufficient facts to support declaratory relief in Counts I and II concerning the Franklin Assignment and the Hi Bar Transfer Agreement.  The arguments by both Spin and Hi Bar do not dispute that the Third Spin Contract was secretly hidden from Wing Lake, but instead argue that this Court should sanction their fraud based upon a twisted interpretation of the Wing Lake Assignment Document.  The arguments made by both Spin and Hi Bar also serve to eviscerate any potential "good faith and for value" defenses as to the Trustee's fraudulent transfer claims.

18

50.     Spin asks this Court to sanction the fraud committed by it and Hi Bar, and in Spin's recitation of the holding in *Price v. Haynes*, 37 Mich. 487, 489 (1877), does not recite the full legal analysis therein.  The pertinent portion of the holding is "[n]o single clause in such an instrument may be conclusive; we must judge of its intent as a whole." *Id*.

51.     The term "Obligations" in the Wing Lake Assignment Document, when reading the instrument as whole, clearly contemplates that the intent of the parties was that all obligations owed to Spin by the Debtor and each of its affiliates were being assigned to Wing Lake.  *See* Amended Complaint, ¶¶ 100-102, 110, and 198.  This includes the Third Spin Contract and the purported balance due thereunder, which, in part, included balances owed under the First and Second Spin Agreement.   Spin and Hi Bar's sole argument is that their trickery and fraud worked.

52.     In the Wing Lake Assignment Agreement, Spin agrees to sell and assign:

> 1.     all outstanding obligations ("Obligations") of Excell Auto Group, Inc. and each of its affiliates (collectively, "Company") owing to Assignor under each of (i) the Revenue Purchase Agreement, dated as of June 1, 2021, by and between Assignor and Company, **and** (ii) the Revenue Agreement, dated as of July 9, 2021, by and between Assignor and Company (collectively, the "Merchant Agreements") **and all rights of Assignor under any similar or related documents** (including without limitations, any guaranties, security agreements, forbearance agreements and judgments), including with respect to all collateral securing the obligations of Company under the Merchant Agreements or securing any guaranties in respect thereof (**the documents, including the Merchant Agreements, are defined collectively as "Merchant Documents"**), for purchase price of $1.00 (the "Purchase Price').

Amended Complaint, Ex. L, p. 169 (emphasis added).

53.     Spin incorrectly argues that the Third Spin Contract was not contemplated by the term Obligations.  The defined term "Obligations" begins with "all obligations" and then includes two categories identified in romanettes (i) and (ii), which are joined by "and."  "[T]he ordinary meaning of the conjunctive 'and' is to denote joinder or union." *Mayer v. Credit Life Ins. Co.*, 42

19

Mich. App. 648, 650, 202 N.W.2d 521, 523 (1972).  In contrast to romanette (i), which only references the First Spin contract, Romanette (ii) has two categories joined by "and," "the [Second Spin Contract] (collectively, the "Merchant Agreements") **and** all rights of Assignor under any similar or related documents (including without limitations, any guaranties, security agreements, forbearance agreements and judgments), including with respect to all collateral securing the obligations of Company under the Merchant Agreements or securing any guaranties in respect thereof (the documents, including the Merchant Agreements, are defined collectively as "Merchant Documents")." Amended Complaint, Ex. L, p. 169 (emphasis added).  Romanette (ii) is not limited to the Second Spin Contract. Further, the use of the term "any" with respect to "similar or related documents," is telling where the ordinary meaning of "any" is interpreted as broadly as possible. 2 *Crooked Creek, LLC v. Cass Cty. Treasurer*, 507 Mich. 1, 11 n. 21 (Mich. 2021) (*citing* Random House Webster's College Dictionary (1999) (defining "any" as "1. one, a, an, or some; one or more without specification or identification[.] . . . 2. whatever or whichever it may be[.] . . . 3. in whatever quantity or number, great or small; some[.] 4. every; all[.]); *People v Harris*, 495 Mich 120, 131; 845 N.W.2d 477; 495 Mich. 120; 845 NW2d 477 (2014) (explaining that " 'any' is commonly understood to encompass a wide range of things" such that "it is difficult to imagine how the Legislature could have cast a broader net given the use of the word[] 'any' "), *citing People v Lively*, 470 Mich 248, 253-254; 680 N.W.2d 878; 470 Mich. 248; 680 NW2d 878 (2004)).

54.     Spin's argument fails when it takes out of context and argues that the language "including without limitations, any guaranties, security agreements, forbearance agreements and judgments,", etc. somehow limits the term Obligations.  Further, Spin incorrectly argues, "[w]hile Obligations is expanded to include "similar or related agreements," that the Third Spin Contract was not covered, since the general description "similar or related agreement" is given specific

20

**definition to include** "any guaranties, security agreements, forbearance agreements, settlement agreements and judgments." ECF No. 29 (Emphasis added).   The statement by Spin is misleading, because Spin excludes the qualifying language "**including without limitation** . . ." (Emphasis added).   This qualification belies Spin's contention that the specified items were limiting the defined term of Obligations, rather than its plain meaning of a non-exhaustive of the items that could be included. *See People v. Martinez*, 307 Mich. App. 641, 651-52 (1st DCA Mich. 2014) (In general contract language is interpreted according to its plain meaning or common meaning.) (internal citations omitted).  *See also Auto-Owners Ins. Co. v. White Consol. Indus.*, 1996 Mich. App. LEXIS 680 at *2-3, 1996 WL 33349362 (Ct. App. Mich. Nov. 22, 1996) (finding "including but not limited to" to be non-limited); *Accord United States v. Water Supply & Storage Co.*, 546 F. Supp. 2d 1148, 1152 (D. Colo. 2008) ("The plain meaning of 'including but not limited to' … is meant to include the subsequently specified examples[,] and also is meant to include other items not specified in the statute…is not ambiguous.").

55.     Furthermore, the First Spin Contract and Second Spin Contract were defined as the "Merchant Agreements" and with the other documents were defined as the "Merchant Documents." Amended Complaint, Ex. L, p. 169.

56.     The Trustee clearly asserts that the Third Spin Contract, in part, refinanced the First Spin Contract and the Second Spin Contract. *See* Amended Complaint, ¶ 102, and Exhibits F, G, and L. There appears to be no factual dispute on this point.

57.     Further, in the Wing Lake Assignment Agreement, Spin affirmatively represented and warranted, in part, that Spin had

> not sold, assigned, transferred, granted a participation in or pledged the Obligations, the Merchant Documents or the Third-Party Claims and [Spin] owns the Obligations, the Merchant Documents and the Third Party Claims free and clear of any lien or other encumbrance

and [Spin], including any of its affiliates, as not entered into any written or oral agreement with [the Debtor or any of the Debtor's affiliates] relating to the Assignment or receipt of any compensation from [the Debtor or its affiliates] in consideration for entering into the Assignment.

Amended Complaint, Ex. L, p. 169, ¶ 4.

58.     This along with the rest of the Wing Lake Assignment Agreement, read together, demonstrates that the intent of the parties was for Spin to sell, transfer, and assign all obligations owed to Spin by the Debtor including the Third Spin Contract. *Price v. Haynes*, 37 Mich. at 489.

59.     Further, the Evidence of Assignment executed by Lubin on November 1, 2021, FAC Ex. L, p.174, clearly includes the First Spin Contract, the Second Spin Contract "and all rights of [Spin] under any similar or related documents" under the Wing Lake Assignment and Spin confirmed that it had "sold, transferred and assigned all of its right, title and interest in the Merchant Documents to Assignee" and "this Evidence of Assignment may be relied upon by any person as evidence of the foregoing." FAC Ex. L, p. 174 (emphasis added).

60.     Spin attempts to justify its deception by arguing that Spin did not own the Third Spin Contract or the balance therein when it executed the Wing Lake Assignment on November 1, 2021, because Spin had executed the H Balance Transfer Agreement a few days prior on October 27, 2021.  Spin completely ignores its affirmative representation that the balance owed to Spin as to all outstanding Obligations was equal to $1.00 as of October 21, 2023, and that Spin had not "sold, assigned or transferred the Obligations, the Merchant Documents or Third-Party Claims and [Spin] owns the Obligations, the Merchant Documents and the Third Party Claims free and clear of any liens or other encumbrances."  Simply put, Spin lied knowing that the $1.00 balance of outstanding Obligations on October 21, 2021, was really $2,114,312.50. See FAC Exhibit 3.  Spin lied again when it affirmatively represented that Spin had not sold or transferred the Obligations when it executed the Wing Lake Assignment on November 1, 2021.  There seems to be no dispute

22

as to the underlying facts, Spin's position is predicated on a twisted reading of the Wing Lake Assignment. Further, this Court should allow the Trustee to present parole evidence to assist in determining the intent of the parties. *UAW-GM Human Resource Ctr. v. KSL Rec. Corp.*, 228 Mich. App. 486, 492-493 (Mich. 1998) (noting four exceptions to parole evidence rule including fraud).

61.     Based upon the arguments made in the Spin Motion to Dismiss and the Hi Bar Motion to Dismiss, the Defendants are attempting to justify their intentional and fraudulent conduct based upon a parsed reading of the Wing Lake Assignment Document. The Trustee respectfully requests that this Court not endorse, as requested, this admitted fraud and deny Hi Bar's Motion to Dismiss.

**G. In Count XXVIII the Trustee sets Forth the Elements of Promissory Estoppel Sufficient under Either New York or Michigan Law**

62.     The elements of promissory estoppel appear to be the same, or at least substantially similar, under both New York and Michigan law. See *Redhead Builders LLC v. Aran World Inc.*, 2019 NY Slip Op 31228(U), ¶ 9 (Sup. Ct.) citing *Condor Funding, LLC v. 176 Broadway Owners Corp.*, 2017 NY Slip Op 00719, ¶ 1, 147 A.D.3d 409, 411, 46 N.Y.S.3d 99, 101 (App. Div.) and *Nicholas Logistics, Inc. v. Sargent Appliance Sales & Serv.*, No. 359793, 2023 Mich. App. LEXIS 2046, at *5-6 (Ct. App. Mar. 23, 2023).

63.     The Trustee sets forth facts to establish each element to establish a claim of promissory estoppel. Further, the Trustee asserts that the Debtor was a third-party beneficiary to the Wing Lake Assignment Document executed by Spin. FAC pp. 92-93, ¶¶ 489-491. Further, the Trustee asserts that Scott Zankl did not have the corporate authority to execute the Hi Bar Transfer Agreement. FAC, p. 93, ¶ 494. Neither Kristen Zankl nor Ed Brown knew that there were balances owed to Spin not transferred to Wing Lake. FAC p. 93, ¶¶ 492-493. The Trustee

only acknowledges that the Hi Bar Transfer Agreement was only "purportedly signed by Kristen Zankl." FAC p. 19, ¶ 106(a), and states "allegedly agreed to by Kristen Zankl, etc. FAC p. 92, ¶ 486. The Court will need to make a factual determination that Kristen Zankl actually executed the Hi Bar Transfer Agreement and that the Debtor did not reasonably rely upon the representations made by Spin.

## H. The Trustee Properly Alleges Claims to Avoid Fraudulent Transfers under Counts X, XI, XII, XIII, XIV, XV, and XVI

64.     The Trustee has properly pled various actual and constructive fraudulent conveyance claims against the Spin Defendants under federal bankruptcy law and under Florida state law.   Fla. Stat. § 726.105(1)(a) or 11 U.S.C. § 548(a)(1)(A). The Trustee's Fraudulent Transfer Claims are sufficiently pled under Fed. R. Civ. P. 8(a), *Twombly* and *Iqbal*.

### (i)     The Hi Bar Transfers Were Interests in Property of the Debtor Made Within 2 or 4 years of the Petition Date

65.     The Trustee has sufficiently alleged that the transfers were an interest in property of the Debtor, because it was either the cash payments from the Debtor's bank accounts, *see* FAC pp. 74 and 85, ¶¶ 398 and 457[6], and Ex B, or a release of claims of the Debtor against Hi Bar which also constitute property of the Debtor.  FAC, p. 69, ¶ 374.  The FAC also alleges that each of the Hi Bar Transfers occurred within 2 or 4 years of the Petition Date.  FAC, pp. 69 and 85, ¶¶ 375 and 458.

### (ii)     The FAC Sufficiently Alleges "Actual Intent to Hinder, Delay, or Defraud" Creditors

66.     "Actual intent" is from the viewpoint of the transferor and is generally determined by a totality of the circumstances in which Courts consider the non-exhaustive "badges of fraud."

---

[6] "Hi Bar Transfers," which as defined include the "Hi Bar Contract Transfers" and the cash payments on Ex. B, Amended Complaint, p. 74, ¶ 399.

*See In re Rollaguard Sec., LLC*, 570 B.R. 859, 878 (Bankr. S.D. Fla. 2017) *see also Pearlman*, 440 B.R. at 904.  The FAC contains sufficient, well pled, factual allegations to maintain a plausible claim under Fla. Stat. 726.105(1)(a) or 11 U.S.C. § 548(a)(1)(A).  The Spin Defendants ignore the incorporation of paragraphs 1 through 87 and Counts I and IV, into Counts X, XI, XII, XIII, XIV, XV, and XVI.  *See* FAC, pp. 52, 57, 61, 62, 63, 64, and 65 ¶¶ 282, 307, 331, 337, 342, 346 and 350.  Further, Counts X and XI include substantial factual allegations relating to the totality of the circumstances surrounding the Debtor's reasons behind the Spin Transfers, including detailing that the Debtor was being run as a Ponzi Scheme.  FAC pp. 57-61, ¶¶ 307-330.

67.      Spin's argument that there could not be a Ponzi scheme involving "loans" is unavailing at best. *Cunningham v. Brown*, 265 U.S. 1, 7-8 (1924) (Charles Ponzi's scheme was predicated upon "borrowing money on his promissory notes.").  Further, the *Pearlman* opinion does not talk in absolutes but says "traditionally" because a valid debt obligation is extinguished dollar-for-dollar with each payment. *Kapila v. TD Bank, N.A. (In re Pearlman)*, 440 B.R. 900, 905 (Bankr. M.D. Fla. 2010).  Here, the Spin Contracts are criminally usurious loans in which the "obligation" was void *ab initio*.  The collection of these loans by Spin was, itself, a criminal act.

**(iii)      The Spin Defendants Reliance on "Value" is Misplaced Both Factually and Legally**

68.      First and foremost, the Spin Defendants misapprehend the allegations in the FAC, and argue Spin was a "net loser," however, as set forth above regarding damages, on the face of the FAC, Spin is not a "net loser" because in addition to the $2.3 million it received from the Debtor's bank account, Spin also purportedly received the $2,114,312.50, from the First Hi Bar Contract on which Debtor paid $2.2 million. *See* FAC Exhibits A, B, H, and I, pp. 95-98 and 135-149.

25

69.    The Spin Defendants do not distinguish between the counts in the FAC that seek to avoid the Spin Transfers under theories of actual fraud, (Counts X, XI, XIV, and XXIII) versus constructive fraud, (Counts XII, XIII, XV)[7].  The Spin Defendants focus solely on constructive fraud statutes and case law.  *See* ECF No. 27, pp. 27-30 (citing 11 U.S.C.  §548(a)(1)(B)(i) and (ii)(I); Fla. Stat. §§ 726.105(1)(b) and 726.106(1) and *PSN Liquidating Tr. v. Intelsat Corp. (In re PSN USA, Inc.)*, 615 F. App'x 925, 930 (11th Cir. 2015)).

70.    The Trustee has asserted facts to support actual fraud based upon a totality of the circumstances.  "Good faith and for value" are affirmative defenses to which Spin will not be able to prove.  *See* FAC, ¶¶ 1-185, Counts I, II, and III.  Accordingly, the Spin Defendants' MTD fails.

**FURR AND COHEN, P.A.**
*Attorneys for the Plaintiff*
2255 Glades Road, Suite 419A
Boca Raton, FL 33431
Telephone: 561-395-0500
Facsimile: 561-338-7532

By: */s/ Alan R. Crane*
       Alan R. Crane, Esq.
       Florida Bar No.: 0963836
       E-Mail: acrane@furrcohen.com

---

[7] Count XVI is included in the Spin MTD but Count XVI is a claim for recovery of any amounts avoided in Counts X through XV under 11 U.S.C. § 550.