UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:

EXCELL AUTO GROUP, INC.

          Debtor.
_____/

NICOLE TESTA MEHDIPOUR,
as Chapter 7 Trustee for Excell Auto Group, Inc.

          Plaintiff,

v.

HI BAR CAPITAL, LLC, et al.,

          Defendant(s).
_____/

Case No.: 22-12790-EPK
Chapter 7

Adv. Pro. No. 23-01132-EPK

**TRUSTEE'S RESPONSE TO MOTION TO DISMISS CORRECTED FIRST AMENDED COMPLAINT FILED BY HI-BAR CAPITAL, LLC, MORDECHAI HERBST, YISROEL HERBST**

Nicole Testa Mehdipour, chapter 7 trustee and plaintiff in this adversary proceeding files this response to *Motion to Dismiss Corrected First Amended Complaint filed by Hi-Bar Capital, LLC, Mordechai Herbst, Yisroel Herbst* [ECF No. 29][1] and states as follows:

**Preliminary Statement**

1. For the reasons set forth herein, the Hi Bar MTD should be denied as the issues raised by the Defendants require a review of the totality of the circumstances, which is not

---

[1] "ECF No. __" refers to documents filed in the above captioned adversary proceeding. "Main ECF No. __" refers to documents filed in the main bankruptcy case, 22-12790-EPK.

1

appropriate for a motion to dismiss.  In the alternative, the Trustee requests leave to amend the FAC.[2]

**A. The First Settlement Agreement and the Second Settlement Agreement, including the Releases therein, are Avoidable by the Trustee and the Trustee's Claims are not Barred**

2.      The Hi Bar Defendants, Hi Bar Capital LLC, Mordechai Herbst, and Yisroel Herbst, incorrectly assert that the Trustee is barred from asserting claims raised in the FAC because, pre-petition, Scott Zankl and Kristen Zankl executed the First Settlement Agreement and the Second Settlement Agreement which contain certain release language.  The Hi Bar Defendants leave out of their analysis, that the Trustee specifically seeks avoidance of the Hi Bar Transfer Agreement, First Hi Bar Contract, First Settlement Agreement, Second Settlement Agreement, and the releases contained therein as either constructive or actual fraudulent transfers under 11 U.S.C. § 544 and Florida Statutes §§ 726.105(1)(a) and (b) and 726.106(1), and 11 U.S.C. §548(a)(1) or (2).  *See* FAC, Counts XVIII, XIX, XX, XXI, XXII, XXIII, and XXIV.

3.      A release which bars further pursuit of causes of action constitutes a transfer of the Debtor's claims within the meaning of the Bankruptcy Code and applicable state law. *See* Fla. Stat. § 726.102(14) ("Transfer" … includes …release.").  *See also e2 Creditors' Tr. v. Farris (In re e2 Commun's, Inc.)*, 320 B.R. 849, 856 (Bankr. N.D. Tex. 2004) (Holding that causes of action constitute property and the release of causes of action is a method of "disposing of or parting with" property and therefore a transfer). *Accord Potter v. Alliance United Ins. Co.,* 37 Cal. App. 5th 894 (2019) (A release of a bad faith claim was an avoidable transfer under California's Uniform Voidable Transactions Act, Cal. Civ. Code §§ 3439-3439.14); *HedBack v. American Family Mut. Ins. Co. (In re Mathews)*, 207 B.R. 631 (Bankr. D. Minn. 1997) (Avoiding a release under

---

[2] Trustee/Plaintiff incorporates by reference all arguments made in *Trustee's Response to Motion to Dismiss Corrected First Amended Complaint Filed by Spin Capital, LLC and Avrumi Lubin* as many of the arguments are the similar but not identical and some parts may be more thoroughly addressed therein.

Minnesota Uniform Fraudulent Transfer Act); *Steinberg v. Alpha Fifth Grp.*, No. 04-60899-CIV-MARRA, 2008 U.S. Dist. LEXIS 25527, at \*18 (S.D. Fla. Mar. 31, 2008) (Congress expressed an intent for the definition of "transfer" to be read as broadly as possible). *See also Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247 (S.D.N.Y. 2022) (Plaintiff stated a claim to avoid a release as fraudulent).

4.      The Hi Bar Defendants challenge the fraudulent transfer counts on the grounds of "value" as both a complete and partial defense to the Trustee's Fraudulent Transfer claims in Counts XVIII, XIX, XX XXI, XXII, XXIII, XXIV and XV.  *See* ECF No. 29, pp. 14-15.  The Hi Bar Defendants challenge the sufficiency of the allegations regarding actual intent to hinder, delay or defraud in Counts XVII and XXIII.  *See* ECF No. 29, 15-16.  Count XVII is a request for declaratory relief, accordingly, the Trustee is reading that to refer to Count XVIII.

5.      Sufficient factual allegations in each of the respective counts, including the incorporated paragraphs and counts support the alternative theories that the "Hi Bar Contract Transfers[3]" and "Hi Bar Transfers[4]" are avoidable as either actual or constructive fraudulent transfers.  As more fully set forth below, the Trustee details the fraudulent transfer analysis. Section B, *infra*.

6.      As to constructive fraud, the Trustee also argues that the Debtor received less than reasonable equivalent value for entering into each of the Hi Bar Transfers because the obligations were previously assigned to Wing Lake.  The Trustee alleges that the amounts that the Debtor obligated itself to take on in exchange for each of the Hi Bar Transfers was not reasonable.  For

---

[3] "Hi Bar Contract Transfers" are, collectively, the Hi Bar Transfer Agreement, First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement were obligations incurred by the Debtor and the releases contained in the First Settlement Agreement and Second Settlement Agreement.  *See* Amended Complaint, p. 69, ¶ 374.

[4] The "Hi Bar Transfers" are, collectively, the Hi Bar Contract Transfers plus the cash payments in Exhibit B.  *See* Amended Complaint, p. 74, ¶ 399.

instance, purportedly, the Debtor was obligated to pay Spin $2,114,312.50 under the Third Spin Contract.  As part of the Hi Bar Transfer Agreement, Spin sold the debt to Hi Bar.  Also, as a part of Spin selling this obligation to Hi Bar, the Debtor entered into the First Hi Bar Contract.  Hi Bar paid nothing to the Debtor in exchange for entering into the First Hi Bar Contract but became obligated to pay Hi Bar $3,177,880.00 under more onerous terms. The Debtor received less than reasonable equivalent value for entering into the Hi Bar Transfer Agreement and the First Hi Bar Contract.  Further, every payment made by the Debtor to reduce these avoidable obligations was for less than reasonably equivalent value.

7.      For the actual fraud theories, the issue of reasonably equivalent value is not part of the claim.  Instead, the burden of proof is on the Defendants to establish a defense under 11 U.S.C. §548(c) or Fla. Stat. § 726.109(1) which, at a minimum, requires the Defendants to plead and prove both that it provided value and in good faith.  Although not required in the FAC, the FAC has provided sufficient facts to preemptively refute that value was given to the Debtor in good faith.

8.      Therefore, if the First Settlement Agreement and the Second Settlement Agreement along with the releases are avoided as being the products of fraudulent transfers, then two Settlement Agreements, including the releases, provide no defense to the Hi Bar Defendants. Accordingly, the Motion to Dismiss should be denied.

**B.  The Trustee Has Sufficiently Pled Fraudulent Transfer Actions Against Hi Bar, in Count XVIII and XXIII, which are Not Solely Predicated Upon Hi Bar's Agreements Being <u>Criminally Usurious Loans</u>**

9.      The Trustee's Fraudulent Transfer Claims are sufficiently pled under Fed. R. Civ. P. 8(a), *Twombly* and *Iqbal*.  To sustain a fraudulent transfer action under Fla. Stat. § 726.105(1)(a) or 11 U.S.C. § 548(a)(1)(A), the Trustee must allege: (i) there was a transfer of the debtor's interest in property; (ii) the transfer to have occurred within the 2-year period (11 U.S.C. § 548) or the later of 4-year period or 1-year of after the transfer was or could reasonably have been discovered (Fla.

4

Stat. § 726.110(1)) immediately preceding the petition date; and that (iii) the transfer was made with the "actual intent to hinder, delay, or defraud" any current or future creditor.

### (i)   The Hi Bar Transfers Were Interests in Property of, or Obligations Incurred by, the Debtor, Within 2 or 4 years of the Petition Date

10.   The Trustee pleads the Hi Bar Transfers and the Hi Bar Contract Transfers were interests in property of the Debtor, because it was either the cash payments from the Debtor's bank accounts, *see* FAC, pp. 74 and 85, ¶¶ 374, 398, 399, 424 and 457[5], and Ex B, a contractual right or obligation or a release of claims of the Debtor against Hi Bar, all of which constitute property of the Debtor.  FAC, p. 69, ¶ 374[6].  Further, the obligations incurred by the Debtor under the Hi Bar Transfer Agreement, the First Hi Bar Contract, the First Hi Bar Settlement Agreement and the Second Hi Bar Settlement Agreement are all obligations incurred by the Debtor subject to being avoided under both Florida and Bankruptcy law.  11 U.S.C. § 548(a)(1) and Fla. Stat. §§ 726.105(1) and 726.106(1).  The FAC also alleges that each of the Hi Bar Transfers occurred within 2 or 4 years of the Petition Date.  FAC, pp. 69 and 85, ¶¶ 375 and 458.

### (ii)   The FAC Sufficiently Alleges "Actual Intent to Hinder, Delay, or Defraud" Creditors

11.   "Actual intent" in generally determined by a totality of the circumstances in which Courts consider the non-exhaustive "badges of fraud."  *See In re Rollaguard Sec., LLC*, 570 B.R. 859, 878 (Bankr. S.D. Fla. 2017). The FAC contains sufficient, well pled, factual allegations to maintain a plausible claim under Fla. Stat. 726.105(1)(a) or 11 U.S.C. § 548(a)(1)(A).  The Hi Bar Defendants ignore the incorporation of paragraphs 1 through 185 and Counts I, II, and III, into

---

[5] "Hi Bar Transfers," which as defined include the "Hi Bar Contract Transfers" and the cash payments on Ex. B, Amended Complaint, p. 74, ¶ 399.

[6] The Trustee is seeking avoid as fraudulent transfers, the Hi Bar Transfer Agreement, the First Hi Bar Contract, the First Hi Bar Settlement Agreement, the Second Hi Bar Settlement Agreement, including the releases and the payments of funds from the Debtor to Hi Bar.  The Trustee asserts that no actual cash was paid by Hi Bar to the Debtor.  The Trustee is seeking to amend the FAC and will clear up any potential ambiguity.

Counts XVIII and XXIII.  *See* FAC, pp. 68 and 85, ¶¶ 365 and 456.  Further, Count XVIII includes substantial factual allegations relating to the totality of the circumstances surrounding the Debtor's reasons behind the Hi Bar Transfers and Hi Bar Contracts, including detailing that the Debtor was being run as a Ponzi Scheme.  FAC, pp. 68-73, ¶¶ 366-395.

12.    Actual intent is from the point of view of the Debtor (transferor) rather than the Defendants (transferees).   The Trustee alleges sufficient facts to support each of her alternative actual fraud theories. FAC p.4-5 ¶¶ 17-26; p. 17 ¶¶ 88-89; p. 19-22 ¶¶ 99-123; p.36-37 ¶¶ 197-203; p. 52-56 ¶¶ 285-306; p. 57-60 ¶¶ 310-330; P. 66 -67 ¶¶ 356-362; p. 68-73 ¶¶ 366-396; p. 74-78 ¶¶ 398-421; p. 79-82 ¶¶423-445; p. 92-93 ¶¶ 486-496.

13.    *First*, the Debtor operated but not owned by Scott Zankl, was advertised as a luxury, high-end, used car dealership.  However, by no later than May of 2021, the Debtor had ceased operating as a used car dealership and was being used to borrow money primarily from Private Lenders and Merchant Cash Advance companies to fund his lifestyle and repay prior investors/lenders.  No later than May of 2021, the Debtor was being operated as a Ponzi scheme. Each transfer made, and obligation incurred, by the Debtor and between the MCA companies and Private Lenders was in furtherance of the Ponzi scheme, including with both Hi Bar and Spin. Therefore, the obligations incurred, and transfers made by, the Debtor with Spin and Hi Bar were each done with the actual intent to hinder, delay, or defraud creditors.

14.    *Second*, while negotiating and obtaining a $6,000.000.00 loan from Wing Lake, the Debtor, in part, executed the Hi Bar Transfer Agreement and the First Hi Bar Contract with the actual intent to hinder, delay, or defraud Wing Lake and other creditors of the Debtor.  Thereafter, each of the First Settlement Agreement, Second Settlement Agreement, including releases, and

transfers of payments to Hi Bar were also made with the actual intent to hinder, delay or defraud Wing Lake and the Debtor's other creditors.

15.    *Third*, the Trustee, alternatively alleges, that the same underlying facts support a finding that the transfers were made, and obligations occurred, were done so with the actual intent to hinder, delay, or defraud creditors even absent a Ponzi scheme presumption.

16.    Preemptively, the Trustee has alleged sufficient facts to negate an affirmative defense that Hi Bar may raise asserting a good faith and value defense.  For instance, the Trustee asserts that the Hi Bar Transfers and Hi Bar Contracts were all based upon void, criminally usurious loans whereby the principal and interest were immediately forfeited, and collection was illegal under New York and federal law.  *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 333 (N.Y. 2021) and *Adar Bays, LLC v. GeneSYS ID, Inc.*, 28 F.4th 379, 382-83 (2d Cir. 2022).  When a transaction is one that is absolutely prohibited by law it will rarely, if ever, constitute reasonable equivalent value.  *Tabas v. Lehman (In re Capitol Invs., Inc.)*, 473 B.R. 838, 846 (Bankr. S.D. Fla. 2012).  In this case, the collection of the unlawful debt is absolutely prohibited under New York law and is punishable under both federal criminal and civil law, under both federal criminal and civil RICO statutes.  *See People v. Richmond Capital Group, LLC*, Index No. 451368/2020, 2023 NYLJ LEXIS 2487 (N.Y. Sup. Ct. Sept. 15, 2023) (Special proceeding under New York Executive Law section 63(12) by New York's Attorney General).

17.    Further, if this Court finds that the Hi Bar Contracts were void then Florida law applies, and the entire principal and interest are likewise forfeited.

18.    Accordingly, because in each of Counts XVIII and XXIII all the elements necessary to establish a plausible claim for relief are sufficiently pled, the Motion to Dismiss must be denied.

**C.  The Hi Bar Defendants Reliance on "Value" is Misplaced Both Factually and Legally**

19.     First and foremost, the Hi Bar Defendants do not distinguish between the counts in the FAC that seek to avoid the Hi Bar Transfers under theories of actual fraud, (Counts XVIII (seeking both actual and constructive), XIX, XX, and XXIII) versus constructive fraud, (Counts XVIII (seeking both actual and constructive), XXI, XXII, XXIV)[7].  The Hi Bar Defendants focus solely on constructive fraud statutes and case law.  *See* ECF No. 29, pp. 14-15 (*citing* 11 U.S.C. § 548(a)(1)(B)(i) and (ii)(I); Fla. Stat. §§ 726.105(1)(b) and 726.106(1) and *PSN Liquidating Tr. v. Intelsat Corp. (In re PSN USA, Inc.)*, 615 F. App'x 925, 930 (11th Cir. 2015)).

20.     As set forth above, actual fraud is a totality of the circumstances test, and "value" is not an element necessary for the Trustee to plead, but it can be raised as part of a "good faith and for value" defense, which the Hi Bar Defendants have not raised, and the FAC contains sufficient factual allegations to support that Hi Bar did not act in good faith. *See* FAC, ¶¶ 1-185, Counts I, II, and III.

21.     Furthermore, the Hi Bar Defendants' argument that, within the four corners of the FAC or exhibits attached thereto, the Trustee admitted that "Hi-Bar provided actual value to the Debtor" is absurd.  The Trustee seeks to avoid as constructively fraudulent the entirety of the relationship between the Debtor and Hi Bar, including the Hi Bar Contract Transfers and the Hi Bar Transfers and not just the actual transfer of money.  The Trustee clearly alleges that the Debtor received less than reasonably equivalent value in exchange for each of the obligations incurred and transfers made by the Debtor to Hi Bar during a time that the Debtor was or became insolvent as a result of the obligations and transfers.  As to "reasonably equivalent value," the Trustee alleges that: (i) the Spin Contracts and First Hi Bar Contract are void, criminally usurious loan agreements

---

[7] Count XXV is included in the Motion to Dismiss but Count XXV is a claim for recovery of any amounts avoided in Counts XVII through XXIV.

with a forfeiture of both principal and interest under both New York and Florida law; (ii) that, Spin transferred all obligations owed by the Debtor pursuant to the Wing Lake Assignment;  (iii) the Hi Bar Transfer Agreement merely transferred a purported balance owed by the Debtor to Spin in the amount of $2,120,000.00 to Hi Bar.  There were no funds paid by Hi Bar to the Debtor. Notwithstanding the fact that this was a balance transfer between Spin and Hi Bar, the Debtor's obligation to Hi Bar under the First Hi Bar Contract was increased by over $1.5 million to $3,177,880.00.  The Debtor received less than reasonable equivalent value for entering the Hi Bar Transfer Agreement and the First Hi Bar Contract whereby it received no additional funds, but its obligations increased by over $1.5 million. For the same reasons, the Debtor received less than reasonable equivalent value for entering into the First and Second Settlement Agreements.

22.     For the same reasons, the Hi Bar Defendants' argument that at most Hi Bar would be obligated for $80,000.00 is not appropriate for a Motion to Dismiss.  [ECF No. 29, p.17].  This is a "good faith and for value defense" that Hi Bar must assert and will certainly fail.

23.     Accordingly, this argument must fail and the Motion to Dismiss must be denied.

**D. The Trustee has Sufficiently Alleged that the First Hi Bar Contract is a Criminally Usurious Loan and Void under New York Law**

24.     In summary, the Trustee has sufficiently asserted facts that would allow this Court to find that the First Hi Bar Contract is a criminally usurious loan under New York law and void with the principal and interest being uncollectable and the defense of criminally usury is available to a corporation. *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y. 3d 320, 333 (N.Y. 2021).  The New York Court of Appeals has never addressed the issue of whether an MCA agreement is a usurious loan or is otherwise excluded from New York's usury law. *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247 (S.D.N.Y. 2022).  There are several Appellate Division cases and numerous trial court cases on the issue, whose outcomes are decided based

upon the facts in each case and results vary greatly, and the Appellate Divisions have yet to settle on any specific framework for classifying MCA agreements. *Id*. 247-248.

25.     Under long established New York law, "substance-not form-controls." in determining whether a transaction is a loan, *Adar Bays, LLC v. GeneSYS ID, Inc.*, at 621-22 (*citing Dry Dock Bank v. American Life Ins. & Trust Co.*, 3 N.Y. 344, 354 (N.Y. 1850)).  When usurious intent does not appear on the face of the document, usurious intent, an essential element of usury is a question of fact.  *Haymount* at 247 (*citing Adar Bays* at 336).  Nowhere in any case law or statute are MCA agreements excluded from this analysis, substance controls.

26.     The primary focus for the New York Court of Appeals for determining whether a transaction is a loan is focused on the allocation of risk between the parties. *Haymount* at 247.  If the economic analysis reveals that "the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to [pay]," then there has not been a bona fide purchase of receivables and the transaction is, in substance, a loan."  *Id. See also Adar Bays*, 37 N.Y.3d at 334 ("[P]arties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders."). This is the true analysis to be conducted by the Court.

27.     Despite New York having binding case law requiring courts to engage in a substance over form analysis, the Hi Bar Defendants' assert that the mere presence of words in the agreement that follow the *Principis* factors are enough to end all inquiries on whether the First Hi Bar Contract is a loan or a true purchases [ECF No. 29, p. 5].  Even the case cited by the Hi Bar Defendants holds that the three factors are not dispositive and requires the analysis advocated by

the Trustee.  *Id*.  (*citing US Info. Group LLC v. EBF Holdings, LLC*, [2023 U.S. Dist. LEXIS 169605,] 2023 WL 6198803, at *11 (S.D.N.Y. Sept. 22, 2023)). In *US Info Group* the court held:

> "[W]hen determining whether a transaction constitutes a usurious loan it must be considered in its totality and judged by its real character, rather than by the name, color, or form which the parties have seen fit to give it." *Zanfini v. Chandler*, 197 A.D.3d 594, 595, 153 N.Y.S.3d 77 (2d Dep't 2021) (quotation marks omitted). "[T]he outcomes are strongly fact-bound and vary considerably." *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247 (S.D.N.Y. 2022) (Rakoff, J.). New York courts principally look to three non-exclusive factors that distinguish a loan from an MCA: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *LG Funding, LLC v. United Senior Properties of Olathe, LLC*, 181 A.D.3d 664, 122 N.Y.S.3d 309 (2d Dep't 2020).
>
> The *LG Funding* factors "reduce to one overarching principle," which focuses on whether the financing party "is absolutely entitled to repayment under all circumstances" versus whether there has been a "transfer of risk." *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 452 (S.D.N.Y. 2022) (Liman, J.); *see also Haymount*, 609 F. Supp. 3d at 247 (the *LG Funding* factors should not be applied mechanically and are not themselves dispositive). "The buyer bears a risk if the contingency — the seller's success (or lack thereof) collecting future receivables — determines the rate and completeness of repayment."

*US Info. Group LLC,* 2023 U.S. Dist. LEXIS 169605 at * 17-18.

28.     At most, New York Courts will review the three factors only as a guide, but courts must still analyze the totality of the circumstances of both the words on the paper and the mechanics of the agreement itself. *Haymount*, 609 F. Supp. 3d at 247-248 (internal citations omitted). The *Haymount* court also noted that "[the 1st] department[] ha[s] analyzed MCA contracts without applying these three factors." *Id*. (*citing Davis v. Richmond Capital Group LLC*, 194 A.D.3d 516, 517, 150 N.Y.S.3d 2 (1st Dep't 2021)). *See also LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 665-66, 122 N.Y.S.3d 309, 312 (2nd Dep't 2020) (MCA "must be 'considered in its totality and judged by its real character, rather than by the name,

color, or form which the parties have seen fit to give it' and determine whether the MCA company is absolutely entitled to repayment under all circumstances").

29. A more accurate statement about New York law is usually a court will usually begin by looking at the *Principis* factors, if the MCA fails any one of those factors, then the MCA is a loan. However, even with the presence of *Principis* factors, this Court still must look to the totality of the circumstances in making a substance over form determination. *HI Bar Cap. LLC v. Parkway Dental Servs., LLC*, 2022 N.Y. Misc. LEXIS 5814, 2022 NY Slip Op 32934(U) (Sup. Ct., Aug. 25, 2022); *In Fleetwood Servs.*, and *Haymount* at 247 (S.D.N.Y. 2022).

30. In this case, the totality of the circumstances, including the *Principis* factors lead to no conclusion other than the First Hi Bar Contract is a loan subject to applicable criminal usury laws. This conclusion is borne out by the opinion in *Hi Bar Capital LLC v. Parkway Dental Servs., LLC*, *supra*, wherein on a motion to reargue, the Court considered a Hi Bar contract, identical to the contract before the Court in this adversary, and after applying *Principis*, *Adar*, and other case law found that "there are surely questions raised whether the agreement comports with the requirements necessary to be considered a genuine cash advance agreement." 2022 N.Y. Misc. LEXIS 5814 at *14-15.

**(i) The Hi Bar Defendants' Sole Risk is Non-Payment by Excell, Not Predicated on the Performance of any Account Debtors or Customers**

31. It is clear from the plain language of the First Hi Bar Contract that Excell always remained liable for the full "purchase amount" and remittance amounts. *See* FAC Ex. I, p. 139 ("[Excell] remains responsible for ensuring that the agreed Remittance to be debited by [Hi Bar] remains in the Account and will be held responsible for any fees incurred by [Hi Bar] resulting from a rejected ACH attempt or an Event of Default."). *Compare* FAC Ex. I, p. 139 ¶ 1.10 (purportedly making Debtor servicer for "collecting and delivering Receipts to [Hi Bar]…"). The

Hi Bar Defendants' risk is always "derivative or secondary" in that the Hi Bar Defendants' risk is not based upon the performance of account debtors or customers, but only risk that the "account debtor's" non-payment will leave Excell unable to pay.  *See Haymount*, at 247.  *Accord Adar Bays*, 37 N.Y. 3d at 334.

### (ii)   The First Hi Bar Contract was for Definite Time

32.   As clearly stated in the FAC, the First Hi Bar Contract was for a definite time period, which is calculated by dividing the "Purchase Amount" divided by the predetermined "Remittance" amount.  FAC pp. 22, ¶ 121 and 24-25, ¶¶ 135-136.  In *People v. Richmond Capital Group LLC*, 2023 NYLJ LEXIS 2487 at *6-7, in finding that the MCAs were criminally usurious loans, and the MCA company to be a predatory lender under NY law, the court, looked in part, at whether the payments were of fixed term.  In this case, like *Richmond Capital Group*, the daily payment sweeps of the Borrower's bank accounts reflected fixed constant repayments over a fixed term, rather than based on any purported number of receivables purchased.  In this case, the First Hi Bar Contract, executed on October 27, 2021, was based upon $150,000.00 weekly payments. The payments were not based upon actual income collected.  FAC, pp. 21-24, ¶ 118-134.

### (iii)   The Reconciliation Provision is Illusory

33.   In *Richmond Capital Group*, the court found MCA company to be a predatory lender, in part, because the reconciliation provision was a sham where the MCA lender required the borrower to make misrepresentations that there were no other loans, MCA lender knew of the other loans, putting the borrower into immediate default, including conspiring with Spin to secretly transfer the Third Spin Contract. FAC, p.10, ¶¶ 55-60; p. 13 ¶¶ 70-77; p. 17 ¶¶ 88-90; pp. 19-20, ¶¶ 105-112; p. 22, ¶¶ 119-120; pp. 25-28, ¶¶ 137-154; and Ex I, ¶¶ 3(a)-(n). Therefore, Hi Bar, through Lubin, assisted the Debtor in violating the First Hi Bar Contract, FAC Ex I, p. 141, ¶ 3(b), and like Richmond Capital required the Debtor to be in immediate default.

34. In *Haymount* at 248, the court stated, if the mechanics of a reconciliation provision give the MCA lender discretion to grant a reconciliation provision, then the reconciliation provision fails.

35. In this case, the Debtor was immediately in default in the First Hi Bar Contract, not only did Hi Bar and Lubin know of the existing loans, but they participated in the Debtor obtaining additional financing from Wing Lake knowing that it would put the Debtor in default because the Debtor was required to represent that it had no and would have no additional loans. See FAC Exs. H and I. Not only was the Debtor prohibited from having any current or future loans, but the event of default also pertained to the other 14 non-debtor entities that are parties to the First Hi Bar Contract. FAC Ex. I, pp. 141-142, ¶ 3(i) Hi Bar knew that the Debtor and non-debtor entities had other loans, therefore, the Debtor was immediately in default under the terms of the Agreement, and the Debtor never qualified for reconciliation. FAC p.10, ¶¶ 55-60; p. 13 ¶¶ 70-77; p. 22, ¶¶ 119-120; p. 25, ¶¶ 142-151; Ex I, First Hi Bar Contract ¶¶ 3(a)-(n).

36. In the First Hi Contract, the ability to request reconciliation can only happen retroactively provided that the Debtor is not in default. FAC Ex. I, pp. 140 ¶¶ 1.3 and 1.4.

37. The reconciliation provision in the first Hi Bar Contract, while purporting to be "mandatory," is structured to vest substantial discretion in Hi Bar to deny reconciliation. The reconciliation provision requires Excell and all 14 non-debtor entities to "include copies of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding, if applicable, from the date of this Agreement through and including the date the request is made." FAC Ex. I, p. 140, ¶¶ 1.3 and 1.4. Further, "[Hi Bar] retains the right to request additional reasonable documentation including without limitation bank login or access to view Merchant's accounts using third party software, and Merchant's refusal to provide access

shall be a breach of this Agreement and [Hi Bar] shall have no obligation to reconcile." *Id*. As stated in *Haymount*, "[i]t is readily apparent how the lender could use this contractual right to obtain from the merchant further documentation as a procedural pretext for denying reconciliation." *Id*. at 248-248.

38.    In *Haymount*, the court found it significant that the reconciliation provision was drafted in such manner if there was a "decline in revenues would lead a merchant to have insufficient cash to fund its high daily remittance, its inability to even apply for reconciliation could lead its account to return an insufficient funds message to the lender, which would trigger a default under the contract and entitle the lender to immediately seek the whole uncollected amount due from the merchant's principal, via the personal guaranty." *Id*. at 248-249.   Similarly, in the First Hi Bar Contract, the ability to reconcile an account only happens retroactively provided the Debtor is not in default.  FAC Ex. I, p. 140, ¶¶ 1.3 and 1.4.   Therefore, based upon the mechanics of the reconciliation provision, if the Debtor's revenues declined leaving insufficient cash to fund its high weekly remittance, it rendered Excell unable to even apply for reconciliation, and the return of an insufficient funds message to Hi Bar, without 24 hours' notice is an event of default, but even if there was 24 hours' notice provided Excell was only entitled to two NSFs then Excell was in default Hi Bar was entitled to call the entire balance due and exercise all rights under the spin contracts, including security agreement and guarantee. FAC Ex. I, pp. 146, ¶ C ("NSF Fee Standard: $50.00 (each) up to TWO TIMES ONLY before a default is declared."). *See Haymount*, 609 F. Supp. 3d. at 248 -249.  The second *Prinicipis* factor weighs in favor of finding the First Hi Bar Contract constitutes a loan.

    **(iv)**    **The First Hi Bar Contracts Provides for Recourse in the Event of Bankruptcy and Result in Events of Default Even Where the Spin Contracts Attempt to Disclaim**

15

39.     While the words on the paper say that "bankruptcy" is not specifically listed as an event of default and the language "Merchant going bankrupt or going of business…in and of itself, does not constitute a breach of this Agreement[,]" but an "event of default" is different from "recourse."  To ensure that Hi Bar will be paid in full if there is a bankruptcy filing, a bankruptcy:

a.   triggers other events of default, including but not limited to ¶ 3(a), (d), (f), (h), (j), (k), (l), and (n), and Appendix A, ¶ C, *see* [FAC Ex. I, pp. 141-142, and p. 146 ¶ C];

b.   triggers all the "Protections Against Default," *see* FAC Ex. I, pp. 140-141, ¶ 1.12, (identifying 8 protections Hi Bar can invoke "immediately and without notice" upon one of the events in (a) through (g) occur and which do occur when a bankruptcy is filed); and

c.   in the security agreement, securing the obligation against all of Excell's assets, Hi Bar does addresses its recourse in the event of a bankruptcy, stating:

> Merchant and Guarantor(s) (s) agree(s) that this is a contract of recoupment and [Spin] is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s)(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by [Spin]. Merchant and Guarantor(s)(s) agree(s) to execute and deliver to [Spin] such instruments and documents [Spin] may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. [Spin] is authorized to execute all such instruments and documents in Merchant's and Guarantor(s)(s) name.

FAC Ex. I, pp. 143, ¶ 3 (unnumbered)]

40.     In *Richmond Capital Group*, the court found the provision that non-payment caused by a bankruptcy was not an event of default was likewise a sham, because the MCA lender required the borrower to be in immediate default by making misrepresentation of no other loans, the MCA lender knew to be false. 2023 NYLJ LEXIS 2487 at *6-7.  Accordingly, the Hi Bar Defendants have ample recourse upon the filing of a bankruptcy and the third *Principis* factor weighs in favor of the finding these transactions are loans.

**(v)     <u>Additional Factors Supporting a Finding of a Criminally Usurious Loan</u>**

16

41.     The weekly remittance amounts described in the First Hi Bar Contract alleges to have been negotiated are fixed dollar amounts, and the FAC alleges that these amounts appear not to be good faith estimates of Excell's receipts. FAC p. 21-22 ¶ 118-120.  *See Haymount*, at 249 (*citing Davis,* 194 A.D.3d at 517). *See also Richmond Capital Group LLC*, 2023 NYLJ LEXIS 2487 at *6-7.

42.     As in *Haymount*, the repayment and remedy terms of the First Hi Bar Contract operate in "a manner more akin to a standard, high interest-rate loan than to a genuine transfer of the risks associated with specified receivables." *Id.* at 249.   For instance, a merchant defaults on the MCA agreement if its bank rejects the automated debit for one of those remittances without the merchant having provided prior notice. This default then entitles the lender to immediate repayment of the full amount of the transaction outstanding. *See Id.* (citations omitted) and FAC Ex. I, pp. 141-142, ¶ 3(d).  Further, cancelling out the "prior notice" savings clause for the Debtor, two events of insufficient funds in the account results in a default.  FAC Ex. I, pp. 146, ¶ C.

43.     One of the protections in the First Hi Bar Contract provides: "[Hi Bar] may debit Merchant' depository accounts wherever situated in such amounts as determined by [Hi Bar] in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Amount and other amount owed by Merchant to [Hi Bar] by means of ACH debit or facsimile signature on a computer generated check drawn on Merchant's bank account or otherwise for all sums due to [Hi Bar]." FAC Ex. I, pp. 141, ¶ 1.12 (Protection 8).

44.     Consequently, should a merchant default and the lender be unable to recover the outstanding balance from the merchant's bank accounts, the First Hi Bar Contract entitles Hi Bar to obtain full repayment from the Debtor, non-debtors, and the Debtor's principals, via the personal guaranty. *See Haymount*, 609 F. Supp. 3d at 249; *Rubenstein v Small*, 273 App Div 102, 104, 75

NYS2d 483 (1st Dept 1947) ("For a true loan it is essential to provide for repayment absolutely and at all events **or** that the principal in some way be secured as distinguished from being put in hazard." (emphasis added)).

45. The First Hi Bar Contract's "Events of Default" and Protections are more consistent with a loan than a purchase of accounts or receivables as its onerous provisions are more directed at the Debtor as opposed to only looking for collection against the account debtors. These provisions include: the Power of Attorney provision allowing Hi Bar to sign the name of the Debtor to receive, endorse and collect on any checks, notes and to contact banks and financial institutions using Merchant and Guarantors personal information [FAC Ex. I, pp. 140, ¶ 1.11]; Protections 1-8, allowing enforcement against Debtor and Guarantors through confessions of judgment, allowing Hi Bar the right to enter and take over the Debtor's leased business premises, along with other of Hi Bar's rights and remedies Revenue Purchase Agreement, Security Agreement, and Guaranty of Performance. *See generally* FAC Ex. I. Together, "[t]hese provisions suggest that the [Hi Bar Defendants] did not assume the risk that [merchants] would have less-than-expected or no revenues." *Haymount*, at 249-250 (citations omitted).

46. The Trustee has pled sufficient factual allegations to support plausible claims that the First Hi Bar Contract functions as a loan and is criminally usurious. *Id*. Likewise, the Hi Bar Defendants do not dispute that the implied interest rates on these transactions far exceed 50% per annum (twice the New York State criminal usury rate and the Florida criminal usury rate), therefore, the Trustee has adequately pled that the debt created by the First Hi Bar Contract is an unenforceable, "unlawful debt" under the RICO statute. *Id*. at 250.

47. Other courts that have reached the same or similar conclusion are *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 2020 NY Slip Op 01607, ¶ 2, 181 A.D.3d 664, 665-66,

122 N.Y.S.3d 309, 312 (2ⁿᵈ Dep't. 2020) (Court reversed trial court so that defendant could assert MCA agreement was a criminally usurious loan as an affirmative defense). The court must examine whether the MCA lender "is absolutely entitled to repayment under all circumstances." *Id*. (citations omitted). *Accord Funding Metrics, LLC v. NRO Boston, LLC*, 2019 N.Y. Misc. LEXIS 4878, 2019 WL 4376780, at *4 (Sup. Ct. N.Y. Cnty. Aug. 28, 2019) ("Denominating loan documents by another name, such as 'Merchant Agreements' as in this case, and including in such documents language of [the putative lender's purported purchase of account receivables that is unsupported by actual [borrower] receivables dedicated to repayment, does not shield it from the judicial determination that it contemplates a criminally usurious transaction, which is void ab initio as a matter of law."); *HI Bar Cap. LLC v. Parkway Dental Servs., LLC*, 2022 N.Y. Misc. LEXIS 5814, at *10-15 (The court, in granting a motion for reconsideration and vacating a default judgment, stated that the *Principis* factors are only a starting point and not an exhaustive list for the analysis and looked to federal court opinions which were "engag[ing] in a more thorough and exacting scrutiny of merchant cash advance agreements, looking at the agreements in, a holistic and comprehensive manner and the conclusions they have reached are compelling."); *Lateral Recovery*, 2022 U.S. Dist. LEXIS 129032, at *3-4 (the court noted that failing to notify the funder of an impending rejection or two rejected attempts to withdraw the daily amount really means there is no risk to the funder). *See* FAC Exs. I, pp. 141-142, ¶¶ 3(d) and 3.3 ("Remedies. Upon the occurrence of an Event of Default…") and p. 146, ¶ C (two rejected attempts results in default). *See also Richmond Capital Group LLC*, 2023 NYLJ LEXIS 2487 at *7-10 (finding the MCA Company, using substantially similar contracts as Hi Bar, was a predatory lender, that the transactions were criminally usurious loans, both procedurally and substantively unconscionable and void).

19

48.     The Trustee has asserted, among other reasons, that because the First Hi Bar Contract was void and unenforceable, the First Hi Bar Settlement and Second Hi Bar Settlement must also fail.

49.     As the First Hi Bar Contract is void, so is the choice of law provision. *Haymount Urgent Care PC v. GoFund Advance, LLC*, 2023 U.S. Dist. LEXIS 151141 at *7-11 (S.D.N.Y. Aug. 28, 2023).  Applying New York's conflict of laws case law, Florida law would apply under New York's "center-of-gravity" test. *Id*. at *12.  "Five specific contacts are relevant: 'the place[s] of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties.' " *Id*. (internal citations omitted).  The facts and analysis of *Haymount* are almost identical to the facts and analysis in this case.  The Debtor's domicile and the subject matter of the funding are both located in Florida and deserve "particular emphasis," because "states have a particular interest in protecting in-state borrower's no matter where the lender is located. *Id*. at *12 (internal citations omitted). Accordingly, applying New York's center of gravity test, Florida' usury law would apply under which the First HI Bar Contract is 25% interest and the First Hi Bar Contract is void.

**E.  Counts I, II and XXVIII Concerning the Franklin Assignment and Balance Transfer Agreement is Properly Pled and Not Subject to a Motion to Dismiss**

50.     The arguments by both Spin and Hi Bar do not dispute that the Third Spin Contract was secretly hidden from Wing Lake, but instead argue that this Court should sanction their fraud based upon a twisted interpretation of the Wing Lake Assignment Document.  The arguments made by both Spin and Hi Bar also serve to eviscerate any potential "good faith and for value" defenses as to the Trustee's fraudulent transfer claims.

51.     Hi Bar asks this Court to sanction the fraud committed by it and Spin, and in Hi Bar's recitation of the holding in *Price v. Haynes*, 37 Mich. 487, 489 (1877), does not recite the

full legal analysis therein. The pertinent portion of the holding is "[n]o single clause in such an instrument may be conclusive; we must judge of its intent as a whole." *Id*.

52. The term "Obligations" in the Wing Lake Assignment Document, when reading the instrument as whole, clearly contemplates that the intent of the parties was that all obligations owed to Spin by the Debtor and each of its affiliates were being assigned to Wing Lake. *See* FAC, ¶¶ 100-102, 110, and 198. This includes the Third Spin Contract and the purported balance due thereunder, which, in part, included balances owed under the First and Second Spin Agreement. Spin and Hi Bar's sole argument is that their trickery and fraud worked.

53. In the Wing Lake Assignment Agreement, Spin agrees to sell and assign:

> 1. all outstanding obligations ("Obligations") of Excell Auto Group, Inc. and each of its affiliates (collectively, "Company") owing to Assignor under each of (i) the Revenue Purchase Agreement, dated as of June 1, 2021, by and between Assignor and Company, **and** (ii) the Revenue Agreement, dated as of July 9, 2021, by and between Assignor and Company (collectively, the "Merchant Agreements") **and all rights of Assignor under any similar or related documents** (including without limitations, any guaranties, security agreements, forbearance agreements and judgments), including with respect to all collateral securing the obligations of Company under the Merchant Agreements or securing any guaranties in respect thereof (**the documents, including the Merchant Agreements, are defined collectively as "Merchant Documents"**), for purchase price of $1.00 (the "Purchase Price').

FAC, Ex. L, p. 169 (emphasis added).

54. Hi Bar incorrectly argues that the Third Spin Contract was not contemplated by the term Obligations. The defined term "Obligations" begins with "all obligations" and then includes two categories identified in romanettes (i) and (ii), which are joined by "and". "[T]he ordinary meaning of the conjunctive 'and' is to denote joinder or union." *Mayer v. Credit Life Ins. Co.*, 42 Mich. App. 648, 650, 202 N.W.2d 521, 523 (1972). In contrast to romanette (i), which only references the First Hi Bar contract, romanette (ii) has two categories joined by "and," "the

[Second Hi Bar Contract] (collectively, the "Merchant Agreements") **and** all rights of Assignor under any similar or related documents (including without limitations, any guaranties, security agreements, forbearance agreements and judgments), including with respect to all collateral securing the obligations of Company under the Merchant Agreements or securing any guaranties in respect thereof (the documents, including the Merchant Agreements, are defined collectively as "Merchant Documents")." FAC, Ex. L, p. 169 (emphasis added).  Romanette (ii) is not limited to the Second Hi Bar Contract. Further, the use of the term "any" with respect to "similar or related documents," is telling where the ordinary meaning of "any" is interpreted as broadly as possible. 2 *Crooked Creek, LLC v. Cass Cty. Treasurer*, 507 Mich. 1, 11 n. 21 (Mich. 2021) (*citing* Random House Webster's College Dictionary (1999) (defining "any" as "1. one, a, an, or some; one or more without specification or identification[.] . . . 2. whatever or whichever it may be[.] . . . 3. in whatever quantity or number, great or small; some[.] 4. every; all[.]); *People v Harris*, 495 Mich 120, 131; 845 N.W.2d 477; 495 Mich. 120; 845 NW2d 477 (2014) (explaining that " 'any' is commonly understood to encompass a wide range of things" such that "it is difficult to imagine how the Legislature could have cast a broader net given the use of the word[] 'any' "), *citing People v Lively*, 470 Mich 248, 253-254; 680 N.W.2d 878; 470 Mich. 248; 680 NW2d 878 (2004)).

55.     Further, the *Evidence of Assignment* executed by Lubin on November 1, 2021, FAC Ex. L, p.174, clearly includes the First Spin Contract, the Second Spin Contract "and all rights of [Spin] under any similar or related documents" under the Wing Lake Assignment and Spin confirmed that it had "sold, transferred and assigned all of its right, title and interest in the Merchant Documents to Assignee" and "this Evidence of Assignment may be **relied upon by any person** as evidence of the foregoing." FAC Ex. L, p. 174 (emphasis added).

22

56.     Hi Bar's intellectually dishonest argument fails when it takes out of context and argues that the language "(including without limitations, any guaranties, security agreements, forbearance agreements and judgments) etc. somehow limits the term Obligations.   Further, Hi Bar incorrectly argues, "[w]hile Obligations is expanded to include "similar or related agreements," that the Third Spin Contract was not covered, since the general description "similar or related agreement" is given specific **definition to include** "any guaranties, security agreements, forbearance agreements, settlement agreements and judgments." ECF No. 29 (Emphasis added). The statement by Hi Bar is misleading, because Hi Bar excludes the qualifying language "**including without limitation** . . ." (Emphasis added).   This qualification belies Hi Bar's contention that the specified items were limiting the defined term of Obligations, rather than its plain meaning of a non-exhaustive list of the items that could be included. *See People v. Martinez*, 307 Mich. App. 641, 651-52 (1st DCA Mich. 2014) (In general contract language is interpreted according to its plain meaning or common meaning.) (internal citations omitted).   *See also Auto-Owners Ins. Co. v. White Consol. Indus.*, 1996 Mich. App. LEXIS 680 at *2-3, 1996 WL 33349362 (Ct. App. Mich. Nov. 22, 1996) (finding "including but not limited to" to be non-limited); *Accord United States v. Water Supply & Storage Co.*, 546 F. Supp. 2d 1148, 1152 (D. Colo. 2008) ("The plain meaning of 'including but not limited to' … is meant to include the subsequently specified examples[,] and also is meant to include other items not specified in the statute…is not ambiguous.").

57.     Furthermore, the First Spin Contract and Second Spin Contract were defined as the "Merchant Agreements" and with the other documents were defined as the "Merchant Documents" and assigned under ¶ 2(a). FAC, Ex. L, p. 169.

58.     The Trustee clearly asserts that the Third Spin Contract, in part, refinanced the First Spin Contract and the Second Spin Contract. *See* FAC, ¶ 102, and Exhibits F, G, and L. There appears to be no factual dispute on this point. *See* Ex. L, p. 174 ("this Evidence of Assignment may be relied upon by any person as evidence of the foregoing.").

59.     Further, in the Wing Lake Assignment Agreement, Spin affirmatively represented and warranted, in part, that Spin had

> not sold, assigned, transferred, granted a participation in or pledged the Obligations, the Merchant Documents or the Third-Party Claims and [Spin] owns the Obligations, the Merchant Documents and the Third Party Claims free and clear of any lien or other encumbrance and [Spin], including any of its affiliates, as not entered into any written or oral agreement with [the Debtor or any of the Debtor's affiliates] relating to the Assignment or receipt of any compensation from [the Debtor or its affiliates] in consideration for entering into the Assignment.

FAC, Ex. L, p. 169, ¶ 4.

60.     This along with the rest of the Wing Lake Assignment Agreement, read together, demonstrates that the intent of the parties was for Spin to sell, transfer, and assign all obligations owed to Spin by the Debtor including the Third Spin Contract. *Price v. Haynes*, 37 Mich. at 489.

61.     Additionally, the Trustee alleges that the Hi Bar Transfer Agreement is an obligation that is avoidable under actual and constructive fraud theories.  In its Motion to Dismiss, Hi Bar states, "Plaintiff alleges that Spin and Hi-Bar "negotiated a secret agreement of the Third Spin Contract to Hi Bar." ECF No. 29 p. 15.  "Although characterized as a "secret assignment," Plaintiff attaches a "Balance Transfer Agreement" *signed by* Kristen and Scott Zankl making the allegation of a "secret" agreement somewhat confusing." ECF No. 29 p. 15.  To alleviate Hi Bar's confusion, in the context of avoidance of a transfer under actual fraud, court's look at the fraudulent intent of the transferor.  The Hi Bar Transfer Agreement was an obligation incurred by the Debtor with the actual intent to hinder, delay or defraud Wing Lake. Any assertion that Kristen and Scott

24

Zankl participated in the executing the Hi Bar Transfer Agreement in knowing violation of the Wing Lake Assignment Agreement supports the Trustee's actual fraud claims while the allegations that Hi Bar and Spin participated with the Debtor preemptively eviscerates any potential defense of good faith by Hi Bar and Spin.

62.    Based upon the arguments made in the Spin Motion to Dismiss and the Hi Bar Motion to Dismiss, the Defendants are attempting to justify their intentional and fraudulent conduct based upon a parsed reading of the Wing Lake Assignment Document.    The Trustee respectfully requests that this Court not endorse, as requested, this admitted fraud and deny Hi Bar's Motion to Dismiss.

**F.  In Count XXVIII the Trustee sets Forth the Elements of Promissory Estoppel Sufficient under either New York or Michigan Law**

63.    The elements of promissory estoppel appear to be the same, or at least substantially similar, under both New York and Michigan law. See *Redhead Builders LLC v. Aran World Inc.*, 2019 NY Slip Op 31228(U), ¶ 9 (Sup. Ct.) (*citing Condor Funding, LLC v. 176 Broadway Owners Corp.*, 2017 NY Slip Op 00719, ¶ 1, 147 A.D.3d 409, 411, 46 N.Y.S.3d 99, 101 (App. Div.)) and *Nicholas Logistics, Inc. v. Sargent Appliance Sales & Serv.*, No. 359793, 2023 Mich. App. LEXIS 2046, at *5-6 (Ct. App. Mar. 23, 2023).

64.    The Trustee incorporates sets forth facts to establish each element to establish a claim of promissory estoppel.  Further, the Trustee asserts that the Debtor was a third-party beneficiary to the Wing Lake Assignment Document executed by Spin. *See* FAC, pp. 92-93, ¶¶ 489-491.  Further, the Trustee asserts that Scott Zankl did not have the corporate authority to execute the Hi Bar Transfer Agreement. *Id*. at p. 93, ¶ 494.  Neither Kristen Zankl nor Ed Brown knew that there were balances owed to Spin not transferred to Wing Lake. *Id*. at p. 93, ¶¶ 492-493. The Trustee only acknowledges that the Hi Bar Transfer Agreement was only "purportedly signed

by Kristen Zankl." *Id*. at p. 20, ¶ 106(a). and states "allegedly agreed to by Kristen Zankl, etc. *Id*. at p. 92, ¶ 486.  The Court will need to make a factual determination that Kristen Zankl actually executed the Hi Bar Transfer Agreement and that the Debtor did not reasonably rely upon the representations made by Spin.

Therefore, the Motion to Dismiss should be denied.

> **FURR AND COHEN, P.A.**
> *Attorneys for the Plaintiff*
> 2255 Glades Road, Suite 419A
> Boca Raton, FL 33431
> Telephone: 561-395-0500
> Facsimile: 561-338-7532
>
> By: */s/ Alan R. Crane*
>         Alan R. Crane, Esq.
>         Florida Bar No.: 0963836
>         E-Mail: acrane@furrcohen.com