UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:

EXCELL AUTO GROUP, INC.

      Debtor.

_____/

NICOLE TESTA MEHDIPOUR,
as Chapter 7 Trustee for Excell Auto Group, Inc.

      Plaintiff,

v.

HI BAR CAPITAL, LLC, et al.,

      Defendant(s).

_____/

Case No.: 22-12790-EPK
Chapter 7

Adv. Pro. No. 22-01132-EPK

**PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AGAINST SPIN CAPITAL, LLC**

Nicole Testa Mehdipour ("**Plaintiff**"), chapter 7 trustee of the estate of Excell Auto Group, Inc., by and through undersigned counsel, pursuant to Federal Rule of Civil Procedure 56, made applicable by Federal Rule of Bankruptcy Procedure 7056, files this partial motion for summary judgment and, in support, states as follows:

**Summary of Argument and Relief Sought**

1.     The Plaintiff is entitled to summary judgment on Count 4 of the Second Amended Complaint as the Spin Contracts are all loans which charge interest in excess of New Yor's criminal usury statute and are void under New York law, and which constitute a violation of Florida's criminal usury statute, the applicability of which is neither arbitrary nor fundamentally

1

unfair.  The Plaintiff is therefore entitled to recover all payments made to or for the benefit of Spin (the forfeited principal and interest) from Spin on account of the Spin Contracts.

2.    With the principal and interest having been forfeited and the Spin Contracts unenforceable, Plaintiff is also entitled to summary judgment of Count 10, 11, 12, 13, 14, 15, and 16 to avoid the obligations incurred by the Debtor to Spin and Transfers made to Spin as Fraudulent Transfers under 11 U.S.C. § 548(a)(1)(A) or (B) and 11 U.S.C. § 544(b) and Fla. Stat. §§ 726.105(1)(a) and (b) or 726.106, and a money judgment against Spin for all amounts paid to or for the benefit of Spin. Under 11 U.S.C. § 550(a).

## I.    Jurisdiction

3.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (E), (H), and (O).

## II.    Summary Judgment Standard of Review

4.    To prevail on a motion for summary judgment under Federal Rule of Civil Procedure 56(a) and Federal Rule of Bankruptcy Procedure 7056 the movant must "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Fitzpatrick v. Schlitz* (In re Schlitz), 97 B.R. 671, 672 (Bankr. ND. Ga. 1986).  A "material" fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  A "genuine" dispute means that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.  In determining entitlement to summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).

**III.    Procedural History**

      **A.    The Bankruptcy Case**

5.      On April 8, 2022 (the "**Petition Date**"), the Debtor filed a voluntary petition ("**Petition**") for relief under Chapter 7 of the Bankruptcy Code to commence this case [Bankr. ECF No. 1][1]. Nicole Testa Mehdipour was appointed as the duly authorized and acting Trustee of the Debtor's bankruptcy estate [Bankr. ECF No. 2].

      **B.    The Adversary Case**

6.      On March 27, 2024, the Plaintiff filed a *Second Amended Complaint* [ECF No. 75] against Hi Bar Capital, LLC ("**Hi Bar**"), Spin Capital, LLC a/k/a Spin Capital ("**Spin**"), Yisroel Herbst ("**Y. Herbst**"), Mordechai Dov Ber Herbst a/k/a Mordi Herbst ("**M. Herbst**"), Avrumi Lubin a/k/a Josh Lubin ("**Lubin**"), and Franklin Capital Funding, LLC and Franklin Capital Group, LLC, d/b/a Wing Lake Capital (collectively, "**Wing Lake**").

7.      Hi Bar, M. Herbst, and Y. Herbst filed an *Answer to the Second Amended Complaint* [ECF No. 90] on April 24, 2024. Spin and Lubin filed an *Answer to the Second Amended Complaint* [ECF No. 102] on May 17, 2024

**IV.    Legal Basis for Summary Judgment in Favor of Plaintiff**

      **A.    Florida's Usury Laws Apply**

8.      Unless otherwise specifically allowed by law, Florida makes it a crime to charge, take, or receive interest at a rate more than 25% per annum Fla. Stat. § 687.071(2) and (3).

9.      Once the Spin Contracts are determined to be criminally usurious loans and void under New York law, Florida's substantive and statutory usury laws apply because it is neither arbitrary nor fundamentally unfair to apply Florida's law. *See Franchise Tax Bd. V. Hyatt*, 538 U.S.

---

[1] "ECF No. __" refers to documents filed in the above captioned adversary proceeding. "Bankr. ECF No.__" refers to documents filed in the main bankruptcy case, 22-12790-EPK.

488 (2003) ("a [s]tate's substantive law [can apply where] the [s]tate [has] a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair.") (citations omitted).  *See also Brea 3-2 LLC v. Hagshama Fla. 8 Sarasota, LLC*, 327 So. 3d 926, 935-36 (Fla. 3d DCA 2021) ("the usury claim … "arises under" Florida's usury statute rather than under the Agreement itself. That is, the duty and obligation not to commit usury, and the resulting illegality of the Agreement, arise under state statutory law.").

10.     The Debtor was a Florida corporation with its principal place of business in Florida. SMF, ECF No. 102 (Admitting paragraph 17).  No one from the Debtor ever travelled to New York to negotiate or execute the Spin Contracts; each of the Spin Contracts was sent electronically via DocuSign to the Debtor in Florida.  SMF. p. 7, ¶¶ 30-31, and Ex. 4; Ex.16, p. 6, Ex. 18, Ex. 19, and Ex.  29.  In fact, Lubin on behalf of Spin initiated contact with the Debtor and even tried to meet with Scott Zankl at the Debtor's premises while in Florida to address delinquencies. SMF, Ex. 3, p. 1, ¶ 1, p. 50, ¶¶ 327-329. The performance ("Remittance") and subject matter (the "Receipts" and other collateral) of the Spin Contracts all occurred or were in Florida.  SMF, Ex. 5, Ex. 7 and Ex. 10.   All funds transferred from the Debtor's bank accounts in Florida to Spin's account in New Jersey. SMF, Ex. 3, p.37, ¶ 231.  Application of Florida's usury laws is neither arbitrary nor fundamentally unfair.

11.     As detailed below, the First Spin Contract, the Second Spin Contract, and the Third Spin Contract, (collectively "**Spin Contracts**") are criminally usurious loans under New York law. Therefore, the Spin Contracts are not "otherwise specifically allowed by law" under Fla. Stat. §687.071(2) or (3).  Under Florida law, the Plaintiff is entitled to a return of all principal and interest payments, attorneys' fees and costs, because Spin forfeited all principal and interest, on account of the Spin Contracts.  *See* Fla. Stat. § 687.071(7) and *Lopez v. Mel-Mont Med, LLC*, Case

4

No. 1111, 2024 Fla. App. LEXIS 8083 at*2 (Fla. 3d DCA Oct. 16, 2024) (*citing Velletri v. Dixon*, 44 So. 3d 187, 192 (Fla. 2d DCA 2010)).

**B.      The Spin Contracts are Loans**

12.      The Spin Contracts all constitute criminally usurious loans under New York Law. The Spin Contracts have New York choice of law provisions, so that is the starting point of the analysis. Each of the Spin Contracts are substantially similar in their general terms, including default provisions and protections and purport to be a sale of "Future Receipts."

13.      Under long established New York law, "substance-not form-controls" in determining whether a transaction is a loan and is "considered in its totality and judge by its real character." *See Zanfini v. Chandler*, 197 A.D.3d 594, 595, 153 N.Y.S.3d 77 (2d Dep't 2021); *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y. 3d 320, 334 (N.Y. 2021) (*citing Dry Dock Bank v. American Life Ins. & Trust Co.*, 3 N.Y. 344, 354 (N.Y. 1850)).  The primary focus is the allocation or transfer of "market risk," from the seller to the buyer, wherein the buyer takes the risk of non-payment by the account debtor instead of lender only bearing the risk that the account debtor's non-payment will leave the borrower unable to pay.  *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247 (S.D.N.Y. 2022).  *See also Adar Bays*, 37 N.Y.3d at 334 ("[P]arties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders."). Nowhere in any case law or statute are MCA contracts excluded from this analysis, substance controls.

14.      While the "substance" of a contract is determined from the totality of the circumstances, New York's lower courts consider three non-exclusive factors as a guide to distinguish a loan from a sale: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *LG Funding, LLC v. United Senior Properties of Olathe, LLC*, 181

A.D.3d 664, 122 N.Y.S.3d 309 (2d Dep't 2020). There is no New York Court of Appeals case that directly addresses whether MCA loans are, in fact, loans. *But see Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, n.2, 37 N.Y.3d 591, 609 n. 2, 163 N.Y.S.3d 467, 478, 183 N.E.3d 1185, 1196 (N.Y. 2021) (Wilson, J. dissenting) (Noting that the agreements described as factoring agreements appear more like high interest loans because, they did not sell identifiable receivables, received fixed daily withdrawals regardless of collection from customers, and did not bear the risk of nonpayment by any specific customer).

15.     The risk of non-payment, by one of the Debtor's account debtors, remains with the Debtor, merchant, rather than passing to Spin as the purported purchaser.   The Spin Contracts charge interest that exceeds 25%, the maximum allowable under New York law. N.Y. Penal Law § 190.40.  Therefore, under New York law all of the Spin Contracts are void, including the choice of law provisions. *Adar Bays, LLC*, 37 N.Y. 3d at 323-24 and 331-333.

> ### i.  In Each of the Spin Contracts, the Sole "Risk" Borne by Spin is Non-Payment by Excell and is Not Predicated on the Performance of any Account Debtors or Customers

16.     In the Spin Contracts, the Debtor always remained liable for the full "Purchased Amount" and "Remittance Amounts" from inception until the entire "Purchased Amount" of "receipts" is remitted to Spin. SMF, Ex. 5, Ex. 7, and Ex.10. The Spin Contracts do not have actual receivables or other property interests being identified or required to be turned over to Spin. *Id*. Spin is entitled to its full "Purchased Amount" regardless of whether one of the Debtor's accounts receivables becomes uncollected, in full or in part. SMF, Ex. 5, Ex. 7, and Ex.10.   This is borne out by provisions in the Spin Contracts, including but not limited to: (i) "[Spin] is entering this Agreement knowing the risks that [Debtor's] business may not perform as expected or fail, and …[Spin] acknowledges that it may never receive the Purchased Amount if the [Debtor] does not generate sufficient revenue, SMF. Ex. 5, p. 1, ¶ unnumbered, Ex. 7, p. 1, ¶ unnumbered, and Ex.

10, p. 1, ¶ unnumbered; (ii) making the Debtor responsible to ensure that the "agreed Remittance to be debited by [Spin] remains in the Account[,]" *see* SMF. Ex. 5, p. 1, ¶ unnumbered, Ex. 7, p. 1, ¶ unnumbered, and Ex. 10, p. 1, ¶ unnumbered; and (iii) "to secure [the Debtor's] obligations" grant Spin a security interest in "all accounts…and inventory, all proceeds therefrom, and all funds at any time in the Merchants' and/or Guarantor(s)(s) [sic] Account, **regardless of the source of such funds**," and "if any time there are insufficient funds in the Merchant's Account to cover [Spin's] entitlements under this agreement, [Spin] is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets." SMF. Ex. 5, p. 5; Ex. 7, p. 5; and Ex. 10, p. 5 (emphasis added).

17.     The "risk" that the Debtor would "not generate sufficient revenues" to repay its obligation to Spin, is the risk every lender takes when issuing a loan to a borrower.  It is the derivative risk discussed in the applicable case law.  *Haymount*, 609 F. Supp. 3d at 247; *Adar Bays*, 37 N.Y.3d at 334.  The Debtor, therefore, retained the risk of loss with respect to each individual account. Spin was protected if any particular account debtor did not pay the Debtor; in essence the property purportedly "sold" would shift to ensure that the "buyer" received full value. *Id*. While nothing in the transactions purports to give the buyer recourse against the Debtor in the event that the receipts were less than anticipated, the structure of the Spin Contracts effectively means that the Debtor bore the risk of the collectability of the individual receivables. *See Haymount*, 609 F. Supp. 3d at 247.

18.     The actions of Lubin on behalf of Spin evidence that Spin was looking solely to the Debtor to recover the "Purchased Amount." See SMF and Ex. 3, pp. 1-52.  When there was a missed payment Lubin sent Scott Zankl a message looking for a wire to clear up the payment and showing up at the dealership to meet with Scott to resolve the delinquencies. SMF, Ex. 3, pp. 36-

43, ¶¶ 227 -234, 237-246, and 251-277, p. 48-51, ¶ 315-340, pp. 59-77, ¶¶ 387-516, p. 96, ¶¶ 637, 639, 641-42, p. 104, ¶¶ 701-704, p. 106-108, ¶¶ 713-731, pp.109- 110, ¶¶ 743-745, 750, pp. 111-- 114, ¶¶ 751- 770.

19. Spin's risk is always "derivative or secondary" in that the Spin's risk is not based upon the performance of account debtors or customers, but only risk that the "account debtor's" non-payment will leave the Debtor unable to pay. *See Haymount*, at 247. *Accord Adar Bays*, 37 N.Y. 3d at 334.

### ii. The Debtor was in Default Immediately Upon Execution of Each of the Spin Contracts

20. On March 25, 2021, Josh Lubin "cold-called" or messaged Scott Zankl offering up "750k-1MM" in financing "as a 3rd, behind Getback[d] and Libertas." SMF, Ex. 3, ¶ 1.

21. During the negotiations of the First Spin Contract, on May 28, 2021, Lubin requested, and Scott Zankl provided, the pre-existing MCA contracts with "24 [C]apital and [D]iverse" to Lubin to confirm what Lubin saw in the Debtor's bank statements. SMF, Ex 3, pp. 6 -10, ¶¶ 41, 45, 49, 55-56, and 61-64. In addition, there were UCCs encumbering the Debtor's inventory and accounts receivables. *See* Ex. 36, Ex. 37, Ex. 38, and Ex. 39. There was no requirement that the Debtor use the First Spin Contract to payoff the pre-existing 24 Capital or Diverse loan. *See* Ex. 5.

22. Likewise, when the Debtor entered into the Second Spin Contract and Third Spin Contract, Spin knew the Debtor had other MCAs and other loans outstanding, including UCC filings. SMF, Ex 3, pp. 6 -10, ¶¶ 41, 45, 49, 55-56, and 61-64, and p. 39, ¶ 244, p. 47, ¶ 308, and p. 71, ¶ 467. In fact, Spin did not care about senior liens. Ex. 25 (A. Lubin Dep. Tr., p. 124, Line 24 – p. 125/Line 4, March 15, 2024).

23.     Notwithstanding this knowledge, Spin required the Debtor to use and execute its form contracts, which contains the specific representation that the "[Debtor] has good, complete, unencumbered and marketable title to all Receipts and all collateral …free and clear of any all liabilities, liens, claims, … and encumbrances…" SMF, Ex. 5, p. 5, § 2.10; Ex. 7, p. 5, § 2.10; and Ex. 10, p. 5§ 2.10.  The Debtor was immediately, contractually in default.

### iii.    The Reconciliation and Adjustment to Remittance Provisions are Illusory

24.     As a result of being in default under each Spin Contract, any purported rights of the Debtor conditioned upon an "Event of Default" having not occurred were subject to Spin's sole and exclusive discretion or could never be exercised and are illusory, including the Reconciliation and Remittance adjustment provisions in each of the Spin Contracts.  *See* Ex. 5, p. 4, §§ 1.3 and 1.4; Ex. 7, p. 4, §§ 1.3 and 1.4; and Ex. 10, p. 4, §§ 1.3 and 1.4.

25.     Even without the immediate default the reconciliation and remittance adjustment provisions are illusory, because while purporting to obligate Spin to reconcile or adjust the remittance, there is no remedy or enforcement mechanism available to the Debtor if Spin failed to do so. *See* Ex. 5, generally, and p. 4, §§ 1.3 and 1.4; Ex. 7, generally, and p. 4, §§ 1.3 and 1.4; and Ex. 10, generally, and p. 4, §§ 1.3 and 1.4.

26.     The illusion is more profound in that there is no way for the Debtor to actually substantiate a basis to reconcile or adjust the remittance, when Lubin and Scott Zankl just agreed upon a remittance amount completely unrelated to any actual financials.  *See* SMF, Ex. 3, p. 1 ¶¶ 1 and 6, p. 25-33, ¶¶ 155-202, p. 52, ¶¶ 344-345.

### iv.    Spin's Rights upon Bankruptcy Filing

27.     The simple statement in the Spin Contracts, stating, "Merchant going bankrupt or going of business…in and of itself, does not constitute a breach of this Agreement[,]"" is illusory.

In the event of a bankruptcy filing, the Spin Contracts attempt to give Spin "recourse" which are contrary to the protections and policies under the Bankruptcy Code and, if enforceable, provides Spin with expanded rights to collect against the Debtor's assets. A bankruptcy filing by the Debtor:

a. triggers other events of default, including but not limited to § 3.1 (a), (d), (f), (h), (j), (k), (l), and (n), and Appendix A, § C, *See* Ex. 5, p. 5-6, and p. 10; Ex. 7, p. 5-6, and p. 10; and Ex. 10, p. 5-6, and p. 10;

b. triggers all the "Protections Against Default," *see* Ex. 5, p. 2-3; Ex. 7, p 2-3; and Ex. 10, p. 2-3, § 1.12 (identifying 8 protections [Spin] can invoke "immediately and without notice" upon one of the events in (a) through (g) occur and which do occur when a bankruptcy is filed); and

c. in violation of every aspect of the Bankruptcy Code, requires the Debtor to grant Spin a super-priority lien or interest in not only the "receipts" allegedly purchased, but all of the Debtor's assets, by way of agreeing that the Spin Contracts are one of "recoupment" so that the automatic stay would not apply, or not challenging any motion for stay relief filed by Spin, and then the Debtor, or Spin on behalf of the Debtor, executing any instrument or document "to perfect and confirm the lien, security interest and right to setoff set forth in [the Spin Contracts]." SMF, Ex. 5, p.7, ¶ 3 (unnumbered); Ex. 7, p.7, ¶ 3 (unnumbered); and Ex. 10, p.7, ¶ 3 (unnumbered).

### v. **Each Spin Contract was for a Definite Time-Period**

28. Each Spin Contract has a "Purchased Price," a "Purchased Amount," and "Remittance Amount. SMF, Ex. 5, p. 1; Ex. 7, p. 1; and Ex. 10, p. 1. The "Purchase Price" is the amount to be advanced, less certain fees. The "Purchased Amount" is the advanced amount plus the predetermined interest Spin was charging. *See* SMF, Ex. 3, pp. 30-32, ¶¶ 184-202. And the Remittance Amount was a fixed amount. SMF, Ex. 5, p. 1; Ex. 7, p. 1; and Ex. 10, p. 1.

29. Simple mathematical calculations show the time-period, Spin intended to be repaid:

    a. The First Spin Contract – 16 weeks ($1,499,000/93,687.50), SMF, Ex. 5, p.1.

    b. The Second Spin Contract – 18.77 weeks ($749,500/$40,000), SMF, Ex. 7, p.1.

    c. The Third Spin Contract – 19.98 weeks ($2,998,000/$150,000), SMF, Ex. 10, p.1.

30. The 18.77-week repayment term is consistent with the time period Lubin stated to Scott Zankl in connection with the Second Spin Contract. SMF, Ex. 30, p. 30, ¶ 184-185.

31. As stated above, the Debtor never had any rights under the Reconciliation or Remittance Adjustment Provisions. Even if such rights existed, those rights were so filled with technical requirements that made such rights vague, speculative and impossible for the Debtor to enforce so that the only conclusion is that Spin intended that the amounts set forth in the Spin Contracts would be repaid within the specific-time periods or be in default.

### vi. Additional Indicia that Each Spin Contract was a Loan and Not a Sale

#### 1. A Default by One is a Default by All

32. In each of the Spin Contracts, the Debtor and all of the non-debtor entities are considered collectively one "Merchant." SMF, Ex. 5, p. 1; Ex. 7, p. 1; and Ex. 10, p. 1. Therefore, all of the rights of the Debtor, to the extent that they actually existed, were lost if one of the non-debtor entities was in default, including obtaining loans, having sperate bank accounts, closing its business. The Karma entities had loans with filed UCC-1s on inventory and accounts receivables. Ex. 40

#### 2. No Upside to Spin

33. Spin does not have the ability to collect more than the "Purchased Amount," i.e., if the Debtor's business over the periods specified above quadrupled, Spin are only ever entitled to repayment of the "Purchase Amount." SMF, Ex. 5, p.1, introductory paragraph; Ex. 7, p.1, introductory paragraph; and Ex. 10, p.1, introductory paragraph. *See Endico Potatoes v. CIT*

*Group/Factoring Inc.*, 67 F.3d 1063, 1068 (2d. Cir. 1995) ("In determining the substance of the transaction, the Court may look to a number of factors, including … whether the debtor has a right to any funds recovered from the sale of assets above that necessary to satisfy the debt…") (citations omitted).

### 3. Spin did no Due Diligence on the Credit Worthiness of Any Customers or the Source of the Funds in the Account

34.     To the extent the Debtor collected any receivable during the applicable time period, June 1, 2021 through February 9 2022, Spin did no due diligence to determine the credit worthiness of any such account debtor, which would be important to estimate the value of any accounts Spin was preparing to purchase. Spin's due diligence was purportedly done by "participants" in each of the Spin Transactions and limited to bank statements, bank log-ins, and tax returns. **Ex. 25 (A. Lubin Dep. Tr., p. 86/Line 14-p.87/Line11, p. 100/Lines 14-24, p.104/Line18-p.106/Line 6, p.109/Line 21 – p.110/Line 6, March 15, 2024)**.

### 4. No Other Incidents of Ownership by Spin

35.     Further, Spin did not acquire any other incidents of ownership, such as the authority to determine what collection actions to take, the authority to change the servicer, the authority to enter into a binding settlement with any account debtor, the right to assign any of the "receivables," the duty to maintain records relating to the receivables, or the burden of collection costs. SMF, Ex. 5, Ex. 7; and Ex. 10. *See Fenway Fin., LLC v. Greater Columbus Realty, LLC*, 995 N.E.2d 1225, 1229-30 (Ohio Ct. App. 2013). In fact, Spin required the Debtor to carry the burden of all collection costs. SMF, Ex. 5, p. 1, intro paragraph and Apendix A; Ex. 7, p. 1, intro paragraph and Apendix A; and Ex. 10, p. 1, intro paragraph and Apendix A.

### vii. Under the Totality of the Circumstances Each of the Spin Contracts is a Loans Under NY Law

12

36.     Therefore, applying a totality of the circumstances analysis to each of the MCA Contracts are loans under New York law.

### viii. Each of the Spin Contracts Violate New York's Criminal Usury Statute and are Void

37.     Furthermore, each of the Spin Contracts charged interest in excess of the 25% cap allowed under New York law. **Ex. 28 (Barbee Declaration, p. 6, ¶ 26 (citing Barbee Report at pp. 32-33 ¶ 97-98 a, Exhibits 5A and 5B).**

38.     Since under the totality of the circumstances, each of the Spin Contracts is a loan and the interest charged exceeds 25%, the Spin Contracts are void, including the choice of law provision. *See Adar Bays, LLC*, 37 N.Y.3d at 323-24 and 331-333.

### C. The Third Spin Contract and All Payments to Spin Can Be Avoided Under 11 U.S.C. § 548 and 11 U.S.C. 544(b) and Fla. Stat. §§ 726.105(1), 726.106(1), and 726.108(1)

39.     Transfers and obligations can be avoided as either "constructively fraudulent" under Fla. Stat. § 726.105(1)(b) or 11 U.S.C. § 548(a)(1)(B) or having been made with the "actual intent to hinder, delay, or defraud" any current or future creditor under Fla. Stat. § 726.105(1)(a) or 11 U.S.C. § 548(a)(1)(A).  The elements for each are set forth in *In re Rollaguard Sec., LLC.* 570 B.R. 859, 870-871 (Bankr. S.D.Fla. 2017).

40.     For purposes of 11 U.S.C. § 544(b)(1), the triggering creditors that could have brought a claim under Chapter 726, Florida Statutes, include: (i) American Express (AMEX TRS Co., Inc.), *see* Proof of Claim No. 1, and (ii) Edward M. Brown, see Proof of Claim No. 9.

### i. Constructive Fraud

#### 1. The Debtor Incurred the Obligations and the Transfers Were the Debtor's Interests in Property

##### a. The Third Spin Contract

13

41.     As detailed in Section B, above, each of the Spin Contracts constitutes an obligation for the Debtor to repay the specified "Purchased Amount" to Spin, which is payable in installments equal to the "Remittance Amount," stated in each of the MCA Contracts.  SMF, Ex. 5, p. 1; Ex. 7, p. 1; and Ex. 10, p. 1. *See also Midwest Holding # 7, LLC v. Anderson (In re Tanner Family, LLC)*, 556 F.3d 1194, 1196 (11th Cir. 2009) (applying the concept of a "claim" under the bankruptcy code to "obligation").

42.     The Third Spin Contract simultaneously created a new obligation for the Debtor and transferred an interest in property of the Debtor, in that it causes the transfer of the $750,562.50 of the advance due from Spin under the Third Spin Contract, to Spin.  SMF Ex 9 and Ex.10.

43.     Access to a line of credit extended to a debtor is a property interest of the debtor and is no different from the lender giving the cash directly to the debtor. *See Bank of Am., N.A. v. Mukamai (In re Egidi)*, 571 F.3d 1156, 1161 (11th Cir. 2009). *See also Parks v. FIA Card Servs., N.A. (In re Marshall)*, 550 F.3d. 1251, 1254-57 (10th Cir. 2008) (holding that a transfer of loan proceeds constituted a preferential transfer).

44.     The Debtor exercised complete control over the use of the loan proceeds as the only condition the Third Spin Contract puts on the Debtor's use of the funds is that the funds cannot be used for "personal, family, or household purposes." Ex. 10, p. 5, § 2.4.  The Debtor paid Spin $883,687.50 directly to Spin on account of the Third Spin Contract.  SMF, Ex. 31.  The Transfers therefore caused a diminution to the estate.  The Debtor also paid over $2,114,312.50 to Hi Bar on account of the First Hi Bar Contract which purportedly paid off the Third Spin Contract. Therefore, the transfer to Hi Bar in satisfaction of the Spin "Purchase Price" constitutes a transfer of the Debtor's interest in property.

14

45.     The Third Spin Contract also constitutes an obligation, wherein the Debtor was obligated to pay Spin $2,998,000.

**b. The Debtor's Transfer of Money to Spin is an Interest in Property**

46.     Furthermore, the Debtor then paid the corresponding obligations to Spin from funds in the Debtor's Chase Accounts ending xx3181 or xx3199.

47.     Each of the transfers on Exhibit 31 came from one of the Debtor's Chase deposit accounts ending xx3181 or xx3199 and constitutes an interest in property of the Debtor.

**2. The Debtor made the Transfers or Incurred the Obligations Within the Applicable Two Year and Four -Year Periods Immediately Preceding the Petition Date**

48.     All of the Transfers or Obligations to Spin occurred on or after June 1, 2021, 10-months and 1 week prior to the April 8, 2022, Petition Date satisfying 11 U.S.C. § 548(a)(1) has a two-year statute of limitations (or "look-back period") and Fla. Stat. § 726.110(1) and (2) have a four-year period of repose. *See* SMF, Ex. 5, Ex. 7, Ex. 9, Ex. 10, Ex. 30, and Ex. 31.

49.     Accordingly, each of the Transfers occurred and Obligations were incurred within the time periods required under both 11 U.S.C. § 548(a) and Fla. Stat. 726.110(2).

**3. The Debtor Received Less Than Reasonably Equivalent Value in Exchange for the Transfers**

50.     The Debtor received less than reasonably equivalent value in exchange for the Transfers.

51.     For purposes of avoiding transfers under 11 U.S.C. § 548, the Bankruptcy Code defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor." *Bakst v. United States (In re Kane & Kane)*, 2013 Bankr. LEXIS 1139 at *28 (Bankr. S.D. Fla. 2013) (*quoting* 11 U.S.C. § 548(d)(2)(A)).

52.     Similarly, Florida law defines "value" as "'[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied.'" *Id*. at \*28-29 (*quoting* Fla. Stat. 726.104).

53.     "Reasonably equivalent value" does not require a dollar-for-dollar exchange and can be conveyed directly or indirectly. *Id*. at \*29 (citations omitted).  In the case of indirect value, the burden shifts to the Defendant to prove the indirect economic benefit to the Debtor.

54.     When the transaction itself is absolutely prohibited by law it will rarely, if ever, constitute reasonably equivalent value. *Tabas v. Lehman (In re Capitol Invs., Inc.)*, 473 B.R. 838, 846 (Bankr. S.D. Fla. 2012) (The transaction involving gambling, illegal under Florida law, did not support value for the purposes of 548 or 550).   A loan that is criminally usurious is void under New York, including the underlying obligation and the choice of law provision. See *Adar Bays, LLC*, 37 N.Y.3d at 323-24 and 331-333.  If the interest rate is at least more than 2 times the state criminal usury statute, there are both criminal and civil remedies under federal law for the collection of an unlawful debt.  18 U.S.C §1961(6) – 1964.

55.      Under Florida law, loan sharking under Fla. Stat. §687.071 provides both criminal and civil remedies against anyone that makes an extension of credit, who willfully and knowingly charged, took or received an interest rate which exceeds 25%, whether directly or indirectly, or conspires to do so.  Further, the same actions are subject to Fla. Chapter 895 (Florida RICO (Racketeer Influenced and Corrupt Organization Act (Fla. Stat. §8 95.02(8)(a)(21) (pattern of racketeering for violations of Fla. Chapter 687) and the collection of an unlawful debt Fla. Stat. § 895.02(12).   Further, Florida provides civil remedies for the same conduct. (Fla. Stat. § 772.102(11) (pattern of racketeering for violation of Florida Chapter 687) and Fla. Stat. § 772.102(2)(a)(3) (collection of an unlawful debt).

16

56. As detailed in Section B, above, each of the Spin Contracts was a void, criminally usurious loan under New York law, which as result the Debtor had no obligations to repay.

57. Accordingly, when Spin used the Third Spin Contract to "refinance" the First Spin Contract and Second Spin Contract, which were illegal and unenforceable, the Debtor received no value in exchange for "rolling" the First Spin Contract and Second Spin Contract into the Third Spin Contract.

58. The Debtor also paid Spin from one of its Chase deposit accounts ending xx3181 or xx3199, on account of each of the criminally usurious and void Spin Contracts. SMF Ex. 31. Because each one of the Spin Contracts was illegal, the Debtor did not receive reasonably equivalent value in exchange for any one of the Transfers to Spin identified in Ex. 31.

59. Therefore, the Debtor received less than reasonably equivalent value in exchange for the Transfers because the Debtor received nothing in exchange for the Transfers.

**4. The Debtor was insolvent at the time of the Transfers.**

60. The Debtor was insolvent at the time of the Transfers.

61. Pursuant to 11 U.S.C. § 101, when referring to a corporation, the term "insolvent" means that the sum of the entity's debts is greater than all of the entity's property at a fair valuation, excluding property transferred with the intent to hinder, delay, or defraud the debtor's creditors and excluding exempt property. *See* 11 U.S.C. §101(32)(A).

62. The Debtor was insolvent at the time of the Transfers under the Balance Sheet Test. To determine whether a debtor is insolvent is to "compare the debtor's debt obligations with the debtor's assets, at fair value, as of the relevant date" (i.e., the "Balance Sheet Test"). *Mukamal v. Nat'l Christian Charitable Found., Inc. (In re Palm Beach Fin. Partners, L.P.)*, 598 B.R. 885, 890 (Bankr. S.D. Fla. 2019). If called to testify, Mr. Barbee would testify, consistent with the conclusions in the Expert Report, substantially as follows:

a. Mr. Barbee utilized the balance sheet test to determine the solvency of the Debtor. Ex. 28, (Decl. A. Barbee, p. 5 ¶¶ 18 -19).

b. The results of the balance sheet test showed that the Debtor was insolvent every quarter from December 31, 2020 through March 31, 2022 ("**Measurement Dates**").

c. During this period, there were no substantial changes in the Debtor's assets or liabilities, and applying the theory of retrojection the Debtor remained insolvent during the entire period between the Measurement Dates. *See Herendeen v. Regions Bank (In re Able Body Temp. Servs., Inc.)*, 626 B.R. 643, 678 (Bankr. M.D. Fla. 2020) (Under the retrojection theory, when a debtor is shown to be insolvent on the first known date and also insolvent on a later date, in the absence of any substantial change in the debtor's assets or liabilities between the two dates, the debtor is "deemed to have been insolvent at all intermediate times.").

d. The Debtor was insolvent as of December 31, 2020 and remained insolvent through the Petition Date.

SMF, Ex. 28 (Declaration of Alan Barbee p. 5, ¶ 18 and Barbee Report, p. 30, ¶ 92 and Table 10).

63. Accordingly, the Debtor was insolvent on the date of each of the Transfers.

64. Therefore, the Transfers can be avoided as constructively fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(B) and Fla. Stat. §§ 726.105(1)(b) and 726.106.

ii. **Actual Intent**

65. Actual intent is from the point of view of the Debtor (transferor) rather than the Defendants (transferees).

1. **The Debtor's Incurring the Obligations and Transfers of Property were with done with the Actual Intent to Hinder, Delay or Defraud Creditors**

18

66.     In this case, Scott Zankl has admitted the Debtor's intent to hinder, delay, or defraud creditors, stating the Debtor continued to obtain new financing in 2021 and 2022 because "it still had to make payments to the investors that were in Excel[,]" Ex. 1 (S. Zankl 2004 Tr., p.57/Lines 9-25, June 6, 2022), even though the Debtor stopped making vehicle sales to individual end-user consumers and began selling vehicles to either Karma Palm Beach or Karma Broward at cost or at a loss.

67.     The Debtor's books are consistent with Scott Zankl's testimony, showing that no later than April or May 2021, the Debtor was being run as a Ponzi scheme or other revolving advance fraud, with the Debtor's primary business operations ceasing while continuing to incur obligations to repay existing investors.  SMF, Ex. 28 (Decl. of Alan R. Barbee, p. 6, ¶ 24 and Barbee Report, pp. 33-35, ¶¶ 100 – 102, Tables 14 and 15, and pp. 37-40, ¶¶ 107-120).

### 2. The "Badges of Fraud" Also Demonstrate that the Transfers Were Made and Obligations were Incurred to Hinder, Delay, or Defraud Creditors

68.     Because debtors generally do readily admit their "actual intent," "actual intent" is generally determined by a totality of the circumstances in which Courts consider the non-exhaustive "badges of fraud."  *See Rollaguard Sec., LLC*, 570 B.R. at 878 and Fla. Stat. 726.105(1)(a).   The "lack of reasonably equivalent value" and "insolvency" elements of "constructive fraud" are included in the "badges of fraud" used to establish that a transfer was made with the actual intent to hinder, delay, or defraud creditors, when the debtor does not readily admit to such intent.  *See* Fla. Stat. § 726.105(2)(h) and (i) and *Rollaguard Sec., LLC*, 570 B.R. at 878.  Accordingly, the Plaintiff incorporates Section (i)(3) and (4), above.

69.     In this case, however, Scott Zankl admits his intent to defraud.  From at least April 2021, the Debtor stopped making vehicle sales to individual end-user consumers and began selling vehicles to either Karma Palm Beach or Karma Broward at cost or at a loss, but still continued to

obtain new financing in 2021 and 2022 because "it still had to make payments to the investors that were in Excel." Ex. 1 (S. Zankl 2004 Tr., p.57/Lines 9-25, June 6, 2022).

70.     Beginning no later than April or May 2021, the Debtor was being run as a Ponzi scheme or other revolving advance fraud, with the Debtor's primary business operations ceasing while continuing to incur obligations to repay existing investors.  SMF, Ex. 28 (Decl. of Alan R. Barbee, p. 6, ¶ 24 and Barbee Report, pp. 33-35, ¶¶ 100 – 102, Tables 14 and 15, and pp. 37-40, ¶¶ 107-120).

71.     Therefore, each transfer made or obligation incurred by the Debtor to Spin was in furtherance of the Ponzi scheme or revolving advance fraud, and done with the actual intent to hinder, delay, or defraud creditors.

**D.     The Plaintiff is Entitled to Summary Judgment under 11 U.S.C. § 550(a) to Recover the $4,581,625.00 from the Defendants**

72.     According to 11 U.S.C. § 550(a) the Trustee is authorized to recover the property or value thereof transferred by the Debtor from the initial transferee or the entity for whose benefit such transfer was made or any immediate or mediate transferee. The Plaintiff can recover the value of the Transfers from any combination of the initial and subsequent transferees. S*ee In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1198 (11th Cir. 1988).

73.     In this case, the Debtor made constructively fraudulent transfers directly to Spin via the Debtor's Chase deposit accounts ending xx3181 and xx3199 and via the Hi Bar Transfer Agreement and First Hi Bar Contract. SMF Ex. 31 and SMF, pp. 5 - 10, ¶¶ 19 – 45 and Ex 17, 23, 30, 32, and 35.

74.     Therefore, the Plaintiff is entitled to a money judgment in the amount of $4,581,625.00, against Spin as initial transferee(s), mediate or immediate transferee(s).

**WHEREFORE**, the Plaintiff respectfully requests that this Honorable Court:

20

(a)      Enter an Order Granting this Motion;

(b)      Enter Summary Judgment against Spin finding that each of the Spin Contracts is a criminally usurious loan under Florida law;

(c)      Enter Summary Judgment against Spin avoiding the obligations incurred and Transfers made on account of the Spin Contracts pursuant to 11 U.S.C. § 548(a)(1)(A) or (B) and entering a money judgment pursuant to 11 U.S.C. § 550(a) in the amount of $4,581,625.00 plus prejudgment interest, post-judgment interest, and all taxable costs;

(d)      Enter Summary Judgment against Spin avoiding the obligations incurred and Transfers made on account of the Spin Contracts pursuant to 11 U.S.C. § 544(b)(1) and Fla. Stat. §§ 726.105(1)(a) or (b) and 726.106(1) and entering a money judgment pursuant to 11 U.S.C. § 550(a) in the amount of $4,581,625.00 plus prejudgment interest, post-judgment interest, and all taxable costs;

(e)      Alternatively, granting summary judgment in favor of the Trustee as to any fact or element established that is necessary to any of the claims to relief; and

(f)      Grant such other and further relief as this Court deems just and proper.

Respectfully submitted this 27th day of December 2024.

FURR AND COHEN, P.A.
*Special Counsel for Trustee*
2255 Glades Road, Suite 419A
Boca Raton, FL 33431
Telephone: (561) 395-0500
Facsimile: (561) 338-7532

BY:    /s/ *Jason S. Rigoli*
       Alan R. Crane, Esq.
       Florida Bar No.: 0963836
       E-mail: acrane@furrcohen.com
       Jason S. Rigoli, Esq.
       Florida Bar No.: 91990
       E-mail: jrigoli@furrcohen.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via transmission of Notices of Electronic Filing generated by CM/ECF to those parties registered to receive electronic notices of filing in this adversary proceeding.

Dated: December 27, 2024

By: */s/ Jason S. Rigoli*
Jason S. Rigoli