UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:

EXCELL AUTO GROUP, INC.

    Debtor.

_____/

NICOLE TESTA MEHDIPOUR,
as Chapter 7 Trustee for Excell Auto Group, Inc.

    Plaintiff,

v.

HI BAR CAPITAL, LLC, et al.,

    Defendant(s).

_____/

Case No.: 22-12790-EPK
Chapter 7

Adv. Pro. No. 22-01132-EPK

**PLAINTIFF'S MOTION FOR PARTIAL
<u>SUMMARY JUDGMENT AGAINST HI BAR CAPITAL, LLC</u>**

Nicole Testa Mehdipour ("**Plaintiff**"), chapter 7 trustee of the estate of Excell Auto Group, Inc., by and through undersigned counsel, pursuant to Federal Rule of Civil Procedure 56, made applicable by Federal Rule of Bankruptcy Procedure 7056, files this partial motion for summary judgment and, in support, states as follows:

**<u>Summary of Argument and Relief Sought</u>**

1.    The Plaintiff is entitled to summary judgment on Count 4 of the Second Amended Complaint as the Spin Contracts are all loans which charge interest in excess of New Yor's criminal usury statute and are void under New York law, and which constitute a violation of Florida's criminal usury statute, the applicability of which is neither arbitrary nor fundamentally

1

unfair. The Plaintiff is therefore entitled to recover all payments made to or for the benefit of Spin (the forfeited principal and interest) from Spin on account of the Spin Contracts.

2. With the principal and interest having been forfeited and the Spin Contracts unenforceable, Plaintiff is also entitled to summary judgment of Count 18, 19, 20, 21, 22, 23, 24 and 25 to avoid the obligations incurred by the Debtor to Spin and Transfers made to Spin as Fraudulent Transfers under 11 U.S.C. § 548(a)(1)(A) or (B) and 11 U.S.C. § 544(b) and Fla. Stat. §§ 726.105(1)(a) and (b) or 726.106, and a money judgment against Spin for all amounts paid to or for the benefit of Spin. Under 11 U.S.C. § 550(a).

3. Alternatively, the Plaintiff is entitled to summary judgment on Counts 26 and 27 to avoid and recover the $1,500,000.00 the Debtor paid to Hi Bar within 90-days of the Petition Date in connection with settlements of the Debtor's defaults on its antecedent debt obligations, which allowed Hi Bar to recover more than it would have in this chapter 7 case.

## I.   **Jurisdiction**

4. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (E), (H), and (O).

## II.   **Summary Judgment Standard of Review**

5. To prevail on a motion for summary judgment under Federal Rule of Civil Procedure 56(a) and Federal Rule of Bankruptcy Procedure 7056 the movant must "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Fitzpatrick v. Schlitz* (In re Schlitz), 97 B.R. 671, 672 (Bankr. ND. Ga. 1986). A "material" fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A "genuine" dispute means that "the evidence is such that a reasonable jury

2

could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.  In determining entitlement to summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).

### III.   Procedural History

#### A.   The Bankruptcy Case

6.      On April 8, 2022 (the "**Petition Date**"), the Debtor filed a voluntary petition ("**Petition**") for relief under Chapter 7 of the Bankruptcy Code to commence this case [Bankr. ECF No. 1][1].  Nicole Testa Mehdipour was appointed as the duly authorized and acting Trustee of the Debtor's bankruptcy estate [Bankr. ECF No. 2].

#### B.   The Adversary Case

7.      On March 27, 2024, the Plaintiff filed a *Second Amended Complaint* [ECF No. 75] against Hi Bar Capital, LLC ("**Hi Bar**"), Spin Capital, LLC a/k/a Spin Capital ("**Spin**"), Yisroel Herbst ("**Y. Herbst**"), Mordechai Dov Ber Herbst a/k/a Mordi Herbst ("**M. Herbst**"), Avrumi Lubin a/k/a Josh Lubin ("**Lubin**"), and Franklin Capital Funding, LLC and Franklin Capital Group, LLC, d/b/a Wing Lake Capital (collectively, "**Wing Lake**").

8.      Hi Bar, M. Herbst, and Y. Herbst filed an *Answer to the Second Amended Complaint* [ECF No. 90] on April 24, 2024. Spin and Lubin filed an *Answer to the Second Amended Complaint* [ECF No. 102] on May 17, 2024

### IV.   Legal Basis for Summary Judgment in Favor of Plaintiff

#### A.      Florida's Usury Laws Apply

---

[1] "ECF No. __" refers to documents filed in the above captioned adversary proceeding.  "Bankr. ECF No.__" refers to documents filed in the main bankruptcy case, 22-12790-EPK.

9. Unless otherwise specifically allowed by law, Florida makes it a crime to charge, take, or receive interest at a rate more than 25% per annum Fla. Stat. § 687.071(2) and (3).

10. Once the Spin Contracts are determined to be criminally usurious loans and void under New York law, Florida's substantive and statutory usury laws apply because it is neither arbitrary nor fundamentally unfair to apply Florida's law. *See Franchise Tax Bd. V. Hyatt*, 538 U.S. 488 (2003) ("a [s]tate's substantive law [can apply where] the [s]tate [has] a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair.") (citations omitted). *See also Brea 3-2 LLC v. Hagshama Fla. 8 Sarasota, LLC*, 327 So. 3d 926, 935-36 (Fla. 3d DCA 2021) ("the usury claim … "arises under" Florida's usury statute rather than under the Agreement itself. That is, the duty and obligation not to commit usury, and the resulting illegality of the Agreement, arise under state statutory law.").

11. The Debtor was a Florida corporation with its principal place of business in Florida. **Ex. 32, p. 1**. No one from the Debtor ever travelled to New York to negotiate or execute the First Hi Bar Contract; the First Hi Bar Contract was sent electronically via Docusign to the Debtor in Florida. SMF. p. 7, ¶¶ 30-31, and Ex. 4; Ex.16, p. 6, Ex. 18, Ex. 19, and Ex. 29. The performance ("Remittance") and subject matter (the "Receipts" and other collateral) of the First Hi Bar Contract all occurred in Florida. SMF, Ex. 32. All funds transferred from the Debtor's bank accounts in Florida to Hi Bar Pursuant to the First Hi Bar Contract went to Hi Bar's Optimum Bank Account ending xx2968, which is also in Florida. SMF, Ex. 33 and 34. Application of Florida's usury laws is neither arbitrary nor fundamentally unfair.

12. As detailed below, the First Hi Bar Contract is a criminally usurious loan under New York law. Therefore, the First Hi Bar Contract is not "otherwise specifically allowed by law" under Fla. Stat. §687.071(2) or (3). Under Florida law, the Plaintiff is entitled to a return of all

principal and interest payments, attorneys' fees and costs. Hi Bar forfeited all principal and interest, and the Plaintiff is entitled to recover all amounts paid to Hi Bar on account of the First Hi Bar Contract. *See* Fla. Stat. § 687.071(7) and *Lopez v. Mel-Mont Med, LLC*, Case No. 1111, 2024 Fla. App. LEXIS 8083 at*2 (Fla. 3d DCA Oct. 16, 2024) (*citing Velletri v. Dixon*, 44 So. 3d 187, 192 (Fla. 2d DCA 2010)).

**B.** **The First Hi Bar Contract is a Criminally Usurious Loans under New York Law**

13.     The First Hi Bar Contract constitutes a criminally usurious loan under New York Law.  The First Hi Bar Contract has a New York choice of law provision, so that is the starting point of the analysis. The First Hi Bar Contract purports to be a sale of "Future Receipts."

14.     Under long established New York law, "substance-not form-controls" in determining whether a transaction is a loan and is "considered in its totality and judge by its real character." *See Zanfini v. Chandler*, 197 A.D.3d 594, 595, 153 N.Y.S.3d 77 (2d Dep't 2021); *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y. 3d 320, 334 (N.Y. 2021) (*citing Dry Dock Bank v. American Life Ins. & Trust Co.*, 3 N.Y. 344, 354 (N.Y. 1850)).  The primary focus is the allocation or transfer of "market risk," from the seller to the buyer, wherein the buyer takes the risk of non-payment by the account debtor instead of lender only bearing the risk that the account debtor's non-payment will leave the borrower unable to pay.  *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247 (S.D.N.Y. 2022).  *See also Adar Bays*, 37 N.Y.3d at 334 ("[P]arties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders."). Nowhere in any case law or statute are MCA contracts excluded from this analysis, substance controls.

15.     While the "substance" of a contract is determined from the totality of the circumstances, New York courts consider three non-exclusive factors as a guide to distinguish a

loan from a sale: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *LG Funding, LLC v. United Senior Properties of Olathe, LLC*, 181 A.D.3d 664, 122 N.Y.S.3d 309 (2d Dep't 2020).

16.     Under the totality of the circumstances, the First Hi Bar Contract is a criminally usurious loan under New York and Florida law. In the First Hi Bar Contract, the risk of non-payment remains with the Debtor, merchant, rather than passing to Hi Bar as the purported purchaser.   The First Hi Bar Contract charges interest that exceeds 25%, the maximum allowable under New York law. N.Y. Penal Law § 190.40.  Therefore, under New York law each of the MCA Contracts is void, including the choice of law provisions.  *Adar Bays, LLC*, 37 N.Y. 3d at 323-24 and 331-333.

> **i.   In the First Hi Bar Contract, the Sole "Risk" Borne by Hi Bar is Non-Payment by Excell and is Not Predicated on the Performance of any <u>Account Debtors or Customers</u>**

17.     In the First Hi Bar Contract, the Debtor always remained liable for the full "Purchased Amount" and "Remittance Amounts" from inception until the entire "Purchased Amount" was remitted to Hi Bar.  SMF, Ex. 32. The First Hi Bar Contract does not have actual receivables or other property interests being identified or required to be turned over to Spin. *Id*. This is borne out by provisions of the First Hi Bar Contract, including but not limited to: (i) "[Hi Bar] is entering this Agreement knowing the risks that [Debtor's] business may not perform as expected or fail, and …[Hi Bar] acknowledges that it may never receive the Purchased Amount if the [Debtor] does not generate sufficient revenue, SMF. Ex. 32, p. 1, ¶ unnumbered; (ii) making the Debtor responsible to ensure that the "agreed Remittance to be debited by [Hi Bar] remains in the Account[,]" *see* SMF, Ex. 32, p. 1, ¶ unnumbered, and (iii) "to secure [the Debtor's] obligations" grant Hi Bar a security interest in "all accounts…and inventory, all proceeds

therefrom, and all funds at any time in the Merchants' and/or Guarantor(s)(s) [sic] Account, **regardless of the source of such funds**," and "if any time there are insufficient funds in the Merchant's Account to cover [Hi Bar's] entitlements under this agreement, [Hi Bar] is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets." SMF Ex. 32, p. 5 (emphasis added).

18.     The "risk" that the Debtor would "not generate sufficient revenues" to repay its obligation to Hi Bar, is the risk every lender takes when issuing a loan to a borrower.  It is the derivative risk discussed in the applicable case law.  *Haymount*, 609 F. Supp. 3d at 247; *Adar Bays*, 37 N.Y.3d at 334.  The Debtor, therefore, retained the risk of loss with respect to each individual account. Hi Bar was protected if any particular account debtor did not pay the Debtor; in essence the property purportedly "sold" would shift to ensure that the "buyer" received full value. *Id*. While nothing in the transactions purported to give the buyer recourse against the seller in the event that the receipts were less than anticipated, the structure of the First Hi Bar Contract effectively meant that the Debtor bore the risk of the collectability of the individual receivables. *See Haymount*, 609 F. Supp. 3d at 247.

19.     The actions of Lubin on behalf of Hi Bar evidence that Hi Bar was looking solely to the Debtor to recover the "Purchased Amount." See SMF, Ex. 3, pp. 53-121 and Ex 4.  When there was a missed payment Lubin sent Scott Zankl messages looking for a wire to clear up the payment and eventually threatening litigation and causing a lawsuit to be filed by Hi Bar. SMF, Ex. 3, p. 99, ¶¶ 664, pp. 100-108, ¶¶ 672 - 731, pp.109- 110, ¶¶ 743-745, 750, pp. 111--114, ¶¶751-770; Ex. 4.

20.     Hi Bar's risk is always "derivative or secondary" in that the Hi Bar's risk is not based upon the performance of account debtors or customers, but only risk that the "account

debtor's" non-payment will leave Excell unable to pay. *See Haymount,* at 247. *Accord Adar Bays,* 37 N.Y. 3d at 334.

### ii. The Debtor was in Default Immediately Upon Execution of the First Hi Bar Contract

21.     The First Hi Bar Contract was entered into by Scott Zankl, through the Debtor, and Josh Lubin, through Spin and Hi Bar, to induce Wing Lake to close and fund the Wing Lake Refinance in an attempt to get Spin paid its outstanding interest on the Third Spin Contract p, SMF, pp. 5 -8, ¶¶ 19-36 and **Ex. 3, pp. 75-76, ¶¶ 502-504, p. 79, ¶ 529, pp. 89-90, ¶¶ 583-596; Ex. 13 (Aff. S. Zankl, p. 1, ¶¶ 7, 9- 14, March 29, 2022); Ex. 14, p. 1-2; Ex. 15, p. 1, ¶ 1-7; Ex. 25 (A. Lubin Dep. Tr., p. 120/Line 22 – p.130/Line3, Mar. 15, 2024), Ex. 18, Ex. 19, Ex. 20, Ex. 21, and Ex. 22, p. 2 (e-mail on 5.1.23 at 3:42:44PM)**

22.     Going into the First Hi Bar Contract, it is clear that Hi Bar knew the Debtor had other outstanding obligations and that all assets and "receipts" were not free and clear from encumbrances, as Lubin on behalf of Spin and Hi Bar participated in the negotiations of the Wing Lake Refinance, which was secured on all of the Debtor's assets and proceeds therefrom. **SMF, p. __, and Ex 3, pp. 75-76, ¶¶ 502-508, and pp. 79-99, ¶¶ 525-664, Ex.6, Ex. 8, and Ex. 11**.

23.     Notwithstanding this knowledge, Hi Bar required the Debtor to use and execute its form contract, which contain the specific representation that the "[Debtor] has good, complete, unencumbered and marketable title to all Receipts and all collateral …free and clear of any all liabilities, liens, claims, … and encumbrances…" SMF, Ex. 32, p. 3, § 2.10.

### iii. The Reconciliation and Adjustment to Remittance Provisions are Illusory

24.     As a result of being in default under each Spin Contract, any purported rights of the Debtor conditioned upon an "Event of Default" having not occurred were subject to Spin's sole and exclusive discretion or could never be exercised and are illusory, including the Reconciliation

and Remittance adjustment provisions in the First Hi Bar Contract.   *See* Ex. 32, p. 2, §§ 1.3 and 1.4.

25.     Even without the immediate default the reconciliation and remittance adjustment provisions are illusory, because while purporting to obligate Hi Bar to reconcile or adjust the remittance, there is no remedy or enforcement mechanism available to the Debtor if Hi Bar failed to do so.  *See* Ex. 32, generally, and p. 2, §§ 1.3 and 1.4.

26.     The illusion is more profound in that there is no way for the Debtor to actually substantiate a basis to reconcile or adjust the remittance, when Lubin and Scott Zankl just agreed upon a remittance amount completely unrelated to any actual financials of the Debtor.

### iv.  Hi Bar's Rights upon Bankruptcy Filing

27.     The simple statement in the Spin Contracts, stating, "Merchant going bankrupt or going of business…in and of itself, does not constitute a breach of this Agreement[,]"" is illusory. In the event of a bankruptcy filing, the Spin Contracts attempt to give Spin "recourse" which are contrary to the protections and policies under the Bankruptcy Code and, if enforceable, provides Spin with expanded rights to collect against the Debtor's assets.  A bankruptcy filing by the Debtor:

a.     triggers other events of default, including but not limited to § 3(a), (d), (f), (h), (j), (k), (l), and (n), and Appendix A, § C, *see* SMF Ex. 32, pp. 3-4,§ 3, and p. 8, § C;

b.     triggers all the "Protections Against Default," *see* SMF Ex. 32, pp. 2-3, § 1.12, (identifying 8 protections [Hi Bar] can invoke "immediately and without notice" upon one of the events in (a) through (g) occur and which do occur when a bankruptcy is filed); and

c.     in violation of every aspect of the Bankruptcy Code, requires the Debtor to grant Hi Bar a super-priority lien or interest in not only the "receipts" allegedly purchase, but all of the Debtor's assets, by way of agreeing that the First Hi Bar Contract is one of

9

"recoupment" so that the automatic stay would not apply, or not challenging any motion for stay relief filed by Hi Bar, and then the Debtor, or Hi Bar on behalf of the Debtor, executing any instrument or document "to perfect and confirm the lien, security interest and right to setoff set forth in [the First Hi Bar Contract]."   SMF, Ex. 32, p.5, ¶ 3 (unnumbered).

## v.    The First Hi Bar Contract was for a Definite Time-Period

28.    The First Hi Bar Contract has a "Purchased Price," a "Purchased Amount," and "Remittance Amount.  SMF, Ex. 32, p. 1. The "Purchase Price" is the amount to be advanced, less certain fees.  The "Purchased Amount" is the advanced amount plus the predetermined interest Hi Bar was charging.  *See* SMF, Ex. 3, pp. 30-32, ¶¶ 184-202.  And the Remittance Amount was a fixed amount.  SMF, Ex. 32, p. 1.

29.    A simple mathematical calculations shows that Hi Bar intended to be repaid within 21.19 weeks ($3,177,880/$150,000), SMF, Ex. 32, p.1.  As stated above, the Debtor never had any rights under the Reconciliation or Remittance Adjustment Provisions.  Even if such rights existed, those rights were so filled with technical requirements that made such rights vague, speculative and impossible for the Debtor to enforce so that the only conclusion is that Spin intended that the amounts set forth in the Spin Contracts would be repaid within the specific-time periods or be in default.

## vi.    Additional Indicia that Each MCA Contract was a Loan and Not a Sale

### 1.    A Default by One is a Default by All

30.    In the First Hi Bar Contract, the Debtor and all of the non-debtor entities are considered collectively one "Merchant."   SMF, Ex. 32, p. 1, pp. 9-10. Therefore, all of the rights of the Debtor, to the extent that they actually existed, are lost if one of the non-debtor entities is in default, including obtaining loans, having sperate bank accounts, closing its business.

10

### 2. No Upside to Hi Bar

31.     Hi Bar does not have the ability to collect more than the "Purchased Amount," i.e., if the Debtor's business over the periods specified above quadrupled, Hi Bar is only ever entitled to repayment of the "Purchase Amount." SMF, Ex. 32, p. 1, § introductory paragraph. *See Endico Potatoes v. CIT Group/Factoring Inc.*, 67 F.3d 1063, 1068 (2d. Cir. 1995) ("In determining the substance of the transaction, the Court may look to a number of factors, including … whether the debtor has a right to any funds recovered from the sale of assets above that necessary to satisfy the debt…") (citations omitted).

### a. Spin did no Due Diligence on the Credit Worthiness of Any Customers or the Source of the Funds in the Account

32.     To the extent the Debtor collected any receivable during the applicable time period, June 1, 2021 through February 9, 2022, Spin did no due diligence to determine the credit worthiness of any such account debtor, which would be important to estimate the value of any accounts Spin was preparing to purchase.   Spin's due diligence was purportedly done by "participants" in each of the Spin Transactions and limited to bank statements, bank log-ins, and tax returns.   **Ex. 25 (A. Lubin Dep. Tr., p. 86/Line 14-p.87/Line11, p. 100/Lines 14-24, p.104/Line18-p.106/Line 6, p.109/Line 21 – p.110/Line 6, March 15, 2024)**.

### 3. No Other Incidents of Ownership by Hi Bar

33.     Further, Hi Bar did not acquire any other incidents of ownership, such as the authority to determine what collection actions to take, the authority to change the servicer, the authority to enter into a binding settlement with any account debtor, the right to assign any of the "receivables," the duty to maintain records relating to the receivables, or the burden of collection costs. **SMF, Ex. 32.** *See Fenway Fin., LLC v. Greater Columbus Realty, LLC*, 995 N.E.2d 1225,

11

1229-30 (Ohio Ct. App. 2013). In fact, Hi Bar required the Debtor to carry the burden of all collection costs. **SMF, Ex. 32, p. 1, intro paragraph and Appendix A**.

### vii. The First Hi Bar Contract Violates New York's Criminal Usury Statute and is Void

34. Furthermore, the First Hi Bar Contract charge interest in excess of the 25% cap allowed under New York law. **Ex. 28 (Barbee Declaration, p. 6, ¶ 26 (citing Barbee Report at pp. 32-33 ¶ 97-98 a, Exhibits 5A and 5B)**.

35. Since under the totality of the circumstances, the First Hi Bar Contract is a loan and the interest charged exceeds 25%, the First Hi Bar Contract is void, including the choice of law provision. *See Adar Bays, LLC*, 37 N.Y.3d at 323-24 and 331-333.

### C. The First Hi Bar Contract, Hi Bar Transfer Agreement, First Settlement Agreement, and Second Settlement Agreement Including the Releases Can Be Avoided Under 11 U.S.C. § 548 and 11 U.S.C. 544(b) and Fla. Stat. §§ 726.105(1), 726.106(1), and 726.108(1)

36. Transfers and obligations can be avoided as either "constructively fraudulent" under Fla. Stat. § 726.105(1)(b) or 11 U.S.C. § 548(a)(1)(B) or having been made with the "actual intent to hinder, delay, or defraud" any current or future creditor under Fla. Stat. § 726.105(1)(a) or 11 U.S.C. § 548(a)(1)(A). Each of the elements necessary to prove "constructive fraud" are the same as "actual intent." The elements for each are set forth in *In re Rollaguard Sec., LLC*. 570 B.R. 859, 870-871 (Bankr. S.D.Fla. 2017).

37. For purposes of 11 U.S.C. § 544(b)(1), the triggering creditors that could have brought a claim under Chapter 726, Florida Statutes, include: (i) American Express (AMEX TRS Co., Inc.), *see* Proof of Claim No. 1, and (ii) Edward M. Brown, see Proof of Claim No. 9.

### i. Constructive Fraud

#### 1. The Debtor Incurred the Obligations and the Transfers Were the Debtor's Interests in Property

a. **The First Hi Bar Contract and Hi Bar Transfer Agreement**

38. As detailed in Section B, above, the First Hi Bar Contract constitutes an obligation for the Debtor to repay the specified "Purchased Amount" to Hi Bar, which is payable in installments equal to the "Remittance Amount," stated in the First Hi Bar Contract.  SMF, Ex. 32, p. 1. *See also Midwest Holding # 7, LLC v. Anderson (In re Tanner Family, LLC)*, 556 F.3d 1194, 1196 (11th Cir. 2009) (applying the concept of a "claim" under the bankruptcy code to "obligation").

39. The Hi Bar Transfer Agreement, which was signed simultaneously with the First Hi Bar Contract, SMF, p. 7, ¶ 30, and Exs. 18 and 19, constitutes a transfer of an interest in property of the Debtor, in that it causes the transfer of the $2,114,312.50 advance due from Hi Bar under the First Bar Contract, to Spin.  SMF, Ex. 17.

40. Access to a line of credit that has been extended to a debtor is a property interest of the debtor no different from the lender giving the cash directly to the debtor. *See Bank of Am., N.A. v. Mukamai (In re Egidi)*, 571 F.3d 1156, 1161 (11th Cir. 2009)

41. The Debtor exercised complete control over the use of the loan proceeds as the only condition the First Hi Bar Contract puts on the Debtor's use of the funds is that the funds cannot be used for "personal, family, or household purposes." Ex. 32, p. 1, § Intro Paragraph and p. 3 § 2.4.  The Debtor paid Hi Bar $2,200,000 on account of the First Hi Bar Contract.  Ex. 30. The Transfers therefore caused a diminution to the estate.  Therefore, the transfer from Hi Bar to Spin of the $2,114,312.50 "Purchase Price" constitutes a transfer of the Debtor's interest in property.

42. Alternatively, the Hi Bar Transfer agreement also constitutes an obligation, wherein the Debtor was obligated to Spin to turnover the proceeds of a new loan agreement with Hi Bar.

b. **The First Settlement Agreement, Second Settlement Agreement, and Releases Contained Therein**

13

43. As a result of purported defaults under the First Hi Bar Contract, the Debtor entered the First Settlement Agreement on December 19, 2021. SMF, p. 8, ¶ 37, and Exhibit 23. The First Settlement Agreement acknowledges indebtedness of the Debtor to Hi Bar of $2,677,880.00 and causes the Debtor to incur a greater obligation of $4,016,820.00. *See* Ex. 23, p. 1. The First Settlement Agreement constitutes an "obligation." *See Tanner Family, LLC*, 556 F.3d at 1196. The First Settlement Agreement also included a release of claims against Hi Bar and related entities. Ex. 23, p. 3, ¶ 6 ("Waiver of Purchaser's Liability"). *See* Fla. Stat. § 726.102(14) ("Transfer" … includes …release."). *See also e2 Creditors' Tr. v. Farris (In re e2 Commun's, Inc.)*, 320 B.R. 849, 856 (Bankr. N.D. Tex. 2004) (Holding that causes of action constitute property and the release of causes of action is a method of "disposing of or parting with" property and therefore a transfer).

44. Thereafter, the Debtor entered into the Second Settlement Agreement. SMF, p. 9, ¶ 42 and Exhibit 35. The Second Settlement Agreement again created a new obligation between the Debtor and Hi Bar, obligating the Debtor to pay Hi Bar $3,800,000. Exhibit 35, p. 1, ¶ 1. *Tanner Family, LLC*, 556 F.3d at 1196. The Second Settlement Agreement also contained a release by the Debtor of all claims against Hi Bar and related parties. Ex. 35, p. 3, ¶ 6 ("Waiver of Purchaser's Liability"). *See* Fla. Stat. § 726.102(14) and *In re e2 Commun's, Inc.*, 320 B.R. at 856.

### c. The Debtor's Transfer of Money to Hi Bar is an Interest in Property

45. Furthermore, the Debtor then paid the corresponding obligations to Spin and/or Hi Bar from funds in the Debtor's Chase Accounts ending xx3181, xx3199, or xx6901. SAC, ¶ 192, and Hi Bar Answer [ECF No. 90, admitting ¶ 192 (Exhibit B to the SAC shows the cash receipts and cash disbursements made into and from the Debtor's Chase accounts ending xx3181 and xx3199, from or to Hi Bar.")].

14

46.    Each of the transfers on Exhibit 30 came from one of the Debtor's Chase deposit accounts ending xx3181, xx3199, or xx6901, and constitutes an interest in property of the Debtor.

### 2. The Debtor made the Transfers or Incurred the Obligations Within the Applicable Two Year and Four -Year Periods Immediately Preceding the Petition Date

47.    All of the Transfers or Obligations to Hi Bar occurred on or after June 10, 2021, 10-months and 1 week prior to the April 8, 2022, Petition Date satisfying 11 U.S.C. § 548(a)(1) has a two-year statute of limitations (or "look-back period") and Fla. Stat. § 726.110(1) and (2) have a four-year period of repose. *See* SMF, Ex. 17, Ex. 23, Ex. 30, Ex. 32, and Ex. 35.

48.    Accordingly, each of the Transfers occurred and Obligations were incurred within the time periods required under both 11 U.S.C. § 548(a) and Fla. Stat. 726.110(2).

### 3. The Debtor Received Less Than Reasonably Equivalent Value in Exchange for the Transfers

49.    The Debtor received less than reasonably equivalent value in exchange for the Transfers.

50.    For purposes of avoiding transfers under 11 U.S.C. § 548, the Bankruptcy Code defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor." *Bakst v. United States (In re Kane & Kane)*, 2013 Bankr. LEXIS 1139 at *28 (Bankr. S.D. Fla. 2013) (*quoting* 11 U.S.C. § 548(d)(2)(A)).  Similarly, Florida law defines "value" as "'[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied.'" *Id*. at *28-29 (*quoting* Fla. Stat. 726.104).

51.    When the transaction itself is absolutely prohibited by law it will rarely, if ever, constitute reasonably equivalent value. *Tabas v. Lehman (In re Capitol Invs., Inc.)*, 473 B.R. 838, 846 (Bankr. S.D. Fla. 2012) (The transaction involving gambling, illegal under Florida law, did

not support value for the purposes of 548 or 550). A loan that is criminally usurious is void under New York, including the underlying obligation and the choice of law provision. *See Adar Bays, LLC*, 37 N.Y.3d at 323-24 and 331-333. If the interest rate is at least more than 2 times the state criminal usury statute, there are both criminal and civil remedies under federal law for the collection of an unlawful debt. 18 U.S.C §1961(6) – 1964.

52.     Under Florida law, loan sharing under Fla. Stat. § 687.071 provides both criminal and civil remedies against anyone that makes an extension of credit, who willfully and knowingly charged, took or received an interest rate which exceeds 25%, whether directly or indirectly, or conspires to do so. Further, same actions are subject to Fla. Chapter 895 (Florida RICO (Racketeer Influenced and Corrupt Organization Act (Fla. Stat. §895.02(8)(a)(21) (pattern of racketeering for violations of Fla. Chapter 687) and the collection of an unlawful debt Fla. Stat. §895.02(12). Florida provides civil remedies for the same conduct. (Fla. Stat. §772.102(11) (pattern of racketeering for violation of Florida Chapter 687) and Fla. Stat. §772.102(2)(a)(3) (collection of an unlawful debt).

53.     As detailed in Section B, above, the First Hi Bar Contract was a void, criminally usurious loan under New York law, which as result the Debtor had no obligations to repay.

54.     The First Hi Bar Contract provides no value at all as is purports to "refinance" the Third Spin Contract, which is itself a void, criminally usurious loan, and had been assigned by Spin to Wing Lake through the Wing Lake Assignment Document prior to Hi Bar's attempted refinance through the First Spin Contract. SMF, p. 6, ¶ 25, and Ex. 16.

55.     Since Spin sold and assigned the Third Spin Contract to Wing Lake effective prior to the Hi Bar Transfer Agreement and First Hi Bar Contract, when Hi Bar transferred the "Purchase Price" to Spin as a purported "refinance", the Debtor received no value in exchange for such

obligation to Hi Bar because there was no longer any obligation to Spin outstanding.  SMF, p. 6, ¶ 25, and Ex. 16.

56.     The same holds true for the First Settlement Agreement which is premised on an alleged default under the First Hi Bar Contract, a criminally usurious and void loan, for which no legal obligation from the debtor existed. Included within the First Settlement Agreement was a release of the Hi Bar, and affiliates, from any all causes of action.  SMF, Ex. 23.  The Debtor, likewise, did not receive any value in exchange for releasing Hi Bar and affiliates from the claims.

57.     The Second Settlement Agreement then follows along and is premised on satisfying the same non-existent illegal obligations as the First Settlement Agreement.  SMF, Ex. 35. Therefore, the Debtor received no value in exchange for incurring the obligations and transferring the claims by way of the release under the Second Settlement Agreement.

58.     The Debtor also paid Hi Bar from one of its Chase deposit accounts ending xx3181, xx3199, or xx6109, on account of the criminally usurious and void First Hi Bar Contract along with the Hi Bar Transfer Agreement, First Settlement Agreement, and Second Settlement Agreement.  SMF, Ex.30.  Because the First Hi Bar Contract was illegal and the First Settlement Agreement and Second Settlement Agreement are also avoidable, the Debtor did not receive reasonably equivalent value in exchange for any one of the Transfers to Hi Bar identified in Ex. 30.

59.     Therefore, the Debtor received less than reasonably equivalent value in exchange for the Transfers made and Obligations incurred because the Debtor received nothing in exchange for the Transfers.

**4.   <u>The Debtor was insolvent at the time of the Transfers.</u>**

60.     The Debtor was insolvent at the time of the Transfers.

17

61.     Pursuant to 11 U.S.C. § 101, when referring to a corporation, the term "insolvent" means that the sum of the entity's debts is greater than all of the entity's property at a fair valuation, excluding property transferred with the intent to hinder, delay, or defraud the debtor's creditors and excluding exempt property. *See* 11 U.S.C. §101(32)(A).

62.     The Debtor was insolvent at the time of the Transfers under the Balance Sheet Test. To determine whether a debtor is insolvent is to "compare the debtor's debt obligations with the debtor's assets, at fair value, as of the relevant date" (i.e., the "Balance Sheet Test"). *Mukamal v. Nat'l Christian Charitable Found., Inc. (In re Palm Beach Fin. Partners, L.P.)*, 598 B.R. 885, 890 (Bankr. S.D. Fla. 2019). If called to testify, Mr. Barbee would testify, consistent with the conclusions in the Expert Report, substantially as follows:

a. Mr. Barbee utilized the balance sheet test to determine the solvency of the Debtor. Ex. 28, (Decl. A. Barbee, p. 5 ¶¶ 18 -19).

b. The results of the balance sheet test showed that the Debtor was insolvent every quarter from December 31, 2020 through March 31, 2022 ("**Measurement Dates**").

c. During this period, there were no substantial changes in the Debtor's assets or liabilities, and applying the theory of retrojection the Debtor remained insolvent during the entire period between the Measurement Dates. *See Herendeen v. Regions Bank (In re Able Body Temp. Servs., Inc.)*, 626 B.R. 643, 678 (Bankr. M.D. Fla. 2020) (Under the retrojection theory, when a debtor is shown to be insolvent on the first known date and also insolvent on a later date, in the absence of any substantial change in the debtor's assets or liabilities between the two dates, the debtor is "deemed to have been insolvent at all intermediate times.").

18

d. The Debtor was insolvent as of December 31, 2020 and remained insolvent through the Petition Date.

SMF, Ex. 28 (Declaration of Alan Barbee p. 5, ¶ 18 and Barbee Report, p. 30, ¶ 92 and Table 10).

63. Accordingly, the Debtor was insolvent on the date of each of the Transfers.

64. Therefore, the Transfers can be avoided as constructively fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(B) and Fla. Stat. §§ 726.105(1)(b) and 726.106.

### ii. Actual Intent

65. Actual intent is from the point of view of the Debtor (transferor) rather than the Defendants (transferees).

### 1. The Debtor's Incurring the Obligations and Transfers of Property were with done with the Actual Intent to Hinder, Delay or Defraud Creditors

66. In this case, Scott Zankl has admitted the Debtor's intent to hinder, delay, or defraud creditors, stating the Debtor continued to obtain new financing in 2021 and 2022 because "it still had to make payments to the investors that were in Excel[,]" Ex. 1 (S. Zankl 2004 Tr., p.57/Lines 9-25, June 6, 2022), even though the Debtor stopped making vehicle sales to individual end-user consumers and began selling vehicles to either Karma Palm Beach or Karma Broward at cost or at a loss.

67. The Debtor's books are consistent with Scott Zankl's testimony, showing that no later than April or May 2021, the Debtor was being run as a Ponzi scheme or other revolving advance fraud, with the Debtor's primary business operations ceasing while continuing to incur obligations to repay existing investors. SMF, Ex. 28 (Decl. of Alan R. Barbee, p. 6, ¶ 24 and Ex. A Expert Report of Alan R. Barbee, CPA/ABV, dated June 25, 2024 ("Barbee Report"), pp. 33-35, ¶¶ 100 – 102, Tables 14 and 15, and pp. 37-40, ¶¶ 107-120).

**2. The "Badges of Fraud" Also Demonstrate that the Transfers Were Made and Obligations were Incurred to Hinder, Delay, or Defraud Creditors**

68. Because debtors generally do readily admit their "actual intent," "actual intent" is generally determined by a totality of the circumstances in which Courts consider the non-exhaustive "badges of fraud." *See Rollaguard Sec., LLC*, 570 B.R. at 878 and Fla. Stat. 726.105(1)(a). The "lack of reasonably equivalent value" and "insolvency" elements of "constructive fraud" are included in the "badges of fraud" used to establish that a transfer was made with the actual intent to hinder, delay, or defraud creditors, when the debtor does not readily admit to such intent. *See* Fla. Stat. § 726.105(2)(h) and (i) and *Rollaguard Sec., LLC*, 570 B.R. at 878. Accordingly, the Plaintiff incorporates Section (i)(3) and (4), above.

69. In an attempt to ease its burden because of the cessation of its business, *see* supra., the Debtor through Scott Zankl, negotiated the Wing Lake Refinance to refinance its high-interest MCA loans and free up additional cash for the Debtor to use. Ex. 14. A condition of the Wing Lake Refinance was for the Debtor to disclose all of its existing MCA loans to Wing Lake. SMF, Ex. 13, p. 1, ¶ 14. One of the MCA loans outstanding at the time of the negotiations was the Third Spin Contract in which Hi Bar was a participant. SMF, Ex. 11 and Ex. 13, p.1, ¶ 13. The alleged amount outstanding on the Third Spin Contract was $2,114,312.50. SMF, Ex.17. At $6 Million, the Wing Lake Refinancing was insufficient to cover the amount due to Spin and the other MCA Lenders. SMF., Ex. 14, pp. 1-2.

70. At first, Scott Zankl attempted to refinance using a different corporate entity, Excell Auto Sport and Finance, but this proved to be unworkable. SMF, p 6, ¶ 24. Thereafter, Scott Zankl, on behalf of the Debtor, and Lubin devised a scheme whereby the balance owed to Spin under the Third Spin Contract would be transferred to Hi Bar, which was accomplished by the Hi

Bar Transfer Agreement and the First Hi Bar Contract in which Spin was a participant. SMF Ex 15, 17, 24, 25 and 32

71.     The Wing Lake Assignment Document was provided to Spin in or around October 21, 2021. There were several versions of the Wing Lake Assignment Document that went back and forth between Spin and Wing Lake. The Wing Lake Document was executed by Spin on November 1, 2021. The Debtor and Spin and Lubin knew that Wing Lake would not close on the Wing Lake Refinance if Wing Lake had known that there was an outstanding balance owed to Spin that was not being satisfied. SMF, p. 6 , ¶¶ 24-26.

72.     The Debtor incurring additional obligations and making transfers of the Debtor's interests in property under the First Hi Bar Settlement Agreement, the Second Hi Bar Settlement Agreement, including the releases, and the transfers of funds to Hi Bar was a continuation of the Debtor's attempts to hinder, delay, or defraud Wing Lake.  SMF, Ex. 4, pp. 52-54, ¶¶ 1126 -1137.

73.     Therefore, the Debtor incurred the obligations and transferred the interests in property under the Hi Bar Transfer Agreement, the First Hi Bar Contract, and the First Settlement Agreement and the Second Settlement Agreement, including the releases therein with the actual intent to hinder, delay or defraud a creditor.

**D.     The Plaintiff is Entitled to Summary Judgment under 11 U.S.C. § 550(a) to Recover the $4,581,625.00 from the Defendants**

74.     According to 11 U.S.C. § 550(a) the Trustee is authorized to recover the property or value thereof transferred by the Debtor from the initial transferee or the entity for whose benefit such transfer was made or any immediate or mediate transferee. The Plaintiff can recover the value of the Transfers from any combination of the initial and subsequent transferees. S*ee In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1198 (11th Cir. 1988).

75.     In this case, the Debtor made constructively fraudulent transfers directly to the or for the benefit of Hi Bar via the Debtor's Chase deposit accounts ending xx3181, xx3199, and/or xx6109. SMF, Ex.30.

76.     Therefore, the Plaintiff is entitled to a money judgment in the amount of $2,200,00.00, against the Defendants as initial transferee(s), mediate transferee(s), and immediate transferee(s).

77.     The Plaintiff is entitled to summary judgment on Count 26 and 27 to avoid and recover the $1,500,000 the Debtor transferred from its Chase accounts ending xx3181, xx3199, and xx6901 within 90-days of the Petition Date under 11 U.S.C. §§ 547(b) and 550. SMF, Ex. 30.

78.     Prior to all transfers made within the 90-days, the Debtor had default on the First Hi Bar Contract and entered the First Settlement Agreement, on which it also defaulted. SMF, Ex. 23 and 35. The payments were outside the ordinary course of business in that the terms changed because the Debtor defaulted and was delinquent in its payments to Hi Bar, and the Debtor's payments were not even consistent with the repayment terms of the First Hi Bar Contract or either settlement agreement. SMF, Ex. 23. Ex.30, and Ex. 35. *See In re Daikin Miami Overseas, Inc.*, 65 B.R. 396, 398 (S.D. Fla. 1986) ("the purpose of the (c)(2) exception was to leave undisturbed ordinary financial relations between a debtor and its creditors.").

79.     The accelerated repayment schedules and the Transfers made by the Debtor to Hi Bar allowed Hi Bar to recover more than it would have in this Chapter 7 bankruptcy case, which is currently administratively insolvent, and the Trustee does not expect a 30% distribution to creditors.

80.     Each of the Transfers was made directly to Hi Bar to the law offices of Steven Zakharayev on behalf of Hi Bar.

22

81.     Accordingly, the Transfers within 90-days of the Petition Date can be avoided as referential transfers under 11 U.S.C. § 547(b) and recovered from Hi Bar as the initial or mediate transferee of each avoided Transfer under 11 U.S.C. § 550.

**WHEREFORE**, the Plaintiff respectfully requests that this Honorable Court:

(a)     Enter an Order Granting this Motion;

(b)     Enter Summary Judgment against Hi Bar finding that the First Hi Bar Contract is a criminally usurious loan under Florida law;

(c)     Enter Summary Judgment against Hi Bar avoiding the obligations incurred and Transfers made on account of the Hi Bar Transfer Agreement, First Hi Bar Contract, First Settlement Agreement, Second Settlement Agreement, pursuant to 11 U.S.C. § 548(a)(1)(A) or (B) and entering a money judgment pursuant to 11 U.S.C. § 550(a) in the amount of $4,581,625.00 plus prejudgment interest, post-judgment interest, and all taxable costs;

(d)     Enter Summary Judgment against Hi Bar avoiding the obligations incurred and Transfers made on account of the Hi Bar Transfer Agreement, First Hi Bar Contract, First Settlement Agreement, Second Settlement Agreement, pursuant to 11 U.S.C. § 544(b)(1) and Fla. Stat. §§ 726.105(1)(a) or (b) and 726.106(1) and entering a money judgment pursuant to 11 U.S.C. § 550(a) in the amount of $4,581,625.00 plus prejudgment interest, post-judgment interest, and all taxable costs;

(e)     Alternatively, entering summary judgment against Hi Bar and avoiding the $1,350,000 in Transfers from the Debtor's Chase bank accounts made to or for the benefit of Hi Bar under 11 U.S.C. § 547(b) as preference payments and entering a money judgment

23

pursuant to 11 U.S.C. § 550(a) against Hi Bar in the amount of $1,350,000.00, plus prejudgment interest, post-judgment interest, and all taxable costs;

(f)     Alternatively, granting summary judgment in favor of the Trustee as to any fact or element established that is necessary to any of the claims to relief; and

(g)     Grant such other and further relief as this Court deems just and proper.

Respectfully submitted this 27th day of December 2024.

FURR AND COHEN, P.A.
*Special Counsel for Trustee*
2255 Glades Road, Suite 419A
Boca Raton, FL 33431
Telephone: (561) 395-0500
Facsimile: (561) 338-7532

BY:    /s/ *Jason S. Rigoli*
        Alan R. Crane, Esq.
        Florida Bar No.: 0963836
        E-mail: acrane@furrcohen.com
        Jason S. Rigoli, Esq.
        Florida Bar No.: 91990
        E-mail: jrigoli@furrcohen.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via transmission of Notices of Electronic Filing generated by CM/ECF to those parties registered to receive electronic notices of filing in this adversary proceeding.

Dated: December 27, 2024

By: /s/ *Jason S. Rigoli*
        Jason S. Rigoli

24