UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:

EXCELL AUTO GROUP, INC.

      Debtor.

_____/

NICOLE TESTA MEHDIPOUR,
as Chapter 7 Trustee for Excell Auto Group, Inc.

      Plaintiff,

v.

HI BAR CAPITAL, LLC, et al.,

      Defendant(s).

_____/

Case No.: 22-12790-EPK
Chapter 7

Adv. Pro. No. 22-01132-EPK

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS**

Plaintiff, Nicole Testa Mehdipour, chapter 7 trustee of the estate of Excell Auto Group, Inc., by and through undersigned counsel, files this statement of material facts which relates to the *Plaintiff's Motion for Summary Judgment Against Hi Bar Capital, LLC* [ECF No. 171] ("**MSJ**"), and respectfully states:

### I.   The Bankruptcy Case and Adversary Proceeding

1.   The Defendants are Hi Bar Capital, LLC ("**Hi Bar**"), Spin Capital, LLC a/k/a Spin Capital ("**Spin**"), Yisroel Herbst ("**Y. Herbst**"), Mordechai Dov Ber Herbst a/k/a Mordi Herbst ("**M. Herbst**"), Avrumi Lubin a/k/a Josh Lubin ("**Lubin**"), and Franklin Capital Funding, LLC and Franklin Capital Group, LLC, d/b/a Wing Lake Capital (collectively, "**Wing Lake**").

### II.   Prepetition Events

#### a.   Ownership Structure and Business Operations of the Debtor

1

2.      At all times relevant, the Debtor was owned, 49% by Ed Brown and 51% by Kristen Zankl. *See* **Exhibit 2.**  Previously, the Debtor was owned 100% by Kristen Zankl. *See* **Exhibit 1 (S. Zankl 2004 Tr., p. 11/Line 21- p. 13/Line 20, June 6, 2020)**.

3.      The Debtor primarily sold luxury used vehicles to individual end-user consumers until about April 2021. *See* **Ex. 1 (S. Zankl 2004 Tr., page 57/lines 9-25, June 6, 2022)**.

4.      Beginning in April or May 2021, the Debtor stopped making vehicle sales to individual end-user consumers *See* **Ex. 1 (S. Zankl 2004 Tr., page 57/lines 9-25, June 6, 2022)** and began selling vehicles to either Karma Palm Beach or Karma Broward at cost, or for a loss, while continuing to obtain substantial financing used to repay its preexisting financing/debt obligations *See* **Ex. 28 (Decl. of Alan R. Barbee, p. 6, ¶ 24 and Ex. A Expert Report of Alan R. Barbee, CPA/ABV, dated June 25, 2024 ("Barbee Report"), pp. 33-35, ¶¶ 100 – 102, Tables 14 and 15, and pp. 37-40, ¶¶ 107-120).**

5.      The Debtor continued to obtain new financing in 2021 and 2022 because "it still had to make payments to the investors that were in Excel." *See* **Ex. 1 (S. Zankl 2004 Tr., p 57/Lines 9-25, June 6, 2022)**.

   b.  **The Spin Contracts**

      i.  **Lubin Communications Leading to The First Spin Contract**

6.      On March 25, 2021, Lubin contacted Excell, through Scott Zankl, through an unsolicited text message offering "750K-1MM" with Spin willing to take "a 3rd [position] behind Getbackd and Libertas." **Exhibit 3, p. 1, ¶ 1**[1].  *See also* **Exhibit 25 (A. Lubin Dep., p.85/Line 16 – p. 88/Line 2, March 15, 2024)**.

---

[1] In connection with Exhibit 3 (SPIN_001578-SPIN_001698) and Exhibit 4 (SPIN_001699-SPIN_1765) which are printouts of text or other forms of messages between Josh Lubin and Scott Zankl that were produced by Spin, "¶_" refers to the sequentially numbered messages from 1 to 1212.

7.      Lubin continues to message Scott Zankl, offering to do "1M at 120 payments," **Ex. 3, p. 1, ¶ 6**, and states his knowledge of two additional pre-existing MCA Loans, 24 Capital and Diverse, and Lubin requests, and receives, documents related to both. ***Id*., pp. 6-10, ¶¶ 41-64**.

### ii.    The First Spin Contract

8.      On or about June 1, 2021, Spin and the Debtor, along with 13 non-debtor entities related to Scott or Kristen Zankl, entered a "Revenue Purchase Agreement" (the "**First Spin Contract**").  A true and correct copy of this First Spin Contract is attached as **Exhibit 5**.

9.      The First Spin Contract terms included: (i) the "Purchase Price" was listed as $1,000,000.00: (ii) the "Remittance" was $93,687.50 per week; and (iii) "Purchased Amount" was $1,499,000.00.   Hi Bar participated in the Second Spin Contract, syndicating 50% of the transaction. *See* **Exhibit 6**.

### iii.    The Second Spin Contract

10.      At the end of June 2021, Lubin and Scott Zankl discussed additional funding.  ***See* Exhibit 3, p. 24-32, ¶¶ 147-203**.

11.      On July 8, 2021, Lubin states "I'll fund $500k without any login or statements….", **Ex. 3, p.27, ¶ 165**, and without reviewing any financials, Lubin and Scott Zankl negotiate a deal for a $500,000 advance, with a $40,000 per week remittance based solely upon the request by Scott Zankl, ***id*. at pp. 26-27, ¶¶ 161-169**, and a rate of return of 45% over 18 weeks, with discounts if paid back earlier. ***See* Ex. 3, pp. 30-32, ¶¶ 184-203**.

12.      On July 9, 2021, Spin, on the one hand, and the Debtor entered a "Revenue Purchase Agreement," attached as **Composite Exhibit** 7 (the "**Second Spin Contract**").   The terms of the Revenue Purchase Agreement, including the Purchase Price ($500,000), the Purchase Percentage (20%), the Purchase Amount ($749,500), the weekly remittance ($40,000) and the

"Protections against Default" and "Events of Default and Remedies" are set forth in **Composite Ex. 7. p. 1, pp. 2-3, § 1.12, and p. 3-4, §§ 3(a)-(n) – 3.6**   Hi Bar participated in the Second Spin Contract, syndicating 30% of the transaction. *See* **Exhibit 8**.

13.     Based upon the weekly ACH withdrawal of $40,000.00, the loan would be paid off in just 18.77 weeks. *See also*, **Ex. 3, p. 30, ¶¶ 184-185**.

### iv.   The Third Spin Contract

14.     On August 6, 2021, Lubin messaged Scott Zankl stating that he knew the Debtor took another deal the prior week obtaining $1.5 million from another MCA lender. **Ex. 3, p. 47, ¶ 308**.

15.     On August 31, 2021, Spin issued a Balance Transfer Agreement letter. A copy of the 8/31/2021 Balance Transfer Agreement letter is attached as **Exhibit 9**.  As of August 31, 2021, Spin and Scott Zankl agreed that a purported balance owed of $281,062.50 on account of the First Spin Contract and $469,500.00 on account of the Second Spin Contract would be deducted from the Third Spin Contract (defined below).

16.     On August 31, 2021, Spin, on the one hand, and the Debtor, entered into another "Revenue Purchase Agreement," dated August 31, 2021, attached as **Composite Exhibit 10** (the "**Third Spin Contract**").   The terms of the Third Spin Contract are set forth in Composite Exhibit 10, including Purchase Price ($2,000,000), Purchased Percentage (20%), Purchased Amount ($2,998,000), weekly payment remittance ($150,000), and "Protections against Default" and "Events of Default and Remedies". **Composite Ex. 10, p. 1, pp. 4-5, § 1.12, and p. 5-6, §§ 3.1-3.6**. The annualized interest rate based upon the Purchase Price, Purchased Amount and the ACH withdrawal exceeds 50% (paid off in 19.98 weeks).

17. Not only did Hi Bar participate in the Third Spin Contract as a syndicator of 30% of the transaction, *see* **Exhibit 11**, Lubin had Hi Bar's staff preparing documents including the 8/31/2021 Balance Transfer Agreement. **Exhibit 12**.

18. Collectively, the First Spin Contract, Second Spin Contract, and Third Spin Contract shall be referred to as the "**Spin Contracts**."

    **c. The Debtor, with the Actual Intent to Hinder, Delay or Defraud Creditors and Incurred the Obligations under the First Hi Bar Transfer Agreement and the First Hi Bar Contract by Participating with Spin's Execution of the Wing Lake <u>Assignment Document</u>**

19. Prior to October 21, 2021, the Debtor entered negotiations with Wing Lake for a $6,000,000.00 loan to refinance the Debtor's outstanding MCA Loans ("**Wing Lake Refinance**").

20. As conditions of the Wing Lake Refinance, the Debtor was required to disclose all of its outstanding MCA loans and was prohibited from taking out any additional MCA loans while the Debtor owed money to Wing Lake. **Ex. 13 (Aff. S. Zankl, p. 1, ¶¶ 7, 9-12, March 29, 2022)**.

21. By no later than October 19, 2021, Josh Lubin became aware of the Debtor's negotiations with Wing Lake and began threatening to file UCCs against all entities. **Ex. 3, pp. 75-76, ¶¶ 502-504**.

22. At $6 million, the Wing Lake refinance was insufficient to pay off the Debtor's other MCA loans plus Spin at $2,114,312.50. ***See* Ex. 14, p. 1-2.** Scott Zankl understood that the Debtor needed to show Wing Lake that the Debtor had no obligations owing to Spin. **Ex.13 (Aff. S. Zankl, p.1, ¶ 14, March 29, 2022)**.

23. Scott Zankl began negotiating with Lubin to secretly transfer the balance under the Third Spin Contract to the First Hi Bar Contract knowing that this was a violation of the closing requirements for the Wing Lake Refinance. **Ex. 13 (Aff. S. Zankl, p. 1, ¶¶ 12-13, Mar. 29, 2022). Ex. 3, p.79, ¶ 529, pp. 89-90 ¶¶ 583-596**.

24.     Lubin confirmed in an email to Spin's attorney Morgan Edelboim, dated April 22, 2023, Scott Zankl's request that Spin accept a reduced balance of $587,289.00 from Wing Lake and Scott Zankl would then cause Excell Auto Sport and Service, Inc. to become obligated for the balance, which Lubin refuses to do.  **Ex.15, p. 1, ¶ 3, Ex. 3, pp. 75-90. ¶¶ 502- 596, Ex. 25 (A. Lubin Dep. Tr., p. 120/Line 22 – p.130/Line3, Mar. 15, 2024)**.

25.     On November 1, 2021, at 1:13:20 PM, Lubin Executed the Wing Lake Assignment Documents on behalf of Spin, attached hereto as **Exhibit 16 at p. 6** (the "**Wing Lake Assignment Documents**").  The Wing Lake Assignment Documents state that the entire outstanding balance owed to Spin as of October 21, 2021, was $1.00, *id*. **at p. 1 ¶ 2(a)**, affirmatively represented and warranted that Spin had not sold, assigned, transferred, granted a participation in or pledge the Obligations, Merchant Documents or Third Party Claims **to anyone[,]**" *id*. **at p. 1, ¶ 4**; included "the Evidence of Assignment" that states as of 11/1/2021, Spin does not have any rights or interest in any claims against the Debtor or in the Debtor's assets, *id*. **at 5**, and that Spin sold and assigned all rights, title, and interest to all outstanding obligations of the Debtor and its affiliates to Wing Lake. *See* **Ex. 16, p. 1, ¶¶ Recitals and 2(a)**.

26.     Additionally, Spin was prohibited from purchasing any portion of the Debtor's future receipts and similar income, making any other loan to the Debtor or taking a security interest in the Debtor's assets.  **Ex. 16, p. 2, ¶ 6**.

27.     Spin executed the Wing Lake Assignment Documents despite knowing it was claiming the Debtor owed Spin $2,114,312.50.  **See Ex. 15, p. 1, ¶¶ 1-7; Ex. 25, (A. Lubin Dep. Tr., p. 121/Line 20 - p.127/Line 9, Mar. 15, 2024)**.

28.     The result of the Debtor's transfer was an of the purported balance due and owing on the Third Spin Contract to Hi Bar, the Debtor was able to refinance the Diverse Capital MCA

loan and GetBackd MCA loan and receive more funds from the Wing Lake Refinance which would not have occurred if the $2,114,312.50 balance purportedly owed to Spin had been disclosed to Wing Lake. **Ex. 16, pp. 1-2**.

29. The "Hi Bar Capital Balance Transfer Agreement" has a date of October 27, 2021, and purportedly signed by Kristen Zankl on October 28, 2021, and Scott Zankl on November 1, 2021. *See* **Exhibit 17** (the "**Hi Bar Transfer Agreement**"). The Hi Bar Transfer Agreement authorizes Hi Bar "to deduct $2,114,312.50" from the First Hi Bar Contract, as defined below. **Ex. 17**.

   d.  **The First Hi Bar Contract**

30. Approximately, one hour after Lubin executed the Wing Lake Assignment Documents, on November 1, 2021, Hi Bar Capital sent the Hi Bar Transfer Agreement and First Hi Bar Contract to Scott Zankl via DocuSign. ***Compare* Ex. 16, p. 6**, with **Exhibit 18, p. 1,** and **Exhibit 29 (S. Zank. Dep. Tr., p. 93/ Line 5 - p. 95/Line 20, July 15, 2024)**,

31. The Hi Bar Transfer Agreement and First Hi Bar Contract were executed solely by Scott Zankl approximately 4 minutes after Hi Bar sent them. **Exhibit 18, p.1; Ex. 19, p.1; Ex. 29 (S. Zank. Dep. Tr., p. 93/ Line 5 - p. 95/Line 20, July 15, 2024); and Ex. 4, p. 18, ¶ 906 – p. 22, ¶ 937**.

32. The Purchase Price is listed as $2,120,000.00 with the Purchased Percentage being 20% and the Purchased Amount is $3,177,880.00. **Ex. 32 (the "First Hi Bar Contract")**. The Purchase Price is $5,687.50 ($2,120,000.00-2,114,312.50) more than the "transferred balance" from Spin. The annualized interest rate is more than 50 percent. **Ex. 28 (A. Barbee Decl., p. 6, ¶ 26 and Barbee Report, pp. 32-33, ¶¶ 97-98, and Exhibit 5A and 5B)**

33.    Hi Bar did not transfer any funds to the Debtor on account of the First Hi Bar Contract. *See* **Ex. 26 (Y. Herbst Tr., p. 149/Line 4-19, May 7, 2024)**. *See also* **Ex. 28 (Barbee Report, p. 9, ¶ 32)**.

34.    Within two hours of Scott Zankl executing the Hi Bar Transfer Agreement and First Hi Bar Contract, on November 1, 2021, Spin transferred exactly $2,114,312.50 to Hi Bar and Hi Bar transferred the exact same amount $2,114,312.50 back to Spin.  *See* **Exhibits 20 and 21, p. 4.**

35.    In an e-mail to his counsel, Lubin stated he refused to send Wing Lake a "zero balance letter for Spin" because Spin was "syndicated in the Hi Bar deal."  **Exhibit 15, p.1, unnumbered introductory paragraph**.  Lubin also told Zankl," ill (sic) give my UCC to Franklin for free though would (sic) need to get another company to pay off Spin so theres (sic) no issues with Franklin owning the obligation (this was just me being cautious and **should've kept the balance on Spin**). No where (sic) in the assignment does it say Spin is obligated to Notify Franklin of other Debt (sic) and Spin never sent a zero balance letter.") **Ex. 15, p. 1, ¶ 4** (emphasis added).

36.    Further, in another e-mail from Josh Lubin to attorneys Corey D. Berman and Scott D. Cosgrove, Lubin acknowledges that Spin may have assigned its rights to Wing Lake but tries to qualify it because Spin had syndicators participating in the Third Spin Contract.  **Ex. 22, p. 2 (E-mail on 5.1.23 at 3:42:44PM)**. Lubin stated say if it gets brought up in a deposition, we['] re going to say I gave a loan to Hi Bar to pay off my obligation to pay off Spin[']s balance and that loan would get paid back on contingent Excell/Karma pay." *Id*.

e.    **The Hi Bar Settlement Agreements**

37.    On December 19, 2021, the First Settlement Agreement was entered as a result of a purported default by the Debtor under the First Hi Bar Contract. **Exhibit 23**.

38.    Lubin, in part, was in charge of negotiating the First Settlement Agreement.  **Ex. 27 (Y. Herbst Dep. Tr., p. 62/ Line 5 – p. 63/Line 21, May 28, 2024)**.

39.     The First Settlement Agreement alleges that the Debtor owes $2,677,880.00 under the First Hi Bar Contract. The First Settlement Agreement provides for a repayment of 150% of that amount, or $4,016,820.00, which shall be paid back at $200,000.00 per week over 20 weeks. *See* **Ex. 23, p. 1**.

40.     By December 20, 2021, the Debtor had paid Spin $2,381,625.00[1] and had paid Hi Bar 700,000.00.  **Ex. 30 and 31**. Therefore, the Debtor had been advanced only $2,524,437.50 since June 1, 2021, and had paid back $3,081,625.00 at the time of the entry of the First Settlement Agreement with the Debtor purportedly still owed approximately $4,016,820.00.

41.     The Debtor purportedly defaulted under the First Settlement Agreement. However, the Debtor paid an additional $400,000 to Hi Bar between December 20, 2021, and February 1, 2022. **Ex. 30.**

42.     On February 1, 2022, the Debtor and Hi Bar entered into the Second Settlement Agreement, **Exhibit 35**, which required the Debtor to pay $3,800,000.00 within 21-days. *Id*. at **pp. 1-2, ¶ 1**.  Payments were to be made to the Law Offices of Steven Zakharyayev, PLLC.  *Id*. at **p. 2**.  Lubin and/or Zakharayayev were again in charge of negotiating the Second Settlement on behalf of Hi Bar. **Ex. 27 (Y. Herbst Dep. Tr., p. 121/Line19- p. 125/Line 1, May 28, 2024)**. *See also***, Ex. 4, p. 29, ¶ 981, p. 32, ¶¶ 996, 1002, p. 38-39, ¶¶ 1044-1055, pp. 63-67, ¶¶ 1188-1209.**

43.     The Debtor entered into the Second Hi Bar Settlement Agreement in its continued efforts to keep litigation and UCCs from being filed, which allowed the Debtor to continue to borrow new funds and pay the pre-existing obligations the Debtor owed.

---

[1] See Exhibit 31 attached hereto.  This amount reflects an adjustment for the $40,000.00 reversed on 9/3/2021 for the duplicate payment on 9/1/2021, the adjustment is on both the amounts received by the Debtor and paid by the Debtor. Accordingly, the difference remains the same as set forth in the Exhibit.

44. On January 10, 2022, between the First Settlement Agreement and Second Settlement Agreement, Spin and Hi Bar executed an Escrow Agreement with the Law Offices of Steven Zakharyayev, PLLC, as Escrow Agreement, regarding Hi Bar and the Debtor. *See* **Exhibit, 24**.

45. The Debtor paid an additional $1,300,000.00 on the Second Settlement Agreement through the escrow agent. ***See*** **Ex. 30**. The payment by the Debtor of the $1,300,000.00 was in violation of the terms of the Wing Lake Refinance. The obligation incurred by the Debtor under the Second Settlement Agreement was an obligation incurred by the Debtor, and the transfer of the $1,300,000.00 was a transfer of an asset of the Debtor, done with the actual intent to hinder, delay or defraud a creditor.

    **f.   The Debtor was Insolvent at All Times Between June 1, 2021, and the Petition Date**

46. According to Mr. Barbee's declaration, Mr. Barbee would testify consistent with the Expert Report he provided to the Defendants. **Ex. 28 (Decl. A. Barbee, p. 1, ¶ 2).**

47. Under any of the three regularly used solvency analyses: the Balance Sheet Test, Capital Adequacy Analysis, and Financial Ratio Analysis, the Debtor is insolvent during the entire period from June 1, 2021, through the Petition Date. *See* Barbee Declaration, attached as **Exhibit 28.**

48. Furthermore, as Mr. Zankl testified, the Debtor essentially ceased the sale of vehicles to individual consumers in about April 2021. **Ex. 1 (S. Zankl 2004 Tr., p. 57/Lines 9-25, June 6, 2022)**. Mr. Barbee's testimony is that his review of the Debtor's books and records is consistent with Mr. Zankl's testimony and that in 2021 the Debtor's financing receipts were four times the amount of the purchases of vehicles, and the Debtor's financing disbursements were five times the Debtor's vehicle sales during that year. **Ex. 28 (Barbee Report, pp. 33-34, ¶ 101(c)).**

**WHEREFORE**, the Plaintiff respectfully requests that this Honorable Court grant the

relief in the *Plaintiff's Motion for Summary Judgment against Hi Bar Capital, LLC* [ECF No. 171]

and such other and further relief as this Court deems just and proper.

Respectfully submitted this 27th day of December 2024.

FURR AND COHEN, P.A.
*Special Counsel for Trustee*
2255 Glades Road, Suite 419A
Boca Raton, FL 33431
Telephone: (561) 395-0500
Facsimile: (561) 338-7532

BY:    /s/ *Jason S. Rigoli*
Alan R. Crane, Esq.
Florida Bar No.: 0963836
E-mail: acrane@furrcohen.com
Jason S. Rigoli, Esq.
Florida Bar No.: 91990
E-mail: jrigoli@furrcohen.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via transmission of Notices of Electronic Filing generated by CM/ECF to those parties registered to receive electronic notices of filing in this adversary proceeding.

Dated: December 27, 2024

By: */s/ Jason S. Rigoli*
Jason S. Rigoli

11