IN THE CIRCUIT COURT OF THE
                    SEVENTEENTH JUDICIAL CIRCUIT IN
                    AND FOR BROWARD    COUNTY, FLORIDA

                    CASE NO.:  CACE-22-05125


FVP OPPORTUNITY FUND, III, LP, a Delaware.
Limited Partnership, FVP INVESTMENTS, LLC, a
Delaware limited liability company, and FVP
SERVICES, LLC, a Delaware limited liability
company,

                              Plaintiffs,
vs.

KARMA OF BROWARD, INC., a Florida corporation,
et al.,

                              Defendants.

_____/



                         Friday, March 15, 2024
                         9:35 a.m. – 5:07 p.m.


                ****VIDEOCONFERENCE***




              VIDEO DEPOSITION

                    O F

              AVRUMI LUBIN



                 - - - - - - - -

**PLAINTIFF'S EXHIBIT**

**25**

APPEARANCES:

Appearing on behalf of the Plaintiff.
     SCHWARTZ BRESLIN, PLLC
     BY: JERRELL A BRESLIN, ESQUIRE
     169 East Flagler Street
     Miami,FL 33131
     (305)577-4626
     jb@jsjb.law

Appearing on Behalf of Defendant Avrumi Lubin
     EGOZI & BENNETT, P.A.
     BY:  BERNARD L. EGOZI, ESQUIRE
     2999 Northeast 191 Street
     Aventura, FL 33180
     (305)931-3000
     begozi@egozilaw.com

Appearing on behalf of Defendant Hi Bar Capital
     LETO LAW FIRM
     BY:  MATTHEW P. LETO, ESQUIRE
     201 S. Biscayne Boulevard
     Miami, FL 33131
     (305)341-3155
     mleto@letolawfirm.com

Appearing on behalf of Defendant Franklin Capital
Funding
     SHRAIBERG PAGE, P.A.
     BY: ERIC S. PENDERGRAFT, ESQUIRE
     2385 NW Executive Center Drive
     Boca Raton, FL 33431
     (561-526-8459
     ependergraft@slp.law

Appearing on behalf of Defendant Moshe Farache &
Vantiff, Inc.
     SCOTT C. GHERMAN, P.A.
     BY: SCOTT C. GHERMAN, ESQUIRE
     902 Clint Moore Road
     Boca Raton, FL 33487
     (561)757-6266

Appearing on behalf of Defendant Vantiffs
     FELDMAN KODSI, PLLC
     BY:  ANDREW M. FELDMAN, ESQUIRE
     9100 S. Dadeland Boulevard
     Miami, FL 33156
     (305)445-2005
     afeldman@feldmankodsi.com

Appearing on behalf of Defendant Excell Auto Sports & Service
     LAW OFFICES OF MARK PERRY, P.A.
     BY: MARK C. PERRY, ESQUIRE
     6245 North Federal Highway
     Fort Lauderdale, FL 33308
     (954)351-2601
     mark@markperrylaw.com

Appearing on behalf of Defendant Karma and Zankl
     LAW OFFICE OF HARRY WINDERMAN
     BY:  HARRY WINDERMAN, ESQUIRE
     2255 Glades Road
     Boca Raton, FL 33431
     (561)707-0000
     lynoramae@gmail.com

Appearing on behalf of Defendant Moshe Farache
     EBERST LAW FIRM
     BY:  CATHERINE GLEASON, ESQUIRE
     6560 West Rogers Circle
     Boca Raton, FL 33487
     (561)725-0444
     cgleason@eberstlaw.com

Also present: Shanna Decker, Videographer

 (All parties appearing via videoconference)

I N D E X

AVRUMI LUBIN
     Direct Examination                          6


     C E R T I F I E D   Q U E S T I O N S

                    Page 64, Line 17
                    Page 97, Line 13
                  Page 102, Line 21
                   Page 114, Line 5
                  Page 151, Line 17
                  Page 216, Line 18
                   Page 219, Line 7
                   Page 220, Line 1



                    E X H I B I T S

Plaintiffs' Exhibit 38 (Notice of Depo)          10
Plaintiffs' Exhibit 6 (HiBar operating)          70
Plaintiffs' Exhibit 7 (Complaint)                89
Plaintiffs' Exhibit 4 (Answers to Inter.)        92
Plaintiffs' Exhibit 8 (Rev Purchase Agreement)   96
Plaintiffs' Exhibit 11 (Assignment)              130
Plaintiffs' Exhibit 12 (Rev Purchase Agreement) 147
Plaintiffs' Exhibit 37 (E-mail)                  172
          (Marked as confidential)
Plaintiffs' Exhibit 13 (Wire confirmation)       177
Plaintiffs' Exhibit 42 (Wire confirmation)       184
Plaintiffs' Exhibit 15 (Texts)                   211
Plaintiffs' Exhibit 14 (Financing Statement)     224
Plaintiffs' Exhibit 16 (Affidavit)               242

Avrumi Lubin

5

THEREUPON:

Avrumi Lubin, a witness of lawful age, taken by the

Plaintiffs, for the purpose of discovery and for use

as evidence in the above-entitled matter wherein FVP

OPPORTUNITY FUND, III,LP, et al.,  are the

plaintiffs and KARMA OF BROWARD, INC., et al., are

the defendants, pending in the Circuit Court of the

Seventeenth Judicial Circuit in and for Broward

County, Fort Lauderdale, Florida, pursuant to notice

heretofore filed, before Donna Meyers, Court

Reporter, a Notary Public in and for the State of

Florida At Large, taken via videoconference, on the

15th day of March, 2024, commencing at 9:35 a.m.

                    * * * * * *

WHEREUPON

          The following proceedings were had:

          THE VIDEOGRAPHER:  In the case styled FVP

     Opportunity Fund III, LP, et al. vs. Karma of

     Broward, Inc., this is the video deposition of

     Avrumi Josh Lubin on March 15,2024.  The time

     is now 9:35 a.m.

          Would counsel please state your

     appearances for the record.

          MR. BRESLIN:  Yes.  Good morning, Jerry

     Breslin, for the FVP parties.

Avrumi Lubin

6

          MR. EGOZI:  Bernard Egozi, for Josh
Lubin.

          MR. LETO:  Matt Leto, for Hi Bar Capital.

          MR. PENDERGRAFT:  Eric Pendergraft, for
Franklin Capital Funding.

          MR. GHERMAN:  Scott Gherman, on behalf of
Moshe Farache and Vantiff, LLC.

          MR. FELDMAN:  Andrew Feldman, I'm here on
behalf the Vantiffs, defendants.

          MR. PERRY:  Mark Perry, on behalf of
Excell Auto Sports and Service.

          MR. WINDERMAN:  Harry Winderman, on
behalf of the Karmas and the Zankls.

          MS. GLEASON:  Catherine Gleason, on
behalf of Moshe Farache.

          MR. EGOZI:  You ready to swear in the
witness?

WHEREUPON,

                    AVRUMI LUBIN

A witness of lawful age, being called as
a witness by the Plaintiffs, and having been
first duly sworn, testified under oath as
follows:

                DIRECT EXAMINATION

you were participating on the Hi Bar platform, you would wire money and participate in the Hi Bar funding of the transactions, correct?

A    Yeah.

Q    And in 2021, the wires that went back and forth, called the funds transfers that went back and forth between you and Hi Bar, which banks were involved in those transactions?

A    I don't know.  I don't know.  Optimum, all the three banks that I mentioned to you.

Q    All right.  But there wasn't any other banks, correct?

A    No.

Q    Okay.

A    I don't think so, no.

Q    All right.  So let's go back to June of 2021 when you first got involved with an MCA with a company called Excell in Florida.

Do you recall that?

A    Yes.

Q    Okay.  Tell me how that first transaction came into existence.

A    I cold-called Mr. Zankl.  I think I had some knowledge on the deal of maybe a position that existed and asked him if he was looking to sell his

Avrumi Lubin

86

revenue at a discount, and I don't remember the exact negotiations, but, yeah.

Q     All right.   And that was with Scott Zankl?

A     All my communications were with Scott Zankl, yeah.

Q     Did you ever have any communications with his wife, Kristen?

A     I don't think so.

Q     Do you know -- and were these communications regarding Excell Auto Group?

A     These communications were regarding Excell Auto Group, Karma of Palm Beach, Karma of Broward and maybe some other entities.

Q     And so do you recall when you first approached Mr. Zankl, when that may have been, your best guess?

A     Based on reviewing the documents last night that you were provided, it appears I first reached out to him in May or April, I forgot, and the first deal got done in June.

Q     Okay.   And so was that a deal that you did the due diligence on?

A     No.

Q     Who did the due diligence on that deal?

A     As I mentioned before, I'm a little bit

dyslexic, and maybe some of the due diligence I did, but I have participants, obviously, to mitigate risks.  I work with -- I try to work with the most trustworthy participants, and they assist me in giving me an opinion.

I'll send them the financials.  They'll review them.  They'll get on the phone -- I'm a big phone guy.  Look at my e-mails.  I'm not the best speller.  And give me an opinion on whether they think it's a good idea, and I'm kind of like a broker.  That's really what I am.

Spin was created to be a broker company. The only reason why I started funding is because of my Queen $1.3 dispute, which I'm like, Wow, if I'm participating on people's platforms, I need to kind of take some collateral, too, and protect my interests, so be a broker on my own platform.  Yeah, that's what happened.

Q    All right.  So do you recall who told you to reach out to Mr. Zankl, how that contact took place?

A    I don't remember.  I don't recall exactly, no.  I have people who send me deals.  Probably some funder sent me the deal.

Q    But you reached out to him.  He didn't

Avrumi Lublin

88

reach out to you, correct?

A   Correct.

Q   Did Yoel Getter have anything to do with the initial Spin contract with Excell in June of 2021?

A   I'm not saying he's the one that sent me the deal.  I don't think it was him, actually, but Yoel had the deal submitted to him.  I think he actually had docs signed on it with Hi Bar -- or docs out, and I maybe used that to my advantage to get the deal done, but that's the only --

Q   Okay.  So --

A   I'm a broker.  I knew there was an offer out, like, let's say, there's a real estate purchase, so whatever intent to buy at this price.  You're aware of it.  You'll make a bid for it higher.

Q   Okay.  So to the best of your recollection, at the time that you were negotiating with Mr. Zankl, you believed that Hi Bar was attempting to acquire that financing with Excell and that you got ahead of them and closed the deal?

A   I'm a broker.  That's a broker's job.

Q   I'm just trying to find out what happened.

A   Yeah.

Avrumi Lubin

100

Q   Okay.  So in June, a million dollars would have been paid to the merchant, correct?

A   A million dollars, minus any fees the merchant agreed to pay.

Q   All right.  But the gross --

A   Yeah.

Q   -- funding in the June one was a million, and then there was some number of -- there was some number of a purchase amount, correct?

A   Yeah.

Q   Okay.  Was the purchase percent in the June transaction -- was that 20 percent?

A   I don't recall.

Q   And do you recall who did the due diligence for the June transaction?

A   I do not recall.

Q   Do you recall --

A   It might have been a few participants.

Q   What documents were provided to Spin Capital to consider whether or not it should enter into the June MCA with Excell?

A   I don't recall, but I'm assuming bank statements, maybe tax returns.  I have to -- yeah, I don't recall.

Q   Who would have requested the merchant to

Avrumi Lubin

104

agreement.

Q    All right.  But the document defines what default is, correct?

A    Yeah.

Q    And so now we have a second agreement that was entered into in July.  When that second agreement was entered into in July, did that agreement supercede the June agreement?

A    No.  It was an additional agreement.

Q    All right.  So, then, there were two agreements, and payments were due under both agreements, correct?

A    Correct.

Q    All right.  Now, do you know whether or not Excell ever defaulted on the July agreement?

A    I just -- no.  I don't think he defaulted on the July agreement.

Q    All right.  Do you know whether or not Spin or any of its participants were given any due diligence documents prior to the July agreement?

A    Spin was not participating in the July agreement.

Q    Sorry?  You're saying there was a July agreement with Excell that Spin had nothing to do with?

Avrumi Lubin

105

A       Did I not say it clearly?

Q       You told me that there were three agreements between Spin and Excell; June, July and August.

A       Then I'm telling you that Spin was not participated in the July agreement.

Q       Oh, okay.   Who were the parties to the July agreement?

A       That goes back to Bernie instructing me not to answer, but it wasn't Spin or Hi Bar.

Q       Was there a contract in July, a Revenue Purchase Agreement, between Spin and Excell in July?

A       Yes.

Q       Okay.   All right.   So I think we're confused here.

So there was a Revenue Purchase Agreement between Spin and Excell in July, right?

A       Yes.   And Spin and Hi Bar did not participate in that agreement.

MR. EGOZI:   Mr. Lubin, just answer the question.

BY MR. BRESLIN:

Q       Okay.   So what you're saying is is that Spin entered into a Revenue Purchase Agreement with Excell in July, but that Spin did not fund it.

There were other parties that funded it other than Spin and Hi Bar, correct?

A    And Spin was the mere broker, correct.

Q    Okay.   And the contracting party?

A    Yeah.   I don't know.   That's a legal question.

MR. BRESLIN:  All right.  This is good time to take a break.  It's 12:30.  Ms. Court Reporter, is a half an hour okay for you?

THE COURT REPORTER:  That's fine. Whatever is good for everybody.

MR. BRESLIN:  Okay.  I need to take care of a couple of matters.  I'll see everyone back here at 1:00 .

MR. EGOZI:  Thank you.

THE VIDEOGRAPHER:  We're going off the record at 12:31 p.m.

(Thereupon, a recess was taken.)

THE VIDEOGRAPHER:  We're going back on the record at 1:02 p.m.

BY MR. BRESLIN:

Q    Mr. Lubin, have you spoken to anybody during the break about your testimony today other than your attorney?

A    No.

Avrumi Lubin

109

MR. BRESLIN:  I understand, and you're telling him, if you know, and don't answer it a certain way.

Just please let him answer.  He can speculate.  He can give his opinions.  He can do whatever he wants.  You can object, and if it's ever going to be used at trial, you can try to keep it out.

MR. EGOZI:  I said, don't speculate.  I simply want him to truthfully answer your question.

MR. BRESLIN:  And I would like that, as well, but please don't instruct him how to answer a question, okay?  Fair enough?

MR. EGOZI:  We're not doing that.

BY MR. BRESLIN:

Q    So this transaction was substantially more than the June transaction and the July transaction, correct?

A    Yes.  Substantially --

Q    Well, this is for $2 million, and the other ones were for considerably less than that, correct?

A    Yes.

Q    Okay.  So what due diligence did Spin do

Avrumi Lubin

110

prior to entering into this contract?

A    Spin did not do the due diligence.  I likely either did a bank log-in or had someone else -- one of the participants do a bank log-in, or Zankl sent me the statements, and I forwarded it to participants, and that's how it came about.

Q    How many participants were involved in this transaction?

A    I think four or five.

Q    Okay.  And would those participants be listed in your Orgmeter software?

A    Yes.

Q    Was Spin Capital a participant?

A    Yes.

Q    Were you personally a participant?

A    Yes.

Q    Was Hi Bar Capital a participant?

A    Yes.

Q    Okay.  How much was Hi Bar Capital's participation in this contract?

A    I believe 20 to 30 percent.

Q    Okay.  So when you say 20 to 30 percent, are you talking about of the purchase price?

A    I'm talking about both.  They're 20, 30 percent of the purchase price, and they're going

Q    Okay.  All right.

A    Maybe September, I think October. Whatever.  Around October, yeah.

Q    Okay.  So, now, you mentioned the name Shaya Baum, is that accurate?

A    Yes.

Q    And how did you know him?  On a personal level?

A    No.  He reached out to me a few times about this specific deal after Hi Bar already paid off the Spin obligation, but other than that, I don't think I ever spoke to him before that.

Q    All right.  So when did you become aware that -- well, was it the name Franklin that was used at the time, or was it called Wing Lake?

A    I don't know, but let's say, for this record, use them as the same name.  Whatever, if you say Franklin, it means either/or.  I don't know.

Q    All right.  Okay.  So I'll refer to them as Franklin.  I'm not sure what name they were using at the time.

So when did you become aware that Franklin had planned on funding Zankl and paying you off in full?

A    We just answered that.  Around October.

Avrumi Lubin

121

He was preventing me from filing a lawsuit.  Getting very frustrated.

Q     So at that time, and I don't have those text messages, just so you know, are you saying that you threatened Zankl with a lawsuit?

A     I don't know if I said the words that I'm going to sue him.  Good chance that I did, but, yeah, I was getting aggressive.  I'm like -- I just did a $2 million deal, and there's issues right away.  You tell me that there's wires sent, and they're not, but, yeah.

Q     At what point did you become aware that Franklin required a zero balance on the Spin debt for them to fund Zankl?

A     Franklin never required a zero balance on the Spin debt to fund.

Q     Okay.

A     We can go very deep into that.

Q     Yes, please.

A     Franklin sent a DocuSign for 600 and something thousand dollars -- and I may be off by a few dollars.  I sent a payoff letter to Zankl.  All the communications were with Zankl, and Zankl said he sent it to Franklin, which you have to assume based on the closing statement from the Franklin

docs that they did have that balance -- and we'll get into that in a second. And that balance letter referenced the August 31st agreement that you just mentioned.

Q Okay.

A Basically, I get a DocuSign directly from Franklin after I sent this balance letter asking for, I think it was, $2.2 million. Zankl said, can I get a discount? I said, if it's going to get paid within a week or two, sure, I'll discount a few hundred thousand dollars. Never got back to me on that.

A few days later, I get a DocuSign for 600K. I call him up and said, The balance is not 600K. What the hell is going on over here?

He tells me that Franklin is about to try to settle with me and sue me, and whatever, and they only want to pay me 600 grand. No, they're not going to sue you. He's like, just take -- because Franklin's interested is a first position lien, which I think maybe they thought was Spin's lien.

And I said, I can't sign this document. He says, How about transfer some of the balance to Excell Auto Sports and Service, which is not secured by Franklin, and I'll pay -- have Excell Auto Sports

Avrumi Lubin

123

and Service sell receipts to Spin paying off a portion of Spin's balance and then take the 600K from Franklin.

So I said, Send me the financials to Excell Auto Sports and Service.  Let me see if the company is eligible for a Revenue Purchase Agreement of $1.5 million, whatever the number would be, right?  The company needs to be eligible for it.

He was refusing to send me documents. Maybe like send me one month's statement.  I said, I need everything.  I need all the Wing Lake docs.  I need everything that has to go to my attorney.  I need all documentation.

Refusing, playing games, sending me a few documents.  He sent the closing summary for Franklin, which showed the same dollar amount that was on the assignment agreement, the 600K amount, and the cash collateral reserve, which is what they used to file a CRO in New York Court, and you can see a bunch of those on the record from Franklin against MCA companies, and that equals to about Spin's amount.  I'm like, This is a bunch of shenanigan's of Shaya Baum trying to screw me for -- them paying me only 600K for my balance or whatever, to settle it.

Avrumi Lubin

124

Q     Do you recall what your balance was at that time?

A     About 2.1 million, cash collateral reserve with the Spin payoff equaled about $30,000 more than my balance, which is on the New York stock -- you need to have that in order to get a CRO.

And I said, I can't sign this.  Look at my messages.  I did send it to an attorney.  I said, I can't -- I don't know Excell Auto Sports and Services -- they're not giving me the financials.  I can't underwrite.  I don't know if it's eligible for a $1.5 million MCA, and it appears it wasn't.  It appears the revenue is way too low.

And I said, I can't, and I'm like, not only that, the UCC in the assignment is not Spin's UCC.  It says West Lake or some other company.

I said, What the hell is going on over here?  They amended the assignment agreement a bunch of times, and Zankl is begging me to sign it, saying, If you don't fund it, the deal is off the table.  I said, There's nothing I can do about that. I said, I'm not going to sign something I'm not comfortable with signing.

It's very, very simple.  I said, you can call Franklin and tell them that Spin doesn't mind

Avrumi Lubin

125

giving them the first position -- Spin agrees -- we don't mind being first position.  We do second, third, fourth, fifth.  It doesn't matter.  A lot of times when you do UCC searches.

Spin doesn't mind being injury to Franklin on Excell.  We'll give them the UCC for free, like, if they're not going to pay me off my full balance and they're going to try to settle, I'm not interested in that.  I'm not looking to get sued by them.  I'm not interested.  Give it to them for free.  He reached out and he said they'll do that.

I said, okay, no problem.  They send me an assignment of obligation for zero dollars of two MCA agreements that were already paid off, which Franklin had full knowledge that those MCA agreements were paid off.  They send a balance letter that showed -- a third one that specifically left it out with trick language, typical Shaya Baum move, and, basically, assigning two zero-dollar balances for zero dollars.  The UCC field was left blank.  I'm like, how does it benefit them?  I'm not sure, I think the UCC may have been filed incorrectly, and I said, I can't sign this.  It's just -- it said in the suit provisions, I'm not a lawyer, but the suit provisions, it was assigning

Avrumi Lubin

126

all rights and obligations of Spin -- do you want me to stop?

Q     Please continue.

A     It said it was assigning all rights and obligations -- there was funny language in there.  I don't know if it was enforceable language or not.  I said, I'm not fucking signing this.  I told -- excuse my French -- I told Zankl, I can't sign this unless they modify the language.  They modified it like six, seven times.  I wish I had those documents.  They voided them out, so I can't even get them in DocuSign.

And, then, it came to a point where like -- like I spoke to Zankl.  I said, If you want, I can reach out to a company and see if they're willing to do the deal, being second position, if they don't mind, and see if I can get it.  It's a business decision.  Can I get some other company to pay off this Spin obligation?

In my view -- and I'm a super-cautious, paranoid guy that runs a lot of things by attorneys, I don't want to unintentionally assign a $2.2 million balance for zero dollars.  It's common sense.  I don't think anybody would want to do that.

And pretty much Zankl agreed to do that

Avrumi Lubin

127

with a prepaid discount if he paid off -- I spoke to Hi Bar.  They said they were interested in the deal. There's allegedly $20 million in cars, and they're willing to do the deal for whatever, x dollar amount.

The deal -- Zankl signs the deal.  Hi Bar pays off Spin, and I believe Franklin funded the deal a few days later.  I don't know if they kept the $2.2 million in the cash collateral reserve.

Q    Okay.  So -- are you finished?

A    No, because you're going to ask me a lot more questions and it's going to go deeper, but go ahead.

Q    Yes.  I'm going to ask you a couple of questions.

Now, you talked about a Spin lien.  Had Spin filed a UCC on any of the MCAs that were signed in the summer with Excell?

A    I think it didn't, but at the time I thought it did.  I don't know if I did think -- I wasn't thinking about it.  I think it was a mistake, yeah, there was no UCC even when it was in default.

Q    So there are -- in your view, there should have been a UCC, but there was not?

A    I don't know if there should have been a

Avrumi Lubin

128

UCC, but probably after the payments started bouncing, there probably should have been one filed.

Q    Okay.  So it was your policy once payments bounced --

A    There's no policy.  It's a deal by deal basis.

Q    All right.  And you mentioned that Franklin wanted from Spin a document saying that Spin was not owed any money, correct?

A    No.

Q    What did Franklin want from Spin exactly?

A    Franklin wanted --

MR. EGOZI:  Objection.

THE WITNESS:  Franklin wanted from Spin their first priority UCC, and they don't give a -- they don't care if it's junior positions, and then after they get their first position UCC, they probably had intentions to maybe --

MR. EGOZI:  Mr. Lubin, don't speculate on whatever anybody else --

BY MR. BRESLIN:

Q    Yeah.  I only want to know what you know, and Franklin was requiring documents from you and Spin that you did not want to give them, correct?

A    What?

Avrumi Lubin

129

Q    Franklin wanted Spin to give them documents that you refused to give them, correct?

A    No, that's not correct.  What documents did I refuse to give Franklin?

Q    Well, you said they wanted an assignment, and they wanted all these other documents that they sent to you, they wanted you to sign, and you refused to sign them?

MR. EGOZI:  Objection to form.

THE WITNESS:  You're talking about the assignments, assignment agreement?

BY MR. BRESLIN:

Q    Yes.  I'm talking about whatever you were talking about.

A    I refused to sign them because of the language in there.

Q    Okay.  Ultimately, you did sign an assignment, though, correct?

A    After they modified it seven, eight times.

Q    Okay.  All right.  So there came a time when the Spin debt was paid off by Hi Bar, correct?

A    Correct.

Q    Okay.  And was if after the Spin debt was paid off by Hi Bar that you gave an assignment of whatever rights you had against Excell to Franklin?

Avrumi Lubin

130

A   I gave them an invalid assignment form because that UCC never existed, which I didn't know at the time.   It was a mistake.

Q   Okay.   So I'm going to show you a document, and I'm going to ask you if you recognize it.   So I'm showing you Plaintiffs' Deposition Exhibit 11.   It starts at Page 2105, and this is an Assignment of Obligations and Merchant Documents, and this is dated November 1st, 2021, by Spin Capital to Franklin Capital Group, and it says the total amount of outstanding obligations is one dollar.

(Thereupon, Plaintiffs' Exhibit 11 was marked for identification.)

BY MR. BRESLIN:

Q   Do you see where it says that?

A   Yeah.   Wait.   The total amount of outstanding obligations, it's referring to those two purchase agreements.   Those were zero dollars way before October 21st, as of August 30th, but, yeah.

Q   Okay.   It says the total amount of the outstanding obligations as of October 21st is a dollar.

A   Yeah.

Q   Okay.   So this document is representing to

Avrumi Lubin

253

Bernie, you, as well.

Ms. Court Reporter, I will take a copy. Ms. Videographer, we will likewise take a copy of the video.  So normal delivery.  No rush is needed.

MR. EGOZI:  I know we aren't completed, but we will read, just so that's on the record.  We will wait to take a copy until the next session is done and read all at once, so, Donna, you can put that on there, and thank you, Donna, for working so hard, and everybody have a great weekend.

MR. BRESLIN:  Thank you, again, Mr. Lubin, and thank you all that appeared today, and all have a great weekend.

THE VIDEOGRAPHER:  We are going off the record at 5:07 p.m.

(Thereupon, the deposition was adjourned at 5:07 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA      )

COUNTY OF BROWARD      )

     I, DONNA MEYERS, Notary Public in and for the State of Florida at Large, do hereby certify that Avrumi Lubin, personally appeared via videoconference on this 15th day of March 2024.

     Identification Produced:  Driver's License

     WITNESS my hand and official seal this 30th day of March 2024.

_Donna Meyers_

Donna Meyers
Court Reporter, Notary Public
Commission # HH010200
Expires August 13, 2024

Avrumi Lubin

255

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA          )
                          )  SS:
COUNTY OF BROWARD          )

I, DONNA MEYERS, Court Reporter and Notary Public for the State of Florida at Large, do certify that I was authorized to and did stenographically report the deposition of Avrumi Lubin; and that the foregoing transcript, Pages 1 through 255 is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, of any of the parties, nor relative or employee of such attorney or counsel, or financially interested in the foregoing action.

This certification does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the reporter.

Dated this 15th day of March 2024.


Donna Meyers

Donna Meyers