UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:

                                              Case No.: 22-12790-EPK

EXCELL AUTO GROUP, INC.                Chapter 7

       Debtor.
_____/
NICOLE TESTA MEHDIPOUR,
as Chapter 7 Trustee for Excell Auto Group, Inc.

               Plaintiff,

                                   Adv. Pro. No. 22-01132-EPK

v.

HI BAR CAPITAL, LLC, *et al*.,

               Defendant(s).
_____/

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY**
**JUDGMENT AGAINST HI BAR CAPITAL, LLC AND SPIN CAPITAL, LLC**

Nicole Testa Mehdipour ("**Plaintiff**"), chapter 7 trustee of the estate of Excell Auto Group, Inc., by and through undersigned counsel, pursuant to Federal Rule of Civil Procedure 56, made applicable by Federal Rule of Bankruptcy Procedure 7056, files this partial motion for summary judgment and, in support, states as follows:

## Summary of Argument and Relief Sought

1.      Partial Summary Judgment is requested in Counts 1through 4 and 18 through 27. The Spin Contracts and the First Hi Bar Contract are criminally usurious loans which are void under New York and Florida law, based upon the totality of the circumstances, including the absence of risk shifting of risk from the Debtor to Spin and Hi Bar.  The choice of law provision is void and the principal and interest are forfeited.

2.      Plaintiff is entitled to avoid the obligations, and transfer of property, under the Hi Bar Transfer Agreement, the First Hi Bar Contract and the First and Second Settlement Agreements, including the releases,  as fraudulent under both actual and constructive fraud theories pursuant to 11 U.S.C. § 548(a)(1)(A) or (B) and 11 U.S.C. § 544(b) and obtain a money judgment for all amounts paid to Spin and Hi Bar under 11 U.S.C. § 550(a).

3.      Alternatively, the Plaintiff, in Counts 26 and 27, is entitled to avoid and recover the preference payment of $1,500,000.00 transferred to Hi Bar within 90-days of the Petition Date as payment under the First and Second Settlement Agreements which was for an antecedent debt allowing Hi Bar to recover more than it would have in this chapter 7 case.

## I.    Jurisdiction and Summary Judgment Standard

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (E), (H), and (O).

5.      The summary judgment standard, including shifting burdens, is set forth in this Court's opinion in *BioEnergy Plus, Inc. v. Lenaburg (In re All. BioEnergy Plus, Inc.)*, Nos. 18-23071-EPK, 18-1451-EPK, 2019 Bankr. LEXIS 1473, at *7 (Bankr. S.D. Fla. May 10, 2019).

## II.   Procedural History

6.      April 8, 2022, is the petition date (the "**Petition Date**") [Bankr. ECF No. 1][1]. Nicole Testa Mehdipour is the duly appointed Trustee and Plaintiff in this case. [Bankr. ECF No. 2].

7.      On March 27, 2024, the Plaintiff filed a *Second Amended Complaint* [ECF No. 75]. On April 24, 2024, an answer was filed by Hi Bar Capital, LLC ("**Hi Bar**"), Yisroel Herbst ("**Y. Herbst**"), Mordechai Dov Ber Herbst ("**M. Herbst**") [ECF No. 90].  On May 17, 2024, an answer was filed by Spin Capital, LLC ("**Spin**") and Avrumi ("Josh") Lubin ("**Lubin**"). [ECF No. 102].

## Legal Basis for Summary Judgment in Favor of Plaintiff

### A.   Florida's Usury Laws Apply

8.      Florida makes it a crime to charge, take, or receive interest at a rate more than 25% per annum Fla. Stat. § 687.071(2) and (3), unless the loans are specifically authorized by law.  The Spin Contracts and the First Hi Bar Contract are void and unenforceable under New York law.

9.      Florida's substantive, statutory usury laws apply because it is neither arbitrary nor fundamentally unfair to apply Florida's law. [2] *See Franchise Tax Bd. V. Hyatt*, 538 U.S. 488 (2003). A claim for usury arises under Florida's usury statute rather than under the Agreement itself.  The duty to not commit usury is a statutory obligation as opposed to an obligation arising under an agreement.  *Hagshama Fla. 8 Sarasota, LLC*, 327 So. 3d 926, 935-36 (Fla. 3d DCA 2021).

---

[1] "ECF No. __" refers to documents filed in the above captioned adversary proceeding.  "Bankr. ECF No.__" refers to documents filed in the main bankruptcy case, 22-12790-EPK.
[2] Capitalized terms not otherwise defined shall have the meaning ascribed in the Second Amended Complaint [ECF No. 75].

10.      The Debtor was a Florida corporation with its principal place of business in Florida. **(admitted by Spin [ECF 102, ¶ 17])**.  No one from the Debtor ever travelled to New York to negotiate or execute the Spin Contracts or First Hi Bar Contract as each was sent electronically via DocuSign to the Debtor in Florida.  SMF, pp.2-3 and 7, ¶¶ 6-7 and 30-31, and Ex. 5; Ex. 7, Ex. 10, Ex. 17, Ex. 18, Ex. 19, and Ex. 21.

11.      The performance ("Remittance") took place in and subject matter (the "Receipts" and other collateral) of the Spin Contracts and First Hi Bar Contract all were located in Florida. Ex. 5; Ex. 7, Ex. 10, and Ex. 21.   The Debtor's bank accounts are in Florida.  Ex. 32.  Hi Bar funded and received payment through its Optimum Bank Account ending xx2968, which is located in Florida. Ex. 22, Ex. 34, and Ex. 35.  Spin also funded and received payments in its account at Optimum Bank. *See* Ex. 32, pp. 31 and 83.

12.       Lubin on behalf of Spin and Lubin and Yoel Getter on behalf of Hi Bar both engaged in collection activities in Florida with respect to the Spin Contracts and First Hi Bar Contract.  Ex. 3, p. 1, ¶ 1, p. 50, ¶¶ 327-329; Ex. 25 (A. Lubin Dep. Tr., p. 163/Lines 11 –25, March 15, 2024).  Accordingly, application of Florida's usury laws is neither arbitrary nor fundamentally unfair.

13.      Loans that are criminally usurious under a New York choice of law provision cannot be considered loans that are "otherwise specifically allowed by law" for purposes of Fla. Stat. § 687.071(2), (3), and (7).  As such, Plaintiff is entitled to recover all principal and interest payments made by the Debtor to Spin or Hi Bar, plus attorneys' fees and costs. *Lopez v. Mel-Mont Med, LLC*, Case No. 1111, 2024 Fla. App. LEXIS 8083 at*2 (Fla. 3d DCA Oct. 16, 2024).

**B.      <u>The Spin Contracts and First Hi Bar Contract are Criminally Usurious Loans under New York Law</u>**

3

14. The Spin Contracts and First Hi Bar Contract constitute criminally usurious loans under New York Law. The First Hi Bar Contract has a New York choice of law provision, so that is the starting point of the analysis.

15. Under long established New York law, "substance-not form-controls" in determining whether a transaction is a loan and is "considered in its totality and judge by its real character." *See Zanfini v. Chandler*, 197 A.D.3d 594, 595, 153 N.Y.S.3d 77 (2d Dep't 2021); *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y. 3d 320, 334 (N.Y. 2021) (*citing Dry Dock Bank v. American Life Ins. & Trust Co.*, 3 N.Y. 344, 354 (N.Y. 1850)). The primary focus is the allocation or transfer of "market risk," from the seller to the buyer, wherein the buyer takes the risk of non-payment by the account debtor instead of lender only bearing the risk that the account debtor's non-payment will leave the borrower unable to pay. *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247 (S.D.N.Y. 2022). *See also Adar Bays*, 37 N.Y.3d at 334 ("[P]arties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders."). Nowhere in any case law or statute are MCA contracts excluded from this analysis, substance controls. While New York Courts consider the three factors in *LG Funding, LLC v. United Senior Properties of Olathe, LLC*, 181 A.D.3d 664, 122 N.Y.S.3d 309 (2d Dep't 2020), the factors are not exclusive nor determinative and a totality of circumstances must be considered.

16. Under the totality of the circumstances, each of the Spin Contracts and First Hi Bar Contract is a criminally usurious loan under New York and Florida law, charging interest exceeding 25% per annum, the maximum allowable under New York law. N.Y. Penal Law § 190.40. Therefore, under New York law each of the Spin Contracts and First Hi Bar Contract is void, including the choice of law provision. *Adar Bays, LLC*, 37 N.Y. 3d at 323-24 and 331-333.

> i. **The Sole "Risk" Borne by Spin and Hi Bar is Non-Payment by Excell and is Not Predicated on the Performance of any Account Debtors or <u>Customers</u>**

17.     The Debtor always remained liable for the full "Purchased Amount" and "Remittance Amounts" from inception until the entire "Purchased Amount" was remitted to Spin or Hi Bar.  Ex. 5, Ex. 7, Ex.10 and Ex. 21. The Spin Contracts and First Hi Bar Contract do identify actual receivables or other property interests that would be required to be turned over to Spin or Hi Bar.  Ex. 5, Ex. 7, Ex.10 and Ex. 21.

18.     Facially, the terms of each of the Spin Contracts and First Hi Bar Contract evidence the Debtor's retention of risk, including but not limited to: (i) "[Spin or Hi Bar] is entering this Agreement knowing the risks that [Debtor's] business may not perform as expected or fail, and …[Spin or Hi Bar] acknowledges that it may never receive the Purchased Amount if the [Debtor] does not generate sufficient revenue, Ex. 5, Ex. 7, Ex.10 and Ex. 21, p. 1, ¶ unnumbered; (ii) making the Debtor responsible to ensure that the "agreed Remittance to be debited by [Spin or Hi Bar] remains in the Account[,]" *see* Ex. 5, Ex. 7, Ex.10 and Ex. 21, p. 1, ¶ unnumbered, and (iii) "to secure [the Debtor's] obligations" grant Spin or Hi Bar a security interest in "all accounts…and inventory, all proceeds therefrom, and all funds at any time in the Merchants' and/or Guarantor(s)(s) [sic] Account, **regardless of the source of such funds**," and "if any time there are insufficient funds in the Merchant's Account to cover [Spin or Hi Bar's] entitlements under this agreement, [Spin or Hi Bar] is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets." Ex. 5, Ex. 7, Ex.10, and Ex. 21, p. 5 (emphasis added).

19.     The "risk" that the Debtor would "not generate sufficient revenues" to repay its obligation to Spin or Hi Bar is the risk every <u>lender</u> takes when issuing a loan to a borrower.  It is

the derivative risk discussed in the applicable case law.  *Haymount*, 609 F. Supp. 3d at 247; *Adar Bays*, 37 N.Y.3d at 334.

20.     The actions of Lubin on behalf of Spin and Hi Bar evidence that Spin and Hi Bar were looking solely to the Debtor to recover the "Purchased Amount." *See* Ex. 3 and Ex 4.  When there was a missed payment Lubin sent Scott Zankl messages looking for a wire to clear up the payment, showing up at the dealership to meet with Scott to resolve the delinquencies, and eventually threatening litigation and causing a lawsuit to be filed by Hi Bar. Ex. 3, pp. 36- 43, ¶¶ 227 -234, 237-246, and 251-277, p. 48-51, ¶ 315-340, pp. 59-77, ¶¶ 387-516, p. 96, ¶¶ 637, 639, 641-42, p. 99, ¶ 664, pp. 100-108, ¶¶ 672 - 731, pp.109- 110, ¶¶ 743-745, 750, pp. 111-114, ¶¶ 751- 770; and Ex. 4.

21.     Spin and Hi Bar's risk is always "derivative or secondary" in that the Spin and Hi Bar's risk is not based upon the performance of account debtors or customers, but only risk that the "account debtor's" non-payment will leave Excell unable to pay.  *See Haymount*, at 247. *Accord Adar Bays*, 37 N.Y. 3d at 334.

### ii.  The Debtor was in Default Immediately Upon Execution of Each of the Spin Contracts and First Hi Bar Contract

22.     Prior to entering the First Spin Contract, including the initial "cold-call" or message from Lubin to Scott Zank, Spin identified 4 other MCA contracts to which the Debtor was a party, and yet continued to negotiate and enter the First Spin Contract, requiring the Debtor to use Spin's form agreement.  *See* Ex. 3, ¶ 1, pp. 6 -10, ¶¶ 41, 45, 49, 55-56, and 61-64.  In addition, there were filed UCC-1 financing statements providing notice of existing liens on the Debtor's inventory and accounts receivable. *See* Exs. 37-40.

23.     Likewise, when the Debtor entered into the Second Spin Contract and Third Spin Contract, Spin knew the Debtor had other MCAs and other loans outstanding, including U.C.C.

filings. Ex 3, pp. 6 -10, ¶¶ 41, 45, 49, 55-56, and 61-64; p. 39, ¶ 244, p. 47, ¶ 308; and p. 71, ¶ 467. In fact, Spin did not care about senior liens. Ex. 25 (A. Lubin Dep. Tr., p. 124, Line 24 – p. 125/Line 4, March 15, 2024) ("We do second, third, fourth, fifth. It doesn't matter.").

24.     The First Hi Bar Contract was entered into by Scott Zankl, through the Debtor, and Josh Lubin, through Spin and Hi Bar, to induce Wing Lake to close and fund the Wing Lake Refinance in an attempt to get Spin paid its outstanding interest on the Third Spin Contract. SMF, pp. 5 -8, ¶¶ 19-36 and **Ex. 3, pp. 75-76, ¶¶ 502-504, p. 79, ¶ 529, pp. 89-90, ¶¶ 583-596; Ex. 13 (Aff. S. Zankl, p. 1, ¶¶ 7, 9- 14, March 29, 2022); Ex. 14, p. 1-2; Ex. 15, p. 1, ¶ 1-7; Ex. 25 (A. Lubin Dep. Tr., p. 120/Line 22 – p.130/Line 3, Mar. 15, 2024), Ex. 18, Ex. 19, Ex. 20, Ex. 21, and Ex. 23, p. 2 (e-mail on 5.1.23 at 3:42:44PM).**

25.     Going into the First Hi Bar Contract, it is clear that Hi Bar knew the Debtor had other outstanding obligations and that all assets and "receipts" were not free and clear from encumbrances, as Lubin on behalf of Spin reached out to Hi Bar to see if Hi Bar would be willing to sit in second position, which Hi Bar agreed to do.  **Ex. 25 (A. Lubin Dep. Tr., p. 126/Line 4 – p.127/Line 9, Mar. 15, 2024).  *See* also Ex 3, pp. 75-76, ¶¶ 502-508, and pp. 79-99, ¶¶ 525-664, Ex.6, Ex. 8, and Ex. 11**.

26.     Notwithstanding this knowledge, Spin and Hi Bar required the Debtor to use and execute their form contracts, which contain the specific representation that the "[Debtor] has good, complete, unencumbered and marketable title to all Receipts and all collateral …free and clear of any all liabilities, liens, claims, … and encumbrances…" Ex. 5, Ex. 7, Ex. 10, p.5, § 2.10, and Ex. 21, p. 3, § 2.10.

> **iii.  The Reconciliation and Adjustment to Remittance Provisions are Illusory**

27.     As a result of being in immediate default under each Spin Contract and the First Hi Bar Contract, any purported rights of the Debtor conditioned upon an "Event of Default" having not occurred were subject to Spin and Hi Bar's sole and exclusive discretion or could never be exercised and are illusory, including the Reconciliation and Remittance adjustment provisions in the Spin Contracts and First Hi Bar Contract.   *See* Ex. 5, Ex. 7, Ex. 10, and Ex. 21, p. 2, §§ 1.3 and 1.4.

28.     Even without the immediate default the reconciliation and remittance adjustment provisions are illusory, because while purporting to obligate Spin and Hi Bar to reconcile or adjust the remittance, there is no remedy or enforcement mechanism available to the Debtor if Spin or Hi Bar failed to do so.   *See* Ex. 5, Ex. 7, and Ex. 10, p. 4, generally and §§ 1.3 and 1.4, and Ex. 21, generally, and p. 2, §§ 1.3 and 1.4.

29.     The illusion is more profound in that there is no way for the Debtor to actually substantiate a basis to reconcile or adjust the remittance when Lubin and Scott Zankl just agreed upon a remittance amount completely unrelated to any actual financials of the Debtor.   *See* Ex. 3, p. 1 ¶¶ 1 and 6, p. 25-33, ¶¶ 155-202, p. 52, ¶¶ 344-345.

### iv.  Spin and Hi Bar's Rights upon Bankruptcy Filing

30.     The simple statement in the Spin Contracts and First Hi Bar Contracts, stating, "Merchant going bankrupt or going of business…in and of itself, does not constitute a breach of this Agreement[,]" is illusory, because, in the event of a bankruptcy filing, Spin/Hi Bar are provided expanded rights to collect against the Debtor's assets and are provided "recourse" otherwise unavailable to creditors and are contrary to the protections and underlying policy of the Bankruptcy Code.

31.     In each, the "Security Agreement and Guaranty of Performance" the Debtor "agrees" that the Spin Contracts and First Hi Bar Contract are "contract[s] of recoupment," thereby

expanding Spin and Hi Bar's rights by prioritizing their lien(s) and circumventing the automatic stay. Ex. 5, Ex. 7, and Ex. 10, p. 7, ¶ 3 (unnumbered), and Ex. 21, p.5, ¶ 3 (unnumbered). Additionally, if Spin or Hi Bar files a motion for stay relief, the Debtor "agrees not to contest or object" and "agrees to execute" any documents reasonably necessary to perfect and confirm the lien, security interest and right to setoff set forth in [the Spin Contracts or First Hi Bar Contract]. Astonishingly, Spin and Hi Bar are actually authorized to execute any instrument or document in the name of the Debtor during the bankruptcy proceeding. *Id.* (unnumbered).

32.        A bankruptcy filing also triggers the 8 "Protections Against Default," including the full uncollected Purchase Amount plus 30% for attorneys' fee and costs becoming immediately due and payable, enforcement of the Guaranty, all rights under Article 9 of the U.C.C., exercise all rights under the assignment of lease by the Debtor, and debiting any of the Debtor's deposit accounts. Ex. 5, p. 2-3; Ex. 7, p 2-3; and Ex. 10, p. 2-3, § 1.12 and Ex. 21, pp. 2-3, § 1.12, because the events of default are triggered, including insufficient funds in the account, a transfer of substantially all assets, and the deposit account is closed along with either an NSF or other code being returned. S*ee* Ex. 5, Ex. 7, and Ex. 10, p. 5-6§ 3(a), (d), (f), (h), (j), (k), (l), and (n), and p. 10 (Appendix A), ¶ C, and Ex. 21, pp. 3-4, § 3(a), (d), (f), (h), (j), (k), (l), and (n), and p. 8 (Appendix A), ¶ C.

> **v.    The Spin Contracts and First Hi Bar Contract were for Definite Time-Periods**

33.        Each of the Spin Contracts and First Hi Bar Contract sets forth a "Purchased Price" which is the amount of the loan. The "Purchased Amount" represents the principal amount of the loan plus interested.   The "Remittance Amount" is the weekly payment amount which is fixed. *See* Ex. 3, pp. 30-32, ¶¶ 184-202, Ex. 5, Ex. 7, Ex. 10, and Ex. 21, p. 1. The intended repayment period is easily calculated by dividing the "Purchased Amount" by the "Remittance Amount,"

which show 16 weeks for the First Spin Contract, Ex. 5, p. 1, 18.77 weeks for the Second Spin Contract, Ex. 7, p. 1, 19.98 weeks for the Third Spin Contract, Ex. 10, p. 1, and 21.19 weeks for the First Hi Bar Contract, Ex. 32, p.1.

34.    The 18.77-week repayment term for the Second Spin Contract is consistent with the time period Lubin stated to Scott Zankl in connection with the Second Spin Contract. Ex. 3, p. 30, ¶¶ 184-185.

35.    As stated above, the Debtor never had any rights under the Reconciliation or Remittance Adjustment Provisions.  Even if such rights existed, those rights were so filled with technical requirements that made such rights vague, speculative and impossible for the Debtor to enforce so that the only conclusion is that Spin and Hi Bar intended that the amounts set forth in the Spin Contracts and First Hi Bar Contract be repaid within the specific-time periods or be in default.

### vi.   Additional Indicia that Each MCA Contract was a Loan and Not a Sale

### 1.   A Default by One is a Default by All

36.    In the Spin Contracts and First Hi Bar Contract, the Debtor and all of the non-debtor entities are considered collectively one "Merchant."  Ex. 5, pp. 1-3; Ex. 7, pp. 1-3; and Ex. 10, pp. 1-3, and Ex. 21, p. 1, pp. 9-10. Therefore, all of the rights of the Debtor, to the extent that they actually existed, are lost if one of the non-debtor entities is in default, including obtaining loans, having sperate bank accounts, closing its business.

### 2.   No Upside to Spin or Hi Bar

37.    Neither Spin or Hi Bar had the ability to collect more than the "Purchased Amount," i.e., if the Debtor's business over the periods specified above quadrupled, Spin and Hi Bar are only ever entitled to repayment of the "Purchase Amount."  SMF, Ex. 5, Ex. 7, Ex. 10, and Ex. 21, p. 1, § introductory paragraph. *See Endico Potatoes v. CIT Group/Factoring Inc.*, 67 F.3d 1063, 1068

(2d. Cir. 1995) ("In determining the substance of the transaction, the Court may look to a number of factors, including … whether the debtor has a right to any funds recovered from the sale of assets above that necessary to satisfy the debt…") (citations omitted).

          **a. Spin and Hi Bar's Due Diligence was limited to Bank Statements and Tax Returns**

38.     Spin's due diligence was purportedly done by "participants" in each of the Spin Transactions and limited to bank statements, bank log-ins, and tax returns. **Ex. 25 (A. Lubin Dep. Tr., p. 86/Line 14-p.87/Line11, p. 100/Lines 14-24, p.104/Line18-p.106/Line 6, p.109/Line 21 – p.110/Line 6, March 15, 2024)**. Meanwhile, Hi Bar could not identify any due diligence conducted, or who the underwriters of its deals, including the First Hi Bar Contract were, because the underwriters purportedly work for Yoel Getter. Ex. (M. Herbst Dep. Tr., p. 47/Line 13 – p. 48/Line 2, and p. 118/Line11-120/Line22, Mar. 13, 2024).

          **3. <u>No Other Incidents of Ownership by Spin or Hi Bar</u>**

39.     Further, Spin and Hi Bar did not acquire any other incidents of ownership of the purportedly purchased Receipts, such as the authority to determine what collection actions to take, the authority to change the servicer, the authority to enter into a binding settlement with any account debtor, the right to assign any of the "receivables," the duty to maintain records relating to the receivables, or the burden of collection costs. **Ex. 5, 7, 10, and 21.** *See Fenway Fin., LLC v. Greater Columbus Realty, LLC*, 995 N.E.2d 1225, 1229-30 (Ohio Ct. App. 2013). In fact, Spin and Hi Bar required the Debtor to carry the burden of all collection costs. **Ex. 5, 7, 10, and 21, p. 1, intro paragraph and Appendix A**.

          **vii. The Spin Contracts and First Hi Bar Contract Violates New York's <u>Criminal Usury Statute and are Void</u>**

40.     The Spin Contracts and First Hi Bar Contract charge interest of between approximately 179% and 413%, well in excess of the 25% cap allowed under New York law. **Ex.**

**28 (Barbee Declaration, p. 6, ¶ 26 (citing Barbee Report at pp. 32-33 ¶ 97-98 a, Exhibits 5A and 5B)**.

41.     Since under the totality of the circumstances, the Spin Contracts and First Hi Bar Contract are each loans and the interest charged exceeds 25%, the First Hi Bar Contract is void, including the choice of law provision.  *See Adar Bays, LLC*, 37 N.Y.3d at 323-24 and 331-333.

     **C.**     **The First Hi Bar Contract, Hi Bar Transfer Agreement, First Settlement Agreement, and Second Settlement Agreement Including the Releases Can Be Avoided Under 11 U.S.C. § 548 and 11 U.S.C. 544(b) and Fla. Stat. §§ 726.105(1), 726.106(1), and 726.108(1)**

42.     Transfers and obligations can be avoided as either "constructively fraudulent" under Fla. Stat. § 726.105(1)(b) or 11 U.S.C. § 548(a)(1)(B) or having been made with the "actual intent to hinder, delay, or defraud" any current or future creditor under Fla. Stat. § 726.105(1)(a) or 11 U.S.C. § 548(a)(1)(A).  Each of the elements necessary to prove "constructive fraud" and "actual intent" are set forth in *In re Rollaguard Sec., LLC*. 570 B.R. 859, 870-871 (Bankr. S.D.Fla. 2017).

43.     For purposes of 11 U.S.C. § 544(b)(1), the triggering creditors that could have brought a claim under Chapter 726, Florida Statutes, include: (i) American Express (AMEX TRS Co., Inc.), *see* Proof of Claim No. 1, and (ii) Edward M. Brown, see Proof of Claim No. 9.

     **i.**  **Constructive Fraud**

          **1. The Debtor Incurred the Obligations in the Third Spin Contract, First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement**

44.     As detailed above, each of the Spin Contracts and the First Hi Bar Contract constitutes an obligation for the Debtor to repay the specified "Purchased Amount" to payable in installments equal to the "Remittance Amount."  Ex. 5, Ex. 7, Ex. 10, and Ex. 21, p. 1. *See also Midwest Holding # 7, LLC v. Anderson (In re Tanner Family, LLC)*, 556 F.3d 1194, 1196 (11th Cir.

2009) (applying the concept of a "claim" under the bankruptcy code to "obligation"). The First

Settlement Agreement acknowledges indebtedness of the Debtor to Hi Bar of $2,677,880.00 and

causes the Debtor to incur a greater obligation of $4,016,820.00. *See* Ex. 24, p. 1.   The Second

Settlement Agreement again created a new obligation between the Debtor and Hi Bar, obligating

the Debtor to pay Hi Bar $3,800,000. Exhibit 36, p. 1, ¶ 1.

### a. The Releases in the First Settlement Agreement and Second Settlement Agreement are Transfers of an Interest in Property of the Debtor

45.    The First Settlement Agreement and Second Settlement Agreement include releases

of claims against Hi Bar and related entities.  Ex. 23, p. 3, ¶ 6 ("Waiver of Purchaser's Liability")

and Ex. 35, p. 3, ¶ 6 ("Waiver of Purchaser's Liability").  A release of claims constitutes a transfer

of the Debtor's interest in property under Florida law and the Bankruptcy Code.  See Fla. Stat. §

726.102(14) ("Transfer" … includes …release.").  *See also e2 Creditors' Tr. v. Farris (In re e2*

*Commun's, Inc.)*, 320 B.R. 849, 856 (Bankr. N.D. Tex. 2004) (Holding that causes of action

constitute property and the release of causes of action is a method of "disposing of or parting with"

property and therefore a transfer).

### b. The Payment by Hi Bar to Spin and Debtor's Transfer of Money to Spin are all Transfers of the Debtor's Interest in Property

46.    The Debtor paid Spin $2,381,625.00 from Debtor's Chase Accounts ending xx3181

or xx3199, constituting an interest in property of the Debtor, on account of the Spin Contracts. *See*

Exhibit 31, Exhibit 32, and Composite Exhibit 42.

47.    In addition, the Hi Bar Transfer Agreement, which was signed simultaneously with

the First Hi Bar Contract, caused the purported advance of $2,114,312.50 from the First Hi Bar

Contract to Spin on account of the Third Spin Contract. SMF, pp. 7-8, ¶¶ 30-33, and Exs. 17, 18,

19, and 21.  *See Bank of Am., N.A. v. Mukamai (In re Egidi)*, 571 F.3d 1156, 1161 (11th Cir. 2009).

13

*See also Parks v. FIA Card Servs., N.A. (In re Marshall)*, 550 F.3d. 1251, 1254-57 (10th Cir. 2008) (holding that a transfer of loan proceeds constituted a preferential transfer). The Debtor became obligated to Hi Bar as a result of the First Hi Bar Contract. Ex. 21. The Debtor paid Hi Bar $2,200,000.00. **(Admitted by Hi Bar, ¶¶ 189 and 192)**. The Debtor exercised complete control over the use of the loan proceeds of the First Hi Bar Contract with the only condition being that the funds cannot be used for "personal, family, or household purposes," Ex. 21, p. 5, § 2.4. The Debtor's repayment of $2.2 million to Hi Bar caused diminution to the estate.

48.     Alternatively, the Hi Bar Transfer agreement constituted an obligation, wherein the Debtor was obligated to Spin to turnover the proceeds of a new loan agreement with Hi Bar.

### c.   The Debtor's Transfer of Money to Hi Bar is an Interest in Property

49.     Afterwards, the Debtor paid Hi Bar $2,200,000.00 from the Debtor's Chase Accounts ending xx3181, xx3199, or xx6901, constituting an interest in property of the Debtor. ECF No. 75, ¶ 192, and Hi Bar Answer [ECF No. 90, admitting ¶ 192 (Exhibit B to the SAC shows the cash receipts and cash disbursements made into and from the Debtor's Chase accounts ending xx3181 and xx3199, from or to Hi Bar.")].

### 2.   The Debtor made the Transfers or Incurred the Obligations Within the Applicable Two- and Four Year Periods Immediately Preceding the Petition Date

50.     All of the Transfers or Obligations to Spin and Hi Bar occurred on or after June 10, 2021, 10-months and 1 week prior to the April 8, 2022, Petition Date satisfying 11 U.S.C. § 548(a)(1) has a two-year statute of limitations (or "look-back period") and Fla. Stat. § 726.110(1) and (2) have a four-year period of repose. *See* Exs. 5, 7, 10, 17, 21, 24, 30, 31, 32, and 36.

51.     Accordingly, each of the Transfers occurred and Obligations were incurred within the time periods required under both 11 U.S.C. § 548(a) and Fla. Stat. 726.110(2).

### 3.  The Debtor Received Less Than Reasonably Equivalent Value in Exchange for the Transfers to Spin and Hi Bar

52.    The Debtor received less than reasonably equivalent value in exchange for the Transfers.

53.    The Bankruptcy Code and Florida law similarly define "value" for purposes of avoiding transfers as the receipt of property or satisfaction or securing of a present or antecedent debt of the debtor. *See Bakst v. United States (In re Kane & Kane)*, 2013 Bankr. LEXIS 1139 at *28-29 (Bankr. S.D. Fla. 2013) (*citing* 11 U.S.C. § 548(d)(2)(A) and Fla. Stat. § 726.104).

54.    When the transaction itself is absolutely prohibited by law it will rarely, if ever, constitute reasonably equivalent value. *Tabas v. Lehman (In re Capitol Invs., Inc.)*, 473 B.R. 838, 846 (Bankr. S.D. Fla. 2012) (The transaction involving gambling, illegal under Florida law, did not support value for the purposes of 548 or 550).   A loan that is criminally usurious is both illegal and void under New York and Florida law, *Adar Bays, LLC*, 37 N.Y.3d at 323-24 and 331-333, and subjects the lender to imprisonment. *See* N.Y. Penal Law §§ 70.00 and 190.40 and Fla. Stat. §§ 687.071 and 775.082 and Chapter 895, Florida Statutes.  If the interest rate is at least more than 2 times the state criminal usury statute, there are both criminal and civil remedies under federal law for the collection of an unlawful debt.  18 U.S.C. §§1961(6) – 1964.

55.    The Payments by the Debtor to Spin and Hi Bar on account of the Spin Contracts and First Hi Bar Contract, *See* Ex. 30 (admission of ¶¶ 189 and 192 by Hi Bar), Ex. 31, Ex. 32, and Ex. 42, provide less than reasonably equivalent, as they are void, criminally usurious loans, and the Debtor had no corresponding obligation satisfied on account of the payments.

56.    With respect to Hi Bar, since Spin sold and assigned the Third Spin Contract to Wing Lake effective prior to the Hi Bar Transfer Agreement and First Hi Bar Contract, when Hi Bar transferred the "Purchase Price" to Spin as a purported "refinance", the Debtor received less

than reasonably equivalent value in exchange for incurring the obligation to Hi Bar because there was no longer any obligation to Spin outstanding.  SMF, p. 6, ¶ 25, and Ex. 16. The attached order from the Michigan circuit court establishes that Spin transferred everything to Spin.  Ex. 43, p. 5 and 6.

57.    Likewise, the First Settlement Agreement is premised on an alleged default under the First Hi Bar Contract, a criminally usurious and void loan, for which no legal obligation from the Debtor existed.  The Debtor received less than reasonable equivalent value for incurring an obligation and transferring property of the Debtor on account of an obligation that was void and unenforceable. Included within the First Settlement Agreement was a release of the Hi Bar, and affiliates, from all causes of action.  Ex. 24, p. 3, ¶ 6.  The Debtor, likewise, did not receive reasonable equivalent value in exchange for releasing Hi Bar and affiliates from the claims.

58.    The Second Settlement Agreement then follows along and is premised on satisfying the same void and illegal obligations as the First Settlement Agreement.  Ex. 36, p. 3, ¶ 6. Therefore, the Debtor received less than reasonable equivalent value in exchange for incurring the obligations and transferring the claims by way of the release under the Second Settlement Agreement.

59.    Therefore, the Debtor received less than reasonably equivalent value in exchange for the Obligations incurred and the Transfers of the Debtor's property, including the release, given or transferred to Hi Bar.

**4.   <u>The Debtor was insolvent at the time of the Transfers.</u>**

60.    The Debtor was insolvent at the time of the Transfers and Obligations incurred to Spin and Hi Bar under the Balance Sheet Test. To determine whether a debtor is insolvent is to "compare the debtor's debt obligations with the debtor's assets, at fair value, as of the relevant date" (i.e., the "Balance Sheet Test"). *Mukamal v. Nat'l Christian Charitable Found., Inc. (In re*

*Palm Beach Fin. Partners, L.P.)*, 598 B.R. 885, 890 (Bankr. S.D. Fla. 2019); 11 U.S.C. §101(32)(A). If called to testify, Mr. Barbee would testify, consistent with the conclusions in the Expert Report, and that the balance sheet test evidences that the Debtor was insolvent each day from December 31, 2020 through the Petition Date. Ex. 28 (Declaration of Alan Barbee p. 5, ¶ 18 and Barbee Report, p. 30, ¶ 92 and Table 10).

61.     Accordingly, the Debtor was insolvent on the date of each of the Transfers and Obligations incurred. Therefore, the Transfers can be avoided as constructively fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(B) and Fla. Stat. §§ 726.105(1)(b) and 726.106.

### ii.  **Actual Intent**

62.     Actual intent is from the point of view of the Debtor (transferor) rather than the Defendants (transferees).

### 1.  **The Debtor's Incurring the Obligations and Transfers of Property were with done with the Actual Intent to Hinder, Delay or Defraud Creditors**

63.     In this case, Scott Zankl has admitted the Debtor's intent to hinder, delay, or defraud creditors, stating the Debtor continued to obtain new financing in 2021 and 2022 because "it still had to make payments to the investors that were in Excel[,]" Ex. 1 (S. Zankl 2004 Tr., p.57/Lines 9-25, June 6, 2022), even though the Debtor stopped making vehicle sales to individual end-user consumers and began selling vehicles to either Karma Palm Beach or Karma Broward at cost or at a loss.

64.     The Debtor's books are consistent with Scott Zankl's testimony, showing that no later than April or May 2021, the Debtor was being run as a Ponzi scheme or other revolving advance fraud, with the Debtor's primary business operations ceasing while continuing to incur obligations to repay existing investors.  Ex. 28 (Decl. of Alan R. Barbee, p. 6, ¶ 24 and Ex. A (Barbee Report), pp. 33-35, ¶¶ 100 – 102, Tables 14 and 15, and pp. 37-40, ¶¶ 107-120).

       2. **The "Badges of Fraud" Also Demonstrate that the Transfers Were Made and Obligations were Incurred to Hinder, Delay, or Defraud Creditors**

65.     "Actual intent" is generally determined by a totality of the circumstances considering the non-exhaustive "badges of fraud," including lack of reasonably equivalent value and "insolvency." *See Rollaguard Sec., LLC*, 570 B.R. at 878 and Fla. Stat. § 726.105(1)(a) and (2)(h) and (i).  Accordingly, the Plaintiff incorporates Section (i)(3) and (4), above.

66.     It is clear from the communication between Scott Zankl and Josh Lubin, that Scott Zankl on behalf of the Debtor was doing anything necessary to try and keep the Debtor's creditors from exercising any rights, including filing U.C.C.'s or lawsuits, which would cause the Debtor to collapse.  *See* Ex. 3, p. 19-21, ¶¶ 121-132, p. 116, ¶¶ 777-780, and Ex. 4, generally, and p. 52, ¶ 1126, p. 53, ¶ 1130, and p. 54, ¶ 1136. Included in these efforts was getting the Wing Lake Refinance closed to clear out some of the MCA Lenders who were being more aggressive than others. Ex. 13, ¶ 14. Scott Zankl worked with Lubin to move the Spin balance to Hi Bar, to induce Wing Lake to close on the refinance, while Spin could be satisfied in full on the Third Spin Contract and Lubin could Sign the Wing Lake Assignment Documents. See SMF, pp.5-6, ¶¶ 22-24, Ex. 4, pp. 52-54, ¶¶ 1126 -1137, Ex. 13, p. 1, ¶ 14; Exs. 15, 17, 21, 23, and 25.

    D.    **The Plaintiff is Entitled to Summary Judgment under 11 U.S.C. § 550(a) to Recover the $4,581,625.00 from the Defendants**

67.     According to 11 U.S.C. § 550(a) the Trustee is authorized to recover the property or value thereof transferred by the Debtor from the initial transferee or the entity for whose benefit such transfer was made or any immediate or mediate transferee. The Plaintiff can recover the value of the Transfers from any combination of the initial and subsequent transferees. S*ee In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1198 (11th Cir. 1988).

68.     In this case, the Debtor made the avoided fraudulent transfers directly to or for the benefit of Spin and/or Hi Bar via the Debtor's Chase deposit accounts ending xx3181, xx3199, and/or xx6109. Ex. 17, Ex. 18, Ex. 19, Ex. 21, Ex. 30 (Hi Bar Admits receipt of $2,200,000.00, ¶¶ 189 and 192), Ex. 31, Ex. 33, and Ex. 42.

69.     Therefore, the Plaintiff is entitled to a money judgment in the amount of $2,200,00.00, against the Defendants as initial transferee(s), mediate transferee(s), and immediate transferee(s).

**E.     The Plaintiff is Entitled to Summary Judgment on Counts 26 and 27 to Avoid and Recover the $1,500,000 Preference from Hi Bar under 11 U.S.C. § 550(a)**

70.     The Plaintiff is entitled to summary judgment on Count 26 and 27 to avoid and recover the $1,500,000 the Debtor transferred from its Chase accounts ending xx3181, xx3199, and xx6901 within 90-days of the Petition Date under 11 U.S.C. §§ 547(b) and 550. Ex. 30 and (Hi Bar Admits receipt of $2,200,000.00, ¶¶ 189 and 192).

71.     Prior to all transfers made within the 90-days, the Debtor had defaulted on the First Hi Bar Contract and entered the First Settlement Agreement, on which it also defaulted. Ex. 24 and 36. The payments were outside the ordinary course of business in that the terms changed because the Debtor defaulted and was delinquent in its payments to Hi Bar, and the Debtor's payments were not even consistent with the repayment terms of the First Hi Bar Contract or either settlement agreement. Ex. 24, Ex.30, and Ex. 36. *See In re Daikin Miami Overseas, Inc.*, 65 B.R. 396, 398 (S.D. Fla. 1986) and *FI Liquidating Trust v. C.H. Robinson, Co. (In re Fred's Inc.)*, 2025 Bankr. LEXIS 63 at *31 (Bankr. D. Del. Jan. 15, 2025) (citation omitted).

72.     The accelerated repayment schedules and the Transfers made by the Debtor to Hi Bar allowed Hi Bar to recover more than it would have in this Chapter 7 bankruptcy case, which

19

is currently administratively insolvent, and the Trustee does not expect a 30% distribution to creditors.

73.    Accordingly, the Transfers within 90-days of the Petition Date can be avoided as referential transfers under 11 U.S.C. § 547(b) and recovered from Hi Bar as the initial or mediate transferee of each avoided Transfer under 11 U.S.C. § 550.

**WHEREFORE**, the Plaintiff respectfully requests that this Honorable Court to (a) Enter Summary Judgment in favor of the Plaintiff on Counts 1 through 4 and 18 through 27; (b) Find that the Spin Contracts and the First Hi Bar Contract are criminally usurious loans under New York and Florida law; (c) Find that the Hi Bar Transfer Agreement, the First and Second Hi Bar Settlement Agreements are voidable by the Plaintiff as obligations and/or transfers under 11 U.S.C. § 548(a)(1)(A) or (B); (d) Enter a money judgment, under 11 U.S.C. §550(a) against Defendants in the amount of $4,581,625.00 plus prejudgment interest, post-judgment interest, and all taxable costs; (e) Enter a money judgment, under 11 U.S.C. §550(a) against Hi Bar in the amount of $4,581,625.00 plus prejudgment interest, post-judgment interest, and all taxable costs; (f) in the alternative, enter a judgment against Hi Bar in the amount of $1,500,000 as preferential transfer, under 11 U.S.C. § 547(b) and § 550(a), plus prejudgment interest, post-judgment interest, and all taxable costs.

Respectfully submitted this 20th day of January 2025.

FURR AND COHEN, P.A.
*Special Counsel for Trustee*
2255 Glades Road, Suite 419A
Boca Raton, FL 33431
Telephone: (561) 395-0500
Facsimile: (561) 338-7532

BY:    /s/ *Jason S. Rigoli*
        Alan R. Crane, Esq.
        Florida Bar No.: 0963836
        E-mail: acrane@furrcohen.com
        Jason S. Rigoli, Esq.
        Florida Bar No.: 91990
        E-mail: jrigoli@furrcohen.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via transmission of Notices of Electronic Filing generated by CM/ECF to those parties registered to receive electronic notices of filing in this adversary proceeding.

Dated: January 20, 2025.

By: */s/ Jason S. Rigoli*
        Jason S. Rigoli