UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

FILED-USBC, FLS-WPB
'25 FEB 3 PM2:48

In re:

CASE NO.: 22-12790-EPK

EXCELL AUTO GROUP, INC. Chapter 7
Debtor.

_____/

NICOLE TESTA MEHDIOUR,
as Chapter 7 Trustee for Excell Auto Group, Inc.
    Plaintiff,

v.                                                                    Adv. Pro. No. 23-01132-EPK

HI BAR CAPITAL, LLC, et al.
    Defendants.

_____/

<u>DEFENDANT AVRUMI LUBIN'S MOTION TO DISQUALIFY MATTHEW P. LETO, ESQ.
AND LETO LAWFIRM AS COUNSEL FOR HI BAR CAPITAL, LLC, MORDI HERBST,
AND YISROEL HERBST</u>

COMES NOW, Defendant, AVRUMI LUBIN a/k/a JOSH LUBIN ("Lubin"), moves

for the entry of a order disqualifying attorney Matthew Leto, Esq. and the Leto Lawfirm

(together, "Leto") from representation of Hi Bar Capital, LLC ("Hi Bar"), Mordi Herbst, and

Yisroel Herbst on the basis of a material conflict of interest adverse to the interests of

Spin Capital, LLC ("Spin") and Lubin caused by its concurrent representation of all the

parties. In support, Lubin states:

<u>CONFLICT SUMMARY</u>

The genesis of this matter originates in the concurrent representation undertaken

by Leto of Lubin, Spin, Hi Bar and Mordi and Yisroel Hebst (Mordi and Yisroel together,

"Herbst") in the matters *Nicole Testa Mehdipour v. Hi Bar Capital, et. al.*, U.S. Bankruptcy

Court for the Southern District of Florida Case No.: 22-12790-EPK and *Hi Bar Capital,*

*LLC v. Karma of Palm Beach, Inc., et. al.*, State of Florida Seventeenth Judicial Circuit Court for Broward County Case No.: CACE22-006401. The matters are defense of claims against the parties and prosecution of claims against third parties arising out of transactions related to advancing merchant cash funds to sellers of future receivables. Through a series of transactions, Hi Bar and Spin formed relationships where they syndicated the funding of the purchase of various clients future receivables or assigned contractual rights to one another under the purchase agreements and contracts. Leto agreed to accept a concurrent representation of the parties under that certain instrument entitled Authority to Represent dated August 1, 2023 ("Agreement").

Under the Agreement, Leto represented that,

> "It is understood that Joshua Lubin has agreed to pay all fees and costs associated with this representation pursuant to the terms of the Common Interest and Joint Litigation Agreement dated January 28, 2022, which is incorporated herein by reference. Furthermore, it is understood by Clients that the Common Interest and Joint Litigation Agreement provides Mr. Lubin with "the authority to prosecute and settle" the matters and unless terminated pursuant to Section 2(f). Finally, *counsel understands that Spin Capital and Josh Lubin have an interest in the outcome of this case*, and while not counsel of record in the case for Spin and Lubin, understands *they are a joint client for purposes of this case.*"

Leto further represented under the Agreement that,

> "As you know, the Firm represents more than one client in this matter. An undertaking by a lawyer to represent more than one client in the same matter is called a "joint representation." The applicable rules of professional responsibility permit the representation of more than one client in the same matter provided that, among other things, the lawyer *reasonably believes that he or she can adequately represent each client's interests competently and diligently and each client provides informed consent in writing to the joint representation.* Joint representation is, of course, not mandatory in this matter, and

you have the right to retain an attorney other than the Firm as your counsel.

We believe, based on the information furnished to us, that the Clients share a common interest with respect to the Engagement. Based upon the information provided to us about the facts of this matter, there does not appear to be an actual conflict among the Clients. *It is possible that, however, that, in the future, your goals, objectives and interests in the Engagement might change and become different from that the other Clients. This creates a potential conflict of interest in the Firm's representation of the Clients now and may create an actual conflict of interest in the future*. You are entitled to counsel who does not face either a potential or actual conflict of interest. Should you wish to retain the Firm, each Client agrees to waive any potential and/or actual conflict of interest which arises from our Firm's joint representation of the other Clients.

Although we are not currently aware of any actual or reasonably foreseeable adverse effects of joint representation, it is possible that issues may arise in which our representation of you may be materially limited by our representation of the other Clients. And, you acknowledge that it is not possible to predict all of the conflicts which may arise in a matter where multiple clients are being jointly represented. If such circumstances arise, the Firm will evaluate whether continued joint representation is appropriate, as discussed below.

We understand that no Client objects to the Firm representing the other Clients in this matter and that, to the extent that any potential conflict may exist or appear to exist, each Client waives any such conflict. *Based on the information provided to us by you, and your expressed desire for joint representation, we have concluded that the Firm may appropriately represent the Clients in this matter at this time.* If at any time you have any concerns about the appropriateness of continued joint representation, you should let us know immediately so that we can reevaluate the Firm's continuing joint representation of the Clients. If we become aware of any such circumstances, we will do the same.

In the event that joint representation is no longer appropriate in the Firm's determination, including because of any adversity, dispute, conflict, or differing interests among the Clients, *you agree that the Firm may in its sole discretion withdraw from representing any of the Clients and may in its sole discretion continue to represent the other Clients in the Engagement*. In such scenario, each Client agrees not to

move to disqualify the Firm from continuing to represent the other Clients in any action related to the Engagement, nor will the client authorize any counsel they retain to move for such disqualification.

You also understand that if the Firm were to represent any Client alone in this matter, *it would not be able to share the information provided by the Client with anyone except as provided by law. However, when a law firm jointly represents multiple clients in a single matter, there is no privilege which may be asserted as between the clients*. You understand, therefore, that the Firm may elect, as it deems appropriate, to share information provided by you with the other Clients; but you further understand that the Firm may not necessarily share with you all of the information it receives from any other Client. *You agree that, should the Firm be discharged by you or should the Firm withdraw from representing you under any of the circumstances described in this Engagement Letter, any information previously acquired by the Firm from you may be used by the Firm in furtherance of its continued representation of the other Clients in this matter.*

Your signature below confirms that you have been given the option to consult with independent counsel concerning the conflict and joint representation issues discussed above and have had adequate time to do so, and further confirms that you waive any actual and/or potential conflicts of interest raised by the Firm's joint representation in this matter."

After the representation was undertaken by Leto of the parties, a dispute arose as to interests under the Common Interest and Joint Litigation Agreement dated January 28, 2022 ("CJLA") where Leto claimed that "Pursuant to the JDA, Spin Capital was obligated to pay for all litigation costs associated with various legal proceedings…….. Under the Fee Agreement with my law firm and the JDA, Mr. Lubin and Spin were obligated to pay all legal fees and costs incurred on behalf of Hi Bar and the Herbst's that were associated with the cases identified in the JDA and in the Fee Agreement……… Mr. Lubin expressly severed the attorney-client relationship with my firm and stated that he would no longer pay the legal fees and costs incurred by Hi Bar or the Herbst's in any action going

forward." Based on this conduct, Leto declared a breach of the CJLA and represented Hi Bar and the Herbsts declaring that Spin and Lubin was no longer entitled to certain benefits under the CJLA, a position which is material adverse to Spin and Lubin given Leto's representation that "Spin Capital and Josh Lubin have an interest in the outcome of this case" which are the benefits derived under the CJLA. There is a present conflict of material interests warranting disqualification of Leto from representation in this matter. Leto, after the conflict arose, never sought express waiver of representation from Spin and Lubin.

## ARGUMENT AND LAW SUPPORTING DISQUALIFICATION

The disqualification of counsel is an extraordinary measure that acts immediately to the detriment of the client by separating the client from chosen counsel. *Metrahealth Insurance Co. v. Anclote Psychiatric Hospital, Ltd.*, 961 F.Supp. 1580, 1582 (M.D.Fla.1997); *Fisons Corp. v. Atochem North America, Inc.*, No. 90 Civ. 1080(JMC), 1990 WL 180551, at *2 (S.D.N.Y. Nov.14, 1990). A court "must take care to preserve the delicate balance between a party's right to retain the counsel of his choice and the need to ensure adherence to the highest ethical standards for professional responsibility." *Fisons*, 1990 WL 180551, at *2 (citing *Emle Indust., Inc. v. Patentex, Inc.,* 478 F.2d 562, 564 (2d Cir.1973)). The burden of proof initially is on the moving party to establish grounds for disqualification. *Metrahealth*, 961 F.Supp. at 1582 (citing *Moyroud v. Itek Corp.*, 528 F.Supp. 707 (S.D.Fla.1981)). When the representation is concurrent, as in this situation, adverse representation is prima facie improper. *Cinema 5 Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir.1976). The standard for disqualifying of lawyers because of concurrent representation is more strict than the standard for adverse representation of a former

client. *Florida Insurance Guaranty Assn., Inc. v. Carey Canada, Inc.*, 749 F.Supp. 255, 260 (S.D.Fla.1990) ("FIGA"). Where attorneys have undertaken representation that is adverse to a current client, the conduct of the attorneys undertaking the concurrent representation must be measured against the duty of undivided loyalty to each of the attorneys' clients. *Cinema 5*, 528 F.2d at 1386; *FIGA*, 749 F.Supp. at 258–9. Conflicted attorneys must meet the heavy burden of demonstrating that there will be no actual or apparent conflict in loyalties or a diminution in the vigor of their representation. *Cinema 5*, 528 F.2d at 1387. The standards of professional conduct of the members practicing before this Court include the current Rules Regulating the Florida Bar. Southern District of Florida Local Rule 11.1.C; *FIGA*, 749 F.Supp. at 258.

Disqualification is inherently costly to the client of the disqualified attorney. Such costs include "the delay, inconvenience, and expense an innocent client may incur, as well as the deprivation of the innocent client's counsel of choice." *Id.* at *1 (citing *SWS Financial Fund A v. Salomon Bros., Inc.*, 790 F. Supp. 1392 (N.D. Ill. 1992)). The Court, therefore, must consider whether disqualification is "a desirable sanction" in light of the purposes of the violated rule. *Id.* "The two basic purposes of Rule 4-1.7 are (1) to protect confidences that a client may have shared with his attorney and (2) to safeguard loyalty as a feature of the attorney-client relationship." *Id.* at *1 (citing *Prudential Ins. Co. of America v. Anodyne, Inc.*, 365 F. Supp. 2d 1232, 1236 (S.D. Fla. 2005)).

Courts have presumed that an adverse effect results when an attorney takes a position adverse to a present client. See *Unified Sewerage Agency, etc. v. Jelco, Inc.*, 646 F.2d 1339, 1345 (9th Cir.1981); *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746 (2d Cir.1981). The duty of undivided loyalty entitles a client to "rely upon his [attorney's]

'undivided allegiance and faithful, devoted service.' " *Cinema 5*, 528 at 1386 (quoting *Von Moltke v. Gillies*, 332 U.S. 708, 725 (1978) (citations omitted)). The possible effects on the quality of an attorney's services on behalf of a client being sued by the attorney include diminution in the vigor of the representation of the client in the other matter and a deleterious effect on the attorney-client relationship. *International Business Machines Corp. v. Levin*, 579 F.2d 271, 280 (3d Cir.1978). Disqualification must be ordered when an attorney's multiple representation gives the appearance of representing multiple interests. *Cinema 5*, Ltd., 528 F.2d at 1387. However, "with rare and conditional exceptions, the lawyer may not place himself in a position where a conflicting interest may, even inadvertently, affect, or give the appearance of affecting, the obligations of the professional relationship." *Cinema 5, Ltd.*, 528 F.2d at 1386 quoting *Matter of Kelly*, 23 N.Y.2d 368, 376, 296 N.Y.S.2d 937, 244 N.E.2d 456 (1968). Even if a conflict were found to exist, disqualification is not mandatory. See *Great Amer. Ins. Co. v. General Contractors & Constr. Mngmt., Inc.*, 2008 WL 1994857, at *1-2 (S.D. Fla. May 6, 2008) ("It is well-settled that disqualification is not mandatory even after a finding that a law firm has violated a conflict of interest rule.").

Concurrent representation is regulated by Rule 4–1.7 of the Rules Regulating the Florida Bar, which reflects the heavy burden on the attorneys seeking to engage in adverse concurrent representations.1 Rule 4–1.7 states, "[a] lawyer shall not represent a client if the representation of that client will be directly adverse to the interests of another client, unless…(1) the lawyer reasonably believes the representation will not adversely affect the lawyer's responsibilities to and relationship with the other client; and (2) each client consents after consultation." Thus, Rule 4–1.7 prohibits concurrent adverse

representation unless the attorney obtains consent from each client and can demonstrate that their representation will not be impaired. The commentary to rule 4–1.7 further explains that "[a]n impermissible conflict of interest may exist before representation is undertaken, in which event the representation should be declined. If such a conflict arises after representation has been undertaken, the lawyer should withdraw from the representation. Where more than 1 client is involved and the lawyer withdraws because a conflict arises after representation, whether the lawyer may continue to represent any of the clients is determined by rule 4–1.9."

Here, the conflict between Spin, Lubin and Leto occurred after the representation of all of the parties by Leto commenced. Therefore, continued representation would be determined under rule 4-1.9. "Matters are 'substantially related' for purposes of this rule if they involve the same transaction or legal dispute, or if the current matter would involve the lawyer attacking work that the lawyer performed for the former client." Comment to R. Regulating Fla. Bar 4–1.9. A party seeking disqualification under rule 4–1.9 does not have to demonstrate actual prejudice to the former client as a result of the subsequent representation because the existence of an attorney-client relationship "giv[es] rise to an irrefutable presumption that confidences were disclosed." *K.A.W.*, 575 So.2d at 633–34. Leto had the responsibility, once the conflict arose, to seek a waiver of conflict and explain the conflict in detail in seeking the waiver. It did not do so. Leto's duty to protect his client's confidences continues even after that attorney-client relationship ends. R. Regulating Fla. Bar 4–1.6. Consequently, Rule 4–1.9 is intended to prevent an attorney from compromising those confidences by later representing a client with an adverse interest.

There is no protection for Leto under the Rules Regulating the Florida Bar. The interests are in in matters which are substantially related, to wit, the recovery of funds under assigned contracts related to the same futures receivables purchases which Hi Bar and Spin syndicated funding for and participated in. The CJLA and Agreement both relate to that relationship and contractual transactions. There is no difference in the fact patterns concerning the matter. The authority granted and benefits derived under the CJLA are the same interest the representation was undertaken under the Agreement. The representation was to enforce the CJLA and payment to Leto of fees related to litigation under the CJLA. Leto is now taking a position adverse to Lubin and Spin under a presupposed breach of the CJLA by Spin and Lubin. Leto has not withdrawn representation of Hi Bar and the Herbsts. There is no doubt that there is a conflict of interest here derived from the concurrent representation which Leto has engaged.

"Once the existence of an attorney-client relationship is established, an 'irrefutable presumption' arises that confidences were disclosed during the course of the relationship." *In re Weinhold*, 380 B.R. at 852(citing *State Farm v. K.A.W.*, 575 So.2d at 633). Because of the irrefutable presumption that client confidences were disclosed, the party seeking disqualification is not required to show that it suffers from an unfair informational disadvantage because of the attorney's current representation. Consequently, the existence of the prior attorney-client relationship, with its attendant presumption that client confidences were disclosed, is sufficient to entitle the moving party to the protection of the Rule. This court has the power and responsibility to regulate the conduct of attorneys who practice before it. *United States v. Kitchin*, 592 F.2d 900, 903 (5th Cir.1979). The court's power is essential to ensure both the quality of justice in the

Page **9** of **11**

immediate matter at hand and to maintain the public's trust in the legal profession and the judicial process. *Id.* at 904; *In re Yarn Processing Patent Validity Litigation*, 530 F.2d 83, 89 (5th Cir.1976). Accordingly, Leto should be disqualified from continued representation.

WHEREFORE, Lubin seeks the entry of a order of the Court, after a determination made through a evidentiary hearing, that Leto be disqualified from further representation due to a violation of the Ruled Regulating the Florida Bar regarding concurrent representation, or any other relief the Court deems just and proper favoring Lubin.

I HEREBY CERTIFY THAT I HAVE READ AND REVIEWED THE FOREGOING AND THAT THE FACTS ARE TRUE, CORRECT AND COMPLETE, MADE FROM FIRST HAND KNOWLEDGE UNDER PENALTY OF PERJURY.

/s/

Avrumi Lubin, Pro Se
1460 Arboretum Parkway
Lakewood, NJ 08701
(718) 570-3796
Office@spincapital.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT the foregoing has been served upon all parties as indicated on the Court's electronic service list via CM/ECF on this _____ day of February 2025 and those listed below via email or U.S. Mail.

Regards,

/s/_____

Avrumi Lubin, Pro Se
1460 Arboretum Parkway
Lakewood, NJ 08701
(718) 570-3796
Office@spincapital.com

Matthew P. Leto, Esq.
Leto Lawfirm
201 South Biscayne Blvd.
Suite 2700
Miami, Florida 33131
305.341.3155 tel
305.397.1168 fax

# EXHIBIT "A"

## AUTHORITY TO REPRESENT

Hi Bar Capital, LLC, Mordi Herbst, Yisroel Herbst, Spin Capital, and Josh Lubin (referred to herein as "Clients") hereby retain and authorize the Leto Law Firm to represent them in the following lawsuits:

- Nicole Testa Mehdipour v. Hi Bar Capital, et. al., Southern District of Florida Case No.: 22-12790-EPK;
- Hi Bar Capital, LLC v. Karma of Palm Beach, Inc., et. al., Broward County Case No.: 22-006401

1.  For services rendered, it is understood that Joshua Lubin has agreed to pay all fees and costs associated with this representation pursuant to the terms of the *Common Interest and Joint Litigation Agreement* dated January 28, 2022, which is incorporated herein by reference. Furthermore, it is understood by Clients that the *Common Interest and Joint Litigation Agreement* provides Mr. Lubin with "the authority to prosecute and settle" the matters and unless terminated pursuant to Section 2(f). Finally, counsel understands that Spin Capital and Josh Lubin have an interest in the outcome of this case, and while not counsel of record in the case for Spin and Lubin, understands they are a joint client for purposes of this case

2.  For the representation described above, it agreed that Leto Law Firm shall receive an initial $20,000 non-refundable retainer. Although the retainer is non-refundable and deemed earned upon receipt, Clients will not be billed until services rendered on an hourly basis exceed the amount of the non-refundable retainer. Matthew Leto will bill at an hourly rate of $525 per hour and Charlie Gourlis will bill at an hourly rate of $450 per hour. Any paralegal time will be billed at $125 per hour. In addition to the forgoing, a refundable trial retainer in the amount of $50,000 will be required no later than 30 days prior to any scheduled trial date. Any unused portion of that trial retainer (after application to pending fees) shall be returned at the conclusion of the trial.

3.  In addition to the fees described above, Mr. Lubin also agrees to pay all necessary costs incurred in this matter and out-of-pocket expenses incurred related to this representation. These costs include, but are not limited to, items such as filing fees, costs of serving summonses and subpoenas, witness fees, court reporting fees, expert witness fees, postage, photocopying, parking, certified copies, courier services, travel expenses, photographs, graphics, and records.

4.  As you know, the Firm represents more than one client in this matter. An undertaking by a lawyer to represent more than one client in the same matter is called a "joint representation." The applicable rules of professional responsibility permit the representation of more than one client in the same matter provided that, among other things, the lawyer reasonably believes that he or she can adequately represent each client's interests competently and diligently and each client provides informed consent in writing to the joint representation. Joint representation is, of course, not mandatory in this matter, and you have the right to retain an attorney other than the Firm as your counsel.

We believe, based on the information furnished to us, that the Clients share a common interest with respect to the Engagement. Based upon the information provided to us about the facts of this matter, there does not appear to be an actual conflict among the Clients. It is possible that, however, that, in the future, your goals, objectives and interests in the Engagement might change and become different from that the other Clients. This creates a potential conflict of interest in the Firm's representation of the Clients now and may create an actual conflict of interest in the future. You are entitled to counsel who does not face either a potential or actual conflict of interest. Should you wish to retain the Firm, each Client agrees to waive any potential and/or actual conflict of interest which arises from our Firm's joint representation of the other Clients.

Although we are not currently aware of any actual or reasonably foreseeable adverse effects of joint representation, it is possible that issues may arise in which our representation of you may be materially limited by our representation of the other Clients. And, you acknowledge that it is not possible to predict all of the conflicts which may arise in a matter where multiple clients are being jointly represented. If such circumstances arise, the Firm will evaluate whether continued joint representation is appropriate, as discussed below.

We understand that no Client objects to the Firm representing the other Clients in this matter and that, to the extent that any potential conflict may exist or appear to exist, each Client waives any such conflict. Based on the information provided to us by you, and your expressed desire for joint representation, we have concluded that the Firm may appropriately represent the Clients in this matter at this time. If at any time you have any concerns about the appropriateness of continued joint representation, you should let us know immediately so that we can reevaluate the Firm's continuing joint representation of the Clients. If we become aware of any such circumstances, we will do the same.

In the event that joint representation is no longer appropriate in the Firm's determination, including because of any adversity, dispute, conflict, or differing interests among the Clients, you agree that the Firm may in its sole discretion withdraw from representing any of the Clients and may in its sole discretion continue to represent the other Clients in the Engagement. In such scenario, each Client agrees not to move to disqualify the Firm from continuing to represent the other Clients in any action related to the Engagement, nor will the client authorize any counsel they retain to move for such disqualification.

You also understand that if the Firm were to represent any Client alone in this matter, it would not be able to share the information provided by the Client with anyone except as provided by law. However, when a law firm jointly represents multiple clients in a single matter, there is no privilege which may be asserted as between the clients. You understand, therefore, that the Firm may elect, as it deems appropriate, to share information provided by you with the other Clients; but you further understand that the Firm may not necessarily share with you all of the information it receives from any other Client. You agree that, should the Firm be discharged by you or should the Firm withdraw from representing you under any of the circumstances described in this Engagement Letter, any information previously acquired by the Firm from you may be used by the Firm in furtherance of its continued representation of the other Clients in this matter.

Your signature below confirms that you have been given the option to consult with independent counsel concerning the conflict and joint representation issues discussed above and have had adequate time to do so, and further confirms that you waive any actual and/or potential conflicts of interest raised by the Firm's joint representation in this matter.

5. Clients understand that there have been no guarantees made regarding the disposition of any phase of this case. All expressions which relate to the possible results in the case are based strictly on opinion. Likewise, it is impossible to determine in advance the amount of time or expenses needed to complete your case and no assurances of what those costs will ultimately be can be given to you.

6. All bills for costs incurred shall be payable upon receipt. In addition, Clients and Mr. Lubin agree to carefully review all statements and to promptly notify this firm in writing of any errors or discrepancies in billing within twenty (20) days of the date of the statement.

7. As permitted by law, an award of legal fees and/or costs may be sought from the opposing party. The payment of such fees shall not be determinative of the amount owed by Clients. Clients understands that the pursuit of an award of attorney's fees is an additional service and any time required to collect the amount due from the opposing party will also be chargeable to Clients.

8. Representation in this matter will be withdrawn if Clients misrepresent or fail to disclose material facts, or if Clients fails to cooperate or follow advice as given, or if Clients do not make the payments required by this agreement. If suit must be filed for the collection of any sums due under this agreement, then Clients shall pay reasonable attorney's fees together with court costs for collection of such unpaid amounts. In addition, should Clients fail to timely pay for services rendered, Clients acknowledge that an attorney's charging lien and/or retaining lien may be placed against any proceeds or assets you receive or retain pursuant to this matter.

9. Clients understand that this representation is limited to the matter described above. Should any appeal proceedings be required, a new fee agreement for that appeal will have to be signed.

10. The provisions of this agreement may be disclosed to the Court in connection with any application for fees and services which may be rendered on Clients' behalf and the Court may be advised by the undersigned of any amounts that have been received on account of fees and costs.

9 This agreement contains the entire understanding between us and may not be varied or modified unless in writing.

11. FLORIDA LAW GOVERNS THIS FEE AGREEMENT AND ITS TERMS AND CONDITIONS (EXCLUDING FLORIDA'S CONFLICT OF LAW RULES) AND YOU CONSENT TO EXCLUSIVE JURISDICTION AND VENUE IN A COURT IN MIAMI DADE COUNTY, FLORIDA FOR RESOLUTION OF ANY DISPUTE ARISING FROM OR RELATED TO THIS FEE AGREEMENT.

12.     If the above correctly and fully sets forth our agreement, please sign a copy hereof where indicated below and return it with the initial retainer fee.

13.     YOU UNDERSTAND THAT LETO LAW FIRM DOES NOT HAVE THE AUTHORITY PROCEED UNTIL SUCH TIME AS THIS DOCUMENT IS SIGNED BY ALL PARTIES.

THIS IS A LEGALLY BINDING CONTRACT.  BEFORE SIGNING, PLEASE READ IT CAREFULLY AND BE SURE YOU UNDERSTAND ALL OF ITS CONTENTS.  IF THERE IS ANYTHING YOU DO NOT UNDERSTAND, PLEASE ASK. DO NOT HESITATE TO HAVE THIS AGREEMENT REVIEWED BY ANOTHER ATTORNEY OF YOUR CHOICE.

READ, APPROVED AND ACCEPTED THIS __ DAY OF_____, 2023.


By: _____
     Mordechai Herbst (Aug 1, 2023 12:46 EDT)
     Hi Bar Captial, LLC

Address: 2250 59th street Brooklyn NY
Business Telephone:  929-491-9130
Cellular Telephone:  929-491-9130
E-Mail: Mordi@hibarcapital.com


By: _____
     Mordechai Herbst (Aug 1, 2023 12:46 EDT)
     Mordi Herbst

Address: 2250 59th street Brooklyn NY
Business Telephone:  929-491-9130
Cellular Telephone:  929-491-9130
E-Mail: Mordi@hibarcapital.com


By: _____
     Yisroel M Herbst (Aug 1, 2023 17:50 GMT+1)
     Yisroel Herbst

Address: 2250 59th Street Brooklyn NY 11204
Business Telephone:  91757738882
Cellular Telephone:  9175773882
E-Mail: Ymherbst@gmail.com

By: _____
   Joshua Lubin

Address: 1460 arboretum pkwy lakewood NJ 0i8701
Business Telephone: 732-608-4905
Cellular Telephone: 732-608-4905
E-Mail: Josh@spincapital.com


The above employment is hereby accepted upon the terms stated above.


Dated:_____        _____

                                   Matthew Leto
                                   LETO LAW FIRM

# Authority to Represent - Hi-Bar Matters

Final Audit Report                                              2023-08-01

| | |
|---|---|
| Created: | 2023-08-01 |
| By: | Matthew Leto (mleto@letolawfirm.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAX2MzRrj-KnxuofdWUFMwj9Lj5tx_WLA5 |

## "Authority to Represent - Hi-Bar Matters" History

📄 Document created by Matthew Leto (mleto@letolawfirm.com)
2023-08-01 - 2:47:45 PM GMT- IP address: 38.132.160.173

📧 Document emailed to josh@spincapital.com for signature
2023-08-01 - 2:50:34 PM GMT

📄 Email viewed by josh@spincapital.com
2023-08-01 - 4:39:45 PM GMT- IP address: 174.208.226.102

✍️ Signer josh@spincapital.com entered name at signing as Josh lubin
2023-08-01 - 4:42:05 PM GMT- IP address: 174.208.226.102

✍️ Document e-signed by Josh lubin (josh@spincapital.com)
Signature Date: 2023-08-01 - 4:42:07 PM GMT - Time Source: server- IP address: 174.208.226.102

📧 Document emailed to mordi@hibarcapital.com for signature
2023-08-01 - 4:42:08 PM GMT

📄 Email viewed by mordi@hibarcapital.com
2023-08-01 - 4:44:16 PM GMT- IP address: 104.47.66.126

✍️ Signer mordi@hibarcapital.com entered name at signing as Mordechai Herbst
2023-08-01 - 4:46:35 PM GMT- IP address: 69.118.107.4

✍️ Document e-signed by Mordechai Herbst (mordi@hibarcapital.com)
Signature Date: 2023-08-01 - 4:46:37 PM GMT - Time Source: server- IP address: 69.118.107.4

📧 Document emailed to ymherbst@gmail.com for signature
2023-08-01 - 4:46:38 PM GMT

📄 Email viewed by ymherbst@gmail.com
2023-08-01 - 4:47:32 PM GMT- IP address: 86.8.175.20

![Adobe Acrobat Sign] **Adobe Acrobat Sign**

Signer ymherbst@gmail.com entered name at signing as Yisroel M Herbst
2023-08-01 - 4:49:59 PM GMT- IP address: 86.8.175.20

Document e-signed by Yisroel M Herbst (ymherbst@gmail.com)
Signature Date: 2023-08-01 - 4:50:01 PM GMT - Time Source: server- IP address: 86.8.175.20

Agreement completed.
2023-08-01 - 4:50:01 PM GMT

**Adobe Acrobat Sign**

# EXHIBIT "B"

EXECUTION COPY

## COMMON INTEREST AND JOINT LITIGATION AGREEMENT

This COMMON INTEREST AND JOINT LITIGATION AGREEMENT (this "Agreement") is effective as of January 28, 2022 (the "Effective Date"), by and among SPIN CAPITAL, LLC, a New Jersey limited liability company ("Spin Capital"), and HI BAR CAPITAL, LLC, a New York limited liability company ("Hi Bar"). Spin Capital and Hi Bar shall be referred to each as a "Party" and collectively as "Parties."

## RECITALS

A.      On January 28, 2022, Hi Bar initiated an action captioned *Hi Bar Capital, LLC v. Excell Auto Group, Inc., et al.*, in the Supreme Court of the State of New York, County of Kings (the "NY Court"), as Index No. 502846/2022 (the "NY Litigation").

B.      On May 2, 2022, Hi Bar initiated an action captioned *Hi Bar Capital, LLC v. Karma of Palm Beach Inc., et al.*, in The Circuit Court of The Seventeenth Judicial Circuit, Broward County, Florida (the "Florida Court"), as Case No. 22-006401 (the "FL Litigation").

C.      In addition to Excell Auto Group, Inc. and Karma of Palm Beach Inc., the defendants in the FL Litigation include each of the following (collectively with Excell Auto Group, Inc. and Karma of Palm Beach Inc., "Defendants"): Automotive Service Systems, Inc.; Kz Consultants, Inc.; Miss Kris, LLC; Excell Auto Leasing Inc.; Excell Auto Wholesale Inc.; Dealer Souq USA LLC; Eag Wholesale LLC; Karma of Broward, Inc.; Lavish Hero Fund Inc.; Apple 3 Investments, Inc.; KZ Consultants Inc.; Excell Auto Sport And Service, Inc.; FVP Opportunity Fund III, LP; FVP Investments, LLC; FVP Servicing, LLC; Franklin Capital Group, LLC; Franklin Capital Management, LLC; Auto Wholesale of Boca, LLC; MMS Ultimate Services, Inc.; and Moshe Farache.

D.      In addition to the NY Litigation and the FL Litigation, one of the initial Defendants in the FL Litigation, Auto Wholesale of Boca, LLC ("AWB Debtor"), has filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida, Case No. 22-15627-EPK (the "Bankruptcy Case"). In connection with the Bankruptcy Case, Hi Bar, along with FVP Opportunity Fund III, LP, FVP Investments, LLC, and FVP Servicing, LLC (collectively, "FVP Entities"), initiated an adversary proceeding against AWB Debtor in the Bankruptcy Case, Adversary Case No. 22-01218-EPK (the "Adversary Proceeding," collectively with the Bankruptcy Case, the "Bankruptcy Proceedings").

E.      In conjunction with the NY Litigation, FL Litigation and the Bankruptcy Proceedings, (1) some or all of Defendants were indebted and liable to Hi Bar in the aggregate amount of $3,227,739.73 (the "Hi Bar MCA/Obligation") as of April 28, 2022, and (2) certain Defendants granted to Hi Bar a lien and security interest in certain vehicles, including those described on Schedule 1 hereto (the "Vehicle Collateral"), which secured the Hi Bar MCA/Obligation (the "Hi Bar Secured Claim").

F.      Hi Bar possesses or may possess claims, causes of action, and can seek certain relief against Defendants, and any entities affiliated with or owned by Defendants (collectively, "Litigation Parties") resulting or related to the Hi Bar MCA/Obligation, the Hi Bar Secured Claims, and the Vehicle Collateral, including, *inter alia*, claims, causes of action, and motion practice seeking relief for foreclosure, replevin, fraudulent transfer and avoidance claims arising under the

Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and applicable state and federal law. The foregoing claims, causes of action, and motion practice seeking relief against Litigation Parties that Hi Bar may have or may be able to assert against Litigation Parties in the NY Litigation, the FL Litigation, the Bankruptcy Proceedings, shall collectively be referred to as the "Hi Bar Claims."

G.      In addition, as the holder of a portion of the Hi Bar MCA/Obligation and the Hi Bar Secured Claim, Spin Capital possesses or may possess certain claims and causes of action against certain of Litigation Parties resulting or related to the Hi Bar MCA/Obligation and the Hi Bar Secured Claims, including, *inter alia*, claims, causes of action, and motion practice seeking relief for foreclosure, replevin, fraudulent transfer and avoidance claims arising under the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and applicable state and federal law (collectively, the "Spin Capital Claims," with Hi Bar Claims, the "Litigation Claims").

H.      In the NY Litigation, on or about March 18, 2022: (x) Excell Auto Group, Inc. filed a verified third-party complaint against Spin Capital asserting certain claims and causes of action against Spin Capital; and (y) certain Defendants filed counterclaims against Hi Bar. On or about March 25, 2022, Franklin Capital Group, LLC ("FCG LLC") initiated an action captioned *Franklin Capital Group, LLC v. Spin Capital, LLC and Hi Bar Capital, LLC*, in the United States District Court for the Eastern District of Michigan (the "MI Court"), as Case No. 2022-193300-CB (the "Michigan Litigation").[1] Consequently, as part of and in conjunction with the NY Litigation and the Michigan Litigation (and potentially in the FL Litigation and Bankruptcy Proceedings ), certain Defendants and FCG LLC have asserted, and may assert in the future,  claims, causes of action, and counterclaims against one or both Parties (collectively, the "Counterclaims").

I.      Parties have had discussions and negotiations regarding an agreement providing for the collective pursuit of the Litigation Claims and the defense of the Counterclaims for the benefit of both Parties. In light of Spin Capital's interest in the Hi Bar MCA/Obligation and the Hi Bar Secured Claim and its willingness to fund the litigation to recover against Litigation Parties (and to defend Parties against Counterclaims), Parties have determined that (x) the collective pursuit of the Litigation Claims by Hi Bar with the assistance and participation of Spin Capital and (y) the collective defense by Parties against the Counterclaims is in Parties' best interests. Parties have now reached an agreement regarding the pursuit of the Litigation Claims and the defense of the Counterclaims, subject to the terms and conditions set forth herein.

J.      Each Party has concluded that the execution of this Agreement is in its respective best interest, and acknowledges that the terms and provisions hereof are fair and reasonable, that each has had the opportunity to consult with legal counsel, and that each is receiving a substantial and valuable benefit if the transactions contemplated herein are consummated.

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      **Recitals**. The recitals hereinbefore set forth constitute an integral part of this Agreement, evidencing the intent of the parties in executing this Agreement, and describing the

---

[1]      FGC LLC initially filed the Michigan Litigation in the Sixth Judicial Circuit Court of Oakland County, Michigan. Thereafter, Parties removed the Michigan Litigation to the MI Court.

2

circumstances surrounding its execution. Accordingly, said recitals are, by express reference, made a part of this Agreement, and this Agreement shall be construed in the light thereof. Nothing contained in the recitals shall limit the scope of or damages sought with respect to the Bankruptcy Proceedings Hi Bar Claims.

2. **Prosecution and Settlement of Litigation Claims and Defense of Counterclaims**.

(a)     From and after the Effective Date, Hi Bar hereby assigns to Spin Capital any and all Hi Bar Claims, subject to the terms and conditions of this Agreement, including but not limited to, Spin Capital's obligation to assign all Hi Bar Claims back to Hi Bar in the event it exercises its rights pursuant to Section 2(f) hereof.

(b)     From and after the Effective Date, Spin Capital will have full authority to prosecute and settle the Litigation Claims, and may settle such Litigation Claims in whole or in part against some or all of Litigation Parties, in its discretion. Nothing contained in this Agreement is intended or shall be deemed in any manner whatsoever to govern the manner in which Spin Capital pursues (or elects not to pursue) the Litigation Claims related to Litigation Parties. Notwithstanding the foregoing, Spin Capital will cooperate with Hi Bar and keep Hi Bar abreast of the status of its pursuit of Litigation Claims and potential recoveries therefrom. Any settlement of the Litigation Claims will be subject to Hi Bar's written consent (which consent it shall not unreasonably withhold).

(c)     From and after the Effective Date, Spin Capital will have full authority to defend the Counterclaims and will use commercially reasonable efforts to defend the Counterclaims on advice of counsel for the benefit of Parties. Notwithstanding the foregoing, Spin Capital will cooperate with Hi Bar and keep Hi Bar abreast of the status of its defense of the Counterclaims. Spin Capital may settle Counterclaims in conjunction with a global settlement of the Litigation Claims, but any eventual settlement may not result in Hi Bar being required to make any out of pocket payments to any Defendants, and any settlement of any Counterclaim must be paid from recoveries collected in the Litigation Claims. Any settlement of the Counterclaims will be subject to Hi Bar's written consent (which consent it shall not unreasonably withhold).

(d)     Until termination of this Agreement (as provided in Section 2(f) hereof), Spin Capital shall pay all past, present, and future Professional Fee Claims (as defined below) as they become due. For purposes hereof, "Professional Fee Claims" shall mean all legal and professional fees owed to counsel (and any expert witnesses and consultants retained by counsel), which professionals are retained to represent Hi Bar and the interests of Spin Capital in the prosecuting the Litigation Claims and defense of the Counterclaims. For purposes hereof, Professional Fee Claims shall include fees owed to those counsel identified on **Schedule 2** hereof, with all such retained professionals referred to hereinafter as "Retained Professionals".

(e)     Spin Capital and Hi Bar agree that, with respect to the Litigation Claims, Hi Bar will continue to be the plaintiff or claimant for purposes of pursuing recoveries against Litigation Parties. Hi Bar shall execute all pleadings and affidavits/declarations as requested by Spin Capital with respect to either the Litigation Claims or the Counterclaims.

(f)     **Termination Provisions:**

3

(i)     In the event that Spin Capital in its absolute discretion determines that it no longer wishes to actively pursue the recovery of any Litigation Claims, it will inform Hi Bar in writing of such decision, whereupon (and thereafter), Hi Bar shall be entitled to take the lead in pursuing the Hi Bar Claims and shall be entitled to make any decisions as to any matter relating to such pursuit (or non-pursuit) of such Hi Bar Claims. Spin Capital shall provide written notice of such decision, which shall result in a termination of this Agreement as of the date of such notice ("SC Termination Date"). If, on or before the one (1) year anniversary of the SC Termination Date (and provided Hi Bar has not theretofore breached the terms of this Agreement), Spin Capital settles or obtains recovers on any Litigation Claims, then either Spin Capital or escrow agent (if applicable) shall provide payments to Hi Bar as provided in Section 3(a) hereof.

(ii)     In the event Hi Bar in its absolute discretion is not satisfied with Spin Capital's management of defense of Counterclaims against Hi Bar, then Hi Bar shall provide written notice of such decision, which shall result in a termination of this Agreement as of the date of such notice ("HB Termination Date"), and Hi Bar shall be entitled to continue pursuing its Hi Bar Claims and Spin Capital shall be entitled to continue pursuing Spin Capital Claims. If, on or before the one (1) year anniversary of the HB Termination Date (and provided Spin Capital has not theretofore breached the terms of this Agreement), Hi Bar settles or obtains recovers on any of its Litigation Claims, then either Hi Bar or escrow agent (if applicable) shall provide payments to Spin Capital as provided in Section 3(a) hereof.

(g)     To the extent that Counterclaims continue to be asserted against Parties after either SC Termination Date or the HB Termination Date, then each Party shall be required to defend itself against such Counterclaims, and no Party shall have an obligation to other Party to defend such Counterclaims after the termination of this Agreement.

3.     **Agreement of Priority of Distribution**.

(a)     Parties shall direct Litigation Parties to pay any cash or other recoveries obtained from Litigation Parties (including any judgment recoveries from or settlements of any claims against Litigation Parties and the liquidation of any Vehicle Collateral) as a result of any Litigation Claims  (collectively, "Litigation Proceeds") to an escrow account designated by Parties, which shall be subject to an escrow agreement between Parties. Escrow agent of such escrow account shall pay and distribute Litigation Proceeds as provided below:

(i)     First, all funds necessary to reimburse Spin Capital for all Professional Fee Claims;

(ii)     Second, subject to Section 3(d) hereof, all funds (if any) necessary to resolve or settle all Counterclaims;

(iii)     Third, the balance if any, after payment of the Professional Fee Claims and the Counterclaims ("Net Litigation Proceeds"), shall be paid as follows: (x) thirty percent (30%) shall be paid to Hi Bar; and (y) seventy percent (70%) shall be paid to Spin Capital of the first $1,100,000 in net Litigation Proceeds (i.e., up to $330,000 to be paid to Hi Bar and up to $770,000 to be paid to Spin Capital from the first $1,100,000 in net Litigation Proceeds);

4

(iv)    Fourth, fifteen percent (15%) shall be paid to Hi Bar and eighty-five percent (85%) shall be paid to Spin Capital of the next $900,000 in net Litigation Proceeds (*i.e.*, up to $135,000 to be paid to Hi Bar and up to $765,000 to be paid to Spin Capital from the next $900,000 in net Litigation Proceeds); and

(v)    Fifth, ten percent (10%) shall be paid to Hi Bar and ninety percent (90%) shall be paid to Spin Capital of all net Litigation Proceeds after the recovery by Parties of the first $2,000,000 in total net Litigation Proceeds.

By way of example only, payouts from total Net Litigation Proceeds would be as follows (assuming net Litigation Proceeds (after payment of Professional Fee Claims and Counterclaims) in the amounts set forth below):

| Total net Litigation Proceeds | Aggregate Amount to Hi Bar | Aggregate Amount to Spin Capital |
|---|---|---|
| $500,000 | $150,000 | $350,000 |
| $1,000,000 | $300,000 | $700,000 |
| $1,500,000 | $390,000 | $1,110,000 |
| $2,000,000 | $465,000 | $1,535,000 |
| $2,500,000 | $515,000 | $1,985,000 |
| $3,000,000 | $565,000 | $2,435,000 |
| $3,500,000 | $615,000 | $2,885,000 |
| $4,000,000 | $665,000 | $3,335,000 |

(b)    Notwithstanding the provisions of Section 3(a) hereof, to the extent any Party breaches this Agreement before the recovery of any Litigation Proceeds by the other Party, then breaching Party shall not be entitled to recoveries as provided in Section 3(a) to the extent of damages incurred by non-breaching Party relating to the breach, and non-breaching Party shall be entitled to direct any Litigation Parties to transfer so much of the recoveries as required to cover damages relating to the breach, directly to non-breaching Party for its own account.

(c)    Nothing contained herein is intended or shall be deemed to obligate or otherwise compel either Party to accept any non-cash payment or other non-cash distribution of any Litigation Proceeds in partial or full satisfaction of any of Litigation Claims.

(d)    To the extent all Counterclaims are not resolved at the time of the receipt of Litigation Proceeds, then the escrow agent shall hold all Litigation Proceeds until all such Counterclaims are either (x) resolved in favor of Parties or (y) liquidated or settled to an amount certain owed by Parties.  Notwithstanding the foregoing, Parties may order escrow agent to release Litigation Proceeds in advance of resolution of all Counterclaims subject to a further written agreement between them.

(e)    To the extent insufficient Litigation Proceeds are recovered to pay any damages awarded with respect to all Counterclaims, then Parties agree that such damages in excess of the Litigation Proceeds shall be paid seventy percent (70%) by Spin Capital and thirty percent (30%) by Hi Bar.

5

(f)     For all Professional Fees Claims incurred through the earlier of (x) the SC Termination Date, (y) the HB Termination Date, and/or (z) the resolution and settlement of all Litigation Claims and Counterclaims, and to the extent sufficient Litigation Proceeds are not recovered to pay Spin Capital in full for all Professional Fee Claims paid through such date, then Parties agree that: (i)

(i)     Hi Bar paid or must pay thirty (30%) of such amounts;

(ii)    Spin Capital paid or must pay seventy (70%) of such amounts; and

(iii)   Hi Bar shall pay Spin Capital for its proportion of these legal fees on submission of a written request by Spin Capital, provided that Spin Capital may only make such a written request on the termination of this Agreement or resolution in full of all Litigation Claims and Counterclaims (and the receipt by Parties of insufficient Litigation Proceeds to pay all Professional Fee Claims in full after resolution of all Counterclaims).

On or before the one (1) year anniversary of the date of such written request, Hi Bar shall make payment in full to Spin Capital.  To the extent Hi Bar fails to pay Spin Capital for any amounts owed pursuant to this Section 3(f), Spin Capital may initiate litigation to recover such amounts, but may not pursue litigation until the one (1) year anniversary of the date in which Spin Capital provides written notice to Hi Bar as provided in Section 3(f)(iii).

4.     **Further Assurances and Clawbacks**.  Parties shall reasonably cooperate with each other and shall coordinate their activities in respect of all actions reasonably necessary to consummate or obtain orders approving this Agreement.  Hi Bar shall deliver such other documents, instruments or agreements as Spin Capital may reasonably request in order to effect fully the grant of authority to prosecute the Hi Bar Claims.  Spin Capital, in its sole discretion, shall advance monies and funds for payment of fees and expenses of Retained Professionals, as incurred by Hi Bar in conjunction with the prosecution of the Litigation Claims and defense of Counterclaims against Litigation Parties.  In the event that any of the Litigation Proceeds paid out to any of the parties hereto are subsequently disgorged by any Party, or in the event that after Parties are paid Net Litigation Proceeds, either Party incurs further liability relating to a Counterclaim, then each Party shall fund any clawback/disgorgement or Counterclaim liability in the same proportions as their receipt of the Net Litigation Proceeds as set forth in Section 3. Parties' obligations to pay back Net Litigation Proceeds to fund any clawback/disgorgement or liability relating to counterclaims shall survive termination of this Agreement.

5.     **Relationship of Parties**. Nothing contained herein shall be construed to impose any fiduciary duty on either Party in favor of the other Party or any other person or entity. Except as expressly set forth herein, neither Party shall have any duty or obligation to the other Party by virtue of this Agreement, and without limiting the generality of the foregoing, there are no implicit duties or obligations imposed on either Party in favor of the other Party or any other person or entity by virtue of this Agreement.

6.     **Representations and Warranties**.  Each Party hereby represents and warrants to the other Party that its execution, delivery, and performance of this Agreement are within its respective powers, have been duly authorized by all necessary corporate action, and that this Agreement, when so executed and delivered shall constitute its legal, valid, and binding obligations, enforceable against it in accordance with its terms, subject to applicable bankruptcy,

6

insolvency and similar laws and general equitable principles. Neither Party makes any representations or warranties to the other party regarding the recoverability, existence, or value of the Litigation Claims. Except as expressly set forth in this Section 6, neither Party makes any representations or warranties, express or implied, to the other Party by virtue of this Agreement.

7. **Effectiveness of This Agreement**. This Agreement shall be effective as of the date hereof conditioned only upon the execution and delivery of this Agreement by all Parties.

8. **Common Interest**.

(a)  In order to pursue the Litigation Claims and defend the Counterclaims effectively, Parties have determined that their common interests may be best served by sharing documents, factual material, mental impressions, memoranda, interview reports, and other information, including the confidences of each of them, pursuant to this Agreement (collectively, the "Common Interest Materials") *provided, however,* that no Party shall be obligated to share or disclose any Common Interest Materials with or to any other Party solely by virtue of entering into this Agreement. Any document produced as Common Interest Materials shall be stamped or otherwise labeled as "privileged" or "confidential." Parties agree that Common Interest Materials obtained from any of them shall remain confidential and shall be protected from disclosure to any third party except as provided herein. Parties further agree that they will not disclose Common Interest Materials received from each other to anyone except, as applicable, their respective attorneys, representatives, employees, or agents involved in the Litigation Claims, without first obtaining the express consent of one or more of the parties who produced such Common Interest Materials. It is understood that all work performed and to be performed has been and shall be accomplished by the law firms, their attorneys, employees and agents with regard to their representations shall be accomplished pursuant to the work product and the attorney client privileges and to the "common interest doctrine" and all other applicable rights and privileges, including those recognized in *United States v. Evans,* 113 F.3d 1457 (7th Cir. 1997); *United States v. McPartlin,* 595 F.2d 1321 (7th Cir. 1979); *Hunydee v. United States,* 355 F.2d 183 (9th Cir. 1965); and *Continental Oil Co. v. United States,* 330 F.2d 347 (9th Cir. 1964).

(b)  No Waiver. The joint interest and defense effort undertaken by Parties, by virtue of its purpose, operation and use, is attorney work product and has required, and may in the future require, the exchange of Common Interest Materials subject to work product protection, attorney-client, joint defense and/or other privileges. Parties do not, by virtue of entering into this Agreement, waive any privilege as to any communication or as to any sharing of work product.

(c)  Permissive, Not Mandatory. This Agreement is intended to allow, but not require, each party to this Agreement, in its sole and exclusive discretion, to exchange with the other Parties Common Interest Materials, which are subject to work product protection, attorney-client, joint defense and/or other privileges. Parties are not required to agree to any particular litigation strategy or position taken before any court by virtue of having entered into this Agreement.

(d)  Use. It is further agreed that any Common Interest Materials exchanged among Parties shall be used solely in connection with the Litigation Claims and the defense of the Counterclaims. Each Party specifically agrees that, in any subsequent litigation or action that

7

may be brought, they will not attempt to discover or offer as evidence any Common Interest Materials exchanged between them relating to the foregoing absent court order or written consent by one or more of Parties producing such Common Interest Materials.

(e)     Joint Experts.  Parties may jointly retain one or more experts in furtherance of the Litigation Claims and in the defense of the Counterclaims.  All Common Interest Materials transmitted to the joint experts, as well as any work product generated by the joint experts in any form whatsoever shall be subject to this Agreement.   No joint expert shall publish or disseminate any information, theories, opinions, or conclusions based upon Common Interest Materials in any way other than in furtherance of the Litigation Claims and in the defense of the Counterclaims without advance written approval by all of Parties by whom the expert is retained.

(f)     Individual Experts.  Nothing herein shall preclude any of Parties from individually retaining an expert.  Any Common Interest Materials or work product related to or generated by the individually retained expert shall be subject to this Agreement.

(g)     Joinder of Experts to Agreement.   No Common Interest Materials exchanged pursuant to this Agreement shall be disclosed or distributed in any way to any joint or individually retained expert until (i) such person shall have read a copy of this Agreement and shall have signed a Confidentiality Agreement agreeing to be bound by the terms of this Agreement, and (ii) advance written approval is obtained from the party whose information is to be given, shown, made available or communicated to the expert in furtherance of the Litigation Claims.

(h)     Discovery of Common Interest Materials.  If any person or entity requests or demands, by subpoena or otherwise, any Common Interest Materials received by any Party pursuant to this Agreement, the recipient of the demand shall immediately notify all other Parties. Each Party against whom the request or demand of said Common Interest Materials is directed shall take all steps necessary to permit the assertion of all applicable rights and privileges with respect to said Common Interest Materials, and shall cooperate fully with Parties in any judicial or other proceeding relating to the disclosure of said Common Interest Materials.

(i)     Withdrawal from Agreement.  Parties also agree that, if any Party to this Agreement no longer has interests in common with the other Parties, such party shall immediately notify, in writing, attorneys for the other Parties and promptly withdraw from this Agreement. Withdrawal from this Agreement shall not terminate Parties' mutual obligation to hold confidential all Common Interest Materials previously exchanged among the same.  At the request of a withdrawing party, documents furnished by such withdrawing party shall be returned to the same; *provided, however*, that such withdrawing party also returns all Common Interest Materials disclosed to it pursuant to this Agreement, and, further, destroys any internal notes, memoranda, analyses or other work product based upon or relating to Common Interest Materials produced by another party; *provided, however*, if a withdrawing party has received a subpoena or similar legal demand that would require production of any Common Interest Materials, the obligations imposed by this sentence shall be deferred until the discovery demand is resolved in accordance with the procedures outlined in this Agreement.

(j)     Electronic Communications.   Parties further agree that electronic communication (via the internet or other network) among themselves may involve the

8

communication of Common Interest Materials. By engaging in electronic communications during the course of the Litigation Claims, Parties do not intend to waive or in any way weaken any statutory, common law or other privileges or protections to which the Common Interest Materials would otherwise be entitled.

(k)    Continuation of Agreement.    This Agreement is not terminated by the conclusion through trial (including appeals) or settlement or other resolution of the Litigation Claims, and Parties shall keep all Common Interest Materials confidential as directed by the terms of this Agreement, unless all Parties consent in writing to the disclosure of said Common Interest Materials. Nothing in this Agreement, however, shall preclude any Party from disclosing their own privileged or work product materials at any time.

### 9.    **Provisions Solely to Define Relative Rights**.

(a)    The provisions of this Agreement are intended solely for the purpose of defining the rights of Parties. Without limiting the generality of the provisions hereof, there are no third party beneficiaries of this Agreement. Without limiting the generality of the foregoing, no other person or entity, including any Litigation Party or any affiliate or creditor thereof, shall have any rights or benefits hereunder or shall otherwise be entitled in any manner whatsoever to rely on any of the provisions hereof. Nothing contained herein is intended to or shall impair the rights of either Party against any non-party, including any Litigation Party.

(b)    This Agreement, including, *inter alia*, Section 3(f) hereof, shall not waive, release, or impair the rights of either Party against any other Party with respect to separate business relationships or other claims or causes of action any Party may have against other Party unrelated to the Litigation Claims, Counterclaims, Defendants, or any of the proceedings described in the Recitals hereto. Any and all current or future claims or causes of actions of one Party against other Party are expressly preserved, and Parties do not intend to effect or impair such claims or causes of action as part of their Agreement hereunder.

### 10.    **General Terms**.

(a)    Time is of the Essence.    Parties agree that time is of the essence with respect to each of the terms and conditions of this Agreement.

(b)    Waivers, Amendments, Etc.    The provisions of this Agreement may from time to time be amended, modified or waived, if such amendment, modification or waiver is in writing and consented to by each Party. No waiver or approval by any Party under this Agreement shall, except as may be otherwise stated in such waiver or approval, be applicable to subsequent transactions. No waiver or approval hereunder shall require any similar or dissimilar waiver or approval thereafter to be granted hereunder.

(c)    Notices. All notices and other communications provided to any Party hereto under this Agreement shall be in writing (except as otherwise specifically provided in this Agreement) and sent by first class mail, by overnight delivery service, or by facsimile and addressed, delivered or transmitted to such Party at its address or facsimile number set forth below its signature hereto or at such other address or facsimile number as may be designated by such Party in a notice to the other Parties. Any notice, if mailed and properly addressed with

9

postage prepaid or if properly addressed and sent by pre-paid courier service, shall be deemed given when received; any notice, if transmitted by facsimile, shall be deemed given when transmitted and the Party giving such notice shall have received (including either through telephonic communication initiated by it or telephonic communication received by it) telephonic, machine, or other confirmation that such notice has been received by the intended recipient.

(d)    No Implied Right to Notice; Nonwaiver; Cumulative Remedies.  No notice to or demand on any of the parties hereto in any case shall entitle them to any notice or demand in similar or other circumstances. No failure to exercise, no delay in exercising, and no single or partial exercising, on the part of either Party, of any right, power or privilege hereunder shall operate as a waiver thereof or otherwise preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies of Parties herein provided are cumulative and not exclusive of any rights or remedies provided by law.

(e)    Successors; Survival of Agreements. All agreements, representations, warranties, and covenants made herein shall survive the consummation of this Agreement.

(f)    No Third Party Beneficiaries. This Agreement shall be binding upon, inure to the benefit of, and be enforceable by, Parties and their respective successors and assigns. No other person or entity shall be entitled to claim or assert (including as a defense to any liability) any right or benefit hereunder, including the status of being an express or implied third party beneficiary of this Agreement.

(g)    Captions. Captions in this Agreement are for convenience of reference only and shall not define or limit any of the terms or provisions hereof. References herein to Sections or provisions without reference to the document in which they are contained are references to this Agreement.

(h)    Counterparts; Signatures.  This Agreement may be executed by Parties on any number of separate counterparts, and by each Party on separate counterparts; each counterpart shall be deemed an original instrument; and all of the counterparts taken together shall be deemed to constitute one and the same instrument. To facilitate execution of this Agreement, Parties may execute and exchange facsimile or electronic mail (e-mail) executed counterparts of this Agreement. Facsimile signatures and signatures exchanged by electronic mail (e-mail) shall be deemed valid and binding to the same extent as the original.

(i)    Expenses.  Without limiting the right of any Party to apply any Litigation Proceeds received by it in accordance with the provisions of this Agreement in satisfaction of any such expenses, each Party hereto shall be responsible for the payment of its own fees and expenses, unless otherwise set forth herein.

(j)    Entire Agreement.  This Agreement, together with the exhibits and schedules hereto, contains the entire agreement between Parties with respect to the matters addressed herein. There are no agreements, restrictions, promises, representations, warranties, covenants or undertakings, written or oral, other than those expressly set forth herein.  This Agreement supersedes all prior agreements and understandings between Parties (if any) with respect to the matters addressed herein.

10

(k) <u>Interpretation</u>. The use of the masculine, feminine or neuter gender or the singular or plural form of words herein shall not limit any provision of this Agreement. The use of the terms "including" or "include" shall in all cases herein mean "including, without limitation" or "include, without limitation," respectively. Reference to any person or entity includes such person's or entity's successors and assigns to the extent such successors and assigns are permitted by the terms of this Agreement, and reference to a person or entity in a particular capacity excludes such person or entity in any other capacity or individually. Reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof. Reference to any law means such law as amended, modified, codified, replaced or re-enacted, in whole or in part, and in effect on the date hereof, including rules, regulations, enforcement procedures and any interpretations promulgated thereunder. Underscored references to Sections, clauses, Exhibits or Schedules shall refer to those portions of this Agreement, and any underscored references to a clause shall, unless otherwise identified, refer to the appropriate clause within the same Section in which such reference occurs. The use of the terms "hereunder", "hereof", "hereto" and words of similar import shall refer to this Agreement as a whole and not to any particular Section or clause of or Exhibit or Schedule to this Agreement. All terms defined in this Agreement shall have the above-defined meanings when used in any certificate, report or other document made or delivered pursuant to this Agreement, unless the context therein shall clearly otherwise require. In the computation of periods of time in this Agreement from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to, but not through." This Agreement and the other documents relating to this Agreement are the result of negotiations among and have been reviewed by counsel to Parties, and are the products of all Parties. Accordingly, they shall not be construed against (or in favor of) either Party merely because of such Party's involvement (or non-involvement, as the case may be) in their preparation.

(l) <u>APPLICABLE LAW</u>. THIS AGREEMENT AND ANY OTHER WRITING EXECUTED IN CONNECTION HEREWITH SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAW. COURTS SITTING IN NEW YORK STATE SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY AND ALL ACTIONS BROUGHT BY THE PARTIES RELATING IN ANY WAY TO THIS AGREEMENT.

(m) <u>WAIVER OF RIGHT TO JURY TRIAL</u>. EACH OF THE PARTIES IRREVOCABLY HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN ANY AND ALL SUITS, ACTIONS OR OTHER PROCEEDINGS THAT ARISE FROM, OR CONSIST OF, A CLAIM FOR DAMAGES UNDER, A CLAIM OF A BREACH OF, OR A DECLARATORY JUDGMENT ACTION FOR THE INTERPRETATION OF, THIS AGREEMENT.

**[Signature Pages Follows]**

11

IN WITNESS WHEREOF, the parties hereto have caused this Common Interest and Joint Litigation Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

HI BAR CAPITAL, LLC

By: _____ *Yisroel Herbst*
Name: Yisroel Herbst
Its: Owner

Contact Address:
HI Bar Capital, LLC
1825 65th Street
Brooklyn, NY 11204
ATTN: Yisroel Herbst
        Mordi Herbst
Email: ymherbst@gmail.com
        mordi@hibarcapital.com

*With a copy to:*
Law Office of Michael Ehrenreich PLLC
555 Willow Avenue, Suite 105
Cedarhurst, NY 11516
Attention: Michael Ehrenreich
Email: me@ehrenreichlaw.com

[Signature Page to Common Interest and Joint Litigation Agreement]

SPIN CAPITAL, LLC

By: _____

*Josh Lubin* (DocuSign signature)

Name: Arvumi Lubin
Its: President


Contact Address:
Spin Capital, LLC
1460 Arboretum Parkway
Lakewood, NJ  08701
ATTN: Josh Lubin
Email: josh@spincapital.com

*With a copy to:*
Bryan Cave Leighton Paisner LLP
161 North Clark Street, Suite 4300
Chicago, Illinois 60601
ATTN: Jason J. DeJonker
Email: Jason.Dejonker@bclplaw.com

[Signature Page to Common Interest and Joint Litigation Agreement]

**Schedule 1**

DocuSign Envelope ID: 62C6B345-12A6-4E3A-A100-EEID457629F92

## Schedule 2

- Bryan Cave Leighton Paisner LLP

- Feldman Law Group, P.A.

- Wells Law P.C.

- Foley & Lardner LLP

- Proskauer Rose LLP

- Law Office of Michael Ehrenreich

- Law Offices of Steven Zakharyayev