UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:

EXCELL AUTO GROUP, INC.

      Debtor.

Case No.: 22-12790-EPK
Chapter 7

_____/

NICOLE TESTA MEHDIPOUR,
as Chapter 7 Trustee for Excell Auto Group, Inc.

      Plaintiff,

v.

HI BAR CAPITAL, LLC, *et al.*,

      Defendant(s).

Adv. Pro. No. 22-01132-EPK

_____/

**PLAINTIFF'S RESPONSE TO HI-BAR CAPITAL, LLC, MORDECHAI HERBST,
AND YISROEL HERBST'S MOTION FOR SUMMARY JUDGMENT AND
DEFENDANTS, SPIN CAPITAL, LLC AND AVRUMI (JOSH) LUBIN'S JOINDER TO
DEFENDANTS' HI-BAR CAPITAL, LLC, MORDECHAI HERBST,
AND YISROEL HERBST'S MOTION FOR SUMMARY JUDGMENT**

Nicole Testa Mehdipour ("**Plaintiff**"), chapter 7 trustee of the estate of Excell Auto Group,

Inc., by and through undersigned counsel, pursuant to this Court's *Order Setting Briefing Schedule*

*on Motion for Summary Judgment* [ECF No. 175], files this response to *Hi-Bar Capital, LLC,*

*Mordechai Herbst, And Yisroel Herbst's Motion For Summary Judgment* [ECF No. 168] (the "**Hi**

**Bar MSJ**") and *Defendants, Spin Capital, LLC and Avrumi (Josh) Lubin's Joinder to Defendants'*

*Hi-Bar Capital, LLC, Mordechai Herbst, and Yisroel Herbst's Motion for Summary Judgment*

[ECF No. 174] (the "**Joinder**") and states as follows:

    **I.**    **Summary Judgment Standard**

1

1.      The Court is very familiar with the applicable law and standard for summary judgment.  The Plaintiff does not dispute the case law and standard set forth in the Hi Bar MSJ. Fed. R. Civ. P. 56(f) also permits the Court to grant summary judgment for the nonmovant, on grounds not raised by a party, or *sua sponte* after identifying facts that may not be genuinely disputed.

## II.     There is No Genuine Dispute of Material Facts and Summary Judgment Can be Granted in Favor of the Nonmovant (Plaintiff) on Counts 3, 6, 7, and 8, because the First Hi Bar Contract is a Loan that Charges Interest at a Rate that Exceeds the Criminal Usury Statutes in New York and Florida

2.      Hi Bar, Y. Herbst, and M. Herbst (collectively, "Hi Bar") continue to pursue the same legal position this Court has already concluded is incorrect; that the three *Principis* (or *LG Funding*) factors, which New York courts look to as guideposts, are dispositive of whether a transaction is a "loan" vs. "true sale." *See* Hi Bar MSJ, § II, pp. 3-10.  *See also* Oral Ruling [ECF No. 67, p. 16/Lines 2-4].   Hi Bar completely ignores any issue dealing with "exposure to market risk." *See* Hi Bar MSJ, § II.

3.      In this adversary, this Court has stated the correct analysis to determine "loan" vs. "true sale" under New York law is to "determine how each transaction allocates risk between the parties," Oral Ruling [ECF No. 67, p. 15/Lines 3-5 and p. 16/Lines 2-7 (*citing Haymount Urgent Care [PC] v. GoFund Advance[, LLC]*, 609 F. Supp. 3d 237 (S.D. N.Y. 2022) Mar. 13, 2024].

4.      In the 10 months since this Court issued its Oral Ruling, there has not been any material change to the law in New York.  Accordingly, the analysis begins with the New York Court of Appeals in *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 157 N.Y.S.3d 800, 179 N.E.3d 612 (2021), held that "[w]hen determining whether a transaction is a loan, substance—not form—controls." *Id*. at 334-35 (*citing Dry Dock Bank v. American Life Ins. & Trust Co.*, 3 N.Y. 344, 354 (N.Y. 1850)).   The Court of Appeals continued; holding that when determining the

substance of a transaction, "several factors help" in the analysis. *Id*. The very first factor the Court

of Appeals points to is "market risk," stating "parties who are not directly exposed to market risk

in the value of the underlying assets are likely to be lenders[.]" *Id*. (*citing Dry Dock Bank*, 3 N.Y.

at 354).

      5.     Consistent with the case law in New York, this Court stated:

> [i]n a true sale of receivables, the buyer obtains all the risk of
> nonperformance by account debtors who owe funds to the seller.  In
> contrast, if the facts indicate that the borrower remains liable for the advance
> and retains the risk that its account debtor will not pay, then there is no real
> sale and the transaction is a loan.

Oral Ruling [ECF No. 67, p. 15/Lines 5-11. Mar. 13, 2024]. *Accord Haymount Urgent Care PC v.*

*GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247 (S.D.N.Y. 2022); *HI Bar Capital LLC v. Parkway*

*Dental Servs., LLC*, Index No. 533245/2021, 2022 N.Y. Misc. LEXIS 5814, 2022 NY Slip Op

32934(U) (2022) (vacating consent judgment because "there are surely questions raised whether

the agreement comports with the requirements necessary to be considered a genuine cash advance

agreement.").

      6.     Judge Wilson provides additional guidance in his dissent in *Plymouth Venture*

*Partners, II, L.P. v. GTR Source, LLC*, 37 N.Y.3d 591, 609 n. 2, 163 N.Y.S.3d 467, 183 N.E.3d

1185 (2021) (Wilson, J. dissenting), where, identifying facts identical to those in this case, he

stated:

> Although the GTR and CMS agreements are described as "factoring"
> agreements, they do not bear several of the hallmarks of traditional factoring
> arrangements, in that FutureNet did not sell any identifiable receivable to
> GTR or CMS; GTR and CMS did not collect any receivables; GTR and
> CMS received fixed daily withdrawals from FutureNet's bank account
> regardless of whether or how much FutureNet collected from or billed to its
> clients; and GTR and CMS did not bear the risk of nonpayment by any
> specific customer of FutureNet. The arrangements FutureNet entered with
> GTR and CMS appear less like factoring agreements and more like high-
> interest loans that might trigger usury concerns (*see Adar Bays, LLC v*
> *GeneSYS ID, Inc.*, 37 NY3d 320, 157 NYS3d 800, 179 NE3d 612, 2021 NY

Slip Op 05616 [2021]). Nevertheless, for the purpose of these certified questions, we are asked to assume the judgments rendered on those agreements are valid.

*Id*.

7.      The reality is that the Hi Bar transaction was a refinance of an obligation to Spin, in which Hi Bar was also a participant. Ex. 11 (Y. Herbst Dep. Tr., p. 70/Line 2 – p.85/Line 9, May 7, 2024) ("originally [Hi Bar] joined the deal on the outside and then eventually [Hi Bar] took over the deal, as far as I remember."); Ex. 6, Ex. 7, and Ex. 8. Each of these factors indicate that the transaction was a loan.

8.      The Debtor always remained liable for the full "Purchased Amount" and "Remittance Amounts" from inception until the entire "Purchased Amount" was remitted to Hi Bar.  Ex.1, p. 2, § 1.2. The First Hi Bar Contract does not identify actual receivables or other identifiable property interests that would be required to be turned over to Hi Bar.  Ex.1, generally. Hi Bar simply looks to the cash, regardless of the source, in the Debtor's bank accounts.

9.      Hi Bar limits its "risk" of non-payment by the Debtor through the language of the First Hi Bar Contract, including but not limited to: (i) "[Hi Bar] is entering this Agreement knowing the risks that [Debtor's] business may not perform as expected or fail, and …[ Hi Bar] acknowledges that it may never receive the Purchased Amount if the [Debtor] does not generate sufficient revenue, Ex. 1, p. 1, ¶ unnumbered; (ii) making the Debtor responsible to ensure that the "agreed Remittance to be debited by [Hi Bar] remains in the Account[,]"Ex. 1, p. 1, ¶ unnumbered, and (iii) "to secure [the Debtor's] obligations" grant Hi Bar a security interest in "all accounts…and inventory, all proceeds therefrom, and all funds at any time in the Merchants' and/or Guarantor(s)(s) [sic] Account, **regardless of the source of such funds**," and "if any time there are insufficient funds in the Merchant's Account to cover [Hi Bar's] entitlements under this agreement,

4

[Hi Bar] is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets." Ex. 1, p. 5 (emphasis added).

10.     It is clear from the Events of Default, Protections Against Default and Remedies set forth in the contract, Hi Bar only anticipates nonperformance by the Merchant (Debtor) as opposed to any specific customer or account debtor, because proceeding against such customer or account debtor is not contemplated in the First Hi Bar Contract. *See* e.g., Ex. 1, p. 1 (unnumbered paragraph), pp. 2-3, § 1.12, and pp. 3-4, §§ 3, 3.3, 3.4, and 3.5.  As such, the case law supports a finding that the First Hi Bar Contract is a loan.  *See Haymount*, 609 F. Supp. 3d at 247; *Adar Bays*, 37 N.Y.3d at 334.

11.     The actions of Lubin and others on behalf of Hi Bar evidence that Hi Bar was looking solely to the Debtor and non-debtor, co-obligors, to recover the "Purchased Amount." *See* Ex. 3 and Ex 4.  When there was a missed payment Lubin sent Scott Zankl messages looking for a wire to clear up the payment, showing up at the dealership to meet with Scott to resolve the delinquencies, and eventually threatened litigation and caused a lawsuit to be filed by Hi Bar. Ex. 9, p. 99-121, ¶¶ 660 - 800; Ex. 10; Ex. 11 (Y. Herbst Dep. Tr., p. 205/Line 1- p.209/Line 9, May 7, 2024) and Ex. 12 (Y. Herbst Dep. Tr., p. 91/Line17 – p.94/Line 4, May, 28, 2024).

12.     Because, Hi Bar's risk is always "derivative or secondary," in that Hi Bar's risk is not based upon the performance of account debtors or customers, but only risk that the "account debtor's" non-payment will leave Debtor unable to pay, the First Hi Bar Contract is a loan.  *See Haymount*, at 247.  *Accord Adar Bays*, 37 N.Y. 3d at 334; Oral Ruling [ECF No. 67, p. 15/Lines 5-11. Mar. 13, 2024].

13.     Additionally, the First Hi Bar Contract fails each of the *Principis/LG Funding Factors*, which New York Court's look to as guideposts.

a. **The Reconciliation and Adjustment to Remittance Provisions are Illusory**

i. **The Debtor was in Immediate Default Upon Executing the First Hi Bar Contract Rendering All Provisions Condition Upon No Default Existing Illusory Including the Reconciliation and Adjustment to Remittance Provisions**

14.    The First Hi Bar Contract was concocted to induce Wing Lake to close and fund the Wing Lake Refinance.  Scott Zankl, for the Debtor, and Josh Lubin, for Spin and Hi Bar, were attempting to hide the purported remaining balance on the Third Spin Contract from Wing Lake while allowing Spin to get paid through the First Hi Bar Contract. Ex. 9, pp. 75-76, ¶¶ 502-504, p. 79, ¶ 529, pp. 89-90, ¶¶ 583-596, p. 99, ¶ 664, p. 100, ¶¶ 672-67.; Ex. 14 (Aff. S. Zankl, p. 1, ¶¶ 7, 9- 14, March 29, 2022); Ex. 13 (A. Lubin Dep. Tr., p. 120/Line 22 – p.130/Line 3, Mar. 15, 2024); Ex. 15, p. 2 (e-mail on 5.1.23 at 3:42:44PM). Ex. 17, p. 1, ¶ 1-7.

15.    There was an agreement between Scott Zankl, Lubin and Hi Bar that if the Debtor, and non-debtor entities, were not in default, then Hi Bar would not record a UCC-1. Lubin and Hi Bar knew that Wing Lake would record a UCC-1 on all of the Debtor's assets, including receivables as part of the Wing Lake Refinance.  Further, Hi Bar knew the Debtor had other outstanding obligations that were not being refinanced with the Wing Lake refinance that also encumbered the all assets and "receipts." *See e.g.* Ex. 18 and 19. This is evidenced by Lubin, on behalf of Spin, reaching out to Hi Bar to see if Hi Bar would be willing to sit in second position, to which Hi Bar agreed.  Ex. 13 (A. Lubin Dep. Tr., p. 126/Line 4 – p.127/Line 9, Mar. 15, 2024) and Ex. 9, pp. 75-76, ¶¶ 502-508, and pp. 79-99, ¶¶ 525-664, Ex. 6, Ex. 7, and Ex. 8.

16.    Even though Hi Bar fully contemplated the Wing Lake refinance, the Debtor was still immediately in contractual default, because the First Hi Bar Contract required the Debtor to specifically represent that the "[Debtor] has good, complete, unencumbered and marketable title to all Receipts and all collateral …free and clear of any all liabilities, liens, claims, … and

6

encumbrances…" Ex. 1, p. 3, § 2.10, and that "execution of and/or performance under [the First Hi Bar Contract] will not cause or create an event of default by [Debtor] with any other person or entity," Ex. 1, p. 3, § 2.21, putting the Debtor in immediate default of the First Hi Bar Contract. Ex. 1, pp. 3-4, § 3(a), (b), and (i).  Hi Bar required the Debtor to use its standard form.  Therefore, the Debtor was in immediate contractual default because Wing Lake had a lien superior to Hi Bar and the Debtor was prohibited, in part, from taking out any additional merchant cash advances, under the terms of the Wing Lake refinance.

17.    In the First Hi Bar Contract, Hi Bar is entitled to invoke the "Protections Against Default" if, as set forth in paragraph 1.12(d), "Merchant  . . . ceases the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of [Hi Bar] . . ."  Ex. 1, pp. 2-3.  The First Hi Bar Contract defines the singular "Merchant" as  Excell Auto Group, Inc., and the listed non-debtor entities, including Automotive Service, Inc., was voluntarily dissolved in March 2017, Ex. 20; Miss Kris, LLC, which was dissolved in June 2009, Ex. 23; KZ Consultants, Inc., which was dissolved in September2020, Ex. 22; and Dealer Souq USA, LLC, which was dissolved in June 2017, Ex. 21.

18.    Additionally, under Representations, Warranties and Covenants, in § 2.3, of the First Hi Bar Contract, there is a representation that "Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized. Ex. 1, p. 3 The failure of this representation to be accurate is an event of default under § 3(b). *Id*.  Neither Scott Zankl nor Kristen Zankl had the authority to bind Excell Auto Sport and Service, Inc. and Automotive Service, Inc. to the First Hi Bar Contract.

19.     The pre-existing liens and encumbrances, merchants being out of business and Kristen Zankl and Scott Zankls' lack of authority to bind certain of the entities defined as "Merchants" each triggered an of "Event of Default" under the plain terms of the First Hi Bar Contract. Ex. 1, pp. 2-3, §§ 1.12(d), 2.3, 2.10 and 3(b). Therefore, any potential rights that the Debtor could have exercised, but were conditioned upon the Debtor not being in default were immediately lost.  Immediately, those potential rights were at the sole and absolute discretion of Hi Bar.  Therefore, the Reconciliation and Remittance adjustment provisions in the First Hi Bar Contract were illusory.   *See* Ex. 1, p. 2, §§ 1.3 and 1.4, and pp. 3-4 § 3 (no events of default or remedies available against Hi Bar).

20.     Even without the immediate default, Hi Bar has sole and exclusive discretion to reconcile or adjustment to the remittance as the First Hi Bar Contract provides no remedy for the Debtor to enforce the reconciliation or remittance adjustment provisions.  *See* Ex. 1, pp. 1-12, generally, and p. 2, §§ 1.3 and 1.4, and pp. 3-4 § 3 (no events of default or remedies available against Hi Bar).  The Reconciliation and Remittance Adjustment provision, both require the "Merchant," defined as the Debtor and non-debtor entities, to submit all "bank account statements, credit card processing statements, and accounts receivable report outstanding if applicable, from the date of this Agreement through and including the date the request is made." Ex. 1, p. 2, §§ 1.3 and 1.4.  Hi Bar can then request "additional reasonable documents," which is undefined, and request whatever it determines to be "reasonable," and the Debtor cannot challenge such request. The reconciliation and adjustment provisions are merely an illusory guise in Hi Bar's attempt to avoid criminal usury laws.  *See* Ex. 1, generally, and p. 2, §§ 1.3 and 1.4.

21.     The illusion is more profound in that there is no way for the Debtor to actually substantiate a basis to reconcile or adjust the remittance, the remittance amount appears to be

completely unrelated to any actual financials of the Debtor.  For instance, the First Hi Bar Contract was based upon a purported amount of money owed to Spin rather than an actual review and understanding of the financials of the Debtor and non-debtor entities.  Hi Bar knew that it was taking a second position and that the Debtor did not have sufficient unencumbered future receipts for Hi Bar to purchase as they were all encumbered.  *See* Ex. 9, p. 1 ¶¶ 1 and 6, p. 25-33, ¶¶ 155-202, p. 52, ¶¶ 344-345 and Ex. 13 (A. Lubin Dep. Tr., p. 126/Line 4 – p.127/Line 9, Mar. 15, 2024).

22.     The cumulative effect of each of the provisions in the First hi Bar Contract and Hi Bar's knowledge of Excell's pre-existing liens and refinancing with Wing Lake, demonstrates Hi Bar's intent to have the First Hi Bar Contract operate as a loan, while disguised as a revenue purchase agreement. Accordingly, the first *Principis* factor weighs in favor of a loan.

### ii.  Hi Bar's Rights upon Bankruptcy Filing

23.     The simple statement in the First Hi Bar Contract, stating, "Merchant going bankrupt or going of business…in and of itself, does not constitute a breach of this Agreement[,]" is also illusory.  In the event of a bankruptcy, the First Hi Bar Contract actually expands Hi Bar's rights to collect against the Debtor's assets and are provided "recourse" otherwise unavailable to creditors.  The provisions in the First Hi Bar Contract are contrary to the protections and underlying policy of the Bankruptcy Code.

24.     In the "Security Agreement and Guaranty of Performance" the Debtor "agrees" that the First Hi Bar Contract is a "contract of recoupment," thereby expanding Hi Bar's rights by prioritizing their lien(s) and circumventing the automatic stay. Ex. 1, p.5, ¶ 3 (unnumbered). Additionally, if Hi Bar files a motion for stay relief, the Debtor "agrees not to contest or object" and "agrees to execute" any documents reasonably necessary to perfect and confirm the lien, security interest and right to setoff set forth in [the First Hi Bar Contract].  Astonishingly, Hi Bar

is actually authorized to execute any instrument or document in the name of the Debtor during the bankruptcy proceeding. *Id.* (unnumbered).

25.     A bankruptcy filing also triggers the 8 "Protections Against Default," including the full uncollected Purchase Amount plus 30% for attorneys' fee and costs becoming immediately due and payable, enforcement of the Guaranty, all rights under Article 9 of the U.C.C., exercise all rights under the assignment of lease by the Debtor, and debiting any of the Debtor's deposit accounts, Ex. 1, pp. 2-3, § 1.12, because "Events of Default" are triggered, including insufficient funds in the account, a transfer of substantially all assets, and the deposit account is closed along with either an NSF or other code being returned.  S*ee* Ex. 1, pp. 3-4, § 3(a), (d), (f), (h), (j), (k), (l), and (n), and p. 8 (Appendix A), ¶ C.  Accordingly, the second *Principis* factor weighs in favor of a loan.

### iii.   The First Hi Bar Contract was for a Definite Time-Period

26.     The First Hi Bar Contract sets forth a "Purchased Price" which is the principal amount of the loan, a "Purchased Amount" representing the principal amount of the loan plus interest, and "Remittance Amount" representing the weekly payment amount which is fixed.  *See* Ex. 1, p. 1.  The intended repayment period is easily calculated by dividing the "Purchased Amount" by the "Remittance Amount," which show 21.19 weeks for the First Hi Bar Contract, Ex. 1, p.1.

27.     As stated above, the Debtor never had any rights under the Reconciliation or Remittance Adjustment Provisions.  Even if such rights existed, those rights were so filled with technical requirements that made such rights vague, speculative and impossible for the Debtor to enforce so that the only conclusion is that Hi Bar intended that the amounts set forth in the First Hi Bar Contract be repaid within the specific-time periods or be in default. Accordingly, the third *Principis* factor weighs in favor of a loan.

### i. __Additional Indicia that the First Hi Bar Contract was a Loan and Not a Sale__

#### 1. __A Default by One is a Default by All__

28.      In the First Hi Bar Contract, the Debtor and all of the non-debtor entities are considered collectively one "Merchant."   Ex. 1, p. 1, pp. 9-10. Therefore, all of the rights of the Debtor, to the extent that they actually existed, are lost if one of the non-debtor entities is in default, including obtaining loans, having sperate bank accounts, or closing its business.

#### 2. __No Upside to Hi Bar__

29.      Hi Bar does not have the ability to collect more than the "Purchased Amount," i.e., if the Debtor's business over the periods specified above quadrupled, Hi Bar is only ever entitled to repayment of the "Purchase Amount." Ex. 1, p. 1, § introductory paragraph. *See Endico Potatoes v. CIT Group/Factoring Inc.*, 67 F.3d 1063, 1068 (2d. Cir. 1995) ("In determining the substance of the transaction, the Court may look to a number of factors, including …  whether the debtor has a right to any funds recovered from the sale of assets above that necessary to satisfy the debt…") (citations omitted).

#### 3. __No Other Incidents of Ownership by Hi Bar__

30.      Further, Hi Bar did not acquire any other incidents of ownership of the purportedly purchased Receipts, such as the authority to determine what collection actions to take, the authority to change the servicer, the authority to enter into a binding settlement with any account debtor, the right to assign any of the "receivables," the duty to maintain records relating to the receivables, or the burden of collection costs. Ex. 1, generally**.** *See Burns v. Pennsylvania Dept. of Corr.*, 544 F.3d 279, 287 (3d. Cir. 2008) ("Ownership entails 'the right to possess, the right  to use, the right to manage, the right to the income of the thing, the right to the capital, the right to security, the rights or incidents of transmissibility and absence of term, the prohibition of harmful use, liability to

execution, and the incident of residuarity.'") (citation omitted)).  Hi Bar obtained none of the "standard incidents" of ownership and, in fact, required the Debtor to carry the burden on all collection costs.  Ex.1, p. 1, intro paragraph and Appendix A.  The power of attorney purportedly granted to Hi Bar is conditioned on an event of default by the Merchant, except with respect to the Processor, which is really nothing more than collecting from the Merchant (Debtor), Ex. 1, p. 2, § 1.11.  Likewise, Hi Bar's authority to assign anything is limited to the right to receive payment under the First Hi Bar Contract, not any specific interest in an "account." Ex. 1, p.4, § 4.2.

### ii.  The First Hi Bar Contract Violates New York's Criminal Usury Statute and are Void

31.     The First Hi Bar Contract charge interest of between approximately 179% and 413%, well in excess of the 25% cap allowed under New York law.  Ex. 15 (Barbee Declaration, p. 6, ¶ 26 (*citing* Barbee Report at pp. 32-33, ¶ 97-98 a, Exhibits 5A and 5B).

32.     Since under the totality of the circumstances, the First Hi Bar Contract is a loan and the interest charged exceeds 25%, the First Hi Bar Contract is void *ab initio*, including the choice of law provision.  *See Adar Bays, LLC*, 37 N.Y.3d at 323-24 and 331-333.

33.     Accordingly, pursuant to Fed. R. Civ. P. 56(f)(1), summary judgment on Counts 3, 6, 7, and 8 should be granted in favor of the non-movant, Plaintiff, or, alternatively, Hi Bar's request for summary judgment should be denied.

### III.  The Nonmovant is Entitled to Summary Judgment on Count 1, 2, and 28, Concerning the Franklin Assignment and Hi Bar Transfer Agreement

34.     Hi Bar pursues the same argument it pursued in its Motion to Dismiss the First Amended Complaint.  Hi Bar's argument ignores Paragraph 2.a., the operative paragraph, of the Wing Lake Assignment, which reads, in pertinent part:

> For good and valuable consideration, the receipt and adequacy of which is acknowledged, Assignor agrees as follows:

\*\*\*

2. Effective upon receipt by Assignor of the Purchase Price, which Purchase Price must be paid by Assignee to Assignor by no later than November 3, 2021 (the "Deadline") by wire transfer of immediately available funds in accordance with wire instructions set forth below:

> (a) **Assignor** [Spin] **sells, transfers and assigns to Assignee** [Wing Lake] the Obligations and all of Assignor's right, title and interest under the **Merchant Documents**, including any claims, rights or actions Assignor may have (whether known or unknown to Assignor as of the date hereof) against any third party arising in connection with, or otherwise related to, the Merchant Documents or the Obligations ("Third Party Claims")[.]

Ex. 4, p. 1, ¶ 2.a. (emphasis added).

Pertinent to this issue are three defined terms in the Wing Lake Assignment Document, found in the unnumbered "Recitals" paragraph. First, "**Merchant Agreements**" which is specifically defined as and limited to the First Spin Contract and Second Spin Contract. Ex. 4, p. 1 (Recitals) (emphasis added). Second, "**Merchant Documents**" is defined as

> all rights of Assignor [Spin] under any similar or related documents (including without limitation, any guaranties, security agreements, forbearance agreement, settlement agreements and judgments), including with respect to all collateral securing the obligations of Company [Debtor and affiliates] under the **Merchant Agreements** or securing any guaranties in respect thereof (the documents, including the **Merchant Agreements**, are defined collectively as "**Merchant Documents**").

Ex. 4, p. 1 (Recitals) (emphasis added). Third, "Obligations" means "all outstanding obligations of Excell Auto Group, Inc. and each of its affiliates … owing to [Spin] under each of" the Merchant Agreements (the First and Second Spin Contract) <u>and</u> Merchant Documents (which includes "any similar or related documents).

35.    Hi Bar misapprehends the holding in *Price v. Haynes*, 37 Mich. 487 (1877), and its application to this adversary proceeding. While *Price* generally holds that a general grant of assignment, followed by a specific enumeration of property interests to be assigned, will be limited

13

to the enumerated property interests, *id.* at 489, it does not permit a court to read out of an assignment the actual words in the document. *Price* further holds that "[n]o single clause in such an instrument may be conclusive; we must judge of its intent as a whole." *Id.* at 489.

36.     The canons of contract construction state that intent is determined by the plain, unambiguous language of the contract. *People v. Martinez*, 307 Mich. App. 641, 651-52 (1st DCA Mich. 2014) (citations omitted). The plain, unambiguous language of the Wing Lake Assignment Document makes it clear that the Third Spin Contract was included in the definition of Merchant Documents, which were being sold, transferred, and assigned to Wing Lake. Ex. 4.

37.     The Wing Lake Assignment Document should be read in its entirety, rather than choosing selected portions and reading them out of context.    The Wing Lake Assignment Document expressly states that the <u>Obligations and all of Assignor's (Spin's) right, title, and interest under the Merchant Documents</u>, were being sold, transferred, and assigned to Wing Lake. Ex. 4, p. 1, and ¶ 2.a.    The use of the word "and" throughout the relevant portions of the Wing Lake Assignment Document, including in the term "Obligations" which were being purchased and sold.    Obligations includes two categories identified in two romanettes joined by "and." Ex. 4, p.1 ("Recitals"). "[T]he ordinary meaning of the conjunctive 'and' is to denote joinder or union." *Mayer v. Credit Life Ins. Co.*, 42 Mich. App. 648, 650, 202 N.W.2d 521, 523 (1972).    Romanette (i) only references the First Hi Bar contract. Romanette (ii), however, has two categories again joined by "and," "the [Second Spin Contract] **and** all rights of Assignor under any similar or related documents … including the Merchant Agreements … defined collectively as the "Merchant Documents")[.]" Ex. 4, p. 1 (emphasis added).

38.     Romanette (ii) is not limited to the Second Spin Contract but includes "any similar agreements… etc.". *Id.* Further, the use of the term "any" with respect to "similar or related

documents," is telling where the ordinary meaning of "any" is interpreted as broadly as possible. 2 *Crooked Creek, LLC v. Cass Cty. Treasurer*, 507 Mich. 1, 11 n. 21 (Mich. 2021) (*citing* Random House Webster's College Dictionary (1999) (defining "any" as "1. one, a, an, or some; one or more without specification or identification[.] . . . 2. whatever or whichever it may be[.] . . . 3. in whatever quantity or number, great or small; some[.] 4. every; all[.]); *People v Harris*, 495 Mich 120, 131; 845 N.W.2d 477; 495 Mich. 120; 845 NW2d 477 (2014) (explaining that " 'any' is commonly understood to encompass a wide range of things" such that "it is difficult to imagine how the Legislature could have cast a broader net given the use of the word[] 'any' "), *citing People v Lively*, 470 Mich 248, 253-254; 680 N.W.2d 878; 470 Mich. 248; 680 NW2d 878 (2004)).

39.     Therefore, under the plain language of the Wing Lake Assignment Agreement, all Merchant Agreements, including the Third Spin Contract, was sold, transferred, and assigned to Wing Lake.

40.     Lubin, on behalf of Spin, also executed the *Evidence of Assignment* as part of the Wing Lake Assignment Documents. Ex. 4, p.5, The Evidence of Assignment clearly includes the First Spin Contract, the Second Spin Contract "and all rights of [Spin] under any similar or related documents" under the Wing Lake Assignment.  Ex. 4, p. 5.  Further, Spin confirmed that Spin had "sold, transferred and assigned all of its right, title and interest in the Merchant Documents to Assignee" and "this Evidence of Assignment may be **relied upon by any person** as evidence of the foregoing." *Id*. (emphasis added).  This not only reconfirms that all of the Merchant Agreements, including the Third Spin Contract, were sold, transferred and assigned to Wing Lake, but also supports the Plaintiff's position for enforcing the Wing Lake Assignment Document and the Evidence of Assignment as a third-party beneficiary, because any person may rely upon the Evidence of Assignment, including third parties.

41.     Hi Bar's next argument is equally without merit and unpersuasive. Hi Bar cherry-picks words from the Wing Lake Assignment Documents in order to construct is "limiting" argument to exclude the Third Spin Contract.  Hi Bar incorrectly argues, "[w]hile Obligations is expanded to include "similar or related agreements," the Third Spin Contract was not covered, since the general description "similar or related agreement" is given specific definition **to include** "any guaranties, security agreements, forbearance agreements, settlement agreements and judgments." Hi Bar MSJ, p. 11 (Emphasis added).  Hi Bar acknowledges that "Obligations" is "expanded" but obviously ignores the introductory phrase "including without limitation" to argue the enumerated items limit the expansion. Hi Bar MSJ, p. 11.  *Compare* Ex. 4, p. 1 (Recitals).

42.     The relevant portion of the paragraph from the Wing Lake Assignment Document reads:

> …and all rights of Assignor under any similar or related documents (**including without limitations**, any guaranties, security agreements, forbearance agreements and judgments) …"

Ex. 4, p. 1 (Recitals) (emphasis added)

43.     The qualifying language "**including without limitation** . . ." belies Hi Bar's contention that the specified items were limiting the defined term of Obligations, rather than its plain meaning of a non-exhaustive list of the items that could be included. *See Martinez*, 307 Mich. App. at 651-52.  *See also Auto-Owners Ins. Co. v. White Consol. Indus.*, 1996 Mich. App. LEXIS 680 at *2-3, 1996 WL 33349362 (Ct. App. Mich. Nov. 22, 1996) (finding "including but not limited to" to be non-limited); *Accord PNH, Inc. v. Sayavich (In re Girton, Oakes & Burger, Inc.)*, Case No. 04-8052, 2005 Bankr. LEXI 1205 at*18 (6th Cir. BAP June 22, 2005) (*quoting Black's Law Dictionary* 766 (7th Ed. 1999); *United States v. Water Supply & Storage Co.*, 546 F. Supp. 2d 1148, 1152 (D. Colo. 2008) ("The plain meaning of 'including but not limited to' … is meant to include

the subsequently specified examples[,] and also is meant to include other items not specified in the statute…is not ambiguous.").

44.     Moreover, in the Wing Lake Assignment Agreement, Spin affirmatively represented and warranted, in part, that Spin had

> not sold, assigned, transferred, granted a participation in or pledged the Obligations, the **Merchant Documents** … [Spin] owns the … the **Merchant Documents** … free and clear of any lien or other encumbrance and [Spin], including any of its affiliates, has not entered into any written or oral agreement with Company relating to the Assignment or receipt of any compensation from Company in consideration for entering into the Assignment.

Ex. 4, p. 1, ¶ 4 (emphasis added).

45.     In viewing the plain language of the Wing Lake Assignment Agreement in its totality, it is clear that Spin was selling, transferring, and assigning, all obligations owed to Spin by the Debtor including the Third Spin Contract. *Price v. Haynes*, 37 Mich. at 489.

46.     It is axiomatic, that one cannot sell what one does not own.  If all of the Spin Contracts were sold and transferred to Wing Lake, then the purported consideration, the refinancing of the Spin Contracts, must fail.

47.     Alternatively, if the Court finds that there is an ambiguity in the Wing Lake Assignment Document, then Summary Judgment cannot be granted, because the Court will need to consider parole evidence.   Certainly, Wing Lake understood that Wing Lake was purchasing all outstanding obligations of Spin.   When Wing Lake found that Spin transferred an undisclosed balance to Hi Bar, then Wing Lake insisted on Scott Zankl executing an affidavit setting forth the violations of the various Wing Lake Agreements.

### a.   Avoiding the Hi Bar Transfer Agreement

48.    Hi Bar's argument regarding Count 2 likewise fails, because it is premised on the same erroneous logic pointed out in paragraphs 34-47, above, to argue that the Wing Lake Assignment excludes the Third Spin Contract.

49.    Hi Bar also confuses the definitions in the Wing Lake Assignment Document. Hi Bar states "the First and Second Spin Contract (the "Merchant Document")," Hi Bar MSJ, p. 11, however it is clear that the First and Second Spin Contract are defined as the "Merchant Agreements" in the Wing Lake Assignment Document, Ex. 4, p. 1 (Recitals), while "Merchant Documents" is defined as the Merchant Agreements plus "similar or related agreements." *Id*. at p. 1 (Recitals).

50.    Finally, while the Hi Bar Transfer Agreement and First Hi Bar Contract are dated October 27, 2021, the transfer and transaction did not occur until November 1, 2021.

51.    Neither the Hi Bar Transfer Agreement nor the First Hi Bar Contract are countersigned by anyone on behalf of Hi Bar. See Ex. 1.  Hi Bar has no obligation to fund the First Hi Bar Contract. *See* Ex. 1.  In fact, the effectiveness of the First Hi Bar Contract is predicated on Hi Bar paying the purchase price.  Ex. 1, p.1 (unnumbered paragraph).  Accordingly, the First Hi Bar Transfer Agreement is ineffective or unenforceable until Hi Bar funds or becomes obligated to fund the First Hi Bar Contract.

52.    The pertinent facts evidence that on November 1, 2021, Hi Bar did not have the $2,114,312.50 to fund the First Hi Bar Contract, Ex. 3, Spin wired the $2,114,312.50 to Hi Bar at 3:22 p.m. on November 1, 2021, as a purported loan to Hi Bar for Hi Bar's refinancing of the Third Spin Contract, Ex. 2 and Ex. 15, p. 2, followed by Hi Bar wiring the $2,114,312.50 back to Spin at 4:06 p.m. Ex. 2. Lubin, on behalf of Spin, executed the Wing Lake Assignment Document 7-minutes later at 4:13 p.m. on November 1, 2021. Ex. 4, p. 6.  Hi Bar never funded the First Hi Bar

Contract, therefore, there was no acceptance of the First Hi Bar Contract by Hi Bar. *See* Ex. 1, p. 1 (unnumbered) ("[Hi Bar's] payment of the Purchase Price shall be deemed the acceptance and performance by [Hi Bar] of this Agreement.").

53.    Even if the Court finds that Hi Bar funded the First Hi Bar Contract, the Debtor did not receive reasonably equivalent value because the Third Spin Contract was a void, criminally usurious loan for which all principal and interest had been forfeited and the Debtor was not legally obligated to repay Spin any amount under the Third Spin Contract.  *See* Ex. 15 (Barbee Declaration, p. 6, ¶ 26 (*citing* Barbee Report at pp. 32-33 ¶ 97-98 a, Exhibits 5A and 5B)..

54.    Accordingly, the non-movant Plaintiff is entitled to summary judgment. Alternatively, if the Court does not find that the Plaintiff is entitled to summary judgment, then the Hi Bar Defendants' request for summary judgment must be denied.

## IV.    **Count 17 Unconscionability**

55.    Hi Bar provides no factual support for its summary judgment on Count 17 of the Second Amended Complaint.  Hi Bar's arguments are purely legal arguments, more aptly found in a motion to dismiss.

56.    The legal argument similarly misses the mark.  The Plaintiff is not seeking declaratory relief or affirmative relief under New York's criminal usury statute.  *See* SAC, pp. 70-73, ¶¶ 378-398 (Count 17).  The Plaintiff is seeking to have the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement declared "void and unenforceable" because they are "unconscionable" under New York law.  *See* SAC, pp. 70-73, ¶¶ 378-398 (Count 17) and HI Bar MSJ, pp. 12-13 (acknowledging the same).

57.    Count 17 set forth 20 paragraphs of allegations supporting Plaintiff's position that at each step along the way of the First Hi Bar Contract, First Settlement Agreement, and Second

19

Settlement Agreement being entered, Scott Zankl was being pressured and threatened leaving no choice but to have the Debtor execute each of the Agreements. *See* Ex. 9, p. 99, ¶ 664, pp. 100-108, ¶¶ 672 - 731, pp.109- 110, ¶¶ 743-745, 750, pp. 111-114, ¶¶ 751- 770; and Ex. 10.

58.     Accordingly, there is a genuine dispute of material fact that regarding the lack of meaningful choice for the Debtor to walk away or enter into the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement.  Summary Judgment must be denied.

### V.    The Fraudulent Transfer Claims Do Not Arise From Hi Bar Enforcing Security Interests in any Property of the Debtor

59.     Hi Bar fails to address any of the Plaintiff's arguments to avoid the obligations incurred – not just transfers to – Hi Bar from each of the Hi Bar Transfer Agreement, First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement.  *See* SAC, Counts 18, 19, 20, 21, 22, 23, 24, and 25. Instead, Hi Bar raises a defense for the first time that it failed to plead [ECF No. 90, pp. 35-39] and to which the Plaintiff does not consent to litigate.

60.     Furthermore, the statute and case law on which Hi Bar relies are inapplicable to this adversary proceeding.   Fla. Stat. § 726.109(5) is an affirmative defense to the Plaintiff's constructive fraud claims under Fla. Stat. §§ 726.105(1)(b) and 726.106 for which Hi Bar carries the burden of proof. *Rauch v. AJP Pine Island Warehouses, Inc.*, 313 So. 3d 625, 629 (Fla. 4th DCA 2021) (*citing Custer Med. Ctr. V. United Auto. Ins. Co.*, 62 So. 3d 1086, 1096 (Fla. 2010)).

61.     Hi Bar ignores its burden, fails to allege or assert any "undisputed law or facts" to establish a valid underlying security interest or Hi Bar's enforcement thereof in connection with how Hi Bar complied with U.C.C. Article 9, instead relies on a single, self-serving statement by Yisroel Herbst, including the legal conclusion that "Hi Bar's UCC Financing Statement remains properly recorded." *Hi Bar MSJ*, p. 14 (*citing* SMF, ¶ 20, *citing* Herbst Declaration, ¶ 16).

62.    Similarly, *Wiand v. Wells Fargo Bank, N.A.*, 86 F. Supp. 3d 1316 (M.D. Fla. 2015) is inapplicable. In *Wiand* the receiver could not dispute the validity of the underlying security interest and that the loan payments were made at arms-length and in the ordinary course of business. *Id*. at 1327. The Plaintiff in this case has brought multiple counts to determine that the underlying obligations that purport to create the security agreement are void *ab initio* or, alternatively, subject to being avoided themselves under FUFTA or 11 U.S.C. §§ 548 and 550. SAC, Counts 1, 2, 3, 6, 7, 8, 17, 18, 19, 20, 21, 22, 23, 24, and 25.

63.    Finally, Hi Bar fails to address Plaintiff's reasonably equivalent value arguments, including that Hi Bar did not actually pay the Purchase Amount, that the First Hi Bar Contract increases the obligation of the Third Spin Contract of $2,114,312.50 to $3,177,880.00, with no explanation or rationale, and that the First Hi Bar Contract is a refinancing of the void, criminally usurious Third Spin Contract.  SAC, Counts 18, 19, 20, 21, 22, 23, 24, and 25.

64.    Accordingly, the Hi Bar MSJ on the fraudulent transfer counts should be denied.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter an order: (i) granting summary judgment in favor of the non-movant (Plaintiff) on each claim for relief addressed in the Hi Bar MSJ; (ii) denying Hi Bar's requests for summary judgment and the Joinder by Spin Capital, LLC and Avrumi (Josh ) Lubin; and (iii) granting the non-movant (Plaintiff) such other and further relief as this Court deems just and proper.

Remainder of Page Intentionally Left Blank

Respectfully submitted this 6th day of February 2025.

FURR AND COHEN, P.A.
*Special Counsel for Trustee*
2255 Glades Road, Suite 419A
Boca Raton, FL 33431
Telephone: (561) 395-0500
Facsimile: (561) 338-7532

BY:    /s/ *Jason S. Rigoli*
       Alan R. Crane, Esq.
       Florida Bar No.: 0963836
       E-mail: acrane@furrcohen.com
       Jason S. Rigoli, Esq.
       Florida Bar No.: 91990
       E-mail: jrigoli@furrcohen.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via transmission of Notices of Electronic Filing generated by CM/ECF to those parties registered to receive electronic notices of filing in this adversary proceeding.

Dated: February 6, 2025.

By: */s/ Jason S. Rigoli*
    Jason S. Rigoli