IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT IN AND
FOR BROWARD COUNTY, FLORIDA

CASE NO.:  CACE-22-05125


FVP OPPORTUNITY FUND III, LP, a Delaware
limited partnership; FVP INVESTMENTS, LLC,
a Delaware limited liability company; and
FVP SERVICING, LLC, a Delaware limited
liability company,

        Plaintiffs,

vs.

KARMA OF BROWARD, INC., a Florida
corporation; et al.

        Defendants.
_____/


                        Tuesday, May 7, 2024
                        10:40 a.m. – 5:12 p.m.




                ***VIA VIDEOCONFERENCE***






                    VIDEO DEPOSITION
                          OF
                    YISROEL HERBST

PLAINTIFF'S
EXHIBIT

11

APPEARANCES:

Jerrell A Breslin, Esq.
Schwartz Breslin PLLC
The DuPont Building 169 E Flagler Street
Suite 700
Miami, FL 33131-1203
305-577-4626
jb@jsjb.law
Counsel for the Plaintiffs

Matthew Paul Leto, Esq.
Leto Law Firm
201 S Biscayne Boulevard
Miami, FL 33131-4330
305-341-3155
mleto@letolawfirm.com
Counsel for Hi Bar Capital

Harry Winderman, Esq.
Law Office of Harry Winderman
2255 Glades Road
Boca Raton, FL 33431
(561)707-0000
Lynoramae@gmail.com
Counsel for Karma and Zankl

Luke Thomas Jacobs, Esq.
Weissman & Dervishi, P.A.
1 SE 3rd Avenue
Suite 1700
Miami, FL 33131-1714
305-347-3204
Ljacobs@wdpalaw.com
Counsel for Avrumi Lubin a/k/a Josh Lubin

Scott C. Gherman
Scott C. Gherman, PA
902 Clint Moore Road
Suite 120
Boca Raton, FL 33487-2846
561-757-6266
Sgherman@scottghermanpa.com
Counsel for Moshe Farachi and Vantiff, Inc.

Catherine Gleason, Esq.
Eberst Law Firm
6560 West Rogers Circle
Boca Raton, FL 33487
(561)725-0444
Cgleason@eberstlaw.com
Counsel for Moshe Farachi

D. Brett Marks, Esq.
Akerman, LLP
201 East Las Olas Blvd.
Suite 1800
Fort Lauderdale, FL 33301
954-463-2700
Brett.marks@akerman.com
Counsel for Millco-Atwater

Patrick D. Dorsey, Esq.
Shraiberg Page, P.A.
2385 NW Executive Center Drive
Suite 300
Boca Raton, FL 33431-8530
561-443-0800
Pdorsey@slp.law
Counsel for the Franklin entities

Andrew M. Feldman, Esq.
Feldman Kodsi, PLLC
9100 S Dadeland Blvd Ste 1500
Miami, FL 33156-7816
305-445-2005
Afeldman@feldmankodsi.com
Counsel for Kurkin Forehand Brandes and Mark Brandes

Also Present:  Oliver Lee
               (Videographer)

               Greg Nelson and Sam Seligson
               (Franklin Capital Group)

I-N-D-E-X


WITNESS:   YISROEL HERBST


Direct Examination                                Page 8
By Mr. Breslin


E-X-H-I-B-I-T-S


Plaintiffs' Exhibit 1                             Page 9
(Re-Notice of Taking Videotaped
Deposition Duces Tecum of Corporate
Representative - Hi Bar)

Plaintiffs' Exhibit 2                             Page 48
(Re-Notice of Taking Videotaped
Deposition Duces Tecum - Yisroel Herbst)

Plaintiffs' Exhibit 6                             Page 85
(Operating Agreement of Hi Bar Capital
LLC)

Plaintiffs' Exhibit 7                             Page 90
(Hi Bar Capital vs. Yoel Getter -
Amended Complaint)

Plaintiffs' Exhibit 8                             Page 120
(Revenue Purchase Agreement)

Plaintiffs' Exhibit 13-A                          Page 149
(Wire Confirmation Detail:  Excell
Payoff - Spin Capital LC)

Plaintiffs' Exhibit 13-B                          Page 157
(Wire Detail Report - Spin Capital LLC)

Plaintiffs' Exhibit 11                            Page 182
(Assignment of Obligations and Merchant
Documents)

Plaintiffs' Exhibit 12                            Page 213
(Hi Bar Capital Revenue Purchase
Agreement)

Plaintiffs' Exhibit 14                          Page 215
(Uniform Commercial Code Financing
Statement Form)

Plaintiffs' Exhibit 15                          Page 221
(Text Messages)

Plaintiffs' Exhibit 16                          Page 225
(December 17, 2021 Email)

Plaintiffs' Exhibit 17                          Page 235
(Settlement Agreement)

Plaintiffs' Exhibit 9                           Page 245
(Payment Spreadsheet)

CERTIFIED QUESTIONS

| Page | | Line | |
|---|---|---|---|
| Page 11 | | Line 3 | |
| Page 59 | | Line 24 | |
| Page 61 | | Line 12 | |
| Page 179 | | Line 25 | |
| Page 180 | | Line 12 | |

Deposition of YISROEL HERBST, a witness of lawful age, taken by the Plaintiff for the purpose of discovery and for use as evidence in the above-entitled cause, wherein FVP Opportunity Fund III, LP, a Delaware limited partnership; FVP Investments, LLC, a Delaware limited liability company; and FVP Servicing, LLC, a Delaware limited liability company, are the Plaintiffs, and Karma of Broward, Inc., a Florida corporation; et al., are the Defendants, pending in the Circuit Court of the 17th Judicial Circuit in and for Broward County, pursuant to notice heretofore filed, before Colleen Foote, Court Reporter and Notary Public in and for the State of Florida at Large, via videoconference, on May 7, 2024, commencing at 10:40 a.m.

- - - - -

THE VIDEOGRAPHER:  In the case styled FVP Opportunity Fund III, LP, et al., versus Karma of Broward, Inc., Case Number CACE22-05125, this is the video recorded deposition of Yisroel Herbst.

This deposition is taking place via Zoom on May 7, 2024.  The time is now 10:40 a.m.

Our videographer is Oliver Lee.

Counsel will state their appearances for

the record, after which our court reporter, Colleen Foote, will swear in the witness.

MR. BRESLIN:  Yes, good morning.  Jerry Breslin for the FVP parties.

MR. LETO:  Good morning.  Matthew Leto on behalf of Hi Bar and also on behalf of the witness.

MR. JACOBS:  Luke Jacobs on behalf of Josh Lubin.

MR. GHERMAN:  Scott Gherman --

MR. WINDERMAN:  Harry Winderman --

MR. GHERMAN:  Go ahead, Harry.

MR. WINDERMAN:  Harry Winderman on behalf of the Karmas and the Zankls.

MR. GHERMAN:  Scott Gherman on behalf of Moshe Farachi.

MR. DORSEY:  Patrick Dorsey on behalf of the Franklin entities.

MR. FELDMAN:  Andrew Feldman here on behalf of Kurkin Forehand Brandes and Mark Brandes.

MS. GLEASON:  Catherine Gleason for Moshe Farachi.

MR. NELSON:  Greg Nelson, with Franklin Capital Group Credit here observing, along with Sam Seligson.

MR. MARKS: Brett Marks with Akerman, appearing for Millco-Atwater.

COURT REPORTER: Okay. Mr. Herbst, raise your right hand, please.

Do you solemnly swear or affirm the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I affirm.

COURT REPORTER: You may put your hand down.

We may begin.

MR. BRESLIN: Matt, can you hear me?

MR. LETO: I sure can.

Thereupon:

YISROEL HERBST

a witness named in the notice heretofore filed being of lawful age and being first duly sworn in the above cause, testified on his oath as follows:

DIRECT EXAMINATION

BY MR. BRESLIN:

Q. Can you hear me, Mr. Herbst?

A. Yes.

Q. Okay. I don't know -- I don't know if it's a bandwidth problem on my end or your end, but

a company is filing bankruptcy?

Q.    You indicated earlier that there were people that had the authority to sign for Hi Bar. Who were those people?

A.    Nobody had a blanket authority to sign, but if somebody produced a contract and I was okay with the contract or okay to fund and if it was part of the paperwork, then it was okay for them to sign.

Q.    Okay.  So correct me if I'm wrong, the ultimate authority to enter into any contract or deal was yours and, on occasion, if you were requested, you would grant that authority to particular individuals on a case-by-case basis?

A.    Right.

Q.    Do you know of any agreements that were made by Hi Bar that you did not authorize?

A.    I'm not aware of any right now.  It's something that I'm trying to find out.

Q.    What do you mean by that?  There -- do you believe there are some deals out there that were not authorized?

A.    I believe that it's possible that there were things that happened in the name of Hi Bar or associated with Hi Bar.  Only because you're asking me a global question, I'm giving you a global answer.

Iisrbel Herbst

71

Q.   Okay.  Well, tell me why -- well, tell me why you believe that there may be those things out there.  What has given you that reason to believe that?

A.   It's -- it's a gut feeling and also because of the informality of the process that somebody who would want to may have taken advantage of at the time.

Q.   All right.  Now, when you say "the informality of the process," what do you mean by that?

A.   Meaning it was a small group of people, close-knit group of people.  It was a certain ebb and flow to the way business was done.  And it's possible that somebody could have represented something on behalf of Hi Bar, done something on behalf of Hi Bar.

Q.   Okay.  So when you say there's a small group of people, that would have been Yoel Getter, Josh Lubin; correct?

MR. JACOBS:  Objection.

MR. BRESLIN:  Who objected?  Who was that that objected?

Was that you, Matt?

MR. JACOBS:  Sorry, my computer froze, but I did.

Iisrbeli hefbbt

72

MR. BRESLIN:  Okay.  This isn't -- you're not a party to this depo.  You can't object.

MR. JACOBS:  I don't think that's the rule. I think I can object as a lawyer and a party to the case.

MR. BRESLIN:  Okay.

MR. LETO:  He can object.

THE WITNESS:  Okay.  I'm --

MR. BRESLIN:  Did he give a cross-notice?

MR. LETO:  You don't have to give a cross-notice to object or ask questions in a deposition.

MR. BRESLIN:  Of course you do.

MR. JACOBS:  Especially when you name my client, but --

BY MR. BRESLIN:

Q.    Okay.  So who is this small -- tell me the names of the people in the small group, please.

A.    It's anybody that we -- we mentioned, meaning that this -- this wasn't a big corporation with a hierarchy and -- and rules and procedures, you know.  There was -- and, actually, I'll say I don't know necessarily that I -- I'm saying there were always brokers involved, right, so they were dealing with people on behalf of Hi Bar or maybe some of the

other entities, and I can't speak or represent something that somebody may have said in the name of Hi Bar.

Q.    Okay.   So let's talk about that.   You said that there were no rules and procedures, there was a small group, that it was mostly informal; right? Correct?

MR. LETO:  Object to the form.  Object to the form.

THE WITNESS:  Okay.

BY MR. BRESLIN:

Q.    Is that correct?

A.    What I'm saying informal compared to a corporate hierarchy of the United -- you know, that's common in -- in many other corporations.

Q.    Okay.   So you said that there were no rules and procedures.   There -- so let's just --

A.    I didn't -- I didn't say that.

Q.    Okay.   What were -- were there rules and procedures at Hi Bar?

A.    Not specific and documented.   That's all I said.

Q.    Okay.   So no written rules?

A.    Correct.

Q.    No written procedures?

Yisroel Herbst

74

A.    There may have even been written procedures but -- or written rules, but, you know, it could have maybe -- it would have been just like parking in New York City, you know, like driving rules in New York City, it's a suggestion.

Q.    Well, it was your company.  Did you -- were there written rules or not?

A.    As far as -- I don't -- it's not something that we live by.

Q.    Let me just make it --

A.    Like --

Q.    Let me make it real clear.

Are you aware of any written rules that Hi Bar had?

A.    I'm not aware.

Q.    Okay.

A.    That doesn't mean that it doesn't exist. That doesn't mean that at some point we didn't want to give guidance to somebody that we were onboarding and said, look, this is the general idea.  But that's all I meant.  What I'm saying is it wasn't part of our primary focus on a daily basis.

Q.    Okay.  Were there written procedures at Hi Bar?

A.    There were general procedures.  You know,

Iisrael Herbst

75

there were general ideas.  There were people that were focused.  As far as I understood, the people that were focused on doing the underwriting, they had general formulas that they work worked with that were somewhat industry standard.  I'm just -- all I'm addressing is the formality of it.

Q.    And I understand that.

So you already said there were no written rules.  Were there written procedures at Hi Bar?

A.    It may exist, but it's not what --

Q.    Have you ever seen a written procedure regarding Hi Bar's transactions?

A.    I don't recall seeing.

Q.    Now, wouldn't you think, as the owner and as the ultimate authority who authorized every single transaction, that if there was a written procedure, you would be aware of it?

We would agree on that, right?

A.    I don't agree with the inference.  Like I said before, if somebody was being onboarded, they may have referenced a document that existed within the industry that this is the general idea of how to go ahead and underwrite a company.

Q.    Did you, as the owner and controller of Hi Bar, ever issue any general guidelines to your

employees or representatives or brokers that were bringing you transactions regarding what you at Hi Bar wanted to see?

A.    Not in a hard-core formality.

Q.    Okay.

A.    It would likely be an oral communication.

Q.    All right.   So tell me about the brokers. You've mentioned brokers.   Who were the brokers?

A.    There were -- there were a few in the industry that we dealt with.   I don't remember all the names offhand.   Some of them --

Q.    Go ahead.

A.    I'm saying they had -- some of them had like, you know, company names other than personal names that we referred to.

Q.    How did it work with a broker?

A.    There were different structures.   Sometimes they weren't paid their commissions until a certain amount of performance.   Sometimes it was a bigger amount, a smaller amount.   I didn't primarily negotiate with them.   It was mostly --

Q.    Who did?

A.    Mostly Yoel, but I was usually briefed or informed about them.

Q.    Was a broker ever paid any commissions or a

broker promised any commissions without your authority that you know of?

A.   When you're saying my authority, you want to know if somebody was promised something if they checked with me specifically beforehand?

Q.   Yes.

A.   Not always.

Q.   All right.  So let's -- let's just talk a little bit about how these transactions occurred.

A.   Okay.

Q.   Ultimately Hi Bar would be the company that paid the money out, right?

A.   Right.

Q.   And there would be a merchant that would be desirous of some amount of money, correct?

A.   Okay.

Q.   Is that -- is that accurate?

A.   Yes.

Q.   Okay.  And before Hi Bar gave any money to any merchant, there would have to be a contract signed with that merchant; correct?

A.   Yes.

Q.   And that before you approved of any money going to any merchant, you would also have to approve of the contract, would you not?

Iisrbel Herbst

78

A.   Generally, yes.

Q.   Okay.  Now, the brokers, would it be a fair statement to say that the brokers would be the -- the persons that would be coming and presenting to Hi Bar a particular merchant that needed money?

A.   Yeah.

Q.   Okay.  So a broker would come with a deal, say, you know, XYZ company needs money and they need X and are you interested, and then Hi Bar would make a determination of whether or not they would be willing to do that deal; right?

A.   Yeah.  I mean --

Q.   Okay.

A.   -- if you're asking me how -- how the brokers work, I believe that the brokers also became aware of certain people who were looking for money and they were --

Q.   Right.  I'm --

A.   -- always able to get it from one place and then they came, oh, I'm sure I can get Hi Bar to do the --

Q.   That's not what I'm asking you.

A.   Okay.

Q.   That's not what I'm asking.  I know there's a million different ways for a broker to find a

Iisroel Herbst

79

company that needs money.

A.    Okay.

Q.    I don't care about that.

A.    Exactly my point.

Q.    I'm only concerned what happened once the broker came to you.  Okay?

A.    Well, generally they would -- they would come to Yoel.  They wouldn't come to me directly.

Q.    Okay.

A.    And if they would come to me directly, I would likely refer them to Yoel at that point.

Q.    Okay.  All right.  So if -- if a deal was being presented to Hi Bar by a broker, a broker would have a customer, and if they contacted you directly, you would refer them to Yoel.  And then there would be some determination made whether or not you would be willing to give any money to that merchant, correct?

A.    Right.

Q.    Okay.  And so these brokers, were they typically paid a commission of the total amount of money that they were seeking?

A.    I don't remember the specifics about whether the commission was on the amount of money they were seeking or the amount of money that would

Iisrael Herbst

80

eventually come, you know, supposedly need to be coming Hi Bar's way.  Everybody had their little schtick going, but there were all different types of structures.

Q.    Okay.  But the brokers weren't --

A.    Like it was constantly being -- huh?

Q.    Right.  The brokers weren't doing this for free.

A.    Right.

Q.    They intended to be paid a commission, correct?

A.    Absolutely.

Q.    And who negotiated that commission?

A.    I'd say on the front end, primarily Yoel.  You know, if something would -- would fit into the standard, then I wouldn't question it.  If something felt different or off or inconsistent, then I'll get more involved.

Q.    Now, were any of your MCA contracts with any merchants, did they indicate that a commission was being paid to a broker?

A.    If it's written in the contract?

Q.    Correct.

A.    I don't -- I don't remember.  Not necessarily.  Meaning if it's not written in the

Iisrbe1 Herbst

81

contract doesn't mean that there was no broker or commission paid.

Q.    Okay.  All right.  Well, my question is if a broker was being paid a commission on a particular transaction between Hi Bar and a merchant, was the merchant made aware in writing of what the broker was to receive as a commission?

MR. LETO:  Object to the form.

Go ahead.

THE WITNESS:  Not that -- not that I'm aware of.

BY MR. BRESLIN:

Q.    And would -- would each deal be different, a different -- a different negotiation with each broker for commissions on each deal?

A.    Sometimes.

Q.    All right.  And would the determination on that be made on the amount of money they want and the likelihood of the merchant paying what he's supposed to pay?

A.    Those would be factors, yeah.

Q.    Now, were there any policies in place that you know of at Hi Bar regarding the due diligence before any particular merchant was given any amount of money?

Prestige Reporting Service, Inc. (954) 764-7297 | info@prestigereportingservice.com

Iisroel Herbst

82

A.    Hard-core policies --

Q.    Well --

A.    -- or general understandings?

Q.    Just, I'm trying to -- just explain to me how it worked.

A.    Well, a lot of it was done between Yoel, the broker and the merchant.  Yeah, there was certain amount of data.  You know, there were usually credit checks that were run.  There were bank statements that were generally reviewed.

I don't know for sure, but I'm aware of it that sometimes it would be discussed with other MCA companies because many merchants would send some documents to one company, different documents to different companies, and it would be a way of coordinating, you know, accurate data.

I mean, it's, yeah, low on the formalities, a lot more on the street smarts of the --

Q.    Ultimately it was your decision to enter into any contract, correct?

A.    Usual -- I'm the one who -- who wired the money.

Q.    Okay.  And before you wired the money, what information did you want on any particular deal?

A.    It also depends.  If it was a larger deal,

Iisroel Herbst

83

if it was a smaller deal, if it was coming from somebody that we dealt with and had a stronger comfort level, if it was coming from somebody on the outside that wasn't so, if it was a name that I had heard of in the past, of a company that I've heard of in the past, if not, generally there would be a -- like I said, it wasn't formal.  It was -- it depended on the situation.  I mean --

Q.    Okay.

A.    -- obviously, but there was -- there was a little bit of a process.  I mean, generally speaking, I wasn't the one who actually set up the wire.  I would have somebody in the office do it so there would be a way to cross-reference wiring information and match it to -- to a company that was presented. You know, generally we like to fund only a company and not an individual on a personal level, so...

Q.    Did -- okay.  Did you -- did you enter into any contracts because Yoel Getter told you this is a good deal?

A.    Yes.

Q.    Okay.  And -- and did you enter into any contracts when Yoel Getter told you it was a good deal without you looking at any information about that particular merchant, just trusting his analysis?

Iisrbei herbst

84

A.    Occasionally.

Q.    Now, how about Josh Lubin, did he also give you advice on what would be a good deal and what would not be a good deal?

A.    Sometimes.

Q.    And if Josh Lubin told you that any particular deal was a good deal, would you rely on that representation?

MR. LETO:  Object to the form.

You can answer.

THE WITNESS:  Sometimes.

BY MR. BRESLIN:

Q.    Now, do you remember the deal with Excell or the Karma companies?

A.    Yes.

Q.    And do you recall how you got involved in that deal?

MR. LETO:  Object to the form.

You can answer.

THE WITNESS:  Well, it's a name that I've heard of quite often.  How I got involved, I know that there was a conversation about it for some time with Yoel.

BY MR. BRESLIN:

Q.    Okay.

Iisrbel Herbst

85

A.   I heard about it from Yoel.   I may have heard about it from Josh Lubin.   They were, you know, working the streets in -- in Florida, which I think their company is located in Florida.   One or -- one or both of them may have actually met with Excell. It was something that was percolating for some time.

And then I think originally we -- we joined the deal on the outside and then eventually we took over the deal, as far as I remember.

Q.   Okay.   We're going to get into those details in a moment.   Just give me a moment, please.

All right, Mr. Herbst.   I'm going to show you -- I'm going to share my screen with you.

(Plaintiffs' Exhibit 6 was marked for identification.)

BY MR. BRESLIN:

Q.   Do you see Plaintiffs' Deposition Exhibit 6 on your screen?

A.   Yes.

Q.   Okay.   I'm going to scroll through this document.   This document purports to be an Operating Agreement of Hi Bar Capital.

MR. BRESLIN:   This is Exhibit 6, Ms. Court Reporter.   Ms. Court Reporter, I'm going to be numbering exhibits and they're not going to be

So did Mr. Lubin have the authority to demand payments from Excell or Mr. Zankl on behalf of Karma?

MR. BRESLIN:  Excuse me for one moment. I'm very sorry.

(Discussion held off the record.)

COURT REPORTER:  Are we going off the video record?  Are we going off the video record?  Are we back?

MR. LETO:  I think we're back.

THE WITNESS:  Yeah.

MR. BRESLIN:  I am very sorry.  One of the joys of Zoom depos.  Okay.

MR. LETO:  It happens -- it happens to the best of us.  No problem.

MR. BRESLIN:  At least I don't have my cat up anymore.

Okay.  So, I'm sorry, where was I? Ms. Court Reporter, what was my last question? I'm sorry.

COURT REPORTER:  Hang on one second.

(Thereupon, the requested portion of the transcript was read back.)

MR. JACOBS:  Objection.

BY MR. BRESLIN:

Q.    All right.   You heard the question.   What's the answer, please?

A.    I don't understand what "authority to demand payment" was.

Q.    All right.   Well, did -- did Mr. Lubin have the authority to attempt to collect the debt from Mr. Zankl for Hi Bar?

A.    Do you mean if I was okay from Mr. Lubin helping me get paid; is that your question?

Q.    My question to you is did Mr. Lubin have the authority to attempt to collect the Hi Bar debt that was owed to Hi Bar by Excell and Karma?

A.    So what I'm having a challenge understanding is what authority does somebody need if he's --

Q.    Well --

A.    -- in fact, giving me the money.   If he took it for himself, the answer is, you know, obviously not.   But if somebody is helping me out to get paid, I don't need a lot of authority for that.

Q.    Well, I understand.   But, you know, you're a businessman and you have a business and somebody owes you money and, you know --

A.    Am I okay if the broker --

Q.    -- are you okay with that anybody just goes

Israel Herbst

207

and tries to collect your debt for you or --

A.    No.

Q.    -- or do you want -- do you want only people that you authorize to go collect your debt for you?

A.    There's no specific authorization, but I would appreciate a broker who brokered me the deal and got me into this situation in the first place to help me get paid.

Q.    Mr. Herbst, Mr. Herbst, I'm not saying you gave him a badge and said, go collect.

A.    Okay.  That's what I'm saying.

Q.    What I'm saying is when he was contacting Mr. Zankl and attempting to get the money owed to Hi Bar, that was with your consent and your permission; correct?

A.    Yes.

Q.    Okay.  So when Mr. Lubin was interacting with Scott Zankl, telling him you owe money, you're late, you know, lawsuits are coming, all of that was with the consent of Hi Bar in an attempt to collect the Hi Bar debt; correct?

MR. LETO:  Object to the form.

You can answer.

THE WITNESS:  I would phrase it more it was

Iisrael Herbst

208

with my general knowledge that he was trying to get me paid.  I don't know what he told him.  I don't know what he told him specifically, but I was comfortable, you know, with him reaching out for payment.

BY MR. BRESLIN:

Q.    Okay.  So and that's all I'm asking. When he was attempting to get the money, he wasn't, you know, a rogue out there just trying to do his own thing; this was, you know, at the behest of Hi Bar and Hi Bar knew what he was doing and consented to what he was doing, correct?

A.    "Consent" is a very strong word and I know that when it comes to trying to collect a debt, there are some parameters that somebody may use as far as --

Q.    Of course.

A.    -- I don't want to be out of it and I don't know what else is going to be thrown my way.  So I'm saying it was helpful that Mr. Lubin was trying to complete the process.

Q.    All right.  You knew he was doing it, right?

A.    To some degree, yes.

Q.    Okay.  And so, as a matter of fact, you

knew in November, you knew in December, you knew in January 2022, you knew that Mr. Lubin was attempting to collect the Hi Bar debt from Mr. Zankl in all of those months; correct?

A.    Yes.

Q.    Okay.  And he reported back to you, did he not, and advised you of his efforts to collect the debt; correct?

A.    Occasionally.

Q.    Okay.  I'm going to share the screen again, and this is the Hi Bar MCA.  And we talked about earlier that the Hi Bar MCA authorizes Hi Bar to file a UCC Financing Statement, correct?

A.    Yes.

Q.    And it expressly talks about that and authorizes you to protect your -- your investment or your advance or whatever we want to refer to it as, correct?

A.    Yes.

Q.    And there's this security agreement that's part of the -- there's this security agreement that's part of the -- the MCA and it talks about collateral, you collateralizing, you know, certain collateral that your merchant may have so you're protected and can collect; right?

264

about Hi Bar having a security interest in the Karma companies' collateral; correct?

A.    Correct.

Q.    And there's more language in here that talks about UCCs.  So we will stop on this.  I -- you would then agree just generally that this Settlement Agreement makes very clear in no uncertain terms that Hi Bar is protecting its -- the money that it's owed by a security interest and collateral that's protected by a UCC; correct?

MR. LETO:  Form.

THE WITNESS:  It seems so, yes.

MR. BRESLIN:  Okay.  All right.  Thank you very much, Mr. Herbst.

(Thereupon, at 5:12 p.m., the video deposition was adjourned.)

CERTIFICATE OF OATH


STATE OF FLORIDA )
                    SS
COUNTY OF BROWARD)


          I, COLLEEN FOOTE, Notary Public in and for

the State of Florida at Large, do certify that

YISROEL HERBST appeared before me via videoconference

and was duly sworn.

          WITNESS my hand and official seal this 17th

day of May, 2024.




          COLLEEN FOOTE
          Notary Public – State of Florida
          Commission #HH 174470
          Expires:  September 18, 2025

Yisroel Herbst

266

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA   )
                              SS.
COUNTY OF BROWARD )

I, COLLEEN FOOTE, Court Reporter and Notary Public, certify that I was authorized to and did stenographically report the deposition of YISROEL HERBST; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 17th day of May, 2024.

COLLEEN FOOTE, Court Reporter