1

IN THE CIRCUIT COURT OF THE SEVENTEENTH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA


FVP OPPORTUNITY FUND III, LP,        )
a Delaware limited partnership;      )
FVP INVESTMENTS, LLC, a Delaware     )
limited liability company; and       )
FVP SERVICING, LLC, a Delaware       )
limited liability company,           )
                                     )
               Plaintiffs,           )
                                     ) CASE NO.:
vs.                                  ) CACE-22-005125
                                     )
                                     )
KARMA OF BROWARD, INC., a            )
Florida corporation; et al.,         )
                                     )
               Defendants.           )
_____)

                              Videoconference
                              May 28th, 2024
                              11:53 a.m. – 4:20 p.m.








                   - - - - - - - -

              CONTINUED VIDEO DEPOSITION

                        OF

                  YISROEL HERBST

                   - - - - - - - -

PLAINTIFF'S
EXHIBIT

12

APPEARANCES:

SCHWARTZ | BRESLIN PLLC
The DuPont Building
169 E. Flagler Street, Suite 700
Miami, FL 33131-1203
(305)577-4626
jb@jsjb.law
By JERRELL A. BRESLIN, ESQ.
Attorney for the Plaintiffs

LETO LAW FIRM
201 S. Biscayne Boulevard, Suite 2700
Miami, FL 33131-4330
(305)341-3155
mleto@letolawfirm.com
By MATTHEW P. LETO, ESQ.
Attorney for the Hi Bar Capital

HARRY WINDERMAN
LAW OFFICE OF HARRY WINDERMAN
One Boca Place, Suite 205E 2255 Glades Rd
Boca Raton, FL 33431-7382
(561)707-0000
lynoramae@gmail.com
By HARRY WINDERMAN, ESQ.
Attorney for the Karma and the Zankls

WEISSMAN & DERVISHI, P.A.
1 S.E. 3rd Avenue, Suite 1700
Miami, FL 33131-1714
(305)347-3204
ljacobs@wdpalaw.com
By LUKE T. JACOBS, ESQ.
Attorney for Avrumi Lubin a/k/a Josh Lubin

SCOTT C. GHERMAN, P.A.
902 Clint Moore Road, Suite 120
Boca Raton, FL 33487
(561)757-6266
sgherman@scottghermanpa.com
By SCOTT C. GHERMAN, ESQ.
Attorney for Moshe Farachi and Vantiff, Inc.

APPEARANCES CONTINUED:

EBERST LAW FIRM
6560 W. Rogers Circle, Suite 27
Boca Raton, FL 33487-2746
(305)725-0444
cgleason@eberstlaw.com
By CATHERINE GLEASON, ESQ.
Attorney for Moshe Farachi


KLEIN PARK LOWE, P.L.
9130 S. Dadeland Boulevard, Suite 2000
Miami, FL 33156-7809
(561)655-1500
shortc@kleinpark.com
By CHARLES G. SHORT, ESQ.
Attorney for Kurkin Forehand Brandes and Mark Brandes


Also Present:   Oliver Lee - Videographer
                Greg Nelson
                Michael Howell
                Shaya Baum


        (All parties appearing via videoconference.)

                              I N D E X

                                                            PAGE

     WITNESS:  YISROEL HERBST

     DIRECT EXAMINATION
     BY MR. BRESLIN                                          11

     CROSS-EXAMINATION
     None

Prestige Reporting Service, Inc. (954) 764-7297 | info@prestigereportingservice.com

C E R T I F I E D   Q U E S T I O N S

GROUP A:

Page   15  Line    9
Page   15  Line   23
Page   22  Line    7
Page   28  Line    8
Page   54  Line    3
Page   83  Line   24
Page  150  Line   18
Page  152  Line   19

GROUP B:

Page  171 Line    1
Page  173  Line    2
Page  173  Line   10
Page  173  Line   18
Page  174  Line   10
Page  174  Line   17
Page  174  Line   23
Page  175  Line    5
Page  175  Line   10

E X H I B I T   I N D E X

Plaintiffs' Exhibit 4 for I.D.                         12
  Answers to Interrogatories

Plaintiffs' Exhibit 12 for I.D.                        39
  Hi Bar Capital - Revenue Purchase
  Agreement; 10-27-21


Plaintiffs' Exhibit 12-A for I.D.                      39
  Hi Bar Balance Transfer Agreement;
  10-27-21

Plaintiffs' Exhibit 12-B for I.D.                      47
  Email - Excell Funding Group; 11-15-21

Plaintiffs' Exhibit 13-A for I.D.                      25
  Wire Confirmation Detail - Excell
  Payoff - Spin Capital; 11-1-2021

Plaintiffs' Exhibit 13-B for I.D.                      26
  Wire Detail Report - Spin Capital;
  11-1-2021

Plaintiffs' Exhibit 18 for I.D.                        69
  UCC Termination Statement;
  Filed 12-19-21 at 6:46 p.m.

Plaintiffs' Exhibit 20 for I.D.                        78
  Email from F. O'Donnell, Biltmore
  Consultants; 12-20-21 at 11:26 a.m.

Plaintiffs' Exhibit 22 for I.D.                        94
  Email from S. Zankl to J. Lubin
  RE:  Feenix Karma Loan Agreement;
  1-21-22

Plaintiffs' Exhibit 23 for I.D.                        84
  Text Messages between J. Lubin and
  S. Zankl; 1-3-22

Plaintiffs' Exhibit 24 for I.D.                        90
  Text Messages between S. Zankl and
  J. Lubin; 1-13-22

Plaintiffs' Exhibit 25 for I.D.                        96
  Email from S. Zankl to J. Lubin
  Karma Loan Agreement; 1-24-22

C O N T I N U E D   E X H I B I T   I N D E X

Plaintiffs' Exhibit 26 for I.D.                    98
  Email from S. Zankl to J. Lubin
  Karma Exclusivity Agreement; 1-24-22

Plaintiffs' Exhibit 27 for I.D.                    101
  Email from S. Zankl to J. Lubin
  Karma Pledge Agreement; 1-24-22

Plaintiffs' Exhibit 28 for I.D.                    101
  Email from S. Zankl to J. Lubin
  Karma Security Agreement; 1-24-22

Plaintiffs' Exhibit 29 for I.D.                    102
  Email from S. Zankl to J. Lubin
  Feenix Signature Pages; 1-24-22

Plaintiffs' Exhibit 30 for I.D.                    107
  Text between S. Zankl and J. Lubin;
  1-25-22

Plaintiffs' Exhibit 31 for I.D.                    109
  Hi Bar's UCC Financing Statement;
  Filed 1-25-22 at 10:05 p.m.

Plaintiffs' Exhibit 32 for I.D.                    114
  FVP's UCC Financing Statement;
  Filed 1-26-22 at 5:37 p.m.

Plaintiffs' Exhibit 33 for I.D.                    114
  FVP's UCC Financing Statement;
  Filed 1-26-22 at 5:37 p.m.

Plaintiffs' Exhibit 34 for I.D.                    118
  Text Messages between S. Zankl and
  J. Lubin

Plaintiffs' Exhibit 35 for I.D.                    121
  Stipulation EAG and Hi Bar; 2-1-22

Plaintiffs' Exhibit 39 for I.D.                    143
  Motion for Summary Judgment

Plaintiffs' Exhibit 40 for I.D.                    127
  Payment Schedule (Excell/Spin/Hi Bar)

Plaintiffs' Exhibit 41 for I.D.                    145
  Email from J. Lubin to S. Baum;
  3-21-24

C O N T I N U E D   E X H I B I T   I N D E X

Plaintiffs' Exhibit 43 for I.D.                         149
    Email from J. Lubin to J. Breslin;
    3-21-24

Plaintiffs' Exhibit 44 for I.D.                         154
    Text Message from J. Lubin to
    S. Zankl

Plaintiffs' Exhibit 45 for I.D.                         156
    Hi Bar Complaint - State Case

Plaintiffs' Exhibit 46 for I.D.                         159
    RICO Case Against Hi Bar Excell Trustee

Plaintiffs' Exhibit 47 for I.D.                         162
    Diverse Capital RICO Complaint

Plaintiffs' Exhibit 48 for I.D.                         165
    Alpine Business RICO Complaint

Plaintiffs' Exhibit 49 for I.D.                         167
    Libertas RICO Complaint

+ + + + + + + +

Video deposition of YISROEL HERBST, a witness of lawful age, taken by the Plaintiffs for the purpose of discovery and for use as evidence in the above-entitled cause, wherein: FVP OPPORTUNITY FUND III, LP, a Delaware limited partnership; FVP INVESTMENTS, LLC, a Delaware limited liability company; and FVP SERVICING, LLC, a Delaware limited liability company are the Plaintiffs and KARMA OF BROWARD, INC., a Florida corporation; et al., are the Defendants in the Circuit Court in and for Broward County, Florida, pursuant to notice heretofore filed, before VICTORIA PAEZ NEIL, a Shorthand Reporter and Notary Public in and for the State of Florida at Large, via videoconference, Broward County, Florida, on the 28th day of May 2024, commencing at 11:53 a.m.

- - -

VIDEOGRAPHER: In the case styled FVP Opportunity Fund, III, LP, et al. versus Karma of Broward, Inc., Case number CACE-22-05125.

This is the continued video recorded deposition of Yisroel Herbst.

This deposition is taking place via Zoom on May 28th, 2024. The time is now 11:57 a.m.

Our videographer is Oliver Lee.

Counsel will state their appearances for

the record, after which our court reporter, Victoria Neil, will swear in the witness.

MR. BRESLIN: Yes. Good afternoon or morning. Jerry Breslin for the FVP parties.

MR. LETO: Good morning. Matthew Leto, on behalf of Hi Bar and the witness, Yisroel Herbst.

MR. JACOBS: Good afternoon. Luke Jacobs, on behalf of Josh Lubin.

MR. WINDERMAN: Harry Winderman, of behalf of the Zankls and Karma.

MR. SHORT: This is Charles Short, from Klein, Park & Lowe, on behalf of Kurkin Forehand Brandes, LLP and Mr. Brandes.

MR. GHERMAN: Scott Sherman, on behalf of Moshe Farachi.

MS. GLEASON: Good morning. Attorney Catherine Gleason, on behalf of Moshe Farachi.

MR. BRESLIN: That's it. You can swear the witness.

COURT REPORTER: Oliver?

VIDEOGRAPHER: Yeah. You swearing the witness in?

COURT REPORTER: Oh. I'm sorry. You're waiting on me.

VIDEOGRAPHER:  That's okay.

COURT REPORTER:  Mr. Herbst, please raise your right hand.

THEREUPON,

YISROEL HERBST,

being a witness in the notice heretofore filed, being of lawful age and being first duly sworn in the above cause, testified on his oath as follows:

THE WITNESS:  Affirm.  I affirm.

COURT REPORTER:  Thank you.

CONTINUED DIRECT EXAMINATION

BY MR. BRESLIN:

Q.    Yes.  Good morning, Mr. Herbst.  You are here for the continuation of your deposition that we started last month.  You're aware of that, correct, sir?

A.    Yes.

Q.    And since the -- since we terminated the deposition last time, other than attorneys, have you spoke to anyone about your testimony in this case?

A.    Just my son Mordechai.

Q.    And Mordechai is the corporate representative of Hi Bar, is he not?

A.    He was, yes.  I mean is, yeah.

Q.    Mr. --

A.   It's temporary.

Yeah?

Q.   I'm sorry.  I didn't --

A.   I'm saying to the extent that we're still taking caring of Hi Bar stuff.

Q.   Mr. Herbst, what your home address?

A.   2111 57th Street, Brooklyn, New York 11204.

Q.   And do you live there with your daughter Esther?

A.   Yes.

Q.   Mr. Herbst, have you taken any medications or anything that you feel would prevent you from understanding my questions here today?

A.   No.

Q.   Mr. Herbst, we -- we left off after a review of Plaintiffs' Exhibit Number 17.  And I just go back and go over a couple of other exhibits before we move on to Number 18.

So I am going to share my screen with you.  Okay?

A.   Okay.

(Whereupon, Plaintiffs' Exhibit 4 was marked for identification.)

BY MR. BRESLIN:

Q.   Okay.  On the screen you should see a --

Plaintiffs' Deposition Exhibit Number 4.

Do you see that?

A.    Yes.

Q.    All right.  I'm going to scroll through this document, Mr. Herbst.  And what this purports to be is a response to answers to interrogatories that were filed in this case.  And I'm going to scroll through it slowly and I'm going to show you the signature at the bottom.  And it appears to be verified by you on February 22nd, 2024.  You see that?

A.    Yes.

Q.    Do you recall signing this document in February of 2024?

A.    Yes.

Q.    All right.  So what was your understanding of what this document required of you?

A.    Responsive information given.

Q.    Okay.  So it was your understanding that you, under oath, were required to answer the questions that were posed here, correct?

A.    Yeah.

Q.    So the first question says:  Identify all companies or entities in which Hi Bar uses as an alias or does business as.  And there are a number of

companies that are listed there:

One is Diverse Capital.

The second is Crusader Group.

Third is Gold Capital.

The fourth is Kingdom Kapital.

And we have Parkview Advance New York LLC.

And United Funding New York LLC.

Do you see that answer?

A.    Yes.

Q.    Was -- when you gave that answer, was it true and correct at the time you gave it?

A.    I believe so.

Q.    So Diverse Capital is a d/b/a of Hi Bar; is that accurate?

A.    Yeah.

Q.    Okay.  Now, is -- does Diverse Capital have a full identification?  Is it Diverse Capital LLC or is it just the phrase Diverse Capital?

A.    I think it's just Diverse Capital.

Q.    Okay.  Now, is that a registered d/b/a in the -- in the State of New York?

A.    I believe so.

Q.    Does Diverse Capital have its own bank accounts?

A.    I believe so.

Q.    Okay.  Are -- are you a signatory on the Diverse Capital bank accounts?

A.    Yes.

Q.    And what bank are those accounts kept at?

MR. LETO:  You can answer.

A.    Optimum.

Q.    OptimumBank?

A.    Uh-huh.

Q.    And how many accounts at OptimumBank does Diverse Capital have there?

MR. LETO:  All right.  That's -- I would instruct you not to answer.

This is not discovery in aid of execution.

BY MR. BRESLIN:

Q.    Do you -- do you --

MR. BRESLIN:  Are you instructing -- you're instructing him not to answer, correct?

MR. LETO:  Correct.

MR. BRESLIN:  All right.

That will be the first certified question, Ms. Court Reporter.

BY MR. BRESLIN:

Q.    The -- how many accounts does Diverse Capital have at OptimumBank?

MR. LETO:  Same -- that was the same

question, so same instruction.

MR. BRESLIN:  All right.  So you're instructing him not to answer.

That's Certified Question Number 2, Ms. Court Reporter.

BY MR. BRESLIN:

Q.    Does Diverse Capital have any accounts at any banks other than OptimumBank?

MR. LETO:  You can answer.

A.    Not that I'm aware of.

Q.    And are you the sole signatory on all the Diverse Capital bank accounts?

A.    Yes.  Other people may -- may be able -- in the office -- may be able to set up or appear in the release, but I -- I'm usually in the final release.

Q.    Okay.  So when you say the final release, that means before any moneys leave that account it would require your authority, correct?

A.    Yes.

Q.    And how long has Hi Bar been using Diverse Capital as a d/b/a?

A.    Not too long after Hi Bar was established. I don't remember the exact date.

Q.    Well, if you recall, Hi Bar was formed in January of '21.  So if that refreshes your memory,

how long after the company was formed would Diverse Capital have been formed as a d/b/a?

A.    How long after Hi Bar?

Q.    Right.

A.    I -- I think it was within a month or two.

Q.    So then Hi Bar was formed in January of 2021.  And then, to the best of your recollection Diverse was formed as a d/b/a around February of 2022, give or take?

A.    I -- I don't remember if it was in February or March, you know.

Q.    Fair enough.

A.    When Hi Bar started getting some traction, we added multiple d/b/a's.  Usually we get --

COURT REPORTER:  I'm sorry.  When Hi Bar started getting --

THE WITNESS:  Traction we -- we added d/b/a's -- (Internet disruption) -- different brokers who wanted to reflect their activity in the market.

BY MR. BRESLIN:

Q.    Okay.  So are the Diverse Capital bank accounts still operational or have they been closed?

A.    I don't -- I don't think that there's been much activity the last year or two, but they haven't

been formally closed.

Q.   And how would you determine, if you were going to do business for or on behalf of Hi Bar, whether or not you would use Diverse Capital as a d/b/a for Hi Bar?

A.   Best always would be at the request of a broker.

MR. BRESLIN:  Ms. Court Reporter, did -- did you understand what he just said?

COURT REPORTER:  I missed the beginning. He's breaking up a tiny bit when he speaks.  I'm not sure why.

THE WITNESS:  I'm -- I'm saying almost always the primary reason would be because the broker involved would say let's put it under this paper or that paper.

BY MR. BRESLIN:

Q.   Okay.  So if I understand you correctly, the reason that you would use a d/b/a for Hi Bar would be at the request of a broker to use a different name for the company other than Hi Bar, would that be an accurate statement?

A.   Usually, yeah.

Q.   Okay.  Now, why would a broker want to use a different name other than Hi Bar?

MR. LETO:  Object to the form.

BY MR. BRESLIN:

Q.    What's the difference?

A.    Most of the time it would be a broker that would -- a way to be able to claim and show how much money he, quote, unquote, funded.

Q.    All right.  But why would a d/b/a help or assist in that process?  I don't understand.

A.    Cause if you can show that, look how many loan -- how much business transactions he did. So if his name was Diverse and he wants to brag or show potential clients that he has muscle in the industry, he'll say, look, we have -- we did this deal, we did that deal.

Q.    Okay.  So then, if I understand you correctly, you would create these d/b/a's for a particular broker who would then be able to tell merchants that, Look at all these deals I've done and I -- I have all these different contracts under the name Diverse, would that be accurate?

A.    I guess, yeah.

Q.    Okay.  So then Diverse, the -- the business that was done with Diverse would have been done with a particular broker, correct?

A.    Usually, yes.

Q.    Okay.   And who was that broker?

A.    I don't -- I don't know him personally.

Q.    Have -- did you -- have you ever known him?

A.    I've heard his name in the background. I've never dealt with him direct.

Q.    Okay.   What is his name?   That's what -- I'm trying to get his name.

A.    I don't know.

Q.    Okay.   So --

A.    I don't remember.   I never dealt with him. I -- I never really had a need.   It was --

Q.    Who dealt with him?

A.    Probably Yoel.

Q.    Okay.   So if I understand you correctly, you were requested to form a d/b/a broker, a bank account was formed for that d/b/a, a bank account that you controlled, the deals were done through that d/b/a with merchants, correct?

A.    Uh-huh.

Q.    And you don't know the name of the broker that brought the deals to Hi Bar, correct?

A.    Correct.

Q.    Let's go to Crusader.

A.    At -- at the time, when I was more active, could be I would remember the name.   At this moment I

don't remember the name.

Q. I understand.

All right. Let's go to Crusader Group.

Tell me about the formation of the d/b/a Crusader Group.

MR. LETO: Object to the form.

A. I -- I --

Q. You can answer.

A. I believe -- I believe almost everything that I explained about Diverse would be the same on Crusader Group. I mean, I don't know if it was created on the same day but --

Q. Okay. So to -- to re- -- restate what you said then, Crusader Group would have been a d/b/a that was registered and created for Hi Bar to do business with a particular broker and so that particular broker could identify to his customers or merchants that he was --

A. Right.

Q. -- engaged and did deal -- deals in the industry, correct?

A. Right.

Q. And did you form a bank account for Crusader Group?

A. Yes.

Q.    At what bank?

A.    Optimum.

Q.    Was there more than one account opened at OptimumBank for Crusader Group?

MR. LETO:  I'm instructing him not to answer.

MR. BRESLIN:  Certify that question, Ms. Court Reporter.

BY MR. BRESLIN:

Q.    Were there any other bank accounts at any other bank, other than OptimumBank, in which Crusader Group either took in money or paid out money?

A.    Not that I'm aware of.

Q.    Now, when these bank accounts were opened for these d/b/a's, were those bank accounts opened in the name of Hi Bar d/b/a that company or was it simply a Hi Bar?

A.    I don't understand the question.

Q.    If -- or if I got it bank -- a bank statement from OptimumBank for the Diverse Capital account, what would be at the top of it?  How would their customer be identified on their bank statement?

A.    I don't -- I don't remember what it looks like.

Q.    Okay.  So you don't know if it was in the

name of Diverse or in the name of Hi Bar, correct?

A.    Correct.  What I -- what I do know is that when the client sent money to Hi Bar, it would likely say Crusader, not Hi Bar.

Q.    Okay.  So if the -- for these particular transactions with these different merchants that had deals with either Diverse or Crusader, would they then send the money directly to the bank account at Optimum or would it go to a Hi Bar account and then you would transfer it?

A.    No, it would go directly to these accounts that were set up.

Q.    Okay.  So would it be fair to say that when the MCAs that Diverse issued and Crusader issued, those MCAs would have specific bank information related to their account at OptimumBank, correct?

A.    Yes.

Q.    How many MCAs were executed with Diverse Capital as a d/b/a of Hi Bar?

A.    I don't remember.

Q.    Could you estimate?  Was it over 20?  Under 20?

MR. LETO:  Object to the form.

A.    It's probably over 20.

Q.    And how about Crusader Group, the -- the

number of transactions with Crusader Group, would that be the same, over 20?

A.    Probably.

Q.    And do you know the name of the -- of the broker that was associated with Crusader Group?

A.    I don't remember right now, but him I have met once or twice.

Q.    Okay.

A.    I bumped into him.

Q.    All right.  So what's his name?

A.    I don't remember his name right now.  But if it's like thrown at me, I could say, yeah, I think he was involved.

Q.    Okay.  And so as far as Crusader Group goes, as far as you know, those bank accounts that -- for Crusader, account or accounts at OptimumBank for Crusader, they -- they still remain open and operational, correct?

A.    Yes.

Q.    Did Hi Bar Capital in its own name maintain any bank accounts at OptimumBank?

A.    Yes.

Q.    Okay.  So Hi Bar Capital had accounts at TD Bank and OptimumBank, correct?

A.    I don't remember TD Bank.

Q.    Okay.

A.    Where -- where is that coming from?

Q.    I'm sorry.  I -- I might be mistaken.  Let me just --

Okay.  I'll going to show you -- I'm going to share the screen again just to refresh your memory.

(Whereupon, Plaintiffs' Exhibit 13-A was marked for identification.)

BY MR. BRESLIN:

Q.    We went over this at -- at the last -- your last deposition.  This is Plaintiffs' Exhibit 13-A.  This would be a wire, TD Bank, from Hi Bar to Spin.

See that, 2.1 million?

A.    Yeah.

Q.    Okay.  Does that refresh your memory that -- Hi Bar's accounts at TD Bank?

A.    One minute.

Q.    You want me to make it bigger?

A.    Yeah.  Yeah.  No, I know what this is.

Okay.  What about this?  This is what?

Q.    I asked you if Hi Bar had also had accounts at OptimumBank and -- in addition to accounts at TD Bank.

A.    Okay.

Q.   And from what I see here is that there was a wire from TD Bank from Spin -- from Hi Bar to Spin, is that accurate or am I reading this wrong?

A.   No, you're reading it wrong.

Q.   Okay.  So the originating bank is OptimumBank and it went to TD Bank; is that accurate?

A.   I believe so, yes.

Q.   Okay.  I see where it says OptimumBank.  So I stand corrected.

So then this -- this -- this wire to Spin went from OptimumBank to TD Bank, correct?

A.   Yes.

(Whereupon, Plaintiffs' Exhibit 13-B was marked for identification.)

BY MR. BRESLIN:

Q.   Okay.  And then the -- 13-B that we went -- that we went over last time as well -- and from TD Bank to OptimumBank.

So, yes, I'm sorry, I certainly didn't mean to try to say anything that was not accurate.  So both of these transactions, these wire transfers are from TD Bank to or from OptimumBank, correct?

A.   It seems so, yes.

Q.   Okay.  So then getting back to my -- my question:  So Hi Bar never had any accounts at TD

Bank, only OptimumBank, correct?

A.   As far as I recall, yeah.  I -- I personally have -- I may have had some back -- you know, we sold -- whatever.  I've done business with TD Bank but not with Hi Bar.

Q.   Okay.  All right.  So let's go back.

All right.  Thank you for clearing that up for me.

All right.  So now we're at -- we're getting down to Gold Capital.  So when was the d/b/a for Gold Capital formed?

A.   Also about three months later.

Q.   Okay.  And was Gold Capital -- is that a -- a d/b/a that was formed for a particular broker as well?

A.   Mostly, yes.

Q.   Okay.  Do you know the name of that broker?

A.   I believe it was Yoel's brother.

Q.   And what would -- what would his name be?

A.   I think -- I don't know what he identifies as.  It's -- I think it's Aaron.

Q.   Aaron Getter?

A.   Uh-huh.

Q.   So do you recall how many MCAs were issued in the name of Gold Capital?

A.    I would say about 50.

Q.    5-0?  50?

A.    Yeah.

Q.    Okay.  And so did Gold Capital maintain bank accounts at OptimumBank as well?

MR. LETO:  You can answer.

A.    Yes.

MR. BRESLIN:  Now, Matt, if I ask for the bank accounts, are you going to object?

MR. LETO:  Yes, 100 percent.

MR. BRESLIN:  Okay.  So let's just agree that that's a certified question.  Okay?

MR. LETO:  Absolutely.

MR. BRESLIN:  All right.  Ms. Victoria, please add that, account numbers for all these accounts.

I'm not going to go through the litany.

BY MR. BRESLIN:

Q.    All right.  So are -- are the Gold Capital accounts, as far as you know, still operational, like the other ones?

A.    Yes.

Q.    Okay.  Let's go to Kingdom Kapital.

MR. BRESLIN:  I'm sorry?  I didn't hear you, Matt.

MR. LETO:  No, I was asking him to move to the center more cause he's on the video.

MR. BRESLIN:  Okay.

BY MR. BRESLIN:

Q.   All right.  Now, we're at Kingdom Kapital. For Kingdom Kapital --

A.   I --

Q.   I'm sorry?

A.   I want to make you -- I want to make you aware, though --

Q.   Okay.

A.   -- just to -- what did you say, to spare the litany -- there may be other people running around with d/b/a's with the same exact names.

Q.   Okay.

A.   I say that cause I'm triggered by one of the people that you asked.  I know clearly that they went ahead with a Gold Capital d/b/a and collected from my clients into their accounts.  So --

Q.   Okay.  So --

All right.  So what you're saying as far as Gold Capital goes, you know that whoever was dealing with some merchants went ahead and took moneys from the merchants into their own accounts or -- or --

A.   Yes.

Q.    -- into accounts --

A.    Yes.

Q.    -- that -- that had nothing to do with Hi Bar?

A.    Well, yeah.  Well, Hi Bar didn't get the money, yeah, correct.

Q.    All right.  But --

All right.  So your agreement with these brokers was that --

A.    No, it's not an agreement.  They may have done so without my agreement.

Q.    Right.  But my -- my understanding is when -- when you entered into these agreements with these d/b/a's with these brokers, the money was supposed to come into the -- to the either Diverse account or Crusader account or the Gold account and then --

A.    That we --

Q.    -- distribute it and then everyone would get their participation --

A.    Right.

Q.    -- correct?

A.    Right.

Q.    All right.  And so what you're saying is that you know for a fact that, at least as far as

Gold Capital is concerned, some of these brokers told merchants to pay them directly and -- and that was in breach of whatever agreement you had with them, correct?

A. Correct.

Q. Okay. And did that -- do you know of that -- do you know whether or not that happened with Diverse or Crusader or only Gold?

A. I don't know.

Q. All right. And how about Kingdom, was -- when was Kingdom formed?

A. I think it was also a little bit later, maybe 2, 3, 4 months.

Q. And does Kingdom -- does Kingdom Kapital also have an account at OptimumBank?

A. Yes.

Q. Now, who is the broker associated with Kingdom Kapital?

A. Again, I haven't met him personally but I knew his name at the time. And I -- I think I've had like, you know, videoconference with him once or twice.

COURT REPORTER: I'm sorry, you've had what conference?

MR. BRESLIN: Video.

THE WITNESS: Like a videoconference or Zoom or maybe, you know, video call, but I don't recall his name right now. If you throw the name at me, I can confirm.

BY MR. BRESLIN:

Q. And, again, there are Kingdom Kapital account or accounts at OptimumBank, correct?

A. Yes.

Q. How about Parkview Advance New York LLC, what can you tell me about --

A. I don't think -- I don't remember all the details. I don't think that I have that much activity. But that was formed as an LLC, not as a d/b/a.

Q. Okay. So who formed that company and when?

A. It was -- it was also within the first three or four months of Hi Bar.

Q. Okay. But who formed that company? Was that you?

A. Yeah.

Q. Okay. So you formed another limited liability company in New York called Parkview Advance New York LLC, correct?

A. Uh-huh. Yes.

Q. And that was to -- and that was to do MCA

business, correct?

A. Yes.

Q. And does Parkview Advance New York LLC have an operating agreement?

A. Probably.

Q. And who are the owners or members of Parkview Advance New York LLC?

A. As far as I remember, it was just me, but I don't remember for sure. I -- I don't think it was highly active. I think --

Q. Okay. As far as, you know --

MR. LETO: Hang on. I don't think he was done answering.

BY MR. BRESLIN:

Q. I'm sorry.

A. I'm saying I think -- I think it was set up, you know, to have -- to have the ability to do. I don't think we ever really did anything much.

Q. Okay. Does Parkview Advance New York LLC have bank accounts anywhere?

A. If it has, it would be at Optimum. I don't remember for sure.

Q. Do you recall whether or not Parkview Advance ever executed any MCAs with any merchants?

A. I don't recall at this moment.

Q.   Was -- was --

Like the other companies, was this company associated with a particular broker?

A.   Likely that was the intention.

Q.   Okay.  Can you recall how many MCAs were entered into between Parkview Advance and -- and a merchant?

A.   No.  I would say, if it was, it was a little, not a lot.

Q.   So under ten, under five?

A.   Yeah, something like that.  If anything. I'm saying it's not a name that caught my attention a lot.

Q.   Okay.  So there may have been some deals, you just don't know?

A.   I don't remember this minute.  You know, we're talking 2021.

Q.   All right.  And, I'm sorry, did I ask you approximately how many deals Kingdom Kapital did?

A.   No, but I -- I would say 20, 30, maybe more.

Q.   Okay.  And, all right, let's go to -- let's go to United Funding New York LLC.  Did you form that company as well?

A.   I believe so, yes.

Q.    Okay.  And was that formed in 2021, shortly after Hi Bar was formed?

A.    Yes.

Q.    And was that company formed by you to perform or engage in MCA transactions with merchants?

A.    I believe so, yes.

Q.    Okay.  And were you the controlling owner of that company as well?

A.    Yes.

Q.    And to the extent that that company has any bank accounts, would they be at OptimumBank also?

A.    Yes.

Q.    As you sit here today, do you recall any MCA contracts that were entered into with -- between United Funding New York LLC and any merchants?

A.    Yeah, I would say a handful; 5, 10.

Q.    Now, when we go down to the -- the next question, Mr. Herbst, you identified certain people that had information about the December 15th Hi Bar ECC financing statement.  Do you see that?

        MR. LETO:  Object to form.

A.    Uh-huh.  Yes.

Q.    Now, you list certain people and one of those people that's listed is Frank O'Donnell.  Do you see that?

A.    Yes.

Q.    Okay.  What was Frank O'Donnell's role?

MR. LETO:  Object to the form.

A.    I don't know.

Q.    Do you know who Frank O'Donnell is?

A.    I know that it's associated with this transaction but I never dealt with him.

COURT REPORTER:  I never?

THE WITNESS:  Dealt with him or needed to refer to him.  I didn't rem- -- I remember the name Zankl.

MR. BRESLIN:  Okay.  Is that -- is that coming from your end, Matt?

THE WITNESS:  Yeah.

MR. LETO:  I don't know.

THE WITNESS:  Yeah.

VIDEOGRAPHER:  Yeah, if you can put the laptop on do not disturb, that will solve that problem.

THE WITNESS:  Okay.

BY MR. BRESLIN:

Q.    All right.  So when -- when you gave these answers to the interrogatories and you stated that Frank O'Donnell was an individual with knowledge of that -- the filing in December of 2021, on -- on what

did you base your knowledge to make that statement?

MR. LETO: Object to the form.

A. It probably came from my son. We tried to be as complete and truthful, so I came forward. I mean --

Q. Okay. So would it be an accurate statement to say that your son prepared these answers for your signature, you reviewed them --

A. Contributed. Contributed.

Q. Okay. Did you review this doc- -- these interrogatories before you signed at the bottom that they were true and accurate?

A. To the best of my knowledge, yeah, I do.

Q. All right. So with regard to Mr. O'Donnell, do you know whether or not he was the representative of -- of the Zankls?

A. I'm not going to guess. It's not something that I reviewed this minute, so I don't remember role he played.

Q. Okay. So as you sit here today, you don't know what role he -- he had, correct?

A. Correct.

Q. Okay. You -- you -- in one of your statements here, you say that, in response to Number 8, you say Mr. Lubin did not have the authority to

act on behalf of and bind Hi Bar; is that a true statement?

A.   Yes.

Q.   It says:  Given his participation interest in the Hi Bar MCA and his role as a broker, he was a point of contact with Scott Zankl, and there are no documents relating to his authority between Hi Bar and Lubin; is that an accurate statement?

A.   Yes.

Q.   Sir --

A.   Yes.

Q.   -- is that accurate?

MR. LETO:  Yes.

A.   Yes.

Q.   All right.

All right.  In response to Number 6 --

There's no need -- there's no need for me to go through all these individually.

You -- you reviewed all of these questions and answers before you signed your name at the bottom attesting that they were all accurate, correct?

A.   Yes, to the best of my knowledge at the time.

Q.   And before you signed this document, did you do anything to ensure that the answers you gave

were full, complete and accurate?

A.     I reviewed it with counsel, I reviewed it with my son, I went through it briefly and tried to do my best to be straightforward.

(Whereupon, Plaintiffs' Exhibit 12 was marked for identification.)

BY MR. BRESLIN:

Q.     All right.  Mr. Herbst, last time we were here, we went over Plaintiffs' Deposition Exhibit Number 12, which is the Hi Bar MCA.

Do you remember us going through that?

A.     Yes.

(Whereupon, Plaintiffs' Exhibit 12-A was marked for identification.)

BY MR. BRESLIN:

Q.     Okay.  Now I'm going to show you what's been marked as Exhibit 12-A, which is a document that you were not shown last time but we -- we talked about it.  And you talked about the authority that Hi Bar was given by the Zankls to pay that 2.1 million to Spin, correct?

A.     Okay.

Q.     Do you recall us talking about that?

A.     Yes.  Yes.

Q.     Okay.  So I should -- what's -- what's on

the screen now is Plaintiffs' Exhibit 12-A, which purports to be a document dated 10-27-2021, which appears to show or instruct that Hi Bar is to make a payment of 2,114,312.50 to Spin, correct?

A.    Yes.

Q.    Now, do you know who prepared this document?

A.    No.

Q.    Do you know how this document got to either Kristen Zankl or Scott Zankl for signature?

A.    No.

Q.    Do you know how this document got back to Hi Bar?  How it was delivered to Hi Bar, in what manner?

A.    I don't know.  I don't remember.

Q.    Did you --

A.    Back then -- I'm just saying in the industry, this is a pretty standard type of a document.

Q.    All right.  But so do you know whether or not Kristen Zankl ever signed this document?

A.    I believe --

COURT REPORTER:  I'm sorry?

THE WITNESS:  I believe he did.

BY MR. BRESLIN:

Q.   No.  Kristen Chris.  The wife.  Kristen.

A.   Oh.

Q.   A woman.

A.   No, I don't know.

Q.   You'll -- you'll -- you'll see the first name is Kristen Zankl.

A.   Yeah.  Yeah.  I see.  I see.

Yeah, I don't know about that.

Q.   Do you know whether or not Kristen Zankl signed this document in any way, either physically or electronically?

A.   I don't know.  I do -- I -- I -- my understanding was in the early stages she wasn't aware what was going --

COURT REPORTER:  I'm sorry, you broke up, Mr. Herbst.

THE WITNESS:  I only remember in the back of my mind that in the early stages she wasn't involved but somehow or other, as things were getting more active she became more involved.  I don't remember why.

BY MR. BRESLIN:

Q.   Okay.  So you said that early on Kristen Zankl was not involved, correct?

A.   Right.

Q.    Now, what do you mean by "early on"?  When would early on be?

A.    When -- when I first heard about Excell Auto.

Q.    And when -- when would that have been?

A.    I would say in the -- probably in the summer of 2021.

Q.    Okay.  So that was when Spin was doing its deal with -- with Zankl and Excell, correct?

A.    With -- I think that's when Spin actually did the deal, but there was a point in time -- I think there was -- there was communication before that with Yoel.

Q.    Okay.  All right.  But as far as -- as Hi Bar was concerned, the first time that Hi Bar got involved in this was in October of 2021, correct?

A.    Yes.

Q.    Okay.

A.    But that doesn't mean that there weren't conversations prior is all I'm saying.

Q.    Well -- well, right.  And you also indicated in your last dep- -- deposition that you actually put up money and funded part of the Spin deals with --

A.    Correct.

Q. -- Excell during the summer, correct?

A. Right. Right.

Q. Okay. All right. So -- so my question to you, getting back to the signature on this document: Did you know whether or not Kristen Zankl, on October 28th, 2021, actually signed this document?

A. I have no way of knowing.

Q. Okay. Do you know whether or not Scott Zankl, on 11-1-2021, signed this document?

A. I believe so. That's most I could -- it was -- I -- if I relied on the document, on the instruction to send the money to -- to Spin, then I would believe that he signed it.

Q. Of course. And -- and I'm showing you the document. And it -- and it appears to have electronic signatures. Okay. And I get that. That's obvious. I'm trying to ask you what your knowledge was about the actual signing of this document. So you indicated that you don't know whether or not Kristen Zankl actually signed it and now -- then I asked you whether or not you knew whether Scott Zankl actually signed this, and what is your answer to that question?

A. We can get into the semantics of what knowledge means, but I -- at the time I believed that

he signed it.

Q. Okay. Did -- did you have any conversations with Mr. Zankl where he -- he said to you: I've -- I have now signed this document?

A. No, I never had conversations with Mr. Zankl directly.

Q. Right. And you -- and you never had conversations with Kristen Zankl, correct?

A. Correct.

Q. All right. So any information that you would have received about either of these people signing this document would have come from other people, correct?

A. Correct.

Q. Okay. And you did not go into DocuSign, the software, the program, to take a look at the metadata to determine how -- how and when and by whom these documents were signed, correct?

A. Correct.

Q. Okay.

A. But I will point out that it wasn't necessary because there were additional documents, right, that were happening at the same time.

Q. Right. Well, of course. I just showed you --

A.    Settlement documents and there were other things that would indicate that this is a transaction.

Q.    I -- I understand.  There's the MCA and -- and we'll get to the settlement documents in a moment.

A.    There -- there are times where I would look into the metadata if it was necessary, but --

Q.    Okay.  I understand.  But as far as for this particular document, you just testified you did not, correct?

A.    I didn't check the metadata, correct.

Q.    All right.  So do you know whether or not Scott Zankl had any authority to sign for Excell in October of 2021?

A.    My understanding all along was that he was the owner.

Q.    Okay.  So you -- do you know --
      What was your understanding of what Kristen Zankl's role was at the Excell Auto Group?

A.    I -- I don't remember specifically but I -- I do remember hearing from other people at the time that she became involved somehow.

Q.    Okay.  Do you know whether or not there were other substantial hold- -- stockholders in

Excell Auto Group in October of 2021?

A. No.

Q. So as far as -- well -- well, let me just ask you: What was your understanding in October of 2021 of who owned Excell?

A. Nothing changed from -- I wasn't aware of any change in ownership.

Q. All right. So you believed that was -- it was Scott Zankl?

A. I believe so, yes.

Q. Okay. Why was Kristen Zankl's name put on this document then?

A. Again, it could be that she became involved or aware of some of the things happening in the business at the time and maybe she insisted on being here. I don't -- it's not -- it wasn't within my purview to figure out all the details.

Q. Do you know who at Hi Bar prepared this document for their signature?

A. No, I don't know. But, like I said, it's -- it's pretty standard in the industry.

Q. I understand. But do you know who? Was it your son? Was it Yoel Getter? Was it Josh Lubin? Who was it at Hi Bar that actually prepared this document and sent it to Scott and Kristen Zankl

allegedly for their signatures?  Do you know who that person was?

MR. LETO:  Object to the form.

A.    I don't know.

(Whereupon, Plaintiffs' Exhibit 12-B was marked for identification.)

BY MR. BRESLIN:

Q.    Okay.  I show you what's been marked as Plaintiffs' Exhibit Deposition Exhibit 12-B.  And this is -- this purports to be an email from Josh Lubin to Mr. Getter and you regarding the Excell MCA, correct?

A.    Yeah.

Q.    Okay.  So if you look at that, it says funded 11-1-2021, right?

A.    Yes.

Q.    Funding amount, pay back, bank fee, previous balances, net to merchant, weekly payments and then commission, do you see that?

A.    Yes.

Q.    Do you remember getting this email back in October -- excuse me -- November of 2021?

A.    I don't recall getting it then but I've seen it, you know, in -- in the course of a conversation of what's going on now.

Q.   Okay.  So now the commission says 18 points.  That was for Mr. Lubin, correct?

A.   I believe so, yeah.

Q.   Okay.  And that says, Will be charged -- so 381,600, that would be Mr. Lubin's share, which will be charged at principal.  You see where it says that?

A.   Uh-huh.

Q.   What does that mean, will be charged at principal?

A.   Usually it means that he's deferring getting any payment until the principal is recovered.

Q.   All right.  It says:  Do not put into OrgMeter.  What does that mean?

MR. LETO:  Object to the form.

A.   I don't know.

Q.   What's OrgMeter?

A.   I believe OrgMeter is a -- I don't know what they call it -- like each industry has its own software.  So it was a software that I've heard about in the industry.

Q.   Well, Hi Bar used OrgMeter, correct?

A.   Again.

Q.   Hi Bar used OrgMeter software to track its deals, correct?

A.   Not that I recall.  It was considered at

one point -- at one point, but I don't know if we ever actually used it or maybe we started using it and --

Q.   Okay.  As -- as you sit here today, do you know whether or not Hi Bar ever put any information into OrgMeter for any of its transactions?

A.   In the early days I remember discussing it but I -- I don't think -- it wasn't an active thing going on as far as I know.

Q.   Okay.  Do you --

A.   Maybe some of the people in the back end used it.  I don't know.

Q.   All right.  So you've never seen a report from OrgMeter or a printout or a summary or any -- any data compilation from OrgMeter regarding Hi Bar's transactions, correct?

A.   Never is a big word as I said that I did consider using it.  So when I considered using it, I must have seen data and printouts, but in my day-to-day life, OrgMeter was not a big factor or a factor at all as far as I remember.

Q.   Okay.  Well, this says do not put into OrgMeter.

A.   Yeah.  I -- I cannot explain why that would be relevant to me at the time.

Q.   Okay.  So this was Mr. Lubin --

A.   It could be -- it could be there was people that were BCCs or -- I don't know.

Q.   Okay.  Well, this was sent to you and -- and Yoel -- Yoel Getter and your accounting department, correct?

A.   Uh-huh.  Yes.

Q.   And it says -- it says very clearly do not put this deal into your OrgMeter, right?

A.   Yes.

Q.   Okay.  Do you know why Mr. Lubin did not want this deal put into the software?

MR. LETO:  Object to the form.

MR. JACOBS:  Objection.

A.   I don't know.

Q.   Okay.  All right.  It goes on to say: Syndication:  BMF 30 percent.  What is BMF?

A.   It's also a funding company.

Q.   Okay.  So BMF had 30 percent of this deal?

A.   It seems so, yes.

Q.   Okay.  So how did BMF get 30 percent of this transaction with Excell?  Did they put up any money?

A.   It happens on the back end.  You know, I don't know what -- I don't believe I -- to them on

this.

COURT REPORTER: I don't believe I?

I'm sorry, could you repeat --

BY MR. BRESLIN:

Q. What was that?

A. I'm saying I -- I -- I -- it was usually handled, I guess, by the broker, by Josh Lubin.

Q. Okay. Well, what's BMF stand for?

A. F probably stands for funding. B and M, I don't know.

Q. All right. So as you sit here today, for this Excell transaction that Hi Bar allegedly put up 2.1 million, a company called BMF had 30 percent of that -- that business transaction and you don't know who they are; is that an accurate statement?

MR. LETO: Object to the form.

A. I didn't say --

MR. LETO: Object to the form.

Go ahead.

THE WITNESS: I didn't say I don't know who they are. I said how it's kind -- how they figured out to have contributed the 30 percent is usually on the back end of the broker.

BY MR. BRESLIN:

Q. Okay. Well, we already --

A.    Josh Lubin would figure out that part.

Q.    All right.  So Josh Lubin figured out BMF's participation; is that accurate?

MR. JACOBS:   Objection.

A.    Most -- most likely.  As I am looking at this document, that's likely what happened.

Q.    Okay.  All right.  So this was a -- this was a $2.1 million transaction.  That was a relatively large transaction for Hi Bar in -- in October 2021, correct?

A.    Yes.

Q.    Okay.  So, now, you testified that wire was monied -- excuse me -- money was wired to Hi Bar in the amount of 2.114 million for this exact amount, correct?

A.    Yes.

Q.    And we also talked about that an identical amount was also wired to Hi Bar, correct?

A.    Yes.

Q.    All right.  So explain to me how this syndication works on the bottom line where BMF is entitled to $636,000.  How does that -- how did that come into being?

MR. LETO:   Object to the form.

A.    I don't know.  And I -- it wasn't relevant

to me at the time.   If --

Q.   So --

A.   As you can see, just like do not put into OrgMeter, it wasn't speaking to me, it was kind -- this is like an email that Josh Lubin sent at the time to keep some things on record.

As you notice, this happened on November 15th.   The transaction that you're referring to happened on November 1st.   Right?   So obviously this is not a legal document.   It's a point of reference.   It wasn't my issue at the time to deal with BMF's 30 percent or anything else that you see over here.

Q.   Okay.   Well --

A.   It was -- it was a point -- it was a point reference that was done 15 days after the transaction.

Q.   Well, so my -- my question to you is:  Did BMF put up any money to participate in the Excell MCA?

A.   I'm sure he did but it doesn't mean that he necessarily sent me direct money.  He could -- just like I didn't send Excell money and I sent it to -- to Spin, okay, we have a more formal capacity of how we did that, perhaps there was some way of BMF and

Josh Lubin figuring out how he participates.  I'm sure he didn't do it for free.

Q.   Well, how -- I don't understand, Mr. Herbst.  It's Hi Bar's deal.  Hi Bar supposedly puts up 2.1 million.  Now I'm seeing an email that says that there's all this other participation going to all these other companies, which means money is going to all these other companies.  I would think that you would have some interest, after allegedly putting up 2.1 million, that you have to pay out all these very large sums to other companies.  Didn't that get your attention?

MR. LETO:  Object to the form.  Move to strike counsel's commentary.

What is the actual question, Jerry?

MR. BRESLIN:  He understands the question.

MR. LETO:  I -- I don't know if he does or doesn't.  What's the question?

MR. BRESLIN:  Wait.  Don't -- stop coaching the witness, man.

MR. LETO:  I'm not coaching the witness.  I think you should ask --

MR. BRESLIN:  You are coaching the witness.

MR. LETO:  I think you should ask an appropriate question instead of just trying

to --

MR. BRESLIN:  All right.  Ms. Court Reporter, please mark that.

MR. LETO:  -- instead of trying to just fill the record with your own commentary.

MR. BRESLIN:  Please bookmark this part of the record.  Okay.  Put that with the certified questions.

BY MR. BRESLIN:

Q.    Do you understand the question, Mr. Herbst?

A.    No, I don't hear a question, but it's a little bit of an accusation.  What I'm saying --

Q.    I'm trying to find out how these companies are entitled to this amount of money that's explained in this email.  And if -- if it's a Hi Bar deal, just explain to me how all these companies get very large percentages of it.

MR. LETO:   Object to the form.

A.    I'm sitting here across the street of Intercontinental, which is a beautiful building.  If I go ahead and I buy the building and then I go back home and I figure out, okay, I just spent $50 million on a building, I don't want to have $50 million, I want to have 25, I figure out how to deal with it.  As far as Continental -- Intercontinental is

concerned, I own Intercontinental.  So, yeah, in a bigger transaction there's a lot of things that happen.  It doesn't always involve me.  If it involves me, then I need to know.

Q.    Okay.  So if you're buying Intercontinental and you put up 50, you only want your exposure to be 25 million, then you're going to get 25 million from other participants, right, then your exposure is less and then they get a piece, right?

A.    Either I'll get 25 million or I'll get a share in a different building --

Q.    Right.  But --

A.    -- and there won't be a $25 million transaction.  I don't know.

This -- in this type of business and in any type of business, there's multiple things that could have happened.  It doesn't --

Do you see anywhere where BMF is asking me for money?

Q.    Mr. -- Mr. Herbst, I don't know what happened here.  I'm trying to find out what happened.  That's why I'm asking you?

A.    No, so I shared to you that I know who BMF is.  And I saw -- I likely saw the email at the time.  It wasn't all that relevant to me in any way to where

action -- at the time.  And if you're asking me what's relevant at the time or what would prompt a -- a reaction and what wouldn't, I'd say the only thing that would have prompted a reaction is if somebody was asking me for money.  But at the time it's not -- you know, let's just say I was in the driver's seat, right, so if somebody would make any type of a claim or any -- you know, that they put up money or their own money, then they would -- the burden of proof would be on them.

Q.   Okay.  So from -- from this email, does this refresh your memory about BMF putting up any money in the Excell deal?  Did they put up $636,000?

A.   You're asking me if they wired my account 636?  Well, it could be that some of the money that Josh Lubin or Spin wired me on that date, it could be some of it came from him.  I don't know.  I have no way of knowing.

Q.   Well, let me ask just you straight up:  In this Excell deal, did -- did any -- did any of these other participants, if BMF or Cedar -- did they have a participation in the Excell deal?

A.   You're asking me if they wired me money directly?

Q.   No.  I'm asking you did they have a

participation interest in the Excell deal?  Was BMF entitled to 30 percent or $636,000?

A.    If there was no other deal or -- I don't think I signed anything, just with Josh Lubin.

COURT REPORTER:  I don't think?

I'm sorry, you're breaking --

THE WITNESS:  I don't think I -- there was any -- I don't recall getting any direct money transfer at the time and I don't recall signing any documentation.

BY MR. BRESLIN:

Q.    Okay.  And how about Cedar for 10 percent, 212?

A.    The same thing.

Q.    Okay.  So if -- if you look at these percentages, the -- 30 percent of the amount of money, the 2.1 million, is -- is roughly 636,000.  So would you agree that this -- the -- the last sentence to this document is referring to the amount of money that was put up to pay Spin?

A.    Again?  What -- what am I including?

Q.    Well, no, if you look at this document, it says BMF 30 percent is 636,000, right?

A.    Uh-huh.

Q.    Hi Bar, 30 percent, 636,000.  That's

30 percent of the 2.1 million number.

A. Okay.

Q. Okay?

A. Okay.

Q. So that would seem to say or seem to indicate that BMF put up 30 percent of that money, Hi Bar put up 30 percent of that money, Cedar put up 10 percent of that money. Is that your understanding of what this email says?

A. It seems like that's what this email says. How much of it is binding, how much is -- is for reference purposes, I can't tell.

Q. Okay. Well, let's just get right down to it. Did -- did BMF put up any money to participate in the Excell deal? That's a yes or no question.

A. Yeah, but that -- that, like exactly as you just said, if 30 percent of 2.1 million is what is indicated BMF, perhaps they sent that money to -- to Spin, or it could be that Spin had other deals that they swapped out in order for them to have the -- the piece of this deal. I've indicated that I don't recall --

Q. Okay. So --

A. -- BMF sending me a direct wire for this transaction. That's all -- that's what I remember.

Q. Okay.

A. But how it came about or what happens on the back end, I don't know.

Q. All right. So just to clarify, we know for sure BMF didn't give you -- didn't send Hi Bar 636,000, but they may have sent Spin that amount, correct?

MR. LETO: Object to the form.

A. It's one option that I'm postulating that could have happened, that could have connected to this amount. So I --

Q. Okay.

A. -- if you want me to rule out that BMF had nothing to do with it, I'm not in a position to do that. I can only --

Q. All right. How about --

A. -- tell you what happened from --

Q. -- how about Cedar 10 percent, did Cedar put up 10 percent?

A. If you're asking me if they wired me directly 10 percent, not that I recall.

Q. All right. And -- and who is Cedar?

A. I -- their name is a -- a respected firm in the industry.

Q. Okay.

A.    I haven't dealt with them directly.

Q.    Do you know -- do you know their full name?

A.    I know some of the names.  But, again, I knew it at the time.  If somebody threw the name at me, I can confirm.

Q.    Okay.  All right.  Thank you.

MR. BRESLIN:  All right.  So now's a good -- we've -- we've been at it a little over an hour.  Let's -- let's take ten minutes and -- and we'll start back up.

Does that work for you, Mr. Herbst?

THE WITNESS:  Yes.

MR. BRESLIN:  All right.  Very good.  I'll see -- it's 1:02, I'll see everyone at 1:12.

Thank you.

MR. LETO:  Thank you.

THE WITNESS:  Okay.

VIDEOGRAPHER:  Off the record at 1:02.

(Off the video record.)

VIDEOGRAPHER:  Back on the record at 1:13.

BY MR. BRESLIN:

Q.    All right.  Mr. Herbst, I'm going to share my screen with you again.

Before I get to this exhibit, would you agree that, in an MCA agreement, that a loan would

not be considered income or revenue in which an MCA would be entitled to take that money?

A. I don't know. I don't know all the legal terminologies.

Q. All right. Sir, I show you what's been marked as Plaintiffs' Deposition Exhibit 17. We went through this in your last deposition. And this is the settlement agreement that was entered into between your companies and the Karma companies, and that was on December 19th, I believe. Let me see. Yes, December 19th, 2021. You're familiar with this document, correct?

A. Yes.

Q. And the last time we talked about this you indicated that Josh Lubin was taking the lead in negotiating this settlement, correct?

A. Yes.

Q. And prior to -- let me just -- sorry. Just give me one second. I'm sorry. Just give me one moment.

Okay. So we -- we talked last time about the UCC that was filed by Hi Bar in -- on 12-15-21, correct?

A. Yes.

Q. Okay. And then thereafter, on

December 19th, 2021, the document that's on your screen, that is a settlement agreement that was entered into between your companies, the Karmas and the Zankls, correct?

A.    Yes.

Q.    And you indicated to me that, at the last deposition, that you had little to do with this and Mr. Lubin was taking the lead together with your attorney, Mr. Zakharyayev, correct?

A.    Yes.

Q.    You -- you indicated, though, that you were aware of it and you did approve it because it was favorable to you, correct?

A.    Correct.

Q.    All right.  And you see on Page 6 of 10 that this was actually executed by Mr. Zakharyayev as counsel for Hi Bar, correct?

A.    Correct.

Q.    And he had your authority to sign that document on Hi Bar's behalf, correct?

A.    Correct.

Q.    Okay.  So we know that when this document was signed on December 19th that there was a curr- -- a UCC filing statement that was outstanding and filed on December 15th, correct?

A.    (Indiscernible.)

Q.    Is that accurate?

COURT REPORTER:  I'm sorry?  Yeah.

THE WITNESS:  Yeah.

MR. BRESLIN:  Did he -- did he answer?

COURT REPORTER:  I didn't get an answer.

THE WITNESS:  Yes.

BY MR. BRESLIN:

Q.    Is that -- is that correct, Mr. Zak- --
Mr. Herbst?

A.    Yes.

MR. BRESLIN:  Did you get that answer,
Ms. Court Reporter?

COURT REPORTER:  Yes.  It's cutting --

MR. LETO:  He's answered.  He's answered a
few times.  Are you not hearing him?

COURT REPORTER:  No.  It's cut- -- it cuts
off.  But I got the end of the yeah, so I'm
assuming it's yes.

THE WITNESS:  Yes.

MR. BRESLIN:  All right.  Ms. Court
Reporter, if you don't get the answer, please
let us know.  Okay?  Cause it's breaking up for
me as well.

COURT REPORTER:  I will, yeah.

MR. BRESLIN: All right.

BY MR. BRESLIN:

Q. Mr. Herbst, so let's -- let's -- I just want to point out one -- one portion of this settlement agreement. And this is in -- it's in Paragraph -- so if you look at this exhibit, we go down to the different sections and there is -- this would be Section 5, it says: Within five days after sellers' fulfillment of its obligations hereunder and the clearance of all payments in accordance with the terms of this settlement agreement, purchaser terminate any and all UCC filings as liens previously filed by purchaser against sellers. Do you see that?

A. Yes.

Q. Okay. So would it be your understanding that when this settlement agreement was signed, that it increased the amount of money that was owed and it -- it specifically addresses the fact that the UCC filing that was filed of record would not be released unless and until the payments were made under this document, correct?

MR. LETO: Hang on.

Jerry -- Jerry, you're breaking up in the question. I want to make sure that he hears it. I don't know why it's not coming in clear.

Should use the caller --

BY MR. BRESLIN:

Q.    Mr. Herbst, did you hear my question?

MR. LETO:  You're not coming in.

A.    No, it's breaking up.

MR. LETO:  Hang on.  What I'm going to do, if you can hear me, I'm going to call on the phone -- that audio through the phone, cause for whatever reason it's not working well over the Internet, I'll be honest.  So give me a minute and I'll do that.  Okay?

MR. BRESLIN:  Sure.  Take your time.  You want to take five?  Let's take five.  Try to set it up.

MR. LETO:  I don't need five.  I'm just going to call.

MR. BRESLIN:  Okay.  I'll wait.  We're off the record.

MR. LETO:  You can mute yours cause that's now going to be through here.

VIDEOGRAPHER:  Are we going off the record?

MR. BRESLIN:  Well, just don't -- just don't put anything on the record until we're back -- until we're actually talking.

VIDEOGRAPHER:  It's going to stay on the

video record then.

MR. BRESLIN: Yeah, just keep it on there.

VIDEOGRAPHER: Okay. I'll stay on.

MR. LETO: Okay. Can you hear us?

Turn off the volume at the bottom.

THE WITNESS: The volume?

MR. LETO: Yeah, turn off the volume on that.

Now can I hear us, guys and gals?

COURT REPORTER: Yes. Yes.

MR. BRESLIN: I can hear you, Matt.

Mr. Herbst, can you say something?

THE WITNESS: Yeah. Hi.

MR. BRESLIN: Okay.

COURT REPORTER: Okay.

MR. BRESLIN: I heard a hi.

I think that's better. What do you think, Victoria?

COURT REPORTER: Yes, it is. Thank you.

MR. BRESLIN: All right. Good.

BY MR. BRESLIN:

Q. All right. Great. Let me repeat my question.

All right. Mr. Herbst, I'm showing you Paragraph 5 of the settlement agreement that was

executed with -- with your consent and approval on December 19th, 2021, which indicates in Section 5 that within five days after the purchasers -- excuse me -- the sellers' fulfilled their obligations under the agreement that the UCC filing will be terminated. Do you see where it says that?

A. Yes.

Q. In the highlighted area.

Okay.

A. Yeah.

Q. It says -- it says: Purchaser terminate any and all UCC filings and liens. Right? See where it says that?

A. Yeah. Yeah.

Q. So was -- was it your understanding then that the settlement agreement that was executed on behalf of your company required certain payments to be made and if and when those payments were made that the UCC filing, that we just talked about that was filed on December 15th, 2021, would be terminated?

MR. LETO: Object to the form.

BY MR. BRESLIN:

Q. You can answer.

MR. LETO: Go ahead.

A. Yeah.

(Whereupon, Plaintiffs' Exhibit 18 was marked for identification.)

BY MR. BRESLIN:

Q.    Okay.  All right.  I show you what's been marked as Plaintiffs' Exhibit 18.  And I'm going to scroll through this.  This is also attached to the complaint.  And this purports to be a UCC termination statement that was filed on December 19th, 2021 at 6:46 p.m.  That would have been after the -- or at some point the same day that the settlement agreement was signed.

Do you see that document?

A.    Yes.

Q.    Did you have anything to do with this, the filing of this UCC termination statement on December 19th, 2021?

MR. LETO:  Object to the form.

A.    What's the question?  What do you mean if I -- if I had anything to do?  If I filed it?

Q.    Or did you -- did you authorize it?

A.    Yes.

Q.    Okay.  So this -- the -- this UCC termination statement that was filed on December 19, 2021, you authorized this document to be filed in the public record; is that accurate?

A.   Either directly or in advance.

COURT REPORTER:  Or in?

THE WITNESS:  Advance.

BY MR. BRESLIN:

Q.   All right.  What do you mean by in advance?

A.   Meaning I don't know if I told them that day of there was an understanding that if he sticks to the agreement, then we'll stick to our agreement.

Q.   Okay.  So your understanding was that you had an agreement with who that if you stuck with the agreement he stick- -- he sticks with his agreement that you'll do something?  Who did you make that agreement with?

A.   I understood that that's what the -- Zankl requested at the time.

Q.   Okay.  So my question to you is:  Did anyone ask you, as the owner and authority at Hi Bar, whether or not you approved this UCC termination statement being filed on that date, December 19th, 2021?

A.   I don't understand why you're asking about the date, but I -- we entered the agreement.  If that was one of the stipulations, then I would have agreed to it.

Q.   Okay.  So you're telling me that there were

stipulations to enter into that agreement, the settlement agreement?

A.   You -- you showed it to me.

Q.   Right.  All right.  Let -- let me go back to it.

This is -- this is Plaintiffs' Deposition Exhibit -- this is a settlement agreement.  It's signed on the same date -- well, appears to be signed on the same date -- it's dated the same date, December 19th -- for all these payments.  Okay.  So it calls for a total payback of $4 million.  See where it says that?

MR. LETO:  Form.

A.   Yeah.

Q.   4. -- $4,6 -- 016,820.  You see where it says that?  That's what this agreement required the Zankls to pay, right?

MR. LETO:  Form.  Form.

A.   Okay.

Q.   Do you see that?

A.   I -- I don't see the 4 million number.

Where do you see 4 million?

Q.   I see -- it says --

A.   Yeah.  Yeah.  I see it.  Okay.

Q.   It says it's 2.6 at a 1.5 factor rate.

A.    Yeah.

Q.    So there's a debt and that's multiplied by one-and-a-half, and it comes out to 4,016,820.  You see where it says that?

A.    Yes.

Q.    Okay.  So you know that this --

COURT REPORTER:  I'm sorry.  Can Mr. Scott Gherman please mute himself?

MR. GHERMAN:  I am mute- -- ah.  Sorry.

COURT REPORTER:  That's okay.  Thank you.  Sorry.

BY MR. BRESLIN:

Q.    Okay.  Do you see where it says that?

A.    Yeah.

Q.    Okay.  So -- so this -- you would agree that this document required a payment of over $4 million, right?

A.    If they -- if they don't pay early, yeah.

Q.    Okay.  Okay.  So then if they paid early, they only had to pay 2.9 million, right?

A.    Well, frankly, it wasn't early.  It would have been on target but we tried to accommodate.  If everything that he said that he was going to pay was actually going to pay then --

Q.    Well, it -- it says the first payment shall

be due on Monday, December 20th.  So apparently this was signed on a Sunday, right?

A.    That -- that detail I -- I don't remember but I'm -- looking at the document --

Q.    Well, I'm just --

A.    -- it seems like if he would have keep his original agreement and been -- and made the timely payment, then he would have -- he would have received a sufficient discount.

Q.    Okay.  But I'm -- I'm just looking at what this document says.  All right?

A.    Okay.

Q.    And if you look at just what this document says, is it requires a payment of 4.1 million, right? It says the very first payment is due on the 20th, the next day.  So nothing's due until the -- the following day, Monday.

A.    Okay.

Q.    It says if it's -- if it's all paid off within 30 days then they get a -- it's not a 1.5 factor, it's a 1.1 factor, so only 2.9 million has to be paid.  Do you see where it says that?

A.    Yeah.

Q.    Okay.  So those are the payment obligations under this document, correct?

A.    Yeah.

Q.    Okay.  So that's -- so on the 19th there was nothing due, no payments due.  Nothing was due until the next day.  The very first payment was due the next day and those payments were $200,000 a week, correct?

A.    Okay.

Q.    Is that accurate?

A.    If it was a Sunday then, yeah, it would be the next day.

Q.    Well, it says -- well, I'm just reading it. It says Monday, December 20th.

A.    Yeah.  Okay.

Q.    Okay.  But -- but my -- my point is there were no payment- -- when this document was signed, there were no payments due that day, the payment -- the first payment was due the next day, December 20th.  Correct?

A.    Yeah.

Q.    Okay.  All right.  So now let's go down to that sentence I just showed you about the UCC filing. It says:  Within five business days after sellers' fulfillment of its obligations hereunder and the clearance of all payments in accordance with the terms of this settlement agreement, purchaser

terminate any and all UCC filings and liens previously filed.

Do you see where it says that?

A.    Yeah.

Q.    So this document very clearly states that there's not going to be any termination of any UCC filings unless and until the payments are made, right?

MR. LETO:  Objection.

MR. JACOBS:  Object to the form.

BY MR. BRESLIN:

Q.    Is that accurate?

A.    That's not accurate.

Q.    What is accurate?

A.    It says within five days we're obligated, but it doesn't say only if.

Q.    Okay.  Well, I'm just reading it.  It says --

A.    I know.

Q.    -- Within five business days after -- after -- after sellers' fulfillment of its obligations, right?

So it seemed to me -- to me that that means --

A.    Does that -- does that mean that I will pay

off the whole 4 million?

Q. It's your agreement. What does it mean, you tell me?

A. I asked that we're obligated to rescind it if they live up to our satisfaction of the agreement.

COURT REPORTER: I'm sorry. I'm sorry. Can you repeat your answer?

THE WITNESS: I'm saying is that we agreed in this Article 5 that we -- if they fulfill their obligation, we'll agree to clear up the UCCs and the filings. It's not a hundred percent clear what those obligations are.

BY MR. BRESLIN:

Q. Okay. But we would -- we -- we can agree that it says here that after the payments are made that you will terminate your UCC and lien filings, correct?

A. No, it actually doesn't say that. It says --

Q. It says within five business days after --

A. Okay.

Q. -- does it say that?

A. Yeah, it does say. But it doesn't say anything about a payment. And, it says, and a clearance of all the payments in accordance with the

terms.  Okay.  Yes.  I guess it means, clear, there's no ACHs, I guess, rescinded or anything like that.

Q.    Can we just agree that what this paragraph says is that after the payments are made that Hi Bar must remove the UCC filings?

A.    Okay.  Yes.

Q.    Would you -- would you agree with that?

A.    Yes.

Q.    Okay.  Now, let's go to the document I just showed you.  This is 2021 -- December 19, 2021.  Same day.  No payments are due yet.  Nothing has been paid yet, correct?

A.    Correct.

Q.    Okay.  And do you know when either Excell or the Karma companies made any payments on that settlement agreement?

A.    I don't remember the exact date of that payment -- of -- of --

Q.    Do you know if they made any -- do you know if they made any payments around that time?

A.    My memory -- I believe they did make a payment or two.

Q.    Okay.  All right.  But you would agree that this, this December 19th UCC termination statement, was filed before any payments were made or even

required to be made under that settlement agreement?

A.    It seems to be at the same time.

Q.    What seems to be at the same time?

A.    It seems that this was filed at the same time that the agreement was final.

Q.    Right.

A.    Hold on one second.

Q.    Right.  So --

A.    Okay.

Q.    -- the -- the agreement got signed and this UCC termination statement was filed or the UCC termination statement was filed and the agreement got signed, but they both happened on the same day. Can -- just from the date on it, can we agree on that?

A.    It seems to.

(Whereupon, Plaintiffs' Exhibit 20 was marked for identification.)

BY MR. BRESLIN:

Q.    Okay.  All right.  Let me show you what's been marked as Plaintiffs' Deposition Exhibit Number 20.  And this purports to be an email from Frank O'Donnell, Biltmore Consultants, dated December 20th, 11:26 a- -- a.m.  Okay?

You see that?

A.    Yeah.

Q.    We talked earlier about Frank O'Donnell and you indicated that you knew he had some involvement. But now that you've had a chance to think about it, do -- do you have any better recollection of what his involvement was in the Excell/Karma/Zankl transactions?

A.    It seems like he was involved in getting Zankl financing.

Q.    Okay.  So your understanding was that Frank O'Donnell's role was to get other financing for Scott Zankl and his companies, correct?

A.    It's my understanding based on the document.

Q.    Okay.  Was it your understanding at the time, in 2021, that that's what Frank O'Donnell's role was in -- in -- in the transactions with Mr. Zankl and his companies?

A.    No.  I -- I don't recall his name at the time.

Q.    Okay.  Do you -- do you recall being copied with any communications by either Josh Lubin or anyone else to Mr. O'Donnell regarding financing?

A.    No, I don't recall at all.

Q.    Okay.  All right.  So this -- this document

that I'm showing, what purports to be an email from Mr. O'Donnell to Matthew Pilkington, William Baker, Scott Zankl, and the subject UCC termination – Hi Bar Capital.

Do you -- you don't have any knowledge of any communications with Mr. O'Donnell at the time, in December of 2021, correct?

A.    Correct.

Q.    All right.  Do you know who Matthew Pilkington is?

A.    No.

Q.    How about William Baker?

A.    No idea.

Q.    Okay.  So what it says here is:

Matthew and Will, attached is the termination of the UCC erroneously filed by Hi Bar Capital.

And then it says:  Thanks.

Matt – let us know if you want to review financial analysis.

So do you -- do you have any understanding of where this comment from Mr. O'Donnell to the -- to Mr. Pilkington and Mr. Baker that the UCC was erroneously filed, do you know where that might have come from?

MR. LETO: Object to the form.

A. No idea.

Q. All right. So I go down and now --

A. (Undiscernible.)

COURT REPORTER: I'm sorry?

Q. Sorry?

A. It certainly wasn't erroneously filed.

Q. Okay. So we're talking about the termination statement, correct?

A. What do you -- who you talking about?

Q. Right. You said it certainly was not erroneously filed.

A. Yeah. The UCC was not -- the UCC wasn't erroneously filed.

Q. Okay. Are -- are you saying that the UCC was not erroneously filed or the UCC termination statement was not erroneously filed?

A. Neither.

Q. I don't understand. Are you saying that they both were intentionally filed?

A. Yes.

Q. So the UCC was intentionally filed, the financing statement was intentionally filed on December 15th and the UCC termination statement was intentionally filed on December 19th, correct?

A.    Yeah.

Q.    Okay.  So now we go down and we have another email from Frank O'Donnell to William Baker and you'll that see that their emails are now at the Feenix companies.  Do you see that?

A.    Yes.

Q.    Okay.  So it says:  See comment from Attorney Zakharyayev below.

And now we have an email from Steven Zakharyayev.

And this is sent the day after the settlement agreement was signed and the day after the UCC was terminated, do you agree --

A.    Yeah.

Q.    -- on the date?

A.    Yeah.

Q.    Okay.  It says:  Frank, as a follow-up, the attached UCC3 terminates the attached UCC1, under filing number, which includes all of debtors listed therein.  You see where it says that?

A.    Yes.

Q.    All right.  Now, do you know what he's referring to as the follow-up?

A.    No.

Q.    And attached to that email is, in fact, the

termination statement that we just looked at.

So were you aware that Mr. Zakharyayev forwarded that termination statement to Mr. O'Donnell the next day?

A. No.

Q. Do you know why he -- do you know why he did that?

MR. LETO: I'm going to instruct you not to answer. That would be privileged.

BY MR. BRESLIN:

Q. Don't tell me what he said to you.

Do you know why that happened?

MR. LETO: You can answer. No, you know what, instruct you not to answer. It's privileged. It doesn't matter.

BY MR. BRESLIN:

Q. Do you have any knowledge, other than information that you communicated to your attorney or received from your attorney, as to why that UCC termination statement was filed?

MR. LETO: You can answer yes or no to that question.

A. Rephrase the question.

Q. Okay. Can you articulate to me why the UCC termination statement was filed on December 19th,

2021?

MR. LETO:  I'm going to instruct you not to answer to the extent that the information came from Mr. Zakharyayev, even if it came through a third-party source.  So if you can answer irrespective of anything to do with Mr. Zakharyayev go ahead; otherwise, it's privileged.

A.    I'm not gonna --

MR. BRESLIN:  All right.  Certify the question, please, Ms. Court Reporter.

(Whereupon, Plaintiffs' Exhibit 23 was marked for identification.)

BY MR. BRESLIN:

Q.    Okay.  All right.  Mr. Herbst, I'm showing you Plaintiffs' Deposition Exhibit Number 23, which purports to be a text message between Josh Lubin and Scott Zankl, dated January 3rd of 2022.

So I'd like to show you this whole text and ask you if you recognize it?

A.    If I recognize the text?

Q.    Yes.  You ever seen it before?

A.    Is this a text to me?

Q.    No.  It's a text between Josh Lubin and Scott Zankl.

A.   So you mean if I recognize it and --

Q.   Right.  Have -- have you seen this text before?

A.   It could be.

Q.   Well, it's attached to the complaint as an exhibit.  Have you ever looked at this text before?

A.   Probably, yeah.

Q.   Okay.  This -- this text appears to be a statement from -- from Mr. Zankl, in the green, saying that he's going to make certain payments.  And he's -- he's talking to Mr. Lubin.

He's saying:  200,000 this week.  Trying for the full 400,000.  Will let you know tomorrow morning.

And he said:  Should I wire Hi Bar?

Excuse me.

And the response is:  Wire to Spin.  Info below.  TD Bank.  And then it has the account information on it.

See where it says that?

A.   Yes.

Q.   Did -- did you approve Mr. Lubin sending this text to Mr. Zankl on January 3rd, 2022?

A.   I don't remember specifically.

Q.   Did Mr. Lubin have the authority to request

that payments go to the Spin bank account, as opposed to the Hi Bar bank account?

A.    The authority?

Q.    Yeah.   Did he have your authority to -- to request a merchant who has signed an MCA with Hi Bar Capital, to tell that merchant to send the money to his own company's bank account and not the Hi Bar account?   Did he have the authority to do that?

A.    He would likely have asked me.

Q.    So did he ask you?

A.    I don't remember right now, but I -- I don't -- I don't remember details.

Q.    Okay.   So you talked earlier about, you know, some of your d/b/a's where these brokers were having money sent to different accounts when the money should have been going to Hi Bar.   Wouldn't this be the exact same thing you were talking about?

MR. LETO:   Object to the form.

A.    Absolutely not.

Q.    What's different?

A.    Josh Lubin --

Q.    What's different here?

A.    Josh Lubin was always honest and we trusted each other and we always agreed what to do together. It was -- this is -- I did not refer to Josh Lubin.

Q. Okay. All right. So Josh Lubin had the authority to tell Scott Zankl to send the money to a Spin account or a Hi Bar account or a different account and that was okay with you, he had your approval to do that, correct?

A. Not -- you know, it depended. We most likely discussed it. There was most likely a reason that he felt that it was more likely that he would get the money -- I don't remember any details, but --

Q. Well --

A. -- if he would have -- if he would have sent the money, I would have known about it right away or he would have told me that he's going to ask or he's going to be getting the money.

Q. All right. But your relationship was so close that money could go to his bank account, money could go to your bank account and it would be worked out among you?

MR. LETO: Object to the form.

A. Yes.

Q. Now, do you know whether or not any -- any money was ever wired to a Spin bank account from either Zankl or the Karma companies after the Hi Bar contract was signed?

A. I would have to look at my records.

Q.    On January 3rd, 2022 --

A.    I know there were payments.  I don't remember --

COURT REPORTER:  I'm sorry.  I'm sorry, could you repeat the beginning?

THE WITNESS:  I know that there were payments.  I don't remember to which account it went to.

BY MR. BRESLIN:

Q.    All right.  Did -- did Hi Bar or you owe any money to Josh Lubin or Spin on the date that he told Zankl to send the money to Spin?

MR. LETO:  Object to the form.

A.    I don't know right now.

Q.    So you testified at your last deposition that there are numerous transactions --

A.    Right.  The likelihood --

Q.    -- deposited.

A.    The likelihood is extremely high.

Q.    That there was money owed?

A.    That there was -- yeah, in one direction or another, yeah.

Q.    And all of those transfers would have been between the Hi Bar bank accounts and the Spin bank accounts, correct?

A.   Most likely.

Q.   Okay.  Other than the Hi Bar bank accounts and the Spin bank accounts, did you have any other monetary transactions with Mr. Lubin outside of the corporate accounts?

A.   What do you mean corporate?

Q.   Okay.  Hi Bar had bank accounts, right?

A.   Outside of the accounts listed?

Q.   Right.  Outside of the Hi Bar bank accounts and outside of the Spin bank accounts, was there ever any money that went back and forth between you and Mr. Lubin in different accounts?

MR. LETO:  Hold on.  When you say "you," are you talking about Hi Bar or --

BY MR. BRESLIN:

Q.   I'm talking about you -- you, Mr. Herbst, and Josh Lubin.

A.   Not that I recall this minute.

Q.   All right.  So your -- your recollection is all these deals with Mr. Lubin, the moneys went from one corporate account to another corporate account, right?  From the Hi Bar accounts to the Spin accounts; would that be accurate?

A.   A vast majority for sure.

Q.   Okay.  And for the ones that -- that were

not, how would they have happened?

A. No, I just -- I don't know. I didn't -- it's not something that I looked at because it's not likely.

(Whereupon, Plaintiffs' Exhibit 24 was marked for identification.)

BY MR. BRESLIN:

Q. Okay. I show you what's been marked as Plaintiffs' Deposition Exhibit Number 24. And I'll scroll through it. And this purports to be more texts between Mr. Zankl around Mr. Lubin. These are now dated January 13th. And the green would be Mr. Zankl, and the gray and black would be Mr. Lubin.

Okay. Do you see this? Have you had a chance to review it as I scrolled through it?

A. Yeah. I'm -- I'm not sure who's the green.

Q. The green would be Scott Zankl.

A. Okay.

Q. All right. So this would appear to be Mr. Zankl making promises to pay money.

It says:

Game plan:

100,000 tomorrow, maybe 200,000.

Monday 50.

Tuesday 100.

Thursday 50.

Friday 100.

A.    Okay.

Q.    You see that?

A.    Yeah.

Q.    Okay.  And this is on January 13th.

And response, Mr. Lubin is indicating to Mr. Zankl that this is too much stress and that he has to --

He says:  I need a game plan you can keep to or I have to file tomorrow.

Do you see where he says that?

A.    Uh-huh.

Q.    Do you know what he meant by that?

MR. LETO:  Object to the form.

A.    No.

Q.    So we already talked about Mr. Lubin as the point of contact with Mr. Zankl for the collection efforts, to try to get Mr. Zankl to pay money, and that was with your authority, correct?

A.    In a broader sense, yes.  Not every text message.

Q.    Right.  But he had -- he had your consent and your authority to attempt to collect the money that Hi Bar deemed it was owed, correct?

A.    Consent and authority?

Q.    Yes.

A.    He had my consent, not authority.

Q.    Okay.  All right.  So he had -- he was doing this with your consent and it was okay with you that he was trying to collect for you, correct?

A.    Within limits.

Q.    Okay.  What were the limits?

A.    I don't know.  I guess, you know, physical violence wouldn't be okay.

Q.    Okay.

COURT REPORTER:  I'm sorry.  Physical?

THE WITNESS:  Physical violence wouldn't be okay.  Not that he -- I would ever consider it.  But I'm saying nobody has a blanket authority or consent.

BY MR. BRESLIN:

Q.    Okay.  So anything -- anything short of physical violence, he could attempt to collect, right?

MR. JACOBS:  Objection.

A.    I didn't say that.  I said it's not open-ended, that's all.  It means that I'm not making the phone calls, I'm not the one reaching out to him. I let the broker handle it.

Q.   All right.  How about threatening lawsuits, is that acceptable?

A.   I'm not sure --

MR. LETO:  Object to the form.

THE WITNESS:  -- I'm not sure the legal ramifications of that is.  I -- we -- we discussed last time that a threat of a lawsuit does not -- is not a real threat.  Either a person has a standing or he doesn't.

BY MR. BRESLIN:

Q.   Okay.  All right.  So it's okay -- it was okay for him to say pay us, pay us, pay us, and it was okay for him to say if you don't us, we're going to sue you, and what else was it okay for him to do other than -- other than getting violent?

MR. LETO:  Objection to form.

A.   What's -- what's the question?

MR. LETO:  Ask him to rephrase it if you didn't --

THE WITNESS:  Yeah, I'm not --

What -- what do you want me to say?  I don't understand what you want.

What I'm saying is he had my consent to reach out and try to collect.  I'm also of the position that saying that he's going to file a

lawsuit is not even a threat, it's just factual.

If we're not getting paid and if calls and promises are not coming through, there --

there's no choice but to file a lawsuit as well.

MR. BRESLIN: Okay. It's a good time to take a break. Let's take 10 minutes. I'll see you-all at 2:07.

MR. LETO: Okay.

THE WITNESS: Okay.

VIDEOGRAPHER: Off the record at 1:57.

(Off the video record.)

VIDEOGRAPHER: Back on the record at 2:10.

(Whereupon, Plaintiffs' Exhibit 22 was marked for identification.)

BY MR. BRESLIN:

Q.    Okay. All right. Mr. Herbst, I'm -- do you see Plaintiffs' Deposition Exhibit 22 on your screen?

A.    Yeah.

Q.    Okay. I'm showing you what's been marked as Plaintiff Deposition Exhibit Number 22. And I'm going to scroll through it. And this purports to be an email from Scott Zankl, dated Friday, January 21st, 2022, to Josh Lubin. And the subject matter is the Feenix Karma Loan Agreement. And there are

various attachments to it.

And it says:  The guys are in my store today and Monday.  We are signing today.  They are funding money [sic].  I will get you paid next week.

Do you see where it says that?

A.    Yeah.

Q.    Okay.  I'm going to scroll through this document, but what this -- what is attached to this document -- will be attached as a record in the depo -- is the actual document that was emailed to Josh Lubin on that day.

And you'll see here it says:  Kutak Rock, draft.

And there's a loan agreement there.

And I'll go through it quickly.

It's a draft of a loan agreement.  It's unsigned.  There's signature pages.  There's exhibits.  Et cetera.  Et cetera.  So you'll be able to look at those documents.

But my question to you is:  As you look at this Exhibit Number 22 -- and that appears to be a -- an email from Mr. Zankl to Mr. Lubin, dated January 21st, 2022 -- do you contest that on that date, at that time, that Mr. Zankl forwarded to Mr. Lubin the actual loan documents that he was

anticipating to sign with the Feenix companies?

MR. LETO: Object to the form.

BY MR. BRESLIN:

Q. You can answer.

COURT REPORTER: I'm sorry. Who objected?

MR. BRESLIN: Mr. Leto.

MR. LETO: Matt Leto. Object to the form.

COURT REPORTER: Oh, okay. Sorry. Sorry. Okay.

A. You're -- you're asking me if this is what the email seems to be? Yes.

Q. Okay. So were you aware that in January that Mr. Zankl was having conversations with Mr. Lubin about the FVP financing?

MR. LETO: Object to the form.

A. No.

Q. Okay. Were you aware that in both December and in January -- this would be December 2021 and in January 2022 that Mr. Lubin -- excuse me -- Mr. Zankl, in fact, emailed all of the draft loan documents to Mr. Lubin prior to their execution?

MR. LETO: Object to the form.

MR. JACOBS: Objection.

A. I don't remember.

(Whereupon, Plaintiffs' Exhibit 25 was

marked for identification.)

BY MR. BRESLIN:

Q.    So I now show you what's been marked as Plaintiffs' Deposition Exhibit 25, which is another email, and this is dated January 24th, from Scott Zankl to Josh Lubin.  And this, again, attaches loan documents.  And it says:  Signing at 12 noon at my attorney office.

I'm going to scroll through this.

And this is, you know, yet again another draft of the loan documents that Mr. Zankl was anticipating signing with the FVP parties.  Do you see that email?

A.    Yeah.

Q.    Do you contest that this email was sent from Mr. Zankl to Mr. Lubin on January 24th, 2022?

MR. LETO:  Object to the form.

A.    It seems to be this is the email that he -- Scott sent Josh Lubin.

Q.    Okay.  Now, in January, around that time, in -- 21st, 24th, in that part of January, do you have conversations with Mr. Lubin that Mr. Zankl was, in fact, getting ready to close his transaction with the FVP parties?

MR. LETO:  Object to the form.

A.    I -- I don't remember.

(Whereupon, Plaintiffs' Exhibit 26 was marked for identification.)

BY MR. BRESLIN:

Q.    Okay.  I'll show -- I show you what's been marked as Plaintiffs' Deposition Exhibit 26.  This is another -- another email that occurred that same date, on the 24th.  And I will scroll through it.

And this is another one of the closing documents that was sent to Mr. Zankl from Kutak Rock.  And that is the transactional attorney for Mr. -- for the FVP parties.

And as you look at that, do you have any recollection of you being aware of these documents being sent to Mr. Lubin at that time?

A.    No.

Q.    Do you recall having any conversations with Mr. Lubin at that point, in January of 2022, wherein he talked to you about the fact that Scott Zankl was attempting to borrow over $7 million from the FVP parties?

A.    No.

Q.    When did you first become aware that Mr. Zankl was attempting to get financing from the FVP parties?

MR. LETO:  Object to the form.

You can answer.

A.    I don't remember any specifics but, you know, when we weren't getting payments, you know, that's when he would always -- would occasionally repeat things that he would say, I'm going to get you money, I'm going to get you paid.  I don't remember any specifics.

Q.    Okay.  Now, would --

Those were not conversations that you had with Mr. Zankl, correct?

A.    Correct.

Q.    All right.  So these were conversations that Mr. Zankl had with other people who relayed that information to you, would that be correct?

A.    Yeah.

Q.    And other than Mr. Lubin, were there any other people associated with Hi Bar that had any conversations with Mr. Zankl about paying Hi Bar the money that it -- it deemed that it was owed?

A.    Well, Mr. Zakharyayev, wasn't he involved?  I don't know if he was involved directly.  But, I mean, it would be primarily Josh Lubin.

Q.    All right.  So as you sit here today, you can't recall anyone else making any comments about

what Mr. Zankl was saying or promising back in January of 2022, would that be a correct statement?

A.    Right.

Q.    Now, when the information was relayed to you by Mr. Lubin, or whoever else may have relayed to you, was it relayed to you that Zankl was representing to them that he had a big deal coming and that he expected to get a substantial amount of money that he could pay to -- over to Hi Bar?

MR. LETO:  Object to the form of the question.

A.    I never paid attention to the details when he was relaying things that Scott Zankl said because how many payment plans did you see coming from Scott Zankl?  They're so irrelevant as to that happened. Everything else was up here.

Q.    Okay.  So other than money actually being paid, everything else was just a lot of talk, right?

A.    Yes.

Q.    And that talk would have been between Mr. Lubin and Mr. Zankl, correct?

MR. LETO:  Form.

A.    I -- I -- I don't know to what degree Mr. Zakharyayev was directly involved, but you told me some indication that he was, so --

Q.    Okay.  So there -- there may have been conversations with Mr. Zakharyayev as far as you know?

A.    He was -- you know, he was the attorney on the case.

Q.    I understand, but I don't want to ask you what he said to you.  But as far as you know, Zankl may have spoken to Zakharyayev, correct?

A.    Possible, yeah.

Q.    Okay.  Do you have any specific recollection of any conversations Zankl had with Zakharyayev?

A.    No.

        (Whereupon, Plaintiffs' Exhibit 27 was
    marked for identification.)

        (Whereupon, Plaintiffs' Exhibit 28 was
    marked for identification.)

BY MR. BRESLIN:

Q.    All right.  I'm going to show you Exhibit Number 28 and I'll -- and I'll do it quickly.

        This is the same date, another email to -- from Scott Zankl to Josh Lubin and this one, the Karma Security Agreement was attached.  Again, it's clearly indicated that these are coming from FVP's attorneys.

MR. LETO:  What's this?

BY MR. BRESLIN:

Q.    Was that brought to your -- was this brought to your attention back in January of 2022 that these documents were sent to Mr. Lubin?

A.    No.

(Whereupon, Plaintiffs' Exhibit 29 was marked for identification.)

BY MR. BRESLIN:

Q.    All right.  I show you Plaintiffs' Deposition Exhibit 29, which is just more documents on the same day.  These would be closing documents.

These are signature pages.

Again, you -- you were not -- this was not brought to your attention at the time, back in January 2022?

A.    Not that I remember specifically.

Q.    Okay.  Do you know why Mr. Zankl would have been sending these documents to Mr. Lubin?

MR. LETO:  Object to the form.

MR. JACOBS:  Objection.

MR. LETO:  Calls for speculation.

A.    No.  I mean, I could surmise but, I know, no.

Q.    Well, was it your understanding that these

documents were sent to Mr. Lubin to show Mr. Lubin

that money was coming and, therefore --

MR. JACOBS:  Objection.

BY MR. BRESLIN:

Q.    -- that he should not sue him?

MR. LETO:  Object to the form.

MR. JACOBS:  Sorry.  Objection.

A.    I can make assumptions but I don't know.

Q.    Okay.  Well, you -- you knew that Zankl owed Hi Bar money, right?

A.    Yeah.

Q.    You knew that he was telling Hi Bar that he had financing coming, right?

MR. LETO:  Form.

A.    Okay.

Q.    Is that correct?

MR. LETO:  Form.

A.    I if knew that he was telling --

Q.    Right.  You -- you said that he would make statements that he had financing coming but you didn't pay any attention to it because it was all talk, right?

A.    I didn't say I knew that he had financing coming.  He had money coming, not financing.  There's a difference.  (Indiscernible.)

Prestige Reporting Service, Inc. (954) 764-7297 | info@prestigereportingservice.com

Q.    Oh.

A.    (Indiscernible.)

COURT REPORTER:  I'm sorry.

THE WITNESS:  -- inheritance.

COURT REPORTER:  I'm sorry.  Could you repeat the end of that because you were both speaking at the same time.

THE WITNESS:  Okay.  Mr. Breslin indicated I said that I knew that he had -- he was told that he had financing coming.  That's not an accurate statement.  He said there was always a story of how he has money coming to pay us.  It could have been inheritance, it could have been selling cars, it could have been bringing in a partner, it could have been selling a different business, and a house.  I mean, I've heard many, many stories when it came to collect.

BY MR. BRESLIN:

Q.    Okay.  Now these stories that you're referring to in your last statement, are they stories that were relayed by Scott Zankl?

A.    I didn't speak to Scott Zankl.  But --

Q.    Okay.

A.    -- overall -- overall with -- in my business dealings.

Q.   Oh, okay.  All right.

A.   Different people.

Q.   So I'm -- I'm only referring to information that was relayed to you that you can attribute to Scott Zankl.

It was relayed to you that Scott Zankl said that he was coming into some money, would that be a correct statement?

A.   It was -- Josh Lubin, when we -- when he was giving me an overall understanding of the conversation with Scott Zankl, our money is coming, our money is coming -- he would -- he may have said something about why money is coming, which didn't matter to me or to him, quite frankly, that much.  It was just a different story which we've both heard over the years.  So --

Q.   Okay.

A.   -- I don't think anybody would have paid much attention to any of those details.

Q.   All right.  So Josh Lubin did say to you that Zankl said to him that he was coming into some money, right?

MR. LETO:  Form.

A.   Always.

Q.   All right.  So --

A.    Anytime he was behind on a payment, he would say that he's coming into money.

Q.    Okay.   And was it relayed to you how he said he would come into money, how he was going to get the money?

A.    It -- it was never all that relevant.

Q.    I -- I understand it wasn't important to you.   What I'm trying to find out is what was said to you.

A.    I -- I don't recall any details.   It was all fog.   If I was told I'm going to get money and we signed an agreement and we released the termination because he said he was going to make payments and still didn't make payments, the details of the story weren't all that relevant.

Q.    Okay.   So what's relevant in your business is you either pay or you don't and stories really don't pay the bills, correct?

A.    Right.   Sometimes it could delay --

MR. JACOBS:   Objection.

THE WITNESS:   -- buy a little time, other than that, no.

BY MR. BRESLIN:

Q.    All right.   So can --

Do you know why Mr. Zankl would be --

why -- would be sending Mr. Lubin all the closing documents from FVP if, in fact, he was not making promises to Lubin regarding the FVP money?

MR. JACOBS:  Objection.

MR. LETO:  Object to the form.

A.    No.

(Whereupon, Plaintiffs' Exhibit 30 was marked for identification.)

BY MR. BRESLIN:

Q.    Okay.  I'm going to share my screen with you and I'm going to show you what's been marked as Deposition Exhibit 30, which purports to be a text between Mr. Zankl and Mr. Lubin, dated January 25th, 2022.

A.    Okay.

Q.    And you can read it for yourself.

A.    Okay.

Q.    It says -- in the green would be Mr. Zankl: You're getting a big wire tomorrow.  $750,000.  Closing my loan today.  I'm signing the deal at 12 noon.  Check your email.

See where it says that?

A.    Yes.

Q.    And do you know what loan he was referring to?

A.    No.  I also never got -- I -- I don't think anybody saw $750,000.

COURT REPORTER:  I'm sorry.  Nobody --

Q.    Say that again.

COURT REPORTER:  Yeah, I didn't understand it.

A.    No, I'm saying I'm not fixated on checking emails.  I'm looking at the 750 that I don't think ever happened.

Q.    Okay.  So when you look at that text, you see the Number 750 and, as far as you're concerned, that payment was never made; is that accurate?

A.    Based on my recollection, correct.

Q.    But you would agree that, at least in Mr. Zankl's mind based on what you see here in his text, that he was relaying to Mr. Lubin that he was getting a big loan and -- he was closing a big loan and when he got the money he was going to pay Lubin, would you agree to that?

MR. JACOBS:  Objection.

A.    Agree to what?  That that's what he said? Yeah, that's in the text.

Q.    Okay.

A.    Anything by text is true?  Not to my recollection.

Q.    I didn't hear -- I didn't understand what you just said.

A.    No, I'm trying to reflect.  Like, did he get the -- the loan?  I didn't see a big wire.

I'm not sure that any of this -- this sounds like all imagination.

(Whereupon, Plaintiffs' Exhibit 31 was marked for identification.)

BY MR. BRESLIN:

Q.    Okay.  I show you what's been marked as Plaintiffs' Deposition Exhibit 31.  And this is what purports to be a UCC financing statement that was filed January 25th at 10:05 p.m.

Do you see this document?

A.    Yeah.

Q.    Okay.  So do you -- do you understand that Hi Bar filed a UCC financing statement on January 25th, 2022 at 10:55 p.m.?

A.    Yeah.

Q.    Do you know why it was filed on January 25th, 2022 at 10:55 p.m., in the evening?

A.    You want to know why it was filed or why it was filed at that time?

Q.    Both.

A.    Well, it was filed because he wasn't

keeping to the agreement.  He didn't make the payments.

Q.   Okay.  And how about filed at that time?

A.   I'm not sure.  Maybe that's when they got to it.

Q.   So now if we go back to Exhibit 30, this -- this document -- this text is saying, on that same day, at 5:14, late that afternoon, that he's closing his loan and he's signing the deal the next day at 12 noon.  You would agree with that, right?

MR. JACOBS:  Objection.

MR. LETO:  Object to the form.

A.   What am I agreeing to?  That that's what it says?

Q.   You -- you would agree that this docu- -- that this text says -- this text to Mr. Lubin is saying that he's signing his loan the next -- tomorrow at noon and tomorrow at noon I'm going to be able to wire you $750,000?

You would agree that -- that this text was sent on January 25th at 5:14 p.m. --

MR. JACOBS:  Objection.

BY MR. BRESLIN:

Q.   -- correct?

A.   That's what this shows.

Q.    Okay.  And then a few hours, that same night, later that same night, Hi Bar elected to file a UCC financing statement late in the evening, correct?

MR. LETO:  Object to the form.

A.    That's not when we made the decision to file, that's when it was actually filed.

Q.    When did you make the decision to actually file it?

A.    I don't remember exactly but we made a decision to file when we kept on hearing stories and we weren't getting paid.

Q.    Okay.  And so do you know how long before this UCC statement was filed that the decision was made to file it?

A.    I don't -- I don't remember the details.

Q.    Was it hours, days, weeks?  What was it?

A.    I don't remember.  It wouldn't be weeks because it was weeks when we -- when we rescinded the -- the filing.  So it was probably --

Q.    When did -- when did he go into default of the December settlement agreement?

A.    Quite early on, as far as I remember.

Q.    I mean, he went into default almost immediately, didn't he?

A. Yeah.

Q. Okay. So he went into default in December, could we agree on that?

A. Yeah.

Q. Okay. And now it's January 25th, at almost 11:00 p.m. in the evening that a UCC gets filed. And he's been in default that entire time. Why was it filed that night, at that time, right after Mr. Lubin gets a text that he's signing and closing the next morning at noon?

MR. JACOBS: Objection.

MR. LETO: Object to the form.

COURT REPORTER: I'm sorry, Mr. Leto, did you object?

MR. LETO: I sure did.

COURT REPORTER: I got Mr. Jacobs.

Thank you.

And your answer?

THE WITNESS: What's the question again? I'm sorry, we got --

MR. BRESLIN: Please repeat the question, Ms. Court Reporter.

COURT REPORTER: Give me a second.

(Whereupon, the following portion of the record was read back by the COURT REPORTER:

Okay.  Now it's January 25th, at almost 11:00 p.m. in the evening that a UCC gets filed.  And he's been in default that entire time.  Why is -- why was it filed that night, at that time, right after Mr. Lubin gets a text that he's sign- -- signing and closing the next morning at noon?)

MR. LETO:  Object to the form.

THE WITNESS:  I don't -- I don't see the connection.  I don't understand the question.

BY MR. BRESLIN:

Q.    Okay.  You indicated to me that the decision was made sometimes prior to January 25th at 11:00 p.m. to file a UCC, correct?

A.    Sometime prior, right.

Q.    Right.  Sometime prior.

You said you don't know -- you're not sure when, but it wasn't weeks, so it could have been days, correct?

A.    Well, weeks meaning the whole time frame over here is five, six weeks so that's what I meant.

Q.    Okay.  Well, Mr. -- Mr. Herbst, I'm just trying to find out when the decision was made?

A.    I already indicated that I don't remember exactly when the decision was made but it was

definitely made prior to 10:55 and very likely that it was prior to 5:14.

Q.   All right.  Mr. Herbst, that was Deposition Exhibit Number 31, and that was -- that's the Hi Bar UCC filing, January 25th, 2022 at 10:55:00 p.m.

(Whereupon, Plaintiffs' Exhibit 32 was marked for identification.)

BY MR. BRESLIN:

Q.   I now show you what's been marked as Deposition -- Plaintiffs' Deposition Exhibit 32, which purports to be the FVP UCC filing that is made the following day.

Are you familiar with the fact that FVP filed a UCC financing statement the day after Hi Bar filed its financing statement?

A.   Now I am.

Q.   So you would agree that the F- -- the FVP party's UCC financing statement was filed on the same day that Mr. Zankl had been telling Mr. Lubin for some time he was going to get his loan, right?

MR. LETO:  Object to the form.

A.   Seems like that's the fact, yes.

(Whereupon, Plaintiffs' Exhibit 33 was marked for identification.)

BY MR. BRESLIN:

Q.    All right.  I show you what's been marked as Plaintiffs' Deposition Exhibit Number 33.  And this is a second UCC filing on the same date and time by the FVP parties, which is consistent with their loan documents.

Do you -- are you familiar with this document?

A.    This is what we just discussed, right? This is --

Q.    Yeah, it's -- it's a different -- they filed two at the same time against the companies and the people.

So are you familiar -- so I assume your answer is the same?

A.    Yeah.

Q.    You were not familiar then but you are now?

A.    Yeah.

Q.    When did you first become aware that the FVP parties had filed a UCC financing statement shortly after Hi Bar?

A.    I think -- I think when everything kind of fell apart.

COURT REPORTER:  Everything kind of fell?

THE WITNESS:  Apart.

BY MR. BRESLIN:

Q.    So when you --

What do you mean by fell apart?

A.    When things -- I don't know.  The -- the cars disappeared.  They filed for bankruptcy.  I don't --

COURT REPORTER:  I'm -- I'm sorry.

THE WITNESS:  -- remember all the details.

COURT REPORTER:  I'm sorry.  Mr. Herbst, can you repeat that, please?

THE WITNESS:  When -- when -- I -- I don't remember if Excell filed for bankruptcy or Zankl filed for bankruptcy or -- all the cars disappeared.  There was a lot of action here.  So that's when all the details started coming through.

BY MR. BRESLIN:

Q.    So you understand, do you not, that when you file a UCC financing statement, that protects your security interest in the collateral, correct?

A.    Yes.

Q.    So if you don't have a UCC financing statement, you're really not secure in the collateral that's been promised by the borrower, correct?

MR. LETO:  Form.

You can answer.

A.     Well, not as -- not as protected, yeah. You can make a claim but it's not --

Q.     Okay.  So if Zankl and his companies owed you over $4 million in -- on December 20th, 2021 and they had a history of nonpayment, why would you, instead of keeping your UCC on the collateral, why would you terminate it?

MR. LETO:  Object to the form.

A.     It was a -- a way of restructuring what was owed and Mr. Zankl came up with a plan of how he was going to pay, that's why he signed the agreement, and we did it in good faith.

Q.     Okay.  So what was the plan of Mr. Zankl to pay you that $4 million?

MR. LETO:  Objection; form.

You can answer.

A.     I don't remember the details of what he said at the time but it was like, okay, let's do this right.  I -- I believe that the signing of the agreement put us in a more secure position as well.

Q.     Well, how would the signing of an agreement and a termination of a UCC put you in a more secure position than having a UCC filed?

MR. LETO:  Object to the form.

You can answer.

A.    It -- it put me in a more secure position as in a better agreement than an MCA agreement.

Q.    Okay.  So you had an MCA agreement and you traded the MCA agreement for a settlement agreement, would that be accurate?

A.    Yes.  So that was enough to give us good faith, you know, and -- and we also believed that he would take advantage of the early payment, a discount, so we hoped that this matter will be settled and we took that risk.

(Whereupon, Plaintiffs' Exhibit 34 was marked for identification.)

BY MR. BRESLIN:

Q.    All right.  So I'm going to show you what's been marked as Plaintiffs' Deposition Exhibit 34.

And let me blow it up.

And this appears to be a text between Mr. Lubin and Mr. Zankl regarding the timing of the filing of the UCC statement.  And I will scroll through it.

A.    Yeah.  The gray is -- is --

MR. LETO:  Gray is who?

MR. BRESLIN:  Mr. Lubin.

THE WITNESS:  Yeah.  I'm not following that quickly, but what's the gist of it?

BY MR. BRESLIN:

Q.   Okay.  Well, what it says here, it says: It's time to -- Mr. Lubin is saying:  It's time to go to war.

And then Mr. Zankl --

A.   What's the date?

COURT REPORTER:  I'm sorry?

THE WITNESS:  What's the date on these texts?

BY MR. BRESLIN:

Q.   I'm not -- I'm not showing a date.  But this would be after the -- after the lawsuit was filed by you in New York on the settlement agreement, based on what's in here.

So what it says here, it says, by Josh: Whatever you sent me doesn't give FVP any claims against me.  Time to go to war.

Josh, that's all you know.

And I guess you're going to say that you just happened to get lucky and filed your UCC the night before FVP did?  Boy, you're very lucky.  And I guess you're going to try to say I never told you I signed the deal with FVP and I never told you I was getting funded.

I hope you keep saying that.

And then he puts a quote and he -- and he says -- he quoted what was said by Mr. Zankl. And then he says: What if there's evidence of this? Then you're fucked.

He says: Honestly, in your opinion it was just filed because you're --

You happened to get lucky and filed your UCC the night before --

What if there's evidence on this?

Honestly. In your opinion, if it was just filed because you weren't paying and Hi Bar noticed a few months later, then you're fucked.

You see where it says that?

A.    Yeah.

Q.    Okay. So what this text is indicating is that Hi -- Hi Bar just happened to notice on January 25th that they weren't getting paid and they -- and that's why they filed the UCC. Is that -- was that an accurate statement?

MR. LETO:  Object to the form. Totally mischaracterizes that entire text.

A.    Yeah. I'm not sure what -- what -- what you're indicating, but I think he is being honest. He -- we did file it because he wasn't paying.

The only thing that's not accurate is he's

writing it's a few months later, but I don't know when this text was written. But it seems to me like it was just a couple of weeks of nonpayment and then we decided to file.

Q. Okay. All right. So -- so it's Hi Bar's position then, to be clear, that the reason that the UCC was filed on January 25th, at almost 11:00 p.m., is because the Karma entities and Zankl and Excell were not paying and that -- that the decision was made to protect your interest and it had nothing to do with the pending closing with FVP the following day; is that accurate?

MR. LETO: Objection to form.

A. Absolutely.

MR. LETO: You can answer.

THE WITNESS: One hundred percent, my opinion, my belief, the truth, call it whatever you want.

(Whereupon, Plaintiffs' Exhibit 35 was marked for identification.)

BY MR. BRESLIN:

Q. All right. I show you what's been marked at Plaintiffs' Deposition Exhibit Number 35. And this is what purports to be a -- another settlement agreement. And now this one is dated February 1st.

Are you familiar with this document?

A.    No.

But can I take a -- a three-minute break.

MR. BRESLIN:  Yeah.  It's -- it's 12:47. Let's -- let's just take 10 minutes right now and we'll come back at -- at -- excuse me -- it's 2:47.  We'll come back at 2:58.  How's that?

VIDEOGRAPHER:  Very good.

Off the record 2:47.

(Off the video record.)

VIDEOGRAPHER:  Okay.  We're back on the record at 2:54.

BY MR. BRESLIN:

Q.    Mr. Herbst -- let me share my screen -- we were talking about the settlement agreement that was entered into between Hi Bar and the Excell and Karma companies on February 1st.  And that would be just a few days after you filed your UCC and the FVP parties filed their UCC.

Are you familiar with this document?

A.    This is the one that FVP filed?

Q.    No.  No.  No.  This is -- this is a settlement agreement between Hi Bar --

A.    Yes.  Yes.

Q.    -- and Zankl.

There's -- there's two of them.  There's one from December and then there's another one in -- in February.

A.    Okay.

Q.    Okay.  This is the second one, in February.

Are you familiar with this document?

A.    Yeah.

Q.    Okay.  How did this document come into being?  What happened?

A.    I guess there was pressure to pay and he came up --

COURT REPORTER:  I'm sorry.  I'm sorry, can you get a little closer to the mic?

THE WITNESS:  He came up -- he came up with a new plan of how to settle this.

BY MR. BRESLIN:

Q.    Well, who came up with a new plan?

A.    Scott Zankl.

Q.    Okay.  So this -- this settlement agreement, this document that's -- Plaintiffs' Exhibit 35 -- this was drafted because Scott Zankl came up with a new plan to pay you; is that accurate?

A.    Well, not came up on his own.  He was -- he was in default on the old one.

Q.    And so now there was a new agreement?

A.    Uh-huh.

Q.    Is that accurate?

A.    Yes.

Q.    So who was it that negotiated this particular settlement with Mr. Zankl?

A.    Either Zakharyayev or Josh Lubin or together.

Q.    Did you have anything to do with it at all?

A.    I was probably kept aware.  Not -- not every back and forth.

Q.    Do you have -- do you have any recollection at all of having any involvement in either the negotiation of this document or the execution of this document or the approval this document?

          MR. LETO:   Object to the form.

          You can answer.

A.    I definitely have my approval and, like I said, yeah, it was worked out but it wasn't -- not every detail.

          COURT REPORTER:   I wasn't what?

          THE WITNESS:   I'm -- I'm saying I wasn't kept aware of every back and forth of the negotiation.   I said I was willing to sign the agreement.   It was an agreement that I was able

to live by.  I agreed to it.

BY MR. BRESLIN:

Q.    Was -- was Mr. Zankl represented by counsel when this document was signed?

A.    I don't know.

Q.    Was Mr. Zankl represented by counsel in December when the first settlement was signed?

A.    I have no idea.

Q.    Was Mr. Zankl represented by counsel when the MCA contract was signed?

A.    I don't know.

Q.    Okay.  Do you have any evidence anywhere in the records of Hi Bar that any of the -- either the Hi Bar MCA or any communications between Hi Bar and Zankl, any communications regarding the settlement agreement that was executed in December or any communications regarding this settlement agreement in -- in February of -- of 2022 or either copied to or that Mr. Zankl or any of his companies had an attorney conferring with him?

MR. LETO:  Object to the form.

You can answer, if you know.

A.    I don't know.

Q.    Does Hi Bar have a policy prior to entering into a settlement agreement with a merchant to

either -- and since Hi Bar -- (Internet disruption) -- obviously cause it's Hi Bar's attorney --

COURT REPORTER:  I'm sorry.  Mr. Breslin, you broke up.

MR. BRESLIN:  Okay.  I'll -- I'll start over.

BY MR. BRESLIN:

Q.   Is it Hi Bar's policy, since Hi Bar has an attorney and it's dealing with a merchant or customer that does not, to suggest to the customer or merchant that they seek legal counsel before signing any agreements?

MR. LETO:  Object to the form.

A.   No.

Q.   All right.  So as far as you know, this stipulation of settlement was another settlement agreement entered into between Hi Bar and Zankl and his companies to memorialize debt that was owed by Zankl and those companies to Hi Bar, correct?

A.   I lost track of the question.

Q.   Okay.  So as far as you know, the second stipu- -- the second settlement agreement was like the first one, it was a document where Zankl is promising to pay some amount of money that is typed

into this agreement to Hi Bar, correct?

A.    Yeah.

(Whereupon, Plaintiffs' Exhibit 40 was marked for identification.)

BY MR. BRESLIN:

Q.    Okay.  Now, let's go --

We -- we went over this document partially -- this is Plaintiffs' Exhibit Number 40 -- we went over this document partially last time.  And this is a -- an accounting of the moneys that were paid to either Excell and the Karma companies, and by that I mean all the Zankl companies, by both Spin and/or Hi Bar and the moneys that were repaid.  And I'm going to go through this.  And as I go through it, I'm going to want you to tell me if there's anything you see on this document that appears to be incorrect or inaccurate.  Okay?

A.    It's -- it's a very detailed document.

Q.    I understand.  And you either don't know or you know that it's inaccurate.  Okay?

A.    Okay.

Q.    All right.  So this shows -- this document shows that there was a Spin MCA with Excell on June 1st, 2021.  We talked about that, didn't we?

A.    Yeah.

Q.    Okay.  So you actually participated in that.  So, you know that Spin gave money to the Excell companies in June of 2021, correct?

A.    Yeah.

Q.    Okay.  And are you aware that the initial payment from Spin to the Excell companies was $950,000?

A.    Yeah.

Q.    Okay.  And were you aware that there were repayments made to Spin, as reflected in this document, on June 8th, 15th, 22nd and 30th?  Were you aware that those payments were made?

A.    Yes.

Q.    Okay.  Were you aware that Spin then gave an additional $475,000 to the Karma companies, Excell Karma companies on July 9th, 2021?

A.    Yeah.

Q.    Okay.  And so that raised the amount of money that was forwarded by -- by Spin to a total of an outstanding balance of 1,050,250, correct?

A.    Yeah.

Q.    Okay.  And now we have a series of payments from --

MR. LETO:  I'm going to object -- object to the form.

Go ahead, Jerry.

BY MR. BRESLIN:

Q.    Right.  Okay.

And then we have a series of payments that begin on July 6th and go through August 31st.  Okay.  And if -- and all of those payments are reflected in this column here.  Do you have any reason to believe that these payments were not made as reflected in this column?

MR. LETO:  Object to the form.

A.    It seems -- it seems accurate.

COURT REPORTER:  I'm sorry?

BY MR. BRESLIN:

Q.    I didn't -- I didn't hear you.

A.    It seems accurate.

Q.    Okay.  And -- and, Mr. Herbst, I'm not trying to trick you here.  You can have accountants and your own lawyers look at whatever is attached to this deposition and they can certainly opine on it.  Okay?

A.    Okay.

Q.    So, that said, now, when we get to -- when we get down to September 1st, if you -- if you look at the amount of money that was forwarded by Spin to Excell and the amount of money that was paid back, in

fact $112,000 was paid more than came in, would you agree with that?

MR. LETO:  Object to the form.

A.    Yeah.

Q.    Okay.  So now we have, on 9-2, we have an additional $1,099,000 being paid from Spin to the Excell companies, which when you take into consideration the amount that was paid back over what was brought in, overpaid in, now there would be $986,000 that was in fact out of pocket from Spin to Excell.  Would you agree with that?

MR. LETO:  Form.

COURT REPORTER:  I didn't hear an answer.

BY MR. BRESLIN:

Q.    Did you answer?

A.    Yeah.

Q.    Okay. All right.  Now, bear in mind, these -- these numbers are not looking at what the payment schedule in your contract is.  Don't get me wrong.  I'm not look- -- this is not an analysis of what the payments were supposed to be under your contract.  So, just so you know, I'm not trying to trick you but what I'm trying to show you is the amount of money that was paid to the Excell companies and Karma companies and the amount that was paid

back.  Okay.  Do you understand?

A.    Yeah.

Q.    Okay.  All right.  So now we have a million -- 1,099,000 was put in on 9-2.

And there was a credit here of 40,000.

There was a deposit refund.

So the total amount out of pocket on 9-3 was 1,026,000 after the payments were taken into consideration.

And then we have a number of payments that are made by the Karma companies to Spin.

And we have on 9-7 we have 93,000.

9-8, 40,000.

9-15, 150.

And then there's all these payments made up to 10-20.  Okay?

So if we look at all the money that was paid back and all the money that was paid to, we have a total amount of $2.5 million was paid to the Karma companies and 2.41 million was paid back.  Does that seem accurate to you?

A.    Yeah.

Q.    Okay.  So it was on that -- it was right after that, on 10-27, that Hi Bar entered into its contract with -- with the Karma people.  You

testified that Hi Bar, in fact, paid Spin $2.1 million, right?

A.    Okay.

Q.    Didn't you testify to that?

A.    Yeah.

Q.    Okay.  So -- and I asked you, and I said: Well, before you paid Spin $2.1 million, did you even make any effort to determine how much money Spin put out and how much money they got back, in other words, how much skin they had in the game where you agreed to pay them 2.1 million?  Remember I asked you that?

A.    Yeah.

Q.    And do you recall what your answer was?

A.    I don't recall what my answer was.

Q.    Okay.  All right.  So -- well, let me ask you again:  Had you known that Spin was only out $100,000 over what it had put in, and it got paid back, you know, 2.4 million since June, would you have paid Spin or agreed to pay Spin 2.1 million?

MR. LETO:  Objection to form.

A.    What's the question?

BY MR. BRESLIN:

Q.    That's my question to you.

MR. JACOBS:  Objection.

MR. LETO:  Object to the form.

A. Most likely because whatever I did at the time was based on what the future would be.

Q. What the future hold -- held?

So, in other words, it made sense to you because you believed you could make money here, right?

A. Uh-huh.

Q. So --

A. Yeah.

Q. -- now we have --

Hi Bar takes over the debt, right?

So now Hi Bar has an MCA with -- with Karma and the Karma companies for $2,120,000, right? So now that's what they owe you, right?

A. Uh-huh.

Q. Agreed?

A. Yeah.

Q. 10-27, now there's an MCA. So now Spin's out of the picture. You wired money to Spin. They wired money back. But now you're -- you -- you have a document that's signed by the Karma companies and the Zankls saying that they now you owe you 2.1 million, agreed?

MR. LETO: Object to the form.

A. Was it 2.1 or was it more? I don't

remember what the balance was.

Q. Okay. Well, you had an MCA with the Karma companies where there was a certain amount of debt and that debt was -- let's make it a ballpark, 2.1 million they had started, agreed?

A. That's how much they got in value, but that's not how much they owed.

COURT REPORTER: I'm sorry. Can you say it one more time.

THE WITNESS: That's not how much money I would earn on the contract.

BY MR. BRESLIN:

Q. Right. Right. I'm not saying how many they owed and I'm not saying how much Spin says they owed. I'm saying what the documents say they --

A. What he received.

Q. -- you know, theoretically received. Right?

A. Right. Correct.

Q. Okay. So theoretically in -- on 10-27 money went to Spin to pay off Spin. And now Karma and Zankl, they owed money to Hi Bar. They don't owe it to Spin anymore, now they owe it to you, right?

A. Okay.

Q. Do you agree?

MR. LETO:  Put your face back in the camera cause --

THE WITNESS:  Oh.  Sorry.

BY MR. BRESLIN:

Q.  Do you agree?

A.  They owe at least that much.  Yeah.

Q.  Okay.  So, now -- but we know that you gave Karma no money, right?

They never got -- they never got any money from Hi Bar paid to either Karma or Excell.  We -- we -- we've already been through that, right?

MR. LETO:  Object to the form.

A.  No, they did.  They agreed that I should send the money out.  That was their money.

Q.  Oh.  Okay.  All right.  So they -- they agreed for you to send 2.1 million to Spin, right?

A.  Right.

Q.  Okay.

A.  And they --

Q.  But my -- that -- that wasn't my question.

My question to you was:  You never sent any money to Karma or the Karma companies, right, or Excell?

MR. LETO:  Objection to form.  Object to the form; asked and answered.

Object to the form; asked and answered.

Go ahead again.

A.    They -- I -- I -- they told me --

Q.    Right.

A.    -- to send the money to Spin.

Q.    I get it.  Right.  So I get that.  But --

A.    Okay.

Q.    And you said --

And you -- you wired -- you wired money to Spin and Spin wired money back to you.  We've been through that ten times.  That's not what I'm asking you.

MR. LETO:  Object to the form.

BY MR. BRESLIN:

Q.    What I'm asking you is:  Did you ever --

A.    (Indiscernible.)

Q.    -- did you ever --

A.    -- wired money and they sent it back, that's not what happened.

Q.    Okay.  Did you wire any money to Karma or Excell at either at the time that the MCA was signed or after, at any time?  And I mean directly to them, not to some third party.

MR. LETO:  Object to the form.

A.    I don't have an exact schedule of all the

previous moneys that were sent but it could be as part of my participation originally.  I may have sent them directly money.  I don't remember.

Q.   All right.  So you don't know if you sent Karma any money?

A.   I don't remember right now.  It wasn't something I was supposed to send.

Q.   Okay.  Well, you knew you were being deposed today, right?

MR. LETO:  Jerry, he's not here as -- he's not here as a -- (distorted voices) -- witness.

COURT REPORTER:  I'm sorry?

A.   I'm saying in the previous -- in the previous participation, when you said that Hi Bar participated, I don't recall if we directly sent them money or not.

Q.   Okay.  So what were -- would --

You will agree that on 11-15 the Karma companies paid Hi Bar $300,000, correct?

A.   Yeah.

Q.   Okay.  And on 12-17 they paid $200,000, right?

A.   Okay.

Q.   Do you agree?

A.   According to the sheet, yeah.

Q.    Okay.  Do you have any reason to believe that they didn't pay you $200,000 on 12-17?

A.    No, I have no reason to believe that, no, but --

Q.    Okay.  How about on 12-20, did you get $200,000 on 12-20?

A.    According to this sheet, yeah.

Q.    Okay.  On 1-10 did you get 100,000?

A.    According to the sheet, yes.

Q.    Do you know whether or not Hi Bar got $100,000 on January 10th?

A.    According to the sheet, yes.

Q.    Okay.  But do you dispute that Hi Bar was paid that amount?  Do you know?

A.    I don't dispute.

Q.    Okay.  And -- okay.  And then on 1-12 there's another 100,000 that was paid, correct?

A.    According to the sheet, yes.

Q.    Okay.  And -- and, Mr. Herbst, if you don't know, you could just say I don't know.

       Do you know?

A.    Well, I wouldn't say I don't know because I was about -- but, you know, when you're going through detailed sheets and if you're relying on it, then you have to verify it.

Q.    Okay.  So on -- on -- on February 7th there was another payment of 250,000, correct?

A.    On February 7th?

Q.    Uh-huh.

A.    It says there was a payment to Steven Zakharyayev.

Q.    On 2-7, 2-8 and 2-9 there were multiple payments that all went to the offices of Mr. Zakharyayev -- we talked about this earlier -- and you indicated that that money would have been forwarded to Hi Bar.  Do you dispute that now?

A.    Why would I -- I -- I don't know exactly which moneys went to where at that time.  I don't remember by heart.

If it was paid on behalf of Hi Bar, and they received it -- and then they accepted on behalf of Hi Bar, that would be a payment.

Q.    Okay.  All right.  Then you -- you would agree then from -- from 10-27, the day that the Karma companies and the Zankls signed the MCA with Hi Bar, that they paid $2.2 million to Hi Bar?  Would you agree with that?

A.    According to this calculation, yes.

Q.    Do you have any reason to believe that it's inaccurate?

A.   Not off the top of my head.

Q.   Okay.  Now if -- if you look at the total amount received by Excell or the Karma companies from June 1st through February 9th, the total amount of money out of pocket from Spin or Hi Bar was $2.5 million, would you agree with that?

MR. LETO:  Wait.

A.   No.  No.  No.  No.  You're missing the $2 million payment.

Q.   Okay.  So what you're suggesting is that this $2 million payment should be included in the money that was paid to the Karma companies?

A.   Yeah.

Q.   Okay.  All right.  So money actually received by the Karma companies out of pocket from either Spin or Hi Bar that was actually paid to them, that they received in hand, you would agree was $2.5 million, correct?

MR. LETO:  Object to the form; asked and answer.

BY MR. BRESLIN:

Q.   Do you agree?

MR. LETO:  Objection.

A.   Um.  Well, we have this fundamental difference.  The money was paid to them on their

behalf.

Q.   Okay.  I -- and I -- and I understand what you're saying.  But what I'm trying to say is I'm looking at the money that they actually received, that they actually had to conduct their business with, that they actually had money, something of value to use in their business operations.  And you would agree that when you look at the money that was paid by Spin or Hi Bar to the Karma companies, the total amount that went into their pockets was $2.5 million and change, correct?

MR. LETO:  Object to form.

A.   That's inaccurate because they had to -- I don't know what you will refer to as business operations, but part of business operations is to make payments under obligations.

Q.   Okay.

A.   So --

Q.   All right.  So you would like to add the 2.1 million --

MR. LETO:  Jerry, you're not letting him finish.  You just keep cutting him off.

A.   They were relieved of the pressure that they would have had on their business to make the payment to Spin.

Q.   Okay.  All right.  So --

A.   Payment on their behalf.

So they have additional $2 million to do -- to use in their business operation.

Q.   Okay.  All right.  So then -- but you would agree that, other than the money that you -- you say was paid to Spin, the total amount that went to them, other than you paying a third party for them, was 2.5 million, we could agree on that, right?

MR. LETO:  Object to the form.

A.   Okay.

Q.   Yes?

A.   You want me agree to what you're saying is what you're saying, yes.

Q.   Okay.

A.   I mean --

Q.   All right.  But -- and you also agree that -- that the Karma companies paid Hi Bar and only Hi Bar from 11-15 through -- so from November 15th to November [sic] 9th, you will agree that the Karma companies paid Hi Bar $2.2 million, correct?

A.   Hi Bar and Zakharyayev on behalf of Hi Bar.

Q.   Okay.  Now the money that went to Zakharyayev, was that Hi Bar money or was that Zak- -- did Zak- -- did Zakharyayev have an interest

in this?

A.    Not that I'm aware of.

Q.    Okay.  All right.  All right.  So you --
you -- you do agree that 2.2 million was paid by the
Karma companies only to Hi Bar from 11-15 --
November 15th to February 9th, correct?

A.    Correct.

Q.    Okay.  So you would also then agree that
the total of money paid by Hi Bar -- excuse me -- by
the Excell or the Karma companies to either Spin or
Hi Bar was 4.6 million from June 1st to February 9th,
correct?

MR. LETO:  Object to the form.

A.    Again?  The total is what?

Q.    The total money, if we look at this column
of all the payments made back to either Spin or
Hi Bar from June 1st when -- when -- June 8th, when
they started paying back Spin, to February 9th, when
they sent you the last 450,000, the total amount paid
by Excell and the Karma companies to either Spin or
Hi Bar was 4.6 million, would you agree with that?

A.    According to this calculation, yes.

(Whereupon, Plaintiffs' Exhibit 39 was
marked for identification.)

BY MR. BRESLIN:

Q.    Okay.  Okay.  All right.  Mr. Herbst, I --
I show you what's been marked as Deposition
Exhibit 39.  This is a motion for summary judgment.
I'm going to scroll through it.  And this was
signed -- this was filed of record on December 5th,
2023 by Mr. Leto.  And it's a verified motion and
there's a declaration of you attached to this.

Are you familiar with this document?

A.    Yeah.

Q.    Okay.  And before you affixed your
signature to this document, did you read it to make
sure it was true and accurate?

A.    Yes.

Q.    Okay.  Is there a reason why the wire
transfer from Spin to Hi Bar the same day that Hi Bar
wired the money to Spin is not referenced in this
affidavit?

MR. LETO:  I'm going to -- you know, I'm
going to instruct you not to answer.  That would
be privileged.

COURT REPORTER:  I'm sorry?

MR. LETO:  I'm instructing the witness not
to answer.  That would be privileged.

BY MR. BRESLIN:

Q.    Well, let me -- let me just ask you this

about Number 7 that you swore to, it says:  As such, on November 1st Hi Bar wired 2,114,312.50 to Spin Capital.  You see where it says that?

A.    Yes.

Q.    Why does it say wired and not paid?

A.    Because it was wired.

Q.    You would agree that money could be wired to someone without paying them anything?  Agreed?

MR. LETO:  Objection to form.

A.    Yeah.  Money could be wired for many reasons, right.

Q.    And, in fact, Spin wired you money, that same payment, the exact same amount, and you testified that was for a different reason, correct?

A.    Correct.

(Whereupon, Plaintiffs' Exhibit 41 was marked for identification.)

BY MR. BRESLIN:

Q.    All right.  I'm going to show you what's been marked as Deposition Exhibit 41.  And this is what purports to be an email from Mr. Lubin to Shaya Baum, dated April 30th, 2023.

Do you see that email at the top?

MR. LETO:  Can you make it a little larger, Jerry?

MR. BRESLIN:  Certainly.

A.    Yeah, I see an email.

Q.    Okay.  Now on April 30th, 2023 this lawsuit was in litigation for over a year.  You would agree?

A.    Yes.

Q.    All right.  This is from Mr. Lubin and Mr. Baum.  It says -- he says:  There's five parties that have rights in the Hi Bar obligation.

A.    Okay.

Q.    Do you see where it says that?

A.    Yeah.

Q.    Do you know what Mr. Lubin meant by that?

A.    No.

Q.    It goes on.

And the prior email to Mr. Baum says:  Hi Bar does not own the obligation.

Do you know what Mr. Lubin is talking about in that email?

A.    No.

Q.    Okay.  And let's go back -- let's go down to April 27th, where he sends -- he says to Mr. Baum:  Shaya, Mordi Herbst and Yisroel Herbst have zero authority to give you a release of liability on the Hi Bar versus Karma matter.  They have no authority to make any decisions.  They do not control the

147

obligation.

You see where it says that?

A.    Yes.

Q.    Is that a true statement?

A.    No.

Q.    Okay.  Do you know -- do you have any reason to suggest why Mr. Lubin would tell Mr. Baum that -- that you and -- and your son have no authority to make any decisions in this lawsuit?

MR. JACOBS:  Objection.

A.    No.

Q.    But to be clear, it's not a true statement, correct?

A.    I -- I don't even know where Shaya Baum comes into all of it.

Q.    That wasn't my question.

A.    Oh.  Okay.

Q.    My question to you was:  When --

(Crosstalk.)

COURT REPORTER:  I'm sorry?  I'm sorry?

MR. LETO:  Wait for the question.

A.    Okay.  What's the question?

Q.    My question is:  When -- when you look at this, at the bottom of the page, it's an April 27th, 2023, 2:55 [sic] p.m. email from Mr. Lubin to

Mr. Baum, where it says that you -- that Mordi and Yisroel Herbst have zero authority to give you a release of the liability, they have no authority to make any decisions, they do not control the obligation, that is not a true statement, accurate?

MR. LETO: Form.

A.     That is not a true statement.  I mean, Mordi Herbst doesn't have authority.

Q.     Okay.  How about you, do you have authority?

A.     Absolutely.

Q.     Okay.  So who has the authority to speak and act for Hi Bar?

A.     Yisroel Herbst and his attorney.

Q.     And only Yisroel Herbst?

A.     At this point, yeah.

Q.     Okay.  Was there -- was there ever a point when you did not have authority?

A.     No.

Q.     So from the day this lawsuit was initiated in April of 2022 until today, you, Yisroel Herbst, have had full and complete authority to speak for and on behalf of Hi Bar as to all matters, including settlement, correct?

A.     Correct.

(Whereupon, Plaintiffs' Exhibit 43 was

marked for identification.)

BY MR. BRESLIN:

Q.    All right.  So let's go to Deposition

Exhibit 43.  This is an email from Mr. Lubin to me

and it's dated March of 2024.  And Mr. -- my client

is copied, other counsel for the FVP parties, Mr.

Wiegert, Shaya Baum, Mr. --

A.    The previous email -- the previous email

was 2023 or 2024?

MR. LETO:  That was 2023.  This is 2024.

THE WITNESS:  Oh.

BY MR. BRESLIN:

Q.    Right.  This -- this email -- it's back up

on your screen -- this is 2023.

A.    Okay.

Q.    All right.  That's a year ago.

A.    Okay.

Q.    All right.  That's when this matter was in

the bankruptcy court.  Okay?

A.    Okay.

Q.    Now I'm showing you --

That's -- and that is Number 42 -- excuse

me -- 41.

And now we're going to 43.  And now this

is -- this is this year.  Okay?

This is an email from Mr. Lubin to me.

And it says:  Jerry, to be clear, I authorized the filing of the --

MR. LETO:  (Indiscernible.)

MR. BRESLIN:  I'm sorry?

THE WITNESS:  I've got it.

MR. LETO:  It wasn't on the screen when you started.  Now it is.

MR. BRESLIN:  I'm sorry.

Does everybody see what I'm looking at?  It should be Exhibit 43.

THE WITNESS:  Yeah.  Yeah.

MR. LETO:  Now we can, yes.

MR. BRESLIN:  Okay.  I'm sorry.

BY MR. BRESLIN:

Q.   All right.  So it says:  Jerry, to be clear, I authorized the filing of the Hi Bar receiver motion.  I never authorized any Hi Bar attorneys to withdraw it and that's a power I have in my sole discretion and every Hi Bar attorney was aware I was the only one allowed to make any decisions on this matter.  I'm going to depose and put every attorney on this matter under oath.

You see where he says that?

A.    Yeah.

Q.    Where is that coming from?

MR. LETO:  I'm going to -- hold on.

First of all, I'm going to instruct you not to answer to the extent that it would be all the joint defense issues are work product.  So you don't have to answer that.

MR. BRESLIN:  Are you instructing him not to answer that?

MR. LETO:  I just said that, yes, cause it would be a joint defense privilege.  Yes.

And whether Mr. Lubin thinks he can waive that privilege, Mr. Herbst and Hi Bar didn't. So I'm instructing him not to answer.  It's work product.

MR. BRESLIN:  Okay.  Please -- please certify that question, Ms. Court Reporter.

BY MR. BRESLIN:

Q.    Well, Mr. Herbst, didn't you just tell me that you and only you have the authority to make decisions for Hi Bar?

MR. LETO:  Object to the form; mischaracterizing testimony.

A.    I guess I did say that.

Q.    Okay.  Is -- is that -- is that true and accurate?  Is it you and only you that had the -- has the authority to speak and act for Hi Bar?

A.    Yes.

Q.    So, again, looking at this email, when Mr. Lubin says that -- that he and only he has the authority to speak and act for Hi Bar, is that a true statement?

MR. LETO:  Hold on.  Hang on.

MR. JACOBS:  Objection.

MR. LETO:  It doesn't say that.

A.    It doesn't say that.

MR. LETO:  It doesn't say that.

BY MR. BRESLIN:

Q.    It says:  I authorized the filing of the Hi Bar receiver motion.

MR. LETO:  Yeah.

BY MR. BRESLIN:

Q.    I never authorized any Hi Bar -- Hi Bar attorneys to withdraw it and that's a power I have in my sole discretion and every Hi Bar attorney was aware I was the only one allowed to make any decisions on this matter.

What -- what -- what is unclear about that?

MR. LETO:  Cause your question was --

THE WITNESS:  Yes.

MR. LETO:  -- was the authority over Hi Bar and that's not what the email says.

So you can characterize it any way you want to, the instruction remains, he's not answering it cause it's work product.

MR. BRESLIN:  Oh, so now he can't answer that either, whether or not this is a true statement?

MR. LETO:  Correct.  It's all -- it all goes to the joint defense.  It's work product. So, yes, that's my instruction.

MR. BRESLIN:  Well, that's absolutely not true and -- and, you know, I will be seeking sanctions.

Please certify the question.

MR. LETO:  Certify away.

And just to make it easier, that's going to really go to every single email that Mr. Lubin may have sent you about any sort of joint decision based upon the joint defense that we have.

MR. BRESLIN:  Okay.  So you're -- you're stating on the record that there's, in fact, a joint defense agreement?

MR. LETO:  I'm saying that there's a verbal joint defense agreement, correct.

MR. BRESLIN:  There's not a written one?

MR. LETO:  Jerry, you can depose me when you put me under oath.  My answer to you --

MR. BRESLIN:  Oh, no.  You're an officer -- you're an officer of the court.  Is there a written joint defense agreement?

MR. LETO:  There's a joint defense agreement.

MR. BRESLIN:  A written one?

MR. LETO:  There's a joint defense agreement.

Move on.

MR. BRESLIN:  All right.  Certify that entire section, please, Ms. Court Reporter.

(Whereupon, Plaintiffs' Exhibit 44 was marked for identification.)

BY MR. BRESLIN:

Q.    All right.  I show you a text message from Mr. Lubin, which -- and this is Deposition Exhibit 44.

And this text message says:  I own 100 percent of the Hi Bar claim and obligation. Herbst has zero to do with this obligation.  I am the

only one that can sign settlement agreements in my sole discretion on this claim.  And I never authorized anyone to sign any settlement/agreements on my behalf.

Do you see where that -- where he says that, Mr. Herbst?

MR. LETO:  I need the date of this, Jerry, before I can instruct my client appropriately.

MR. BRESLIN:  I don't have a date.

MR. LETO:  Well, can we find a date?

MR. JACOBS:  And who are these texts with?

MR. BRESLIN:  Scott Zankl.

MR. LETO:  I -- I need a date because --

THE WITNESS:  Who?

MR. LETO:  Scott Zankl.

I need a date.

THE WITNESS:  Oh.  Okay.

MR. BRESLIN:  I don't have a date.

This document speaks for itself.

BY MR. BRESLIN:

Q.    So my question to you, Mr. Herbst, is:  Is this -- is this statement in this text a true statement?

MR. LETO:  I'm going to give you the instruction at this point not to answer under

the joint defense privilege work product.

Unless you can provide me that the date is before any litigation and then that might be a different story.

MR. BRESLIN:  Well, we're going to take up your agreement with the court.

MR. LETO:  Okay.  Well, you were successful in your joint defense so I'll just make the same argument you did.

MR. BRESLIN:  Yeah.  Well, mine was a little different.

MR. LETO:  You can say that.  You can say that again.

(Whereupon, Plaintiffs' Exhibit 45 was marked for identification and received in evidence.)

BY MR. BRESLIN:

Q.    Okay.  Now, Mr. Herbst, I'm showing you now what's been marked as Deposition Exhibit 45, which purports to be a loss -- a verified complaint that was filed in the state court on February -- on, excuse me, on May 22, 2022.  And I'm going to scroll through it.  And the attorney at the time was Mr. Wolfson.

And there's verification page, which

appears to indicate that you, Mr. Herbst, on April 29th, 2022, affirmed the allegations in this complaint.

You see this verification?

A.   Yeah.

Q.   And before signing this document, did you verify that the statements in it were true and correct?

A.   Yes.

Q.   Okay.  And so you signed this document on April 29th of 2022, correct?

A.   Yeah.

Q.   And this document attaches the MCA.

And the documents speaks for itself.

I would like to draw your attention to this exhibit.  And this would be -- there's an Exhibit B, payment schedule.  And then there is a list of, what appears to be Exhibit D, a list of automobiles.

Do you see that?

A.   Yeah.

Q.   Okay.  So this Exhibit D lists numerous automobiles.  Okay.  And it's three pages long.

A.   Okay.

Q.   So when you signed this complaint and verified its contents and requested the court to

order that Hi Bar be able to retrieve all of these vehicles as their collateral, where did you get this list?

A.    I don't recall where the attorney got it from.

Q.    Well, prior to you verifying the accuracy of this complaint, did you check and determine if in fact Hi Bar was entitled to claim any of these vehicles, much less all of them?

MR. LETO:  Well, I'm going to instruct you not to answer to the extent that would have been communications with your counsel at the time.

BY MR. BRESLIN:

Q.    I don't want to -- I don't want to hear your conversations with your lawyer.

MR. LETO:  So if you had any independent verification outside of the legal work with counsel, you can answer; otherwise, I'm instructing you not to answer.

A.    So what's the question?

Q.    The question is:  You verified that this list of cars was true -- a true and accurate depiction of the collateral that Hi Bar was seeking the court to replevy, they were seeking an order that Hi Bar can go out and take these cars and replevin

them.  So before you swore that this list of cars was true and accurate as to Hi Bar's collateral, I want to know where you got this information in this list.

MR. LETO:  Object to the form; asked and answered.

A.    From the attorney.

Q.    Okay.  So when you swore that it was true, did you confirm in any way that this list was a true and accurate list of the collateral that Hi Bar could claim as its secured collateral?

MR. LETO:  My instruction is this:  If your efforts were with counsel, I'm instructing you not to answer.  If there's anything independent that you did outside of counsel, you may answer.

A.    It's with counsel.

COURT REPORTER:  I'm sorry?

I didn't get his answer.

THE WITNESS:  With counsel.

COURT REPORTER:  Thank you.

MR. BRESLIN:  Certify the question, please.

(Whereupon, Plaintiffs' Exhibit 46 was marked for identification.)

BY MR. BRESLIN:

Q.    Okay.  I show you what's been marked as a -- as Deposition Exhibit 46, which purports to be a

lawsuit filed in the United States Bankruptcy Court for the Southern District of Florida against Hi Bar Capital and you personally and Mr. Lubin for racketeering.

Are you familiar with that complaint?

A.    Yeah.

Q.    When did you first become aware of it?

A.    My attorney.  My son.

Q.    I'm talking about you.  When did you first became aware that you were being sued for racketeering?

A.    They told me about it.  I don't remember exactly when.

Q.    Now, when -- when this lawsuit was first filed by the FVP parties and we were in the state court before Judge Tobin Singer and Mr. Wolfson represented Hi Bar, at -- at that point both Hi Bar and the FVP parties were seeking the same thing, were they not, and that was to try to retrieve the -- the automobiles that were taken -- taken by Mr. Farachi, correct?

MR. LETO:  Object to the form.

A.    That's my understanding.

Q.    Okay.  Now, after -- after that the matter then went to the bankruptcy court.  And in bankruptcy

court a -- an adversary complaint was filed, at which point the FVP parties raised their claims seeking to take priority over the collateral; is that your understanding?

A.   Who was seeking to take priority?

Q.   When -- when the matter went to bankruptcy court, FVP and Hi Bar became adverse to each other because we were both seeking priority to the same collateral in that court, would you agree with that?

MR. LETO:  Form.

A.   Yeah.

Q.   And would you agree that the allegations raised by the trustee in the RICO complaint arise from the same facts that were pled by the FVP parties in the bankruptcy adversary proceeding and now in the state court proceeding?

MR. LETO:  Object to the form.

BY MR. BRESLIN:

Q.   You can answer.

MR. LETO:  If you know.

A.   I -- I don't fully understand the -- the racketeering claim.

Q.   Now, was Mr. Leto's comment to you, if you know, did that affect your answer in any way?

A.   No.  That was exactly what I was going to

answer if you're asking me the details of a case.

Q. So he just -- he jumped the gun? You were going to say you didn't know anyway?

A. Yeah, absolutely.

Q. Okay.

A. I don't know and -- whatever.

(Whereupon, Plaintiffs' Exhibit 47 was marked for identification.)

BY MR. BRESLIN:

Q. All right. I show you what's been marked as Deposition Exhibit 47. And this is a -- another RICO case brought by the Excell trustee. And this includes claims against Mr. Getter and other people that were identified in your lawsuit against Mr. Getter that we talked about last time, but importantly it talks about Diverse Capital.

The Diverse Capital that is mentioned in this RICO complaint is that the same Diverse Capital that we were talking about earlier?

A. Possibly. It was Diverse Capital LLC.

COURT REPORTER: I'm sorry. I didn't get the rest of your answer. You said possibly --

THE WITNESS: It's listed Diverse Capital LLC. So it's obviously a company named Diverse Capital, nothing to do with my d/b/a.

BY MR. BRESLIN:

Q.   Okay.  So -- all right.  So this Diverse Capital LLC, it just happens to have the same name as one of Hi Bar's d/b/a's; is that accurate?

A.   Matter of fact, I -- I don't know why you assume that I have a relationship to anybody that's listed here.

COURT REPORTER:  Anybody that?

THE WITNESS:  That's listed here.

MR. LETO:  Just answer the question.  Don't worry about what he's assuming.

THE WITNESS:  No, he said that it has to do with people that I know.

BY MR. BRESLIN:

Q.   Well, Mr. -- Mr. -- Mr. Getter is in here, correct?

A.   Only -- only Mr. Getter is.

Q.   How about -- how about Mr. Isaacoff, wasn't he mentioned in your -- your other complaint?

A.   Mr. Isaacoff?

Q.   Yeah.

A.   Is mentioned in my complaint?  I don't remember.

Q.   Well, I may be mistaken, but certainly Mr. Getter, correct?

A.    Yeah.  Mr. Getter, correct.

Q.    Now, these other -- these other participants, do you know any of them personally?

A.    Not that I recall.

Q.    Have you done business with Diverse Capital, LLC, a Connecticut limited liability company?

A.    If it's -- if it's the same one as the brokerage that I dealt with, then yes.

COURT REPORTER:  I'm sorry.  The same as the brokerage?

THE WITNESS:  That I dealt with back in the day, then -- then -- then it would be the same company.

BY MR. BRESLIN:

Q.    How about Amal Capital Corp., have you done business with Amal -- Amal?

A.    No.

Q.    How about AJ Advance, Inc., have you done business with AJ Advance, Inc.?

A.    I did not do business with them.  I know of them.

Q.    How about DC Fund LLC?

A.    No idea.

Q.    Well, DC Fund LLC, a Florida limited

liability company, d/b/a Diverse Capital, do you know anything about that?

A. No. That just -- this indicates that what I told you was accurate.

Q. So it's another Diverse Capital?

A. Floating out there, yes. I have no idea who that is.

Q. How about Esshan Capital Corp., have you ever done business with them?

A. No.

Q. ADJ 26, LLC, a Florida limited liability company?

A. No idea.

(Whereupon, Plaintiffs' Exhibit 48 was marked for identification.)

BY MR. BRESLIN:

Q. Okay. I show you what's been marked as Deposition Exhibit 48. It's another RICO complaint filed by the trustee.

And this is -- the -- the lead defendant is Alpine Business Capital LLC.

Have you or Hi Bar done business with that company?

A. No.

Q. That -- they have several d/b/a's: Central

Capital, Sheva Capital, Mint Business Capital, Alpine Business Management.  Any of those companies?

A.    No.

Q.    How about Central Capital LLC?

A.    I don't know who that is.

Q.    Vertext Funding LLC?

A.    I don't know.

Q.    They have several d/b/a's.  They go by Alpine Business Capital, Division Capital, EOM Business Capital, Sky City Capital, Hydrid Advanced, Alpine Business.  Any of those companies?

A.    No.

Q.    How about EOM Business Capital LLC, have you done business with them?

A.    No.

Q.    How about Baruch Jungreis -- a/k/a Barry Jungreis, an individual, have you done business with him?

A.    No.

Q.    How about Joseph Rubin?

A.    No.

Q.    Sheva Capital LLC, a New York limited liability company, --

A.    No.

Q.    -- have you done business with that

company?

MCA Fund Advance Inc a New York corporation, have you done business with those comp- -- that company?

A.    No.

Q.    LDR International Limited, a British Virgin Island corporation, have you done business with that company?

A.    No.

(Whereupon, Plaintiffs' Exhibit 49 was marked for identification.)

BY MR. BRESLIN:

Q.    All right.  I show you what's been marked as Deposition Exhibit 49.  And this is another RICO complaint.  This one filed recently, in April.

How about Libertas Funding LLC, has either you or Hi Bar done any business with that company?

A.    No.

Q.    How about TVT Direct Funding LLC, have you done bus -- have you or Hi Bar done business with that company?

A.    No.

Q.    TVT Capital LLC, a Delaware limited liability company --

A.    No.

Q.    -- done business with them?

A.    No.

Q.    Kinetic Direct Funding, LLC, New York limited liability company?

A.    No.

Q.    Kinetic Direct Funding LLC?

A.    No.

Q.    Randy Saluck, Craig Paul, Carolann Cocchiere, David Waill and Michael Thompson, have you done business with any of those individuals?

A.    No.

Q.    Noble Financial Corp. d/b/a Noble Funding, have you --

A.    No.

Q.    -- done business with that?

      How about Matthew Cohen?

A.    No.

Q.    I'll go through one more and then we're going to take a 10-minute break and then wrap it up.

      All right.  I show you what's been marked as Plaintiffs' Exhibit 50, which attaches various documents that you have signed and affirmed.

      So I -- I scroll down.  We have -- I've already introduced the -- the replevin complaint that was filed in your affidavit of April 29th, 2022.  So

you -- you affirmed the accuracy of that filing on that date and time, correct?

A.    Yeah.

Q.    All right.  Exhibit B, we have a verified motion to appoint receiver.  That was filed on 5-23-2023 in this court.  And there is a verified statement of facts and is verified on the 23rd of May 2023 by you, correct?

A.    Uh-huh.  Yeah.

Q.    Is that your signature?

A.    Yeah.

Q.    Okay.  So on that date and time you affirmed that everything that was stated in that motion was true and correct; is that true?

A.    Yeah.

Q.    And, again, that was May 23rd, 2023.

We have the -- this -- this isn't the one, this is a --

COURT REPORTER:  I'm sorry?

MR. BRESLIN:  Yeah.  I'm sorry.  This is -- this is not affirmed by Mr. Herbst.

This is the -- this is the --

All right.  I'm going to withdraw Exhibit 50 because it does not -- it does not accurately reflect my question to Mr. -- to

Mr. Herbst, and the documents speak for themselves.

I'm sorry.  I have two documents here that you didn't sign.  I'm sorry about that.

So let- --

Here's what we're going to do -- it's 3:53, 3:54 -- at 4:04 we're going to come back and -- and I have a few more questions and then we'll be done.  Okay?

THE WITNESS:  Okay.

MR. BRESLIN:  Thank you.

VIDEOGRAPHER:  Very good.  Off the record at 3:54.

(Off the video record.)

VIDEOGRAPHER:  Back on the record at 4:07.

BY MR. BRESLIN:

Q.    All right.  Mr. Herbst, I'm going to ask you some questions about documents.

And so my question -- my first question to you is:  Did you, on behalf of Hi Bar, ever enter into an agreement with Josh Lubin and/or Spin to assign any rights that Hi Bar had to Spin or Lubin?

MR. LETO:  Object to the form.

A.    Again?  If I entered an agreement?  Try again.

Q.    Right.  Did -- did you -- did you enter into an agreement -- when I say you I mean Yisroel Herbst signing an agreement for and on behalf of Hi Bar -- enter into an agreement with Spin Capital, signed by Mr. Lubin, that assigned any rights that Hi Bar had to Spin?

MR. LETO:  I'm going to instruct you not to answer.  Privileged.

MR. BRESLIN:  Certify it.

And make -- make this a separate page, separate certification page, as opposed to the other ones.  You can make all those A.  Make this one B.

BY MR. BRESLIN:

Q.    My next question to you is:  Did you, on behalf of Hi Bar, sign an agreement that settled any claims with Spin and/or Mr. Lubin?

MR. LETO:  Object to the form.

Wait.  Jerry, can you repeat?  Specif- -- Settle any claims by who?

BY MR. BRESLIN:

Q.    Did -- did you, Mr. Herbst, sign any agreements with Spin and/or Mr. Lubin that acted or settled any litigation claims?

A.    From Spin against Hi Bar?

MR. JACOBS: Objection.

BY MR. BRESLIN:

Q. Any settlement agreement that settled any litigation claims.

Did you sign any agreement with Spin or Lubin that acted as a settlement of any litigation claims?

MR. JACOBS: Objection.

A. Litigation claims against -- from who against who?

Q. From -- you tell me. From anybody against anybody.

Did you enter into a settlement agreement with Hi Bar -- excuse me -- with Spin and Mr. Lubin for and on behalf of Hi Bar?

MR. JACOBS: Objection.

MR. LETO: Form.

You can answer. You can answer.

A. Not that I know of.

Q. Okay.

A. I didn't have all --

The only reason I'm asking these questions, because there may have been a deal that him and I were in together and we agreed to settle it for an amount. I don't remember but I'm saying it's a

possibility.

Q.   Okay.  Well, did you, on behalf of Hi Bar, enter into an agreement with Spin and/or Lubin where you agreed to share any proceeds from any of the litigations in this case?

        MR. LETO:  I'm going to instruct you not to answer.

        MR. BRESLIN:  Certify the question.

BY MR. BRESLIN:

Q.   Did you, Mr. Herbst, enter into an agreement with either Mr. Lubin or Spin where you assigned Mr. Lubin or Spin the right and the authority to settle any claims in this litigation?

        MR. LETO:  Instruct you not to answer.  Privileged.

        MR. BRESLIN:  Certify it.

BY MR. BRESLIN:

Q.   Did you, Mr. Herbst, enter into agreement with Mr. Lubin and/or Spin where you granted to Lubin or Spin the authority to defend or prosecute any claims in this case?

        MR. LETO:  Instruct you not to answer.  Privileged.

BY MR. BRESLIN:

Q.   Did you Mr. --

MR. BRESLIN:  Just -- just certify all of these.  You understand, Ms. Court Reporter, right?

COURT REPORTER:  Yes, I do.

MR. BRESLIN:  All right.

BY MR. BRESLIN:

Q.    Did you, Mr. Herbst -- are you speaking to somebody?

A.    No.  No.  No.  I was putting something back, you know.

Q.    Okay.  Did you, Mr. Herbst, on behalf of Hi Bar, execute a document or agreement in which either Mr. Lubin or Spin agreed to pay any professional fees in this or any other litigation?

MR. LETO:  Instruct you not to answer.  Privileged.

BY MR. BRESLIN:

Q.    Did you, Mr. Herbst, on behalf of Hi Bar, enter into any agreement with either Spin or Lubin to share any professional fees or litigation costs in this case?

MR. LETO:  Same instruction.

BY MR. BRESLIN:

Q.    Did you, Mr. Herbst, on behalf of Hi Bar, enter into an agreement with Mr. Lubin or Spin to divide in any manner any litigation proceeds that may

be generated from any claims in this case?

MR. LETO:  Same instruction.

And also asked and answered.

BY MR. BRESLIN:

Q.    Did Mr. Lubin or Spin pay any professional fees for Hi Bar since this matter initiated in May of 2022?

MR. LETO:  Same instruction.  Privileged.

BY MR. BRESLIN:

Q.    Did you, Mr. Herbst, on behalf of Hi Bar, ever withdraw, either yourself or for Hi Bar, from any agreement with Mr. Lubin or Spin regarding or relating to any settlement proceeds, distribution or fee splitting in this case?

MR. LETO:  Privileged.

Instruct you not to answer.

COURT REPORTER:  I'm sorry?

MR. LETO:  I said privileged.

Instruction not to answer.

COURT REPORTER:  Thank you.

MR. BRESLIN:  Okay.  If I can have one moment.

Okay.  I have no further questions.

MR. LETO:  All right.  We'll read.

MR. BRESLIN:  Very well.

All right.  Thank you.

I will take a copy, Victoria.

Same -- Oliver, same.

And, Mr. Herbst, thank you very much for your time.

Matthew, let's coordinate tomorrow on some dates so we can finish this discovery up.

VIDEOGRAPHER:  Very good.  We're off the record at 4:16 p.m.

MR. LETO:  Ms. Neil, I'll take a copy, please.

(Off the video record.)

COURT REPORTER:  Does anybody else want a copy?

MR. NELSON:  Yes, we are, for Brad Shraiberg.

COURT REPORTER:  Do you mind writing it in the chat for me real quick?

MR. NELSON:  Yes.

VIDEOGRAPHER:  All right.  Have a good day, everyone.

COURT REPORTER:  Thank you, everyone.

MR. NELSON:  I'm going to have it go to our attorneys first.

COURT REPORTER:  Okay.  Perfect.  Thank you

so much.

MR. NELSON:  Of course.

I'm giving you his direct email, too, so you have that, too.

COURT REPORTER:  Okay.  Thank you.

MR. NELSON:  And then, actually, if you want to cc me on it that way I can pay the invoice directly.  I'll give you my email as well.

COURT REPORTER:  Okay.  Sure.  I'll have the office send the invoice to you.

MR. NELSON:  All right.  Perfect.

(Off the record.)

- - -

(Whereupon, the video deposition was concluded at 4:20 p.m.)

(The reading and signing of this video deposition was not waived.)

CERTIFICATE OF OATH


STATE OF FLORIDA )
                 :  SS
COUNTY OF BROWARD)


          I, VICTORIA PAEZ NEIL, Notary Public in and

for the State of Florida at Large, do certify that

YISROEL HERBST, appeared via videoconference on this

28th day of May 2024, and was by me duly sworn.

                    Personally known_____ or
               Identification produced:  New York I.D.


WITNESS my hand and official seal this 19th day of
June 2024.




                         VICTORIA PAEZ NEIL
                         Notary Public - State of Florida
                         Commission HH 405099
                         Expires:  7-20-27

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA  )
                  :  SS
COUNTY OF BROWARD )

I, VICTORIA PAEZ NEIL, Shorthand Reporter, do hereby certify that I was authorized to and did stenographically report the deposition of YISROEL HERBST; that a review of the transcript was requested; and that the foregoing transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 19th day of June 2024.

Victoria Paez Neil

PRESTIGE REPORTING
P.O. Box 267967
Weston, FL  33326
(954) 764-7297
info@prestigereportingservice.com

June 19th, 2024


Re:  FVP, et al. v KARMA OF BROWARD, et al.

WITNESS:  YISROEL HERBST
          C/O:  MATTHEW P. LETO, ESQ.
          Via Email:  mleto@letolawfirm.com

The deposition taken in the above-styled cause on May 28th, 2024 is now ready for signature.  Please contact our office at (954) 764-7297 to make an appointment to sign same.  Our office hours are 9:00 a.m. to 5:00 p.m., Monday through Friday.

The original of this deposition has been forwarded to the ordering parties and your errata sheet, once received, will be forwarded to all ordering parties.

If you wish to now waive your right to read and sign, please sign the bottom of this letter and forward it to us at production@prestigereportingservice.com.

Should you have any questions, please feel free to contact our office.  Thank you for your cooperation in this matter.


Sincerely yours,




Victoria Paez Neil
Shorthand Reporter

AFFIDAVIT

FVP, et al. v. KARMA OF BROWARD, INC., et al.

WITNESS:  YISROEL HERBST

DATE:  May 28th, 2024

Under penalties of perjury, I, the undersigned, do hereby certify that I have read the forgoing deposition, or have had it read to me, and that, to the best of my knowledge, said deposition is:

_____ True and accurate, or

_____ Except for changes and/or corrections below, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Done and signed the _____ day of _____ 2024.

_____
YISROEL HERBST

DEPOSITION ERRATA SHEET

PAGES(S)_____LINE(S)_____SUGGESTIONS/REASON_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

SIGNATURE:_____DATE:_____
          YISROEL HERBST

Yisroel Herbst - Continuation    5-28-2024

183

DEPOSITION ERRATA SHEET

PAGES(S)_____LINE(S)_____SUGGESTIONS/REASON_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

SIGNATURE:_____DATE:_____
          YISROEL HERBST