UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In Re:

EXCELL AUTO GROUP, INC.                              Case No.: 22-12790-EPK
                                                     Chapter 7
          Debtor.
_____/
NICOLE TESTA MEHDIPOUR,
as Chapter 7 Trustee for Excell Auto Group, Inc.

          Plaintiff,


v.                                                   Adv. Pro. No. 23-01132-EPK

HI BAR CAPITAL, LLC, a New York limited liability
company, SPIN CAPITAL LLC a/k/a Spin Capital, a
New Jersey limited liability company, YISROEL
HERBST, an individual, MORDECHAI DOV BER
HERBST a/k/a MORDI HERBST, an individual,
AVRUMI LUBIN a/k/a JOSH LUBIN, an individual,
FRANKLIN CAPITAL FUNDING, LLC a Delaware
limited liability company, FRANKLIN CAPITAL
GROUP, LLC, a Michigan Limited Liability Company
d/b/a Wing Lake Capital

          Defendants.


_____/


**THIRD AMENDED COMPLAINT**

Nicole Testa Mehdipour, the Chapter 7 Trustee (the "Trustee") for the estate (the "Estate")

of Excell Auto Group, Inc. (the "Debtor"), by and through undersigned counsel, sues Hi Bar

Capital, LLC ("Hi Bar"), Spin Capital, LLC a/k/a Spin Capital ("Spin"), Yisroel Herbst,

Mordechai Dov Ber Herbst a/k/a Mordi Herbst, and Avrumi Lubin a/k/a Josh Lubin, Franklin

1

Capital Funding, LLC a Delaware limited liability company, Franklin Capital Group, LLC, a Michigan Limited Liability Company d/b/a Wing Lake Capital and states as follows:

## I. PARTIES, JURISDICTION AND VENUE

### A. Parties

1. Plaintiff is the duly authorized Chapter 7 Trustee of the Debtor's estate created pursuant to Section 541 of title 11 of the United States Code (the "**Bankruptcy Code**").

2. Defendant, Hi Bar, is a New York limited liability company with its principal place of business in New York and regularly conducts business in Florida.

3. Defendant, Spin, is a New Jersey Limited Liability Company. Spin Capital conducted business in Florida with the Debtor. Spin is registered to conduct business in New York.

4. Defendant, Yisroel Herbst, is an individual and is the sole member of Hi Bar and was engaged in the management and control of Hi Bar.

5. Defendant, Mordechai Dov Ber Herbst a/k/a Mordi Herbst, is the Chief Operating Officer of Hi Bar. Mordi Herbst was, at all times relevant, exercising management and control of Hi Bar.

6. Defendant, Josh Lubin, is an individual and was president of Spin. In his capacity as president, Lubin exercised management and control of Spin.

7. Based upon information and belief, Joshua Lubin was the owner of Spin.

8. Josh Lubin exercised management and control of Hi Bar in that Josh Lubin negotiated one or more Contracts between the Debtor and Hi Bar, negotiated one or more settlement agreements between the Debtor and Hi Bar, directed outside counsel of Hi Bar in its

2

dealings with the Debtor, and was engaged in managing the collection activities for Hi Bar regarding the Debtor.

9. Franklin Capital Funding, LLC is a Delaware limited liability company.

10. Franklin Capital Group, LLC, is a Michigan Limited Liability Company doing business as Wing Lake Capital. Franklin Capital Funding, LLC and Franklin Capital Group, LLC d/b/a Wing Lake Capital are referred to collectively as "**Wing Lake**."

**B. Jurisdiction and Venue**

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1334(b).

12. This action involves core and non-core causes of action pursuant to 28 U.S.C. § 157 (b)(2)(A) and (O).

13. This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiff's claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961–68 ("**RICO**").

14. The Court has subject-matter jurisdiction over Plaintiff's state-law claims because they are so related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

15. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

16. The Plaintiff consents to the entry of a final judgment by this Court on all counts in this Complaint.

## GENERAL FACTUAL ALLEGATIONS

### A. History of the Debtor

17. The Debtor is a Florida corporation with its principal business in Boca Raton, Florida.

18. The Debtor was formed for the stated purpose of selling high-end luxury vehicles primarily to end users.

19. Scott Zankl, who at all relevant times, was not an owner of the Debtor, was primarily responsible for running the day-to-day operations of the Debtor.

20. The Debtor was considered a used car dealership, so the Debtor was ineligible for more favorable lending terms of new car dealerships from traditional lending sources.

21. On April 8, 2022 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code (11 U.S.C. §§ 101, *et seq*.).

### B. Spin and Hi Bar are Predatory Merchant Cash Advance Lenders

22. Merchant Cash Advance ("MCA") lenders are lenders of last resort, and for many borrowers, MCA loans are often the death knell of a borrower/business.

23. MCA lenders attempt to disguise the MCA agreements, which are in fact loans, as the purchase of receivables or future revenue streams.

24. MCA lenders use the false guise of purchases of receivables or future revenue streams to shield themselves from state usury laws.

25. In this case, Spin and Hi Bar are MCA lenders that attempted to shield themselves from state usury laws by drafting their agreements as purchases of "future receivables" or "future receipts." Spin and Hi Bar use the same form of contract with minimal if any material changes for each of the Spin Contracts (defined below) and the First Hi Bar Contract (defined below).

26. The Debtor had little to no receivables that could be purchased by Spin or Hi Bar, because the Debtor had essentially stopped selling cars to end users and was primarily borrowing money and recirculating the borrowed funds from new lenders to pay prior investor loans.

27. Even if the Debtor had been selling vehicles and had receivables or receipts to pledge, the substance of the Spin and Hi Bar transactions demonstrate that Spin and Hi Bar loaned money to the Debtor rather than purchasing future accounts receivables or receipts.

## C. The First Spin Contract

28. On or about June 1, 2021, Spin and the Debtor, along with 13 non-debtor entities related to Scott or Kristen Zankl entered a "Revenue Purchase Agreement" (the "**First Spin Contract**"). A true and correct copy of this First Spin Contract is attached as **Exhibit C**.

29. The First Spin Contract terms included: (i) the "Purchase Price" was listed as $1,000,000.00: (ii) the "Remittance" was $93,687.50 per week; and (iii) "Purchased Amount" was $1,499,000.00.

30. On June 1, 2021, the Debtor received from Spin a wire transfer of $950,000.00 reflecting the "$1,000,000 "Purchase Price" less certain fees charged by Spin.

31. The terms and conditions of the First Spin Contract are identical, or substantially similar, to the Second Spin Contract and Third Spin Contract.

32. Spin designed the First Spin Contract to avoid applicable criminal usury statutes, but it was nothing more than a disguised loan in which the interest rate was more than twice the amount of the criminal usury rate under applicable New York or Florida law.

**D. The Second Spin Contract**

33. At the end of June 2021, Josh Lubin reached out to Scott Zankl inquiring whether any additional funding was needed. Thereafter, Josh Lubin and Scott Zankl began negotiating a second agreement.

34. On July 8, 2021, Josh Lubin texted Scott Zankl stating, "I'll fund $500k without any login or statements…."

35. On July 9, 2021, Spin, on the one hand, and the Debtor along with 13 non-debtor entities in which Scott and Kristen Zankl had an ownership interest, on the other hand, entered a "Revenue Purchase Agreement," including Addendum to the Future Receivables Sale and Purchase Agreement and Guaranty, Merchant Agreement Terms and Conditions, Security Agreement and Guaranty of Performance, Guaranty of Performance, Authorization Agreement for Direct Deposit (ACH Credit), Direct Payments (ACH Debits), and Check Debit, Appendix A – The Fee Structure, and Bank Login Information. Collectively, these documents shall be known as the "**Second Spin Contract**" and are attached as **Composite Exhibit D**.

36. The Purchase Price is listed as $500,000 with the Purchased Percentage being 20% and the Purchased Amount is $749,500.00. The weekly payment remittance was $40,000.00, to be debited daily by Spin. See Ex. D, p. 1. On July 9, 2021, the Debtor received a wire transfer from Spin Capital in the amount of $475,000.00.

37. Based upon the weekly ACH withdrawal of $40,000.00, the loan would be paid off in just 18.77 weeks, which translates to an annual interest rate of more than twice the amount of the criminal usury rate under applicable New York or Florida law.

38. Spin designed the Second Spin Contract to avoid applicable criminal usury statutes but the Second Spin Contract was nothing more than a disguised loan.

C. **The Third Spin Contract**

39.     On August 31, 2021, Spin issued a Balance Transfer Agreement letter. A copy of the 8/31/2021 Balance Transfer Agreement letter is attached as **Exhibit E**.   As of August 31, 2021, Spin represented that the Debtor owed $281,062.50 on account of the First Spin Contract and $469,500.00 on account of the Second Spin Contract.  The Debtor and Spin agreed to deduct these outstanding balances from a "new Merchant Agreement."

40.     On August 31, 2021, Spin, on the one hand, and the Debtor, including Scott and Kristen Zankl and a list of their other non-debtor entities related to Scott or Kristen Zankl, on the other hand, entered into another "Revenue Purchase Agreement."   The Revenue Purchase Agreement dated August 31, 2021, along with Addendum to the Future Receivables Sale and Purchase Agreement and Guaranty, Merchant Agreement Terms and Conditions, Security Agreement and Guaranty of Performance, Guaranty of Performance, Authorization Agreement for Direct Deposit (ACH Credit), Direct Payments (ACH Debits), and Check Debit, Appendix A – The Fee Structure, and Bank Login Information are attached as **Composite Exhibit F**. Collectively, these documents are the "**Third Spin Contract**."

41.     The Purchase Price is listed as $2,000,000 with the Purchased Percentage being 20% and the Purchased Amount is $2,998,000.00.   The weekly payment remittance was $150,000.00, to be debited weekly by Spin. Composite Ex. F, p. 1.

42.      On September 2, 2021, the Debtor received a wire transfer in the sum of $1,099,437.50 via wire transfer from Spin Capital.

43.     Therefore, in exchange for entering the Third Spin Contract, the Debtor was obligated to pay Spin Capital a minimum of $2,998,000 in exchange for the Debtor receiving $1,099,437.50.

7

44.     Based upon the weekly ACH withdrawal of $150,000.00, the loan would be paid off in just 19.98 weeks which translates to an annual interest rate of more than twice the amount of the criminal usury rate under applicable New York or Florida law.

45.     Spin designed the Third Spin Contract to avoid applicable criminal usury statutes, but the Third Spin Contract was nothing more than a disguised loan.

46.     Collectively, the First Spin Contract, Second Spin Contract, and Third Spin Contract shall be referred to as the "**Spin Contracts**."

**D.  The Spin Contracts were all Loans Disguised as Revenue Purchase Agreements and Designed to Minimize the Risk to the Lender with Illusory Reconciliation and Other Provisions**

47.     The Spin Contracts contained false, misleading, and illusory provisions to disguise the fact that the Spin Contracts are in fact loans subject to applicable usury laws.  Some of the false, misleading, or illusory provisions are: (i) that the Purchased Amount was based upon good faith estimates of the receipts purchased; (ii) no interest was being charged; (iii) that the Merchant and Guarantors are only guaranteeing their performance and not payment; and (iv) the Remittance amount was subject to changes through a reconciliation provision.

48.     In fact, the Spin Contracts were sophisticated documents designed to disguise Spin's ability to minimize any potential loss to Spin while attempting to avoid applicable usury laws.

49.     As a proximate result of the terms and conditions of each of the First Spin Contract, the Second Spin Contract and the Third Spin Contract, the Debtor was damaged as it was charged and paid more than twice the legal rate of interest permitted under applicable New York or Florida law.

i.    **Not Based upon Good Faith Estimates**

50.    Spin was purportedly "purchasing" future receipts from the Debtor and non-debtor entities through the First Spin Contract, the Second Spin Contract and the Third Spin Contract.

51.    Spin prepared and required the Debtor use its form "Revenue Purchase Agreement," which included specific representations Spin knew, or should have known, were inaccurate at the time of execution of the Spin Contracts resulting in the Debtor being in immediate default upon execution.

52.    These Spin Contracts all falsely state that "[t]he Remittance is a good faith estimate of [Spin's] share of the future revenue stream." The weekly remittance amount is purportedly 20% of the Debtor's weekly revenue, based on a "good faith estimate" of the Debtor's weekly revenue calculated by Spin. However, based upon the calculations in each of the Spin Contracts, the Debtor's weekly revenue fluctuated by hundreds of thousands of dollars per week between June 1, 2021, and August 31, 2021.

53.    The First Spin Contract calculated the Debtor's weekly revenue to be $468,437.50 ($93,687.50/.2) and 38 days later the Second Spin Contract calculated $200,000.00 in weekly revenue by the Debtor ($40,000.00/.2). Notwithstanding a purported drop in weekly revenue of $268,437.50, or a 57.3% drop in revenue, Spin continued to collect the $93,687.50 per week from the Debtor and began collecting the additional $40,000.00 per week under the Second Spin Contract.

54.    Fifty-three days later, the Third Spin Contract calculates the Debtor's weekly revenues to be $750,000.00 ($150,000.00/.2), which reflects Debtor increasing its revenues by a multiple of 3.75.

55.     A review of the Debtor's books and records for the three months prior to entering the First Spin Contract demonstrates that there was insufficient revenue being generated by the Debtor to support the good faith estimate under the terms of the First Spin Contract.

56.     For the three months prior to entering the First Spin Contract, most of the deposits coming into the Debtor's accounts were from lenders, including private lenders, floor planning lenders, and other Merchant Cash Advance lenders, not revenues.

57.     For the Second Spin Contract, Spin did not look at the Debtor's revenues and stated that the Second Spin Contract would be approved without review of bank statements or access to the Debtor's accounts.

58.     Even if Spin had reviewed the Debtor's books and records prior to entering the Second Spin Contract, the books and records reveal that the Debtor was not generating actual revenues from the sale of vehicles to support the good faith estimate under the terms of the Second Spin Contract.  In fact, the Debtor's books and records would have shown that the funds coming into the Debtor's accounts were primarily from Private Investor Loans, MCA Loans and/or loans from Karma of Palm Beach or Karma of Broward.

59.     The Third Spin Contract was, in part, a refinance of the balances due under the First Spin Contract and the Second Spin Contract. As stated above, in exchange for entering the Third Spin Contract, the Debtor was obligated to pay Spin Capital a minimum of $2,998,000 in exchange for the Debtor receiving consideration of $1,890,000 in cash and the refinance of loans due under the First Spin Contract and the Second Spin Contract.

60.      The Third Spin Contract was, in fact, a loan that refinanced the First Spin Contract and Second Spin Contract and provided additional funds to the Debtor.

ii.     **The Obligation by the Debtor for Repayment was for a Definite Term**

61.     In reviewing the Spin Contracts, it is clear that these were not agreements for the sale of either future receivables or future receipts, but were, in fact, loans.

62.     Although purporting not to have a definite term of repayment, each of the Spin Contracts required repayment under a definite term.

63.     The term for repayment is determined by taking the Purchase Amount and dividing it by the predetermined weekly remittance amount.  As previously stated, the actual revenues from the sale of vehicles were *de minimis* and if this were a true "sale" of future revenues, the Spin Contracts should have had a weekly reconciliation provision that tied the Debtor's payment to the actual revenues received by the Debtor, but the Spin Contracts did not have such a provision.

64.     The Debtor's repayment obligation is specific and fixed, and not contingent on the existence or amount of cash flow.  This is set forth on the face of each of the Spin Contracts which require a predetermined remittance amount from the Debtor.

iii.     **The Reconciliation Provision in the Spin Contracts was Illusory.**

65.     Another fact supporting that each of the Spin Contracts were loans, is that each of the Spin Contracts contain an illusory reconciliation provision to create a false and misleading impression that the Debtor and the non-debtor entities could reduce the Remittance amount thereby extending the length of repayment.

66.     Each of the Spin Contracts had the same "Reconciliation" provision:

> Reconciliation. **As long as an Event of Default, or breach of this agreement, has not occurred**, Merchant may request a retroactive reconciliation of the total Remittance Amount. All requests hereunder must be in writing to Reconciliations@spincapital.com.   Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding if applicable, from the date of this Agreement through and including the date the request is made. [Spin] retains the right the request additional reasonable documentation including without limitation bank login or access to view

11

> Merchant's accounts using third party software, and Merchant's refusal to provide access shall be a breach of this Agreement and [Spin] shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by [Spin] within two (2) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by [Spin] shall equal the Specific Percentage of the Future Receipts that Merchant collected during the requested month. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with [Spin]'s right and ability to debit Merchant's Account while the request is pending or to unilaterally modify the Remittance Amount, in any method other than the ones listed in this Agreement.

Exs. C, D, and F (emphasis added).

67. The Debtor and the non-debtor entities are precluded, based upon the plain language of the Spin Contracts from seeking reconciliation if the Debtor and the non-debtor entities had an Event of Default or were otherwise in breach of the agreement.

68. Each Spin Contract contains the same provisions for "Event of Default" which states, in part, as follows:

> (a) Paragraph (h) **Merchant shall use multiple depository accounts without the prior written consent of SPC or takes any other action that intentionally interferes with or prevents SPC from receiving the Purchased Amount in accordance with the terms of this Agreement.**
>
> (b) Paragraph (i) Merchant shall enter into any financing **agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party.**
>
> (c) Paragraph (m) **Merchant or any Owner/Guarantor(s), directly or indirectly, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, which operates a business similar to or competitive with that of Merchant.**
>
> (d) Paragraph (n) **Merchant shall default under any of the terms, covenants and conditions of any other agreement with SPC.**

Exs. C, D, and F.

69.     The Debtor and the Non-Debtor entities are included in the definition of "Merchant" or "Seller." The Non-Debtor entities are separate businesses each with their own bank accounts. Spin knew or should have known that the Debtor and non-debtor entities each had one or more separate bank accounts prior to entering each of the Spin Contracts. Pursuant to the plain terms of the Spin Contracts, the Debtor and non-debtor entities' maintenance of these separate accounts constituted an Event of Default.

70.     Prior to entering each of the Spin Contracts, Spin knew or should have known that the Debtor had entered into multiple loan agreements with other lenders, including Merchant Cash Advance Lenders, Private Lenders, floor planning lenders, and other lenders.

71.     In part, Spin's knowledge is based upon Spin's review of the Debtor's bank statements and communication between Scott Zankl and Josh Lubin.

72.     Based upon the broad definitions of Merchants and Owners\Guarantors along with the expansive prohibition of borrowing that would increase the amounts due to any other party, each time the Debtor entered into one of the Spin Contracts there was an immediate Event of Default.

73.     The Debtor and some of the non-debtor entities were in the business of selling new and used vehicles and acquired their inventory through consignment or floor plan financing agreements. The Debtor and/or the non-debtor entities' ordinary course of business and only means of operating constituted an Event of Default under the Spin Contracts.

74.     Further, under the plain reading of the Spin Contracts, the normal use of a credit card by the Debtor or the non-debtor entities is an Event of Default because there is an increase in the debt owed to a third party.

75. Pursuant to the Spin Contracts, the Debtor and the non-debtor entities had to represent that they had "good, complete, unencumbered and marketable title to all Receipts and all collateral in which Spin has been granted a security interest under the Security Agreement, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever other than in favor of Spin or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of Spin."

76. At the time that the Spin Contracts were being entered, Spin knew that the Debtor and the non-debtor entities had other Merchant Cash Advance Agreements, security agreements with floor plan lenders, and other lenders.

77. Spin knew that the Debtor and the non-debtor entities would immediately be in default under the terms of the Spin Contracts and the Events of Default.

### iv. The Adjustment to the Remittance Provision in the Spin Contracts were Illusory

78. The illusory adjustment to the remittance provision is another indication that this was, in fact, a loan.

79. The Spin Contracts have a provision for Adjustments to the Remittance amount. The pre-conditions to obtain an adjustment to the weekly Remittance amount were substantially similar to the requirements to obtain a reconciliation.

80. The Spin Contracts provide, in part, "[t]he Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipt by the Purchased Percentage divided by the number of business days in the previously (2) calendar weeks." The weekly remittance amount could only be reduced for 2 weeks, then the process would

14

need to start all over or the Remittance Amount reverts back to the original Remittance amount without consideration of the Debtor's financial position.

81.    The ability of the Debtor and the non-debtor entities to successfully obtain a reduction to the weekly remittance amount was illusory.

> **v.    The Spin Contracts were Designed to Minimize Any Potential Risk of Loss to Spin**

82.    The Spin Contracts were designed to minimize any potential risk of loss to Spin in the event the Debtor and the non-debtor entities had a business failure or reduction in revenue further supporting that the Spin Contracts were loans.

83.    As a result of the protections built into the Spin Contracts to protect Spin from loss, the Spin Contracts were, in fact, loans.

84.    If there is an Event of Default, the Debtor and non-debtor entities were required to pay 100% of their revenues until all amounts, including any penalties, attorneys' fees, and other were paid in full.

85.    To further minimize the risk of any potential loss, the Spin Contracts contain the following protections:

> **Protection 1**. The full uncollected Purchased Amount plus all fees (including attorney's fees and costs of collection in the amount of 30% of the Purchased Amount then outstanding due under this Agreement and the attached Security Agreement become due and payable in full immediately.
> **Protection 2**. [Spin] may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).
> **Protection 3**. Merchant hereby authorizes [Spin] to execute in the name of the Merchant a Confession of Judgment in favor of [Spin] pursuant to the terms of the Confession of Judgment.
> Upon an Event of Default, [Spin] may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.
> **Protection 4**. [Spin] may enforce its security interest in the Collateral including sending demand letters to account debtors and credit card processors.

15

**Protection 5**. [Spin] may exercise any and all rights and remedies of a secured party under Uniform Commercial Code Article 9

**Protection 6.** [Spin] may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if [Spin] recovers a Judgment against Merchant, Merchant shall be liable for all of [Spin's] costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to [Spin]. Upon breach of any provision in this Agreement, [Spin] may exercise its rights under this Assignment of Lease without prior Notice to Merchant.

**Protection 8.** [Spin] may debit Merchant's depository accounts wherever situated in such amounts as determined by [Spin] in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Amount and other amounts owed by Merchant to [Spin] by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to [Spin].

Exhibits C, D, and F.

86. The Spin Contracts contain a Security Agreement under the Uniform Commercial Code. The Security Agreement creates a lien on the assets of the Merchant under Article 9 of the UCC; requires the Merchant to pledge additional assets as security in the following: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "**UCC**"), now or hereafter owned or acquired by Merchant and/or Guarantor(s)(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s)(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to Spin under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "**Spin Secured Assets**").

87.     The Spin Contracts were intended to be – and in fact are - usurious loans for which the interest rate was charged more than 2 times the criminal rate of usury under applicable New York or Florida law.

**E. The Debtor Refinances MCA Loans with Wing Lake and Spin Sells and Assigns to Wing Lake All Known and Unknown Obligations and Claims Owed by the Debtor and its Affiliates**

88.     Prior to October 21, 2021, the Debtor entered negotiations with Franklin Capital Funding, LLC d/b/a Wing Lake Capital Partners ("**Wing Lake**") for a $6,000,000.00 loan to refinance the Debtor's outstanding MCA Loans.

89.     Prior to October 21, 2021, Spin and Wing Lake, as part of the Debtor's refinancing, began negotiating an agreement whereby Spin would sell and assign all right, title, and interest to all outstanding obligations of the Debtor and its affiliates to Wing Lake. The memorialized assignment agreement, attached hereto as **Exhibit G** (the "**Wing Lake Assignment Document**").

90.     Specifically, Spin agrees to sell and assign:

> all outstanding obligations ("Obligations") of Excell Auto Group, Inc. and each of its affiliates (collectively, "Company") owing to Assignor under each of (i) the Revenue Purchase Agreement, dated as of June 1, 2021, by and between Assignor and Company, and (ii) the Revenue Agreement, dated as of July 9, 2021, by and between Assignor and Company (collectively, the "Merchant Agreements") and all rights of Assignor under any similar or related documents (including without limitations, any guaranties, security agreements, forbearance agreements and judgments), including with respect to all collateral securing the obligations of Company under the Merchant Agreements or securing any guaranties in respect thereof (the documents, including the Merchant Agreements, are defined collectively as "Merchant Documents"), for purchase price of $1.00 (the "Purchase Price').

Exhibit G, p. 1, ¶ "Recitals."

91.     Further, Spin agreed that the "total Obligations as of October 21, 2021 is $1.00."

Ex. G, p. 1, ¶ 1.

17

92.     The Obligations included Merchant Documents and any claims, rights, or actions against any third party arising in connection with, or otherwise related to, the Merchant Documents or the Obligations. *Id.*, p.1, ¶¶ Recitals and 2(a).

93.     Additionally, Spin affirmatively represented and warranted that Spin

> ha[d] not sold, assigned, transferred, granted a participation in or pledged the Obligations, the Merchant Documents or the Third-Party Claims and [Spin] owns the Obligations, the Merchant Documents and the Third Party Claims free and clear of any lien or other encumbrance and [Spin] (including any of its affiliates) has not entered into any written or oral agreement with [the Debtor or any of the Debtor's affiliates] relating to this Assignment or receipt of any compensation from [the Debtor or its affiliates] in consideration for entering into the Assignment.

*Id*. at p. 1, ¶ 4.

94.     Josh Lubin viewed the Wing Lake Assignment Document on October 26, 2021 and signed it on November 1, 2021. *Id*. at p. 7.

95.     Wing Lake made the $1.00 payment to Spin, which was accepted by Spin.

96.     Therefore, the balance of all outstanding Obligations owed to Spin was transferred to Wing Lake, including disclosed and undisclosed Obligations and including, but not limited to any Obligation that existed between October 21, 2021 and November 3, 2021.

97.     The sale and assignment memorialized in the Wing Lake Assignment Document was a material condition precedent to Wing Lake's refinancing of the Debtor's outstanding obligations.

98.     The promises made by Spin in the Wing Lake Assignment Document were for the direct benefit of the Debtor to allow for the loan to close and for the debt to be refinanced by Wing Lake.

99.    The Debtor is a third-party beneficiary of the Wing Lake Assignment Document under Mich. Comp. Laws Serv. § 600.1405 entitled to enforce the promises made in the Wing Lake Assignment Document.

100.    Spin wanted the Debtor to be able to obtain the proceeds from the loan from Wing Lake, in part, because Spin wanted the Debtor to use those funds to pay Spin.

101.    Spin knew that as a condition of the Debtor obtaining a loan from Wing Lake, Wing Lake required a representation that all amounts owed to Spin were satisfied and/or assigned to Wing Lake.  Spin affirmatively represented to Wing Lake that "[t]he total amount of outstanding Obligations as of October 21, 2021 is $1.00."  Ex. G., p. 1, ¶ 1.

102.    The face of the Wing Lake Assignment Document makes it clear that Spin did not disclose the Third Spin Contract, dated August 31, 2021. The Third Spin Contract had refinanced the First Spin Contract and Second Spin Contract, which are specifically referenced in the Wing Lake Assignment Document.  *See* Exs. C, D, E, F, and G.

103.    However, because the Wing Lake Assignment Document included "any similar or related documents" and any "known or unknown" obligations, the Third Spin Contract was sold and assigned to Wing Lake.

104.    On November 1, 2021, Spin Capital executed the Wing Lake Assignment Document.  Ex. G.

**F.  Spin Conspires with Hi Bar to Secretly Transfer the Third Spin Contract to Hi Bar**

105.    Meanwhile, Spin and its affiliate and co-conspirator Hi Bar negotiated a secret assignment of the Third Spin Contract to Hi Bar.

106.    It is unclear as to the date either of the following documents were actually executed and in force, however, Spin, Hi Bar, and Debtor entered the following somewhere between October 27, 2021 and November 1, 2021:

(a)      "Hi Bar Capital Balance Transfer Agreement" which has a date of October 27, 2021, but purportedly signed by Kristen Zankl on October 28, 2021, and Scott Zankl on November 1, 2021, and purports to assign the Third Spin Contract to Hi Bar; *See* **Exhibit H** (the "**Hi Bar Transfer Agreement**"); and

(b)      The First Hi Bar Contract, **Exhibit I**, (detailed below).

107.    Josh Lubin actively participated in the negotiations on behalf of Spin and Hi Bar. Josh Lubin negotiated and signed the Wing Lake Assignment Document.  Josh Lubin was on both sides of the Spin to Hi Bar Assignment.

108.    The Debtor was an intended third-party beneficiary of the payoff and assignment of the Spin Contracts as the Wing Lake Assignment Document executed by Spin Capital in favor of Wing Lake was a condition of the closing of the loan between the Debtor and Wing Lake.

### G. The First Hi Bar Contract

109.    Josh Lubin had the Debtor execute the Hi Bar Transfer Agreement.  The Hi Bar Transfer Agreement was purportedly signed by Kristen Zankl on October 28, 2021, and signed by Scott Zankl on November 1, 2021. Despite the representations and warranties made by Spin and Josh Lubin to Wing Lake in the Wing Lake Assignment Document, the Debtor agreed that there was still a balance due and owing on the Third Spin Contract in the amount of $2,114,312.50.

110.    The Third Spin Contract was an undisclosed Merchant Document that was assigned to Wing Lake as part of the Wing Lake Assignment Document.

111.    The Hi Bar Transfer Agreement states that $2,114,312.50 would be transferred from Spin to Hi Bar and that the $2,114,312.50 would be deducted from a "new Merchant Agreement" to be entered into between the Debtor and Hi Bar.

112.    Josh Lubin negotiated the Hi Bar Capital Transfer Agreement on behalf of Spin and Hi Bar.

20

113.   On or about October 27, 2021, Hi Bar, on the one hand, and, on the other hand, the Debtor, along with 14 non-debtor entities, which are the same 13 non-debtor entities included in the Spin contracts with Karma of Palm Beach being duplicated, entered a "Revenue Purchase Agreement." The Revenue Purchase Agreement dated 10/27/2021 along with Merchant Agreement Terms and Conditions, Security Agreement and Guaranty of Performance, Guaranty of Performance, Authorization Agreement for Direct Deposit (ACH Credit), Direct Payments (ACH Debits), and Check Debit, Appendix A – The Fee Structure, Bank Login Information, and Addendum to the Future Receivables Sale and Purchase Agreement and Guaranty are attached as **Composite Exhibit I.** Collectively, these documents are the "**First Hi Bar Contract.**"

114.   Josh Lubin negotiated the First Hi Bar Contract with the Debtor and its affiliates on behalf of Hi Bar.

115.   The Purchase Price is listed as $2,120,000.00 with the Purchased Percentage being 20% and the Purchased Amount is $3,177,880.00.   The Purchase Price is $5,687.50 ($2,120,000.00-2,114,312.50) more than the "transferred balance" from Spin.

116.   Hi Bar did not transfer any funds to the Debtor on account of the First Hi Bar Contract.

117.   At approximately, 2:34 p.m. on November 1, 2021, Yisroel M. Herbst, individually or on behalf of Hi Bar, caused exactly $2,114,312.50 to be transferred to Spin.  *See* **Exhibit J.** Approximately 50-minutes later at 3:23 p.m. on November 1, 2021, Spin then transferred the exact same amount $2,114,312.50 back to Hi Bar. *See* **Exhibit K**.

118.   Based upon the plain terms of the Wing Lake Assignment Document, the actual balance transferred from Spin to Hi Bar was zero.

119. Even if Hi Bar actually made a loan to the Debtor under the First Hi Bar Contract, a review of the Debtor's books and records for the three months prior to entering the First Hi Bar Contract demonstrates that there was an insufficient amount of deposits going into the Debtor's account from revenue to support the good faith estimate under the terms of the First Hi Bar Contract.

120. At the time of the First Hi Bar Contract, the Debtor was borrowing more money to repay pre-existing obligations.

121. A review of the Debtor's bank statements demonstrates that most of the deposits coming into the Debtor's accounts were from lenders, including private lenders, Merchant Cash Advance lenders, and other lenders.

122. The weekly payment remittance was $150,000.00, to be debited by Hi Bar. **Composite Ex. I, p. 1**. Based upon the weekly ACH withdrawal of $150,000.00, the loan would be paid off in just 21.19 weeks which translates to an annual interest rate of more than twice the amount of the criminal usury rate under applicable New York or Florida law.

   i. **The First Hi Bar Contract was a Loan Disguised as Revenue Purchase Agreements and Designed to Minimize the Risk to the Lender with Illusory <u>Reconciliation and Other Provisions</u>**

123. The totality of the circumstances demonstrates that the Hi Bar Contract was merely a loan at criminally usurious interest rates.

124. The funds taken by Hi Bar came, primarily, from funds the Debtor was borrowing from other MCAs, private lenders, and other third-party lenders and were not "proceeds" from the Debtor's sale of goods or services as contemplated in the First Hi Bar Contract. The Debtor had little to no actual receipts as contemplated by the First Hi Bar Contract.

125. Furthermore, the First Hi Bar Contract contained false, misleading, and illusory provisions to disguise the fact that the First Hi Bar Contract was in fact, a loan subject to applicable

22

usury laws.  Some of the false, misleading, or illusory provisions are: (i) that the Purchased Amount was based upon good faith estimates of the receipts purchased; (ii) no interest was being charged; (iii) that the Merchant and Guarantors are only guaranteeing their performance and not payment; and (iv) the Remittance amount was subject to changes through a reconciliation provision.

126.    The First Hi Bar Contract was substantially similar to the Spin Contracts.  In fact, in Section 1.10 of each of the Spin Contracts and the First Hi Bar Contract contain the same reference that "all such Receipts shall be received and held in trust for the benefit of SPFL for carrying on the terms of this Agreement."  *See* Exhibit C, p. 4, § 1.10; Exhibit D, p. 4, § 1.10; Exhibit E, p. 4, § 1.10, and Exhibit I, p. 2, § 1.10. The reference to SPFL is allegedly an error in each of the contracts.

127.    For the First Hi Bar Contract, the receivables are not based upon good faith estimates; the obligations for repayment are for a definite term; the reconciliation provision is illusory; the adjustment to the remittance provision is illusory; and the First Hi Bar Contract is crafted to minimize the risk of loss to Hi Bar.

128.    The "Specified Percentage" and the "Reconciliation Provision" falsely represent to courts that their agreements are not absolutely repayable, usurious loans with fixed repayments and fixed terms, but are rather purchases of accounts receivables, with varying daily or weekly terms and repayment based on the merchant's actual generation and collection of accounts receivable, with the Enterprise assuming the risk that the merchant will fail to generate or collect the same.

ii.    **Not Based upon Good Faith Estimates**

129.    Pursuant to the First Hi Bar Contract, the Debtor and 14 non-debtor entities were defined as the Merchant.  The Merchant agreed to sell, assign, and transfer the Purchased

23

Percentage, defined as 20%, of all of Merchant's payments, receipts, settlements and funds paid to or received by or for the account of the Merchant from time to time on and after the date hereof in payment or settlement of Merchant's existing and futures accounts, payment intangibles, credit, debit and/or stored value card transactions, contract rights, and other entitlements arising from or relating to the payment of monies from Merchant's customers and/or other payors or obligors (the "Future Receipts" defined as all payments made by cash, check, clearing house settlement, electronic transfer or other form of monetary payment) of the payments to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the Purchased amount has been delivered by or on behalf of Merchant to [Hi Bar]"

130. The First Hi Bar Contract falsely state that "[t]he Remittance is a good faith estimate of [Hi Bar's] share of the future revenue stream." The weekly remittance amount is purportedly 20% of the Debtor's weekly revenue, based calculated on a "good faith estimate" of the Debtor's weekly revenue calculated by Hi Bar.

131. The First Hi Bar Contract calculated the Debtor's weekly revenue to be $750,000.00. The Debtor did not have Future Receipts equaling $750,000.00 per week for 21.19 weeks. Notwithstanding, Hi Bar insisted on payment of the $150,000.00 per week.

132. A review of the Debtor's books and records for the three months prior to entering the First Hi Bar Contract demonstrates that there was insufficient revenue being generated by the Debtor to support the good faith estimate under the terms of the First Hi Bar Contract.

133. For the three months prior to entering the First Hi Bar Contract, most of the deposits coming into the Debtor's accounts were from lenders, including private lenders, floor planning lenders, and other Merchant Cash Advance lenders not revenues.

24

134. The First Hi Bar Contract was nothing more than a refinancing of an alleged balance due under the Third Spin Contract.

135. However, as stated above, any balance owed to Spin was assigned to Wing Lake so that there was never an actual balance transferred to Hi Bar.

### iii. The Obligation by the Debtor for Repayment was for a Definite Term

136. Another indication that the First Hi Bar Contract was a loan was that the obligation owed by the Debtor was for a definite term.

137. The term for repayment is determined by taking the Purchase Amount and dividing the weekly remittance amount or 21.19 weeks.

### iv. The Reconciliation Provision in the First Hi Bar Contract was Illusory.

138. The First Hi Bar Contract creates a reconciliation provision, which is illusory, to create a false and misleading impression that the Debtor and the non-debtor entities could reduce the Remittance amount thereby extending the length of repayment.

139. Pursuant to the plain terms of the First Hi Bar Contract, the Debtor and the non-debtor entities were never eligible for reconciliation.

140. At the time that the First Hi Bar Contract was entered into, Hi Bar knew or should have known, that the Debtor and the non-debtor entities could never be eligible for reconciliation.

141. The Hi Bar Contract had a "Reconciliation" provision:

> Reconciliation. **As long as an Event of Default, or breach of this agreement, has not occurred**, Merchant may request a retroactive reconciliation of the total Remittance Amount. All requests hereunder must be in writing to  Reconciliations@hibarcapital.com.  Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding if applicable, from the date of this Agreement through and including the date the request is made. [Hi Bar] retains the right the request additional reasonable documentation including without limitation bank login or access to view Merchant's accounts using third party software, and Merchant's refusal to provide access shall be a breach of this Agreement and [Hi Bar]

25

shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by [Hi Bar] within two (2) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by [Hi Bar] shall equal the Specific Percentage of the Future Receipts that Merchant collected during the requested month. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with [Hi Bar]'s right and ability to debit Merchant's Account while the request is pending or to unilaterally modify the Remittance Amount, in any method other than the ones listed in this Agreement.

Ex. I p. 2 (emphasis added).

142.    The Debtor and the non-debtor entities are precluded, based upon the plain language of the First Hi Bar Contract from seeking reconciliation if the Debtor and the non-debtor entities had an Event of Default or were otherwise in breach of the agreement.

143.    The First Hi Bar Contract contains the following provision for "Event of Default" which states, in part, as follows:

(a) Paragraph (h) **Merchant shall use multiple depository accounts without the prior written consent of HBC or takes any other action that intentionally interferes with or prevents HBC from receiving the Purchased Amount in accordance with the terms of this Agreement.**

(b)  Paragraph (i) Merchant shall enter into any financing **agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party.**

(c) Paragraph (m) **Merchant or any Owner/Guarantor(s), directly or indirectly, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, which operates a business similar to or competitive with that of Merchant.**

(d) Paragraph (n) **Merchant shall default under any of the terms, covenants and conditions of any other agreement with HBC.**

Ex. I, First Hi Bar Contract  §3(a)-(n).

144.    The Debtor and the Non-Debtor entities are included in the definition of "Merchant" or "Seller."  The Non-Debtor entities are separate businesses each with their own bank

accounts.   Hi Bar knew or should have known that the Debtor and non-debtor entities each had one or more separate bank accounts prior to entering each of the First Hi Bar Contract.   Pursuant to the plain terms of the First Hi Bar Contract, the Debtor and non-debtor entities' maintenance of these separate accounts constituted an Event of Default.

145.   Prior to entering the First Hi Bar Contract, Hi Bar knew or should have known that the Debtor had entered into multiple loan agreements with other lenders, including Merchant Cash Advance Lenders, Private Lenders, floor planning lenders and other lenders.

146.   In part, Hi Bar's knowledge is based upon the review of the Debtor's bank statements and communication between Scott Zankl and Josh Lubin.

147.   Lubin, on behalf of both Hi Bar and Spin, had actual knowledge of the loan with Wing Lake.

148.   Based upon the broad definitions of Merchants and Owners\Guarantors along with the expansive prohibition of borrowing that would increase the amounts due to any other party, created an immediate Event of Default.

149.   The Debtor and some of the non-debtor entities were in the business of selling new and used vehicles, including on consignment and through the use of floor plan financing agreements. Any transaction by the Debtor and/or the non-debtor entities would constitute an Event of Default.

150.   Further, under the plain reading of the First Hi Bar Contract, the normal use of a credit card by the Debtor or the non-debtor entities is an Event of Default because there is an increase in the debt owed to a third party.

151.   Pursuant to the First Hi Bar Contract, the Debtor and the non-debtor entities had to represent that they had "good, complete, unencumbered and marketable title to all Receipts and all

collateral in which Spin has been granted a security interest under the Security Agreement, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever other than in favor of Spin or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of Hi Bar."

152. At the time that the First Hi Bar Contract was being entered, Hi Bar knew that the Debtor and the non-debtor entities had other Merchant Cash Advance Agreements, security agreements with floor plan lenders, and other lenders.

153. Hi Bar knew that the Debtor and the non-debtor entities would immediately be in default under the terms of the First Hi Bar Contract and the Events of Default.

### v. The Adjustment to the Remittance Provision in the First Hi Bar Contract was Illusory

154. The First Hi Bar Contract has a provision for Adjustments to the Remittance amount. The pre-conditions to obtain an adjustment to the weekly Remittance amount were substantially similar to the requirements to obtain a reconciliation.

155. The First Hi Bar Contract provides, in part, "[t]he Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipt by the Purchased Percentage divided by the number of business days in the previously (2) calendar weeks." The weekly remittance amount could only be reduced for 2 weeks, then the process would need to start all over or the Remittance Amount reverts back to the original Remittance amount without consideration of the Debtor's financial position.

156. The ability of the Debtor and the non-debtor entities to successfully obtain a reduction to the weekly remittance amount was illusory.

### vi.   The First Hi Bar Contract was Designed to Minimize Any Potential Risk of Loss to Hi Bar

157.   The First Hi Bar Contract was designed to minimize any potential risk of loss to Hi Bar in the event the Debtor and the non-debtor entities had a business failure or reduction in revenue.

158.   As a result of the protections built into the First Hi Bar Contract to protect Hi Bar from loss, the First Hi Bar Contracts were, in fact, loans.

159.   If there is an Event of Default, the Debtor and non-debtor entities were required to pay 100% of their revenues until all amounts, including any penalties, attorneys' fees, and other were paid in full.

160.   To further minimize the risk of any potential loss, the Contracts contain the following protections:

> **Protection 1**. The full uncollected Purchased Amount plus all fees (including attorney's fees and costs of collection in the amount of 30% of the Purchased Amount then outstanding due under this Agreement and the attached Security Agreement become due and payable in full immediately.
> **Protection 2**. [Hi Bar] may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).
> **Protection 3**. Merchant hereby authorizes [Hi Bar] to execute in the name of the Merchant a Confession of Judgment in favor of [Hi Bar] pursuant to the terms of the Confession of Judgment.
> Upon an Event of Default, [Hi Bar] may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.
> **Protection 4**. [Hi Bar] may enforce its security interest in the Collateral including sending demand letters to account debtors and credit card processors.
> **Protection 5**. [Hi Bar] may exercise any and all rights and remedies of a secured party under Uniform Commercial Code Article 9
> **Protection 6.** [Hi Bar] may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if [Hi Bar] recovers a Judgment against Merchant, Merchant shall be liable for all of [Hi Bars] costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

29

> **Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to [Hi Bar]. Upon breach of any provision in this Agreement, [Hi Bar] may exercise its rights under this Assignment of Lease without prior Notice to Merchant.
>
> **Protection 8.** [Hi Bar] may debit Merchant's depository accounts wherever situated in such amounts as determined by [Hi Bar] in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Amount and other amounts owed by Merchant to [Hi Bar] by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to [Hi Bar].

Ex. I, p. 3.

161.   The First Hi Bar Contract contains a Security Agreement under the Uniform Commercial Code.  The Security Agreement creates a lien on the assets of the Merchant under Article 9 of the UCC; requires the Merchant to pledge additional assets as security and allows the allows the (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s)(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s)(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to Hi Bar under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "*Hi Bar Secured Assets*").

162.   The First Hi Bar Contract, which was intended to refinance the Spin Contracts, was a loan on which interest was charged at more than 2 times the maximum allowable interest rate under applicable New York or Florida law.

H. **The Debtor Purportedly Defaulted Under the First Hi Bar Contract which Led to the Debtor and Hi Bar Entering a Settlement Agreement**

163.    In mid-December 2021, the Debtor had an outstanding balance of $2,677,880, according to Hi Bar.

164.    At this time, Hi Bar, through its counsel, contacted Scott Zankl and advised Zankl that the Debtor was in "default" under the First Hi Bar Contract.

165.    On or around December 15, 2021 and December 16, 2021, Josh Lubin sent a series of text messages indicating that the Debtor was in default, demanding Scott call Josh, and texting a picture of a lawsuit prepared by Hi Bar's attorneys against the Debtor and the non-debtor entities.

166.    Josh Lubin and Hi Bar came to an agreement to collect an unlawful debt from the Debtor.

167.    Hi Bar sent Zankl, a "Settlement Agreement" which Hi Bar through its counsel stated Scott Zankl must sign or Hi Bar would proceed to file a lawsuit against the Debtor, Scott Zankl, Kristen Zankl and the non-debtor entities.

168.    On December 19, 2021, after threatening litigation, Hi Bar, on the one hand, and the Debtor and 14 non-debtor entities, on the other hand, entered a "Settlement Agreement."  A copy of the Settlement Agreement dated December 19, 2021, is attached as **Exhibit L** (the "**First Settlement Agreement**").

169.    The First Settlement Agreement alleges that the Debtor owes $2,677,880.00 under the First Hi Bar Contract. The First Settlement Agreement provides for a repayment of 150% of that amount, or $4,016,820, which shall be paid back at $200,000 per week over 20 weeks. *See* Ex. L, p. 1.

31

170. The First Settlement Agreement is not a Merchant Cash Advance, but a settlement agreement of amounts allegedly previously owed to Hi Bar. This transaction is subject to the criminal usury laws in New York.

171. The Settlement Agreement contains an integration clause that states, in pertinent part:

> Entire Agreement. This Agreement embodies the entire agreement between Seller and Purchaser and supersedes all prior agreements and understandings relating to the subject matter hereof.

Ex. L, ¶ 22.

172. The First Settlement Agreement constitutes a criminally usurious loan with an interest rate of more than twice the amount of the maximum allowable interest rate under applicable New York or Florida law.

173. The First Settlement Agreement required the Debtor and related non-debtor entities to give complete releases for the entry of the First Settlement Agreement other than Hi Bar's obligations under the First Settlement Agreement. Further, the First Settlement Agreement required personal guarantees from Scott and Kristen Zankl and set forth Hi Bar's rights as a secured creditor.

174. Notably by December 20, 2021, the Debtor had paid Spin the sum of $2,381,625.00[1] and had paid Hi Bar the sum of $700,000.00. Therefore, the Debtor, having been advanced only $2,524,437.50 since June 1, 2012, had paid back $3,081,625.00 at the time of the entry of the First Settlement Agreement with the Debtor purportedly still owing approximately $4,016,820.

---

[1] See Exhibit A attached hereto. This amount reflects an adjustment for the $40,000 reversed on 9/3/2021 for the duplicate payment on 9/1/2021, the adjustment is on both the amounts received by the Debtor and paid by the Debtor. Accordingly, the difference remains the same as set forth in the Exhibit.

**I.  Debtor Purportedly Defaults Under the First Settlement Agreement and Hi Bar Files Suit Resulting in the Parties Entering a Second Settlement Agreement in February 2022**

175.    Between January 4, 2022 and the beginning of February of 2022, Josh Lubin is engaged in various collection activities regarding the Hi Bar agreements.  Josh Lubin's activities include sending various text messages to Scott Zankl demanding payment, threatening a lawsuit when payment was not made and negotiating a subsequent settlement with Hi Bar.

176.    On January 13, 2022, Scott Zankl proposed to pay $600,000.00 over the course of one week.  Lubin rejected the proposal on the same day.

177.    On January 18, 2022, Lubin threatened that a complaint was being drafted.

178.    On January 20, 2022, Lubin stated... "$675K wire . . . you will hear from my attorney shortly."

179.    On January 25, 2022, Lubin demanded that Scott Zankl call him.  Scott stated that he had a wire for $300,000.00 sending the next day.   Lubin indicated that the lawsuit would be filed by 1 pm.

180.    Scott was left with the impression that Hi Bar was going to hold off on the lawsuit based upon statements made by Josh Lubin.  Relying upon the statements made by Josh Lubin to Scott Zankl, Scott Zankl repeated the representation to Wing Lake.  Lubin further represented to Scott Zankl that the issues between Excell and Hi Bar could potentially be worked out.

181.    On January 28, 2022, however, Hi Bar through its counsel filed a lawsuit in the Supreme Court of New York, Kings County against the Debtor, non-debtor co-obligors, and guarantors.

182.    Between December 20, 2021, and February 1, 2022, the Debtor paid an additional $400,000 to Hi Bar.

33

183.   On or about February 1, 2022, a "Stipulation of Settlement Pursuant to CPLR 3215(i)" was signed by Hi Bar, the Debtor and 13 non-debtor entities, and Scott Zankl and Kristen Zankl as guarantors.  A copy of the Stipulation for Settlement dated February 1, 2022, is attached as **Exhibit M** (the "**Second Settlement Agreement**").  Hi Bar references a lawsuit filed in Kings County Supreme Court on account of the breach of the First Settlement Agreement.   Under the terms of the Second Settlement Agreement dated February 1, 2022, the Debtor was obligated to pay Hi Bar $3,800,000.00 between February 7, 2022, and ending on February 16, 2022.

184.   The Debtor actually paid Hi Bar an additional $1,300,000.00.  In its lawsuit, Hi Bar alleged that $2,500,000.00 remained due and owing plus an additional $625,000.00 in attorneys' fees and additional costs.

185.   The Second Settlement Agreement was an extension of credit as it was a settlement of amounts allegedly owed to Hi Bar.  The Second Settlement Agreement loan for which the interest rate was charged more than 2 times the criminal usury rate under applicable New York or Florida law.

186.   The Defendants, except for Wing Lake, were in the business of making loans that charge interest at a rate that exceeds the maximum allowable rate of interest under applicable laws.

187.   The Defendants engaged in interstate commerce, including but not limited to the loans at issue in this adversary proceeding.

**J.   The Spin Transfers and Spin Contract Transfers**

188.   **Exhibit A** to this Complaint shows the cash receipts and cash disbursements made into and from the Debtor's Chase accounts ending xx3181 and xx3199, from or to Spin.

189.   In addition to these cash transfers, Spin purportedly received $2,114,312.50 from Hi Bar as part of the Hi Bar Transfer Agreement and First Hi Bar Contract.  The Debtor paid Hi

Bar no less than $2,200,000.00 on account of the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement. *See* Ex. B.

190. Accordingly, the transfers identified on Exhibit A and the $2,114,312.50 are collectively referred to as the "**Spin Transfers**."

191. In addition, to the extent each of the Spin Contracts constitutes an obligation incurred to Spin by the Debtor, they are collectively referred to as the "**Spin Contract Transfers**."

### K. The Hi Bar Transfer and Hi Bar Contract Transfers

192. **Exhibit B** to this Complaint shows the cash receipts and cash disbursements made into and from the Debtor's Chase accounts ending xx3181 and xx3199, from or to Hi Bar. The transfers identified in Exhibit B are referred to as the "**Hi Bar Transfers**."

193. The Hi Bar Transfer Agreement, First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement were obligations to Hi Bar incurred by the Debtor. The release of claims in the First Settlement Agreement and Second Settlement Agreement are transfers of the Debtor's interests in property and constitute transfers to or for the benefit of Hi Bar. Collectively, the Hi Bar Transfer Agreement, First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement as obligations incurred by the Debtor to Hi Bar, and the release of claims in the First Settlement Agreement and Second Settlement Agreement are referred to as the "**Hi Bar Contract Transfers**."

**COUNT 1**
**DECLARATORY RELIEF AS TO EFFECTIVENESS**
**OF WING LAKE ASSIGNMENT DOCUMENT**
(Against Defendants Spin, Hi Bar, and Wing Lake)

194. Plaintiff realleges paragraphs 1 through 193 above and incorporates those allegations by reference.

195. 28 U.S.C. § 2201 authorizes this Court to issue declaratory relief.

35

196. On November 1, 2021, Josh Lubin, on behalf of Spin executed the Wing Lake

Assignment Document, Ex. G, by which Spin sold and assigned to Wing Lake:

> all outstanding obligations ("Obligations") of Excell Auto Group, Inc. and each of its affiliates (collectively, "Company") owing to Assignor under each of (i) the Revenue Purchase Agreement, dated as of June 1, 2021, by and between Assignor and Company, and (ii) the Revenue Agreement, dated as of July 9, 2021, by and between Assignor and Company (collectively, the "Merchant Agreements") and all rights of Assignor under any similar or related documents (including without limitations, any guaranties, security agreements, forbearance agreements and judgments), including with respect to all collateral securing the obligations of Company under the Merchant Agreements or securing any guaranties in respect thereof (the documents, including the Merchant Agreements, are defined collectively as "Merchant Documents"), for purchase price of $1.00 (the "Purchase Price').

Exhibit G, p. 1.

197. Further, Spin agreed that the "total Obligations as of October 21, 2021 is $1.00."

Ex. G, p. 1, ¶ 1.

198. The Obligations included "Merchant Documents and any claims, rights, or actions

against any third party arising in connection with, or otherwise related to, the Merchant Documents

or the Obligations." Ex. G, P.1, ¶ 4.

199. Additionally, Spin affirmatively represented and warranted that Spin

> Ha[d] not sold, assigned, transferred, granted a participation in or pledged the Obligations, the Merchant Documents or the Third-Party Claims and [Spin] owns the Obligations, the Merchant Documents and the Third Party Claims free and clear of any lien or other encumbrance and [Spin] (including any of its affiliates) as not entered into any written or oral agreement with [the Debtor or any of the Debtor's affiliates] relating to the Assignment or receipt of any compensation from [the Debtor or its affiliates] in consideration for entering into the Assignment.

*Id*. at 1, ¶ 4.

200.   The sale and assignment memorialized in the Wing Lake Assignment Document was a material condition precedent to Wing Lake's refinancing of the Debtor's outstanding obligations.

201.   The promises made by Spin in the Wing Lake Assignment Document were for the direct benefit of the Debtor to allow for the loan to close and for the debt to be refinanced Wing Lake.

202.   The Debtor is a third-party beneficiary of the Assignment under Mich. Comp. Laws Serv. § 600.1405 entitled to enforce the promises made in the Assignment.

**WHEREFORE**, the Plaintiff respectfully requests entry of a final judgment in favor of the Plaintiff and against Defendants Spin, Hi Bar, and Wing Lake:

a)   Declaring that each of the Wing Lake Assignment Document is effective and enforceable as of November 3, 2021;

b)   Declaring that the total amount due from the Debtor to Spin as of October 21, 2021, was $1.00, which amount was satisfied;

c)   Declaring that each of the First Spin Contract, Second Spin Contract, and Third Spin Contract and all other obligations owed by the Debtor or Claims against the Debtor or Third Parties arising from the Spin Contracts were assigned to Wing Lake; and

d)   Granting such other and further relief to the Plaintiff as this Court deems just and proper.

**COUNT 2**
**DECLARATORY RELIEF AS TO THE INVALIDITY**
**OF THE HI BAR TRANSFER AGREEMENT**
(Against Defendants Spin and Hi Bar)

203.   Plaintiff realleges paragraphs 1 through 193 above and incorporates those allegations by reference.

204.   28 U.S.C. § 2201 authorizes this Court to issue declaratory relief.

205.   On November 1, 2021, Josh Lubin, on behalf of Spin executed the Wing Lake Assignment Document, Ex. G, by which Spin sold and assigned to Wing Lake all Obligations, Merchant Documents, known and unknown claims, against the Debtor or Third Parties, and represented that the total value of all those claims as of October 21, 2021, was $1.00.

206.   Despite selling and assigning all Obligations, Merchant Documents, and claims, Spin did not specifically disclose the Third Spin Contract to Wing Lake. *See* Ex. G.

207.   Concurrently with the negotiation of the Wing Lake Assignment Document, Spin and Hi Bar negotiated the transfer of the Third Spin Contract, which resulted in the Hi Bar Transfer Agreement which has a date of October 27, 2021, but purportedly signed by Kristen Zankl on October 28, 2021, and Scott Zankl on November 1, 2021, and purports to assign the Third Spin Contract to Hi Bar, *see* **Ex. H**, and the First Hi Bar Contract, **Exhibit I**.

208.   Despite representing to Wing Lake, that as of October 21, 2021, the total outstanding value of all claims was $1.00 and that Spin had not transferred, sold, assigned, or encumbered the claims, the Hi Bar Transfer Agreement, dated 6-days later, states that a $2,114,312.50 balance due on the Third Spin Contract would be transferred from Spin to Hi Bar and that the $2,114,312.50 would be deducted from a "new Merchant Agreement" to be entered into between the Debtor and Hi Bar.

209. Josh Lubin signed the Wing Lake Assignment Document on behalf of Spin. Josh Lubin negotiated the Hi Bar Capital Transfer Agreement on behalf of Spin and Hi Bar.

210. Spin sold and assigned all outstanding Obligations and Merchant Documents of the Debtor and any claims against the Debtor or Third-Parties which included the Third Spin Contract, prior to the Hi Bar Transfer Agreement. Therefore, there was no obligation, merchant document, or claim arising from or in connection with the Third Spin Contract for Spin to transfer to Hi Bar.

211. The "new Merchant Agreement" is the First Hi Bar Contract, which has a "Purchase Price" listed as $2,120,000.00 with the Purchased Percentage being 20% and the Purchased Amount is $3,177,880.00. The Purchase Price is $5,687.50 ($2,120,000.00-2,114,312.50) more than the "transferred balance" from Spin. The Debtor did not receive any funds from Hi Bar.

**WHEREFORE**, the Plaintiff respectfully requests entry of a final judgment in favor of the Plaintiff and against Defendants Spin and Hi Bar:

a) Declaring that the Hi Bar Transfer Agreement is invalid and unenforceable; and

b) Granting such other and further relief to the Plaintiff as this Court deems just and proper.

**COUNT 3**
**<u>DECLARATORY RELIEF – HI BAR CONTRACTS</u>**
**(against Defendant Hi Bar)**

212. Plaintiff realleges paragraphs 1 through 193 above and incorporates those allegations by reference.

213. 28 U.S.C. § 2201 authorizes this Court to issue declaratory relief.

214. Plaintiff seeks declaratory relief that each of the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement: (i) constitute a loan and not a purchase of receipts by Hi Bar; (ii) the amount of interest charged; and (iii) that the amount of interest

charged or sought to be charged is criminally usurious and in violation of the applicable New York or Florida law.

215. The First Hi Bar Contract was nothing more than an alleged refinancing of the Third Spin Contract.

216. The First Hi Bar Contract fixes a specific repayment obligation of the Debtor, over a specific time period, and is not contingent on the existence or amount of cash flow of the Debtor. *See* Ex. I.

217. The interest rate charged on the face of the First Hi Bar Contract, the First Hi Bar Contract charged more than two times the maximum allowable interest rate allowable under Florida law or New York law.

218. The First Settlement Agreement fixes a specific repayment obligation of the Debtor, over a specific time period, and is not contingent on the existence or amount of cash flow of the Debtor. *See* Ex. L.

219. The interest rate charged on the face of the First settlement Agreement is more than two times the maximum allowable interest rate allowable under Florida law or New York law.

220. The Second Settlement Agreement fixes a specific repayment obligation of the Debtor, over a specific time period, and is not contingent on the existence or amount of cash flow of the Debtor. *See* Ex. M.

221. The interest rate charged on the face of the Second Settlement Agreement is more than two times the maximum allowable interest rate allowable under Florida law or New York law.

222. Each of the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement are void or voidable under applicable New York or Florida law as each seek

to charge, or actually charged interest that exceeded the maximum amount of lawful interest allowed to be charged to a corporation under New York or Florida law.

223. To the extent that the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement are voidable under New York or Florida Law, the Trustee seeks to void each of the agreements.

**WHEREFORE,** the Plaintiff respectfully requests entry of a final judgment in favor of the Plaintiff and against Hi Bar:

a) Declaring that the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement each constitute a loan;

b) Declaring the amount of interest charged under each of the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement;

c) Declaring that the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement each charge interest in excess of the maximum amount of lawful interest allowed to be charged to a corporation under New York or Florida law; and

d) Declaring that the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement are void *ab initio* and unenforceable under applicable New York or Florida law; or

e) Declaring that the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement are voidable, voiding each, and rendering each unenforceable under applicable New York or Florida law.

**COUNT 4**
**DECLARATORY RELIEF – SPIN CONTRACTS**
**(against Defendant Spin)**

224.     Plaintiff realleges paragraphs 1, 3, 6, 7, 8, and 11 through 87 above and incorporates those allegations by reference.

225.     28 U.S.C. § 2201 authorizes this Court to issue declaratory relief.

226.     Plaintiff seeks declaratory relief that each of the First Spin Contract, Second Spin Contract, and Third Spin Contract each constitute a loan and not a purchase of receipts by Spin.

227.     The First Spin Contract fixes a specific repayment obligation of the Debtor, over a specific time period, and is not contingent on the existence or amount of cash flow of the Debtor. *See* Ex. C.

228.     The interest rate charged on the face of the First Spin Contract is more than two times the maximum allowable interest rate allowable under Florida law or New York law.

229.     The Second Spin Contract fixes a specific repayment obligation of the Debtor, over a specific time period, and is not contingent on the existence or amount of cash flow of the Debtor. *See* Ex. D.

230.     The interest rate charged on the face of the Second Spin Contract is more than two times the maximum allowable interest rate allowable under Florida law or New York law.

231.     The Third Spin Contract refinances the First Spin Contract and Second Spin Contract and provides additional funding. *See* Ex. F.

232.     The Third Spin Contract fixes a specific repayment obligation of the Debtor, over a specific time period, and is not contingent on the existence or amount of cash flow of the Debtor. *See* Ex. F.

42

233. The interest rate charged on the face of the Third Spin Contract is more than two times the maximum allowable interest rate allowable under Florida law or New York law.

234. Each of the Spin Contracts are void or voidable under applicable New York or Florida law as each seek to charge, or actually charged interest that exceeded the maximum amount of lawful interest allowed to be charged to a corporation under New York or Florida law.

235. To the extent that the Spin Contracts are voidable under New York or Florida Law, the Trustee seeks to void each of the agreements.

**WHEREFORE**, the Plaintiff respectfully requests entry of a final judgment in favor of the Plaintiff and against Spin:

c) Declaring that each of the First Spin Contract, Second Spin Contract, and Third Spin Contract are loans;

d) Declaring the amount of interest charged under each of the First Spin Contract, Second Spin Contract, and Third Spin Contract;

e) Declaring that each of the First Spin Contract, Second Spin Contract, and Third Spin Contract charged interest in excess of the maximum amount of lawful interest allowed to be charged to a corporation under New York or Florida law; and

f) Declaring that each of the First Spin Contract, Second Spin Contract, and Third Spin Contract is void and unenforceable; or

g) Declaring that the First Spin Contract, Second Spin Contract, and Third Spin Contract are voidable, voiding each, and rendering each unenforceable under applicable New York or Florida law.

## COUNT 5
## CIVIL RICO: 18 U.S.C. § 1962
*(As to the First, Second, and Third Spin Contracts against Josh Lubin)*

236.    Plaintiff realleges paragraphs 1, 3, 6, 7, 8, and 11 through 193 and Count 4, including the relief set forth therein, above and incorporates those allegations by reference.

237.    This is a Civil RICO action brought under the federal Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*.,

238.    Pursuant to 18 U.S.C. § 1962(c), it is unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's collection of unlawful debt.

239.    Josh Lubin is a "person" within the meaning of 18 U.S.C. § 1961(3) as he is a natural person capable of owning property.

240.    Josh Lubin is a distinct person from Spin each being a legally different entity with different rights and responsibilities due to their different legal statuses.

241.    For the purposes of 18 U.S.C. § 1961(4), Spin is an "enterprise" as it is a corporation.

242.    The collection of the debt under the First, Second and Third Spin Contracts was unlawful, pursuant to 18 U.S.C. § 1961(6) as Lubin through the Spin enterprise collected, and sought to collect, unlawful debts on in which the interest charged, or sought to be charged, was at least twice the enforceable rate in New York.

243.    Josh Lubin is a culpable person liable under 18 U.S.C. § 1962(c).

244.    Commencing in or around 2021 and continuing through and including the filing of this action, the Defendants violated, and continue to violate 18 U.S.C. § 1962.

44

245.    By virtue of the violations of 18 U.S.C. § 1962(c), the Debtor sustained injury to both its business and property, including but not limited to paying the unlawful debt and incurring additional debt to pay the unlawful debt.

246.    The collection of the unlawful debt was the proximate cause of the Debtor's damages, which would not have occurred without the Defendants' conduct, to wit: funds of the Debtor were transferred to the Enterprise for the purposes of paying on the unlawful debt.    In addition, the acts and violations were the direct, natural and proximate cause of the damage to the Debtor, including, but not limited to, the loss of the Debtor's funds.  Josh Lubin, through Spin, profited from their RICO acts and used at least some proceeds to further their RICO enterprise.

247.    All parties were engaging in interstate commerce in entering into the Spin Contracts and the collection of the unlawful debt.

**WHEREFORE**, the Plaintiff requests that this Court enter judgement against the Defendants, pursuant to 18 U.S.C. § 1964(c), an amount of damages equal to the amount of unlawful debt collected by the Defendants from the Debtor plus treble damages, costs and attorneys' fees.

**COUNT 6**
**CIVIL RICO: 18 U.S.C. § 1962(c)**
(As to the Third Spin Contracts, the First Hi Bar Contract, the First Hi Bar Settlement Agreement and the Second Hi Bar Settlement Agreement as to Josh Lubin, Yisroel Herbst and Mordi Herbst, Spin and Hi Bar)

248.    Plaintiff realleges paragraphs 1 through 193 and Counts 3 and 4 above, including the relief set forth therein, and incorporates those allegations by reference.

249.    This is a Civil RICO action brought under the federal Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 et seq.

45

250.    Pursuant to 18 U.S.C. §1962(c), it is unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's collection of unlawful debt.

251.    Josh Lubin is a "person" within the meaning of 18 U.S.C. § 1961(3) as he is a natural person capable of owning property.

252.    Yisroel Herbst is a "person" within the meaning of 18 U.S.C. § 1961(3) as he is a natural person and is capable of holding a legal or beneficial interest in property.

253.    Mordi Herbst is a "person" within the meaning of 18 U.S.C. § 1961(3) as he is a natural person and is capable of holding a legal or beneficial interest in property.

254.    Hi Bar is a "person" within the meaning of 18 U.S.C. § 1961(3) is an entity and is capable of holding a legal or beneficial interest in property.

255.    Spin is a "person" within the meaning of 18 U.S.C. § 1961(3) is an entity and is capable of holding a legal or beneficial interest in property.

256.    Hi Bar and Spin are two separate companies that come together for the purpose of doing financing deals and transactions both related to, and unrelated to, those mentioned in the complaint.  Hi Bar and Spin created an association in fact enterprise as defined under 18 U.S.C. § 1961(4).  Specifically, the association in fact enterprise of Hi Bar and Spin, at all relevant times, engaged in, and continue to engage in a relationship through which the association in fact enterprise of Hi Bar and Spin find potential borrowers, fund criminally usurious loans and collect upon these unlawful loans, including engaging in litigation.

257.    Defendant Lubin is a distinct person from the association in fact enterprise of Hi and Bar-Spin.  Defendant Lubin was in management and control of the association in fact

46

enterprise of Hi Bar-Spin in that he had the authority, and used such authority, to negotiate, approve the entering of the Third Spin Contract, the First Hi Bar Contract, the First Hi Bar Settlement Agreement and the Second Hi Bar Settlement Agreement.

258.  Defendant Spin is a distinct person from the association in fact enterprise of Hi Bar -Spin.  Spin entered into the Third Spin Contract which was an agreement for the charging and collection of an unlawful debt. Further, Spin transferred its purported balance owed to Hi Bar to continue the charging and collection of the unlawful debt from the Third Spin Contract.

259.  Defendant Hi Bar is a distinct person from the association in fact enterprise of Hi Bar-Spin.  Hi Bar entered into the First Hi Bar Contract, the First Hi Bar Settlement Agreement and the Second Hi Bar Settlement Agreement in furtherance of the collection of the unlawful debt charged by Spin and engaged in the further charging and collection of unlawful debt arising from the First Hi Bar Contract, the First Hi Bar Settlement Agreement and the Second Hi Bar Settlement Agreement.  Hi Bar continues to attempt to collect the unlawful debt in furtherance of the association in fact enterprise of Hi Bar Spin.

260.  Defendant Yisroel Herbst is a distinct person from the association in fact enterprise of Hi Bar-Spin. Yisroel Herbst, at all times relevant, was in management and control of the association in fact enterprise of Hi Bar-Spin through the approval and funding of the First Hi Bar Contract, the First Hi Bar Settlement Agreement and the Second Hi Bar Settlement Agreement, including to further the Hi Bar-Spin's objectives of collecting on the unlawful debt.

261.  Defendant Mordi Herbst is a distinct person from the association in fact enterprise of Hi Bar-Spin. Mordi Herbst, at all times relevant, was in management and control of the association in fact enterprise of Hi Bar-Spin through the approval and funding of the First Hi Bar

47

Contract, the First Hi Bar Settlement Agreement and the Second Hi Bar Settlement Agreement, including to further the Hi Bar-Spin's objectives of collecting on the unlawful debt.

262. Defendants, Spin, Lubin, Hi Bar, Yisroel Herbst and Mordi Herbst, used the association in fact enterprise of Hi Bar-Spin to charge and collect from the Debtor an unlawful debt as set forth in the Third Spin Contract, the First Hi Bar Contract, the First Hi Bar Settlement Agreement and the Second Hi Bar Settlement Agreement. Defendants, Lubin, Hi Bar, Yisroel Herbst and Mordi Herbst continue to use the association in fact enterprise of Hi-Bar Spin to collect the unlawful debt through the filing of lawsuits in New York and through the filing of claims and litigation in the Auto Wholesale of Boca bankruptcy seeking collection of the unlawful debt.

263. Defendants Spin, Lubin, Hi Bar, Yisroel Herbst and Mordi Herbst continuously concealed and promoted the activities of the association in fact enterprise of Hi Bar-Spin which was the collection of an unlawful debt against the Debtor in which the interest charged was more than two times the legal rate of interest in New York.

264. The purpose of the collection of the unlawful debt was to financially benefit Defendants Spin, Lubin, Hi Bar, Yisroel Herbst and Mordi Herbst.

265. As a direct and proximate cause of the unlawful actions of Defendants Spin, Lubin, Hi Bar, Yisroel Herbst and Mordi Herbst, which was a violation of 18 U.S.C. § 1962(c), the Debtor sustained injury to both its business and property, including but not limited to paying the unlawful debt and incurring additional debt to pay the unlawful debt. The Defendants Spin, Lubin, Hi Bar, Yisroel Herbst and Mordi Herbst profited from their violations of 18 U.S.C. § 1962(c).

**WHEREFORE**, the Plaintiff requests that this Court enter judgement against the Defendants, pursuant to 18 U.S.C. § 1964(c), an amount of damages equal to the amount of

48

unlawful debt collected by the Defendants from the Debtor plus treble damages, costs and attorneys' fees.

## COUNT 7
## CONSPIRACY UNDER 18 U.S.C. § 1962(d)

(Conspiracy under 18 U.S.C. §1962(d) as to Defendants Lubin, Spin, Hi Bar, Yisroel Herbst and Mordi Herbst)

266. The allegations of paragraphs 1 through 193 and Counts 1, 2, 3, and 4 above, including all relief set forth therein, are incorporated herein by reference.

267. This Count seeks relief against Josh Lubin, Spin Capital and Hi Bar, Yisroel Herbst and Mordi Herbst for violation of 18 U.S.C. §1962(d).

268. In violation of 18 U.S.C. §1962(d), Defendants agreed and conspired to violate 18 U.S.C. §1962(c) to: (1) use or invest income that is derived from the collection of an unlawful debt in the association in fact enterprise of Hi Bar-Spin, (2) acquire or maintain interests in the association in fact enterprise of Hi Bar-Spin to collect unlawful debt against the Debtor; or (3) conduct and participate in the conduct of the affairs of the association in fact enterprise of Hi Bar-Spin through the collection of unlawful debt from the Debtor.

269. Defendants Lubin, Spin, Hi Bar, Yisroel Herbst, and Mordi Herbst have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from the collection of unlawful debt in an interstate association in fact enterprise of Hi Bar-Spin and conduct and participate in the conduct of the affairs of the association in fact enterprise of Hi Bar-Spin through the collection of unlawful debt from the Debtor and agreed to the commission of those acts to further activities to collect an unlawful debt as described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(a), (b), and (c) in violation of 18 U.S.C. § 1962(d).

49

270.    As a direct and proximate result of Defendants' Lubin, Spin, Hi Bar, Yisroel Herbst, and Mordi Herbst, conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), the Debtor was injured and, in its business, and property in that it paid the unlawful debt.

WHEREFORE, the Plaintiff requests that this Court enter judgement against Defendants, Lubin, Spin, Hi Bar, Yisroel Herbst and Mordi Herbst pursuant to 18 U.S.C. § 1962(d), in an amount of damages not less than the amount of unlawful debt collected by the Defendants from the Debtor plus treble damages, costs and attorneys' fees.

## COUNT 8
## CIVIL RICO: 18 U.S.C. § 1962
(As to the First Hi Bar Contract, First Settlement Agreement,
and Second Settlement Agreement against Josh Lubin, Yisroel Herbst, and Mordi Herbst)

271.    Plaintiff realleges paragraphs 1 through 193 and Count 1, 2, and 3 above, including all relief set forth therein, and incorporates those allegations by reference.

272.    This is a Civil RICO action brought under the federal Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 et seq.,

273.    Pursuant to 18 U.S.C. §1962(c), it is unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's collection of unlawful debt.

274.    Josh Lubin, Mordecai Herbst, and Yisroel Herbst are each a "person" within the meaning of 18 U.S.C. § 1961(3) as they are each a natural person capable of owning property.

275.    Josh Lubin, Mordecai Herbst, and Yisroel Herbst are distinct persons from Hi Bar each being a legally different entity with different rights and responsibilities due to their different legal statuses.

276.    For the purposes of 18 U.S.C. § 1961(4), Hi Bar is an "enterprise" as it is a limited liability company.

277.    The collection of the debt under the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement were unlawful, pursuant to 18 U.S.C. § 1961(6) as Josh Lubin, Mordecai Herbst, and Yisroel Herbst through the Hi Bar enterprise collected, and sought to collect, unlawful debts on in which the interest charged, or sought to be charged, was at least twice the enforceable rate in New York or Florida, whichever is applicable.

278.    Josh Lubin, Mordecai Herbst, and Yisroel Herbst are culpable persons liable under 18 U.S.C. § 1962(c).

279.    Commencing in or around 2021 and continuing through and including the filing of this action, the Defendants violated, and continue to violate 18 U.S.C. § 1962.

280.    By virtue of the violations of 18 U.S.C. § 1962(c), the Debtor sustained injury to both its business and property, including but not limited to paying the unlawful debt and incurring additional debt to pay the unlawful debt.

281.    The collection of the unlawful debt was the proximate cause of the Debtor's damages, which would not have occurred without the Defendants' conduct, to wit: funds of the Debtor were transferred to the Enterprise, Hi Bar, for the purposes of paying on the unlawful debt. In addition, the acts and violations were the direct, natural and proximate cause of the damage to the Debtor, including, but not limited to, the loss of the Debtor's funds.

282.    Josh Lubin, Mordecai Herbst, and Yisroel Herbst through Hi Bar, profited from their RICO acts and used at least some proceeds to further their RICO enterprise.

283.   All parties were engaging in interstate commerce in entering into the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement and the collection of the unlawful debt.

**WHEREFORE**, the Plaintiff requests that this Court enter judgement against the Defendants, Josh Lubin, Mordecai Herbst, and Yisroel Herbst, pursuant to 18 U.S.C. § 1964(c), an amount of damages equal to the amount of unlawful debt collected by the Defendants from the Debtor plus treble damages, costs and attorneys' fees.

**COUNT 9**
**DECLARATORY RELIEF -SPIN CONTRACTS**
**(against Defendant Spin)**

284.   Plaintiff realleges paragraphs 1, 3, 6, 7, 8, 11 through 87 and Count 4 above, including all relief set forth therein, and incorporates those allegations by reference.

285.   28 U.S.C. § 2201 authorizes this Court to issue declaratory relief and, as a form of alternative relief, Plaintiff seeks to have this Court declare that the Spin Contracts are void and unenforceable under New York law.  Under New York law, unconscionability involves reviewing a sliding scale of both procedural and substantive unconscionability.

286.   In each of the First Spin Contract, Second Spin Contract, and the Third Spin Contract, the Debtor lacked a meaningful choice in entering into these agreements and the contract terms unreasonably favor Hi Bar.

287.   The First Spin Contract, Second Spin Contract and the Third Spin Contract were all procedurally unconscionable.

288.   Spin dictated the terms of each of the Spin Contract.

289.   Spin only provided each Spin Contract on the day of funding.

290.   Spin used a combination of high pressure and deceptive tactics to get the Debtor to execute the Spin Contracts.

291. Lubin represented, through messages, the transaction was and an "offer of capital" with no collateral.

292. Scott Zankl had understood that the percentage amount was an interest rate, even agreeing to 37% in the Second Spin Contract.

293. Prior to entering into the Third Spin Contract, and after receiving from Lubin payoffs on the First and Second Spin Contracts, Scott Zankl was told that these were percentages and not interest rates.

294. Scott Zankl found out that the outstanding balances were much higher than the Scott thought that they would be as a result of these loans not stating the true interest rates.

295. The fine print in each Spin Contracts were used as the material terms of each Spin Contract.

296. The Debtor had no bargaining to negotiate the material terms in small print as each Spin Contract was provided on the day of funding.

297. The Debtor understood, at least as to the First and Second Spin Contract, to be loans with the percentage amount of 20% being an interest rate.

298. The Third Spin Contract, which partially refinanced the First Spin and Second Spin Contract, increased the balance of the First Spin and Second Spin Contracts exponentially.

299. Despite the initial representation that there was no collateral for the Spin Contracts, each of the Spin Contracts include a Security Agreements and Spin filed one or more UCC financing statements.

300. Further, the First Spin Contract, Second Spin Contract, and Third Spin Contract contain numerous knowingly false statements. Among these knowingly false statements are that: (1) the transaction is not a loan, (2) the daily payment is a good faith estimate of the merchant's

receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring Lender to charge an exorbitant ACH Program Fee or Origination Fee.

301. The First Spin Contract, Second Spin Contract, and Third Spin Contract are unconscionable because they are designed to fail. Among other things, the First Spin Contract, Second Spin Contract, and Third Spin Contract are designed to result in a default in the event that the merchant's business suffers any downturn in sales by preventing the merchant from obtaining other financing and requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant.

302. The First Spin Contract, Second Spin Contract, and Third Spin Contract also contain numerous improper penalties that violate New York's strong public policy. Among these improper penalties, the First Spin Contract, Second Spin Contract, and Third Spin Contract: (1) entitle the Lenders to attorneys' fees, (2) accelerate the entire debt upon an Event of Default, and (3) require that any Event of Default increases the "Purchased Percentage to 100%."

303. The element of substantive unconscionability is satisfied because the First Spin Contract, Second Spin Contract and Third Spin Contract are all usurious loans.

304. The First Spin Contract, Second Spin Contract and Third Spin Contract should be declared void under New York law as being unconscionable, because they are both procedurally and substantively unconscionable.

305. To the extent that the First Spin Contract, Second Spin Contract Spin Contract are void, the Trustee seeks to have each of these agreements declared void and unenforceable.

**WHEREFORE**, the Plaintiff respectfully requests entry of a final judgment in favor of the Plaintiff and against Spin finding:

a)   Each of the First Spin Contract, Second Spin Contract and Third Spin Contract is substantively and procedurally unconscionable under New York Law and deemed void and unenforceable.

**COUNT 10**
**AVOIDANCE OF FRAUDULENT TRANSFER OF PROPERTY**
**PURSUANT TO 11 USC § 544 AND SECTION 726.105(1)(a), FLA. STAT.**
**(Against Defendant Spin)**

306.   The Plaintiff realleges paragraphs 1, 3, 6, 7, 8, 11 through 87, 188 through 191 and Counts 1 and 4 above, including all relief sought therein, and incorporates those allegations by reference.

307.   Each of the Spin Transfers and Spin Contract Transfers were transfers of the Debtor's interests in property to Spin.

308.   The Debtor made each of the Spin Transfers and Spin Contract Transfers to Spin within the four-year period prior to the Petition Date.

309.   From April 2021 through the Petition Date, during which time all Spin Transfers and Spin Contract Transfers were made, the Debtor was operated as a Ponzi scheme:

(a)   Lack of a legitimate business that produces revenue;

(b)   The promise of guaranteed interest or other earnings at rates higher than market rates;

(c)   Lack of transparency

(d)   Lack of adequate books and records or fabrication of books and records;

(e)   Misrepresentations made to lure and/or retain lenders; and

(f)   Use of new borrowed funds to pay guaranteed interest to existing lenders.

55

310. Scott Zankl attracted the attention of wealthy individuals who provided loans to the Debtor at high rates of return. These Private Lenders often were charging interest in excess of applicable civil and criminal usury laws.

311. No later than May of 2021, the Debtor essentially ceased being in the business of buying and selling high-end luxury vehicles to end users. The Debtor engaged in relatively minor transactions whereby the Debtor sold vehicles to Karma of Palm Beach, Karma of Broward, or Auto Wholesale of Boca Raton, often at cost or at loss.

312. No later than May 2021, the Debtor was primarily engaged in borrowing money and using the proceeds from the increased loans to pay down pre-existing loans.

### (i) The Debtor is Operated as a Ponzi Scheme by Scott Zankl

313. No later than May 2021, Scott Zankl operated the Debtor as a Ponzi scheme.[1]

314. The Debtor obtained loans from the following: (a) Private Lenders; (b) Merchant Cash Advance lenders; (c) Floor Plan lenders; (d) Ed Brown; (e) Karma of Palm Beach and/or Karma of Broward. Scott Zankl continuously sought increased and additional funding from Private Lenders, Merchant Cash Advance Lenders, an overseas lender, and through more traditional financing companies, through the Petition Date.

315. By no later than May 2021, the Debtor was taking on the additional borrowing to pay previous loans and to fund Scott Zankl's lifestyle.

---

[1] The first transactions between the Debtor and Spin were in June of 2021. Therefore, the Trustee is not affirmatively asserting that Scott Zankl did not operate the Debtor as a Ponzi scheme before May of 2021 and reserves the right to do so in other litigation if determined to be appropriate.

### (ii)     The Private Investor Loan Scheme

316.     At least as early as 2015, a Private Investor Loan scheme was created with wealthy individuals ("**Private Lenders**").    Two basic programs were created to document these Private Investor Loans which were the "Locate Deal" program and the "Wholesale Deal" Program.

317.     Both the Locate Deal and the Wholesale Deal programs had the same basic premise: Scott Zankl indicated that the Debtor found a willing and qualified buyer for a specific high-end luxury vehicle which was not currently in the inventory of the Debtor.  The Debtor had located the specific high-end luxury vehicle that the willing buyer wanted to purchase at an agreed upon price. The Debtor needed a loan from the Private Lender to purchase specific high-end luxury vehicle. The Private Lender agreed to fund the loan.  The gross profits of the sale would be split, in most cases, equally between the Private Lender and the Debtor with a closing to take between 30-60 days.[2]

318.     However, the funds received from the Private Lenders were not used for the purchase of a specific high-end luxury vehicle, but rather were treated as unsecured loans.

319.     Reports were generated for each Private Lender of their loans, some of which included the year, make, model, and Vehicle Identification Number.  However, in reality the vehicles listed in these reports were for vehicles previously purchased and sold by the Debtor. Some of the reports issued by Scott Zankl had the same vehicle more than once with sale dates that made it impossible for the vehicle to be sold, repurchased, and sold again.  Some of the reports provided by Scott Zankl to Private Lenders contained the names of other Private Lenders.

---

[2] An illustration of a "locate" transaction is where a private lender sent an email to Scott Zankl, stating, "This is confirming we are wiring out tomorrow to purchase a 2017 Bentley GTC convertible VIN# SCBH3ZA4HC060137 for $178,000. You have the car sold for $200,000 and will return the $178,000 equity plus split the profit of 20,000 equally 10,000 each.

57

320.    In reality, the Private Lenders were being paid closer to a fixed rate of return rather than based upon actual profits of the purported sales of the specific high-end luxury vehicles reflected in the various reports issued by Scott Zankl.

321.    Based upon the high rates of return, new Private Lenders approached Scott Zankl offering additional Private Investor Loans provided the new Private Investors received high rates of returns.

**(iii)    Merchant Cash Advance Loans as a Source of Funding to Prop Up the Ponzi Scheme**

322.    Scott Zankl also caused the Debtor to borrow funds from MCA lenders to perpetuate the Ponzi scheme.  MCA lenders, such as Spin and Hi Bar, loan money at very high rates of interest, generally exceeding most states' criminal usury laws and attempt to avoid usury laws by disguising the agreement as a purchase of future receivables or receipts.

323.    MCA lenders perform perfunctory, if any, due diligence when funding an MCA loan because the business model is front loaded with fees, etc., thereby limiting the MCA's exposure to the failing debtor.

324.    At least as early as October 8, 2020, Scott Zankl caused the Debtor to enter into agreements with MCA lenders.  The first was an entity called Libertas Funding.  From the loan, the Debtor received funds in the amount of $490,000.00, but paid back $600,000 by June 1, 2021.

325.    The Debtor's success in paying back the Libertas Funding resulted in the Debtor receiving additional offers from MCAs.  This allowed the Debtor to use the loans from the MCAs to pay back pre-existing loans while simultaneously attracting new financing to further the Ponzi Scheme.

326.    The perfunctory due diligence of the MCA lenders is typically limited to a review of a debtor's bank records prior to consummating and funding a MCA loan.  As described below,

this was the full extent of the diligence of Spin before issuing an MCA Loan to the Debtor. For each of the MCA lenders a review of bank records, from May 2021 forward, evidences the existence of multiple Private Investor Loans and other MCA loans and no or minimal income being generated from the sale of vehicles.

327.   A review of the Debtor's bank records would prompt further inquiry which would reveal the Debtor had little to no accounts receivable to sell to an MCA lender.

328.   Scott Zankl continued to seek out new financing all the way through the collapse of the Debtor and the filing of the instant bankruptcy case. With each of the new loans, Scott Zankl used the funds to pay prior investor loans.

329.   The Debtor made each of the Spin Transfers and Spin Contract Transfers to Spin with actual intent to hinder, delay, or defraud entities to which the Debtor was or became, on or after the date of the transfer, indebted.

330.   American Express Travel Related Services Co., Inc. is a holder of a claim that is allowable against the Debtor which would have standing to assert a claim for relief under Section 726.105(1)(a) of the Florida Statutes. Each of the Spin Transfers and Spin Contract Transfers are avoidable under Section 544 of the Bankruptcy Code and Section 726.105(1)(a) of the Florida Statutes.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment against Spin:

a)   Finding that the Debtor was being operated as a Ponzi scheme no later than May 1, 2021;

b)   Finding each of the Spin Transfers and Spin Contract Transfers to have been fraudulent transfers pursuant to Section 726.105(1)(a) of the Florida Statutes;

59

c)      Avoiding each of the Spin Transfers and Spin Contract Transfers pursuant to Section 544 of the Bankruptcy Code and Section 726.105(1)(a) of the Florida Statutes and avoiding all other transfers by the Debtor to Spin in addition to those specifically referred to in this Complaint, if any, which are avoidable under Section 726.105(1)(a) of the Florida Statutes; and

d)      Granting such other and further relief as the Court deems proper.

## COUNT 11
## AVOIDANCE OF FRAUDULENT TRANSFER OF PROPERTY
## PURSUANT TO 11 USC § 544 AND SECTION 726.105(1)(a), FLA. STAT.
### (Alternative Relief against Defendant Spin)

331.    The Plaintiff realleges paragraphs 1, 3, 6, 7, 8, 11 through 87, 188 through 191 and Counts 1 and 4 above, including all relief sought therein, and incorporates those allegations by reference.

332.    Count 11 seeks alternative relief to the extent the Court does not find that there was a Ponzi scheme; the Debtor still made each of the Spin Transfers and Spin Contract Transfers with the actual intent to hinder, delay, or defraud creditors.

333.    Each of the Spin Transfers and Spin Contract Transfers were transfers of the Debtor's interests in property to Spin.

334.    The Debtor made each of the Spin Transfers and Spin Contract Transfers to Spin within the four-year period prior to the Petition Date.

335.    Scott Zankl attracted the attention of wealthy individuals who provided loans to the Debtor at high rates of return.   These Private Lenders often were charging interest in excess of applicable civil and criminal usury laws.

336.    No later than May of 2021, the Debtor essentially ceased being in the business of buying and selling high-end luxury vehicles to end users.  The Debtor engaged in relatively minor

60

transactions whereby the Debtor sold vehicles to Karma of Palm Beach, Karma of Broward, or Auto Wholesale of Boca Raton, often at cost or at loss.

337.    No later than May 2021, the Debtor was primarily engaged in borrowing money and using the proceeds from the increased loans to pay down pre-existing loans.

338.    The Debtor obtained loans from the following: (a) Private Lenders; (b) Merchant Cash Advance lenders; (c) Floor Plan lenders; (d) Ed Brown; (e) Karma of Palm Beach and/or Karma of Broward.   Scott Zankl continuously sought increased and additional funding from Private Lenders, Merchant Cash Advance Lenders, an overseas lender, and through more traditional financing companies, through the Petition Date.

339.    By no later than May 2021, the Debtor was taking on the additional borrowing to pay previous loans and to fund Scott Zankl's lifestyle.

340.    At least as early as 2015, a Private Investor Loan scheme was created with the Private Lenders.    Two basic programs were created to document these Private Investor Loans which were the "Locate Deal" program and the "Wholesale Deal" Program.

341.    Both the Locate Deal and the Wholesale Deal programs had the same basic premise: Scott Zankl indicated that the Debtor found a willing and qualified buyer for a specific high-end luxury vehicle which was not currently in the inventory of the Debtor.  The Debtor had located the specific high end luxury vehicle that the willing buyer wanted to purchase at an agreed upon price. The Debtor needed a loan from the Private Lender to purchase specific high end luxury vehicle. The Private Lender agreed to fund the loan.  The gross profits of the sale would be split, in most cases, equally between the Private Lender and the Debtor with a closing to take between 30-60 days.

342. However, the funds received from the Private Lenders were not used for the purchase of a specific high-end luxury vehicle, but rather were treated as unsecured loans.

343. Reports were generated for each Private Lender of their loans, some of which included the year, make, model, and Vehicle Identification Number.  However, in reality the vehicles listed in these reports were vehicles previously purchased and sold by the Debtor.  Some of the reports issued by Scott Zankl had the same vehicle more than once with sale dates that made it impossible for the vehicle to be sold, repurchased, and sold again.  Some of the reports provided by Scott Zankl to Private Lenders contained the names of other Private Lenders.

344. In reality, the Private Lenders were being paid closer to a fixed rate of return rather than based upon actual profits of the purported sales of the specific high-end luxury vehicles reflected in the various reports issued by Scott Zankl.

345. Based upon the high rates of return, new Private Lenders approached Scott Zankl offering additional Private Investor Loans provided the new Private Investors received high rates of returns.

### (i) Merchant Cash Advance Loans as a Source of Funding to Prop Up the Ponzi Scheme

346. Scott Zankl also caused the Debtor to borrow funds from MCA lenders to perpetuate the Ponzi scheme.  MCA lenders, such as Spin and Hi Bar, loan money at very high rates of interest, generally exceeding most states' criminal usury laws and attempt to avoid usury laws by disguising the agreement as a purchase of future receivables or receipts.

347. MCA lenders perform perfunctory, if any, due diligence when funding an MCA loan because the business model is front loaded with fees, etc., thereby limiting the MCA's exposure to the failing debtor.

348. At least as early as October 8, 2020, Scott Zankl caused the Debtor to enter into agreements with MCA lenders. The first was an entity called Libertas Funding. From the loan, the Debtor received funds in the amount of $490,000.00, but paid back $600,000 by June 1, 2021.

349. The Debtor's success in paying back the Libertas Funding resulted in the Debtor receiving additional offers from MCAs. This allowed the Debtor to use the loans from the MCAs to pay back pre-existing loans while simultaneously attracting new financing to further the Ponzi Scheme.

350. The perfunctory due diligence of the MCA lenders is typically limited to a review of a debtor's bank records prior to consummating and funding an MCA loan. As described below, this was the full extent of the diligence of Spin before issuing an MCA Loan to the Debtor. For each of the MCA lenders a review of bank records, from May 2021 forward, evidences the existence of multiple Private Investor Loans and other MCA loans and no or minimal income being generated from the sale of vehicles.

351. A review of the Debtor's bank records would prompt further inquiry which would reveal the Debtor had little to no accounts receivable to sell to an MCA lender.

352. Scott Zankl continued to seek out new financing all the way through the collapse of the Debtor and the filing of the instant bankruptcy case. With each of the new loans, Scott Zankl used the funds to pay prior investor loans.

353. The Debtor made each of the Spin Transfers and Spin Contract Transfers to Spin with actual intent to hinder, delay, or defraud entities to which the Debtor was or became, on or after the date of the transfer, indebted.

354. American Express Travel Related Services Co., Inc. is a holder of a claim that is allowable against the Debtor which would have standing to assert a claim for relief under Section

726.105(1)(a) of the Florida Statutes. Each of the Spin Transfers and Spin Contract Transfers are avoidable under Section 544 of the Bankruptcy Code and Section 726.105(1)(a) of the Florida Statutes.

WHEREFORE, the Plaintiff respectfully requests this Court enter a judgment against Spin:

a) Finding each of the Spin Transfers and Spin Contract Transfers to have been fraudulent transfers pursuant to Section 726.105(1)(a) of the Florida Statutes;

b) Avoiding each of the Spin Transfers and Spin Contract Transfers pursuant to Section 544 of the Bankruptcy Code and Section 726.105(1)(a) of the Florida Statutes and avoiding all other transfers by the Debtor to Spin in addition to those specifically referred to in this Complaint, if any, which are avoidable under Section 726.105(1)(a) of the Florida Statutes; and

c) Granting such other and further relief as the Court deems proper.

### COUNT 12
### AVOIDANCE OF FRAUDULENT TRANSFER OF PROPERTY
### PURSUANT TO 11 USC § 544 AND SECTION 726.106(1), FLA. STAT.
#### (*As to Defendant Spin*)

355. The Plaintiff realleges paragraphs 1, 3, 6, 7, 8, 11 through 87, 188 through 191 and Counts 1 and 4 above, including all relief sought therein, and incorporates those allegations by reference.

356. Each of the Spin Transfers and Spin Contract Transfers were transfers of the Debtor's interests in property to Spin.

357. The Debtor made each of the Spin Transfers and Spin Contract Transfers to Spin within the four-year period prior to the Petition Date.

358. The Debtor received less than reasonably equivalent value in exchange for making each of the Spin Transfers and Spin Contract Transfers.

359.    At the time of each of the Spin Transfers and Spin Contract Transfers the Debtor was insolvent at that time or the debtor became insolvent as a result of each of the Spin Transfers and Spin Contract Transfers.

360.    American Express Travel Related Services Co., Inc. is a holder of a claim that is allowable against the Debtor which would have standing to assert a claim for relief under Section 726.106(1) of the Florida Statutes.  Each of the Spin Transfers and Spin Contract Transfers are avoidable under Section 726.106(1) of the Florida Statutes.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment against Spin:

a)    Finding each of the Spin Transfers and Spin Contract Transfers to have been fraudulent transfers pursuant to Section 726.106(1) of the Florida Statutes;

b)    Avoiding the Spin Transfers and Spin Contract Transfers pursuant to Section 544 of the Bankruptcy Code and Section 726.106(1) of the Florida Statutes and avoiding all other transfers by the Debtor to Spin in addition to those specifically referred to in this Complaint, if any, which are avoidable under Section 544 of the Bankruptcy Code and Section 726.106(1) of the Florida Statutes; and

c)    Granting such other and further relief as the Court deems proper.

**COUNT 13**
**AVOIDANCE OF FRAUDULENT TRANSFER OF PROPERTY**
**PURSUANT TO 11 U.S.C. § 544 AND FLA. STAT. § 726.105(1)(b)**
**(As to Defendant Spin)**

361.    The Plaintiff realleges paragraphs 1, 3, 6, 7, 8, 11 through 87, 188 through 191 and Counts 1 and 4 above, including all relief sought therein, and incorporates those allegations by reference.

65

362. Each of the Spin Transfers and Spin Contract Transfers were transfers of the Debtor's interests in property to Spin.

363. The Debtor made each of the Spin Transfers and Spin Contract Transfers to Spin within the four-year period prior to the Petition Date.

364. The Debtor received less than reasonably equivalent value in exchange for making each of the Spin Transfers and Spin Contract Transfers, and the Debtor intended to incur or believed or reasonably should have believed that Debtor would incur, debts beyond the Debtor's ability to pay as they became due.

365. American Express Travel Related Services Co., Inc. is a holder of a claim that is allowable against the Debtor which would have standing to assert a claim for relief under Section 726.105(1)(b) of the Florida Statutes. Each of the Spin Transfers and Spin Contract Transfers are avoidable under § 544 of the Bankruptcy Code and § 726.105(1)(b) of the Florida Statutes.

**WHEREFORE**, the Trustee respectfully requests this Court enter a judgment against Spin:

a) Finding each of the Spin Transfers and Spin Contract Transfers to have been fraudulent transfers pursuant to § 726.105(1)(b) of the Florida Statutes;

b) Avoiding each of the Spin Transfers and Spin Contract Transfers pursuant to § 544 of the Bankruptcy Code and § 726.105(1)(b) of the Florida Statutes and avoiding all transfers by the Debtor to Spin in addition to those specifically referred to in this Complaint, if any, which are avoidable under § 726.105(1)(b) of the Florida Statutes;

c) Disallowing all claims by or in favor of Spin, or any amounts owed to Spin according to the Debtor's schedules, pursuant to Section 502(d) of the Bankruptcy Code unless and until Spin has returned to the Debtor's estate the amount for which Spin is liable; and

66

d)      Granting such other and further relief as the Court deems proper.

## COUNT 14
## AVOIDANCE OF FRAUDULENT TRANSFER OF
## PROPERTY PURSUANT TO 11 U.S.C. § 548(a)(1)
## (As to Defendant Spin)

366.    The Plaintiff realleges paragraphs 1, 3, 6, 7, 8, 11 through 87, 188 through 191 and Counts 1 and 4 above, including all relief sought therein, and incorporates those allegations by reference.

367.    Each of the Spin Transfers and Spin Contract Transfers were transfers of the Debtor's interests in property to Spin.

368.    The Debtor made each of the Spin Transfers and Spin Contract Transfers to Spin within the two-year period prior to the Petition Date.

369.    The Debtor made each of the Spin Transfers and Spin Contract Transfers with actual intent to hinder, delay or defraud entities to which the Debtor was or became, on or after the date of the transfer, indebted.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment against Spin:

a)      Finding each of the Spin Transfers and Spin Contract Transfers to have been fraudulent transfers pursuant to Section 548(a)(1) of the Bankruptcy Code;

b)      Avoiding each of the Spin Transfers and Spin Contract Transfers pursuant to Section 548 of the Bankruptcy Code and avoiding all transfers by the Debtor to Spin in addition to those specifically referred to in this Complaint, if any, which are avoidable under Section 548 of the Bankruptcy Code; and

c)      Granting such other and further relief as the Court deems proper.

**COUNT 15**
**AVOIDANCE OF FRAUDULENT TRANSFER OF**
**PROPERTY PURSUANT TO 11 U.S.C. § 548(a)(2)**
**(As to Defendant Spin)**

370. The Plaintiff realleges paragraphs 1, 3, 6, 7, 8, 11 through 87, 188 through 191 and Counts 1 and 4 above, including all relief sought therein, and incorporates those allegations by reference.

371. Each of the Spin Transfers and Spin Contract Transfers were transfers of the Debtor's interests in property to Spin.

372. The Debtor made each of the Spin Transfers and Spin Contract Transfers to Spin within the two-year period prior to the Petition Date.

373. The Debtor received less than reasonably equivalent value in exchange for making each of the Spin Transfers and Spin Contract Transfers, and the Debtor (i) was insolvent on the date that each of the Spin Transfers and Spin Contract Transfers were made, or became insolvent as a result of the transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; (iii) intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured; as a result of each of the Spin Transfers and Spin Contract Transfers.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment against Spin:

a) Finding each of the Spin Transfers and Spin Contract Transfers to have been fraudulent transfers pursuant to Section 548 of the Bankruptcy Code;

b) Avoiding each of the Spin Transfers and Spin Contract Transfers pursuant to Section 548(a)(2) of the Bankruptcy Code and avoiding all transfers by the Debtor to Defendant(s)

in addition to those specifically referred to in this Complaint, if any, which are avoidable under Section 548 of the Bankruptcy Code; and

c)       Granting such other and further relief as the Court deems proper.

## COUNT 16
## RECOVERY OF AVOIDED TRANSFERS PURSUANT TO 11 U.S.C. § 550
### (As to Defendant Spin)

374.    The Plaintiff realleges paragraphs 1, 3, 6, 7, 8, 11 through 87, 188 through 191, and Counts 9 through 15 above, including all relief sought therein, and incorporates those allegations by reference.

375.    To the extent the Spin Transfers avoided pursuant to Section 544 of the Bankruptcy Code and Sections 726.105(1)(a), 726.105(1)(b), and/or 726.106(1) of the Florida Statutes, or pursuant to section 548 of the Bankruptcy Code, the Spin Transfers or value thereof are recoverable by the Plaintiff from Spin pursuant to Section 550(a) of the Bankruptcy Code.

376.    Spin is the initial or subsequent transferee of the Spin Transfers and/or the person for whose benefit the Spin Transfers were made.

377.    To the extent Spin is deemed to be mediate or immediate transferees, the Spin Transfers are recoverable because Spin provided no value in exchange for the Spin Transfers, Spin did not receive the Spin Transfers in good faith, and Spin had knowledge of the voidability of the Spin Transfers.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment:

a)       Finding Spin to be the initial transferees of the Spin Transfers and/or the person for whose benefit the Spin Transfers were made;

b)       In the alternative finding Spin to be the immediate or mediate transferee of the Spin Transfers;

c)      Ordering Spin to turn over to the Plaintiff the Spin Transfers or avoided as fraudulent transfers or entering a money judgment in an amount equal to the value of the Spin Transfers, plus interest at the applicable federal statutory rate and costs and expenses permissible by applicable law; and

d)      Granting such other and further relief as the Court deems proper.

## COUNT 17
## DECLARATORY RELIEF – HI BAR CONTRACT AND SETTLEMENT AGREEMENTS

378.    Plaintiff realleges paragraphs 1 through 193 and Counts 1, 2, and 3 above, including all relief sought therein, and incorporates those allegations by reference.

379.    28 U.S.C. § 2201 authorizes this Court to issue declaratory relief.

380.    The First Hi Bar Contract was a refinance of the amounts purportedly owed under the Third Spin Contract.  The First Hi Bar Contract was done to induce Wing Lake to loan funds to the Debtor.  Hi Bar, through its agent, Josh Lubin, knew and participated in obtaining the refinance so that a payoff letter would be issued by Spin to Wing Lake knowing that the loan was not paid off but refinanced by Hi Bar.

381.    The First Settlement Agreement entered by the Debtor and Hi Bar was done under the threat of litigation from Hi Bar for an alleged "event of default" under the First Hi Bar Contract notwithstanding that the First Hi Bar Contract is a criminally usurious loan and void *ab initio*.

382.    The Debtor entered into the First Settlement Agreement to avoid being dragged into litigation along with the Guarantors and their family members.

383.    The First Settlement Agreement requires 150% of the purported amount outstanding under the First Hi Bar Contract, which is due and payable within 20 weeks. The First Settlement Agreement calls for an effective annual interest rate in excess of the maximum amount

allowed to be charged to a corporation under New York law. The Debtor was required to pay $200,000 per week to Hi Bar, which is $50,000 more per week than Debtor was obligated to pay under the First Hi Bar Contract, which Debtor was unable to maintain.

384.   The Plaintiff seeks declaratory relief that the First Hi Bar Contract, First Settlement Agreement and Second Settlement Agreement are unconscionable under New York law.

385.   As a result of a purported breach of the First Settlement Agreement, Hi Bar filed suit against the Debtor and non-debtor entities.

386.   Hi Bar and the Debtor then entered into the Second Settlement Agreement, which required payment of $3.8 million in full within 14 days.

387.   First Hi Bar Contract, the First Settlement Agreement and Second Settlement Agreement should be declared void under New York law as being unconscionable, because of the combination of procedural and substantive unconscionability.

388.   In each of the First Hi Bar Contract, the First Settlement Agreement, and the Second Settlement Agreement, the Debtor lacked a meaningful choice in entering into the First Hi Bar Contract, the First Settlement Agreement and the Second Settlement Agreement which contained provisions that were unreasonably favorable to Hi Bar.

389.   The Debtor was attempting to obtain a refinancing loan from Wing Lake.

390.   Spin and Hi Bar acted together through Lubin with respect to each of the First Hi Bar Contract, the First Settlement Agreement, and the Second Settlement Agreement.

391.   The Debtor did not have a meaningful choice but to agree to the First Hi Bar Contract, because Lubin was using high pressure tactics, including withholding a payoff balance and Spin signing its release with Wing Lake prior to the Debtor entering into the First Hi Bar Contract.

71

392. The First Hi Bar Contract was a refinancing of the Third Spin Contract which exponentially increased the balance owed by the Debtor to Hi Bar. There were no funds paid by Hi Bar to the Debtor for entering into the First Hi Bar Contract.

393. Once the Debtor was unable to make the payments under the First Hi Bar Contract, Lubin's high-pressure tactics continued leaving no choice by the Debtor to enter into the First Hi Bar Settlement Agreement.

394. Lubin continued these same high-pressure tactics leaving the Debtor no other choice but to enter into the Second Hi Bar Settlement Agreement.

395. For each of the First Hi Bar Contract, First Hi Bar Settlement Agreement and Second Hi Bar Settlement Agreement, the Debtor was presented with the documents on the day they were required to be entered providing no meaningful opportunity for the Debtor to review.

396. Further, for each of the First Hi Bar Contract, First Hi Bar Settlement Agreement and Second Hi Bar Settlement Agreement, the fine print of the agreements was used as material terms, including, but not limited to the various default provisions, Protections, increases in balances, and waiver of defenses.

397. The First Hi Bar Contract, First Hi Bar Settlement Agreement and the Second Hi Bar Settlement Agreement was substantively unconscionable, because the underlying debt solely consisted of criminally usurious loans.

398. To the extent that the First Hi Bar Contract, the First Settlement Agreement and Second Settlement Agreement are voidable, the Trustee seeks to have each of these agreements declared void and unenforceable.

**WHEREFORE**, the Plaintiff respectfully requests entry of a final judgment in favor of the Plaintiff and against Hi Bar finding:

a)      Each of First Hi Bar Contract, the First Settlement Agreement and Second Settlement Agreement are substantively and procedurally unconscionable under New York Law and should be deemed void and unenforceable.

**COUNT 18**
**AVOIDANCE OF FRAUDULENT TRANSFER OF**
**PROPERTY PURSUANT TO 11 U.S.C. § 544 AND SECTIONS**
**726.105(1)(a) AND (b), and 726.106(1), FLA. STAT. OR 11 U.S.C. §548(a)(1) OR (2)**
**(Against Defendant Hi Bar)**

399.    The Plaintiff realleges paragraphs 1 through 193 and Count 1, 2, and 3 above, including all relief sought therein, and incorporates those allegations by reference.

400.    As detailed above the First Hi Bar Contract was entered into as part of a scheme between Spin and Hi Bar to defraud Wing Lake.  Hi Bar paid no consideration for the purported transfer of the Third Spin Contract or for the Debtor to enter the First Hi Bar Contract.

401.    The Hi Bar Transfer Agreement and First Hi Bar Contract were negotiated by Josh Lubin, who actively participated on behalf of Spin and Hi Bar and communicated with both Wing Lake and the Debtor respectively.

402.    The Debtor entered incurred the Obligations of the Hi Bar Transfer Agreement and First Hi Bar Contract in furtherance of the Ponzi Scheme detailed herein.

403.    The Debtor received no consideration or reasonably equivalent value in exchange for the incurring the obligation under the First Hi Bar Contract.

404.    Further, the First Hi Bar Contract is a loan, which charges interest in excess of the maximum allowable interest rate under applicable Florida or New York law and is void *ab initio*.

405.    The Debtor's entry into the First Settlement Agreement and Second Settlement Agreement were therefore entered in exchange for no consideration or less than reasonably equivalent value.

406. The First settlement Agreement and Second Settlement Agreement are themselves each loans which charge interest in excess of the maximum allowable interest rate under applicable Florida or New York law and is void *ab initio*.

407. The releases of Hi Bar and others by the Debtor contained in the First Settlement Agreement and Second Settlement Agreement independently constitute a transfer of an interest in property by the Debtor, for which no consideration or less than reasonably equivalent value was received in exchange by the Debtor.

408. The Hi Bar Transfer Agreement, First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement were obligations incurred by the Debtor and the releases contained in the First Settlement Agreement and Second Settlement Agreement were interests in property of the Debtor and constitute transfers to Hi Bar.

409. The Debtor made the Hi Bar Contract Transfers to Hi Bar on or after October 27, 2021, which is within 7-months of the Petition Date. Therefore, the Hi Bar Contract Transfers were made within four-years of the Petition Date, for purposes of Fla. Stat. § 726.110, and two years of the Petition Date for 11 U.S.C. § 548.

**(i)     The Debtor is Operated as a Ponzi Scheme by Scott Zankl**

410. Scott Zankl attracted the attention of wealthy individuals who provided loans to the Debtor at high rates of return. These Private Lenders often were charging interest in excess of applicable civil and criminal usury laws.

411. No later than May of 2021, the Debtor essentially ceased being in the business of buying and selling high-end luxury vehicles to end users. The Debtor engaged in relatively minor transactions whereby the Debtor sold vehicles to Karma of Palm Beach, Karma of Broward, or Auto Wholesale of Boca Raton, often at cost or at loss.

412.    No later than May 2021, the Debtor was primarily engaged in borrowing money and using the proceeds from the increased loans to pay down pre-existing loans.

413.    The Debtor obtained loans from the following: (a) Private Lenders; (b) Merchant Cash Advance lenders; (c) Floor Plan lenders; (d) Ed Brown; (e) Karma of Palm Beach and/or Karma of Broward.  Scott Zankl continuously sought increased and additional funding from Private Lenders, Merchant Cash Advance Lenders, an overseas lender, and through more traditional financing companies, through the Petition Date.

414.    By no later than May 2021, the Debtor was taking on the additional borrowing to pay previous loans and to fund Scott Zankl's lifestyle.

### (i)    The Private Investor Loan Scheme

415.    At least as early as 2015, a Private Investor Loan scheme was created with the Private Lenders.   Two basic programs were created to document these Private Investor Loans which were the "Locate Deal" program and the "Wholesale Deal" Program.

416.    Both the Locate Deal and the Wholesale Deal programs had the same basic premise: Scott Zankl indicated that the Debtor found a willing and qualified buyer for a specific high-end luxury vehicle which was not currently in the inventory of the Debtor.  The Debtor had located the specific high end luxury vehicle that the willing buyer wanted to purchase at an agreed upon price. The Debtor needed a loan from the Private Lender to purchase specific high end luxury vehicle. The Private Lender agreed to fund the loan.  The gross profits of the sale would be split, in most cases, equally between the Private Lender and the Debtor with a closing to take between 30-60 days.

417.    However, the funds received from the Private Lenders were not used for the purchase of a specific high-end luxury vehicle, but rather were treated as unsecured loans.

75

418.    Reports were generated for each Private Lender of their loans, some of which included the year, make, model, and Vehicle Identification Number.  However, in reality the vehicles listed in these reports were vehicles previously purchased and sold by the Debtor.  Some of the reports issued by Scott Zankl had the same vehicle more than once with sale dates that made it impossible for the vehicle to be sold, repurchased, and sold again.  Some of the reports provided by Scott Zankl to Private Lenders contained the names of other Private Lenders.

419.    In reality, the Private Lenders were being paid closer to a fixed rate of return rather than based upon actual profits of the purported sales of the specific high-end luxury vehicles reflected in the various reports issued by Scott Zankl.

420.    Based upon the high rates of return, new Private Lenders approached Scott Zankl offering additional Private Investor Loans provided the new Private Investors received high rates of returns.

**(ii)    Merchant Cash Advance Loans as a Source of Funding to Prop Up the Ponzi Scheme**

421.    Scott Zankl also caused the Debtor to borrow funds from MCA lenders to perpetuate the Ponzi scheme.  MCA lenders, such as Spin and Hi Bar, loan money at very high rates of interest, generally exceeding most states' criminal usury laws and attempt to avoid usury laws by disguising the agreement as a purchase of future receivables or receipts.

422.    MCA lenders perform perfunctory, if any, due diligence when funding an MCA loan because the business model is front loaded with fees, etc., thereby limiting the MCA's exposure to the failing debtor.

423.    At least as early as October 8, 2020, Scott Zankl caused the Debtor to enter into agreements with MCA lenders.  The first was an entity called Libertas Funding.  From the loan, the Debtor received funds in the amount of $490,000.00, but paid back $600,000 by June 1, 2021.

76

424.    The Debtor's success in paying back the Libertas Funding resulted in the Debtor receiving additional offers from MCAs.  This allowed the Debtor to use the loans from the MCAs to pay back pre-existing loans while simultaneously attracting new financing to further the Ponzi Scheme.

425.    The perfunctory due diligence of the MCA lenders is typically limited to a review of a debtor's bank records prior to consummating and funding an MCA loan.  As described below, this was the full extent of the diligence of Spin before issuing an MCA Loan to the Debtor.  For each of the MCA lenders a review of bank records, from May 2021 forward, evidences the existence of multiple Private Investor Loans and other MCA loans and no or minimal income being generated from the sale of vehicles.

426.    A review of the Debtor's bank records would prompt further inquiry which would reveal the Debtor had little to no accounts receivable to sell to an MCA lender.

427.    Scott Zankl continued to seek out new financing all the way through the collapse of the Debtor and the filing of the instant bankruptcy case. With each of the new loans, Scott Zankl used the funds to pay prior investor loans.

428.    Scott Zankl caused the Debtor to make each of the Hi Bar Transfers and HI Bar Contract Transfers to Hi Bar with the actual intent to hinder, delay or defraud creditors of the Debtor.  Each of the Hi Bar Transfers and Hi Bar Contract Transfers were made to continue, perpetuate, and further the Ponzi Scheme.

429.    American Express Travel Related Services Co., Inc. is a holder of a claim that is allowable against the Debtor which would have standing to assert a claim for relief under Section 726.105(1)(a) of the Florida Statutes.  Each of the Hi Bar Transfers and Hi Bar Contract Transfers

77

are avoidable under Section 544 of the Bankruptcy Code and Section 726.105(1)(a) of the Florida Statutes.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment against Spin:

a)        Finding that the Debtor was being operated as a Ponzi scheme no later than May 1, 2021;

b)        Finding each of the Hi Bar Transfers and Hi Bar Contract Transfers to have been fraudulent transfers pursuant to Fla. Stat. §§ 726.105(1)(a), (1)(b), and/or 726.106(1); and/or

c)        Avoiding each of the Hi Bar Transfers and Hi Bar Contract Transfers pursuant to 11 U.S.C. § 544(b) and Fla. Stat. §§ 726.105(1)(a), (1)(b), and/or 726.106(1) and avoiding all other transfers by the Debtor to Hi Bar in addition to those specifically referred to in this Complaint, if any, which are avoidable under Fla. Stat. §§ 726.105(1)(a), (1)(b), and/or 726.106(1); and/or

d)        Finding each of the Hi Bar Transfers and Hi Bar Contract Transfers to have been fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1) or (2);

e)        Avoiding each of the Hi Bar Transfers and Hi Bar Contract Transfers pursuant to 11 U.S.C. § 548(a)(1) or (2) and avoiding all other transfers by the Debtor to Spin in addition to those specifically referred to in this Complaint, if any, which are avoidable under Section 726.105(1)(a) of the Florida Statutes; and

f)        Granting such other and further relief as the Court deems proper.

## COUNT 19
### AVOIDANCE OF FRAUDULENT TRANSFER OF PROPERTY PURSUANT TO 11 USC § 544 AND SECTION 726.105(1)(a), FLA. STAT.
### (Against Defendant Hi Bar)

430.    The Plaintiff realleges paragraphs 1 through 193, and Counts 1, 2, and 3 above, including all relief sought therein, and incorporates those allegations by reference.

78

431. The Hi Bar Transfers and Hi Bar Contract Transfers were transfers of the Debtor's interest in property to Hi Bar.

432. The Debtor made the Hi Bar Transfers and Hi Bar Contract Transfers to Hi Bar within the four-year period prior to the Petition Date.

433. Scott Zankl attracted the attention of wealthy individuals who provided loans to the Debtor at high rates of return. These Private Lenders often were charging interest in excess of applicable civil and criminal usury laws.

434. No later than May of 2021, the Debtor essentially ceased being in the business of buying and selling high-end luxury vehicles to end users. The Debtor engaged in relatively minor transactions whereby the Debtor sold vehicles to Karma of Palm Beach, Karma of Broward, or Auto Wholesale of Boca Raton, often at cost or at loss.

435. No later than May 2021, the Debtor was primarily engaged in borrowing money and using the proceeds from the increased loans to pay down pre-existing loans.

436. The Debtor obtained loans from the following: (a) Private Lenders; (b) Merchant Cash Advance lenders; (c) Floor Plan lenders; (d) Ed Brown; (e) Karma of Palm Beach and/or Karma of Broward. Scott Zankl continuously sought increased and additional funding from Private Lenders, Merchant Cash Advance Lenders, an overseas lender, and through more traditional financing companies, through the Petition Date.

437. By no later than May 2021, the Debtor was taking on the additional borrowing to pay previous loans and to fund Scott Zankl's lifestyle.

     **(iii)**      **The Private Investor Loan Scheme**

438.    At least as early as 2015, a Private Investor Loan scheme was created with the Private Lenders. Two basic programs were created to document these Private Investor Loans which were the "Locate Deal" program and the "Wholesale Deal" Program.

439.    Both the Locate Deal and the Wholesale Deal programs had the same basic premise: Scott Zankl indicated that the Debtor found a willing and qualified buyer for a specific high-end luxury vehicle which was not currently in the inventory of the Debtor. The Debtor had located the specific high end luxury vehicle that the willing buyer wanted to purchase at an agreed upon price. The Debtor needed a loan from the Private Lender to purchase specific high end luxury vehicle. The Private Lender agreed to fund the loan. The gross profits of the sale would be split, in most cases, equally between the Private Lender and the Debtor with a closing to take between 30-60 days.

440.    However, the funds received from the Private Lenders were not used for the purchase of a specific high-end luxury vehicle, but rather were treated as unsecured loans.

441.    Reports were generated for each Private Lender of their loans, some of which included the year, make, model, and Vehicle Identification Number. However, in reality the vehicles listed in these reports were for vehicles previously purchased and sold by the Debtor. Some of the reports issued by Scott Zankl had the same vehicle more than once with sale dates that made it impossible for the vehicle to be sold, repurchased, and sold again. Some of the reports provided by Scott Zankl to Private Lenders contained the names of other Private Lenders.

442.    In reality, the Private Lenders were being paid closer to a fixed rate of return rather than based upon actual profits of the purported sales of the specific high-end luxury vehicles reflected in the various reports issued by Scott Zankl.

80

443. Based upon the high rates of return, new Private Lenders approached Scott Zankl offering additional Private Investor Loans provided the new Private Investors received high rates of returns.

### (iv) Merchant Cash Advance Loans as a Source of Funding to Prop Up the Ponzi Scheme

444. Scott Zankl also caused the Debtor to borrow funds from MCA lenders to perpetuate the Ponzi scheme. MCA lenders, such as Spin and Hi Bar, loan money at very high rates of interest, generally exceeding most states' criminal usury laws and attempt to avoid usury laws by disguising the agreement as a purchase of future receivables or receipts.

445. MCA lenders perform perfunctory, if any, due diligence when funding an MCA loan because the business model is front loaded with fees, etc., thereby limiting the MCA's exposure to the failing debtor.

446. At least as early as October 8, 2020, Scott Zankl caused the Debtor to enter into agreements with MCA lenders. The first was an entity called Libertas Funding. From the loan, the Debtor received funds in the amount of $490,000.00, but paid back $600,000 by June 1, 2021.

447. The Debtor's success in paying back the Libertas Funding resulted in the Debtor receiving additional offers from MCAs. This allowed the Debtor to use the loans from the MCAs to pay back pre-existing loans while simultaneously attracting new financing to further the Ponzi Scheme.

448. The perfunctory due diligence of the MCA lenders is typically limited to a review of a debtor's bank records prior to consummating and funding an MCA loan. As described below, this was the full extent of the diligence of Spin before issuing an MCA Loan to the Debtor. For each of the MCA lenders a review of bank records, from May 2021 forward, evidences the

existence of multiple Private Investor Loans and other MCA loans and no or minimal income being generated from the sale of vehicles.

449. A review of the Debtor's bank records would prompt further inquiry which would reveal the Debtor had little to no accounts receivable to sell to an MCA lender.

450. Scott Zankl continued to seek out new financing all the way through the collapse of the Debtor and the filing of the instant bankruptcy case. With each of the new loans, Scott Zankl used the funds to pay prior investor loans.

451. Scott Zankl caused the Debtor to make each of the Hi Bar Transfers and HI Bar Contract Transfers to Hi Bar with the actual intent to hinder, delay or defraud creditors of the Debtor.

452. American Express Travel Related Services Co., Inc. is a holder of a claim that is allowable against the Debtor which would have standing to assert a claim for relief under Section 726.105(1)(a) of the Florida Statutes. Each of the Hi Bar Transfers and Hi Bar Contract Transfers are avoidable under Section 544 of the Bankruptcy Code and Section 726.105(1)(a) of the Florida Statutes.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment against HI Bar:

a) Finding that the Debtor was being operated as a Ponzi scheme no later than May 1, 2021;

b) Finding each of the Hi Bar Transfer and Hi Bar Contract Transfers to have been fraudulent transfers pursuant to Section 726.105(1)(a) of the Florida Statutes;

c) Avoiding each the Hi Bar Transfers and Hi Bar Contract Transfers pursuant to Section 544 of the Bankruptcy Code and Section 726.105(1)(a) of the Florida Statutes and avoiding

all other transfers by the Debtor to Hi Bar in addition to those specifically referred to in this Complaint, if any, which are avoidable under Section 726.105(1)(a) of the Florida Statutes; and

d)      Granting such other and further relief as the Court deems proper.

**COUNT 20**
**AVOIDANCE OF FRAUDULENT TRANSFER OF PROPERTY**
**PURSUANT TO 11 USC § 544 AND SECTION 726.105(1)(a), FLA. STAT.**
**(As to Defendant Hi Bar)**

453.    The Plaintiff realleges paragraphs 1 through 193, and Counts 1, 2, and 3 above, including all relief sought therein, and incorporates those allegations by reference.

454.    The Hi Bar Transfers and Hi Bar Contract Transfers were transfers of the Debtor's interests in property to Hi Bar.

455.    The Debtor made the Hi Bar Transfers and Hi Bar Contract Transfers to Hi Bar within the four-year period prior to the Petition Date.

**(i)      The Debtor is Operated as a Ponzi Scheme by Scott Zankl**

456.    No later than May 2021, Scott Zankl operated the Debtor as a Ponzi scheme.

457.    The Debtor obtained loans from the following: (a) Private Lenders; (b) Merchant Cash Advance lenders; (c) Floor Plan lenders; (d) Ed Brown; (e) Karma of Palm Beach and/or Karma of Broward.   Scott Zankl continuously sought increased and additional funding from Private Lenders, Merchant Cash Advance Lenders, an overseas lender, and through more traditional financing companies, through the Petition Date.

458.    By no later than May 2021, the Debtor was taking on the additional borrowing to pay previous loans and to fund Scott Zankl's lifestyle.

**(ii)**      **The Private Investor Loan Scheme**

459.      At least as early as 2015, a Private Investor Loan scheme was created with the Private Lenders. Two basic programs were created to document these Private Investor Loans which were the "Locate Deal" program and the "Wholesale Deal" Program.

460.      Both the Locate Deal and the Wholesale Deal programs had the same basic premise: Scott Zankl indicated that the Debtor found a willing and qualified buyer for a specific high-end luxury vehicle which was not currently in the inventory of the Debtor. The Debtor had located the specific high end luxury vehicle that the willing buyer wanted to purchase at an agreed upon price. The Debtor needed a loan from the Private Lender to purchase specific high end luxury vehicle. The Private Lender agreed to fund the loan. The gross profits of the sale would be split, in most cases, equally between the Private Lender and the Debtor with a closing to take between 30-60 days.

461.      However, the funds received from the Private Lenders were not used for the purchase of a specific high-end luxury vehicle, but rather were treated as unsecured loans.

462.      Reports were generated for each Private Lender of their loans, some of which included the year, make, model, and Vehicle Identification Number. However, in reality the vehicles listed in these reports were for vehicles previously purchased and sold by the Debtor. Some of the reports issued by Scott Zankl had the same vehicle more than once with sale dates that made it impossible for the vehicle to be sold, repurchased, and sold again. Some of the reports provided by Scott Zankl to Private Lenders contained the names of other Private Lenders.

463.      In reality, the Private Lenders were being paid closer to a fixed rate of return rather than based upon actual profits of the purported sales of the specific high-end luxury vehicles reflected in the various reports issued by Scott Zankl.

84

464.     Based upon the high rates of return, new Private Lenders approached Scott Zankl offering additional Private Investor Loans provided the new Private Investors received high rates of returns.

### (iii)     Merchant Cash Advance Loans as a Source of Funding to Prop Up the Ponzi Scheme

465.     Scott Zankl also caused the Debtor to borrow funds from MCA lenders to perpetuate the Ponzi scheme.  MCA lenders, such as Spin and Hi Bar, loan money at very high rates of interest, generally exceeding most states' criminal usury laws and attempt to avoid usury laws by disguising the agreement as a purchase of future receivables or receipts.

466.     MCA lenders perform perfunctory, if any, due diligence when funding an MCA loan because the business model is front loaded with fees, etc., thereby limiting the MCA's exposure to the failing debtor.

467.     At least as early as October 8, 2020, Scott Zankl caused the Debtor to enter into agreements with MCA lenders.  The first was an entity called Libertas Funding.  From the loan, the Debtor received funds in the amount of $490,000.00, but paid back $600,000 by June 1, 2021.

468.     The Debtor's success in paying back the Libertas Funding resulted in the Debtor receiving additional offers from MCAs.  This allowed the Debtor to use the loans from the MCAs to pay back pre-existing loans while simultaneously attracting new financing to further the Ponzi Scheme.

469.     The perfunctory due diligence of the MCA lenders is typically limited to a review of a debtor's bank records prior to consummating and funding a MCA loan.  As described below, this was the full extent of the diligence of Spin before issuing an MCA Loan to the Debtor.  For each of the MCA lenders a review of bank records, from May 2021 forward, evidences the

85

existence of multiple Private Investor Loans and other MCA loans and no or minimal income being generated from the sale of vehicles.

470. A review of the Debtor's bank records would prompt further inquiry which would reveal the Debtor had little to no accounts receivable to sell to an MCA lender.

471. Scott Zankl continued to seek out new financing all the way through the collapse of the Debtor and the filing of the instant bankruptcy case. With each of the new loans, Scott Zankl used the funds to pay prior investor loans.

472. Scott Zankl caused the Debtor to make the transfers to Hi Bar with the actual intent to hinder, delay or defraud creditors of the Debtor. The Hi Bar transfers were made to continue, perpetuate and further the Ponzi Scheme.

473. The Debtor made each of the Hi Bar Transfers and Hi Bar Contract Transfers to Hi Bar with actual intent to hinder, delay, or defraud entities to which the Debtor was or became, on or after the date of the transfer, indebted.

474. American Express Travel Related Services Co., Inc. is a holder of a claim that is allowable against the Debtor which would have standing to assert a claim for relief under Section 726.105(1)(a) of the Florida Statutes. Each of the Hi Bar Transfers and Hi Bar Contract Transfers are avoidable under Section 544 of the Bankruptcy Code and Section 726.105(1)(a) of the Florida Statutes.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment against Hi Bar:

a) Finding each of the Hi Bar Transfers and Hi Bar Contract Transfers to have been fraudulent transfers pursuant to Section 726.105(1)(a) of the Florida Statutes;

b) Avoiding each of the Hi Bar Transfers and Hi Bar Contract Transfers pursuant to

Section 544 of the Bankruptcy Code and Section 726.105(1)(a) of the Florida Statutes and avoiding all other transfers by the Debtor to Hi Bar in addition to those specifically referred to in this Complaint, if any, which are avoidable under Section 726.105(1)(a) of the Florida Statutes; and

c)      Granting such other and further relief as the Court deems proper.

**COUNT 21**
**AVOIDANCE OF FRAUDULENT TRANSFER OF PROPERTY**
**PURSUANT TO 11 USC § 544 AND SECTION 726.106(1), FLA. STAT.**
**(As to Defendant Hi Bar)**

475.    The Plaintiff realleges paragraphs 1 through 193, and Counts 1, 2, and 3 above, including all relief sought therein, and incorporates those allegations by reference.

476.    Each of the Hi Bar Transfers and Hi Bar Contract Transfers were transfers of the Debtor's interests in property to Hi Bar.

477.    The Debtor made each of the Hi Bar Transfers and Hi Bar Contract Transfers to Hi Bar within the four-year period prior to the Petition Date.

478.    The Debtor received less than reasonably equivalent value in exchange for making each of the Hi Bar Transfers and Hi Bar Contract Transfers.

479.    The Debtor was insolvent at the time or became insolvent as a result of making each of the Hi Bar Transfers and Hi Bar Contract Transfers.

480.    American Express Travel Related Services Co., Inc. is a holder of a claim that is allowable against the Debtor which would have standing to assert a claim for relief under Section 726.106(1) of the Florida Statutes.  Each of the Hi Bar Transfers and Hi Bar Contract Transfers are avoidable under Section 726.106(1) of the Florida Statutes.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment against Hi Bar:

a)      Finding each of the Hi Bar Transfers and Hi Bar Contract Transfers to have been

fraudulent transfers pursuant to Section 726.106(1) of the Florida Statutes;

b) Avoiding each of the Hi Bar Transfers and Hi Bar Contract Transfers pursuant to Section 544 of the Bankruptcy Code and Section 726.106(1) of the Florida Statutes and avoiding all other transfers by the Debtor to Defendant(s) in addition to those specifically referred to in this Complaint, if any, which are avoidable under Section 544 of the Bankruptcy Code and Section 726.106(1) of the Florida Statutes; and

c) Granting such other and further relief as the Court deems proper.

### COUNT 22
### AVOIDANCE OF FRAUDULENT TRANSFER OF PROPERTY
### PURSUANT TO 11 USC § 544 AND SECTION 726.105(1)(b), FLA. STAT.
### (As to Defendant Hi Bar)

481. The Plaintiff realleges paragraphs 1 through 193, and Counts 1, 2, and 3 above, including all relief sought therein, and incorporates those allegations by reference.

482. Each of the Hi Bar Transfers and Hi Bar Contract Transfers were transfers of the Debtor's interests in property to Hi Bar.

483. The Debtor made each of the Hi Bar Transfers and Hi Bar Contract Transfers to Hi Bar within the four-year period prior to the Petition Date.

484. The Debtor made each of the Hi Bar Transfers and Hi Bar Contract Transfers without receiving reasonably equivalent value and the Debtor intended to incur or believed or reasonably should have believed that Debtor would incur, debts beyond Debtor's ability to pay as they became due.

485. For Section 726.105(1)(b) of the Florida Statutes, American Express Travel Related Services Co., Inc. is a holder of a claim that is allowable against the Debtor which would have standing to assert a claim for relief. Each of the Hi Bar Transfers and Hi Bar Contract Transfers are avoidable under Section 726.105(1)(b) of the Florida Statutes.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment against Hi Bar:

a)      Finding each of the Hi Bar Transfers and Hi Bar Contract Transfers to have been fraudulent transfers pursuant to Section 726.105(1)(b) of the Florida Statutes;

b)      Avoiding each of the Hi Bar Transfers and Hi Bar Contract Transfers pursuant to Section 544 of the Bankruptcy Code and Section 726.105(1)(b) of the Florida Statutes and avoiding all transfers by the Debtor to Hi Bar in addition to those specifically referred to in this Complaint, if any, which are avoidable under Section 544 of the Bankruptcy Code and Section 726.105(1)(b) of the Florida Statutes; and

c)      Granting such other and further relief as the Court deems proper.

## COUNT 23
## AVOIDANCE OF FRAUDULENT TRANSFER OF
## PROPERTY PURSUANT TO 11 U.S.C. § 548(a)(1)
## (As to Defendant Hi Bar)

486.    The Plaintiff realleges paragraphs 1 through 193, and Counts 1, 2, and 3 above, including all relief sought therein, and incorporates those allegations by reference.

487.    Each of the Hi Bar Transfers and Hi Bar Contract Transfers were transfers of the Debtor's interests in property to Hi Bar.

488.    The Debtor made each of the Hi Bar Transfers and Hi Bar Contract Transfers to Hi Bar within the two-year period prior to the Petition Date.

489.    The Debtor made each of Hi Bar Transfers and Hi Bar Contract Transfers with the actual intent to hinder, delay or defraud entities to which the Debtor was or became, on or after the date of the transfer, indebted.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment against Hi Bar:

a)      Finding each of the Hi Bar Transfers and Hi Bar Contract Transfers to have been fraudulent transfers pursuant to Section 548 of the Bankruptcy Code;

b)      Avoiding each of the Hi Bar Transfers and Hi Bar Contract Transfers pursuant to Section 548(a)(1) of the Bankruptcy Code and avoiding all transfers by the Debtor to Hi Bar in addition to those specifically referred to in this Complaint, if any, which are avoidable under Section 548 of the Bankruptcy Code; and

c)      Granting such other and further relief as the Court deems proper.

**COUNT 24**
**AVOIDANCE OF FRAUDULENT TRANSFER OF**
**PROPERTY PURSUANT TO 11 U.S.C. § 548(a)(2)**
**(As to Defendant Hi Bar)**

490.    The Plaintiff realleges paragraphs 1 through 193, and Counts 1, 2, and 3 above, including all relief set froth therein, and incorporates those allegations by reference.

491.    Each of the Hi Bar Transfers and Hi Bar Contract Transfers were transfers of the Debtor's interests in property to Hi Bar.

492.    The Debtor made each of the Hi Bar Transfers and Hi Bar Contract Transfers to Hi Bar within the two-year period prior to the Petition Date.

493.    The Debtor received less than reasonably equivalent value in exchange for making each of the Hi Bar Transfers and Hi Bar Contract Transfers, and the Debtor (i) was insolvent on the date that each of the Hi Bar Transfers and Hi Bar Contract Transfers were made, or became insolvent as a result of each of the Hi Bar Transfers and Hi Bar Contract Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; (iii) intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured; as a result of each of the Hi Bar Transfers and Hi Bar Contract Transfers.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment against Hi Bar:

a)      Finding each of the Hi Bar Transfers and Hi Bar Contract Transfers to have been fraudulent transfers pursuant to Section 548 of the Bankruptcy Code;

b)      Avoiding each of the Hi Bar Transfers and Hi Bar Contract Transfers pursuant to Section 548 of the Bankruptcy Code and avoiding all transfers by the Debtor to Hi Bar in addition to those specifically referred to in this Complaint, if any, which are avoidable under Section 548 of the Bankruptcy Code; and

c)      Granting such other and further relief as the Court deems proper.

## COUNT 25
## RECOVERY OF AVOIDED TRANSFERS PURSUANT TO 11 U.S.C. § 550
(As to Defendant Hi Bar)

494.    The Plaintiff realleges paragraphs 1 through 193 and Counts 17 through 24 above, including all relief set forth therein, and incorporates those allegations by reference.

495.    Each of the Hi Bar Transfers avoided pursuant to Section 544 of the Bankruptcy Code and Sections 726.105(1)(a), 726.105(1)(b), and/or 726.106(1) of the Florida Statutes, or section 548 of the Bankruptcy Code are recoverable by the Plaintiff pursuant to Section 550 of the Bankruptcy Code.

496.    Hi Bar is the initial or subsequent transferee of each of the Hi Bar Transfers and/or the person for whose benefit the Hi Bar Transfers were made.

497.    To the extent the Hi Bar is deemed to be a mediate or immediate transferee the Hi Bar Transfers are recoverable because Hi Bar provided no value in exchange for the Hi Bar Transfers, the Hi Bar Transfers were not received in good faith, and Hi Bar had knowledge of the voidability of the Hi Bar Transfers.

91

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment:

e)        Finding Hi Bar to be the initial transferee of the Hi Bar Transfers and/or the person for whose benefit the Hi Bar Transfers were made;

f)        In the alternative, finding Hi Bar to be the immediate or mediate transferee of the Hi Bar Transfers;

g)        Ordering Hi Bar to turn over to the Plaintiff each of the Hi Bar Transfers avoided as fraudulent transfers, or entering a money judgment against Hi Bar for the value of the avoided Hi Bar Transfers, plus interest at the applicable federal statutory rate and costs and expenses permissible by applicable law; and

h)        Granting such other and further relief as the Court deems proper.

**COUNT 26**
**AVOIDANCE OF PREFERENCE PAYMENTS PURSUANT TO 11 U.S.C. § 547**
(Alternative Relief as to Defendant Hi Bar)

498.    The Plaintiff realleges paragraphs 1, 2, 4, 5, 8, 11 through 27, 105 through 187, and 192 and 193, above and incorporates those allegations by reference.

499.    Of the Hi Bar Transfers set forth in Exhibit B, $1,300,000 was paid by the Debtor to or for the benefit of Hi Bar, through Hi Bar's counsel Steven Zakharyayev ("**Hi Bar Preference Payments**").

500.    The Hi Bar Preference Payments were made within 90 days of the Petition Date and were transfers of the Debtor's interest in property.

501.    The Debtor was insolvent at the time of the Hi Bar Preference Payments were made.

502.    The Hi Bar Preference Payments were not made in the ordinary course of the Debtor's business affairs.

92

503.     To the extent the Second Settlement Agreement is an enforceable debt, the Hi Bar Preference Payments were made on account of an antecedent debt and enabled Hi Bar to receive more than Hi Bar would receive in this Chapter 7 bankruptcy case, if the Hi Bar Preference Payments had not been made and Hi Bar was receiving payment on a claim in this bankruptcy case.

504.     In seeking this relief, the Plaintiff has performed reasonable due diligence in the circumstances of the case and taken into account Hi Bar's known or reasonably knowable affirmative defenses under 11 U.S.C. § 547(c).

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court enter a final judgment in favor of the Plaintiff and against Hi Bar:

(a)     Avoiding the Hi Bar Preference Payments under 11 U.S.C. § 547(b); and

(b)     Granting such other and further relief as this Court deems just and proper.

**COUNT 27**
**RECOVERY OF THE AVOIDED HI BAR PREFERENCE**
**PAYMENTS PURSUANT TO 11 U.S.C. § 550(a)**
(Alternative Relief against Hi Bar)

505.     The Plaintiff realleges 1, 2, 4, 5, 8, 11 through 27, 105 through 187, 192 and 193, and Count 26 above, including all relief sought therein, and incorporates those allegations by reference.

506.     The Hi Bar Preference Payments avoided pursuant to Section 547 of the Bankruptcy Code are recoverable by the Plaintiff pursuant to Section 550 of the Bankruptcy Code.

507.     Within the 90 days prior to the bankruptcy filing, the Debtor made $1,300,000.00 payments to Hi Bar as reflected on Exhibit B.

508.     Hi Bar is the initial or subsequent transferee of the Hi Bar Preference Payments and/or the person for whose benefit the Hi Bar Preference Payments were made.

93

509.    To the extent the Hi Bar is deemed to be a mediate or immediate transferee the Hi Bar Transfers are recoverable because Hi Bar provided no value in exchange for the Hi Bar Payments, the Hi Bar Preference Payments were not received in good faith, and Hi Bar had knowledge of the voidability of the Hi Bar Preference Payments.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter a judgment:

a)    Finding Hi Bar to be the initial transferee of the Hi Bar Preference Payments and/or the person for whose benefit the Hi Bar Preference Payments were made;

b)    In the alternative, finding Hi Bar to be the immediate or mediate transferee of the Hi Bar Preference Payments;

c)    Ordering Hi Bar to turn over to the Plaintiff the Hi Bar Preference Payments avoided as preferences or entering a money judgment against Hi Bar, in the amount of $1,300,000.00, for the value of the avoided Hi Bar Preference Payments, plus interest at the applicable federal statutory rate and costs and expenses permissible by applicable law; and Granting such other and further relief as the Court deems proper.

## COUNT 28
## <u>PROMISSORY ESTOPPEL – SPIN AND HI BAR ASSIGNMENT</u>
### (Spin and Hi Bar)

510.    Plaintiff realleges paragraphs 1 through 46 and 88 through 108 above and incorporates those allegations by reference.

511.    This is a Count for Promissory Estoppel under New York law.

512.    On or about November 1, 2021, Josh Lubin, on behalf of Spin executed the Wing Lake Assignment Document. Exhibit G.  Spin affirmatively represented that the total amount of the outstanding obligations between the Debtor and Spin was $1.00 as of October 21, 2021.

513.    The Wing Lake Assignment Document reads, in pertinent part as follows:

94

[Spin] sells, transfers and assigns to [Wing Lake] the Obligations and all of [Spin's] rights, title and interest under the Merchant Documents, including any claims, rights, or actions Assignor may have (whether known or unknown to [Spin as of the date of hereof) against any third party arising in connection with, or otherwise related to, the Merchant Documents or of the Obligations.

Exhibit G, p. 1.

514.    The Wing Lake Assignment Document defines "Obligations" as follows:

all outstanding obligations of Excell Auto Group, Inc. and each of its affiliates (collectively, "Company") owing to [Spin] under each of (i) the Revenue Purchase Agreement, dated June 1, 2021, by and between Assignor and Company, and (ii) the Revenue Purchase Agreement, dated as of July 9, 2021, by and between [Spin] and Company (collectively, the "Merchant Agreements") and all rights of [SPIN] under any similar or related documents (including without limitation, any guaranties, security agreements, forbearance agreements, settlement agreements and judgments), and any guaranties in respect, thereof (the documents, including the Merchant Agreements, are defined collectively as the "Merchant Documents") for a purchase price of $1.00 (the "Purchase Price.").

Ex. G.

515.    Spin also made the following representations and warranties:

[Spin] represents and warrants, in part,  to [Wing Lake] that (iii) [Spin] has not sold, assigned, transferred, granted a participation in or pledged the Obligations, the Merchant Documents or the Third Party Claims and [Spin] owns the Obligations, the Merchant Documents and the Third Party Claims free and clear of any liens or other encumbrances and (iv) [Spin] (including any of its affiliates) has not entered into any written or oral agreement with Company relating to this Assignment or receipt of any compensation from Company in consideration for entering into this Assignment.  The sale, transfer and assignment is made without recourse, representations or warranties of any kind, except as set forth above.

Exhibit G.

516.    Between October 27 and November 1, 2021, the Hi Bar Transfer Agreement was allegedly agreed to by Kristen Zankl and Scott Zankl, individually and on behalf of Excell Auto

95

Group, Inc. purportedly transferring the balance of Spin in the amount of $2,114,312.50 to Hi Bar and states, in part,

> EXCELL AUTO GROUP, INC., agrees to pay off the remaining RTR of $2,114,312.50 which currently exists on the previous Merchant Agreement with SPIN CAPITAL entered into on or about August 31, 2021 from funds you are receiving from your new Merchant Agreement with HI BAR CAPITAL dated October 27, 2021.

Exhibit H.

517.    Josh Lubin obtained the purported signatures of Kristen Zankl and Scott Zankl on the Hi Bar Capital Balance Transfer Agreement.

518.     At all times relevant, Josh Lubin was an agent for Hi Bar Capital.

519.    The Wing Lake Assignment Document was an integral part of the financing agreement between Wing Lake and the Debtor as Wing Lake would not have closed and funded the loan to the Debtor but for the execution of Wing Lake Assignment Document executed by Spin.  Therefore, the Debtor was a third-party beneficiary of the Assignment of Obligations and Merchant Documents agreement.

520.    The promises, representations, and warranties made by Spin in the Wing Lake Assignment Document are clear and unambiguous.

521.    The Debtor, as a third-party beneficiary, reasonably relied on the representation that the balance of the Obligations owed by the Debtor to Wing Lake were zero and were all otherwise transferred to Wing Lake.

522.    Based upon information and belief, Kristen Zankl did not know that there were balances owed to Spin that were not transferred to Wing Lake.

523.    Based upon information and belief, Ed Brown did not know that there were balances owed to Spin that were not transferred to Wing Lake.

96

524.    Scott Zankl did not have the authority to execute the Hi Bar Transfer Agreement and was acting outside of any corporate authority when he executed the Hi Bar Transfer Agreement.

525.    The Debtor was damaged based upon Spin's breach of the Wing Lake Assignment Document.

526.    Josh Lubin acted as an agent of Hi Bar regarding the Hi Bar Transfer Agreement, the First Hi Bar Contract, the First Hi Bar Settlement Agreement and the Second Hi Bar Settlement Agreement.  At the same time, Josh Lubin was acting as the owner and agent of Spin.  Josh Lubin, Spin and Hi Bar, individually and collectively, breached the Wing Lake Assignment Document.

527.    The Debtor was damaged in amount that exceeds $2,300,000.00 plus attorneys' fees and costs.

WHEREFORE, the Plaintiff respectfully requests entry of a final judgment in favor of the Plaintiff and against Josh Lubin, Spin and Hi Bar finding

a) The Defendants are estopped from asserting that the balance owed to Spin on or about October 21, 2021, was more than $1.00.

b) The Defendants are estopped from asserting that the balance of $1.00 was paid by Wing Lake to Spin.

c) The Defendants are estopped from asserting that a balance was transferred from Spin to Hi Bar regarding the Debtor.

d) The Defendants are estopped from asserting that any amount was owed by the Debtor or any of its affiliates under the Hi Bar Transfer Agreement, the First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement.

e) Each of the Hi Bar Transfer Agreement, First Hi Bar Contract, First Settlement Agreement, and Second Settlement Agreement are void and enforceable.

f) The Debtor was damaged by the collection of debt by Josh Lubin, Spin and Hi Bar.

**COUNT 29**
**ACTION AGAINST DEFENDANTS FOR VIOLATION OF FLORIDA INTEREST, USURY, AND LENDING PRACTICES FLA. STAT. CHAPT. 687**

528. Plaintiff realleges paragraphs 1 through 193 above and incorporates those allegations by reference.

529. This is an action for damages brought pursuant to Chapter 687, including but not limited to Fla. Stat. § 687.071.

530. Spin is a "Creditor" pursuant to Fla. Stat. § 687.071(1)(b).

531. Lubin is a "Creditor" pursuant to Fla. Stat. § 687.071(1)(b).

532. Excell Auto Group, Inc., is a "Debtor" pursuant to Fla. Stat. § 687.071(1)(c).

533. The First, Second, and Third Spin Contracts each constitute an "Extensions of Credit" pursuant to Fla. Stat. § 687.071(d).

534. Spin is a "Loan Shark" as Spin extended credit to the Debtor that was not otherwise allowed by law, on which it knowingly and willfully charged, took, or received interest exceeding 25% per annum or 45% per annum, as applicable. Fla. Stat. § 687.071(1)(f), (2), and (3).

535. Lubin is a "Loan Shark" as Lubin, through Spin and Hi Bar, extended credit to the Debtor that was not otherwise allowed by law, on which it knowingly and willfully charged, took, or received interest exceeding 25% per annum or 45% per annum, as applicable. Fla. Stat. § 687.071(1)(f), (2), and (3).

536. As a direct and proximate cause of the Debtor having to pay usurious interest on the Extensions of Credit, the Debtor was damaged.

537.    Pursuant to Fla. Stat. § 687.071(7), the Plaintiff is entitled to recover against the Defendants, at least, the amount of the payments received by, or on behalf of, Spin as set forth in **Exhibits A**.  Plaintiff is entitled to recover attorneys' fees and costs from the Defendants.

**WHEREFORE**, the Plaintiff requests judgment in her favor and against Lubin and Spin, together with pre- and post-judgment interest, for:

(a)    The amount of actual damages suffered by the Debtor;

(b)    All payments, including principal and interest, received by Lubin and Spin on account of any extensions of credit which are forfeited and recoverable by Plaintiff as it exceeds interest in the amount of 25 percent, or 45% percent per annum, under Florida law.

(c)    Attorney's fees and costs that the Plaintiff has incurred pursuant to Fla. Stat. § 687.147; and

(d)    Such other and further relief as this Court deems just and proper.

Respectfully submitted this 6th day of March 2025.

FURR AND COHEN, P.A.
*Special Counsel for Trustee*
2255 Glades Road, Suite 419A
Boca Raton, FL 33431
Telephone: (561) 395-0500
Facsimile: (561) 338-7532

BY:    /s/ *Alan R. Crane*
    Alan R. Crane, Esq.
    Florida Bar No.: 0963836
    E-mail: acrane@furrcohen.com
    Jason S. Rigoli, Esq.
    Florida Bar No.: 91990
    E-mail: jrigoli@furrcohen.com

**Law Office of**
**Nicole Testa Mehdipour, p.a.**
*Counsel for Chapter 7 Trustee*
6278 N. Federal Highway, Suite 408
Fort Lauderdale, FL 33308
Tel: (954) 858-5880 Fax: (954) 208-0888

By:  /s/ *Nicole Testa Mehdipour*
Nicole Testa Mehdipour
Florida Bar No. 177271
Nicole.Mehdipour@ntmlawfirm.com