Page 1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF FLORIDA

WEST PALM BEACH DIVISION

CASE NO. 22-12790-EPK

IN RE:

 EXCELL AUTO GROUP, INC.,

             Debtor.

_____/

NICOLE TESTA MEHDIPOUR,

CHAPTER 7 TRUSTEE,

             Plaintiff,

vs.                                    ADV. NO. 23-1132-EPK

HI BAR CAPITAL, LLC, et al.,

             Defendants.

 _____/

DOCKET ENTRIES (975), (195), (209), (198), (201)

February 12, 2025

The above-entitled cause came on for hearing before the Honorable ERIK P. KIMBALL, Chief Judge of the UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN DISTRICT OF FLORIDA, at 1515 North Flagler Drive, West Palm Beach, Palm Beach County, Florida, on February 12, 2025, commencing at or about 10:30 a.m., and the following proceedings were had:

Reported Via a Digital Recording By:

Anna M. Meagher, Shorthand Reporter

APPEARANCES:


Furr & Cohen, by
Alan R. Crane, Esquire
Jason Rigoli, Esquire (via Zoom)
On behalf of Nicole Testa Mehdipour,
Chapter 7 Trustee
Email:  Acrane@furrcohen.com
Email:  Jrigoli@furrcohen.com


Klugler Kaplan, by
Marko F. Cerenko, Esquire
On behalf of Avrumi Lubin and Spin Capital, LLC
Email:  Mcerenko@klugerkaplan.com


Egozi & Bennett, P.A., by
Bernard L. Egozi, Esquire
On behalf of Avrumi Lubin and Spin Capital, LLC
Email:  Begozi@egozilaw.com


ALSO PRESENT:
Mr. Avrumi Lubin, a/k/a Joshua Lubin, Pro Se

VIA ZOOM VIDEO CONFERENCE:

Leto Law Firm, by
Matthew P. Leto, Esquire
On behalf of Hi Bar Capital, LLC
Email:  Mleto@letolawfirm.com

- - - - - -

Page 3

THE COURT:  Ms. Leonard.

THE CLERK:  Okay.  I'm gonna call the next two related cases together, EXCEL Auto Group, Inc., Case No. 22-12790, and Mehdipour v. Hi Bar, LLC, et al., Case No. 23-1132.

In the courtroom.

MR. CRANE:  Good morning, your Honor.  Alan Crane again, special counsel for Nicole Testa Mehdipour, the Chapter 7 trustee in the main case, Chapter 7 trustee and the plaintiff in the adversary proceeding.

THE COURT:  Thank you.

THE CLERK:  Mr. Leto.

MR. LETO:  Good morning.  May it please the Court, your Honor, Matthew Leto on behalf of Hi Bar Capital.

THE CLERK:  Mr. Rigoli.

MR. RIGOLI:  Good morning, your Honor. Jason Rigoli, special counsel to the trustee, Nicole Testa Mehdipour.

THE CLERK:  And the rest in the courtroom.

MR. CERENKO:  Good morning, your Honor. Marko Cerenko, still current counsel for Spin Capital.

THE COURT:  Mr. Cerenko, good morning.

MR. CERENKO:  Good morning.

MR. EGOZI:  Good morning, your Honor.

Page 4

Bernard Egozi, current counsel for Spin Capital.

THE COURT:  Thank you.  Good morning.

Mr. Lubin.

MR. LUBIN:  Good morning, your Honor.  Josh Lubin on behalf of myself personally, pro se, pending notice of appearance.

THE COURT:  Right.  But you can always appear on behalf of yourself if you no longer have counsel, which may be the case after today.  Yes?

MR. LUBIN:  Correct.

THE COURT:  Okay.  Good.

All right.  So I'd like to hear the motion to amend the complaint first.

Mr. Lubin, you're welcome to sit up front, make yourself comfortable, yeah.

All right.

MR. CRANE:  Your Honor, we filed a motion to amend the complaint.  The basis is we -- the relief is really couched in declaratory relief in the complaint itself, and we made it into a -- seeking actual affirmative relief --

THE COURT:  Right.

MR. CRANE:  -- under Florida statute 687.071.  This is a statutory remedy under Florida law. We think that there's no prejudice.  I'm going to address

Page 5

the futile argument that Mr. Leto makes in his response. This is not a contractual remedy. This is a statutory remedy.

Florida statute 687.071 states that usury is basically -- if it's an interest rate of over 25 percent, it makes it criminally usurious, unless otherwise specifically allowed by law. I think that's at the point in time when you would look at New York law, which is the choice of law provision in the underlying contract. If this Court finds that under New York law that the offending agreements are actually loans, then they are over 25 percent under New York law. They would actually be criminally usurious under New York law, therefore, not otherwise allowed by law. And, therefore, we have our statutory remedy under Florida law.

THE COURT: So this causes me to start with what I thought was a fairly basic question.

MR. CRANE: Mm-hmm.

THE COURT: So whenever the Court is attempting to determine, in a context such as this, what law applies --

MR. CRANE: Mm-hmm.

THE COURT: -- I have to first ask the question what choice of law applies, and given that we're a federal court sitting in Florida under the

Page 6

circumstances, the choice of law rules would be the Florida choice of law rules.  That's where we start.  You are starting with a Florida substantive law statute as a basis for your choice of law analysis.

Why would the Court be looking at a Florida substantive statute to determine a choice of law question?

MR. CRANE:  I'm going to give you my understanding, having done a lot of research on usury under Florida statute.

So Florida will respect a choice of law provision in another state --

THE COURT:  That selects a different state, yep.

MR. CRANE:  Right.

-- even when the statute would be -- or even when it would result in what would be, under Florida law, a usurious loan, they'll respect it.  So if this was Utah that doesn't recognize a usury, then I think at that point in time, Florida would look at Utah law, say it's not usurious, and there's nothing that anyone can do about it.

THE COURT:  Assuming the choice of law was enforceable under Florida's --

MR. CRANE:  Yeah.

THE COURT:  -- choice of law rules.

MR. CRANE:  Yep.

THE COURT:  Okay.

MR. CRANE:  So under -- the way that you get to determine whether or not there's a choice of law under Florida law is whether or not the parties agreed to a choice of law provision and whether there's reasonable nexus between one of the parties and the place where there's choice of law, the chosen choice of law.

The Florida statute, as I said, makes it clear that because it is a statutory remedy, not a contractual remedy, that the -- it is a -- if it's found to be a criminally usurious loan and it's not otherwise allowed by law, so, basically, it's not allowed here, it's not allowed in New York, we're entitled to our relief under Florida law.

THE COURT:  Now, there's a good deal of Florida case law on choice of law issues in the context of usury, but I've not seen this argument raised in any of the case law.

My concern is that the outcome of your argument is that no matter what even Florida choice of law might show, you're saying that this statute always applies in the context of usury that touches a Florida entity, without regard to choice of law analysis?

MR. CRANE:  Ah, no.  I'm going to say that if the choice of law in New York would make the

Page 8

contract --

THE COURT:  Okay.  You need to stop for a second.

MR. CRANE:  Yep.

THE COURT:  Why would I apply -- are you suggesting I would apply New York choice of law analysis?

MR. CRANE:  I'm -- I think that the way I understood Florida law to be, is that you first look at the choice of law that the parties chose in the contract.

THE COURT:  Okay.  Sorry.  I'm going to make sure we're talking about the same thing.

MR. CRANE:  Okay.  I'm sorry.

THE COURT:  The choice of law question is, simply the Court saying what substantive law applies.

MR. CRANE:  Okay.

THE COURT:  Okay.  So I thought you were telling me I should consider New York choice of law rule with regard to determine what law applies.

MR. CRANE:  No, I think you look at Florida laws.

THE COURT:  Well, yes, I know that, but I thought -- I misunderstood your argument.

MR. CRANE:  No, no, I misunderstood.  I apologize.

THE COURT:  Okay.  So I use Florida choice

Page 9

of law rules.

MR. CRANE:  Yes.

THE COURT:  But Florida choice of law rules would not start with a substantive law on usury.

MR. CRANE:  Correct.  I think it -- Florida choice of law provisions -- or choice of law first looks at the choice of law in the contract --

THE COURT:  Right --

MR. CRANE:  -- so --

THE COURT:  -- does it bear a normal relation to the transaction --

MR. CRANE:  Yes.

THE COURT:  -- and would it violate a public policy, a strong public policy, concerning Florida, are the two focuses.  I don't think it would violate a strong public policy concern in Florida.

MR. CRANE:  That is correct.

THE COURT:  Right.

And I'm focusing on -- this is a count you wish to add to the complaint which actually addresses two separate sets of parties.

MR. CRANE:  That's correct.

THE COURT:  One, Mr. Leto represents only the two defendants named Herbst and Hi Bar.

MR. CRANE:  That is correct.

Page 10

THE COURT:  Not Spin and Mr. Lubin.

MR. CRANE:  That is correct.

THE COURT:  And Hi Bar is domiciled in New York, according to the complaint.

MR. CRANE:  That is correct.

THE COURT:  So I'm trying to figure out how we end up looking at 68.071 (sic) for the choice of law analysis when it's not a -- it isn't something that I would -- let me put it this way.  I only start thinking about the substantive law of some state, New York, Florida in this case, if I've applied the appropriate choice of law rule yet to determine which state's law applies.  But it seems to me you're jumping ahead to the substantive law and telling me I must look at a Florida statute to determine what law applies.

MR. CRANE:  Well, the relief that I'm seeking is adding a count to a complaint.

THE COURT:  Yes, which is based solely on a substantive Florida provision.

So if I were to find that New York law applies, then why does 687.071 mean anything in this case?

MR. CRANE:  Even if you -- because at the time that you would apply New York law, New York law is going to say -- if you ultimately determine under New York that this is a loan, so just follow me with that for a

Page 11

second, under Add Bar's Bay (phonetic), and the other usury case law under New York, where they've actually found usury, the contract is void ab initio.  The choice of law provision is void ab initio, and so, therefore, you don't have a choice of law provision any longer looking at it.  And then -- therefore, then you would look at whether you chose to look at Florida or New York choice of law provisions and conflict of laws at that particular point, so --

THE COURT:  So I have to assume that the ruling will be one way and not the other.  I mean, the choice of law analysis actually takes this into account --

MR. CRANE:  Yes.

THE COURT:  -- in the context -- but not in the way you've presented it, in a different way entirely.

MR. CRANE:  Okay.

THE COURT:  If the parties to a contract --

MR. CRANE:  Mm-hmm.

THE COURT:  This is the restatement of contracts says it, there's a special section on usury, by the way, but there's case law on this.  If the parties to a contract -- and this applies outside of usury as well. If the parties to a contract chose a venue for purposes of law, not a venue place, but, you know, applicable law and that would make the contract void from the start --

MR. CRANE:  Yes.

THE COURT:  -- then they are presumed to prefer that the applicable law be something that allows the contract to not be unenforceable, and then the Court would chose the law of the state that might be applicable where it would be enforceable.

The problem is you've alleged here that it's unenforceable under the law of both New York and Florida, and there's no other potential law, and so that rule doesn't apply, according to the case law.  Which means I ignore the fact that the outcome might be that the contract is later determined to be completely void or unenforceable under whatever law I've decided applies, which means I don't think your argument actually works under choice of law analysis.

MR. CRANE:  Okay.

THE COURT:  I think that, likely, with regard to the two defendants -- three defendants that objected, the choice of law in the contract is binding.

MR. CRANE:  Now -- okay.  So then the --

THE COURT:  Meaning this new count could not apply to them.

MR. CRANE:  Okay.  So the way I had seen it is that because this is a substantive statutory remedy --

THE COURT:  Yes.

Page 13

MR. CRANE:  -- and not --

THE COURT:  It applies --

MR. CRANE:  -- a contractual remedy --

THE COURT:  -- it applies even if only New York law would apply --

MR. CRANE:  Yes.

THE COURT:  -- that's what you're -- no, that can't be.  A substantive provision of a state does not trump the state's choice of law analysis, unless the state's choice of law rule says that.  This isn't applicable to you, yet.

Okay.  Go head.

MR. CRANE:  Okay.  So then when looking at the conflict of laws under New York law, say, if were you to find --

THE COURT:  What do you mean by that?

MR. CRANE:  So if you were -- because there was another -- in one of the cases, there was an MCA case that was determined to be invalid under New York law, then the Court looked --

UNIDENTIFIED SPEAKER:  Haymount.

MR. CRANE:  Haymount, yes.

-- and then the Court looked at the conflicts of laws under New York law, then applied the state in which the borrower -- because the Court found it

Page 14

to be a loan, and then chose the remedy, center of gravity test, and Mr. Lubin is correct.

THE COURT:  Well, hold on.  That decision is by a court sitting in New York, so the center of gravity test is where that court starts --

MR. CRANE:  Okay.

THE COURT:  -- if the choice of law in the contract is not applicable.  In that particular case, the contract was fully enforceable under the other state's law.

Was it New Jersey or Pennsylvania?  I don't remember.

MR. CRANE:  It was -- I thought it was North Carolina.

THE COURT:  Okay.  Yes, it was.  Right, where they don't have usury laws.

MR. CRANE:  That's correct.

THE COURT:  Okay.  But that isn't our -- your own complaint says and your argument today says that the contract would be unenforceable in both applicable states --

MR. CRANE:  Yes.

THE COURT:  -- so the rule doesn't apply.

And, in fact, there's another decision which analyzes Haymount and reaches exactly that -- that

Page 15

particular Haymount case, there are many, and reaches exactly the opposite conclusion, because the alternative jurisdiction also would leave the contract unenforceable. But, again, I do not use the New York choice of law analysis, the rule for choice of law, because I'm not sitting in New York.  And that case was decided in New York.

MR. CRANE:  And so if we're looking at the Florida --

THE COURT:  Choice of law --

MR. CRANE:  -- conflict of laws.

THE COURT:  -- correct.

MR. CRANE:  Then Florida -- and Florida will look at first, where did the parties choose, and what's -- as long as there's a reasonable nexus and all of that --

THE COURT:  Right --

MR. CRANE:  -- okay.

THE COURT:  -- a normal relationship.

MR. CRANE:  A normal relationship.

But then New York, let's assume, you know, we'll just play this out, New York is the choice of law that the parties chose --

THE COURT:  Yes.

MR. CRANE:  -- it's illegal under New York law, let's assume -- assuming that that's ultimately what

the Court finds, and I'm not saying that you are, but let's assume for the moment --

THE COURT:  Okay.  But, see, this is the thing, I'm trying to figure -- I know there's a decision that did that --

MR. CRANE:  Yep.

THE COURT:  -- it's logically circular.

MR. CRANE:  Mm-hmm.

THE COURT:  Because what you're asking me to do is conclude that the outcome of the trial or summary judgment would be a particular way.  So the question under New York law, which is much broader than the three-part test --

MR. CRANE:  Yeah.

THE COURT:  -- much broader than all the factors that people point to in the contract, which in my view, in this and maybe some other cases, looks to extra-contractual circumstances in the case, this one does as well, and there's case law to support all of that, New York law permits an analysis of a whole bunch of things, and my determination today is whether it is New York substantive law, case law, and federal law interpreting New York law that gets applied at trial, not what happens if you win.

MR. CRANE:  Okay.  So then the way that --

Page 17

THE COURT:  Because if it's what happens if you win, you've just flipped the whole choice of law thing on its head, you know.  And I know there's one decision out there that says that, but I have a funny feeling it was outcome determinative.

MR. CRANE:  Okay.  Ah, let's see --

THE COURT:  But you have argued that -- you've made all the arguments under New York law as well.

MR. CRANE:  Yes.

Okay.  So then we would, if -- I mean, then we would ask the Court to allow us to amend to apply the New York law -- the --

THE COURT:  Well, this is a Florida law thing.  You want to add a count that's only Florida law.

MR. CRANE:  Right.

THE COURT:  So far I haven't heard from Spin or Mr. Lubin yet.  So far I've heard from Hi Bar and the two defendants Herbst, and they've argued against this particular amendment.  I'm trying to figure out how the Florida claim can apply to them based on what we've been discussing.

But let's go to -- what's your argument on Spin and Mr. Lubin?

What does the complaint say about their regular relationship to Florida?

MR. CRANE:  Let's see --

THE COURT:  And where's Spin, where is it Spin domiciled, according to the complaint?

MR. CRANE:  Ah --

THE COURT:  Jersey, I think.

MR. CRANE:  Yes.  So --

THE COURT:  Does the complaint have allegations -- some of your other complaints do --

MR. CRANE:  Yes.

THE COURT:  -- about other defendants, allegations about where the business was conducted for Spin, where the money came from for the Spin transaction?

MR. CRANE:  I believe that it does in this particular case, and if need be to supplement, because I know that the facts are that the debtor -- and what some of the case law looked at in terms of -- in making some of these decisions, New York -- whether or not the contract itself identifies the location of the defendant -- or, you know, the merchant cash advance company, here, obviously, you have a Florida borrower --

THE COURT:  Yes.

MR. CRANE:  -- Optimum Bank is where the defendants banked --

THE COURT:  Okay.  But you're doing a balancing analysis, akin to the New York analysis.

Page 19

What I'm asking you is, if I have a contract, which we do --

MR. CRANE:  Yeah.

THE COURT:  -- which chooses New York law as its law --

MR. CRANE:  Yes.

THE COURT:  -- and I'm applying Florida's choice of law analysis, which would say, "That's okay, you can do that," then my next question is, does the transaction have a normal relationship to New York under the Florida choice of law analysis?  Not where does the balance show that the law should be according to the New York analysis, which I do not use at all.

So I'm asking does the complaint have allegations which would tie the transaction with Spin, in particular, to New York such that under the Florida choice of law rule, it would be okay for the parties to have chosen New York and that would remain enforceable, or not?

Yes, I'll get you to, Mr. Lubin.  I promise.

MR. CRANE:  I believe that we did not raise an issue that there was a -- that there was a lack of reasonable relationship between the transaction and New York --

THE COURT:  Well, I'm not asking that.

What is in the complaint?

Page 20

MR. CRANE:  Oh --

THE COURT:  It's a New Jersey entity --

MR. CRANE:  Yes.

THE COURT:  -- but I don't think this complaint talks about -- for example, like the complaint against Go Fund Advance, which has all these details about how the transactions were set up, what entities were involved, and the money came from New York, that some other entities were added in Connecticut to facilitate potential collections, but really the deal is centered in New York, all the -- the bank account was in New York, from which the advances were funded, et cetera.  I don't think that's in this complaint, even as it's amended because the amendment is only at the end.

MR. CRANE:  Okay.  I -- honestly, I don't have the -- all the allegations in the third amended complaint memorized.

THE COURT:  Actually doesn't that mean it's possible that Spin does have a normal connection with New York, or it does not, and that it would be impossible to dismiss the complaint based on the argument that the choice of law should not apply?

Or, maybe put it another way, that perhaps it's appropriate to leave the amendment as to -- to remit the amendment as to Spin, and then have the issue raised

Page 21

at summary judgment?

MR. CRANE:  Yes, and that's what we would ask.

THE COURT:  Okay.  Understood.

All right.  Responses?

Shall I start -- let me start with Mr. Leto, because, Mr. Lubin, I would like you to have the benefit of hearing everybody's argument.  Okay?

And then there are still lawyers representing Spin and Mr. Lubin, and I am going to expect you to talk, and that is the reason why I've not heard the motions to withdraw yet.

All right.  Mr. Leto.

MR. LETO:  Thank you, your Honor.

And as we set forth in our motion, we're talking about a choice of law, and Florida uses the choice of law of the state in which it sits, which here we're in Florida.  So under Florida law, the contractual choice of law provision is presumptively enforceable, unless there's a showing that contravenes public policy or it's unjust or unreasonable.  Certainly the case law I think is legion that if you have a criminal usury statute in Florida, it's not a public policy to enforce it if another state does not have the same type of provision.

In addition to that, there have been no

Page 22

allegations at all that the contract itself, wherever the choice of law provision is, is unjust or unreasonable, which would take us outside of the enforceability of this particular provision.

Finally, we have to talk about the normal relation to the transaction, and as your Honor noted, the complaint expressly states that Hi Bar is a New York entity.  So certainly that is a normal transaction to a -- a normal relationship to this transaction, and we also cited the -- I think it was the -- I think it was the Zach Sack (phonetic) case, which is a Southern District of Florida case from 2007, which says that, "It is generally accepted that the place of one party's residence or incorporation may provide the normal relation to a transaction as contemplated in the choice of a usury law context or at least as a compelling factor in that determination."

So based upon the plain language of the complaint itself, it's our view that it would be a futile amendment, because we are clearly traveling under a New York choice of law provision.  And certainly if there are consequences to usury under New York law, your Honor can certainly apply that at the right time, assuming your Honor finds that this MCA was a loan, as opposed to a merchant cash advance.  But, again, I believe that the

Page 23

proper choice of law is New York based upon the parties' agreement, and for that reason an amendment including 687 would be futile at this time.

THE COURT:  Just a moment, everyone.

MR. LETO:  I'm sorry, your Honor?

THE COURT:  Just a moment.

All right.  Thank you.

Gentlemen, or either of you.

MR. CERENKO:  Marko Cerenko on behalf Spin Capital.

THE COURT:  Just so you know, I am going to let Mr. Lubin speak after you --

MR. CERENKO:  I would hope so.

THE COURT:  -- but I would like to know your views.

Yes.

MR. CERENKO:  Yes.

When Mr. Crane approached us to find out whether we objected to his motion for leave or not, we were directed to consent to the leave for the very reason that your Honor raised a bit earlier, which was that Spin could then move to either dismiss or at summary -- or based on summary judgment on that argument that Mr. Leto just raised.  So that was our position at the time that the motion for leave to file the third amended complaint

Page 24

was filed, your Honor.

THE COURT:  All right.  Thank you.

Mr. Leto, could you come over to the -- I mean, Mr. Lubin, excuse me, come over to the podium.

Sorry, too many names in my head.

All right.

MR. LUBIN:  All right.  Your Honor, I'm not sure where to start, with the usury?

THE COURT:  Okay.  I want you to focus on what is before me today, which is a request to -- this is not about the substance of the underlying claims except to a limited extent.  It's a request to add one count to the complaint, specifically under Florida usury law.

They are not asking me to rule on that today.  The only question is whether the complaint can be amended.  That's my only question today.

MR. LUBIN:  Okay.  I think, your Honor, it would definitely be beneficial for me for the complaint to be amended --

THE COURT:  You want it to be amended?

MR. LUBIN:  -- so I can file a motion to dismiss based on -- there's a ton of reasons, like, there's a general obligations law in New York where -- first of all the Haymount decision --

THE COURT:  Okay --

MR. LUBIN: Yeah.

THE COURT: -- what does that have to do with the request to amend to add a Florida statutory cause of action against Spin and you personally?

MR. LUBIN: That's not an area I'm familiar with, but I know it's beneficial if it could be amended for Spin.

THE COURT: All right. I'm not sure it's beneficial, necessarily, because if it's not amended to add that count, you don't need to move to dismiss it.

Do you see what I'm saying?

MR. LUBIN: If it's not amended -- but then I can't file a motion to dismiss.

THE COURT: I see what you're saying, because there's already been a response in the case.

MR. LUBIN: And my lawyers failed to -- to file summary judgment.

THE COURT: Okay. You don't get to file a motion to dismiss for things that have not been changed. You can only dismiss the new count, and so the only motion to dismiss that you would be able to pursue, if the complaint is amended, is a motion to dismiss this last new count. You don't get a new chance --

MR. LUBIN: Ah.

THE COURT: -- to respond to everything in

Page 26

the complaint.

MR. LUBIN:  Would it give me a chance to file summary judgment?

THE COURT:  Absolutely.  Yeah, there's no -- the deadline has not passed, has it?

MR. LUBIN:  It has.

THE COURT:  The deadline for summary judgment passed.

Did it?

MR. CRANE:  I believe so.  The Court has under consideration motions for summary judgment -- cross- motions for summary judgment.

THE COURT:  I understand that.

Have they been -- are we done?

(No audible response.)

THE COURT:  Okay.  I don't know what that answer is.  Someone --

MR. LUBIN:  It has passed which is an issue --

THE COURT:  It has passed?

MR. LUBIN:  And I've been trying to instruct my lawyers -- I can send them the case law, and I --

THE COURT:  Yeah, yeah.  We're not going there.

MR. LUBIN:  Yeah.

Page 27

THE COURT:  So you're hoping to now get to file a new motion for summary judgment on all the things that have already been pending in the case?

MR. LUBIN:  Correct.

THE COURT:  Okay.  That's not going to happen.

MR. LUBIN:  It's going to go to trial.

THE COURT:  Sure.  Unless I grant summary judgment in your favor on the cross-motions that now exist.  Who filed -- I don't even know who filed --

MR. LUBIN:  Whose summary judgment?

THE COURT:  Hold on.

Who filed cross-motions for summary -- I don't know what they are at this point.

Are they fully briefed?

MR. CRANE:  Well, that's going to be --

UNIDENTIFIED SPEAKER:  They're not --

THE COURT:  They're not fully briefed, right, because there's a deadline coming up.  Understood.

Yes.  Go ahead.

MR. CRANE:  So both procedurally Hi Bar has filed its motion for summary judgment.  There was a joinder by Spin.  Then we had filed one summary judgment motion against Hi Bar, one summary judgment against --

THE COURT:  And I said you can't do that.

Page 28

MR. CRANE:  You said we can't do that.  So we filed, within the timeframe given --

THE COURT:  Yep --

MR. CRANE:  -- an omnibus motion --

THE COURT:  -- now I remember.

MR. CRANE:  -- for summary judgment.  They have different deadlines associated with them, but that's --

THE COURT:  Right.

MR. CRANE:  -- the procedural posture --

THE COURT:  Okay.

MR. CRANE:  -- of them.

THE COURT:  So there is a cross-motion?

MR. CRANE:  Yes.  I mean, it -- it's technically not cross-motion, but --

THE COURT:  I get it --

MR. CRANE:  -- it's effectively a cross-motion.

THE COURT:  -- I get it, yeah.  Simultaneous motions.

MR. CRANE:  Yes.

MR. LUBIN:  By the A-teams, right?

THE COURT:  Hold on.

Okay.  Right.  But I'm not going to have a new set of summary judgment motions in the case.  If

Page 29

that's what you think you get if I let the complaint be amended, that's not happening.  You'll be focusing on this one count that's been added.

MR. LUBIN:  What about --

THE COURT:  And I'll let you file a summary judgment motion on that.

MR. LUBIN:  What about a cross-motion --

THE COURT:  No --

MR. LUBIN:  -- (inaudible.)

THE COURT:  -- I'm telling you -- I'm telling you exactly what I will permit.  The new count could be subject to an answer or a motion to dismiss, and the new count can be subject to an additional summary judgment motion.  That's it.  You don't start all over again.

MR. LUBIN:  Take the new count, take all of that out of the picture, I have an option to file a cross-motion for summary judgment --

THE COURT:  Apparently not, the deadline --

MR. LUBIN:  -- by February 18th.

THE COURT:  -- has passed.

Oh, really?  I thought it was just a response.

MR. LUBIN:  But the thing is, I can't do --

THE COURT:  Stop.  When I'm speaking you

Page 30

should not talk.

MR. LUBIN:  All right.

THE COURT:  There's a deadline on the 18th.

Is that a response deadline?

I'll open my own order.

Mr. Leto is saying yes.

MR. LETO:  It is, your Honor.

THE COURT:  All right.  Okay.  The response is not an opportunity for a cross-motion.  It is an opportunity for a response to the pending motion, saying why it should not be granted.

I'm just -- I know you're about to ask me another question, but that's what it is.

MR. LUBIN:  Okay.  So --

THE COURT:  If you didn't file a motion to begin with, you don't have an extended right to do it now.

MR. LUBIN:  Okay.  So I'll have to do it at trial.  It is what it is.

THE COURT:  Right.

So right now the only question I have is should the complaint be amended to add this one count?

The count is under Florida usury law, which means that the choice of law provision in the contract, as it regards Spin, would not be enforceable.  That's the argument that they are making.

Page 31

MR. LUBIN:  I don't know that.  Your Honor is saying it's not beneficial for me to --

THE COURT:  Well, I think it's a bad word to use in this context.

Now, your counsel has told me that the agreement was, let the complaint be amended, and then you can file a motion for summary judgment, but only on that count.

I assume that's what you meant, Mr. Cerenko?

MR. CERENKO:  It is, your Honor.

THE COURT:  Yes.

And you can.  Sure.

MR. LUBIN:  But even on that count, let's say I get a ruling that the choice of law is New York, which is very clearcut, it's going to be New York, you have a general obligations law to return $50,000 --

THE COURT:  Okay.  So you know, what you just said makes no sense legally.  I just need to let you know.  Just because there is a statute under New York does not mean New York law applies.  I just want to make that clear.  That statute is not a choice of law provision.  It is a --

MR. LUBIN:  The Florida choice of law provision, New York law is going be applying over here.

THE COURT:  Well, that is only if a whole

Page 32

bunch things come first.  There's a contractual provision, sure.  It's enforceable, so long as it does not violate an important provision of the public policy -- it does not -- and so long as the transaction bears a normal relationship with New York.  And that is going to be one of my questions, because Spin is not a New York entity, and there's nothing in the complaint to lead me to believe that Spin has a normal relationship, this transaction, has a normal relationship to New York.

MR. LUBIN:  It's not in the complaint but --

THE COURT:  You can file a summary judgment motion.

MR. LUBIN:  -- Spin is registered to do business in New York.  Spin --

THE COURT:  That's not enough.

MR. LUBIN:  Yeah.

THE COURT:  You can register your business all over the country.

MR. LUBIN:  I'm saying actual physical office is in New York.

THE COURT:  Great.  Then you can address that in the summary judgment motion, but only on the new count.  Understood?

MR. LUBIN:  I guess so.  It's too complex for me, but, yeah, I didn't fully understand the

Page 33

situation.  Yeah, I guess so.

THE COURT:  Okay.  Good.

Anything else you want me to know?

MR. LUBIN:  About amending the complaint?
No.

THE COURT:  Yes.

Okay.  Anyone else wish to be heard?

Yes, Mr. Crane.

MR. CRANE:  I just want to -- if you don't
mind --

THE COURT:  You can give up the podium,
Mr. Lubin.

MR. LUBIN:  Sorry.

THE COURT:  Thank you.

MR. CRANE:  Thanks.

I just wanted to make sure that my argument
was clear, and -- is that our position is that the -- that
there's obviously a substantive Florida law that we
believe does apply to the situation.

THE COURT:  Even if there's a contract with
a New York choice of law and even if Florida conflict of
law's analysis would enforce that provision, in spite of
that the Florida usury statute will apply here?

MR. CRANE:  Yes.

THE COURT:  Okay.

Page 34

MR. CRANE:  Because it is a statutory provision of -- and the transaction -- so --

THE COURT:  So the statute provision --

MR. CRANE:  Florida statutory --

THE COURT:  -- trumps what would otherwise be the choice of law analysis?

MR. CRANE:  I think they work in harmony with one another.

THE COURT:  Well, it isn't harmony.  You're saying that the statutory provision wins.

MR. CRANE:  Let me explain what I mean by harmony with one another, if you don't mind --

THE COURT:  Sure, yeah.

MR. CRANE:  -- so that I can -- so that I can --

THE COURT:  I've been studying this, by the way, in connection with another pending matter that you filed --

MR. CRANE:  (Laughter.)

THE COURT:  -- so, yeah.

MR. CRANE:  Okay.  So then the way that I'm -- this is a criminal -- you know, this statute makes it a criminal act --

THE COURT:  Mm-hmm --

MR. CRANE:  -- for --

THE COURT:  -- but this is not a criminal enforcement.

MR. CRANE:  This is not a criminal enforcement --

THE COURT:  Yep.

MR. CRANE:  -- but it is the same statute, it's a criminal statute that provides a civil remedy, and we're, obviously, only seeking the civil remedy.  But it is a criminal act that occurred in Florida, because the Florida -- Florida is the borrower; Florida is where the collection activity took place; Florida is where the banking of both -- both -- and if not all parties were taking place in Florida.  Florida -- the debtor was certainly banking in Florida, the --

THE COURT:  You might be going beyond the complaint right now.

MR. CRANE:  And if we need to amend further to show that -- to put that in, then we will.

But the way that the -- the Florida substantive statute plays with the choice of law provisions is that it states that if the statute -- if the interest being charged is "otherwise allowed by law" that needs to have some sort of meaning to it, and I find very few cases or really no cases really interpreting it that way, or at all, that if Florida -- if it is allowed under

Florida law, because Florida will respect the Florida choice of law provision, then -- and it's now -- and let's assume it's a valid loan charging usurious, but not criminally usurious, interest or not even usurious interest in the state that the parties have chosen, then it is otherwise allowed by law.  And so, therefore, that criminal statute that provides of civil remedy has -- interplays with the contractual interpretation -- or the contractual conflict of laws under Florida law and the respect of a -- of Florida law with respect to choice of law provisions, but --

THE COURT:  Have you found -- I got that. I've given a lot of thought to this, because it comes up in the Go Fund Advance case --

MR. CRANE:  Yes.

THE COURT:  -- so I've pretty much read every case I can find.

So have you found case law that analyzes the choice of law issue in the context of a contract that chooses law of another state that applies the Florida statute in the way -- as a choice of law analysis, because you're saying it doesn't supplant it, but it really does. Because you're saying that this statute becomes part of Florida's choice of law rule, that the legislature in Florida intended by this statute to modify the choice of

Page 37

law analysis that other courts have undertaken in Florida in the usury context.

MR. CRANE:  What I did find was -- and it's not exactly what you're looking for, but it was a federal court case where the court found -- where the parties actually did choose Florida, there was a reasonable nexus -- or the relationship --

THE COURT:  Yep.

MR. CRANE:  -- with Florida, if the parties had chosen one of the states to it, then the contract would have been valid, but they didn't.  They chose a state that made it invalid.  And so, therefore, the Court said, "You've chosen Florida," this is, you know -- and so it found it to be a criminal usurious loan --

THE COURT:  And so the court, even though there was another potentially applicable law which would have left the contract facially valid --

MR. CRANE:  Correct.

THE COURT:  -- the court said, "I will still apply Florida law," which actually flies in the face of the restatement provisions and case law that interprets that, where, if you have more than one choice, that you don't send it to the place that makes it invalid, you use the law of the place that allows the transaction to be valid.

The problem here is that we don't fall into that, because it's not valid in either state, so it wouldn't matter, if you're right.

MR. CRANE:  Correct.  But, you know, when looking at that -- looking at that case, you know, again, it's what's the effect of the otherwise -- unless otherwise allowed by law.

THE COURT:  There's a decision that actually analyzes that phrase?

MR. CRANE:  No, no, no, I'm telling you there's not.  I haven't been able to find one.  That was as close as I came to it.  I wish I could find one.  It would have helped me out one way or the other.

THE COURT:  The result would be that unless you can tie a transaction to some other state and the transaction is always valid in that other state, even if it's a loan in this case, we'll use the facts of this case, that what you're saying is Florida's usury statute always applies.  So unless you can -- and I don't think there's any case law that suggests that this statute that you're citing is intended to be a modification of the choice of law rules that would otherwise apply what, for example, Mr. Leto argued.

MR. CRANE:  Well, again, that's where I go back to -- so something that the Court said --

Page 39

THE COURT:  If you're right, I would like it.  I just don't think that you are.

(Laughter.)  It would make a lot of things easier, including four pending dispositive motions I have right now.

MR. CRANE:  I'm doing my best to try to convince you.  Now the --

THE COURT:  You're not going to convince me.  I've spent -- one of these motions have been ripe since early December, I think, and I've been studying it for weeks.

MR. CRANE:  So I think that there's a difference between the conflict of laws and the choice of laws --

THE COURT:  Same thing.

MR. CRANE:  Well --

THE COURT:  It's just phrased -- two different phrases used to describe the same thing.  The court -- you know, we have a claim here which starts in federal law, but relies on an underlying state law --

MR. CRANE:  Correct.

THE COURT:  -- concept.  I have to decide which state law is the right law, as do you as the plaintiff's counsel --

MR. CRANE:  Correct.

Page 40

THE COURT:  -- right.  And so I have to start with choice of law analysis.

MR. CRANE:  Well, so there's choice of law and there's conflict of law.  So if you look at the choice of law provisions --

THE COURT:  Oh, you mean the contractual provisions?

MR. CRANE:  Yes.  So if you look --

THE COURT:  Okay.  Go ahead.

MR. CRANE:  -- so the question is if a -- if parties choose a contractual provision that, again, has the relationship, but makes it illegal, then the parties are stuck with that, even though they could have chosen a different -- they could have chosen a different route.  But because Florida is very strong about enforcing the choice of law provision that the parties contractually obligated, then the parties are stuck with what they chose.  You only get to the conflict of law --

THE COURT:  Yeah, I get it --

MR. CRANE:  -- under Florida law --

THE COURT:  -- I understand --

MR. CRANE:  -- if there's --

THE COURT:  -- I misunderstood --

MR. CRANE:  -- no choice --

THE COURT:  -- what you were saying.

Page 41

MR. CRANE:  -- of law provision.

THE COURT:  Right.  I get it.  I get it.

MR. CRANE:  And so at that point in time, we're only dealing with a choice of law provision in a contract where, assuming that we're right on the underlying issues, then it makes it illegal, and, again, the -- again, because I -- you have to look at this, I think, as a civil remedy of a criminal statute that's separate and apart from the contract itself, that the crime that took place that provides a civil remedy took place in Florida, Florida has -- the Florida legislature has the ability to legislate and to punish those types -- either criminally or civilly crimes that have occurred --

THE COURT:  True --

MR. CRANE:  -- in Florida.

THE COURT:  -- I like this as a theory.  I like it as a theory.  But it flies in the face of the Florida case law that says that Florida does not have such a strong feeling about usury that you cannot choose the law of another state by contract.

How do you deal with that?

MR. CRANE:  Because in every single one of those, the choice of law -- except for the one I told you about on the federal law, every single one of those, where there was a choice of law provision used, it found the

Page 42

contract to be a valid -- so in each one of those cases, when the parties chose a choice of law, they chose a place where it made it valid.

THE COURT:  Okay.  Is that part of the Court's analysis?

Because usually the Court's analysis is, does that other law have a normal relationship to the transaction?  That's it.

MR. CRANE:  Because it's -- because they never had to get to the second part, because --

THE COURT:  Right, because they're not ruling on it.

MR. CRANE:  -- there was never --

THE COURT:  Well, there are several decisions that rule on, what I would call, the restatement analysis.

MR. CRANE:  But always when -- but they never get to the part that I'm getting to, because in each one of those cases, the choice of law or where they've chosen, when there is no choice of law, the conflict of law, there was a -- the other state, the foreign state, made it legal, so they never had to get to --

THE COURT:  Not in every instance.  There's one where it was illegal in both states.

MR. CRANE:  Then I'm not aware of that --

Page 43

THE COURT: And that's how the rule works. That's how the analysis works. If the selection of applicable law would make the contract not enforceable --

MR. CRANE: Mm-hmm.

THE COURT: By the way, the case law in this usually means facially unenforceable without the need for additional evidence. But, anyway, makes it unenforceable and another applicable law would leave it enforceable, then you choose the other applicable law, because the idea is the parties intended to have a valid contract.

But there is at least one decision where it was -- the contract would be facially unenforceable under the law of both states that were potentially applicable, and then the Court stuck with the original state that was designated in the contract, which is what the restatement says, by the way.

My problem is you're looking to a substantive statute.

MR. CRANE: Yeah, because I think that, again, I go back to Florida, this is a Florida --

THE COURT: What do you gain, by the way? It's the remedy?

MR. CRANE: It's the remedy.

THE COURT: Yeah, okay. Right. I -- this will make a great appeal.

Page 44

MR. CRANE: (Laughter.)

THE COURT: I don't think you'll win, but it will make a great appeal. But I'm not going to go that way.

MR. CRANE: Okay.

THE COURT: Anything else on that?

MR. CRANE: No. No, your Honor. But I appreciate you allowing me to --

THE COURT: Sure --

MR. CRANE: -- make the argument.

THE COURT: -- I get it. I understand why you're saying that, and I think the most useful distinction you make is, this is criminal-like. It's not the criminal component.

The problem is all the Florida case law in this context says that the analysis is, does it bear normal relation? They're not saying, "We're going to ignore that analysis, because this is a really important statute for Florida." In fact, the case law says the opposite. The case law says Florida does not have a strong public policy to defend its criminal usury provisions.

You can take something which would be harmful to a Florida borrower and choose the law of Nevada, which has no usury, if, you know, they've opened a

Page 45

post office box in Nevada -- that's kind of extreme --
but, you know, so if that's the case, then I don't think
Florida case law is supporting your argument.

See what I'm saying?

MR. CRANE:  I do.

THE COURT:  But you don't have to respond,
because you can do it in the appeal.

All right.  Let me address what I have
before me.  Oh, let me just go back.

So it seems like nobody is challenging the
amendment, but only with regard to Spin and Mr. Lubin,
because we don't have full -- we don't have enough
allegations for me to rule on the other issue at this
point.  It could be that at summary judgment that Spin
will be successful, because they'll show me there's no
normal relationship with New York.  Right?

MR. CRANE:  Correct.

THE COURT:  Okay.  All right.  Let me
address -- why don't you have a seat.

I have some notes.  This might take me a
couple moments.

All right.  I'm ruling on, in this instance,
a motion to amend, which is in the docket at ECF 198, and
I've taken into account the response at 216, some
arguments that I heard today.

Page 46

Under Florida law a contractual choice of law provision is presumptively enforceable, as Mr. Leto argued, and you can find a good discussion of that in the Eleventh Circuit's 2018 decision Viridis Corp., V-I-R-I-D-I-S, Corp. against TCA Global Credit Master Fund, L.P., that's reported at 721 Federal Appendix 865. There's discussion at page 873, and there's a number of decisions cited.  I think one of you cited them.

To overcome this presumption, a party must show that a choice of law provision contravenes the strong public policy of Florida.  The Florida Supreme Court addressed this analysis in its 2000 decision, Mazzoni Farms against DuPont De Nemours and Company, which is reported at 761 So.2d 306 at page 311.  Florida, particularly in a commercial setting, does not have a strong public policy against choosing another jurisdiction's law sufficiently connected with the contract.  I point you to the Florida Supreme Court's 1981 decision.  I think it's Continental Mortgage Investors against Sailboat Key.  In any case it's reported at 395 So.2d 507, and the discussion is at page 509.  Quote, "Florida courts will recognize a choice of law provision provided by the parties, so long as the jurisdiction chosen in the contract has a normal relationship with the transaction," end quote.  That's a quote from page 508 of

the same case.

Here the parties chose New York law in their agreement.  Let me be clear, there's actually two sets of agreements, because we have the Spin transactions addressed, and we also have the Hi Bar transactions addressed in this particular complaint.  Nevertheless, in the count sought to be added to the complaint, the plaintiff would rely on Florida statutory law, a substantive provision of Florida law with regard to criminal usury.

The plaintiff argues that the text of Florida's criminal usury statute, that's Section 687.071 subsection (2) requires the conclusion that Florida law applies in this instance or with regard to those defendants.  That provision begins with the language, "Unless otherwise specifically allowed by law," end quote, quote, unquote, and, thereafter, sets out the parameters for criminal usury under Florida law.  The plaintiff argues that the MCA transactions are criminally usurious loans under the only other potentially applicable law, meaning New York, and so these transactions are not otherwise specifically allowed by law, as that phrase is used in the Florida criminal usury statute.  So the plaintiff concludes that by its terms, the Florida criminal usury statute applies.

Page 48

But this is putting the cart before the horse. Florida's criminal usury statute is a substantive provision of Florida law, not a choice of law provision. This Court would look to Florida's criminal usury statute only if the Court first determines that Florida law applies, and it does not, at least with regard to Hi Bar and the two defendants named Herbst, consistent with the allegations in this particular complaint as it currently sits and as the plaintiff would seek to amend it.

As a federal court sitting in Florida, this Court applies Florida's choice of law rules. Under Florida's choice of law rules, the provision of the MCA agreement with Hi Bar, which selects New York law, is presumptively valid. It's actually presumptively valid in both sets of agreements. No public policy in Florida prevents application of the contractual choice of law in this case. In light of Hi Bar's domicile in New York, New York has a normal relationship with the transaction involving Hi Bar and the two defendants named Herbst.

The analysis is different with regard to Spin, because I cannot tell at this stage that Spin does not have a normal relationship with the transaction in Florida -- excuse me, that New York does not have a normal relationship with the Spin transaction, and that's why the ruling will be different with regard to Spin, at least at

this stage of the litigation.

I want to go back to part of the argument that Mr. Crane made and just make clear where I'm getting my -- part of my analysis from.  Although the Court can decline to enforce a choice of law provision where the selected law would result in the contract being void or unenforceable and the contract would remain enforceable under other potentially applicable law, that's not the case here.  If the plaintiff is correct, the MCA transaction, particularly with Hi Bar, would be unenforceable under both Florida and New York law.  And, in fact, the same allegations are made with regard to the Spin transaction.  And so, essentially, the avoidance provision or the savings provision that the restatement of contracts addresses would not be applicable in this instance, because based on the allegations, the contract would be invalid in both places.

There was a little -- I don't think the words "center of gravity" were actually mentioned during today's hearing, although I thought that part of the argument was aimed at New York's choice of law analysis.  In case it was, the center of gravity test doesn't apply at all in this instance, has no bearing on this case in any regard.  This Court does not apply the choice of law analysis used in New York.  We use the Florida one.  And

Page 50

so that analysis never comes into play.

Based on the allegations in the complaint, the parties selection of New York law is binding with regard to the objecting parties, Hi Bar and the two defendants Herbst. So the Court will apply New York substantive law with regard to those defendants, and so the plaintiff cannot add this last count to the complaint, the proposed amendment, under Florida statutory law with regard to those entities. That amendment would be futile. I think the argument is correct.

And so the motion is denied to the extent that it seeks to amend the complaint to add this last count with regard to Hi Bar and the two defendant named Herbst.

However, with regard to Spin and Mr. Lubin, the motion is granted. You may amend the complaint to add the last -- the new last count with regard to them, because at this stage of the proceedings, the complaint does not make allegations which would cause the Court to conclude that the choice of law provision of New York is invalid with regard to -- excuse me, valid or invalid with regard to those two entities. It's still possible, based on the allegations in the complaint, as it would be amended, that Florida law could apply to Spin and Mr. Lubin, and they can address that issue at summary

Page 51

judgment.

To be clear after the complaint is amended, I will set a new summary judgment deadline only with regard to -- excuse me, a new summary judgment and response deadline, the response deadline should be obvious, it's provided by rule, with regard to the amendment and only the amendment, the amended component of the complaint.  And I'll address that by independent order, just so it is clear, because Mr. Lubin is likely not to be represented after the end of this hearing.

Did I miss anything?

MR. LUBIN:  Yes, your Honor.

THE COURT:  Yes, Mr. Lubin.  If you could come over here.

MR. LUBIN:  Okay.  First of all, this -- without taking the choice of law for Florida, this -- all this stuff has been addressed already in New York, with Mr. Crane, I believe, noticing in to the case, EXCELL Auto filed a third-party complaint against Spin --

THE COURT:  Okay.  So can you raise this in the summary judgment motion with regard to only this count?

MR. LUBIN:  Yeah, I mean -- yes, it can --

THE COURT:  The only thing I'm addressing --

MR. LUBIN:  -- get raised, but it should

Page 52

have been raised a few months ago.  I can raise it at trial too --

THE COURT:  Great.

MR. LUBIN:  -- it's just a waste.  It's costing extra money.  It's costing the Court money.  It's costing me money.

THE COURT:  It's not costing me anything.

We're not going to reopen two additional motions for summary judgment in the case.  This is only about whether the complaint can be amended at this stage.

MR. LUBIN:  All right.  So I'll --

THE COURT:  You've not lost any of your substantive arguments, unless I've already ruled on them.

Do you understand?

MR. LUBIN:  No, I get it.  I can raise it at trial.

THE COURT:  Assuming I haven't already ruled on it before trial, yes.  There are pending motions for summary judgment.

MR. LUBIN:  Okay.

THE COURT:  Okay.  Understood.

Anything else?

(No audible response.)

THE COURT:  All right.  Can you tender an order that reflects?

Page 53

MR. CRANE:  Yes.

THE COURT:  Thank you.

All right.  Let's hear the motions to withdraw.

Mr. Egozi.

MR. EGOZI:  May it please the Court, Bernard Egozi on behalf of Spin Capital and Josh Lubin.

THE COURT:  Yes.

MR. EGOZI:  My office filed a motion to withdraw as counsel.

THE COURT:  It was interesting, because it's signed by someone that's not you.  It has your name under it, but then it has a signature of someone else.

Whose login was used to file that?

MR. EGOZI:  It would have been a lawyer by the name Avi Shohan (phonetic) in my office.  I've been in trial for the last month, so --

THE COURT:  Well, that's fine.

But why didn't he put his own name underneath the -- it's as though he signed his name on behalf of you.  It's very strange.

MR. EGOZI:  I have no idea, your Honor. I've been in a three-week trial, and I asked my office to file it.

THE COURT:  Well, great, I love three-week

Page 54

trials.  That might be my favorite thing.

All right.  But tell me about your history in this case and why you're withdrawing.

MR. EGOZI:  Ah, yeah, so I was retained by Mr. Lubin to represent him in a state court action pending before Judge Tutor, which I had represented him in that case.  In addition to that, he asked me to serve as local counsel for Jacob Nemon and Shaina Kaminski, who both -- I moved them both in pro hac vice --

THE COURT:  Right.

MR. EGOZI:  -- who were the bankruptcy counsel in this case.  I --

THE COURT:  In the adversary?

MR. EGOZI:  Correct, I --

THE COURT:  Yes, Ms. Kaminski.

MR. EGOZI:  Yes.  I moved both Ms. Kaminski, as well as Mr. Nemon, in.  Your Honor granted those motions.

THE COURT:  And then they withdrew.

MR. EGOZI:  That is correct.

THE COURT:  Leaving you in the case.

MR. EGOZI:  That is correct.

Mr. Lubin asked me to stay in, to keep helping him, and that he was retaining new counsel.  He then retained Mr. -- sorry, he then retained Saul Ewing,

Page 55

Carmen -- I forget her last name.

THE COURT:  Contreras-Martinez.

MR. EGOZI:  Yes.

-- came in to represent him.  He asked me again just to help out, if I could gather documents for them and to stay in just helping in that regard.

THE COURT:  Then they withdrew.

MR. EGOZI:  They withdrew.

THE COURT:  And we're back to you.

MR. EGOZI:  And then Mr. Cerenko --

THE COURT:  In December.

MR. EGOZI:  -- was -- that is correct.

THE COURT:  Okay.  And so what personal involvement have you had in filing things, et cetera, in this case?

MR. EGOZI:  None whatsoever, other than to help Ms. Kaminski and Mr. Nemon make filings.  Mr. Nemon filed a motion to dismiss.  I helped him edit that document to insure that it complied with the local rules.

THE COURT:  And the reason behind your withdrawal is?

MR. EGOZI:  I would not disclose that, because I have an attorney/client privilege with Mr. Lubin, but I can -- I have irreconcilable differences.

THE COURT:  Okay.  And anything else?

Page 56

MR. EGOZI:  He has not listened to my instruction with respect to this case or the state court matter.

THE COURT:  Fee issues or not?

MR. EGOZI:  Excuse me?

Yes, your Honor, those as well.

THE COURT:  Fee issues as well.

All right.  Understood.

Mr. Lubin, is it useful for me to take these one at a time, or do you want to hear both first?

MR. LUBIN:  Let's do one at a time.

THE COURT:  All right.  Anything else?

MR. EGOZI:  No, your Honor.

THE COURT:  Thank you.

All right.  If you could come over here.

MR. LUBIN:  This --

THE COURT:  Could you please go to the podium.  Thank you.

MR. LUBIN:  I don't -- your Honor, I don't want to get too aggressive, so I'm going to try and stay --

THE COURT:  That's a good idea, but let me just --

MR. LUBIN:  Yeah.

THE COURT:  -- give you a little bit of -- I

Page 57

was going to say "warning," but I don't want it to sound prohibitive.

You should be very careful about what you say.  It is okay if you want to reveal certain things about what's happened in the representation with Mr. Egozi.  If you do, he gets to respond, and I will let him do that.

And I want you to understand if you reveal something about, for example, your strategy or information which is privileged, that topic, the topic, not just the one thing that you say, is no longer privileged in your case.  You can be deposed about it.  Your former lawyers can be deposed about it.  So you have to be very careful about what you address during the hearing.

Do you understand what I'm saying?

MR. LUBIN:  Yes, your Honor.  I personally believe -- I might be dilutional about it --

THE COURT:  (Laughter.)

MR. LUBIN:  -- but I personally believe that --

THE COURT:  I get it.

MR. LUBIN:  -- that waiving all my attorney/client privilege --

THE COURT:  No.

MR. LUBIN:  -- would not be an issue, but

Page 58

we're not going to get into that right now.

THE COURT: Okay. Yeah, we're not doing that.

MR. LUBIN: Okay.

THE COURT: But I just want you to be very clear that it can be very unhelpful to you to open up your former lawyers to being deposed about everything that has happened in your communications, every -- if you send an email, any email that you sent, any text message that you sent, any memos they took from a phone conversation, anything they remember about your communications with them, including timing, everything. Once you open up a topic, it is open. Okay?

MR. LUBIN: I understand that.

THE COURT: I made my point?

MR. LUBIN: Yes, your Honor.

Could I --

THE COURT: Go ahead.

MR. LUBIN: I put a list of, like, 21 questions that -- or maybe I should show your Honor first before --

THE COURT: No, I want you to tell me -- remember, what you're asking me to do is tell a lawyer that they must continue to represent a party where they say there are irreconcilable differences, which usually

means that they've been placed in a position where -- let me explain -- where either they believe that they would be forced to breach the rules of ethics or come very close to that, or there would be significant harm to their reputation with the Court and before the bar in general. And also he says that there are fee payment -- non-payment issues, okay.

MR. LUBIN:  Okay.

THE COURT:  So I have, in more than 16 years, never required a nondebtor's lawyer to stay in a case who made either of those suggestions, okay --

MR. LUBIN:  (Inaudible.)

THE COURT:  -- so you're going to have to explain to me --

MR. LUBIN:  (Inaudible.)

THE COURT:  -- why this is the exception. Okay?

MR. LUBIN:  Firstly, your Honor, I don't think it's coincidence that Mr. Egozi's -- or I think you mentioned about somebody signing his withdrawal motion.

THE COURT:  Okay.  Let's not focus on that.

MR. LUBIN:  Yeah.  Nothing has been a coincidence in this case, but there's no irreconcilable differences over here.

My attorneys have been ignoring and sending

Page 60

CYA emails purportedly to be setting up a phone call, which would never happened.  The phone records would show that that I tried to make that phone call happen.  And --

THE COURT:  So there's bad communication in your view.

MR. LUBIN:  I'm talking -- the attorneys haven't communicated with me.  They are required to advise me with a plan and communicate and especially someone that learnt a little bit about law over the last three, four, years living this --

THE COURT:  Right.

I mean, did you draft the response that you filed yourself?

MR. LUBIN:  I -- I -- I'm dyslexic, but I worked with a paralegal to do it, yeah.

THE COURT:  Okay.  That's very dangerous --

MR. LUBIN:  Well --

THE COURT:  -- but it's very nicely written. There's a couple of legal problems in it, but it's nicely written.

All right.  So tell me this is -- you have a lawyer who you have difficulty working with, but you'd like to force them to continue to represent Spin, but not you personally --

MR. LUBIN:  Correct --

THE COURT:  -- yes?

MR. LUBIN:  -- because I want my -- first of all, I want to represent myself personally.  I want my --

THE COURT:  Okay.  You can obviously do that.

MR. LUBIN:  Right.  I want to have my signature on -- I mean, potentially there would have to be two motions, but it would be great if the lawyers can work with me.  I get it if there's something complex going on behind the scenes, but, like, just if the request -- if they could just work with me to move the cases forward, like --

THE COURT:  And this is to represent Spin.

MR. LUBIN:  To represent Spin, and I'll represent myself.  I can draft common interest agreements between Spin and me personally and agree to keep it confidential.

THE COURT:  Okay.  Let's get back to the irreconcilable differences and fee payment concerns.

MR. LUBIN:  Yeah.  So with Bernie, he hasn't sent me a bill in, I believe, over a year on this case, so -- and he's been in the case for, I think -- Bernie -- I'm not sure what the date was that he was engaged.

There's a lot of moving -- I'm sure your Honor is aware there's lot of moving parts.  There's a lot

Page 62

of related cases throughout the country. He hasn't sent me a bill in -- yeah, so regarding fee payment, if you're not requiring me to pay a fee, then I'm, like, how is there an issue with fees?

And with regards to Marko, I recently --

THE COURT: Well, we're doing -- you just told me --

MR. LUBIN: One at a time.

THE COURT: -- you wanted to do one at a time. So I said okay.

MR. LUBIN: All right. I have a lot of idiosync --

THE COURT: Mr. Egozi is where we are.

MR. LUBIN: Okay. So there's no -- and then Bernie sent me a WhatsApp message a couple weeks ago that set up a call with Marko, to get you out of this mess. And I replied I'm convinced that this is a CYA message and you're not going to be setting up that phone call. I don't think --

THE COURT: So that's how you replied to counsel?

MR. LUBIN: No. I replied, "Let's set up a phone call," and then a few days --

THE COURT: Okay.

MR. LUBIN: -- later, after that call didn't

Page 63

happen, I said, "You're just sending this to try it protect yourself."

THE COURT:  It doesn't sound like you have a very good relationship with counsel.

Why would you want to force them to remain in the case?

MR. LUBIN:  Because I'm not going to be able to get an attorney.  It's not about money.  I sat down with Jeff Snyder and offered a $250,000 retainer.  He said, "I cannot take this case, because I'm concerned that the DOJ is going to send me an order the next day, the second I notice in."  I mean, I don't want to get too much into the facts until they get disclosed, but this is a very complex situation.

THE COURT:  Okay.

MR. LUBIN:  Yeah, we're like -- you look at the docket, and it's clearcut that there's problems going on, yeah.

THE COURT:  In my docket here in this case?

MR. LUBIN:  Not in your docket.  Throughout the whole country.

THE COURT:  Someplace else.  All right --

MR. LUBIN:  All Spin --

THE COURT:  -- because Mr. Egozi --

MR. LUBIN:  -- cases throughout the country.

Page 64

THE COURT:  Okay.  I know there's a lot of reported Spin cases.  Are there -- is Mr. Egozi involved in those cases still?

MR. LUBIN:  Not related to EXCEL Auto Group, no, he's only in --

THE COURT:  In this one case.

MR. LUBIN:  Oh, he's in -- I granted a -- I terminated him personally in the Broward case, I don't think he ever appeared as Spin.

THE COURT:  Okay.  But you have other relationships with Mr. Egozi, and you actually terminated his representation?

MR. LUBIN:  I terminated all attorneys on behalf of me personally, so I can represent myself pro se in the state action, yes.

THE COURT:  And Spin still has counsel in the state action?

MR. LUBIN:  No, Spin does not have counsel in the state action.  Marko, his engagement letter, purports that he's going to be noticing in --

THE COURT:  We'll get to that, but that --

MR. LUBIN:  No, there's no current Spin attorneys in the state action.  I have until March 1st to get an attorney, or I'm in default.  But Judge Tutor says that there's nothing happening in that case until April

Page 65

and probably even June.

THE COURT:  Okay.  I don't really care about that case.

MR. LUBIN:  Yeah.

THE COURT:  So just be clear about that, all I care about is I have counsel asking to withdraw in this particular case.

MR. LUBIN:  Right.

THE COURT:  Okay.  You're standing, because?

UNIDENTIFIED SPEAKER:  I did file a limited --

THE COURT:  I know.

UNIDENTIFIED SPEAKER:  -- objection.  If the Court would like I'll do it omnibusly at the end of --

THE COURT:  Okay.  That's good.  Thank you.

MR. LUBIN:  It's so simple to get -- to have gotten Spin and me personally dismissed out of this case. Jacob Nemon is not a dummy.  He's a smart attorney, and he filed a motion to dismiss which your Honor said was garbage.  And there's a lot of spooky things that have been going on this case, like, why would he file a motion to dismiss that is not going to get granted, when it's so -- this stuff was litigated.  It's res judicata.

EXCEL is a party to the case in New York. Alan has filed documents at Hi Bar in that case.  There's

Page 66

a ruling that applies to Hi -- even though Hi Bar waived res judicata, if I file a motion to dismiss, based on his allegations, it would dismiss Hi Bar from the complaint too.  And I'm not no friend Hi Bar, I'm very adverse to them.  But if I had the opportunity to -- based on the way the claims are alleged, Alan alleges I own Hi Bar, which is a hundred percent false, but based on the way the claims are alleged, with the New York ruling, it's a few thousand dollars to get me dismissed out of this case, and --

THE COURT:  Well, apparently not --

MR. LUBIN:  Apparently, yeah --

THE COURT:  -- because --

MR. LUBIN:  -- because the attorneys won't do it.

THE COURT:  Okay.  Hold on.

MR. LUBIN:  I don't want it get into sensitive topics.

THE COURT:  Hold on.  I get it.

But there have been many lawyers for Spin in this case, many.  How many?  Five, I think, five different law firms, I'm pretty sure.  So --

MR. LUBIN:  It happens on all my cases.

THE COURT:  Okay.  Well, that is not a good sign.

MR. LUBIN:  No.

THE COURT:  And I know by reputation two of your lawyers who have appeared in multiple matters in this court over the last 16 years, and I'm not suggesting that the others don't have a good reputation.  I just don't know them as well, including the two who are here today.  But my point is, given my knowledge of the reputation of certain of your prior counsel, it seems very unlikely they would refuse to do something that would be immediately helpful to Spin in this particular case, unless there was something else that I don't know.

MR. LUBIN:  There sure is.

THE COURT:  So I'm concerned about that.

But we have lawyers who wish to withdraw from the case, and your only real reason is, you're worried you won't be able to get other counsel.

MR. LUBIN:  I won't, because the U.S. -- the United States government is making it very difficult for me to get counsel.

THE COURT:  How?

MR. LUBIN:  How?

THE COURT:  How does the U.S. government have any impact here?

MR. LUBIN:  I don't want to get into that right now, but there's also -- there's a conflict, a

Page 68

potential conflict, between Spin and Mr. Lubin and with --

THE COURT: Okay.

MR. LUBIN: With Brian Kay (phonetic)
potentially on --

THE COURT: Then don't hire Mr. Lubin's
counsel.

MR. LUBIN: What?

THE COURT: I mean, don't -- you mean,
between you and your own company?

MR. LUBIN: Correct --

THE COURT: Okay. So you --

MR. LUBIN: -- and I own a hundred percent
of the company. There's a document that may have assigned
Spin's rights to one of the adversaries that's a party in
this case.

THE COURT: Okay. Then you've just given me
a reason why both counsels' motions should be withdrawn
(sic), because if Spin has a contact with you -- a
conflict with you, they have been representing both of you
and now they can't represent either of you.

MR. LUBIN: It's never been alleged that
there's been a conflict. It's never been litigated that
there's a conflict.

THE COURT: You just stood at the podium and
told me there was a conflict.

Page 69

MR. LUBIN:  I didn't say there was.  I said there might be a potential conflict that is causing these attorneys to --

THE COURT:  Well, that would be enough. That's another reason for them to withdraw.

If there's a potential for conflict between you and your own entity, which there often is, by the way, then the fact that each of these lawyers has represented both of you during this case, means that under the rules of ethics, they must withdraw.

MR. LUBIN:  From me personally.

THE COURT:  No.  From both.

MR. LUBIN:  There's no conflict if they're only representing -- protecting Spin's interests.

THE COURT:  No, that's not how it's works.

Once you've represented two parties, if they are -- if they now have a conflict, you're not allowed to represent either of them.  And there's problems with confidential information that you now have, which is harmful to one former client and not the other, there's a whole bunch of issues.

MR. LUBIN:  Let's not get into the conflict issue.

THE COURT:  Oh, really?  Even though you're the one who told me about it?

Page 70

MR. LUBIN:  There's so many moving parts here.  I've been living this thing for three years.

THE COURT:  Yeah.

MR. LUBIN:  And almost -- it's almost like I went to law school, just by living in this mess, but -- um -- um -- Spin -- the only option I have if your Honor does not -- first of all, I think Marko is very honest attorney, I think he's very reputable attorney --

THE COURT:  We're not hearing his motion right now.

MR. LUBIN:  Right.

THE COURT:  You told me you wanted one at a time.

MR. LUBIN:  I -- I -- I think there's a complicated situation going on over here.

But the issue I'm going to have is if they're let out of the case, I won't be able to retain counsel.  I'll have to assign Spin's rights to myself personally, which can expose me to corporate issues, and then I would have to file a motion to dismiss as pro se, Spin has -- Josh has --

THE COURT:  Ah, I have to let you know ahead of time, none of that is happening.  Spin is a corporate entity.  It does not disappear.  It was the party to the agreements at question in this particular instance.

Page 71

MR. LUBIN:  Right.

THE COURT:  Spin remains a defendant no matter what it does with its rights that it's assigned, because you cannot assign the liabilities or its contractual obligations in connection with them, and Spin cannot appear in this case without counsel.  And so what you've just described is impossible, and I will not permit it in this case --

MR. LUBIN:  Okay.

THE COURT:  -- you need to understand that.

MR. LUBIN:  I can file -- I could file a motion to appoint a limited receiver over Spin.

THE COURT:  You can't.

MR. LUBIN:  No?

THE COURT:  Well, you can try and do that someplace else --

MR. LUBIN:  No, I'm doing it --

THE COURT:  -- but it's not happening here.

MR. LUBIN:  Not in this courthouse.

THE COURT:  Right.

MR. LUBIN:  To then hire an attorney to defend me, but all this stuff is going to take time.

THE COURT:  Yeah, time --

MR. LUBIN:  I will --

THE COURT:  -- time will not --

Page 72

MR. LUBIN:  -- Spin will suffer irreparable harm.

THE COURT:  -- time is not happening.

Oh, by the way, the provision that you point to in Rule 4-1.16(b) is one of five separate provisions, separated by the word "or."  Withdrawal is not -- it does not require that there be no adverse affect.  It's just one way that withdrawal is permitted.  So if there's an adverse affect that's too bad, under the circumstances of this case, because both of the lawyers who are here cite other provisions under that same subsection.

Do you understand what I'm saying?

MR. LUBIN:  Yes, but there's no irreconcilable difference.  It's a lie.

THE COURT:  I see.  It obviously isn't, because --

MR. LUBIN:  Why?

THE COURT:  Really?

It's obvious from your presentation that there's irreconcilable differences.

MR. LUBIN:  By the lawyer ignoring me, you mean?

THE COURT:  Because they are -- you believe they are not communicating with or assisting you in representation of the clients, correct?

MR. LUBIN:  That in itself is irreconcilable differences?

THE COURT:  Yes.

MR. LUBIN:  Okay.  I didn't --

THE COURT:  They've alleged other things, but they haven't told me what the details are, and I don't want to ask them what the details are, because that will not be helpful to you.  I'm confident it will not be helpful to you.

MR. LUBIN:  So what -- okay.

THE COURT:  Particularly, Mr. Egozi who came in as local counsel to two prior law firms.

MR. LUBIN:  Right.  So Mr. Egozi, I get it. But what about Marko?

THE COURT:  Well, you told me you wanted to do them one at time.

MR. LUBIN:  Okay.

THE COURT:  Mr. Egozi, you may tender an order to have immediate effect that grants your motion.

MR. LUBIN:  Right.

MR. EGOZI:  Yes, your Honor.

THE COURT:  And I'm going to get to the objection regarding timing.  The trustee's objection is regarding timing.  Right?

If you could sit down, so I could see him.

MR. CRANE:  Yes.

THE COURT:  I promise to hear that at the end, yes.

All right.  Mr. Cerenko.

We're going to hear from Mr. Cerenko.

MR. LUBIN:  I'm convinced it will be a different result for Mr. Cerenko.

THE COURT:  Well, we'll see.  We'll see.

Yes.

MR. CERENKO:  Good morning, your Honor -- or I guess, good afternoon.

THE COURT:  Time for lunch.

MR. CERENKO:  Marko Cerenko from the law firm Kluger Kaplan.  We're here on our firm's motion to withdraw.

THE COURT:  Do you have any of the bases for withdrawal?

I know they are in the motion.

MR. CERENKO:  Sure.  Before that I would like to just give you a snippet of the background, because --

THE COURT:  Absolutely.

MR. CERENKO:  -- this is one of those situations where no good deed goes unpunished, your Honor. I was not counsel of record in the bankruptcy.  The motion

for summary judgment that came due on December 27th, Mr. Lubin was having issues with the Saul Ewing firm for whatever reason. I filed a joinder as to the motion for summary judgment, a certain portion of it that Hi Bar had filed, just to preserve his rights.

THE COURT: Yes. Thereby making an appearance.

MR. CERENKO: Correct. And that was it. And shortly thereafter it became very clear that there were significant irreconcilable differences between myself, Mr. Lubin, and him acting on behalf of Spin.

As a courtesy to Mr. Lubin and Spin, I did not file a motion pursuant to 4-1.6(a), your Honor, which I could have very well done. I proceeded under 4-1.16(b) for obvious reasons, because I did not want to waive any sort of attorney/client privilege, nor did I want to color the Court adverse to Mr. Lubin or Spin.

But in terms of the irreconcilable differences, you heard some from Mr. Lubin, I mean, from not taking advice and not listening to advice, to contacting -- and this is all public, contacting the Court at all hours in the night, all hours in the morning, threatening me, threatening other attorneys. It hasn't been a good situation, your Honor.

And for all those reasons and more that I'm

not going to go into, we request that you grant our motion to withdraw.  And I'm happy to answer any questions that your Honor may have.

THE COURT:  I might have questions after Mr. Lubin speaks.

MR. CERENKO:  Not a problem.

THE COURT:  Thank you.

Mr. Lubin.

Let me -- I probably shouldn't say it this way, you probably do understand this, because you have a very sophisticated response filed, but I just want to make clear that Mr. Cerenko's reference to another component of the same ethics rule, that is a component that, to put it as bluntly as possible, permits a lawyer to withdraw when the client is doing something illegal or asking the lawyer to do something illegal, among other things, and that is an automatic right to withdraw.  Okay?

MR. LUBIN:  Right.

THE COURT:  He said he did not cite that rule in his motion because he didn't want to put you in the position of the Court having to hear about what the reasons were.  Instead he cited the permissive withdrawal provision of subsection (b).  He's not making that argument today, but I just want you to understand what he just said to me.

Page 77

MR. LUBIN:  I understand what he just said, and he's not referring to me.

THE COURT:  Okay.  Well, apparently he is.

But go ahead.

MR. LUBIN:  Can we put him under oath and ask him --

THE COURT:  No.

MR. LUBIN:  -- if he's referring to Josh Lubin, or he's referring to somebody purporting as Josh Lubin?

THE COURT:  We don't need to put him under oath, because he's not using that argument.  I just wanted you to understand --

MR. LUBIN:  Right.

THE COURT:  -- what he said.  Okay?

Go ahead.

MR. LUBIN:  Okay.  I'm not sure where to start, but Marko was retained, I believe, December 12th as -- he had a plan, and it -- I mean, it seems he's too new to the case for there to be irreconcilable differences, in my opinion.  Like, he admitted right when he got on, Saul Ewing was playing games, and he reached out to Saul Ewing and said, "What are you guys doing?  You're not protecting your client.  This is crazy."  And right after he noticed into the case, he went on vacation

Page 78

for -- I don't want to talk -- I'm not trying to talk bad on Marko. I think he's a very rep -- ethical and reputable attorney, but I don't think he should be able to withdraw from this case. He has a retainer --

THE COURT: There's --

MR. LUBIN: -- he hasn't sent me a bill.

THE COURT: Just -- there's unspent retainer?

MR. LUBIN: Yes.

THE COURT: Hold on. I'm just curious.

MR. CERENKO: That is correct, your Honor. On three separate occasions, I asked Mr. Lubin for wire instructions to wire the unused portion of the retainer back. None of those have been responded to, your Honor.

THE COURT: He wants you to stay in the case, Mr. Cerenko.

All right. So you know, when a lawyer tells me there's irreconcilable differences that usually means there's ongoing disputes involving advice that's been given that the client has not taken or other things that have been requested of counsel that they feel uncomfortable about, which is perfectly fine as a professional, because law is a profession.

And so you think that's not the case?

MR. LUBIN: That's not the case, your Honor.

Page 79

THE COURT:  Okay.  So why is he moving to withdraw?

MR. LUBIN:  I don't know the full details of why he's moving to withdraw.  It appears lawyers are scared of this case.  There's some real shenanigans going on.

THE COURT:  Well, they're not scared of me, I'm confident.

MR. LUBIN:  No.  I don't think it's coincidence that this case is front of you.

THE COURT:  Really?

MR. LUBIN:  No, yeah, I'm being honest.

THE COURT:  How is that possible?  It's a random assignment of cases.

MR. LUBIN:  I understand that.  I don't -- I don't think --

THE COURT:  And when you say "this case," you mean the adversary?

MR. LUBIN:  I mean, the --

THE COURT:  Because I've had the main bankruptcy case --

MR. LUBIN:  -- chief judge of the Southern District of Florida --

THE COURT:  I was not the --

MR. LUBIN:  -- in Palm Beach County --

Page 80

THE COURT:  -- I was not.

MR. LUBIN:  -- so I don't think it's coincidence.

THE COURT:  I was not the -- stop for a moment.  I don't think I was the chief judge when the bankruptcy was filed.  Was I?  I don't think so.

MR. LUBIN:  I don't think it's coincidence you became chief judge.

THE COURT:  Really?

MR. LUBIN:  Yeah.

THE COURT:  If I told you that it's based on seniority and has nothing to do with who I am, would that affect your outcome?  Also --

MR. LUBIN:  Let's not get into it.

THE COURT:  -- it does not include a raise, and I don't get any less cases.  But other than that, I get this nice nameplate, though.  That's pretty much it, but --

MR. LUBIN:  And you're super smart.  I'm watching the -- the -- $13,000 car, and I was, like, how does the judge process all these cases in one day.  It just -- yeah.

THE COURT:  There's only 3,000 cases under my name right now, which is less than half what it was in 2012.  So it's been much busier.  All right.  But that has

Page 81

nothing do with this --

MR. LUBIN:  Right, right, right.  Let's go back it Marko.

THE COURT:  -- I promise you the fact that I'm the chief judge has nothing to do with how I got this case, because I wasn't the chief judge when I got this case.  But anyway.

MR. LUBIN:  Well, then it's not a coincidence.  You'll see in the future.

THE COURT:  I see.  Okay.

MR. LUBIN:  Yeah.

THE COURT:  Right.

Mr. Lubin, I mean, there's obviously an issue here.  I'm not going to require counsel to stay in the case.  We have to find out -- we have to talk about what happens after counsel is no longer in the case.

You're going to represent yourself in this case --

MR. LUBIN:  Right.

THE COURT:  -- Spin needs a lawyer.

MR. LUBIN:  Correct.

THE COURT:  Yes.

MR. LUBIN:  How is Spin going to get a lawyer?

THE COURT:  I don't know.  That's your

Page 82

problem and not mine.  You're on, I think, it's the fifth law firm in this case.

MR. LUBIN:  It's happening in all my cases throughout the country.

THE COURT:  I think you should take that as a hint.

MR. LUBIN:  What?

THE COURT:  There's something going on.

MR. LUBIN:  I know what is going on.  I don't want to say it on the record.

THE COURT:  Yeah, the common party is you.

All right --

MR. LUBIN:  Yeah --

THE COURT:  -- you can tender an order --

MR. LUBIN:  -- hold on, wait.  Why are you telling him to --

THE COURT:  -- granting the motion.

You told me at the most recent hearing, where someone else was withdrawing, that you had 15 lawyers, I think you said --

MR. LUBIN:  But Marko was just retained, so how is there irreconcilable differences if I just sent the guy a retainer, send me an analysis, a memorandum of a plan, how you're going --

THE COURT:  And he wants to send it back.

Page 83

MR. LUBIN: -- (inaudible.)

THE COURT: He wants to send the retainer back. Lawyers usually like money. Things must be bad.

MR. LUBIN: Right. And -- but you can't -- it doesn't work that way.

THE COURT: That's right. I've already granted --

MR. LUBIN: I sent him --

THE COURT: I've already --

MR. LUBIN: -- a wire --

THE COURT: -- I've already --

MR. LUBIN: -- and give me analysis and a plan.

THE COURT: I've already granted the motion. He's going to tender an order and he'll be out.

MR. LUBIN: Can you grant the stay -- give me time to get an attorney?

THE COURT: That's what I want to hear from the trustee's counsel, because he objected to that request for 20 days. And the problem is there's stuff happening in the very near future, including, I think, a deadline next week, as well as a deposition next week.

MR. LUBIN: I can do a deposition myself, I think. But I need time to get an attorney. I need things to get stayed.

Page 84

THE COURT:  Well, what has to be stayed?

MR. LUBIN:  Deadlines and --

THE COURT:  What deadline?

MR. LUBIN:  Everything's gotta get moved.

THE COURT:  When you say "everything," you need to be more specific.

MR. LUBIN:  I need stay the state case.

THE COURT:  No.  No, no, no, all that -- I'm not -- this motion to withdraw --

MR. LUBIN:  Yeah.

THE COURT:  Are you involved in the state action?

UNIDENTIFIED SPEAKER:  I was, your Honor. Tutor granted our motion to withdraw.  I'm out of the case.

THE COURT:  Okay.  And, Mr. Cerenko?

MR. CERENKO:  I'm not.

THE COURT:  Because they cannot ask me to approve withdrawal in another case entirely, unless they represent the debtor and I have authorized them to be retained in connection with a debtor or that kind of thing.

MR. LUBIN:  I mean, Marko never noticed into the Broward case.  It says --

THE COURT:  That has nothing to do with this

Page 85

case. Nothing at all. I'm permitting them to withdraw from this adversary proceeding.

Do you get it? Only this adversary proceeding, that's it.

So let's talk about deadlines.

What deadlines? We have a deadline for a response to the summary judgment motion on the 18th, yes?

MR. CRANE: Your Honor, Alan Crane on behalf of the trustee. That is what I believe is the 18th is their --

UNIDENTIFIED SPEAKER: Before you grant --

THE COURT: Wait, hold on. I've already granted the motion to withdraw. It's granted.

MR. CRANE: Yes. The 18th is the deadline for the -- for Spin and/or Lubin -- and Lubin to file a response to the motion for summary judgment that was filed by the trustee.

THE COURT: Okay. So the 14th is Friday. I think everybody in the world knows that. So 15th, 16th, 17th -- Tuesday?

MR. CRANE: Yeah.

THE COURT: Okay. Tuesday, next week.

MR. CRANE: And then we had a scheduled deposition --

THE COURT: Of Mr. Lubin.

Page 86

MR. CRANE:  -- of Mr. Lubin, let's see, also on the -- it was continued to the 18th also.

THE COURT:  All right.  And you're proposal is that I let both of those things happen?

MR. CRANE:  Yes.  Before --

THE COURT:  Including the deadline on the summary judgment response?

MR. CRANE:  Here -- my position is, so for the deposition, I think Spin needs counsel, but my -- the trustee's position is as long as the Court is not extending and imposing a stay, then whatever happens happens.  If they don't file a response --

THE COURT:  Okay.  Well, if they don't file a response, then you'd be asking me to grant the motion for summary judgment.

MR. CRANE:  Yeah, yes.

THE COURT:  Understood.

MR. CRANE:  And that particular issue is not necessarily my problem.

THE COURT:  Let's pick up the Magic Eight Ball and see how the District Court will respond to the appeal that follows from me not giving him extra time to find a lawyer.

MR. CRANE:  Well, that's why I had asked for the effective date of the motions to withdraw to be after

Page 87

the 18th. They have counsel that can file a response to the motion for summary judgment, probably not violating any ethics rules to do that.

I had coordinated the Rule 7030 examination with --

THE COURT: And is there a 30(b)(6)?

MR. CRANE: Yes.

THE COURT: Okay. And Mr. Lubin has been designated?

MR. CRANE: That is my understanding, because the emails that I got back is that they had coordinated with Mr. Lubin and that Mr. Lubin had agreed to that date.

THE COURT: Understood.

All right. So we have two issues. We have the summary judgment response and the deposition next week --

MR. CRANE: Yes --

THE COURT: -- same day.

MR. CRANE: -- those are the only things that are coming up most quickly, yes, and trustee doesn't want to see either one of those --

THE COURT: I get it, I know. Yep.

Okay. Gentlemen, so I want to hear first about the request that the withdrawals are effective after

the deadline to file the summary judgment motion.

MR. EGOZI:  Your Honor, we asked for -- your Honor, we requested immediate withdrawal.  Your Honor asked us to upload an order.  We also requested in the papers to give Mr. Lubin -- sorry, Spin 20 days to retain new counsel --

THE COURT:  Right --

MR. EGOZI:  -- so new counsel can --

THE COURT:  -- so what happens is, you have -- they get new counsel, and then she comes in and files a motion that says, "I was just retained, and I really can't respond to a summary judgment motion right now, and so please give me three more weeks," which would be a miracle, three weeks, and so that's really what you're asking for.

Yes, Mr. Cerenko.

MR. CERENKO:  If I may.

I believe, your Honor, you can condition any sort of time for Mr. -- for Spin to obtain new counsel --

THE COURT:  Of course I can --

MR. CERENKO:  -- with the understanding --

THE COURT:  -- that doesn't prevent people from filing more motions.

MR. CERENKO:  Correct.  But the concern is, obviously, that Spin's rights would not be protected in

Page 89

the event that somehow the response deadline were to stay, without granting him time to find new counsel.

THE COURT:  Understood.

Were you involved in preparing a response to summary judgment motion, either of you, ahead of today?

MR. EGOZI:  No, your Honor.

MR. CERENKO:  No, your Honor.

THE COURT:  Was there any advice -- I'm not talking about -- I'm not asking what the advice was.

Was there discussion with either of you about being involved in responding to the summary judgment motion?

UNIDENTIFIED SPEAKER:  No, your Honor.

UNIDENTIFIED SPEAKER:  Tangently (sic).

THE COURT:  Okay.  What does that mean, tangentially?

UNIDENTIFIED SPEAKER:  I apologize, tangentially.

THE COURT:  You're creating a new word.

UNIDENTIFIED SPEAKER:  English is my second language, so every now and then I get --

THE COURT:  You pronounce -- I don't believe you.  Really?  I could not tell.

UNIDENTIFIED SPEAKER:  I was born in Croatia, moved to the U.S. when I was about 13 years old,

so --

THE COURT:  Wow.

UNIDENTIFIED SPEAKER:  -- yes, actually a third language, but I think the education system is a little bit better over there than here, but that's for another day.

But what I mean by that is there was another person that was going to be involved in the Spin -- or Mr. Lubin, I don't know which, was going to have brought on to do that work.  So it -- I was consulting on that basis, but nothing substantive as to the response to the motion for summary judgment.

THE COURT:  Okay.  Right now we're focusing only on the summary judgment motion.

What's your view, Mr. Lubin?

MR. LUBIN:  Marko came up with --

THE COURT:  Come over to the podium, please.

MR. LUBIN:  Marko came up with the idea of filing -- because we were trying to get Saul Ewing to file --

THE COURT:  They're out.

MR. LUBIN:  -- a summary judgment -- I know they're out.

THE COURT:  Response.

MR. LUBIN:  A few weeks before.

THE COURT:  Stop.  We're not talking about a new motion.  We're talking about the response to the existing motion, which is due on the 18th of February, next Tuesday.

MR. LUBIN:  I'm getting into that.

THE COURT:  Well, that's good.

MR. LUBIN:  So Marko came up with the idea of filing cross summary judgment motion --

THE COURT:  It's not happening.

MR. LUBIN:  Right.  And the response was going to be worked with a New York attorney that knows New York -- specializes in New York usury and was going to file it with Marko --

THE COURT:  It was supposed to be somebody else?

MR. LUBIN:  No.  Marko was going to be filing it.  Someone is going to ghostwrite it with Marko.

THE COURT:  Okay.  That means the real work was going to be done by someone else.

MR. LUBIN:  No, only a certain part of it.

THE COURT:  I see, you mean, the --

MR. LUBIN:  Marko was going to do the other part of it.

THE COURT:  I see.

Well, he's saying -- he's nodding "no"

behind you that that is not the case.

MR. LUBIN:  There's emails that confirm all that.

THE COURT:  Okay.  So this, I think, is really -- this is really pointing out to me the irreconcilable differences.  Because when the lawyer is saying one thing and client rep is saying something else --

MR. LUBIN:  I may be misunderstanding this -- what's the word you used?

UNIDENTIFIED SPEAKER:  Tangentially.

THE COURT:  Tangentially.  At least we can all --

MR. LUBIN:  It never --

THE COURT:  -- have a sense of humor about that.

MR. LUBIN:  -- it never fully got addressed, and there's too many things that blew up in those few weeks to where I haven't --

THE COURT:  Yeah, okay.  All righty.

Now, let's go to the deposition that is scheduled this coming week, okay.  So it's really two depositions in a way.  It's you personally, because you're a defendant, and then Spin is a defendant, and Spin has designated someone to be their witness, which is also you,

Page 93

and it seems to me, based on what you've told me previously, it could only be you.

Are you willing to go forward with the deposition next week no matter what?

MR. LUBIN: Without an attorney?

THE COURT: Yeah.

MR. LUBIN: Hypothetical --

THE COURT: What do you mean "hypothetical"? The answer is yes or no. It's not a hypothetical question. These lawyers will not be there, neither of them.

MR. LUBIN: Would your Honor give me an extension of time for other deadlines, if I do that myself?

THE COURT: I would like you to focus on the deposition next week.

Are you sitting for -- I could swear five minutes ago you said, "I'm fine with the deposition."

MR. LUBIN: Yeah, I have nothing to hide. I'm fine with the deposition. I'm just saying, like, the issue is with the other deadlines and responses.

THE COURT: There's only one other deadline that I know of. It's the response to the summary judgment motion.

Does anybody know of any --

MR. LUBIN:  I need more than 20 days --

THE COURT:  -- other deadline?

MR. LUBIN:  -- I've been trying to get an attorney the last two --

THE COURT:  There's no other deadlines, right?

MR. CRANE:  No, not --

THE COURT:  Not currently.

MR. CRANE:  -- currently.  I mean, obviously the pretrial was moved to, I believe --

THE COURT:  June, yeah, the pretrial is in June, so it's --

UNIDENTIFIED SPEAKER:  That was my point, your Honor, in terms of the no prejudice given the fact that everything was pushed back down to June.

THE COURT:  Well, right, but all the other deadlines are running in the meantime.  I mean, there are deadlines under the order, just not any really coming due, likely, in the next month, because most of them are measured backwards, and there's only a few that's measured forward, and they've probably already been addressed, most summary judgment --

UNIDENTIFIED SPEAKER:  You're correct, your Honor.

THE COURT:  Also Spin will get to respond to

the -- only the component of the complaint that gets amended in this instance, and I'm not going to tell them they can't file a summary judgment motion on that.  The deadline is in the order.  The scheduling order -- it's over.  So I would have to specifically allow summary on that last -- the added count?

MR. CRANE:  This is Alan Crane.

Yes.

THE COURT:  Okay.  So I need to give some thought to that, because it's not appropriate to say you can't have a summary judgment motion on something that didn't exist previously.

MR. CRANE:  I agree.

THE COURT:  All righty.  No one is going to like my rulings today.  It's going to be a great day.

All right.  So both of you are out effective today.  You don't have to do anything.  You don't have to prepare for that deposition next week.  You don't have to file a response to the summary motion.

The plaintiff is going to be unhappy, because I'm going to move the summary judgment response deadline for only Mr. Lubin and Spin to 30 days from today.  I don't care when the lawyer gets involved in the case, Spin needs to file (sic) a lawyer.  Spin cannot file a response to the summary judgment signed only by you.  It

Page 96

has to be signed by somebody who is admitted to practice in this Bankruptcy Court.

Understood?

MR. LUBIN:  (Inaudible.)

THE COURT:  Thirty days from today.  Okay?

That is not somebody appearing 30 days from today.  That is not someone talking to you 30 days from today.  That is someone filing the response 30 days from today.

Do you understand?

MR. LUBIN:  Yes, your Honor.

Can it be someone that just passed the bar a few weeks ago?

THE COURT:  Really?

MR. LUBIN:  Yeah.

THE COURT:  If that person is somehow a member of the bar of this court, yes.

MR. LUBIN:  I'll fill out the paperwork for them.  I'll help them do it, yeah.

THE COURT:  Good luck.  That's a really bad idea, but --

MR. LUBIN:  It's the only idea.  I sat down with every --

THE COURT:  But if it is a person who is a member of the bar of this court, that's all I care about,

Page 97

okay.

MR. LUBIN:  Do I have 30 --

THE COURT:  Thirty days from today to file a response to the summary judgment motion.

MR. LUBIN:  Please give me 40 days.  This is very --

THE COURT:  No.

MR. LUBIN:  -- complex.

THE COURT:  No, I'm not.

MR. LUBIN:  Hmm?

THE COURT:  You've already had five separate law firms in this case.

MR. LUBIN:  How did I have five separate law firms?

THE COURT:  Five separate law firms in this case.

MR. LUBIN:  So it's not a coincidence that it's in front of you.

THE COURT:  Oh, it's --

MR. LUBIN:  It's not that --

THE COURT:  -- it's a -- we're not going there.

MR. LUBIN:  Okay.

THE COURT:  I promise you the case, the EXCEL case, was assigned to me --

Page 98

MR. LUBIN:  (Inaudible.)

THE COURT:  Don't talk when I'm talking.

MR. LUBIN:  All right.

THE COURT:  -- was assigned to me randomly. That's the way it happens.

MR. LUBIN:  Oh, I believe that.

THE COURT:  Okay.  Fabulous.

MR. LUBIN:  Yeah.

THE COURT:  All right.  And trustee files whatever -- who is the trustee in this case?

MR. CRANE:  Nicole Testa Mehdipour.

THE COURT:  Ms. Mehdipour.

The trustee files whatever complaints she thinks are appropriate in the case, and those get filed in the same case where the bankruptcy is.  That's the way it works.

All right.  Anyway, two orders from you. I'll do an order on the summary judgment motion.  I'd like you to tender an order on the -- as we discussed, the motion to amend.

And what I would like to do in that -- the response deadline is obviously 14 days, and I'd like to give a new summary judgment deadline for only that count.

What do you propose?

MR. CRANE:  You know, I'm -- 30 days, I

mean --

THE COURT:  I would go -- let's go longer than that -- yeah, no, 30 days is fine.  Actually could you do it after -- either 30 days from -- no, do you it 30 days from the response, or if the response is a motion to dismiss, 30 days after the denial of the motion to dismiss if it's denied.

Do you see what I'm saying?

MR. CRANE:  So it's either 30 days after --

THE COURT:  If the response is an answer, it will be 30 days of the answer date.  And if a response is a motion to dismiss, then 30 days after the denial of the motion to dismiss.  Obviously, if it's granted that's a different matter.

MR. CRANE:  Right, okay.

THE COURT:  Yeah, and let me -- just tender that in the orders, and you may get a request from Ms. Leonard to send it in Word.

MR. CRANE:  Okay.  And then the deposition --

THE COURT:  The deposition goes forward if you wish for it to go forward.

Do you wish for it to go forward?

MR. CRANE:  Yeah.

THE COURT:  All right.  Mr. Lubin, you

should show up for the deposition.  If you fail to show up for the deposition, there's likely to be a motion filed asking me to default both of you.

Do you understand?

MR. LUBIN:  I have it in my calendar I believe.

THE COURT:  Good.  Good luck.

Anything else?

MR. CRANE:  Nope.  Thank you, your Honor.

THE COURT:  Very good.  Yes.

MR. LUBIN:  The order with the deadlines, it's going to be on the -- I don't have it written down.  It's going to be on the -- on Pacer, like, by today.

THE COURT:  Not today.  Counsel needs to draft it and send it in, and then I need to sign it.  But it's fairly straightforward.  The complaint is going to be amended to add that new count only against you and Spin.

MR. LUBIN:  Right.

THE COURT:  It's a Florida usury count.

Under the rules you have 14 days to respond.  A response can be an answer or a motion to dismiss, not both.

MR. LUBIN:  And the rest of the stuff, your Honor --

THE COURT:  Hold on.

If you file an answer, then a summary judgment motion is due, if you file one, only on that count, 30 days later.  If you file a motion to dismiss, then I have to decide the motion to dismiss, right?  If the motion to dismiss is denied, then summary judgment 30 days after that.  If the motion to dismiss is granted, then it's whatever I said in the motion -- in the order granting the motion to dismiss.  Get it?

MR. LUBIN:  Only dismissing that one count?

THE COURT:  Yeah, we're not starting all over again.

MR. LUBIN:  The rest has to go to trial.

THE COURT:  The rest has to move forward as a summary judgment pending.  That does not mean it's going to trial.  I'm not telling you how -- I don't know how I'm ruling on the summary judgment motion.

MR. LUBIN:  I thought I don't have a summary judgment.

THE COURT:  There's one against you.

MR. LUBIN:  Huh?

THE COURT:  There's a summary judgment motion that you would respond to.

You can talk to him off line.  Okay.

MR. EGOZI:  Your Honor, just for the sake of clarity --

THE COURT:  Yes.

MR. EGOZI:  -- and the lawyer in me just trying to protect Mr. Lubin and Spin.  If he could have the 30 days also to file an answer to this newly amended pleading.

THE COURT:  No.

MR. EGOZI:  Okay.  Just --

THE COURT:  It's unbelievably simple count. He can answer that one thing 14 days.

MR. EGOZI:  Spin would need to as well, so they need --

THE COURT:  Right.

MR. EGOZI:  -- to find counsel.

MR. LUBIN:  For Spin can you give me 30 days, and me 14 days personally?

MR. EGOZI:  The reason --

THE COURT:  Stop.

Plaintiff's counsel.

MR. CRANE:  That's fine, your Honor.

THE COURT:  Okay.  Let's make them together, the same day, 30 days to answer, please put that in your order.

Anything else?

MR. LUBIN:  No, I think that's all.

THE COURT:  Good.  Good luck finding a

Page 103

lawyer.

Hold on.  Ms. Leonard -- oh, Mr. Rigoli has his hand up.  That means Mr. Crane failed to say something.

MR. CRANE:  Yes.

MR. RIGOLI:  No, your Honor, it's -- apologies, your Honor.  Jason Rigoli.

I just wanted to make sure for purposes of clarification on the order to respond to the motion for summary judgment, so the -- I know your Honor is going to be submitting orders, so it would be 30 days for Spin to respond to the motion -- to the plaintiff's motion for summary judgment.  Hi Bar's deadline stays the same, but then the reply deadlines, the trustee would be permitted, essentially, to reply one to however Hi Bar responds --

THE COURT:  Well, would you rather I just make them all parallel, so it's easier?  I think that's the wisest thing to do.  Otherwise, it creates a lot more work for you, doesn't it?

Yeah, I don't want do that.  I mean, Mr. Rigoli, I'll just make them all parallel.  It will delay --

MR. RIGOLI:  I just wanted some clarity.

THE COURT:  No, no, I thank you for pointing that out, because that would be a real headache.

Page 104

MR. RIGOLI:  Understood.

THE COURT:  My goal is not to make you spend more time and money.

All right.  Good.  Thank you.

Thank you for pointing -- oops, Ms. Leonard has more question.

(No audible response.)

THE COURT:  Oh, I see.

So although you filed a motion to amend the complaint, you also actually filed the amended complaint at DE 200.  You should withdraw it.

MR. CRANE:  Yes.

THE COURT:  Okay.  Thank you.

All right.  Anything else?

(No audible response.)

THE COURT:  Great.

MR. LUBIN:  My notice of appearance is granted pro se?

THE COURT:  You don't have to.  Yeah, if you're counsel has withdrawn and you are an individual, you're automatically pro se.

MR. LUBIN:  I'm appearing in the case pro se.

THE COURT:  As -- yeah, automatically, because you're an individual defendant, and individual

Page 105

parties in federal court can always represent themselves, unless you have counsel at the time.

Yes. Please do not take that as a license to file things that have no basis in law or fact.

MR. LUBIN: No, I'm talking about something that has a basis --

THE COURT: Well, I'm sure you might think so, but I just want you to know that if you start filing a flurry of documents, you're going to be standing here every week telling me about them, because we are not going to create a disaster in this case.

I've already seen some of the things that you've tried to file, they would have been denied if they were filed by a lawyer. And it seems to me extremely unlikely that a couple of things that I've stricken that any lawyer worth his or her salt would have put their signature on them.

So be very careful what you file. You do not want to get in the situation where I have you here every week denying a bunch of motions. Think long and hard about what you're asking for. Okay?

MR. LUBIN: This party didn't even get start yet --

THE COURT: Right --

MR. LUBIN: -- but, yes, your Honor.

Page 106

THE COURT:  -- oh, no, no.  If you're telling me that you're going to be difficult --

MR. LUBIN:  I'm not going to be difficult. I'm filing one motion.

THE COURT:  Oh, great --

MR. LUBIN:  Yeah.

THE COURT:  -- we will see how that goes.

Good afternoon.

Court is in recess.

(Whereupon, the hearing was concluded.)

Page 107

CERTIFICATION

STATE OF FLORIDA        :

COUNTY OF BREVARD        :


I, Anna M. Meagher, Shorthand Reporter, do hereby certify that the foregoing proceedings were transcribed by me from a digital recording held on the date and from the place as stated in the caption hereto on Page 1 to the best of my ability.

WITNESS my hand this 6th day of March, 2025.


_____

ANNA M. MEAGHER,

Shorthand Reporter