**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re:

EXCELL AUTO GROUP, INC.

Case No.: 22-12790-EPK
Chapter 7

Debtor.

------------------------------------------------------------------ /

NICOLE TESTA MEHDIPOUR, as Chapter 7 Trustee for
Excell Auto Group, Inc.

Adv. Pro. No. 23-01132-EPK

Plaintiff.

-v-

HI BAR CAPITAL, LLC, SPIN CAPITAL LLC, YISROEL
HERBST, MORDECHAI DOV BER HERBST a/k/a MORDI
HERBST, AVRUMI LUBIN a/k/a JOSH LUBIN, FRANKLIN
CAPITAL FUNDING, LLC and FRANKLIN CAPITAL
GROUP, LLC d/b/a WING LAKE CAPITAL,

Defendants.

------------------------------------------------------------------ /

## HI-BAR CAPITAL, LLC, MORDECHAI HERBST, AND YISROEL HERBST'S REPLY IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants, Hi-Bar Capital, LLC ("Hi-Bar"), Mordechai Herbst, and Yisroel Herbst, (collectively, "Hi-Bar Defendants"), file the following Reply to the Trustee's Opposition to the Hi Bar Defendants' Motion for Partial Summary Judgment [D.E. 220].

1

## <u>MEMORANDUM OF LAW</u>

### I.      <u>The First High Bar Contract is Not a Loan or Subject to Usury Laws</u>

In their Motion for Summary Judgment, the Hi Bar Defendants established that the First High Bar Agreement is not a loan. In fact, a court in New York, in an action between Hi Bar and various entities listed in the First Hi Bar Agreement, expressly found that that the First Hi Bar Agreement was not subject to New York's usury laws. *See Hi Bar Capital, LLC v. Excell Auto Group, Inc*., 2023 N.Y. Slip Op. 31593(U), 3, 2023 WL 3431299, at *2 (N.Y.Sup.). As a result, all of the Trustee's claims that are based on usury should be summarily dismissed.

Furthermore, the Trustee's opposition demonstrates a fundamental miscomprehension of New York law. The Trustee claims that, in determining whether a transaction is a bona fide revenue purchase (versus a loan), the "very first factor is…'market risk.'" Opp. ¶ 4 (citing *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334 (2021)).  That's simply incorrect.  In *Adar Bays*, the court referenced "market risk" as a factor only to "help distinguish loans from ***equity purchases and joint ventures***…." *Id*. at 334 (emphasis added).  Further, the court acknowledged that "the parties executed a traditional loan instrument—the note—constituting a promise by GeneSYS to repay the loaned principal, plus interest, in some form, by a maturity date." *Id.* at 335. The issue in this case is not whether the agreements are equity purchases or joint ventures; it's whether they are bona fide purchases of a specified percentage of future revenue at a discount or loans subject to usury laws. *Adar Bays* is irrelevant to this point.

In determining whether a transaction is a bona fide purchase or a loan, the Court must determine "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy" *Principis Capital, LLC v. I Do, Inc.*, 201 A.D.3d 752, 754, 160 N.Y.S.3d 325 (2d Dept. 2022); *Kennard Law P.C. v. High Speed Capital LLC*, 199 A.D. 1406, 1406 (4th Dept.2021); *Samson MCA LLC v. Joseph A. Russo M.D. P.C./IV Therapeutics PLLC* (4th Dept. 2023).

This straightforward analysis serves important policy considerations. It provides parties with certainty in their business transactions; ensures equal, consistent application of the law; and avoids the disruptive effect of different courts reaching different conclusions on the same or similar agreements.[1] Such certainty, predictability, and consistency is especially important because the

---

[1] For instance, the New York Appellate Division has already found that the same form of agreement at issue in this case isn't a loan.  *See Samson MCA LLC v. Joseph A. Russo M.D. P.C./IV*

issue implicates potential violation of the criminal usury statute.  *Cf. People v. Crespo*, 32 N.Y.3d 176, 192 (2018) (noting that *stare decisis* is "strongest in matters of criminal law" because "any change in rule" might "violate due process"). Parties should not be subject to potential criminal liability based on an amorphous and shifting application of the same law.

It's not just New York state courts that have recognized the importance of a straightforward, reliable analysis; the U.S. Court of Appeals for the Second Circuit has too. In *Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC*, 2023 WL 3882697 (2d Cir. June 8, 2023), the District Court engaged in an expansive, wide-ranging analysis to conclude that a revenue purchase agreement was a loan. On appeal, the Second Circuit affirmed the District court's conclusion. It did so, however, solely based on application of the three-factor test (the agreement failed every factor of the test), implicitly rejecting the District Court's expansive, wide-ranging analysis.

The Trustee cites *Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 37 N.Y.3d 591, 609 n.2 (2021), as providing "additional guidance" for how courts should distinguish between revenue purchase agreements and loans. Opp. ¶ 6. The cited portion of *Plymouth*, however, is dicta in a footnote in a dissent and has no precedential value. Perhaps more importantly, it addresses agreements "described as 'factoring' agreements."  *Plymouth*, 37 N.Y.3d at 609 n.2.

This conflation of factoring agreements with revenue purchase agreement permeates the Trustee's opposition. In a factoring agreement, the funder purchases specific receivables.  *See First Bank & Tr. v. Coventina Constr. Corp.*, 2019 WL 4120363, at *1 (E.D.N.Y. July 23, 2019) ("Under factoring agreements, a factor…purchases accounts receivable from a client at a discount"). In contrast, in a revenue purchase agreement, the funder purchases a specified percentage of ***all*** the merchant's future revenue; meaning a specific portion of the merchant's total future revenue in exchange for an upfront purchase price that is not based upon acquiring any rights in any specific account receivable; rather it is revenue received into the merchant's deposit account (which the merchant agrees to deposit into a designated account) on a given business day or week (depending on frequency of remittances) that triggers the merchant's obligation to remit the specified percentage of the revenue received that day or week *See Calvary LLC v. EBF Holdings, LLC*, 2021 N.Y. Misc. LEXIS 5833, at *26 (Sup Ct, Orange County 2021) ("[T]he

---

*Therapeutics PLLC*, 219 A.D.3d 1126 (4th Dep't 2023).  The agreement at issue in *Samson* is publicly available on the New York State Courts Electronic Filing System  (Index No. 23-00008, Doc. No. 5, R. 28-34).

Agreement involved not the purchase of "*specific* receivables," but rather of 15% of *all* of Cavalry's receivables") (italics in original). The risk, therefore, isn't necessarily that a particular receivable won't be paid (although that might be a risk if the receivable is significant), it's that the business's overall revenue will decline.  If that occurs, the merchant is entitled to a return of money previously paid in excess of the specified percentage by way of the estimated remittances (under the reconciliation provision), and a prospective, downward adjustment of the estimated remittance to more closely reflect the specified percentage (under the adjustment provision).

To suggest that a revenue purchase agreement is a loan unless it purchases specific receivables is to suggest that *all* revenue purchase agreements are loans because a plain reading of revenue-based financing agreements, which are valid commercial contracts under New York law, makes clear that they are not purchasing specific accounts receivable; rather they are purchasing a percentage of the company's total future revenue. Accordingly, any analysis based on whether specific receivables are purchased by these agreements is simply a misunderstanding of the mechanics of these types of contracts and the application of an irrelevant analysis and law.

### a.     The Hi Bar Contract Contains Mandatory Reconciliation and Adjustment Provisions

The Trustee attempts to circumvent the mandatory reconciliation and adjustment provisions by turning applicable law on its head.  Opp. ¶¶ 14-22.  For instance, the Trustee claims that reconciliation and adjustment could be "illusory" because Hi Bar was permitted to request "additional reasonable documentation" and (according to the Trustee) could theoretically use this provision as a pretext to delay or deny reconciliation.  Opp. ¶ 20.  This speculative and hypothetical argument ignores the fact that Hi Bar could only request "reasonable" documentation and that "reasonableness is one of the most commonly applied legal standards and indicates an objective test which does *not* give license to enforce the provision in an arbitrary or subjective manner." *New York State Land Title Ass'n, Inc. v. New York State Dep't of Fin. Servs.*, 117 N.Y.S.3d 16, 18 (1st Dep't 2019) (emphasis added). It also ignores the implied covenant of good faith and fair dealing, pursuant to which Hi Bar was precluded from "do[ing] anything…[to] destroy[]or injur[e] the right of the other party to receive the fruit of the contract…." *S. Nassau Med. Grp., P.C. v. 105 Rockaway Realty, LLC*, 174 N.Y.S.3d 426, 429 (2d Dep't 2022). The Trustee's suggestion that the Court should interpret "reasonableness" as a subjective standard (giving license to enforce

provisions in an arbitrary manner) turns applicable law on its head and, respectfully, should be rejected.

Perhaps more importantly, courts have rejected speculative and hypothetical arguments that reconciliation is "illusory" where, as is the case here, the merchant doesn't allege (and has not provided any proof) that it requested reconciliation and was denied. *See, e.g., Streamlined Consultants, Inc. v. EBF Holdings LLC*, 2022 WL 4368114, at \*4 (S.D.N.Y. Sept. 20, 2022) (rejecting the plaintiffs' speculative and hypothetical argument that reconciliation was illusory where the plaintiff didn't allege that "reconciliation did not in actuality function as agreed" or "that Plaintiffs ever even requested reconciliation"). In fact, the Trustee *admits* that the Debtor never requested to invoke these provisions. [SMF at ¶ 12; D.E. 221]. Speculating that a counterparty would have breached a mandatory contractual provision doesn't make that provision "illusory" or in any way warrant recharacterization of the transaction as a loan.

b.       **The Hi-Bar Contract Has No Fixed Duration**

Despite the plain language of the agreement saying otherwise, the Trustee argues that the MCA is actually a loan because it has fixed duration. In support, the Trustee claims that the "Debtor never had any rights under the Reconciliation or Remittance Adjustment Provisions [or] … those rights were so filled with technical requirements that made such rights, vague speculative and impossible for the Debtor to enforce… ." *See* Opp at pg. 27. The Trustee is simply wrong. The Hi Bar Contract has indefinite terms since it expressly provides that it is "in full force an effect until the entire Purchased Amount and any other amounts due are received by HBC as per the terms of this Agreement." [SMF at ¶ 2, § 1.2]. It also explicitly provides on the first page for "no interest rate or payment schedule and no time period during which the Purchase Amount must be collected by HBC." [SMF at ¶ 2].

While the Plaintiff seeks to avoid this unambiguous language by claiming that the reconciliation provision is illusory and thus, the due date can be determined by a simple calculation, as stated above, under New York law, a merchant is prohibited from challenging whether a reconciliation provision as a sham, where, *which the Trustee admits*, the merchant never followed the provision and was denied a reconciliation. [SMF at ¶ 12; D.E. 221] *See e.g.*, *Mazzoni Ctr. v. LCF Group, Inc.,* 2024 WL 4821475, at \*7 (E.D. Pa. Nov. 18, 2024) ("The Center never requested a reconciliation, so there is nothing to suggest that LCF would refuse to honor these terms."); *Spin Capital, LLC v. Golden Foothill Ins. Services, LLC,* 2023 N.Y. Slip Op. 30594(U),

8, 2023 WL 2265717, at *3 (N.Y.Sup.) ("[I]t does not appear that there is any basis for the allegation that the reconciliation process was a sham and that the defendants would not have received an appropriate credit, because on the record before the Court, it does not appear that the Counterclaim Plaintiffs even allege that they requested a reconciliation or adjustment of the payments and that it was done improperly."); *US Info. Group LLC v. EBF Holdings, LLC,* 2023 WL 6198803, at *8 (S.D.N.Y. Sept. 22, 2023) ("The reconciliation provision may have permitted plaintiffs to adjust their payments to Everest, but plaintiffs do not allege that they invoked it or considered doing so."). As such, Hi-Bar satisfies this factor.

> **c.      Bankruptcy Is Not an Event of Default**

As set forth in Defendants' Motion, an MCA is not a loan where there is "no contractual provision [] establishing that a declaration of bankruptcy would constitute an event of default." *Principis Capital, LLC v. I Do, Inc*., 201 A.D.3d 752, 754, (2022); *see also Streamlined Consultants, Inc. v. EBF Holdings LLC,* 2022 WL 4368114, at *5 (S.D.N.Y. Sept. 20, 2022). It is undisputed that bankruptcy not listed as an "Event of Default" under ¶ 3.1 of the Hi Bar Contract. Moreover, the document expressly provides that, "Merchant going bankrupt or going of business…in and of itself, does not constitute a breach of this Agreement." [SMF at ¶ 2] *See e.g. Mazzoni Ctr. v. LCF Group, Inc*., 2024 WL 4821475, at *8 (E.D. Pa. Nov. 18, 2024)(Finding provision that stating that bankruptcy was not event of default satisfied *Principis* factor).

Despite the lack of any ambiguity, the Trustee attempts to side steps the issue of law at hand and argues that the Hi Bar Agreement contains a *remedy* in the event of bankruptcy "otherwise unavailable to creditors … [that] are contrary to the protections and underlying policy of the bankruptcy code." *See* Opp at ¶ 23. A similar argument was made --  and rejected -- in *Reserve Funding Group LLC v. California Organic Fertilizers, Inc*., 2024 WL 1604195, at *4 (E.D.N.Y. Apr. 12, 2024). In *Reserve*, the plaintiff filed a lawsuit for breach of an MCA agreement. In response, the defendant moved to dismiss the claim on the basis that the contract was usurious. In denying the motion to dismiss, the Court considered the defendant's argument that the agreement provided the plaintiff with "minimal" recourse upon the filing of a bankruptcy petition because the "Agreement gives Reserve a security interest in defendants' assets and provides that if defendants ever have insufficient funds to cover their daily payments" and Reserve is "not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Collateral." *Id.* at * 4.  In rejecting this argument, the Court held that:

6

> Although the fact of bankruptcy does not constitute a breach, an inability to make daily payments would likely occur in the runup to bankruptcy; defendants' assets may therefore have become collateral by the time they declare bankruptcy; and the Agreement smooths Reserve's path to realizing on that collateral. **Yet as with defendants' other arguments, this chain of events seems to presume that the reconciliation and adjustment provisions are effectively meaningless— conceivably, if those provisions are workable, the daily remittance amounts could be adjusted and defendants might never miss a daily payment.** Although the Agreement nominally provides that Reserve will not face procedural barriers in realizing on any collateral in the event of defendants' bankruptcy, the events that would result in defendants' assets becoming collateral are somewhat speculative….

*Id.* The Court then noted that that the defendants "pointed to no case in which any court found provisions such as these to counsel in favor of there being a loan, and have no response to the cases cited by Reserve in which the absence of any provision making bankruptcy an event of default counseled against there being a loan [and] [t]o the extent that it is apparent from the face of the complaint that the Agreement gives Reserve any recourse in the event of bankruptcy, that recourse is limited and cannot overcome the weight of the other *LG Funding* factors." *Id.* Similarly, and as described above, any attack on the viability of the reconciliation and adjustment provisions in the Hi Bar Agreement is entirely speculative since the Debtor never attempted to invoke its protections.

The Trustee's argument that a "bankruptcy filing also triggers 8 'Protections Against Default'" is also incorrect. *See* Opp at ¶25. To be sure, neither Sections 1.12 or 3 (which is listed in Section 1.12) states that the filing of a bankruptcy petition triggers any such protection. To the contrary, the MCA expressly states that "Merchant going bankrupt or going of business…in and of itself, does not constitute a breach of this Agreement." [SMF at ¶ 2].

### d. The "Additional Indicia" Cited by the Trustee is Irrelevant

The Trustee argues that because a default by any of the entities listed on the MCA would equate to a default by all, this somehow transforms the agreement into a loan. In making this argument, the Trustee fails to explain *why* this purported cross-default would change the transaction into a loan or cite any case law to support their argument. To be sure, the undersigned has not uncovered any case analyzing the factors set forth in *Principis Capital, LLC v. I Do, Inc.*, 201 A.D.3d 752, 754-55 (2d Dept. 2022) that finds a cross-default changes an MCA into a loan.

Next, the Trustee argues that Hi Bar has "no upside" and does not have the ability to collect more than the "Purchased Amount." This argument is another fundamental misconception of the

Trustee. In a revenue purchase agreement, the variable isn't the amount of revenue that can be collected.  It's the period over which that amount can be collected – if ever.  If the merchant's business "quadruples," the period will be shorter and the funder will receive a greater return on its investment. Conversely, if the merchant's business declines, the period will be greater and the funder will receive a lower (or no) return on its investment (if revenue drops to zero because of adverse business conditions, the specified percentage multiplied by $0 = $0 and the merchant has no further remittance obligations to the funder.  Thus, whether an agreement provides the funder with the right collect more than the "Purchased Amount" is never relevant because that's not how revenue purchase agreements work.

Once again, the Trustee does not explain how "factor" transforms an MCA into a loan. In support, the Trustee cites *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1066 (2d Cir. 1995), a case that has nothing to do with an MCA agreement or any of the issues this case. In *Endico*, the court considered whether a factoring company purchased an assignment of an account receivable or whether it obtained no more than a security interest. *Id.* at 1068. If it was only a purchase of a security interest, then its interest was subject to the superior rights of a trust established by the Perishable Agricultural Commodities Act of 1930 ("PACA"), 7 U.S.C. § 499a–499s. Therefore, the issues framed by *Endico* are entirely irrelevant to the Court's analysis in this case.

Finally, the Truste argues (again without any legal authority), that because Hi Bar did not obtain any "incident of ownership," this somehow suggests that the transaction is a loan. There should be no law (the undersigned did not find any) to support the Trustee's unsupported opinion about "incident of ownership" because, once again, the Trustee is making an argument that applies to factoring agreements that have zero application or relevance to revenue-based financing agreements such as this, wherein funders/buyers purchase a specific percentage of future revenue up to the right to receive a certain purchased amount of the merchant's total future revenue in exchange for an upfront purchase price. On the other hand, factoring companies purchase specific receivables.

**II.     Summary Judgment is Proper as to Counts 1, 2 and 28 Concerning the Franklin Assignment and Balance Transfer Agreement**

In their Motion for Summary Judgment, the Hi Bar Defendants established that the plain and unambiguous language of the Franklin Assignment did not include the Third Spin Contract.

The language makes no mention of the Third Spin Contract and actually defines "Merchant Agreements" as "(i) the Revenue Purchase Agreement, dated as of June 1, 2021, by and between Assignor and Company, and (ii) the Revenue Purchase Agreement, dated as of July 9, 2021, by and between Assignor and Company… ." [D.E. 75 at pgs. 86-95] (emphases supplied). In response, the Trustee seeks to expand the definition of "Merchant Documents" by jumping on the phrase "all rights of the Assignor under any similar or related documents (including without limitation, any guaranties, security agreements, forbearance agreements, settlement agreements and judgments)." However, under "[t]he principle of *ejusdem generis*, [] when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed." *Powers v. Bone*, No. 367748, 2025 WL 466349, at *4 (Mich. Ct. App. Feb. 11, 2025); *see also Fischer v. United States,* 603 U.S. 480, 487 (2024)("Under the [] canon of *ejusdem generis*, "a 'general or collective term' at the end of a list of specific items" is typically " 'controlled and defined by reference to' the specific classes ... that precede it.")

As applied to this case, the general phrase clearly only includes various documents that were signed in connection with the First or Second Spin Contract, which are the specific items that precede the more general phrase. It would make little sense, especially in an agreement between two sophisticated commercial parties, to expand that definition to any other potential contractual relationship between the parties. If the parties intended to include the Third Spin Contract, they would have listed it just like they did with the First and Second Spin Contract. Further demonstrating the erroneous nature of the Trustee's contractual interpretation is that the general phrase she relies upon relied upon is completed with further language referencing the "Merchant Agreements." [D.E. 75 at pgs. 86-95]. Since the Franklin Assignment excluded the Third Spin Contract, the representations under paragraph 4 concerning "Obligations, the Merchant Documents and the Third Party" referenced in SAC cannot be construed to cover or contain any representations concerning the balance under the Third Spin Contract, let alone demonstrate any rights therein had been assigned over to Franklin[2].

---

[2] It should also be noted that Hi Bar was not a party to the Franklin Assignment and never spoke to anyone at Franklin. Therefore, even if Spin breached its agreement with Franklin, that should not impact Hi Bar's arms length transaction with the Merchants identified in the First Hi Bar Contract. [D.E. 167 at ¶ ¶ 22 and 23.]

9

As to the Hi Bar Transfer Agreement, the Trustee also makes two points, both of which should be rejected. First, the Trustee argues that the Hi Bar Transfer Agreement was not countersigned by Hi Bar and thus, was ineffective until payment was made on November 1, 2021.That is incorrect. "Under New York law, a contract need not be signed by either or both parties in order to be enforceable." *In re Weiss Multi-Strategy Advisers LLC*, 664 B.R. 492, 526 (Bankr. S.D.N.Y. 2024).  Therefore, that argument should be considered a non-starter.

Second, the Trustee argues that "Hi Bar never funded the First Hi Bar Contract." *See* Opp at pg. 19. Based on the wire transfers included in the record, that is obviously incorrect. Instead, the Trustee is pointing to an internal Hi Bar business practice to reach the incorrect conclusion that Hi Bar did not satisfy the transfer obligation. While it is accurate that Hi Bar borrowed money from Spin at that time, that business decision would be no different than Hi Bar borrowing the funds from an unrelated third party. Indeed, most alternative finance companies borrow money to transact business with the ultimate customer. Therefore, this argument should rejected as it would effectively eliminate a general business practices of most companies.

In sum, not only did the plain language of the Assignment exclude the Third Spin Contract, but at the time of the Assignment, the Third Spin contract no longer existed. *Riversbend Rehab., Inc. v. Home-Owners Ins. Co.*, 2024 WL 2988877, at *5 (Mich. Ct. App. June 13, 2024)("An assignment of rights can only convey rights "actually held at the time of the execution of the assignment.")  Consequently, Count 2 must also be dismissed, since that claim seeking to set aside the Balance Transfer Agreement dated October 27, 2021 (four days before the Franklin Assignment), is based upon the contention that Spin allegedly sold its interests in, and balance of $2,114,312.50 under, the Third Spin Contract to Franklin. [D.E. 75 at ¶ 208].

### III.     Summary Judgment is Proper as to Count 17

Count 17 seeks a declaration that the Hi-Bar Contract, the First Settlement Agreement, and Second Settlement Agreement are "void and unenforecable" because they are "unconsionable" under New York Law. In response, despite alleging that "the First Hi Bar Contract is a criminally usurious loan" the Trustee suprisingly argues that she is "not seeking declaratory or affirmative releif under New York's criminal usury statute." *See* Opp at pg. 19; SAC at § 381. Instead,  the Trustee shifts gears and claims that its releif is proper because "Scott Zankl was being pressured and threatened leaving no choicve but have Debtor executre each of the Agreements."  New York law provides:

> A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made -- i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.

*Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 10 (1988). Notwithstanding Zankl's claim that he was "pressured," there is simply no evidence that the Debtor entered these contracts with "an absence of meaningful choice," subject to oppressive conduct, without the commercial sophistication to understand what it agreed to, or that the pressure was anything more than a threat to enforce legal rights, which is not actionable. *Dabriel, Inc. v. First Paradise Theaters Corp.*, 99 A.D.3d 517, 521 (1st Dept. 2012) ("All told, plaintiffs failed to plead anything regarding an alleged lack of meaningful choice … and it is noteworthy that plaintiffs were free to walk away from the lease negotiations at any time and rent space elsewhere.") (citation and quotation marks omitted); *See also Cooper Dev. Co. v. Friedman*, 1994 WL 62846, at *4 (S.D.N.Y. Feb. 22, 1994), *aff'd sub nom. Cooper Dev. v. Friedman*, 43 F.3d 1458 (2d Cir. 1994)("Under New York law, threats to enforce a party's legal rights under a contract—or even that party's interpretation of its rights—cannot constitute a wrongful threat sufficient to establish a claim of economic duress."). Given the lack of any evidence to support this claim, and the evidence demonstrating that Hi Bar was exercising its legal rights, summary judgment should be granted.

**IV.    Summary Judgment Should be Granted as to the The Fraudulent Conveyance Counts Because Any Transfers Resulted from the Enforcement of Hi Bar's Security Interest**

In response to HI Bar's Motion for summary judgment on the various fraudulent conveyance claims, the Trustee argues that "Hi Bar raises a defense for the first time that it failed to plead." However, only *affirmative* defenses must be pled. The protection afforded to transferee under § 726.109(5)(b) is not an affirmative defense. Rather, it is a statutory protection from a fraudulent transfer claim. Therefore, there is no requirement for it to be pled. Next, in an effort to overcome the undisputed fact that the Hi Bar UCC remains perfected in the registry, the Trustee argues that it has brought this case to seeking to avoid the security agreements. However, because no legal basis exists to avoid those agreements (as they are not usurious), this circular argument should be rejected.

## CONCLUSION

Based on the forgoing, the Hi-Bar Defendants respectfully requests this Court grants its Motion for Summary Judgement and award all other such relief deemed necessary and proper.

11

Respectfully submitted,

LETO LAW FIRM
201 S. Biscayne Blvd.
Suite 2700
Miami, Florida 33131
Tel.    305-341-3155
Fax:    305-397-1168

*/s/ Matthew P. Leto*
MATTHEW P. LETO
Florida Bar No.: 014504
mleto@letolawfirm.com
kzelaya@letolawfirm.com
pleadings@letolawfirm.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 22, 2025, we electronically filed the foregoing

document with the Clerk of the Court and provided service to all counsel of record using CM/ECF.

*/s/ Matthew P. Leto*
MATTHEW P. LETO