**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re:

                                        Case No.: 22-12790-EPK

        EXCELL AUTO GROUP, INC.            Chapter 7

           Debtor.

--------------------------------------------------------------------- /

NICOLE TESTA MEHDIPOUR, as Chapter 7 Trustee for
Excell Auto Group, Inc.                           Adv. Pro. No. 23-01132-EPK

          Plaintiff.

     -v-

HI BAR CAPITAL, LLC, SPIN CAPITAL LLC, YISROEL
HERBST, MORDECHAI DOV BER HERBST a/k/a MORDI
HERBST, AVRUMI LUBIN a/k/a JOSH LUBIN, FRANKLIN
CAPITAL FUNDING, LLC and FRANKLIN CAPITAL
GROUP, LLC d/b/a WING LAKE CAPITAL,

          Defendants.

--------------------------------------------------------------------- /

**HI-BAR CAPITAL, LLC'S RESPONSE TO PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT**

      Defendant, Hi-Bar Capital, LLC ("Hi-Bar"), files the following Response to Plaintiff's

Motion for Partial Summary Judgment [D.E. 183], and states:

1

<u>**MEMORANDUM OF LAW**</u>

**A.      <u>Florida's Usury Laws Do Not Apply</u>**

As this Court recognized when denying the Trustee's Motion for Leave to Amend to add a claim against Hi Bar based on Florida's usury laws, New York applies to this transaction. [D.E. 242]. The First Hi Bar Contract contains an express choice of law provision that provides:

> This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums, attachments, exhibits, and other documents relating to this Agreement in any way, **shall be governed by by and construed in accordance with the laws of the State of New York**, without regards to any applicable principals of conflicts of law.

(emphasis added) [D.E. 184-21 at pg. 4, § 4.5]. This choice of law provision makes sense since Hi Bar "is a New York limited liability company with its principal place of business in New York… ." [D.E. 75 at ¶ 2].

"A district court sitting in diversity applies the choice-of-law rules of the state in which it sits, in this case Florida." *Viridis Corp. v. TCA Glob. Credit Master Fund, LP,* 721 Fed. Appx. 865, 873 (11th Cir. 2018) *citing  Rando v. Gov't Employees Ins. Co.*, 556 F.3d 1173, 1176 (11th Cir. 2009). "Under Florida law, contractual choice-of-law provisions are presumptively enforceable." *Id.* "[A] party may overcome this presumption by showing that a provision contravenes the strong public policy of Florida or is unjust or unreasonable." *Id.*  Notably, deterring usury is <u>not</u> considered to be a "strong public policy" that would allow a court to disregard an agreed upon choice of law provision. *Id.*  Indeed, "the mere fact that there exists in Florida a usury statute which prohibits a certain interest rate from being charged does not establish some public policy against either ordinary or criminal usury strong enough to override either the express or constructive intent of the parties that the law of a state which permits higher interest and penalizes usury violations less harshly shall apply." *OFS Equities, Inc. v. Conde*, 421 So. 2d 651, 653 (Fla. 3d DCA 1982).

*L'Arbalete, Inc. v. Zaczac*, 474 F. Supp. 2d 1314, 1321 (S.D. Fla. 2007) is instructive on this issue. In *Zaczac,* a Panamanian lender filed suit to recover from a developer based on a promissory note that contained a Delaware choice of law provision.  In response, Zaczac alleged that the promissory note was usurious under Florida law.  When analyzing this issue, and rejecting Zaczac's defense, the district court acknowledged that choice of law provisions that would avoid the application of Florida's usury laws are enforceable so long as the selected state has "a normal

2

relation to the transaction." *Id.* at 1322 *citing Morgan Walton Properties, Inc. v. International City Bank & Trust Co.,* 404 So.2d 1059 (Fla.1981).

The Court then found that based on various factors related to the transaction at issue, Delaware law controlled. *Id.* In doing, the court highlighted that it "is generally accepted that the place of one parties' residence or incorporation may provide the normal relation to a transaction as contemplated in a choice of usury laws context or at least is a compelling factor in that determination." *Id. citing Continental Mortgage,* 395 So.2d at 513, *Ciena Corp. v. Jarrard,* 203 F.3d 312, 324 (4th Cir.2000); *Preferred Capital, Inc. v. Associates in Urology,* 453 F.3d 718 (6th Cir.2006); *Valley Juice Ltd. v. Evian Waters of France, Inc.,* 87 F.3d 604, 608 (2d Cir.1996); *see also Land-Cellular Corp. v. Zokaites,* 2006 WL 3040766 * 12 (S.D.Fla. Oct.23, 2006); *Carlock v. Pillsbury Co.,* 719 F.Supp. 791, 807 (D.Minn.1989); *Hale v. Co-Mar Offshore Corp.,* 588 F.Supp. 1212, 1215 (W.D.La.1984); *Nedlloyd Lines, B.V. v. San Mateo County,* 3 Cal.4th 459, 467, 11 Cal.Rptr.2d 330, 834 P.2d 1148 (1992); Restatement (Second) of Conflicts § 187(2)(a) comments f and g (explaining that a choice of law clause selecting the law of the state of one of the parties is demonstrably reasonable and substantial relationship test met "where one of the parties is domiciled in the chosen state"); *see also Wilmington Tr., N.A. v. Estate of Gonzalez*, 2016 WL 11656681, at Fn3 (S.D. Fla. Nov. 1, 2016)(finding that Utah law applied to transaction despite argument that transaction was usurious under Florida law.) Accordingly, New York law applies to any usury analysis related to Hi Bar.

**B.      The First High Bar Contract is Not a Loan**

In their Motion for Summary Judgment, the Hi Bar Defendants established that the First High Bar Agreement is not a loan. [D.E. 168]. In fact, a court in New York, in an action between Hi Bar and various entities listed in the First Hi Bar Agreement, expressly found that that the First Hi Bar Agreement was not a loan and therefore, not subject to New York's usury laws. *See Hi Bar Capital, LLC v. Excell Auto Group, Inc.*, 2023 N.Y. Slip Op. 31593(U), 3, 2023 WL 3431299, at *2 (N.Y.Sup.)("The Purchase Agreement is enforceable, and not void as a matter of criminal or civil usury, because the repayment terms, rather than being absolute, are contingent (*see Principis Cap., LLC v I Do, Inc., supra)*.") Of course, "[i]f the transaction is not a loan, there can be no usury, *however unconscionable the contract may be*." *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 665 (2d Dept. 2020) (emphasis supplied). Under New York law, "[t]o constitute a loan, the agreement must provide for repayment absolutely and at all events or

that the principal in some way be secured as distinguished from being put in hazard." *Cash4Cases, Inc. v. Brunetti*, 167 A.D.3d 448, 449 (1st Dept. 2018). Unlike the transactional documents at issue here, "[o]rdinarily, a loan consists of a face value, repayable (with interest) over a finite period DEFINED in the transaction documents." *Pirs Capital, LLC v. D & M Truck, Tire & Trailer Repair Inc.*, 69 Misc. 3d 457, 463 (N.Y. Sup. Ct. 2020)(emphasis in original).

The Trustee's Motion demonstrates a fundamental miscomprehension of New York law. The Trustee claims that, in determining whether a transaction is a bona fide revenue purchase (versus a loan), the "very first factor is…'market risk.'" Mot. ¶ 4 (citing *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334 (2021)). That's simply incorrect. In *Adar Bays*, the court referenced "market risk" as a factor only to "help distinguish loans from **equity purchases and joint ventures**…." *Id*. at 334 (emphasis added). Further, the court acknowledged that "the parties executed a traditional loan instrument—the note—constituting a promise by GeneSYS to repay the loaned principal, plus interest, in some form, by a maturity date." *Id.* at 335. The issue in this case is not whether the agreements are equity purchases or joint ventures; it's whether they are bona fide purchases of a specified percentage of future revenue at a discount or loans subject to usury laws. *Adar Bays* is irrelevant to this point.

In determining whether a transaction is a bona fide purchase or a loan, the Court must determine "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy" *Principis Capital, LLC v. I Do, Inc*., 201 A.D.3d 752, 754, 160 N.Y.S.3d 325 (2d Dept. 2022); *Kennard Law P.C. v. High Speed Capital LLC*, 199 A.D. 1406, 1406 (4th Dept.2021); *Samson MCA LLC v. Joseph A. Russo M.D. P.C./IV Therapeutics PLLC* (4th Dept. 2023).

This straightforward analysis serves important policy considerations. It provides parties with certainty in their business transactions; ensures equal, consistent application of the law; and avoids the disruptive effect of different courts reaching different conclusions on the same or similar agreements.[1] Such certainty, predictability, and consistency is especially important because the issue implicates potential violation of the criminal usury statute. *Cf. People v. Crespo*, 32 N.Y.3d

---

[1] For instance, the New York Appellate Division has already found that the same form of agreement at issue in this case is not a loan. *See Samson MCA LLC v. Joseph A. Russo M.D. P.C./IV Therapeutics PLLC*, 219 A.D.3d 1126 (4th Dep't 2023). The agreement at issue in *Samson* is publicly available on the New York State Courts Electronic Filing System (Index No. 23-00008, Doc. No. 5, R. 28-34).

176, 192 (2018) (noting that *stare decisis* is "strongest in matters of criminal law" because "any change in rule" might "violate due process"). Parties should not be subject to potential criminal liability based on an amorphous and shifting application of the same law.

It's not just New York state courts that have recognized the importance of a straightforward, reliable analysis; the U.S. Court of Appeals for the Second Circuit has too. In *Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC*, 2023 WL 3882697 (2d Cir. June 8, 2023), the District Court engaged in an expansive, wide-ranging analysis to conclude that a revenue purchase agreement was a loan. On appeal, the Second Circuit affirmed the District court's conclusion. It did so, however, solely based on application of the three-factor test (the agreement failed every factor of the test), implicitly rejecting the District Court's expansive, wide-ranging analysis.

This conflation of factoring agreements with revenue purchase agreement permeates the Trustee's Motion. In a factoring agreement, the funder purchases specific receivables. *See First Bank & Tr. v. Coventina Constr. Corp.*, 2019 WL 4120363, at *1 (E.D.N.Y. July 23, 2019) ("Under factoring agreements, a factor…purchases accounts receivable from a client at a discount"). In contrast, in a revenue purchase agreement, the funder purchases a specified percentage of ***all*** future revenue; meaning a specific portion of the merchant's total future revenue in exchange for an upfront purchase price that is not based upon acquiring rights in any specific account receivable; rather it is revenue received into the merchant's deposit account (which the merchant agrees to deposit into a designated account) on a given business day or week (depending on frequency of remittances) that triggers the merchant's obligation to remit the specified percentage of the revenue received that day or week *See Calvary LLC v. EBF Holdings, LLC*, 2021 N.Y. Misc. LEXIS 5833, at *26 (Sup Ct, Orange County 2021) ("[T]he Agreement involved not the purchase of "*specific* receivables," but rather of 15% of *all* of Cavalry's receivables") (italics in original). The risk, therefore, is not necessarily that a particular receivable won't be paid (although that might be a risk if the receivable is significant), it's that the business's overall revenue will decline. If that occurs, the merchant is entitled to a return of money previously paid in excess of the specified percentage by way of the estimated remittances (under the reconciliation provision), and a prospective, downward adjustment of the estimated remittance to more closely reflect the specified percentage (under the adjustment provision).

To suggest that a revenue purchase agreement is a loan unless it purchases specific receivables is to suggest that ***all*** revenue purchase agreements are loans because a plain reading of

revenue-based financing agreements, which are valid commercial contracts under New York law, makes clear that they are not purchasing specific accounts receivable; rather they are purchasing a percentage of the company's total future revenue. Accordingly, any analysis based on whether specific receivables are purchased by these agreements is simply a misunderstanding of the mechanics of these types of contracts and the application of an irrelevant analysis and law.

### i.    The Hi Bar Contract Contains Mandatory Reconciliation and Adjustment Provisions

The Trustee attempts to circumvent the mandatory reconciliation and adjustment provisions by turning applicable law on its head. Mot. At pgs. 7-8. Trustee's argument ignores that courts have rejected speculative and hypothetical arguments that reconciliation is "illusory" where, as is the case here, the merchant doesn't allege (and has not provided any proof) that it requested reconciliation and was denied. In fact, the Trustee *admits* that the Debtor never sought this relief. [D.E. 167 at ¶ 12 and D.E. 221]. *See, e.g.,  Streamlined Consultants, Inc. v. EBF Holdings LLC*, 2022 WL 4368114, at *4 (S.D.N.Y. Sept. 20, 2022) (rejecting the plaintiffs' speculative and hypothetical argument that reconciliation was illusory where the plaintiff didn't allege that "reconciliation did not in actuality function as agreed" or "that Plaintiffs ever even requested reconciliation"). Speculating that a counterparty would have breached a mandatory contractual provision does not make that provision "illusory" or in any way warrant recharacterization of the transaction as a loan.

### ii.    Bankruptcy Is Not an Event of Default

An MCA is not a loan where there is "no contractual provision [] establishing that a declaration of bankruptcy would constitute an event of default." *Principis Capital, LLC v. I Do, Inc.*, 201 A.D.3d 752, 754, (2022); *see also Streamlined Consultants, Inc. v. EBF Holdings LLC,* 2022 WL 4368114, at *5 (S.D.N.Y. Sept. 20, 2022). It is undisputed that bankruptcy not listed as an "Event of Default" under ¶ 3.1 of the Hi Bar Contract. Moreover, the document expressly provides that, "Merchant going bankrupt or going of business…in and of itself, does not constitute a breach of this Agreement." [D.E. 167 at ¶ 2; Ex. 1]. *See e.g. Mazzoni Ctr. v. LCF Group, Inc.*, 2024 WL 4821475, at *8 (E.D. Pa. Nov. 18, 2024)(Finding provision that stating that bankruptcy was not event of default satisfied *Principis* factor).

Despite the lack of any ambiguity, the Trustee attempts to side steps the issue of law at hand and argues that the Hi Bar Agreement contains a *remedy* in the event of bankruptcy

6

"otherwise unavailable to creditors [that] are contrary to the protections and underlying policy of the bankruptcy code." *See* Mot. at pg. 8. A similar argument was made -- and rejected -- in *Reserve Funding Group LLC v. California Organic Fertilizers, Inc*., 2024 WL 1604195, at *4 (E.D.N.Y. Apr. 12, 2024). In *Reserve*, the plaintiff filed a lawsuit for breach of an MCA agreement. In response, the defendant moved to dismiss the claim on the basis that the contract was usurious. In denying the motion to dismiss, the Court considered the defendant's argument that the agreement provided the plaintiff with "minimal" recourse upon the filing of a bankruptcy petition because the "Agreement gives Reserve a security interest in defendants' assets and provides that if defendants ever have insufficient funds to cover their daily payments" and Reserve is "not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Collateral." *Id.* at * 4.  In rejecting this argument, the Court held that:

> Although the fact of bankruptcy does not constitute a breach, an inability to make daily payments would likely occur in the runup to bankruptcy; defendants' assets may therefore have become collateral by the time they declare bankruptcy; and the Agreement smooths Reserve's path to realizing on that collateral. **Yet as with defendants' other arguments, this chain of events seems to presume that the reconciliation and adjustment provisions are effectively meaningless— conceivably, if those provisions are workable, the daily remittance amounts could be adjusted and defendants might never miss a daily payment.** Although the Agreement nominally provides that Reserve will not face procedural barriers in realizing on any collateral in the event of defendants' bankruptcy, the events that would result in defendants' assets becoming collateral are somewhat speculative….

*Id.* The Court then noted that that the defendants "pointed to no case in which any court found provisions such as these to counsel in favor of there being a loan, and have no response to the cases cited by Reserve in which the absence of any provision making bankruptcy an event of default counseled against there being a loan [and] [t]o the extent that it is apparent from the face of the complaint that the Agreement gives Reserve any recourse in the event of bankruptcy, that recourse is limited and cannot overcome the weight of the other *LG Funding* factors." *Id.* Similarly, and as described above, any attack on the viability of the reconciliation and adjustment provisions in the Hi Bar Agreement is entirely speculative since the Debtor never attempted to invoke its protections. [D.E. 167 at ¶ 12 and D.E. 221].

The Trustee's argument that a "bankruptcy filing also triggers 8 'Protections Against Default" is also incorrect. *See* Mot. at pg. 9. To be sure, neither Sections 1.12 or 3 (which is listed in Section 1.12) states that the filing of a bankruptcy petition triggers any such protection. To the

contrary, the MCA expressly states that "Merchant going bankrupt or going of business…in and of itself, does not constitute a breach of this Agreement." [D.E. 167 at ¶ 2; Ex. 1].

### iii.      The Hi-Bar Contract Has No Fixed Duration

Despite the plain language of the agreement saying otherwise, the Trustee argues that the MCA is actually a loan because it has fixed duration. In support, the Trustee claims that the "Debtor never had any rights under the Reconciliation or Remittance Adjustment Provisions [or] … those rights were so filled with technical requirements that made such rights, vague speculative and impossible for the Debtor to enforce… ." *See* Mot. pg. 10. The Trustee is simply wrong. The Hi Bar Contract has indefinite terms since it expressly provides that it is "in full force an effect until the entire Purchased Amount and any other amounts due are received by HBC as per the terms of this Agreement." [D.E. 167 at ¶ 2; Ex. 1 at § 1.2]. It also explicitly provides on the first page for "no interest rate or payment schedule and no time period during which the Purchase Amount must be collected by HBC." [D.E. 167 at ¶ 2].

While the Trustee seeks to avoid this unambiguous language by claiming that the reconciliation provision is illusory and thus, the due date can be determined by a simple calculation, as stated above, under New York law, a merchant is prohibited from challenging whether a reconciliation provision as a sham, where, *which the Trustee admits*, the merchant never followed the provision and was denied a reconciliation. *See e.g.*, *Mazzoni Ctr. v. LCF Group, Inc.*, 2024 WL 4821475, at *7 (E.D. Pa. Nov. 18, 2024) ("The Center never requested a reconciliation, so there is nothing to suggest that LCF would refuse to honor these terms."); *Spin Capital, LLC v. Golden Foothill Ins. Services, LLC*, 2023 N.Y. Slip Op. 30594(U), 8, 2023 WL 2265717, at *3 (N.Y.Sup.) ("[I]t does not appear that there is any basis for the allegation that the reconciliation process was a sham and that the defendants would not have received an appropriate credit, because on the record before the Court, it does not appear that the Counterclaim Plaintiffs even allege that they requested a reconciliation or adjustment of the payments and that it was done improperly."); *US Info. Group LLC v. EBF Holdings, LLC*, 2023 WL 6198803, at *8 (S.D.N.Y. Sept. 22, 2023) ("The reconciliation provision may have permitted plaintiffs to adjust their payments to Everest, but plaintiffs do not allege that they invoked it or considered doing so.").

### iv.      The "Additional Indicia" Cited by the Trustee is Irrelevant

The Trustee argues that because a default by any of the entities listed on the MCA would equate to a default by all, this somehow transforms the agreement into a loan. In making this

argument, the Trustee fails to explain *why* this purported cross-default would change the transaction into a loan or cite any case law to support their argument. To be sure, the undersigned has not uncovered any case analyzing the factors set forth in *Principis Capital, LLC v. I Do, Inc.*, 201 A.D.3d 752, 754-55 (2d Dept. 2022) that finds a cross-default changes an MCA into a loan.

Next, the Trustee argues that Hi Bar has "no upside" and does not have the ability to collect more than the "Purchased Amount." This argument is another fundamental misconception of the Trustee. In a revenue purchase agreement, the variable isn't the amount of revenue that can be collected.  It's the period over which that amount can be collected – if ever.  If the merchant's business "quadruples," the period will be shorter and the funder will receive a greater return on its investment. Conversely, if the merchant's business declines, the period will be greater and the funder will receive a lower (or no) return on its investment (if revenue drops to zero because of adverse business conditions, the specified percentage multiplied by $0 = $0 and the merchant has no further remittance obligations to the funder.  Thus, whether an agreement provides the funder with the right collect more than the "Purchased Amount" is never relevant because that's not how revenue purchase agreements work.

Once again, the Trustee does not explain how "factor" transforms an MCA into a loan. In support, the Trustee cites *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1066 (2d Cir. 1995), a case that has nothing to do with an MCA agreement or any of the issues this case. In *Endico*, the court considered whether a factoring company purchased an assignment of an account receivable or whether it obtained no more than a security interest. *Id.* at 1068. If it was only a purchase of a security interest, then its interest was subject to the superior rights of a trust established by the Perishable Agricultural Commodities Act of 1930 ("PACA"), 7 U.S.C. § 499a–499s. Therefore, the issues framed by *Endico* are entirely irrelevant to the Court's analysis in this case. Finally, who conducted Hi Bar's due diligence is irrelevant as they relied upon the Merchants and if any issue arose regarding an ability to pay, the Reconciliation and Adjustment Provisions could be invoked.

Finally, the Truste argues (again without any legal authority), that because Hi Bar did not obtain any "incident of ownership," this somehow suggests that the transaction is a loan. There should be no law (the undersigned did not find any) to support the Trustee's unsupported opinion about "incident of ownership" because, once again, the Trustee is making arguments that apply to factoring agreements that have zero application or relevance to revenue-based financing

9

agreements, wherein funders/buyers purchase a specific percentage of future revenue up to the right to receive a certain purchased amount of the merchant's total future revenue in exchange for an upfront purchase price.

### v.      The Usury Claims Were Released by Excell

Even if the agreement was a loan (its not), the First and Second Settlement Agreements entered between Hi Bar and the Debtor require denial of the motion for summary judmgent. Under New York law, which the Settlement Agreements must be interprerted under, "a valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011). Where the release is broadly worded and releases such persons as, for example, "agents" of the signatories, all claims between a party to the release and the agents of the other party are barred. *Ctr. Lane Partners III, L.P. v. Nature's Bounty Co.*, 193 A.D.3d 498, 498 (1st Dept. 2021). Notably, a release bars claims of criminal usury under New York law provided that the settlement agreement itself is not usurious. *OriginClear Inc. v. GTR Source, LLC,* 2021 WL 5907878 (W.D.N.Y. Dec. 14, 2021).

On February 1, 2022, Hi Bar and the Debtor entered the Second Settlement Agreement, with a total settlement amount of $3,800,000.00. [D.E. 167 at Ex. 5 pg. 28]. Paragraph 6 contains a nearly identical release provision to the First Settlement Agreement, and paragraph 7 provides, "Merchant and Guarantors hereby withdraw any defenses they may have to the claims asserted in the [New York] Action." *Id.* at pg. 30.

"[A]bsent fraud, duress, illegality, mutual mistake or other cause sufficient to invalidate a contract, the signing of a release that contains clear and unambiguous language is a jural act binding on the parties." *Stevens v. Town of Chenango (Forks)*, 167 A.D.3d 1105, 1106 (3d Dept. 2018). "[A] signed release shifts the burden of going forward to the plaintiff to show that there has been fraud, duress or some other fact which will be sufficient to void the release." *Centro Empresarial Cempresa*, 17 N.Y.3d at 276. Here, there are no allegations that the Settlement Agreements were the product of fraud, duress, illegality or mutual mistake upon or concerning the Debtor. While the Trustee has argued that the settlements were "done under the threat of litigation" on a usurious contract and are therefore "unconscionable," settlement agreements are typically entered between parties when litigation is contemplated and as set forth below, there is nothing usurious about the First Hi Bar Contract. *See e.g. Cooper Dev. Co. v. Friedman*, 1994 WL 62846, at *4 (S.D.N.Y. Feb. 22, 1994), *aff'd sub nom. Cooper Dev. v. Friedman*, 43 F.3d 1458 (2d Cir.

1994)("Under New York law, threats to enforce a party's legal rights under a contract—or even that party's interpretation of its rights—cannot constitute a wrongful threat sufficient to establish a claim of economic duress.") Based on the forgoing, summary judgment should be denied.

### vi.   Even the Hi Bar Agreements are Loans, New York Law Would <u>Not</u> Render Them Usurious

Even if the Hi Bar Agreements are issue were considered loans, because the amount at issue exceeds $2.5 million, New York law would not render the usurious. Indeed, Zankl's entities have already attempted to have a New York Court render the Hi Bar Agreements usurious – and lost. *See Hi Bar Capital, LLC v. Excell Auto Group, Inc*., 2023 N.Y. Slip Op. 31593(U), 3–4, 2023 WL 3431299, at *2 (N.Y.Sup.()"Notwithstanding the foregoing, as asserted by plaintiff, even if the subject transactions are viewed as loans, the usury statute does not apply to loans that are for amounts greater than $2.5 million (see General Obligations Law § 5-501 [6] [b]); *see also 72nd Ninth LLC v 753 Ninth Ave Realty LLC*, 168 AD3d 597, 598 [1st Dept 2019]). Here, the agreements at issue--the Purchase Agreement, Settlement Agreement and Stipulation--concern amounts greater than $2.5 million, As such, defendants' defense of criminal usury fails as a matter of law.")

### vii.   Summary Judgment Should Be Denied as to Count 3

Count 3 seeks a declaration that the Hi-Bar Contract, the First Settlement Agreement, and Second Settlement Agreement are "void" because "the amount of intersest charged or sought to be charged is criminally usurious and in violation of applicaible New York or Florida Law.  As demonstrated above, New York law applies. Summary judgment should be denied as to this Count (and entered in favor of Hi Bar) because under New York law, criminal usury is only an affirmative defense and cannot be the basis of a declaratory judgment cause of action, including seeking to declare void an MCA agreement. *Paycation Travel v. Glob. Merch. Cash*, 192 A.D.3d 1040, 1041 (2d Dept. 2021) ("General Obligations Law § 5-521 bars a corporation such as the plaintiff from asserting usury in any action, except in the case of criminal usury as defined in Penal Law § 190.40, *and then only as a defense to an action to recover repayment of a loan, and not as the basis for a cause of action asserted by the corporation for affirmative relief.*") (citations omitted; emphasis supplied); *Colonial Funding Network, Inc. for TVT Capital, LLC v. Epazz, Inc.,* 252 F. Supp. 3d 274, 279 (S.D.N.Y. 2017)("New York law [] [only] allows a corporation to assert criminal usury as a defense, but not as a claim for affirmative relief.") Clearly, there is no basis for a declaratory judgment that the Hi-Bar Contract is criminally usurious.

11

**C.** **Summary Judgment Should Be Denied as to the Fraudulent Conveyance Counts Because the Funds Did Originate from The Debtor And Any Transfers Resulted from the Enforcement of Hi Bar's Security Interest**

**i.** **The Debtor Did Not Make Payments to Hi Bar**

While the Trustee correctly states that the Debtor made payments to Hi Bar *through its accounts*, which Hi Bar admits, the factual record demonstrates that the payments merely *passed through* the Debtor's accounts and funds actually belonged to Karma of Palm Beach and Karma of Broward – both of which had an obligation under the First Hi Bar Agreement. [D.E. 167; Ex. 1 at pg. 12. The Payments were made as follows:

a. **Payment 1** was made on November 15, 2021 in the amount of $300,000 from an Excell account ending in 6901. [D.E. 267 at Exhibit "2."] However, on November 12, 2021, $300,000 was deposited into that account from an account ending in 8711, which is a Karma account. *See Id.* and D.E. 267 at Exhibit "3" which is a sworn declaration from Scott Zankl identifying 8711 as a Karma account.

b. **Payment 2** was made on December 17, 2021 in the amount of $200,000 from an Excell account ending in 6901. [D.E. 267 at Exhibit "4."] However, that same day, $200,000 was deposited into that account from an account ending in 6603, which is a Karma account. *See Id.* and D.E. 267 at Exhibit "3," which is a Declaration from Scott Zankl identifying 6603 as a Karma account.

c. **Payment 3** was made on December 20, 2021 in the amount of $200,000 from an Excell account ending in 6901. [D.E. 267 at Exhibit "4."] However, that same day, $200,000 was deposited into that account from an account ending in 6603, which is a Karma account. *See Id.* and D.E. 267 at Exhibit "3," which is an affidavit from Scott Zankl identifying 6603 as a Karma account.

d. **Payment 4** was made on January 10, 2022 in the amount of $100,000 from an Excell account ending in 6901. [D.E. 267 at Exhibit "5."] However, that same day, $100,000 was deposited into that account from an account ending in 6603, which is a Karma account. *See Id.* and D.E. 267 at Exhibit "3," which is an affidavit from Scott Zankl identifying 6603 as a Karma account.

e. **Payment 5** was made on January 12, 2022 in the amount of $100,000 from an Excell account ending in 6901. [D.E. 267 at Exhibit "5."] However, a day later, $100,000 was

12

deposited into that account from an account ending in 3199, which received seven transfers between January 12 and January 14, 2022 totaling $138,775 from account ending in 8711, which is a Karma account. *See* D.E. 267 Exhibit "6" and Exhibit "3," which is an affidavit from Scott Zankl identifying 8711 as a Karma account.

   f.  **Payment 6** was made on February 7, 2022 in the amount of $250,000 from an Excell account ending in 3181. [D.E. 267 at Exhibit "7."] However, on January 20, 2022, $108,000 was deposited into that account from an account ending in 8711, which is a Karma account. D.E. 267 at Exhibit "8" and Exhibit "3," which is an affidavit from Scott Zankl identifying 8711 as a Karma account. Thereafter, on February 3, 2023, $156,000 was deposited into from an account ending in 6603, which is a Karma account. D.E. 267 at Exhibit "7" and Exhibit "3," which is an affidavit from Scott Zankl identifying 6603 as a Karma account.

   g.  **Payment 7** was made on February 8, 2022 in the amount of $600,000 from an Excell account ending in 3199. [D.E. 267 at Exhibit "9."] Subsequent to that date, and on February 16, 17, and 22, 2022, transfers from Karma related accounts (8711, 7995, and 5966) totaling more than $650,000 were deposited to this account. *Id.;* D.E. 267 at Exhibit "3," which is an affidavit from Scott Zankl identifying 8711 as a Karma account; D.E. 267 at Exhibit "10," which is the statement from account 7995; and D.E. 267 Exhibit "11," which is the statement from 5966.

   h.  **Payment 8** was made on February 9, 2022 in the amount of $450,000 from an Excell account ending in 3199. [D.E. 267 at Exhibit "9."] However, that same day, $450,000 was deposited into that account from an account ending in 5966, which is a Karma account. *See Id. and* D.E. 267 at Exhibit "11."

The origin of these payments cannot be reasonably disputed. At the very least, a genuine issue of material fact exists as to whether the funds belonged to Debtor. If they did not, the fraudulent transfers claims would necessarily fail.

*In re McMillin*, 482 Fed. Appx. 454 (11th Cir. 2012) is instructive. In *McMillin*, a trustee filed several fraudulent transfer claims against Dan Alford. In two of the transactions at issue, the funds passed from a third party through the Debtor's account before being provided to Alford. The bankruptcy court initially found in favor of Alford, in part, because the funds "were never Debtor's property, since neither Debtor not Debtor/VT has 'control' of these funds." *Id.* at 456. After the district court reversed that decision, it was appealed to the Eleventh Circuit. When reinstating the

bankruptcy court's initial decision, the Court described how the "control test" applied and based on the quick turnaround between the deposit into the debtor's account and its transfer, there was insufficient control over the funds and the transfer was not voidable. The Court held:

> The purpose of avoiding fraudulent transfers is to prevent the debtor from diminishing funds that are generally available for distribution to creditors. Consequently, there is a presumption that "any funds under the control of the debtor, regardless of the source," are the debtor's property, "and any transfers that diminish that property are subject to avoidance." *In re Sanborn & Chase Corp.,* 813 F.2d 1177, 1181 (11th Cir.1987). **However, presuming ownership in situations of alleged fraudulent transfers "poses the distinct danger that creditors could receive a windfall in the form of funds that simply passed through the debtor's possession but in fact were not property of the debtor."** *Id.*
>
> In *In re Chase & Sanborn Corp.,* this Court established a "control test" for determining when funds provided to a debtor by a third party become property of the debtor so that an allegedly fraudulent transfer of the funds to a noncreditor is subject to avoidance under 11 U.S.C. § 548. 813 F.2d at 1181–82. **In a fraudulent transfer situation, "more is necessary to establish the debtor's control over the funds than the simple fact that a third party placed the funds in an account of the debtor with no express restrictions on their use.** *Id.* **at 1181**.
>
> **The control test is a "very flexible, pragmatic one; in deciding whether the debtors had controlled property subsequently sought by their trustees, 'the court must look beyond the particular transfers in question to the entire circumstance[s] of the transactions.'** " *Nordberg v. Societe Generale,* 848 F.2d 1196, 1199 (11th Cir.1988) (quoting *In re Chase & Sanborn Corp.,* 813 F.2d at 1181–82). In looking at the entire circumstances of the transactions, courts have considered the source of the funds, which party primarily benefits from the challenged transactions, and whether the debtor has the power to designate which party will receive the funds and the power to actually disburse the funds. *See In re Bankest Capital Corp.,* 374 B.R. 333, 338 (Bankr.S.D.Fla.2007) (following and applying the test established in *In re Chase & Sanborn* ).

*Id.* at 456–57 (emphasis added). As applied to this case, the entire circumstance of the payments reflect that the funds paid to Hi Bar were only in the Debtor's account for a very short period of time or repaid shortly after the transfer by one of the Karma entities. Of course, since Karma was also an obligor under the First Hi Bar Agreement, it was the party primarily benefiting from that transfer. At the very least, given the manner in which the funds were deposited to the Debtor and immediately sent to Hi Bar, a genuine issue of material fact exists as to whether the funds actually belonged to the Debtor. If the funds did not belong to the Debtor, then the transfer would not have diminished funds available to other creditors and would not be avoidable.

14

**ii.      Even If the Funds Belonged to the Debtor, Because Any Transfers Resulted from the Enforcement of Hi Bar's Security Interest**

Even if the funds belonged to the Debtor, the Hi Bar obligations are not subject to a fraudulent transfer attack because "[a] transfer is not voidable under s. 726.105(1)(b) or s. 726.106 if the transfer results from … [e]nforcement of a security interest in compliance with Article 9 of the Uniform Commercial Code." § 726.109(5)(b) [D.E. 167at ¶ 20]. To be sure, "[a] debtor's payment to a secured creditor is not fraudulent even though its natural effect was to hinder or delay the non-preferred creditors." *Wiand v. Wells Fargo Bank, N.A*., 86 F. Supp. 3d 1316, 1327 (M.D. Fla. 2015), *aff'd sub nom. Wiand v. Wells Fargo Bank, N.A., Inc*., 677 Fed. Appx. 573 (11th Cir. 2017) *citing Sunshine Resources, Inc. v. Simpson*, 763 So.2d 1078, 1081 (Fla. 4th DCA 1999) (quoting *Jacksonville Bulls Football Ltd. v. Blatt*, 535 So.2d 626, 629 (Fla. 3d DCA 1988)).

**iii.      No Evidence of Actual Intent to Defraud**

In support of its position that the Debtor made payments to Hi Bar with the actual intent to hinder or defraud creditors, the Trustee cites a statement from Zankl wherein he stated that he continued obtaining financing in 2021 and 2022 in order to make payments to investors and a communication with Lubin where he was trying to avoid the filing of UCC liens. That testimony is insufficient to obtain summary judgment. "The Eleventh Circuit found that when using the badges of fraud to determine the existence of actual fraudulent intent, courts should consider the totality of the circumstances." *In re Model Imperial, Inc.,* 250 B.R. 776, 791 (Bankr. S.D. Fla. 2000). Indeed, "the finding is highly factual and determined on a case-by-case basis*." In re Kudzu Marine, Inc.,* 569 B.R. 192, 206 (Bankr. S.D. Ala. 2017). In sum, the two statements made by Zankl do not reflect an actual intent to defraud.

**iv.      The Debtor Received Reasonably Equivalent Value**

The Trustee's argument that the Debtor did not receive reasonably equivalent value is based on the erroneous assertion that the First Hi Bar Contract is usurious. As set forth above, it is not. Moreover, Spin did not assign the Third Spin Contract to Wing Lake and the Michigan Court Order, which was based on a default, is inadmissible on that point. "A court judgment is hearsay 'to the extent that it is offered to prove the truth of the matters asserted in the judgment.' " *BDO Seidman, LLP v. Banco Espirito Santo Intern*., 38 So. 3d 874, 880 (Fla. 3d DCA 2010) *citing United States v. Sine,* 493 F.3d 1021, 1036 (9th Cir.2007). "[J]udicial findings of fact 'present a rare case where, by virtue of their having been made by a judge, they would likely be given undue

weight by the jury, thus creating a serious danger of unfair prejudice.' " *Id. citing Nipper v. Snipes,* 7 F.3d 415, 418 (4th Cir.1993).

Based on the plain language of the Assignment, the Third Spin Contract (which Hi Bar satisfied on behalf of the various Merchants) was not assigned. The language of that Assignment makes no mention of the Third Spin Contract and actually defines "Merchant Agreements" as "(i) the Revenue Purchase Agreement, dated as of June 1, 2021, by and between Assignor and Company, and (ii) the Revenue Purchase Agreement, dated as of July 9, 2021, by and between Assignor and Company… ." [D.E. 75 at pgs. 86-95] (emphases supplied). Under "[t]he principle of *ejusdem generis*, [] when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed." *Powers v. Bone*, No. 367748, 2025 WL 466349, at *4 (Mich. Ct. App. Feb. 11, 2025); *see also Fischer v. United States,* 603 U.S. 480, 487 (2024)("Under the [] canon of *ejusdem generis*, "a 'general or collective term' at the end of a list of specific items" is typically " 'controlled and defined by reference to' the specific classes ... that precede it.")

As applied to this case, the general phrase clearly only includes various documents that were signed in connection with the First or Second Spin Contract, which are the specific items that precede the more general phrase. It would make little sense, especially in an agreement between two sophisticated commercial parties, to expand that definition to any other potential contractual relationship between the parties. If the parties intended to include the Third Spin Contract, they would have listed it just like they did with the First and Second Spin Contract. Further demonstrating the erroneous nature of the Trustee's contractual interpretation is that the general phrase she relies upon relied upon is completed with further language referencing the "Merchant Agreements." [D.E. 75 at pgs. 86-95]. Since the Franklin Assignment excluded the Third Spin Contract, the representations under paragraph 4 concerning "Obligations, the Merchant Documents and the Third Party" referenced in SAC cannot be construed to cover or contain any representations concerning the balance under the Third Spin Contract, let alone demonstrate any rights therein had been assigned over to Franklin.

Finally, the Court should not rely on Scott Zankl's affidavit wherein he allegedly stated that he worked with Lubin to induce Wing Lake to close on the refinance because he expressly stated in a text message to Lubin that he <u>did not</u> sign that sworn document. [D.E. 267 at Ex. 1].

16

**v.    To the Extent that The Trustee's Claims are Based on a Ponzi Scheme, the Recovery Should be Limited**

Finally, to the extent Trustee's claim is based on the Debtor running a "ponzi scheme", the fraudulent conveyance claims against Hi-Bar should be limited to any amounts received back that exceed the amounts paid. As the Eleventh Circuit held:

> In the case of Ponzi schemes, the general rule is that a defrauded investor gives "value" to the Debtor in exchange for a return of the principal amount of the investment, but not as to any payments in excess of principal. Courts have recognized that defrauded investors have a claim for fraud against the debtor arising as of the time of the initial investment. Thus, any transfer up to the amount of the principal investment satisfies the investors' fraud claim (an antecedent debt) and is made for "value" in the form of the investor's surrender of his or her tort claim. Such payments are not subject to recovery by the debtor's trustee. Any transfers over and above the amount of the principal — *i.e.*, for fictitious profits — are not made for "value" because they exceed the scope of the investors' fraud claim and may be subject to recovery by a plan trustee.

*Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011) (citations omitted). Here, the evidence shows that Hi-Bar paid Spin $2,114,312.50 and incurred additional costs of $5,687.50. [D.E. 167 at Ex. 1]. Hi-Bar only received back $2,200,000, or $80,000.00 more than it paid. As such, assuming the funds belonged to the Debtor, and that the UCC filing does not preclude this claim, the maximum amount that should be considered a fraudulent transfer is the difference should be the ceiling for any fraudulent transfer claim

**D.    Summary Judgment Should be Denied as to the Preference Counts as the Funds Did Not Belong to the Debtor**

Just as with the fraudulent transfer counts, the Trustee's motion for partial summary judgment on its preference claims should also be rejected. While the Trustee correctly states that the Debtor made payments to Hi Bar *through its accounts*, the factual record demonstrates that the funds used belonged to non-debtors, Karma of Broward and Karma of Palm Beach, and thus were not "a transfer of an interest of the debtor in property."

An "sixth element" that the trustee must prove to establish that a transfer is a voidable preference "requires the trustee to establish by a fair preponderance of the evidence that there was a transfer of "... an interest of the debtor in property." *In re Safe-T-Brake of S. Florida, Inc.,* 162 B.R. 359, 362–63 (Bankr. S.D. Fla. 1993) *citing* § 547(b). "The law is clear that if a third party chooses for whatever reason to use its own property, in which the debtor has no interest, to pay

17

one or more of the debtor's creditors, even if the other five elements of a voidable preference are established, the transfer cannot be recovered by the trustee. *Id. citing Coral Petroleum Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1356 (5th Cir.1986); *In re Hartley,* 825 F.2d 1067, 1070–1071 (6th Cir.1987).

"Under the earmarking doctrine, a transfer cannot be avoided where a third party makes a transfer of its property directly to one or more of the debtor's creditors or transfers property to the debtor with the clear agreement that the property transferred is to be used by the debtor to pay one or more of its creditors, and the property is in fact so used." *Id.* Of course, "application of the earmarking doctrine is inherently fact based." *Id.* "[I]f earmarking applies, the property never becomes that of the debtor, and the trustee's effort to recover the property as a preference fails, because she will be unable to establish an element of a preferential transfer under section 547(b)." *Id.* at 364.  Finally, "the plain meaning of section 547 necessarily leads to the conclusion that proof of the nonapplicability of the earmarking doctrine is an element the trustee must prove in order to establish that the transaction in question was indeed an avoidable preference." Despite knowing that the Karma entities deposited the above referenced sums of money in the Debtor's account, which were immediately used to pay funds owed by the Karma entities to Hi Bar, the Trustee completely failed to analyze this issue and thus, failed to meet her burden. In any event, the "inherently fact based" should require the denial of the Trustee's motion.

## **CONCLUSION**

Based on the forgoing, the Hi-Bar Defendants respectfully requests this Court grants its Motion for Summary Judgement and award all other such relief deemed necessary and proper.

Respectfully submitted,

LETO LAW FIRM
201 S. Biscayne Blvd.
Suite 2700
Miami, Florida 33131
Tel.     305-341-3155
Fax:    305-397-1168

*/s/ Matthew P. Leto*
MATTHEW P. LETO
Florida Bar No.: 014504
mleto@letolawfirm.com
kzelaya@letolawfirm.com
pleadings@letolawfirm.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 22, 2025, we electronically filed the foregoing document with the Clerk of the Court and provided service to all counsel of record using CM/ECF.

*/s/ Matthew P. Leto*
MATTHEW P. LETO