# EXHIBIT 3

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT IN AND
FOR BROWARD COUNTY, FLORIDA

Case No. CACE-22-005125

FVP OPPORTUNITY FUND III, LP, A DELAWARE
LIMITED PARTNERSHIP; FVP INVESTMENTS, LLC,
A DELAWARE LIMITED LIABILITY COMPANY; AND
FVP SERVICING LLC, DELAWARE LIMITED
LIABILITY COMPANY,

         Plaintiffs,

vs.

KARMA OF BROWARD, INC.,
a Florida corporation, et al.,

         Defendants.
_____/

HI BAR CAPITAL, LLC, a New York
limited liability company, et al.,
         Plaintiff,

V                 Case No. CACE-22-06401

KARMA OF PALM BEACH, INC.,
a Florida corporation, et al.,
_____/

Judge David Haimes
Broward County Courthouse
201 Southeast Sixth Street,
17150
Fort Lauderdale, Florida 33301
August 13, 2025
1:30 p.m. to 4:50 p.m.

ALL PENDING MOTIONS and
MOTION FOR SUMMARY JUDGMENT

Reported By:
Cheryl L. Jenkins, RPR, RMR

APPEARANCES:

SCHWARTZ BRESLIN, by
JERRELL "JERRY" BRESLIN, Esquire
and
BUSCHEL GIBBONS, by
ROBERT BUSCHEL, Esquire
and
COHEN & MCMULLEN, by
MICHAEL MCMULLEN, Esquire
BRADFORD COHEN, Esquire
and
JONATHAN SCHWARTZ, Esquire (via Zoom)
On behalf of the Plaintiffs, FVP Opportunity Fund III,
LP, a Delaware Limited Partnership; FVP Investments,
LLC, a Delaware Limited Liability Company; and FVP
Servicing LLC, Delaware Limited Liability Company

KATZMAN WASSERMAN BENNARDINI & RUBINSTEIN, by
CHARLES BENNARDINI, Esquire
and
SCOTT C. GHERMAN, P.A., by
SCOTT GHERMAN, Esquire (via Zoom)
On behalf of the Defendants,
Lisa Farache, Moshe Farache,
1001 Clint Moore, LLC/Auto Wholesale of Boca

LETO LAW FIRM, by
MATTHEW LETO, Esquire
On behalf of the Defendant, Hi Bar

SHRAIBERG PAGE, by
PATRICK DORSEY, Esquire
On behalf of Franklin Capital Funding
and Franklin Capital Group

CONTINUED APPEARANCES

DAVID LANGLEY, Esquire
and
KASEN & KASEN, by
MICHAEL KASEN, Esquire (via Zoom)
On behalf of Avrumi Lubin and JL Special Investments

STEVEN MEYER, Esquire (via Zoom)
On behalf of MMS Ultimate Services, Incorporated

AKERMAN, by
BRETT MARKS, Esquire (via Zoom)
On behalf of Millco-Atwater

ALSO PRESENT

Katie Gleason, Esquire
Lisa Farache
Moshe Farache

THE COURT: Okay. So, we are now on the record, all right? So, everything else had nothing to do with the case.

All right. So we're on the record in Case CACE-22-5125, FVP Opportunity Fund III, LP, et al. versus Scott Zankl, et al.

Let me start with the plaintiffs. Can I get appearances?

MR. BRESLIN: Good morning, Judge. Jerry Breslin for the FVP parties.

THE COURT: Good morning, Mr. Breslin, and who else is with you?

MR. BRESLIN: Michael McMullen, Brad Cohen, and Rob Buschel.

THE COURT: All right. Good afternoon.

MR. COHEN: Good afternoon, Judge.

THE COURT: All right. Everyone on Zoom, could you hear that? There's four attorneys for the plaintiff. Could you hear them all?

MR. GHERMAN: Yes.

THE COURT: Okay. Perfect.

And then now for the defense, let me start with Mr. Zankl.

(No verbal response.)

THE COURT: All right. Mr. Zankl is not

here.  He's not on Zoom.

All right.  So let me go for the rest of the co-defendants.  Who wants to go first?

MR. BENNARDINI:  Good afternoon, your Honor. Charles Bennardini on behalf of Lisa Farache, Moshe Farache, 1001 Clint Moore, and nominal defendant Auto Wholesale of Boca, and with me on Zoom is my co-counsel, Mr. Gherman.  Mr. and Mrs. Farache are also in the courtroom, along with another one of their lawyers, Katie Gleason.  Thank you, Judge.

THE COURT:  All right.  Good afternoon, Mr. Bennardini, Mr. Gherman, as well as the Faraches.

All right.  Can I get appearances for the remaining co-defendants?

MR. LETO:  Yes.  Good afternoon, your Honor. I'm Matthew Leto, on behalf of Hi Bar Capital, Mordecai Herbst, and Yisroel Herbst (phonetic).

THE COURT:  All right.  Good afternoon, Mr. Leto.

All right, and then we have next?

MR. DORSEY:  Good afternoon, Judge. Patrick Dorsey, D-O-R-S-E-Y, on behalf of the Franklin parties, Franklin Capital Funding and Franklin Capital Group.

THE COURT:  All right.  Good afternoon,

Mr. Dorsey.

MR. DORSEY:  Thank you, Judge.

THE COURT:  And then next?

MR. LANGLEY:  Yes, good afternoon, your Honor.  David Langley here for Avrumi Lubin and JL Special Investments.

THE COURT:  All right.  Is Mr. Lubin -- Mr. Lubin is not here.

MR. LANGLEY:  I think he's trying to get on Zoom, or maybe he's waiting until 2:30.

THE COURT:  Okay.  I do not see him on Zoom, and nobody's in the waiting room, so --

MR. LANGLEY:  Okay.

THE COURT:  All right, and then -- all right.  Anybody else on Zoom that hasn't made an appearance that wants to make an appearance?

MR. KASEN:  Good afternoon, your Honor.  Michael Kasen, the law firm of Kasen & Kasen, representing Avrumi Lubin.  I think that I have a pro hac vice motion pending, your Honor, that was filed earlier today.

THE COURT:  So you're with Mr. Langley?

MR. KASEN:  I am.

Okay.  Any objection from anybody to the pro hac vice motion?

MR. BRESLIN:  No, Judge.

Page 7

THE COURT: No. All right, and I take it you're a member in good standing, et cetera?

MR. KASEN: I am, your Honor.

THE COURT: All right. So that's granted.

MR. KASEN: Thank you, Judge.

MR. MEYER: Your Honor, I'm Steven Meyer here. I represent Defendant MMS Ultimate Services, Incorporated.

THE COURT: All right. Good afternoon, Mr. Meyer. I'm sorry, you represent MMS?

MR. MEYER: Correct.

THE COURT: Okay. All right. I think that's everybody, right?

Oh, wait, there's Mr. Schwartz?

MR. BRESLIN: Yes.

MR. COHEN: He's on our side, Judge.

MR. SCHWARTZ: Yes, Judge, Jonathan Schwartz. I'm just observing today. I'm co-counsel with Mr. Breslin, Mr. McMullen, Mr. Cohen, and Mr. Buschel.

THE COURT: All right. Good afternoon, Mr. Schwartz.

MR. SCHWARTZ: Good afternoon, Judge.

THE COURT: Let me just see here. How about Brett Marks?

Page 8

MR. MARKS:  Judge, good afternoon.  This is Brett Marks, with Akerman, LLP.  I represent one of the adversary defendants, Millco-Atwater.  We don't have any motions at issue today.  We're just observing the hearing.

THE COURT:  All right.  You are welcome to observe, it's a public courtroom.  All right.  Good afternoon, Mr. Marks.

All right, now I think I have everybody.

All right.  We're here, I've got the afternoon for you.  Let me start with what hopefully is the easier one, and will save me a lot of time going forward, and that is the joint motion to approve settlement.  Let me pull that up.

All right.  Is there an objection from anybody?  Just the Lubin parties --

MR. LANGLEY:  Yes, Judge.

THE COURT:  -- I take it, correct?

MR. LANGLEY:  Yes, Judge.  We filed an objection.  I don't see it showing up on the docket, but I would advise the Court that the same motion was filed in the bankruptcy case with Judge Kimball, and he denied it last night.

THE COURT:  Why did -- what was the basis for his denial?

MR. LANGLEY:  He read through our motion,

which shows that Mr. Lubin actually has an interest in the funds. The three other parties are attempting to take the funds for themselves and to cut out Mr. Lubin, who's the assignee of Spin, and who is the assignee of Hi Bar.

THE COURT: Okay.

MR. LANGLEY: And based on just a letter from Mr. Leto saying the common interest agreement is invalid, they're claiming that we're not a part of it.

THE COURT: All right. That's the 2:30 motion for summary judgment, right?

MR. LANGLEY: Correct, yes, Judge.

THE COURT: So --

MR. LANGLEY: That hasn't been heard yet.

THE COURT: Well, it's part of it.

MR. DORSEY: I'm sorry, I just need to correct a misstatement. Judge Kimball denied the motion because he said he didn't have jurisdiction over the issue. He said, if there's a dispute, I want the state court to decide.

THE COURT: Okay.

MR. DORSEY: He didn't determine anything.

THE COURT: So if I grant the motion, then you go back -- I'm sorry, deny the motion, it's not going to go back, right?

MR. BRESLIN: Correct.

MR. LANGLEY:  If I can add just one thing, Judge, and Mr. Dorsey is correct, but there's some very good language in that order that I think the Court should look at that we quoted in our response, which has been uploaded.

And, Judge, I would point out that the urgency of the motion is that Judge Kimball doesn't want to keep the money in the bankruptcy court registry.

We're fine with either moving it to the state court registry or to Mr. Breslin's trust account. We just don't want it dispersed from there until you make a decision on --

THE COURT:  Let me ask you a question, though.  Say --

MR. BRESLIN:  Judge, it's our motion, if we could argue it?

THE COURT:  No, I know.

Say Mr. Lubin was successful, and at the end of the day, he wins every one of his claims.  He doesn't get the entire pot, right?

MR. LANGLEY:  There's a waterfall provision back to Mr. Leto's client.  Right, so he doesn't get it all, but he gets 70 percent, at least, for the first million.

THE COURT:  So he gets 700,000 --

MR. LANGLEY:  Well --

THE COURT:  -- is the most he can get out of anything?

MR. LANGLEY:  No, no, no.  I mean, there's over 2 million in the bankruptcy court.

THE COURT:  Right.

MR. LANGLEY:  Mr. Leto is holding some funds.  There may be other funds out there, but it's the Hi Bar's claims, as they're defined in the common interest agreement, were assigned to Spin.  They were subsequently assigned to Mr. Lubin.  There's a waterfall provision back to Hi Bar.  So it starts at 70 percent to Spin, 30 percent to Hi Bar, and then it goes down from there, depending on the amount, that's all spelled out in the common interest agreement, but the majority of the funds would go to Mr. Lubin.

THE COURT:  And so you're going to tie up everything just based on Mr. Lubin -- because it sounds as though --

MR. LANGLEY:  Well, Judge --

MR. BRESLIN:  If I could --

MR. LANGLEY:  -- you need to decide who the common interest is.

THE COURT:  I just had a quick question about that to begin with.  So let me start over then.

So we're here for the joint motion to approve settlement. Who wants to take the lead on that?

MR. BRESLIN: Yes, thank you, Judge. I'd like to go first.

Judge, the joint motion was filed by me. It was filed on behalf of the FVP parties, the Franklin parties, and the Hi Bar parties.

Judge, if you take a look at the complaint, the FVP parties and the Franklin parties have sued Hi Bar Capital, as well as the members of Hi Bar Capital, Yisroel Herbst and Mr. Dorsey, through his cross-claim, the Franklin cross-claims, have sued his son, Mordecai.

Judge, the reason that we are here is because we initially went to the bankruptcy court, because this whole matter began when Mr. Farache took the vehicles off the lots at 101 Clint Moore, and then he declared bankruptcy, AWB declared bankruptcy, the cars went to the bankruptcy court. There were three parties fighting in the bankruptcy court over those vehicles, FVP, Hi Bar, Franklin.

So there were three companies.

THE COURT: I remember. That was going to be our first trial, was to see who had priority over that, but now you've settled it --

MR. BRESLIN: Right, so --

THE COURT:  -- and so I don't have to have my first trial as long as I approve the settlement.

MR. LANGLEY:  Correct.

MR. BRESLIN:  Right, right.  So that priority issue got kicked back to this Court, and so the priority issue was scheduled to go to trial in September with trial number one, and trial number one are the Hi Bar parties, movement; trial number two, the Farache parties.

So FVP, Franklin, and Hi Bar, and Hi Bar is represented by Mr. Leto, entered into a settlement agreement.  So we've entered into a settlement agreement to resolve all the issues before your Honor.

And what we did was, we entered into the settlement agreement.  We then went over to the bankruptcy court.  We advised Judge Kimball that we entered into a settlement agreement.

Mr. Lubin filed an objection in the bankruptcy court saying, well, wait a second, I have rights there and, Judge Kimball, I don't want you to rule.

And so what Judge Kimball did was he then kicked it back to your Honor to make a determination as to whether or not we have an enforceable settlement agreement, and let me tell you why we do.

We've entered into a settlement agreement, Judge, but the three named parties to the settlement

agreement are FVP, Franklin, and Hi Bar.

So what is Mr. Lubin's objection?

Hi Bar signed the settlement agreement. So we have a -- we've entered into an agreement with Hi Bar, it's signed, sealed, and it's in effect.

So Mr. Lubin objects because he says that, I entered into an agreement years ago with Hi Bar, where I agreed with Hi Bar that I would fund some of the litigation, and in return for that, I would be entitled to some of the proceeds. So they have what's called a common interest agreement. Their common interest agreement was more or less an assignment of claims in various lawsuits to which Spin would be entitled to some proceeds if there was a recovery.

So a year ago Mr. Leto notified Mr. Lubin that that agreement is breached, that's the common interest agreement. So he gave them a notice of breach. Since that time Hi Bar has been paying their own bills. So to the extent that there ever was an agreement, it has been terminated.

Let's assume for the moment that it was never terminated. If it was never terminated, Judge, Mr. Lubin does not have rights under that agreement to substitute in as a partner. Mr. Lubin -- the only rights Mr. Lubin has under that agreement is to sue Hi Bar, and

Page 15

that's our position, and that's the position that I made in the joint motion.

So we have an agreement. We have a settlement agreement. We want your Honor to endorse the settlement agreement so we can go back to Judge Kimball and say that this agreement has been endorsed, but Mr. Lubin objects to it because he says that our agreement breaches his agreement.

Well, the legal issue here is when Hi Bar signed that settlement agreement with FVP and Franklin, did they have the power to do so? And they did, of course they did. They had the power to sign that agreement. The only question is -- and even if it breached the prior agreement, they still have the power to enter into the agreement, and that gives Lubin a cause of action.

Why is that relevant? Because if you look at the common interest agreement, if Lubin, if there's a default under the common interest agreement, then Lubin would have to bring an action in New York, because the sole jurisdiction under that agreement is in New York. He would have had to have, a year ago, when he was noticed of the termination, brought an action in New York to try to somehow get an order from a New York court that would be honored by your Honor to give him some rights here.

But, Judge, the case is here, Hi Bar is the

party. Josh Lubin is not the party. Josh Lubin is trying to say that I want to substitute in and become Hi Bar, but that's just an absurd ask, legally and factually, because what's he saying, I want to become Hi Bar? We're suing Hi Bar for 7.5 million. We've settled that. So what is it, is Mr. Lubin saying, well, I want to become Hi Bar, but if there's a judgment against me for 7.5 million, I'm going to personally pay it? He's not saying any of that. So what it is, it's just, it's obstructionism.

So he has no legal grounds to prevent your Honor from endorsing the settlement agreement, because Hi Bar is Hi Bar. They're their own company.

THE COURT: Well, I understand your argument. All right.

MR. BRESLIN: They're --

THE COURT: Let me do this, I take it everybody else is in agreement, correct, except for Mr. Lubin?

MR. LETO: Yes, your Honor. I also just want to add one more thing, if we can, Hi Bar.

THE COURT: Go ahead.

MR. LETO: If I can?

The only other thing I wanted to add is, Mr. Lubin also has literally no claim in this case. In his pleadings, there's not a single pleading that he filed

that asks your Honor to deal with this cooperation agreement, make a declaratory judgment about it, nothing. He's simply a defendant right now, that's all he is. So there's nothing even before your Honor which would give him any rights to have a decision made that he has rights under this agreement.

THE COURT:  Let me ask you, did he file a proof of claim in the bankruptcy case?

MR. LETO:  No, he doesn't have a claim.

MR. DORSEY:  He has not.

THE COURT:  All right.  So he's got no claim here, he's only a defendant, and no claim in the bankruptcy case?

MR. LETO:  Right, and just to kind of tie it off, under this cooperation agreement, it is terminable at Hi Bar's absolute discretion.

THE COURT:  No, I understand.

MR. LETO:  So --

THE COURT:  That goes to the merits, and part of what was argued by Mr. Breslin as well goes to the merits.  I'm not going to get into the merits of whether Lubin has a claim against Hi Bar or not for purposes of determining whether to approve the settlement.  I just need to see if he even has basically standing or whatnot even to contest it, and so that is now directed to you,

Mr. Langley.

MR. LANGLEY: Yes, Judge.

THE COURT: Okay. So --

MR. LANGLEY: So first, no court has ruled on a common interest agreement. I think what would be very instructive for the Court would be to read the Kimball opinion that we filed. There's a notice of filing, it should show up. I think --

THE COURT: Okay. Before I would even look at the Kimball opinion, what are the facts? How would Mr. Lubin --

MR. LANGLEY: Well, the same motion --

THE COURT: -- have any basis --

MR. LANGLEY: -- was filed in -- or a similar joint motion was filed in the bankruptcy court. That was set for hearing today at 11 o'clock. Yesterday, Judge Kimball ruled on it and canceled the hearing.

In his order, you asked about a proof of claim in the bankruptcy case. In his sale order he says, three parties are entitled to the proceeds, FVP, Franklin, and Hi Bar.

In his ruling yesterday he says, I previously said the only parties entitled to this are FVP, Franklin, and Hi Bar. I now realize that was incorrect. Lubin, if the common interest agreement survives, has an

interest.

He basically is kicking the ball back to you to decide whether or not the common interest agreement exists or is still in effect and, Judge, the common interest agreement, 2A says, Hi Bar hereby assigns to Spin Capital any and all Hi Bar claims.

MR. LETO:  Can you finish the sentence?

MR. LANGLEY:  Those are defined --

THE COURT:  All right.  Let me --

MR. LANGLEY:  -- subject to the terms --

THE COURT:  I'm looking at your objection, and that was filed, just so we're clear, at 11:40 this morning.

MR. LANGLEY:  Yes.

THE COURT:  So --

MR. LANGLEY:  The motion was filed yesterday, I don't know, after 5:00.

THE WITNESS:  Well, the objection --

MR. LANGLEY:  And I don't know how it got set for hearing today.  I wasn't noticed that --

THE COURT:  Well, but --

MR. LANGLEY:  -- a motion filed yesterday was being set for hearing today.

THE COURT:  What motion?

MR. LANGLEY:  The joint motion to approve

the settlement.

THE COURT:  No, that was filed July 27th.

MR. LANGLEY:  July 27th?

THE COURT:  Joint motion for settlement, urgent motion, expedited hearing requested.

MR. LANGLEY:  Okay.  Do --

THE COURT:  That's the one that we're all discussing, correct?

MR. LETO:  Yes.

MR. LANGLEY:  Okay.

THE COURT:  Okay.  There is not --

MR. LANGLEY:  I'm sorry, there was something filed yesterday.  We filed a response, Judge.  So, two --

THE COURT:  There was a notice of filing yesterday.

MR. LANGLEY:  The notice of filing is the Judge Kimball opinion, which addresses all these same issues.

MR. BRESLIN:  Judge, to give you a little --

THE COURT:  Let me look at this.

MR. BRESLIN:  Or a bigger understanding, Judge Kimball originally scheduled a hearing for today on the motion to release the funds, the motion to approve the settlement, to release the funds in the bankruptcy court.

Mr. Lubin filed objections in the bankruptcy

court.  Judge Kimball canceled the hearing for today and sent the matter back for your Honor to determine whether or not Mr. Lubin had any legal grounds to interfere with our settlement agreement.

So the issue would have been moot --

THE COURT:  No, I understand.

MR. BRESLIN:  -- if we had a hearing before Judge Kimball, and so --

THE COURT:  Let me look at this now.

MR. BRESLIN:  -- he kicked it back to your Honor.

THE COURT:  Hang on.

So at 3:48 yesterday there was a notice of filing of Judge Kimball's order.  It's 11 pages.  I haven't had a chance to see this or the objection, but I'm looking at it.  It says, the Court orders and adjudges as follows, the expedited joint motion to enforce sale order and, two, to order the distribution of auction proceeds, the counsel for the FVP parties is denied.  Two, the Court cannot and will not rule on the dispute between Avrumi Lubin and Hi Bar Capital, LLC regarding their relative rights to the net proceeds held in the registry of this Court.

The parties are encouraged to obtain a ruling from another Court, having competent jurisdiction,

or to present an agreement in a form of agreed order as directed in the show cause -- order to show cause.  Three, the hearing on the expedited joint motion, et cetera, was canceled.

All right.  Well, I take it I am another court having competent jurisdiction.

MR. KASEN:  Your Honor, if I may very briefly, just to clarify some of the procedure that has gone on here.

THE COURT:  Just so the court reporter --

MR. KASEN:  There was a --

THE COURT:  Hang on, hang on, hang on. This is -- just so the court reporter knows, this is Mr. Marks speaking, and you're speaking on behalf of Mr. Lubin, correct?

MR. KASEN:  It's Mr. Kasen speaking on behalf of Mr. Lubin, that's correct.

There was a joint motion --

THE COURT:  Hang on a second.

MR. KASEN:  -- by two --

THE COURT:  Why is that not showing up?

Oh, who is Brett Marks then?

COURT REPORTER:  I think you have something pinned.

THE COURT:  I don't think it's -- did I pin

it? I don't think I did.

COURT REPORTER: No?

THE COURT: No. Now it's pinned, now I'm going to remove the pin.

All right. Mr. Kasen.

MR. KASEN: There was a joint motion to approve this settlement filed some time ago, but no hearing was set on that particular motion, and then last night, sometime after 5 o'clock, I can give you the exact time, it was at 5:48 p.m., it's Filing Number 229282707, the three parties filed what they titled superseding urgent motion, expedited hearing required. The FVP parties, Franklin parties, and Hi Bar parties' joint motion to enforce settlement, consensual resolution, and issue order to bankruptcy court.

And with that particular filing, that took place last night at about quarter of 6:00, that's when a hearing was set for today. Previous to that filing, there had not been a hearing set on this matter.

MR. LANGLEY: Yes, Judge, that's what I was attempting to argue.

THE COURT: All right. Well, I thought this was on for all pending motions, and then -- for a status and all pending motions, and then at 2:30 was the separate motion for summary judgment against Mr. Lubin.

MR. LANGLEY:  I didn't understand that all pending motions included something filed yesterday after 5:00, Judge, but --

THE COURT:  No.

MR. LANGLEY:  -- I can --

THE COURT:  Again, you keep saying something after 5:00.  I was looking at the joint motion, and that's what I read, was the joint motion filed July 27th.

MR. LANGLEY:  That wasn't set for today, to my understanding but, Judge --

THE COURT:  Why would it not be?

MR. LANGLEY:  The simple resolution, we don't have an objection -- the urgency that they're claiming is Judge Kimball wants the money out of the bankruptcy court.  We're fine with the money coming to the state court registry or to Mr. Breslin's trust account. We just don't want it dispersed from there until you decide on a common interest agreement.

Mr. Leto says --

THE COURT:  Well, I may be deciding that in about 15 minutes, right?

MR. LANGLEY:  Well, your Honor --

MR. KASEN:  One more thing that I'd like to raise is that they're asking, the joint parties are asking for an endorsement of the settlement agreements, the terms

of which haven't been disclosed to anybody.

I'm not exactly sure how your Honor can endorse a settlement agreement without knowing the terms of that --

THE COURT:  Wouldn't the bankruptcy -- you'd have to let the bankruptcy court know, right?  Unless it's not -- is it confidential?

MR. BRESLIN:  Judge, the agreement is not confidential.  The agreement has resolved the issue between Hi Bar and Franklin, and we've notified the bankruptcy court that the matter is resolved, and we're notifying your Honor that the matter is resolved.  I'm happy to supply a copy of the settlement agreement to your Honor, but that's never been an issue.

Mr. Lubin is saying, Mr. Lubin is not --

THE COURT:  Hang on.

So as far as the percentages of the 2 million plus that's in the bankruptcy, you're not willing to put that on the record as to what each has?

MR. BRESLIN:  Well, it's --

THE COURT:  Is it supposed to be confidential?

MR. BRESLIN:  Well, the settlement agreement is, 100 percent of the money in the bankruptcy court is going to the FVP parties.

THE COURT:  Okay, and then what does Franklin and Hi Bar get out of it?

MR. BRESLIN:  Franklin, we have a separate agreement with Franklin, and they share the FVP proceeds, and what Hi Bar is getting is there's a release of claims against the individual members.

Don't forget, Judge, we're suing Yisroel Herbst for $7.5 million, just like we're suing Mr. Lubin for $7.5 million.

THE COURT:  Okay.

MR. BRESLIN:  So there's a release of Mr. Herbst, and there are other terms and conditions in there.

THE COURT:  All right, and as far as Franklin goes?

MR. BRESLIN:  Franklin gets its share of the bankruptcy proceeds pursuant to a separate agreement with FVP.

THE COURT:  Okay.

MR. KASEN:  Your Honor, what the parties are intending to do here is cut off any rights that Lubin may have to those funds, and (inaudible) them beyond his reach by cutting Hi Bar out of that --

THE COURT:  No, I understand that, but -- of course that's what they're trying to do, and the question

Page 27

is whether it's legal, and so that's for the Court to decide that.

COURT REPORTER:  Judge, and can you just tell me again who that was that was speaking?

MR. KASEN:  And, your Honor --

THE COURT:  It's Mr. Kasen.  It looks like it's Michael Kasen, K-A-S-E-N.  Is that who's speaking?

MR. LANGLEY:  Yes.

MR. KASEN:  That's right.

THE COURT:  Yeah, for some reason, usually you pop up on the screen, but I'm not sure what's going on with the Zoom.

MR. KASEN:  I'm not sure either.  My camera seems to be frozen also.

THE COURT:  Okay.

MR. KASEN:  I have a funny face that hasn't moved since the first part of the hearing here, so I don't know if it's on my end or on your end, but I'm guessing it might be on my end, and I apologize, your Honor.

MR. BRESLIN:  Judge, I left out one thing.

You asked me about the bankruptcy proceeds. A hundred percent of the bankruptcy proceeds go to the FVP parties, but there are funds outside of the bankruptcy court that go to the Hi Bar parties.

THE COURT:  Okay.

MR. BRESLIN:  A smaller amount.

MR. LANGLEY:  So, Judge, we don't have a problem with the funds going someplace other than the bankruptcy court registry.  We just don't want that dispersed until you rule on the common interest agreement. The common interest agreement says Hi Bar hereby assigns to Spin Capital any and all Hi Bar claims subject to the terms and conditions of this agreement.

THE COURT:  All right.  Do you want to go into --

MR. LANGLEY:  And part two is --

THE COURT:  -- the motion for partial --

MR. LANGLEY:  Part two is --

THE COURT:  Hang on.  Do you want to go into the motion for partial summary judgment then?  Because --

MR. LANGLEY:  I'd be happy to if you want to argue that today, yes.

MR. BRESLIN:  You're Honor, the motion for partial summary judgment --

THE COURT:  That's based on collateral estoppel.  You're saying that all of these issues have already been resolved in a separate case in Michigan.

MR. LANGLEY:  No, no, no, that's the Franklin issue.

MR. BRESLIN:  Yes, that's the --

MR. LANGLEY:  That's the Franklin assignment issue.  That's not the agreement between Hi Bar and --

THE COURT:  But that was against Mr. Lubin also, wasn't it?

MR. LANGLEY:  Yes, but that doesn't concern the common interest agreement.

THE COURT:  Okay, so that's something different.

MR. BRESLIN:  That is --

MR. KASEN:  Your Honor, I think that it's important to note -- again, it's Michael Kasen speaking, that Mr. Leto continues to espouse the idea that Hi Bar has the authority, pursuant to the common interest agreement, to terminate the agreement for any reason whatsoever, but the agreement is really quite clear.  In Paragraph 2 under the common interest agreement, it states that they have the authority to terminate the common interest agreement, and in their sole discretion if they're not satisfied with certain enumerated -- with the defense of certain enumerated counterclaims, all of which have been dismissed, the common interest agreement appears to only allow termination for that one particular reason, not for any reason at all, but only if there's a dissatisfaction with that particular, with the defense of particular counterclaims, and that has not been asserted

by anybody, and I don't think that it could be asserted by anybody, that there's a dissatisfaction with the way the counterclaims were defended --

MR. LETO:  Excuse me, excuse me, Mr. Kasen is new to this, so maybe he just doesn't understand what happened here.  There are counterclaims, because we filed a lawsuit.  FVP filed a separate action, which became their counterclaims, and the action we filed became this case.

MR. KASEN:  No --

(Two people speaking.)

MR. LETO:  Excuse me, excuse me, excuse me, I'm talking, Mr. Kasen.

THE COURT:  Hang on, hang on, hang on, hang on, hang on.  All right.

MR. KASEN:  But the common interest agreement --

THE COURT:  All right.  Mr. Kasen, I'm not even sure how to mute you because I'm not even sure where your voice is coming through on the Zoom, but I need you to stop for one sec.

All right.  So let me -- so right now, I think the only issue that I think I need to resolve is if Mr. Lubin or Spin has any right to, I guess, stand in in this case and contest the settlement, that's the issue.

Not whether there's any merits to a claim between Lubin and Spin and Hi Bar.

I mean, there might be a separate lawsuit there or whatnot down the road. I just need to know -- because right now, as far as I'm aware, the parties that have resolved the issue of the proceeds of the bankruptcy court were the three that were named, and the question is whether Mr. Lubin or Spin, I guess, had a right to be part of that conversation, and so that's the unique issue.

And so, Mr. Langley, the unique issue there, where in this common interest agreement does it say that your client would have a right to, I guess, be in the room where it happens, right?

MR. LANGLEY: Yes, Judge, 2A is the right to the Hi Bar claims, and 2B is the full authority to prosecute and settle the claims. I have a highlighted copy, if you'd like, Judge.

THE COURT: That's fine. I was about to print it out so I didn't have to keep looking at the screen.

MR. LANGLEY: It's right in here.

THE COURT: This is, it's the 11-page common interest agreement, right?

MR. LANGLEY: Yes.

And, Judge, if I could also point out --

THE COURT: Let me just read this into the record. So Subsection 2, or Section 2 of the agreement says, prosecution and settlement of litigation claims and defenses -- and defensive counterclaims. A, from and after the effective date, Hi Bar hereby assigns to Spin Capital any and all Hi Bar claims subject to the terms and conditions of this agreement, including but not limited to Spin Capital's obligation to assign all Hi Bar claims back to Hi Bar in the event it exercised its rights pursuant to Section 2F hereof.

So if I go down to 2F, that's titled termination provisions, and it says, small ii, or small double i, in the event Hi Bar, in its absolute discretion, is not satisfied with Spin Capital's management of defensive counterclaims against Hi Bar, then Hi Bar shall provide written notice of such decision, which shall result in a termination of this agreement as of the date of such notice, and that's --

MR. KASEN: Your Honor, I think it's important to note that the counterclaims discussed in Paragraph 2F are defined in the agreement above.

THE COURT: Okay.

MR. LANGLEY: Yes, Judge, and --

THE COURT: And so above --

MR. LANGLEY: They were dismissed before --

MR. LETO:  That's not true.

MR. LANGLEY:  They were dismissed before Mr. Leto ever got involved in the case, and they were dismissed without the required written notice saying we're unhappy with the defense of the counterclaims.

THE COURT:  All right.  So your argument is the only time they would have had the absolute discretion to terminate is before the counterclaims were dismissed?

MR. LANGLEY:  Exactly, Judge, that's --

THE COURT:  Because that's what the plain language --

MR. LANGLEY:  And they were defined, and they were both dismissed before Mr. Leto ever got hired. So, that might be --

MR. LETO:  You're -- he's misstating the contract.

MR. LANGLEY:  -- why.

(Multiple people speaking.)

MR. LETO:  He's misstating the contract, if we look at Part H --

THE COURT:  Well, there's no misstating it, it doesn't say that in the contract, but --

MR. LETO:  Well, the definition --

COURT REPORTER:  Judge, I can only take one at a time.

MR. LETO:  On Subpart H, which is on Page 2, it talks about counterclaims, but it says at the end, when it defines the term counterclaims, it includes certain defendants and FSG have asserted, and may assert in the future.

THE COURT:  All right.  Let me --

MR. LETO:  So it talks about --

THE COURT:  -- read H.

MR. LETO:  -- potential.

THE COURT:  H, and this is on Page 2, this is actually under recitals.

MR. LETO:  Correct.

THE COURT:  H, in the New York litigation, on or about March 18th, 2022, Excell Auto Group, Inc. filed a verified third-party complaint against Spin Capital, asserting certain claims and causes of action against Spin Capital, and certain defendants filed counterclaims against Hi Bar.

On or about March 25th, 2022, Franklin Capital Group, LLC, initiated an action captioned Franklin Capital Group, LLC versus Spin Capital, LLC, and Hi Bar Capital, LLC in the United States District Court for the Eastern District of Michigan, the Michigan court.  That's Case Number 2022-193300-CV, the Michigan litigation, and that's the subject of the motion for partial summary

judgment.

MR. LANGLEY:  No, no, that's a different --

THE COURT:  That's a different Michigan case, okay.

Consequently, as part of -- and in conjunction with the New York litigation and the Michigan litigation, and potentially in the Florida litigation and the bankruptcy proceedings, certain defendants in FCG, LLC have asserted, and may assert in the future, claims, causes of actions, and counterclaims against one or both parties, collectively the counterclaims.  So all of that is collectively the counterclaims?

MR. LETO:  Yes, your Honor, which includes this case.

THE COURT:  All right, and so --

MR. KASEN:  Your Honor, no matter how you interpret it, there hasn't been an assertion by Hi Bar in an attempt to terminate this about their dissatisfaction with the defense of counterclaims.

The only basis for termination of the agreement that Hi Bar has espoused is that they -- that Mr. Leto wasn't paid his fee.

MR. LETO:  That's not true either.  In my termination letter it says, in addition to the nonpayment, which is required --

THE COURT: Now, what's the date of your termination letter?

MR. LETO: April 3rd, 2024, on Paragraph 2, I can give your Honor a copy, it also says, finally, and for reasons unknown and without any factual basis, Mr. Lubin has taken litigation positions that are adversarial to Hi Bar. That is exactly -- that's not only nonpayment, it's also what he did in this actual case that led to the termination, meaning Hi Bar was more than dissatisfied with his actions.

THE COURT: And it says right there in that letter, April 3rd, 2024, that Hi Bar is exercising its absolute discretion.

MR. LETO: It doesn't use --

(Multiple people speaking.)

MR. BRESLIN: We should put that in the record, Matt.

MR. LANGLEY: It says, Lubin didn't pay Mr. Leto's attorney's fees, so the contract is terminated. That's basically what it says.

There was never the required written notice saying we're dissatisfied with the defense of the counterclaims, and the counterclaims that were contemplated when this agreement was written were the two that got dismissed.

There are other claims pending here.  I don't know that any would be considered counterclaims or direct claims by a plaintiff, and so there's never been any dissatisfaction with the defense of those claims.

It was Mr. Leto who was defending those claims.  It was Mr. Leto who was hired.

The other document you have to see, Judge, is the authority to represent where my client --

THE COURT:  Let me read this for a second.

So it says here, referring to -- those actions referring to failure to pay, as well as litigation positions that are adversarial to Hi Bar.  Those actions, singularly and collectively, constitute a breach of the JDA, which is a reference to the common interest and joint litigation agreement, and so it says here, based upon Mr. Lubin and Spin's breach of the JDA and fee agreement, Hi Bar is no longer obligated to perform under any of the provisions set forth therein, including but not limited to the obligation to allow Spin and/or Mr. Lubin the right to engage in settlement discussions and case strategy, or Spin's right to receive payment under Section 3 of the JDA.

So I think that's pretty clear, and then it even goes on and say, to be clear, given Mr. Lubin and Spin's breach, in the event Hi Bar resolves any pending

matters, Spin is not entitled to payment under the priority of distribution section, and all funds will be --

MR. KASEN:  Judge, that letter --

THE COURT:  -- given to Hi Bar.

MR. KASEN:  -- that letter is a misinterpretation or a blatant ignoring of the language of the --

THE COURT:  That's your argument, but that's for this Court to --

MR. LANGLEY:  Judge --

THE COURT:  -- make that determination.

MR. LANGLEY:  -- Mr. Leto was hired under the joint representation agreement to represent Spin in the name of Hi Bar.  It says in the common interest agreement, Hi Bar will remain as the plaintiff, but will do so on behalf of Spin.

MR. BRESLIN:  Judge, may I be heard?

MR. LANGLEY:  This is Mr. Leto saying Hi Bar is not happy with Mr. Leto's defense of the counterclaim. I mean, Mr. Leto was representing Spin's interest.  There was no record -- there was no written notice, as required under 2F, from Hi Bar saying we're not satisfied with your defense of the counterclaims.

MR. BRESLIN:  Judge --

MR. LANGLEY:  Mr. Leto was the person that,

if there were new counterclaims, and I don't believe that's what was contemplated in the common interest agreement, certainly the prior counterclaims that were contemplated were dismissed successfully.  Anything new that came up, it was up to Mr. Leto to defend those.

There was never anything from Hi Bar saying we're unhappy with Mr. Leto's defense of any counterclaims.

What you just read there is Mr. Leto is unhappy that he didn't get paid, so he alone is terminating the common interest agreement.  That's ridiculous.

MR. BRESLIN:  Judge, may I be heard?

MR. LANGLEY:  And I have one more thing. This is a motion filed a year ago, Judge, and it states, as is seen in the authority to represent, and inconsistent with the representations to this Court from the inception of this case, this entire time Mr. Leto has been secretly representing Josh Lubin and Spin, in addition to other clients, Herbst and Hi Bar.  This was written by Mr. Breslin.

MR. BRESLIN:  Yes, Judge --

MR. LANGLEY:  This is his motion from a year ago, recognizing exactly what I'm arguing, that Mr. Leto is representing the interests of Spin and Lubin.

MR. BRESLIN:  Judge, very, very briefly.

THE COURT:  Hang on, hang on.

Mr. Langley, are you finished?

MR. LANGLEY:  Yes.

THE COURT:  All right.  Go ahead.

MR. BRESLIN:  Judge --

MR. LANGLEY:  Thank you.

MR. BRESLIN:  -- the FVP parties have been dealing with Mr. Leto for the past two years, since we filed this lawsuit.  Hi Bar has been represented by Mr. Leto.  We've dealt with him.  He's been litigating this case from the beginning.

Franklin has been dealing with Mr. Leto, who has represented Hi Bar from the beginning.  We have trial in one month.  We have come to a settlement agreement.  Now we have a settlement agreement.  All of a sudden, Mr. Lubin is saying, whoa, whoa, whoa, wait a second.

If he had a voice in this, he should have raised it a long time ago.  He's estopped from raising it now.  A, he doesn't have standing.

Assuming our settlement agreement breached that agreement between him and Mr. Herbst and Hi Bar and Spin, he can sue them, but that doesn't negate the validity of our settlement agreement.  Mr. Lubin doesn't have the power.

THE COURT:  No, I understand.

All right.  So I am going to grant the joint motion to approve the settlement, and based on just the plain language in the common interest and general litigation agreement, and based on the April 3rd, 2024 letter terminating that agreement, and the rights under Paragraph 3 of that agreement, which is the only basis that Mr. Lubin would have had to even raise any right to any of these proceeds, I am going to grant the joint motion.  I do not see how Mr. Lubin has any right to stand in and contest the settlement.

Certainly he may have claims against Hi Bar and against Mr. Leto and whatnot, but that has nothing to do with the settlement for the proceeds in the bankruptcy court, and so based on all of that, I am granting the joint motion for settlement.

MR. LANGLEY:  Judge, I would like --

THE COURT:  And so the --

MR. LANGLEY:  -- to request a brief stay of the order, giving us a chance to do an emergency --

MR. BRESLIN:  Judge --

MR. LANGLEY:  -- appeal.

You know, what Mr. Breslin is saying is we can go sue Hi Bar in New York.  That's meaningless.  Once the funds are gone, the funds are gone.  So we'd like -- I

Page 42

would respectfully request a stay of the order for 30 days to --

THE COURT:  All right.

MR. LANGLEY:  -- give us a chance --

MR. BRESLIN:  Judge, Judge, then we have to try the case.  You know, then we have --

MR. LETO:  Is he posting a bond?  I mean, it's --

MR. BRESLIN:  Judge, I vigorously --

THE COURT:  Hang on, hang on, hang on.  All right.

MR. BRESLIN:  If they want to take an appeal --

THE COURT:  It's an ore tenus motion to stay, that's denied.

MR. BRESLIN:  Thank you.

THE COURT:  All right.  If they want to take it on appeal, my guess is they're going to have to post a supersedeas bond.

MR. DORSEY:  Judge, this is Mr. Dorsey for the Franklin parties.  Just one point of clarification.

Judge Kimball has been very clear, he thinks he lacks subject matter jurisdiction to determine any facet of this dispute.

Can the order granting the motion instruct

the bankruptcy court to release the funds to Mr. Breslin's escrow account?

THE COURT:  I can't order the bankruptcy court to do that.

What I can order is that, I do make a ruling that Mr. Lubin does not have an interest for the reasons stated on the record, does not have an interest.

MR. BRESLIN:  Thank you.

MR. DORSEY:  Thank you, Judge.

MR. BRESLIN:  That's plenty.

MR. KASEN:  Your Honor, I would ask -- if that's your Honor's ruling, I respect that.

I would ask that the Court is of that ruling require the full text of this particular settlement agreement and any related settlement agreements be made public, or at least provided to Mr. Lubin.

MR. LANGLEY:  Judge --

MR. LETO:  Under what authority?  Discovery closed, like, weeks ago.

MR. LANGLEY:  We filed a notice to produce at the last hearing on behalf of Lubin.  At the same hearing --

THE COURT:  All right.  Is there an objection to turning over the settlement agreement?  I don't even know, is it titled confidential or not?

MR. LETO:  There's no confidential --

MR. BRESLIN:  I have no objection.  I think he's entitled to see it.

THE COURT:  All right.  So Mr. Kasen, your client will get a copy of the settlement.

MR. KASEN:  And all related settlement agreements, because the (inaudible) --

THE COURT:  Well --

MR. KASEN:  -- one settlement agreement that puts all the money to FVP, then there are separate settlement agreements between the FVP parties and the Franklin parties, and separate settlement agreements then between the FVP parties and Hi Bar parties.

MR. LETO:  There's only one agreement with Hi Bar, your Honor.

THE COURT:  All right.  I guess the starting point will be the settlement agreement between the three parties, which includes Hi Bar.  If there's a separate settlement agreement, I have no -- first of all, is there an objection to turning that over?

MR. BRESLIN:  Judge, the Franklin parties and FVP have a common interest agreement, and in that common interest agreement is a blanket agreement.  So that would apply to any of these funds.

MR. LANGLEY:  But FVP --

Page 45

THE COURT:  And is that confidential?

MR. BRESLIN:  Well, it's stated as confidential.  No one has ever moved to produce it.

THE COURT:  All right.  I would defer that one for another day then.

MR. BRESLIN:  Right, thank you.

MR. LETO:  We'll provide the Hi Bar settlement.

THE COURT:  All right.

MR. BENNARDINI:  Can the Farache --

MR. LANGLEY:  Thank you, Judge.

MR. BENNARDINI:  Can the Farache defendants get a copy of that, too, please, Judge?

MR. LETO:  I will send it to you.

MR. BENNARDINI:  Thank you.

MR. BRESLIN:  I'm glad that was the easy one, Judge.

(Laughter.)

THE COURT:  Yeah, I jinxed myself.

MR. BRESLIN:  Let's move on to the tougher ones.

THE COURT:  All right.  So that takes care of the -- well, that takes care of the trial then as well, as long as --

MR. BRESLIN:  It takes care of --

THE COURT: No, I'm sorry, the first trial.

MR. BRESLIN: -- a lot of it.

MR. DORSEY: Most of it.

THE COURT: There's still some issues though?

MR. BRESLIN: Right, there's still the remaining claims against Mr. Lubin. There is a default against Mr. Getter (phonetic). So, and there's cross-claims by Franklin against Mr. Lubin. So, the first trial is --

THE COURT: And so that would not --

MR. BRESLIN: -- trimmed down dramatically.

THE COURT: So that one could not be done at the same time as the Farache defendants?

MR. BRESLIN: There are -- it would be very difficult to try them at the same time. They're completely separate issues, Judge, and that's why they were separated in the first place, and the exhibits in reference to Mr. Lubin's liability has nothing to do with the Farache liability. It is just, it's apples and oranges, Judge.

And we have the --

THE COURT: So let me ask you, if you're releasing all claims to Hi Bar as part of the settlement --

MR. BRESLIN:  We're releasing Yisroel Herbst as an individual defendant.

THE COURT:  Okay.

MR. BRESLIN:  The Franklin parties are releasing Yisroel Herbst and Mordecai Herbst, his son, as individual defendants.

Hi Bar remains a party for the purposes of piercing the corporate veil to achieve liability against Mr. Lubin, who has told everyone who will listen, that he is, in fact, Hi Bar.

So Hi Bar remains a party, but they will not be -- under the terms of the settlement agreement, they will not be appearing at the trial.  We will not be seeking a judgment against Hi Bar, and to the extent that any verdicts are submitted to the jury regarding Hi Bar, we'll only be seeking a judgment against Mr. Getter and Mr. Lubin.  So --

THE COURT:  All right.

MR. BRESLIN:  -- that's how the settlement agreement is laid out.

THE COURT:  All right.

MR. KASEN:  Your Honor, I have a -- this seems a little bit counterintuitive that we just spent the last 45 minutes arguing that Lubin has no right as standing in the shoes of Hi Bar, and now we're going to

have a whole trial to determine if Lubin is, in fact, Hi Bar?

Judge --

MR. BRESLIN:  We're suing him for fraud. We're suing him for seven and a half million dollars that we loaned based on misrepresentations that he made to my client, and --

MR. KASEN:  Well --

MR. BRESLIN:  This other issue, this other issue, the priority issue, has been resolved.  So the priority issue is resolved.  The fraud issue needs to be tried to the jury.

THE COURT:  I understand.

MR. KASEN:  But the priority issue is resolved by you arguing that Mr. Lubin has no connection at all to Hi Bar, and now you're going to argue that actions that were taken by Hi Bar --

THE COURT:  All right.  We're not going to try the case right now.

So, all right, what would be next that you all need to resolve?

MR. DORSEY:  Franklin has a summary judgment motion that was set for 2.30.

THE COURT:  Okay.  That's against Mr. Lubin?

MR. DORSEY:  Mr. Lubin.

MR. BENNARDINI:  We have three motions set for 1:30, Judge.

THE COURT:  All right.  What were those?

MR. COHEN:  I got an easy one, Judge.

MR. BENNARDINI:  Number one is, your Honor ruled back on June 23rd that the words usury, loan sharking, illegal, and criminal are out with respect to speaking about the Faraches, and typically, your Honor was real clear in your order, in fact your Honor at that very hearing, said --

THE COURT:  Are we getting into that motion?  That's what I want to know.

MR. BENNARDINI:  I don't know, but that's what it's about.

THE COURT:  Right.

MR. BENNARDINI:  It's just a motion to have the Court enter an order as to what you already ordered on June 23rd, that's our motion.

THE COURT:  All right.  I need to go get my notes from June 23rd.

MR. BENNARDINI:  I've got a transcript for you.

THE COURT:  All right, but I want to take a look at my notes as well.

MR. BENNARDINI:  Thank you, sir.

THE COURT:  So let me do that, let me take a quick break.

Just so I have a little bit of a heads-up, so what three motions, Mr. Bennardini, do you have?

MR. BENNARDINI:  I just have one.  The second one is --

MR. COHEN:  It's our motion.  Yeah, Judge, it's our motion for clarification, and also to get a more clear outlook on the ruling from the Court on the term, quote/unquote, usury.

So, it -- and we laid it out pretty clearly in the motion, in terms of what we have to prove, and the intent that we have to prove, and the motive that's involved.  So that's kind of the revolving door here, is that in order to get to the motive, we have to use the term usury.  The motive --

MR. BENNARDINI:  We're arguing it, Judge.

MR. COHEN:  No, I'm not arguing it.  I'm just saying, that's what it's about.

THE COURT:  It's a motion for clarification.

MR. COHEN:  That's --

MR. BENNARDINI:  It's actually, Judge --

(Multiple people speaking.)

MR. BRESLIN:  The second one is on Mr. Gray, it's my motion, it's the scope of -- I have an issue to

present to your Honor regarding data entry and expert testimony, and the third motion is Mr. Buschel is going to handle it, where we're seeking a jury instruction on the resolution of the ownership issues of AWB that your Honor has already ruled on, so those are the three, and then the Franklin summary judgment.

MR. BENNARDINI:  Your Honor, the first motion is actually our motion --

THE COURT:  Okay.

MR. BENNARDINI:  -- to have the Court enter an order based upon what you ordered orally, which is what the Court instructed us to do when we could not get the other side to agree to the terms of an order.

THE COURT:  All right.  I'll have to take a look at that.

MR. BENNARDINI:  Thank you.

THE COURT:  And --

MR. BRESLIN:  But it's our motion.

THE COURT:  Okay.  So those three motions.

MR. BRESLIN:  Yes, sir.

THE COURT:  And then we have the motion for summary judgment at 2.30.

All right.  If I remember correctly, though, as far as the motion in limine regarding usurious, loan shark and things of that nature, I thought that was all

agreed --

MR. BENNARDINI:  No.

THE COURT:  -- that you were not going to --
I thought they were not going to use certain terms, I
thought that was agreed.

MR. BENNARDINI:  Well, no.  I can tell you
what you said.

MR. BRESLIN:  Let him leave.

THE COURT:  I'm going to go grab my notes,
and then we'll get into that.

MR. BENNARDINI:  I want to read what he
said.

THE COURT:  All right.  I'm going to take
a --

MR. BENNARDINI:  Thank you.

THE COURT:  We'll take a 10-minute break for
the court reporter, and then we'll just continue on to
finish everything else up.

MR. BENNARDINI:  Thank you.

THE COURT:  Okay.

MR. LETO:  And, your Honor, because Hi Bar
has no other issues today, is it okay if I'm excused?

THE COURT:  No.

You are welcome to leave.

MR. LETO:  I may not want to leave, but if

Page 53

that's okay?

THE COURT:  All right.

MR. LETO:  Thank you, your Honor.

MR. COHEN:  It's been really exciting.

(A recess was taken, after which the following proceedings were had:)

THE COURT:  All right.  We are back on the record with Case CACE-22-5125, FVP Opportunity Fund III versus Scott Zankl, et al.  Let the record reflect the attorneys are all present.  The parties are not present.  That being said, Mr. Leto, I guess, has left, right?

MR. LANGLEY:  Yes.

THE COURT:  Okay.  So it looks like most everybody is still on Zoom.

All right.  I am -- let me see, there is a motion for clarification.  I may have been remembering, there were various motions in limine that we did --

MR. BENNARDINI:  May 1st.

THE COURT:  May 1st, and then we did the ones June 23rd.  So I have my notes here, which is granted in part without prejudice, right --

MR. COHEN:  Correct, Judge.

MR. BENNARDINI:  Not correct.  Not correct, Judge, it was never --

THE COURT:  -- with respect to the term

usurious.

MR. BENNARDINI:  May I?

THE COURT:  And you could not say that it was illegal --

MR. BENNARDINI:  Right.

THE COURT:  -- or loan sharking, that's what my notes indicated.  Maybe I -- I'm not sure --

MR. BENNARDINI:  Can I read the transcript?

THE COURT:  Okay.

MR. BRESLIN:  Judge, can we argue our motion?

MR. BENNARDINI:  No, this is our motion, this is our motion for order to enter -- motion to enter order granting in part Farache defendants a comprehensive motion in limine concerning -- then they get a response, Mr. Cohen.

MR. COHEN:  You got it.

MR. BENNARDINI:  Thank you, sir.

MR. COHEN:  All right.  You're doing great.

MR. BENNARDINI:  Thank you, sir, I appreciate it.

Your Honor, so we were before you on June the 23rd.  They want to tell this jury, in addition that Mr. Farache is going to go throw Mr. Zankl to the alligators, they want to tell the jury that Auto Wholesale

of Boca was in vehicle transactions with Mr. Zankl that added up to greater than 25 percent interest and, therefore, is usurious.

THE COURT: Okay.

MR. BENNARDINI: Your Honor gave them a bone, so to speak, you told Mr. Breslin, you can put in all the evidence you want, Mr. Breslin, about the number, it's 24 percent, 26 percent, all of that, you gave that to them, but the Court clearly said, so -- and this is -- would you like to copy of the transcript? I have it.

THE COURT: That would be great.

MR. BENNARDINI: May I approach?

THE COURT: Yes.

MR. BENNARDINI: Thank you.

And before we got to this part, we had discussions about usury is personal to a borrower, and with respect to FVP, and Mr. Zankl was the borrower in this matter, FVP shouldn't be raising usury at all because they're a lender, and there's case law that says lenders can't raise usury, but what your Honor boiled it down to is that it was unfairly prejudicial, that any probative effect was outweighed by "unfairly prejudicial", and at Page 65, Line 21, the Court, so for now we read the motion, but limit only, so it's granted in part, to using the term usurious, and saying it was illegal, or

illegal/loan sharking, all right?

And then I said, thank you, Judge.

Mr. Breslin started to speak, and then the Court said, Line 67 -- I'm sorry, Page 67, Line 2, that terminology is out.

So what the Court ruled is, no usury, no loan sharking, and then later on the Court said, you can do all that, you can put in the numbers, and you can do all that without saying it's usurious or -- usurious or loan sharking, and then later on, on Page 68, Line 19, as far as the underlying transaction, all of that comes in because the facts are what the facts are.  Whether you can get in front of the jury and say that it's illegal, and they're criminal, I'm going to -- at this point, you're going to keep that out, and you'd have to come up sidebar and show me why it's somehow probative.

And then finally, just highlighting the Court, the Court said later on, after Mr. Breslin was -- he's persistent, I've got to give him credit.  The Court said, the transactions are what the transactions are, they come in.  The actual rate comes in, but telling them that it's a crime is a matter of law, here's the statute, they committed a crime.  I think you run the risk of that, on balancing, there's a danger of unfair prejudice.

Does it substantially outweigh probative

Page 57

value? I'd have to say at this point, I'm going to say without prejudice, keep it out, all right?

So with respect to loan sharking, usurious, usury, criminal --

THE COURT: All right.

MR. BENNARDINI: -- Judge, you said keep it out.

THE COURT: Let me parse this out a little bit.

All right. Coming in and saying it's illegal or it's loan sharking or it's criminal, you're not asking for a clarification on that, you agree?

MR. COHEN: No, we don't agree, and I'm going to tell you why, Judge.

MR. BENNARDINI: Judge --

THE COURT: All right, and then usurious is a little bit different.

MR. COHEN: Right.

THE COURT: So just because it's usurious doesn't make it illegal. Usurious is a rate, it's just a rate over a certain amount.

(Multiple people speaking.)

MR. BENNARDINI: Your Honor, we're doing --

THE COURT: As far as the balancing, and I'm just saying, it's one thing to get up there and say

so-and-so is a criminal, they're doing illegal activities, that's -- on balancing, it becomes a lot more prejudicial.

MR. BENNARDINI:  Well, here we are -- here's what's happening again.

THE COURT:  If somebody says, hey, that rate is usurious, the jury is not -- usually people on the street or whatever aren't going to go, oh, my God.

MR. BENNARDINI:  That's not what the 4th District says.

THE COURT:  All right.

MR. BENNARDINI:  And we went over that, too, and what the 4th District says in Earl Lee Butler v. Target (phonetic), the term usury has a powerful effect on the person who hears it.  It is defined in terms of illegal, unconscionable, and corrupt, and the 4th District in that very case -- this was a lawyer's fee dispute, and the client brought up the lawyer's fee statements were usurious, and then what did the 4th say about that when the Court allowed it in?  The use of the term can so infect the trial that a new trial must be granted.

And you heard this last time, Judge, and one other thing you said last time is --

THE COURT:  I take it, though, if you go into that, the underlying facts, there were probably no facts to support that it was illegal or criminal or

whatnot, and that's why when I say, again, at the end of my ruling I say, here, as far as the transaction, the underlying -- as far as the underlying transactions, all of that comes in, because the facts are what the facts are.

MR. BENNARDINI:  Right.

THE COURT:  Whether you can get in front of the jury and say that it is illegal, and they're criminal, I'm going to -- at this point, you're going to keep that out, and you have to come up sidebar and show me why it's somehow probative.

MR. BENNARDINI:  So that terminology is out, that's what you said at Page 67 --

THE COURT:  No, but it's without prejudice.

MR. COHEN:  Right.

THE COURT:  What I don't -- what you don't want is people in the middle -- in the beginning of the trial saying, members of the jury, you're going to hear that these people are criminals, and then when the evidence doesn't come out to show that there was any criminal acts, now I've got to try the case all over again.

MR. COHEN:  Correct.

THE COURT:  And that's what I'm doing on balancing.  So I'm going to keep out them coming up there

and saying they're criminals.

MR. BENNARDINI: Or loan sharks.

THE COURT: Or loan sharks in opening, but if the evidence comes out, and they come sidebar and say, Judge, now there's a good faith basis -- you know, a good faith basis, and there's evidence to establish that these transactions are illegal, then you still have to do a little bit of balancing, what's the probative value in it? And they'll probably make the argument that it's probative or even highly probative and what not, but I have to wait and see what the evidence is.

And I'm pretty sure, I do this in almost every case when I talk about a motion in limine, you're asking the Court in a vacuum, without knowing much about the case, to make evidentiary rulings, and it's very hard to do that.

MR. BENNARDINI: This is not --

THE COURT: And so I always say, or I always, when I'm ruling, indicate that evidentiary rulings are always without prejudice to revisit as the evidence comes in --

MR. BENNARDINI: Well --

THE COURT: -- because then the Court has a better understanding of the context.

MR. BENNARDINI: -- I think the 4th District

was quite clear, that use of the term can so infect the trial, that a new trial must be granted.

THE COURT:  You are absolutely correct, and if there's no evidence to support those terms and to use those terms, it would so infect the trial, and that's why I'm keeping them out until I have a chance to see the evidence.

And that being said, I guarantee you, if you look at those cases where there's a reversal, it's because there were no facts that back up --

MR. BENNARDINI:  Well, that's true in that case, and it's going to be true in this case as well.

THE COURT:  It might be, and that's why --

MR. BENNARDINI:  But I'm --

THE COURT:  -- I'm sustaining it, but it's without prejudice, all right?

MR. BENNARDINI:  I need an order to that effect.  I submitted one --

THE COURT:  Okay.

MR. BENNARDINI:  -- and if I do it again, they're just going to be back again.

MR. BRESLIN:  No, we're not.

THE COURT:  Let me hear a response.

So what would be the objection to the order saying that, again, the facts are what the facts are, they

come in, but to not get up in opening statements or before coming sidebar and saying, hey, you know, there's a jury, the defendants are criminals, or the defendants committed illegal acts or whatnot?

MR. COHEN: And, Judge, if I may address the Court? I don't know if Mr. Bennardini is --

MR. BENNARDINI: Yes, you can come, Mr. Cohen.

MR. COHEN: Thank you so much, I appreciate it.

MR. BENNARDINI: But what you also said at the last hearing is, you spend more time on the orders than you do on the rulings, and the hearings themselves, and this is deja vu all over again.

THE COURT: In this case that would be the case, but not like --

MR. COHEN: But not --

(Multiple people speaking.)

MR. COHEN: You did great.

Judge, what I wanted to address was, in the 4th DCA case that he's speaking about, that was in terms of attorney's fees, not tortious interference, and if you look at tortious interference, the claimant must prove, and this is in the actual jury instructions, the claimant must prove that the defendant acted unjustifiably because

the defendant violated a statute, committed a tort, or committed other improper acts.

You know, the fact is the facts, you know, they were buying and selling these cars, which weren't even being bought and sold, to avoid looking like it was usury, which it was.

So the long story short here is we have to put that evidence on in order to prove our case, but what you want to do is, and I understand about the criminal, and he's a criminal, and these are illegal acts, and all these different things in opening, but the fact that it's usurious, and the fact that, whether or not we can prove -- essentially the Court said, you can prove and you can say to the jury that it was over the legal amount of 25 percent, you can say that, but you're essentially saying, we can say -- we can show that it's Yahtzee, but we can't yell that it's Yahtzee.

So that's the issue that I have in the opening --

THE COURT:  I haven't played Yahtzee in a long time.

MR. COHEN:  I know, yeah.

Well, I'll give Mike credit, Mike McMullen for the Yahtzee referral.

MR. McMULLEN:  I like to contribute where I

can.

MR. COHEN:  But what I'm trying to say, Judge, is, I'm not going to sit there in opening and point to Mr. Farache and say he's a criminal at this point.

What I would like to do is, I would like to say that we're going to prove that the amount is over the legal amount, and to say that is considered usury.  I don't know how else to say it.  It is considered usury.

Now, I'm not going to sit there and jump up and down and say that he's a criminal and all these other things.  I mean, obviously, it is what it is when it comes out during trial about how these transactions were taking place, and why these cars weren't actually being sold, and why these amounts were being loaned and then paid back at 35 percent.  All these different things are going to come out, but I don't anticipate in opening, you know, yelling that he's a criminal.

Now, in closing, I don't know, but in opening probably not.

THE COURT:  What's the statute again for usurious --

MR. COHEN:  Here, Judge, here's my motion.

THE COURT:  Do you have it?

MR. COHEN:  Yeah, here's my motion.  It's in there.

Page 65

MR. McMULLEN:  I think it's 687.03.

MR. COHEN:  It is.

THE COURT:  All right.

MR. COHEN:  But I think the usurious statute is in the motion.

THE COURT:  687.03?

MR. COHEN:  And it's not -- yeah, 687.03.

And in that case for the 4th DCA, Judge --

THE COURT:  All right.  That statute is defined as unlawful rates of interest.

MR. COHEN:  Right, correct, and that's what it is.

MR. BRESLIN:  Judge, we vote for you to take judicial notice of this statute, you know, as a safety measure.

THE COURT:  I'm not even sure what the claims are here, but --

MR. COHEN:  It's tortious interference, and it goes on, and if you read the jury instruction, Judge, that's part of the tortious interference jury instruction.

MR. BENNARDINI:  It's not.

MR. COHEN:  But we have to -- it absolutely is.

THE COURT:  But in any event, the statute is pretty clear --

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

MR. COHEN: Yeah.

THE COURT: -- Subsection 1, except as provided herein, it shall be usury and unlawful for any person or any agent, officer, or other representative --

MR. COHEN: Mr. Bennardini, I'm not done with my argument, please, I didn't interrupt you.

MR. BENNARDINI: My leg is hurting. I'm going to stand up, if you please.

MR. COHEN: You can stand up as much as you'd like --

MR. BENNARDINI: I can.

THE COURT: All right. So, I mean, there's different layers as well --

MR. COHEN: Yes.

THE COURT: -- as to whether it's, you know, 18, or I think it's 25 is the other, right, or 24?

MR. COHEN: What the argument would be is that we will provide evidence to prove, to show you today that the amounts that were involved were usury. It's not that I'm saying, okay, you have to make a decision that it's usury.

An opening statement is a roadmap to where we're going to go. I mean, that's first year law school.

THE COURT: All right.

MR. COHEN: The roadmap is, I'm going to

show them --

THE COURT:  I understand.

Let me just ask, Mr. Bennardini, what would be the issue with saying, hey, members of the jury, you're going to learn that a rate over x is a usurious rate, it's not lawful?

MR. BENNARDINI:  That's because, number one --

THE COURT:  And the evidence is going to show that the rate was above that rate.

MR. BENNARDINI:  Number one, the word usury does not appear in the pleadings, it's outside the pleadings.  Number two, it can't appear in the pleadings because usury is a personal defense, and I argued this last time, usury is a -- and we went over a case called --

THE COURT:  Usury is a what?

MR. BENNARDINI:  It's a defense.

MR. COHEN:  Your Honor --

MR. BENNARDINI:  It is something that can only be brought up personally to the borrower.  It's not something -- and there's expressly a case, and let me tell you what it was, because you actually read it, in making your order, Adana Investing versus Wells Fargo, 2017, Westlaw, 3668553, which says lenders can't raise usury, it's to the borrower.  There was no lender relationship

here between FVP and Mr. Farache.

THE COURT:  The facts are what the facts are, and I guess it's different to say, just like -- I mean, you can say certain things are illegal, but it's --

MR. BENNARDINI:  Well, here's what you said about that, you said, well, that's the problem, because then you're saying it's no different than all of a sudden we just say, Mr. Farache, we gave him some cocaine. Usury is the same thing as saying cocaine.  It's the same thing --

MR. COHEN:  Well, the facts were we gave him --

MR. BENNARDINI:  -- it's a crime.

MR. COHEN:  -- cocaine.

MR. BENNARDINI:  It's a crime, Judge.

THE COURT:  But it depends on the underlying facts.  That's why it's hard to rule in a vacuum.

But I have no problem -- I didn't realize my ruling was extending to not even be able to say that, look, there's laws out there that say that this rate is a usury rate --

MR. BENNARDINI:  Well, that's what you said. I mean, I'm only reading what your Honor said.

THE COURT:  -- as opposed to, I thought your motion in limine was to calling your own client a

criminal.

You know, so in other words they can, in jury selection, they're not allowed to say, members of the jury, does anyone -- well --

MR. COHEN:   I don't intend --

THE COURT:   -- if they're not even referring to your client, and they say is something a crime, and you jump up and you go, Judge, we have a motion in limine, and you're not allowed to mention that something's illegal, even though they're not even referring to your client.

So, in other words, it gets very difficult --

MR. BENNARDINI:   Mr. Farache --

THE COURT:   -- you're asking me to split hairs here.

MR. BENNARDINI:   Mr. Farache could not have engaged in usury as a matter of law, and neither could AWB, because they were not borrowers of FVP.

THE COURT:   And so they're not going to get up there and say that they're engaged in usury or illegal -- what they're allowed to do is say the facts are --

MR. BENNARDINI:   Right, you said that.

THE COURT:   -- the facts and --

MR. BENNARDINI:   What you said --

THE COURT:   -- and the usury rate is --

MR. BENNARDINI:  What your Honor said, and correctly said was, and you repeated this over and over, you can say it's 24 percent, you can say it's 26 percent, you can't come to the conclusory term usury or loan sharking.  That's what your Honor said after a full-blown hearing.

THE COURT:  All right.

MR. COHEN:  The problem that I have, Judge, is that I have to say what the evidence is going to show, and the evidence very clearly will show --

THE COURT:  Let me cut to the chase.  You can't say that the defendants are loan sharks.  You can't say that the --

MR. COHEN:  That he's a criminal.

THE COURT:  Or a criminal.

MR. COHEN:  Sure.

THE COURT:  But you can, I will allow you to say, look, this is what the evidence is going to show, what a certain rate is, and the law says, I will allow you to put in what a usury rate is.

MR. BENNARDINI:  Well, then he's instructing the jury, Judge.

MR. COHEN:  No, I'm saying --

MR. BENNARDINI:  That's for you to do later on if the facts show that 24 percent, 26 percent --

THE COURT:  And if there's a request made and it's appropriate, and I have to instruct the jury on what is a usury rate, I can do that.

MR. COHEN:  Thank you, Judge.

MR. BENNARDINI:  Well, just so we don't have to come back again, I submitted an order that -- what you did the last time, your Honor, is you got it up on the screen, I emailed it to your assistant, and you put it in there so we don't have to come back again trying to figure out what the order is, please, sir.

THE COURT:  No, I think we know what the order is.

MR. BENNARDINI:  So did I -- I knew last time, too.

MR. COHEN:  No, I can't call him a criminal, I can't call him a loan shark.

MR. BENNARDINI:  I want it in writing, please, not from your mouth.

MR. COHEN:  Well, I'm just, I'm asking the Judge to confirm it, I can't call him a criminal yet, in opening, I can't call him a loan shark in opening.  I can address it as --

MR. BENNARDINI:  You can't call him any of those until the evidence shows it.

MR. COHEN:  Right.  Yeah, I'll wait until

the evidence shows it.

THE COURT: All right.

MR. BENNARDINI: You'll be waiting a while.

THE COURT: So --

MR. COHEN: I don't think so.

THE COURT: -- and I'll allow you to reference what is --

MR. COHEN: Thank you, Judge.

THE COURT: -- a usury rate or not.

MR. COHEN: Thank you, Judge.

THE COURT: All right. I guess what I was trying to stay clear of is name calling in opening statements, before coming sidebar to see whether the evidence is established or not.

MR. BENNARDINI: What are we going to do with the written order?

THE COURT: Do you have one here?

MR. BENNARDINI: I do, and then, again, I uploaded it.

THE COURT: Do you want me to read it in Word and I'll make --

MR. BENNARDINI: Let me get all my papers out of the way.

MR. COHEN: Is it in PDF or is it in Word?

MR. BENNARDINI: My assistant uploaded it in

whatever the judicial assistant told her to upload it in.

MR. BRESLIN:  Well, Judge, if you just want to state what your order is, we'll have the court reporter give us a transcript, and you can say, as stated on the record.

MR. BENNARDINI:  Well, that doesn't work. That's what we have here, I have it stated on the record from June 23rd, and now it's different.

Judge, I have a handwritten one in which I changed it to say, in opening.  May I approach?

THE COURT:  Yes.

MR. BENNARDINI:  And this is the order that was circulated.

THE COURT:  I might have to just type it in myself.

MR. COHEN:  I think that's the order I don't like.

THE COURT:  All right.  Motion is granted in part without prejudice.  The FVP plaintiffs are prohibited from using the terms -- all right, instead of using the terms, I'm going to say, from referring to the Farache defendants as being loan sharks --

MR. COHEN:  Or a criminal.

THE COURT:  -- criminals, or engaging in illegal activities.

MR. BENNARDINI:  Thank you, your Honor.

MR. COHEN:  But I can use scoundrel.  No, just kidding.

MR. BENNARDINI:  I was just ignoring you, Mr. Cohen.

MR. COHEN:  That's all right.

MR. BRESLIN:  Now, your Honor, just to clarify, the evidence -- we expect the evidence to show that they did, in fact, engage in illegal activity.

So, is that, is your order limited to during the course of the trial?  We're certainly permitted to introduce evidence and then argue it after the fact, are we not?

THE COURT:  Yes.

MR. BENNARDINI:  I think I wrote on there in an opening, Judge, until the evidence -- I added that, Jerry.

MR. BRESLIN:  So that's in opening.  Okay.  Thank you.

THE COURT:  All right.  So it says here, the FVP plaintiffs are prohibited from referring to the Faraches as being loan sharks, criminals, or engaging in illegal activity in opening to describe any loan and business transactions between Auto Wholesale of Boca, LLC and its owners, subject to revisiting after the evidence

Page 75

has been presented.

MR. BENNARDINI:  Thank you, Judge.

MR. BRESLIN:  Thank you, Judge.

THE COURT:  All right.

MR. BENNARDINI:  We did email that to your assistant yesterday, Judge, so she does have it.

THE COURT:  Okay.  All right.

MR. BRESLIN:  Are you ready to take the next matter, your Honor?

THE COURT:  All right.  The next matter is --

MR. BRESLIN:  That's the plaintiff's motion for ruling on basis and scope of expert testimony by plaintiff's expert, Richard Gray.  We filed that on July 28th, 2025 and, Judge, just let me explain to you why I filed this motion.

The reason that I filed this motion is because at the last hearing, when we were arguing about the -- we were here on the motion for protective order about Brian Rohl.

Just to give you an understanding of what happened here, the FVP parties hired a company called Fiske & Company, and they're a forensic, they're forensic accountants out of Miami, and they have, I don't know, 10 or 15 different employees, and it's -- and Sheri Fiske is

the lead forensic there, and so we retained Fiske to do a forensic analysis of the bank records of the Karma companies, Excell, to review the deal jackets that were supplied to us both by Mr. Farache, he supplied all his deal jackets, he supplied us with his QuickBooks, etc. So Fiske & Company was hired to do the forensic.

Fiske assigned several different employees to do the data entry. So, Judge, when I say data entry, what they did was they had these deal jackets that are thousands and thousands and thousands of pages. So what they did as far as the deal jackets went, is they went in there and they took out the date of the purchase, the purchase price, who it was bought from, and they created a database.

So Mr. Rohl did that. Another woman by the name of Anneliese Scherer did that at Fiske, and other employees at Fiske put together a database, and from that database, that database had, it had information about the cars, when they were bought. We had information from the trustee, because when the trustee came in, the trustee took all the records from Excell and the Karma companies. So we got the financial records from the trustee. So all of that information was put into a database.

At the time, Judge, this was during the bankruptcy court, Brian Rohl was our expert. So at the

time that this information was entered into the database, Brian Rohl, who was a Fiske employee, was the expert that was going to testify about that in the bankruptcy court, and what Mr. Rohl did was, he created from that database, he created some charts and summaries, and those summaries were filed, and they were introduced in the bankruptcy court. They were litigated by, and reviewed by the AWB expert in the bankruptcy court, and so what happened was, right before the hearing in March, that Judge Kimball ruled, when he converted it to a Chapter 7, Mr. Rohl left the firm. So Mr. Rohl was no longer with Fiske.

Richard Gray was an employee at Fiske during that time period. So Mr. Gray then became our expert, and when he became our expert, he was with Fiske, but then he left Fiske shortly after we hired him, in March of '23, and then he's been on his own. So he's been our expert since that time.

So, your Honor made a comment at the last hearing which kind of concerned me, because you said that Mr. Gray could not adopt another expert's opinion as his own, and we certainly understand that.

So what Mr. Gray did was he went in and he analyzed the database, all the information that was put into this database, and he came to his own conclusions, and his conclusions mirrored, 99 percent, those

Page 78

conclusions as Mr. Rohl's.  So Mr. Gray has his own opinions.

So when you made a comment at the last hearing, you said that Mr. Gray cannot testify from hearsay, that concerned me, because what Mr. Gray did was he based his opinions on the database that was compiled and put together by other employees at Fiske while he was at Fiske, but now he's no longer at Fiske.  So from that database, he looked at that database and he formed his own conclusions.

So, my concern is, and based on what your Honor's comments were, and based on the response that's been filed by Mr. Bennardini, is that because he looked at that database that was entered by others, that his opinion, based on that database, would be based on hearsay and, therefore, he can't testify to that.  He's formed his own opinions, but he's formed opinions based on data that was entered by subordinates of Fiske.

So I need to know if -- and just for the record, Judge, I mean most of the records are, they're the QuickBooks records that we got from AWB, they're the QuickBooks records that we got, and dealer track records that we got from the trustee.  So most of them are financial records, but aside from the financial records are just, you know, thousands of pages of these deal

jackets.

So what I need to know is, experts -- and if you look at the memorandum that I've attached in my motion, experts can rely on hearsay, and they do all the time.

So the question is whether or not Mr. Gray can rely on that database, because experts typically and normally rely on those kind of things.

So I cited two cases which addressed it very specifically. So I need to know that now, because if I have to have Mr. Gray go back and supervise a reevaluation of all that data, that's exactly what we're going to do, and we will get the same people from Fiske, and we'll have them go over everything and check everything under, quote, Mr. Gray's supervision, so then he can issue an opinion based on the database that has been entered.

So, in other words, have the data confirmed under his supervision, because the case law says that subordinates of an expert can do data entry, and they can do any type of work, and an expert can rely on it, and then there's some cases that take it a little bit farther.

So I need to know that, Judge. So I need to know, because just for the record, so the record is absolutely clear, Mr. Gray has come to his own conclusions. He's not based his conclusions or his

opinion on any of Mr. Rohl's work, but what he did is he based his opinions on the database that was formed and created by the Fiske employees, one of which was Mr. Rohl.

So what I need for your Honor to decide is whether or not Mr. Gray can opine from that database, and the reason is, is because, A, it's the type of information that experts normally rely on; B, we gave AWB and the Farache defendants all the underlying data, okay?  We gave them everything that we put into our work product, and they've had that for years.

And so just to put a cherry on top, Judge, what I did was, last week was, I gave Mr. Bennardini all of the Fiske work product.  So, in other words, we gave him all the spreadsheets that the Fiske employees actually put together so they could generate their own reports.

So I've done everything humanly possible to try to permit Mr. Gray to render the opinions that he's rendered, and again I repeat, he's already testified numerous times that he's come to his own conclusions and they're not Mr. Rohl's.

So I need your Honor to determine whether or not he can rely on the database that was created by a company, by other employees at a company he worked for, because it was created at the time he was an employee, but since he has left, he's relying on that database.

And I can call in Sheri Fiske, I can call in the people that actually did the data entry, and I can substantiate all the data entry, which will of course take time at trial, but this is not the type of thing that I believe should take up trial time, and I think if your Honor rules that we can rely on that data, and base an opinion on it, and particularly because Mr. Bennardini's clients have not only the underlying data, but all the work product data, you know, the actual spreadsheets that were made, then I know how I need to proceed.

But if I have to have it redone, I need to know now, Judge, because it's going to take a couple weeks to actually reevaluate all that data.

THE COURT:  You have summaries, I take it, as well, correct?

MR. BRESLIN:  Yeah, right, right.

So we filed in the bankruptcy court summaries to prove content.

THE COURT:  No, but there's a rule on summaries.

MR. BRESLIN:  Right.  For a summary --

THE COURT:  It says here, when it's not convenient to examine in Court the contents of voluminous writings, recordings, photographs, a party may present in

Page 82

the form of a chart summary or calculation by calling a qualified witness.

MR. BRESLIN: Right.

THE COURT: The party intending to use such a summary must give timely written notice of his or her intention to use the summary, proof of which shall be filed with the Court --

MR. BRESLIN: Right.

THE COURT: -- and shall make the summary and the originals, or duplicates of the data from which a summary is compiled, available for examination.

MR. BRESLIN: Right. We did that over a year ago.

THE COURT: And so that's all been done?

MR. BRESLIN: Yeah.

THE COURT: All right, and then so from the summaries --

MR. BRESLIN: But what we didn't give them --

THE COURT: -- from that database, then is that what -- now Mr. Gray is going to be testifying based on those summaries, his opinions?

MR. BRESLIN: Well, his opinion is based on the data. The summary is just a visual, a visual view of the data.

THE COURT:  Okay.

MR. BRESLIN:  What the data shows, and that's where we get back to the whole usury argument, because what Mr. Zankl testified to repeatedly in deposition is that he had a deal with Mr. Farache where he was paying him 30 percent on his money, and he was doing that for years, and years, and years, and so Mr. Farache -- and it wasn't just Mr. Farache, it was numerous people. That was the deal.  Mr. Zankl was paying 30 percent, he was paying usurious interest rates to a lot of different lenders.

So what the analysis has shown is that, A, because Mr. Farache has testified that he was in the business of buying and selling cars.  The evidence is going to show that he didn't buy and sell any cars, but the evidence is going to show that he was getting paid a lot of money, but he was getting paid on his loan, he was getting paid the VIG, and the VIG was over 30 percent, and this went on for years.

So what the experts have done is they've looked at the books and records, the bank records, they've analyzed the different bank records, and they've looked at the deal jackets and, you know, as far as the deal jackets go, the deal jackets are just -- you know, on their face are just, you know, fraudulent, which is neither here nor

Page 84

there, but the long and short of it is, Mr. Gray is going to opine that, A, that Mr. Farache was not in the business of buying and selling cars, the same opinion he gave in the bankruptcy court, and that, B, he's going to testify that he's calculated the interest rate and it was usurious, it was very high. So that's our evidence, but -- and we don't need to go there.

I just need your Honor to narrowly tell me, can Richard Gray rely on the data that was entered by Fiske & Company, that has been supplied to the other side, not only the raw data, but the cumulative and work product data, and can he testify about that?

Because if he can't, then I'm going to have to have it redone. So that's the legal question.

Thank you, Judge.

THE COURT: All right. Response?

MR. BENNARDINI: Yes, sir. Thank you. Good afternoon again, your Honor.

Your Honor, an expert must have a formative role with respect to the formation of his or her expert opinion, otherwise it's not that expert's opinion. The expert opinion that they want to present to this jury is of Mr. Brian Rohl. It is not of Mr. Gray.

I have Fiske time entries that Mr. Breslin just told you about. They're marked confidential, so I

didn't file them in the Court record, but they're going to be in the Court record because these are the same -- the jury is going to see these because they're the same fees that they're trying to recover under the Wrongful Act Doctrine, which is the doctrine where if my clients cause them to go into bankruptcy court to protect their rights, then they get fees and costs.  It's an exception to the American rule.  So they're going to have to put these into evidence.

And, Judge, when you look, and I have copies, and I'm happy to give the Court one, there is not a single data entry, not a single time entry or billing entry in this document, and you heard him say Mr. Rohl did this, not a single entry by Mr. Gray, not a single one.

I also have Mr. Gray's billing records when he left -- do you have a question?

THE COURT:  I'm not sure where you're going with that.

MR. BENNARDINI:  Where I'm going with it is this, an expert cannot rely on the work -- this is what you said on --

THE COURT:  Experts are not allowed to come up on the stand and say, Mr. Rohl went out and did all this and it was Mr. Rohl's opinion --

MR. BENNARDINI:  Right.

THE COURT:  -- because that would be hearsay.

MR. BENNARDINI:  It's not just hearsay, it's called bolstering.

THE COURT:  Okay.  It would be -- but I don't think that -- he's not going to do that, that's not what he -- so what he's going to do is -- I agree.  So if that's the motion in limine --

MR. BENNARDINI:  No, it's not, it's not the --

THE COURT:  So Mr. Gray is not going to say what Mr. Rohl said, correct?

MR. BENNARDINI:  Correct.

Well, actually, this whole thing is premature anyway.  It should be a motion in limine, and they are due on Friday by the trial scheduling order.  So that's really -- after I brief all that, that's really when this should be heard.  It's sort of a backdoor way to get around a motion in limine that's presently due, but if I may continue?

There is -- Mr. Rohl didn't do the work.

THE COURT:  I thought this was a motion in limine.

MR. BENNARDINI:  No, it's because your Honor said on June the -- on July the 22nd, so, Mr. Breslin, to

the extent that you have this third individual now as your new expert, Mr. Gray, they cannot rely on any work whatsoever that Mr. Rohl did.  That's correct, what your Honor said.

THE COURT:  They can rely on it, they just can't repeat it.  They can't --

MR. BENNARDINI:  No, but what you said is right.  He can't rely on Mr. Rohl's work.  He has to -- here's what the law is, if I may.  The case law is this, when testifying at trial, experts may rely on documents and data collected and assembled by their subordinates, so long as the opinion is otherwise admissible under 90.704.

THE COURT:  Okay.

MR. BENNARDINI:  Mr. Gray was not the subordinate of Mr. Rohl.  It was Ms. Scherer who -- let me start that over.  Mr. Gray was not the supervisor of Mr. Rohl, that was Ms. Scherer.  There's not a single time entry here about Mr. Gray giving Mr. Rohl guidance as to what Mr. Gray needs to do his report.

Absent something like that, experts cannot rely on the investigation, review, an analysis of other experts.

As your Honor said --

THE COURT:  Let me just clarify. Mr. Breslin, you're not going to even reference Mr. Rohl,

are you?

MR. BRESLIN:  No.

THE COURT:  Okay.  So the only --

MR. BENNARDINI:  It doesn't matter --

THE COURT:  -- way you would reference the subordinates underneath, is that they input all the data into the database.

MR. BRESLIN:  The only reason I would ever need --

THE COURT:  Well, let me just ask Mr. Bennardini, what would be the objection to --

MR. BENNARDINI:  Because Mr. -- and this is what the case law says, in addition, and I got Marks versus Marks, 576 So.2d 859, 3rd DCA, 1991, Linn versus Fossum, M.D., and these are med-mal cases, 946 So.2d 1032-1039, Florida Supreme Court, 2006, and Gutierrez, G-U-T-I-E-R-R-E-Z v Vargas --

THE COURT:  Sometimes people get caught up too much in just citing a case, or a case says something, but it doesn't matter what a case says.  What matters is the facts of this case.

MR. BENNARDINI:  Well, the facts of this case --

THE COURT:  Yeah, and then --

MR. BENNARDINI:  Agreed, agreed.

THE COURT:  -- there's a case interpreting it, but (inaudible) --

MR. BENNARDINI:  I'm trying to tell you what the facts --

THE COURT:  -- what the facts of this case are, and then we'll look at what the rules are, and then you have the cases that interpret it.

MR. BENNARDINI:  Right.

THE COURT:  So what are the facts of this case?  What are you trying to keep out?  Because it sounds like what you're trying to keep out, they agree.  They're not going to mention --

MR. BENNARDINI:  No.

THE COURT:  Mr. Gray is not going to get on the stand and say that Mr. Rohl did this, and based on that -- they're not even going to reference Mr. Rohl, right?

MR. BENNARDINI:  Mr. Gray is Mr. Ipsodixit. He did not do any of his own work.  He did not -- he has to -- to do his opinion, to have an independent opinion, Mr. Gray has to -- it's okay for Mr. Rohl to gather, analyze, investigate, and come up with data, but Mr. Gray himself can't just buy off on Mr. Rohl's work.

Mr. Gray doesn't have to gather, he doesn't have to create the data, but he has to look at it, and

there's not a single entry in these billing records --

THE COURT:  It's not just the weight of the evidence.  If he didn't look at it, yeah, then he may be out, but they're representing he did.

MR. BENNARDINI:  Well, I read his transcript, all three of them, and there's not a single time where he said he analyzed Mr. Rohl's data.  He just simply did not do it.

THE COURT:  Not Mr. Rohl's data.  He just analyzed the data.

MR. BENNARDINI:  It's Mr. --

THE COURT:  This is the data, this is the --

MR. BENNARDINI:  Mr. Rohl was the expert in the bankruptcy proceedings, or he was going to be.  Mr. Rohl prepared the expert report on which Mr. Gray is relying, not Mr. Gray.  Mr. Rohl prepared those schedules that your Honor talked about.  In fact, those schedules are not, those are not summaries.  Those are demonstratives of what the conclusion by Mr. Rohl was as to what the --

THE COURT:  I'd have to see it.  Again, this is where I'm at a disadvantage.

MR. BENNARDINI:  Well, that's why we need to --

THE COURT:  I mean, you're asking me to rule

in a vacuum here, but I think what was represented by Mr. Breslin is that there was -- there's all these jackets, the information was taken and put into a database, and then it was summarized, and then you have the underlying, and that Mr. Gray has now reviewed those summaries and the underlying data, and now is going to give an opinion.

MR. BENNARDINI:  Respectfully, here's what the Court is missing --

MR. BRESLIN:  Judge, no, almost.

MR. BENNARDINI:  Here is what the Court is missing --

THE COURT:  Okay.  What am I missing?

MR. BENNARDINI:  It would be okay with what your Honor just said if Mr. Gray was the supervisor of Mr. Rohl at Fiske at the time and said, Mr. Rohl, I'm going to be doing this opinion.  Here is my direction and guidance as to what I want you to review, gather, and analyze so I can form my own independent opinion.

If you look at these billing records again, at Fiske, and Mr. Breslin just told you that's where all the work was, that never happened.  Mr. Gray just happened to work there, and when --

THE COURT:  All right.  I understand your argument.  All right.  So --

Page 92

MR. BRESLIN:  Judge, very briefly, please.

THE COURT:  So fill in the blanks, Mr. Breslin.

MR. BRESLIN:  Judge, just so you're not confused, the data was entered by Fiske, various and numerous employees at Fiske, It was Brian Rohl and Anneliese Scherer.

THE COURT:  So Rohl was not the data entry person?

MR. BRESLIN:  Pardon me?

THE COURT:  Mr. Rohl --

MR. BRESLIN:  He was one of them.

THE COURT:  One of the data entry people?

MR. BRESLIN:  He was one of the data entry people.

THE COURT:  Okay.

MR. BRESLIN:  But now there's a database. From that database, Mr. Rohl formed an opinion.  From that same database, Mr. Gray has now formed an opinion. Mr. Rohl created charts from that database.  Mr. Gray formed an opinion based on that database.

So the only issue before your Honor is, can Mr. Gray form his opinion based on the database that was put together by the Fiske employees, because he was an employee there at the time, but he didn't supervise.

THE COURT:  These other charts that Mr. Rohl prepared, he's not using those?

MR. BRESLIN:  Judge, we filed those, and Mr. Gray --

THE COURT:  Are they summaries or are they --

MR. BRESLIN:  Right, right.  Judge, the summaries are the summaries.  The summaries are nothing more -- the charts are nothing more than visual depictions of what's in the database.

So Mr. Gray has looked at the summaries, looked at the underlying data, and he says, yes, those summaries are accurate, and now this is my opinion.

He's not basing his opinion on the summaries.  He's basing his opinion on the underlying data, but he's also opining that the summaries are accurate.

THE COURT:  I'm not sure what -- all right.  The opinion is that the effective interest rate is X?

MR. BRESLIN:  Right, right, that's one of them.

What he did was he analyzed the income, the money in and money out from the Karma companies, the money in and money out from AWB, the money in and money out from Excell, and he's analyzed all of those, and he's compared

those to the AWB records where they say they bought and sold cars.

So they said -- just to give you just a taste of it, AWB, in the year 2021, and that's going to be the focus year, they said that they bought and sold over $30 million worth of cars, and they didn't.  They didn't -- you know, they didn't buy and sell any cars, much less $30 million worth of cars.

What it was is there was just a lot of paper transactions to explain the money back and forth, because what happened was there was this loan out there, and there was money going in, money coming out, money going in, money coming out, and at the end of the month, every month, and Scott Zankl has testified to it numerous times, is it had to be 30 percent, that was the thing.

So all of this, all the paperwork were fraudulently and falsely created to cover up this usurious lending scheme, and interestingly, Mr. Bennardini says there's no allegation of usury in the complaint.  I think he needs to re-read the complaint.  It's chock full of references to usury.

So, but, Judge, I just need a decision.  Can Mr. Gray form his opinion on the database that was entered by Fiske employees while he was an employee there, even though he's no longer an employee at Fiske?  That's the

legal question, because if you say no, then I'm simply going to have it redone, because we've spent way too much money and wasted too much time for him not to be able to give his opinion, because he's already opined from the database. So I just have to reconfirm the database.

THE COURT: All right.

MR. BENNARDINI: Your Honor, I have the Fiske records here, and this is the entry, August 8th, 20 --

(Multiple people speaking.)

MR. BRESLIN: He doesn't have all the Fiske records there --

THE COURT: Okay.

MR. BRESLIN: -- because what he doesn't have is the retainer agreement with Mr. Gray, where he was paid 7,500, and it was to analyze the data. So the first 7,500 in his retainer agreement was to analyze the data.

THE COURT: He went and he actually analyzed the data?

MR. BRESLIN: Yes, yes.

MR. BENNARDINI: I have those billing records as well and it's the same thing.

MR. BRESLIN: And that's cross-examination.

THE COURT: Hang on, hang on. Okay.

MR. BENNARDINI: I have the Gray billing

records as well.  What happened was --

THE COURT:  You don't want him looking at the work that Mr. Rohl did and saying it's my opinion that this --

MR. BENNARDINI:  Well, let me make it clear. It's perfectly obvious under the law there cannot be any bolstering.  In other words, it's not just Mr. Rohl. That's --

THE COURT:  He's not even mentioned Mr. Rohl.

MR. MEYER:  As Mr. Breslin told you earlier, there were four experts they had to do this, Mr. Glick, Mr. Barbee, Mr. Rohl, and Mr. Gray.  None of those --

THE COURT:  Wait a second.  If he testifies, look, this -- the information from these jackets were put into this database, I analyzed the database, and this is my opinion.

MR. BENNARDINI:  He needs to --

THE COURT:  There are no issues, right?

MR. BENNARDINI:  Yes issues.

THE COURT:  What's the issues?

MR. BENNARDINI:  He needs -- he can't -- because he was not Mr. Rohl's supervisor --

THE COURT:  He's not even going to mention Mr. Rohl.

MR. BENNARDINI:  You've got to let me finish, please, sir.

THE COURT:  Okay.

MR. BENNARDINI:  Because he was not Mr. Rohl's supervisor, Mr. Rohl did not have the direction from Mr. Gray to look for what Mr. Gray needed to render his opinions, that's what the case law says.  You can have a subordinate do it, but you've got to give them appropriate direction.  Mr. Gray, to this day, has not laid eyes on deal jackets, he's not laid eyes on dealer track records, there's no evidence.  I've looked at Mr. Gray's billing records, Gray evaluations --

MR. BRESLIN:  He's deposed him twice, he's never even asked him that.

THE COURT:  All right.  If all he's doing is looking at the database, I'm going to allow it.

MR. BRESLIN:  Thank you, Judge.

THE COURT:  But he has to establish that he's looked at the database and --

MR. BRESLIN:  Of course.

THE COURT:  Okay.

MR. BRESLIN:  Of course.

THE COURT:  All right, and he's not allowed to say that Mr. Rohl did this --

MR. BRESLIN:  No, no.

THE COURT:  -- and I agree with what Mr. Rohl said.

MR. BRESLIN:  Judge, I understand the rules and the law.

MR. BENNARDINI:  Also, if I would, Mr. Glick and Mr. Barbee, because they mentioned them in the motion.

THE COURT:  Yes, he can't, he's not going to reference any other experts and what they've done.

MR. BRESLIN:  No, no, of course not.

THE COURT:  It's just that these people put together a database, and then I reviewed the database and --

MR. BRESLIN:  Thank you, Judge.

THE COURT:  All right.  So, I don't know if I need to do a jury instruction on ownership interest today.  That's what you're going to argue, right?

MR. BUSCHEL:  Yes, Judge.  I can give you the proposed jury instruction.  I gave it to you, and I also -- I mean, I could quote the Court, give a 4th DCA case, and then give a special proposed jury instruction. I think it's -- I don't think we have to belabor the point, but I'll quote the Court from the last hearing on Page 99.  I do think there has been a finding, though, that AWB does not have an ownership interest.  The Court also said, all right, that's based on Judge Kimball's

ruling on May 1st as well as the June order, so we are not going to have a separate trial on whether AWB had an ownership interest in those vehicles.  That's already been determined by the bankruptcy court.

And so the proposed instruction, I'll spare the Court all the different res judicata and judicial estoppel, there was a settlement agreement with the Chapter 7 Trustee, but the special instruction would be this, members of the jury, you're instructed as a matter of law that Auto Wholesale of Boca, LLC, AWB, did not, and never had any ownership interest, lien, security interest, property interest, or any other legal claim of any kind in the vehicles that are the subject of this lawsuit.

AWB was never a good-faith purchaser or buyer in the ordinary course of business with respect to any of the vehicles at issue in this case.

That's all we're asking for.  I think that would eliminate a lot of their worries about prejudice, and trying to put in orders from the bankruptcy court. I think once we have this finding, this instruction takes care of that issue.

THE COURT:  All right.  Is there an objection?

MR. BENNARDINI:  Yes, your Honor.

That is --

THE COURT: How can I give --

MR. BENNARDINI: Right.

THE COURT: How can I comment on the facts? All I'm doing is setting myself up to be reversed.

MR. BUSCHEL: You're not commenting on the facts. You're making a conclusion of law that AWB does not have any ownership interest.

THE COURT: I'd be commenting on the facts, so it is res judicata or --

MR. BUSCHEL: So --

THE COURT: -- judicial estoppel issue.

MR. BUSCHEL: Right, and --

THE COURT: -- I've already ruled on that.

MR. BENNARDINI: Yes, you have.

THE COURT: And the Faraches were not --

MR. BUSCHEL: Not the Faraches, AWB. I just quoted the court --

THE COURT: Yes.

MR. BUSCHEL: -- that A -- if the Faraches want to come in here and raise their hand and say, oh, we were the real owners of it --

THE COURT: I thought they were going to get up and raise their right hand and say we thought we were the real owners.

MR. BENNARDINI: They're going to raise

their right hand and say AWB was the owners.

THE WITNESS:  Well --

MR. BUSCHEL:  But they can't --

(Multiple people speaking.)

MR. BENNARDINI:  Right, exactly, exactly.

MR. BUSCHEL:  But they can't say that.

MR. BENNARDINI:  Yes, they can.

MR. BUSCHEL:  No, because we -- there's a court order from the bankruptcy court, if I may, since I thought we had this ironed out, because the court said that is, and I'll read it from the -- it's Docket Entry 694 from the bankruptcy court, it says, the proceeds of the auction, net, buyer's premium, expenses, carve-outs of the net proceeds shall be held pending adjudication by a court of competent jurisdiction as to the validity, priority, and extent of property interests asserted in the net proceeds or consensual resolution between and among the parties whom have appeared in the main bankruptcy case or the adversary proceedings and assert an interest therein.  Only, one, parties to the adversary proceeding complaint.  Two, the parties have appeared in the main bankruptcy case and asserted an interest in the vehicles may make a claim in the net proceeds.

Well, the Faraches didn't do that, and AWB certainly can't do that based upon Paragraph 9 of the

Page 102

bankruptcy order.

THE COURT:  Okay.

MR. BUSCHEL:  The trustee --

THE COURT:  I'm going to take that -- I'm going defer on that.  You're going to have to give me case law that says that this Court, without a stipulation, that this court can tell the jury specific factual findings, because that's where courts always get in trouble by doing that, when a court comments on the evidence or things of that nature --

MR. BUSCHEL:  But they don't want us -- we shouldn't have to prove --

THE COURT:  If there is a summary judgment as to that or something --

MR. BUSCHEL:  Well, there was, and I think we're now at the point of that, but let me read --

THE COURT:  The summary judgment was against the Faraches.

MR. BENNARDINI:  Yes.

MR. BRESLIN:  Right, and, Judge, what you ruled was, you said as far as AWB goes, I'll grant summary judgment on that, but as far as the Faraches go --

THE COURT:  Okay.  So --

MR. BRESLIN:  -- they may come in and claim an ownership issue.

So you've already ruled, and you've already decided very clearly that they can't relitigate AWB ownership.

So we're simply saying, you've ruled that they can't come in and try to prove that AWB owned these cars, so we want a jury instruction to that effect.

THE COURT:  All right.  I mean, they're going to have to think about that.  We'll do that --

MR. BUSCHEL:  Judge, let me --

THE COURT:  -- at the time --

MR. BUSCHEL:  Let me give you one case, if you want that's on point from the 4th District Court of Appeal, it's Southeast Bank versus Equitec Leasing, 446 So.2d 1155, Florida, 4th DCA, I'll read one sentence from it.

THE COURT:  Gosh, that has to be a long time ago.

MR. BUSCHEL:  It was, but it says, we have thoroughly reviewed the matter and hold Southeast Bank collaterally estopped from relitigating the ownership in the state court herein, and it was an appeal from the -- I want to, before I -- it was a federal bankruptcy case.

THE COURT:  I think they were the -- they were the parties, though?

MR. BUSCHEL:  It was a federal bankruptcy

Page 104

case, but it's saying, the summary judgment was granted on the grounds that the ownership of the property being foreclosed have been determined in a federal bankruptcy proceeding.

So, I think the Court -- it is still good law. It cites to other law in the 4th District, and it says if something has been determined in the bankruptcy proceeding, this Court can -- this Court should accept it, and certainly, particularly when the court, a bankruptcy court in -- it said, they are not allowed to go to another court and relitigate it. That's precisely what the Faraches are asking, and AWB is asking to do, is, well, you can't put in the court order -- I mean, you can't give a jury instruction, and we want to raise our hand and say we thought AWB --

THE COURT: Let me look at that. I'll look at it.

MR. BUSCHEL: Okay.

MR. BENNARDINI: Can I briefly respond? You did rule on this already. This was before the Court on May 1st, and I have a copy of your Honor's order if you would like it.

What it says is, genuine issues of material fact remain for determination by the trier of fact regarding these claims, that was conversion of tortious

Page 105

interference, and because Moshe and Lisa Farache were not parties to the bankruptcy proceeding, res judicata and collateral estoppel do not apply to them.

However, as to AWB, as a party to the bankruptcy proceeding, collateral estoppel bars AWB from claiming an ownership interest in the vehicles.

THE COURT:  But they're not a party in this case.

MR. BENNARDINI:  They're not a party in this case, that's right.

And just on July 28th --

MR. BUSCHEL:  Who's not a party to this case?

MR. BENNARDINI:  AWB.

MR. BRESLIN:  AWB is --

MR. BUSCHEL:  Yes, of course --

(Multiple people speaking.)

MR. BENNARDINI:  There's no claim against them.  I'm not defending AWB.  They're not getting a judgment against AWB.  There's no damages claim against AWB.

MR. BUSCHEL:  Judge, I think --

MR. BRESLIN:  We've already amended the complaint to clarify that issue, because he keeps talking about a nominal defendant.

THE COURT: They will be a defendant on the verdict form?

MR. BRESLIN: Absolutely.

MR. BENNARDINI: No, 100 percent, no. No, they won't, Judge. There's no damages claim against AWB.

MR. BUSCHEL: Judge, they are named as a party because we're piercing the --

THE COURT: It sounds like that's a different issue.

MR. BENNARDINI: It is.

THE COURT: So if they are a party, then I could instruct them.

MR. BENNARDINI: 100 percent.

MR. BUSCHEL: But, Judge, if I may --

MR. BRESLIN: Judge, just to clarify --

COURT REPORTER: Judge, Judge, I can only take one at a time.

THE COURT: All right.

MR. BRESLIN: Who would you like to hear from, your Honor?

THE COURT: Mr. Bennardini, go ahead and finish.

MR. BENNARDINI: Thank you, sir.

THE COURT: You've got five minutes --

Page 107

MR. BENNARDINI:  Thank you, sir.

THE COURT:   -- and then we're done.

MR. BENNARDINI:  Thank you, sir.

The stem of all this was this July -- June 16th, 2023 language in an order by Judge Kimball, and that is Paragraph 9 they rely on, where Judge Kimball says, the trustee, as the duly appointed Chapter 7 Trustee of the bankruptcy estate of Auto Wholesale of Boca hereby waives all liens and interest, including any lien and ownership interest in the vehicle -- vehicles, waives.  There was no adjudication.  We went through all this at prior hearings.

In fact, your Honor changed Judge --

THE COURT:  Gosh, every time I come up, we have the same arguments over and over again.  Enough. I'll address this at trial.  I'll have a much better understanding when we get to trial.

You all are, you're coming in here with these little tiny issues and splitting hairs, and asking me to rule on evidentiary issues without even understanding the context.

I mean, you know, we're having a charging conference on a jury instruction when we haven't even heard opening statements yet, and so -- on a fact that you want me to instruct the jury on, I'm not ready to do that.

MR. BENNARDINI:  Thank you, Judge.

Page 108

THE COURT: All right, and so in any event, I don't think there's anything in dispute. There's a bankruptcy that addressed something for what I thought was a non-party, but I guess they are going to be added and they will be on the verdict form. We'll address it, I guess, when we get to trial.

MR. BUSCHEL: Yes, we will.

THE COURT: All right. Now let me handle the motion for summary judgment. All right. This is Franklin versus --

MR. COHEN: Judge, may we be excused?

THE COURT: You are excused.

MR. COHEN: Thank you, Judge.

THE COURT: Nobody's going to require you to be here.

MR. COHEN: What?

THE COURT: Nobody is requiring you to stay.

MR. COHEN: All right. All right. Thanks, Judge.

THE COURT: All right.

MR. BUSCHEL: Nice to see you, Judge.

MR. LANGLEY: Judge, before we begin, I noticed this morning that my response to Mr. Dorsey's motion didn't make it -- doesn't show up on the docket. I wasn't sure if you had it. I have an extra copy, if you

don't.

THE COURT:  All right, it was in the -- I've read your response.  You're saying that it's on appeal, and there's a motion for a new trial.

MR. LANGLEY:  Yes, and for some reason, I looked this morning, and it's not showing on the docket, even though it was filed a week ago.  If you have it, that's fine.

THE COURT:  Yeah.

MR. DORSEY:  Did your Honor want to take a break before we begin, or --

THE COURT:  No.

MR. DORSEY:  -- do you want to just soldier on?

THE COURT:  Actually, let me do this, let me take a five minute break.

MR. DORSEY:  Understood.

THE COURT:  Or a 10 minute, to give the court reporter a break.

MR. LANGLEY:  Okay.

MR. MEYER:  Your Honor, when you come back, it's Steven Meyer, I'm here, we have a 1:30 case, which I think is very short, or a 1:30 motion, Mr. Breslin, and I believe it's quite short.

THE COURT:  Which one was that?  I was

Page 110

not --

MR. MEYER:  I represent MMS Ultimate Services.  Mr. Breslin filed a motion for default.

THE COURT:  All right.  Mr. Breslin.

MR. BRESLIN:  Yeah, I did, Judge.  They never answered the complaint.  They answered it the other day.

Prior to them answering it -- they answered it just the other day, well over a year late, after the court ordered an answer, after the motion to dismiss was denied.  It was just ignored.  They filed a motion for summary judgment a couple of weeks ago, and now -- and that was without any answer being filed.  They made a motion for default, and to strike their motion for summary judgment.  So they just filed an answer and numerous affirmative defenses that I'll be moving to strike.

So what I'd like your Honor to do, I know you can't enter a default because he, in fact, did answer, even though it's a year late under the case law, but I would like your Honor to strike the motion for summary judgment because it was premature, and he filed it before he answered, and he raised affirmative defenses and an answer that are relevant to the summary judgment.

THE COURT:  My understanding is that the case law allows you to file a motion for summary judgment.

Page 111

I think the case law allows you to file a motion for summary judgment, right, even instead of an answer?

MR. BRESLIN: Yeah, it does.

THE COURT: So I don't know if there's a basis to strike it.

MR. BRESLIN: Well, you know, it's just, you know, it's an equitable argument, Judge. It's just, you know -- you know, just ignoring court orders, we have a trial in a month, and he files an answer and affirmative defenses, you know, a month before the trial, while a motion for summary judgment is pending.

THE COURT: Well, I hate to say this --

MR. BRESLIN: It's just --

THE COURT: -- but you probably shouldn't have waited until now to file a motion for default either, right?

MR. BRESLIN: I'm sorry?

THE COURT: You probably shouldn't have waited until this late to file a motion for default and have it heard, I guess.

MR. BRESLIN: That's a very good point, Judge, because I assume that would have triggered it even earlier, but I just noticed it.

THE COURT: No, if you would have done it a year ago, then maybe you would have gotten an answer a

year ago.

MR. BRESLIN:  Yeah, you're right.

THE COURT:  So, all right, the motion for default is denied.

MR. BRESLIN:  Thank you.

THE COURT:  And then the motion to strike is denied, but we need to get those things all heard right away, Mr. Meyer.

See, you've been just retained recently?

MR. MEYER:  No, your Honor, I've been in the case for a while, but there's a very narrow, little limited issue as to this one defendant.

THE COURT:  All right.  Are you part of either of the trials?  Which trial is MMS --

MR. BRESLIN:  The Farache trial.

THE COURT:  Which one, the Farache?

MR. BRESLIN:  The Farache, trial two.

THE COURT:  All right.  I don't know if there's any way you can carve them out or resolve with them or anything.

MR. BRESLIN:  No, Judge, there is not, I'm sorry.

THE COURT:  All right.  You've got to be ready to go, Mr. Meyer.  I guess that --

MR. MEYER:  We'll look forward to it,

Page 113

your Honor.  I would say that probably the last person you want to see in the courtroom is my client with respect to these issues, but --

THE COURT:  All right.

MR. MEYER:  I'm the plaintiff, but --

THE COURT:  All right.  So motion for default, motion to strike is denied.

MR. BRESLIN:  Judge, I don't understand what he meant by that comment.

THE COURT:  I have no idea either.  So I'm not going to ask any follow-up, because it doesn't matter.  You know, why they would want to be there or not be there, unless there's a threat.  I don't think there's a threat, right, Mr. Meyer?

MR. MEYER:  It's not a threat.  I'm saying --

MR. BRESLIN:  Just making sure.

MR. MEYER:  All right.  I'm not here to argue with counsel.  I mean, there are just no facts whatsoever that have anything to do with my client.  I think that --

THE COURT:  That's what the trial is for, so we're not going to do that today.  All right, but the motion for default is denied.

MR. MEYER:  Thank you.  Have a good day,

your Honor.  Thank you, Counsel.

THE COURT:  All right.  I'll be right back, and then we'll do the Franklin versus Lubin.

MR. DORSEY:  Thank you, Judge.

(A recess was taken, after which the following proceedings were had:)

THE COURT:  All right.  All set?

MR. DORSEY:  All set.  Everyone left, Judge, so we started thinking maybe you took off, too.

THE COURT:  I thought about it.  No, I'm just kidding.

(Laughter.)

THE COURT:  All right.  Whenever you take a break, you have all this stuff waiting for you in the office, and, yeah, I ended up getting sidetracked a little bit, but we're back on the record in CACE-22-5125, FVP versus Zankl, et al.  So all we have left are the Franklin parties and Lubin.

MR. DORSEY:  Correct.

THE COURT:  So this is Franklin's motion for some rejection, correct?

MR. DORSEY:  Yes, sir.

My personal promise to you is this presentation will be shorter than the motions in limine you heard, even though it's potentially case dispositive.

Page 115

So I think it's --

THE COURT:  Be careful what you represent here.

MR. DORSEY:  Well, depending on what Mr. Langley has in mind, maybe not, but I'll try to keep my presentation brief.

THE COURT:  All right.

MR. DORSEY:  As a very, very brief kind of 10,000-foot background, because most of your experience in this case has been dealing with the Farache parties and the FVP parties, my clients, the Franklin parties, are commercial lenders.  Basically, their business model is they find companies in business who are suffocating under the weight of usurious loans, merchant cash advances. Franklin locates those companies and essentially flushes out the bad debt.  It buys off the bad debt, and it refinances it with legal debt, allows the company to survive.  Franklin makes a profit.  Everybody wins.

Franklin became involved in this case when it was approached by entities your Honor is familiar with, Excell and the Karma entities in the year 2021.  They were running automobile dealerships, they were drowning under millions of dollars of MCA debt, and so they approached Franklin, based on a common contact, and said, hey, what can you do about a refi?  So Franklin started, you know,

Page 116

talking to Scott Zankl, and otherwise investigating the situation.

At the time Franklin was investigating, Excell was indebted to an MCA entity named Spin Capital, LLC. This is Mr. Lubin's entity you heard about earlier.

Franklin, as a condition precedent to closing on any kind of refinance to Excell, Franklin needed an assurance from Spin that it was acquiring all the Spin debt. Franklin wouldn't want to refinance, have a borrower who's still being bled dry by an MCA out the back door.

So Spin, in November of 2021, executed an assignment to Franklin where it represented, we are -- here are our MCA contracts, the total indebtedness is, I think it was a nominal amount, either zero or a dollar, we hereby assign it to you, Franklin. Enjoy your refinance.

That statement turned out not to be true. It later came out that despite Spin's representations to Franklin in the assignment, that it had secretly spun off some of its debt to another entity, Hi Bar Capital, who your Honor is also familiar with, and after Franklin refinanced the loan, to what it thought were, you know, healthy businesses, who it was going to pull through, these businesses paid, I believe the figures are either 1.2 or 1.8, it's in my papers, they paid seven figures to

Page 117

Hi Bar based off the debt that Spin assigned.

Franklin then sued Spin in Michigan State Court for breach of contract.  This lawsuit was commenced in 2022, Spin at all times was represented by counsel in that lawsuit, and in November of 2024, there was a two-day trial.  The principal witness for Franklin was Scott Zankl, and Mr. Lubin, who is the sole owner of Spin, also appeared at the trial and testified on behalf of Spin.

Following that extensive two-day trial in the spring of this year, the Michigan state court issued extensive findings of fact, which we'll get to in a minute, which basically said Lubin knowingly lied about the transaction.  Franklin relied on that false representation to its detriment, these are detailed in the findings of fact, which are attached to my motion, and about a month or two after the findings of fact were issued, a final judgment was issued closing the case.

So basically, Judge, I have a bunch of -- my clients, the Franklin parties, have numerous tort claims they're alleging against Mr. Lubin in this case, and we'll get to those in a minute, fraud in the inducement, tortious interference with business, what have you.

We're going to walk through it. Essentially, everything that we're alleging against

Mr. Lubin, and that potentially is up for trial in September, the Michigan state court has already dealt with.  The Michigan state court had a two-day trial, dealt with all these issues.

So basically the summary judgment motion, I don't have a binder of exhibits, I have a two-page judgment with some findings of fact we're going to walk through, I have a final order that adjudicates numerous facts.  It's -- I guess it's in a situation where both parties had ample opportunity to litigate these factual findings, and there's mutuality of estoppel.  The movant today is Franklin Capital Funding, LLC, that was the plaintiff in the state court, and I'm seeking to collaterally estop Josh Lubin, who is the sole owner and person who controls Spin, and both Michigan -- Michigan law applies, but I cite both Michigan and Florida cases. They state that if you're the sole owner --

THE COURT:  Why do you need a new case?  It would be different if it was Lubin or Spin suing Franklin, and then you say, hey, collateral estoppel, res judicata and all that.  What are you seeking to get here that you can't already get in Michigan?

MR. DORSEY:  The Michigan judgment was only against Spin.

THE COURT:  Okay.

MR. DORSEY: They couldn't sue Lubin personally in his individual capacity. Mr. Lubin personally is a defendant down here.

THE COURT: All right.

MR. DORSEY: So my client is seeking a judgment against him in his individual capacity.

THE COURT: Why couldn't you sue Lubin there and have just -- you understand what I'm saying?

MR. DORSEY: I understand, Judge. I can tell you there was a forum selection clause in the assignment, such that Spin consented to jurisdiction in Michigan, and that's how they got Spin in Michigan.

They attempted to sue Hi Bar in Michigan, and that was dismissed for lack of personal jurisdiction. I assume if they had attempted to sue Mr. Lubin in Michigan as well, it would have been dismissed for lack of personal jurisdiction because he's not a Michigan resident. The only reason they were able to sue Spin up there was because of a forum selection clause.

THE COURT: So how is their collateral estoppel or res judicata on Lubin if Lubin was not a party there?

MR. DORSEY: So, your Honor, you're peppering me with questions, and you're disrupting the flow of my presentation, but basically I can cite the

Page 120

cases to you, mutuality of estoppel applies when you have obviously the same parties, you know, or you have what are called parties in privity with each other, and a party is in privity with another party when its interests are so aligned that for all intents and purposes it is that party participating in the other litigation.

And again, I can go through it in a minute, there's Michigan case law, there's Florida case law that says if you are the sole owner of a company, if you are controlling the shots of that company, and there's a judgment against that company, collateral estoppel applies to you, and that's particularly true here because, as I said, Mr. Lubin testified personally at the trial over two days.  The Michigan court judged his credibility extensively.

THE COURT:  All right, and so response?

MR. DORSEY:  No, Judge, can I just finish briefly?

THE COURT:  Yeah.

MR. DORSEY:  I want to keep going.

I made a little chart.  I'll go through it quickly, I promise.

THE COURT:  So you don't know why Lubin -- or do you even know if Lubin was sued in Michigan, individually?

MR. DORSEY: No, he was not. There was no personal jurisdiction over him in Michigan.

THE COURT: But it's different than Hi Bar, he was not even sued?

MR. DORSEY: He was not even sued. They attempted to sue Hi Bar, and Hi Bar was dismissed for lack of personal jurisdiction.

THE COURT: Obviously you can waive that, so -- I mean, if you had sued Lubin, he might have waived it and so you could do it all at once. Instead, it seems piecemeal.

MR. DORSEY: I mean, Judge, at the end of the day, Lubin -- they were not required to sue Lubin in Michigan. I don't know -- you know, I doubt they would have had personal jurisdiction over him, but at the end of the day, the parties are now here before you, and essentially what I'm saying is we have a court that's issued binding findings. Why are we going to have the same trial that already occurred last year?

THE COURT: Because that was only against Spin, right?

MR. DORSEY: Well, your Honor --

THE COURT: No, I understand, you're saying that it was essentially one and the same. I just -- all right.

MR. DORSEY:  Well, let me first, because I would like to address Mr. Langley's arguments at the end of my presentation.

THE COURT:  Okay.

MR. DORSEY:  So let me just first walk you through, like, why I think it's so clear-cut.

So you have a chart in front of you that says Count 7, fraud and fraud in the inducement, it states the elements of fraud under Florida law, pretty basic stuff.

So if you look at that chart, you see element, defendant made a false statement regarding the material fact.  Do you see that?

THE COURT:  Yes.

MR. DORSEY:  Okay.  Now look directly to the right of this.  This is verbatim the Michigan court.  On October 21st, 2021, approximately $2.1 million of debt was owed by Excell to Spin, which was concealed from Franklin. The assignment agreement signed by Josh Lubin falsely claimed that the amount of such debt was zero.  This is matching the element exactly.

The next element, defendant knew the statement was false.  Go to the right in the Michigan court, quote, Lubin purposefully lied about the amount in the assignment agreement.

And I could go through the other elements, Judge, and you have the charts in front of you, but literally for each of my counts, element by element, the Michigan court is finding exactly what we would need to prove these claims.  There's no reason to try them a second time.

THE COURT:  Okay.

MR. DORSEY:  Okay.  Judge, I'll conclude by just going -- quickly going over Mr. Langley's arguments.

Number one, he says the Michigan judgment is not final because they still have appellate rights.  That's just wrong.  Under both Michigan law and Florida law, the pendency of an appeal doesn't affect the res judicata or collateral estoppel effect of a judgment.  If you want to post a bond, you can post a bond, and I would cite In Re:  Kramer, 543 BR, 541, that's a Bankruptcy, Eastern District of Michigan case, 2015, analyzing Florida law.

Mr. Langley argues, the issues were never fully litigated because the judgment was based on a default.  Again, that's not true, there was a two-day trial, but even if the judgment was based on a default, collateral estoppel would still apply under Michigan law.  The case site for that is Ursuy versus Yassin, 2021 Westlaw 4815289, that's a Michigan Court of Appeals case

from 2021.

And here, Judge, here's what I think you're getting at, because you asked, well, why not -- Lubin wasn't up there, so can collateral estoppel apply if it was only Spin?  And I would like to read this quote to you, Judge, verbatim, because it directly addresses this point.  This is the Michigan Supreme Court, 1990, quote, collateral estoppel precludes re-litigation of an issue -- excuse me, I misread my outline, give me one second.

I'm sorry, Judge, I misread my outline, but I cite it in my brief, under Michigan law, Mr. Lubin is in privity with Spin.  If Mr. Lubin attended a two-day trial on behalf of Spin, an entity he fully controls, he testified, and the Michigan court found him not credible. He's in privity with Spin, and there's no reason to litigate essentially the same issue today.

That's it, and I'll turn the podium over to Mr. Langley, unless your Honor has questions.

THE COURT:  Nope.

All right.  Mr. Langley.

MR. LANGLEY:  Thank you, Judge.

I want to address a few of the things Mr. Dorsey said first before I get through my main argument, Judge.

Mr. Dorsey represented that the Michigan

court found that Josh Lubin lied.  Well, the Michigan court ruling that you have, it says that the judge questioned Mr. Lubin's credibility.  There's also notices in there that Mr. Lubin was not aware that his attorney had defaulted, and he had some real issues during the case.  The point is, that's not -- there was no representation in the Michigan court ruling that Franklin relied on any false statements made by my client, by Josh, and in particular, Judge, in my --

THE COURT:  Can I ask you a question while I'm thinking about it?  What were the claims against Spin in Michigan?

MR. LANGLEY:  The ruling is on breach of contract and conversion only.  There was --

THE COURT:  It was a breach of contract --

MR. LANGLEY:  Yes, the Court found --

THE COURT:  And?

MR. DORSEY:  Conversion.

MR. LANGLEY:  Conversion.

THE COURT:  Conversion, so different claims.

MR. LANGLEY:  Yes, different from the claims down here.

THE COURT:  Conversion, I guess there could be some overlap.  A breach of contract, it's totally different between a breach of contract versus committing

fraud and --

MR. LANGLEY:  Yes.

THE COURT:  Tortuous interference.  I mean, but --

MR. DORSEY:  No.

MR. LANGLEY:  So, different --

THE COURT:  -- conversion is different.

MR. LANGLEY:  Different parties, different issues, non-final order, and there's some facts that are directly in conflict between the motion for summary judgment and the Michigan ruling.

Okay.  So, yes, Mr. Dorsey touched on it, there was a default entered on liability because the attorney representing Spin in Michigan missed the deadline to respond to a motion for summary judgment, or there it's a motion for summary disposition, and Mr. Lubin didn't even know about that until he appeared at trial.  The trial was only on dollar amount, it was only on damages. It wasn't on any of the main issues, particularly not on any of the issues that we have here alleged.

So we have a non-final order attached to -- we filed a response to the motion for a stay back in July, Judge, and attached to that motion is a ruling by the Michigan court on alter ego.  In the Michigan court they tried to argue that Hi Bar and Spin were alter egos of

each other, and the Court denied that and threw out those counts.  So it only went to trial on breach of contract and conversion.

Now, Michigan law applies to the interpretation of the contract because that's what it says in the contract, but here, we're here today on a motion for a summary judgment under Florida law.

I cited to the Edwards case, Judge, Edwards versus Kings Point, in my motion, and I have a copy here, if you'd like, 351 So.2d, 1073.

THE COURT:  Okay.

MR. LANGLEY:  It's a 4th DCA case that says, essentially, summary judgment was entered on the basis of res judicata.  In an earlier third-party complaint by Kings Point against Acousti (phonetic) involving the same issue, the trial (sic) entered an order granting summary judgment.  However, this was not a final appealable order.  Therefore, it cannot be the basis for res judicata.  That's what we have here.  We have a non-final order in Michigan that cannot be the basis for res judicata.

There's a motion for a new trial pending, which is attached to our response.  If that's denied -- and that's been pending since April, I don't know why it's taken that judge so long to rule on it, if that is denied, there'll be an appeal.

The important point there, Judge is, that ruling is not going to be final for quite some time. We're supposed to be in trial --

THE COURT:  There's no final judgment, it's only findings of fact and conclusions of law.  The judge has not entered a final judgment?

MR. LANGLEY:  There's a final judgment and there's a motion for a new trial pending.

THE COURT:  Okay.

MR. LANGLEY:  Because of the fact --

THE COURT:  The final judgment is an appealable order, a final appealable order, correct?

MR. LANGLEY:  Yes, it's going to be, yes, but the appeal can't be filed because --

THE COURT:  Well, in the case that you cited in Edwards versus Kings Point, it was merely an order granting summary judgment, and so that was not a final appealable order.  Whoever granted the summary judgment had to then enter a final summary judgment afterwards.

MR. LANGLEY:  Okay.  The order in Michigan is a -- there's a motion for a new trial pending, so it's not final, and if the motion for a new trial is denied, there'll be an appeal.  So we're a long ways away from that ruling being a final order.

In addition, Judge, as you were touching on,

Page 129

there are different parties here.  The Michigan ruling does not include all the Franklin parties that are involved in this litigation.  In this litigation, in the Franklin parties' counterclaim, there are two Franklin parties.  There are also additional defendants, Franklin party counter-claimants they brought, and also different issues.

In this case, the Franklin parties sued not only Mr. Lubin and Spin, but also Hi Bar Capital and Mordecai Herbst and other parties.

In the second amended counterclaim in this case, they not only brought, excuse me, the claim for breach of contract, but also declaratory relief against Spin and Hi Bar, declaratory relief against Spin and Hi Bar as to the invalidity of the Hi Bar transfer agreement, declaratory relief against Spin, claiming usury and also claims for a civil RICO and conspiracy.

None of those were resolved by the ruling by the Michigan court.  The Michigan judge only found a breach of contract and conversion, and it's not final, and there are also some contested facts.

In the motion for summary judgment, they claim that Mr. Lubin made false representations to Franklin, but they attach his transcript, it's Exhibit A to the motion for summary judgment.  I copied in a portion

Page 130

of that transcript in my response, and Mr. Lubin says he never spoke with Franklin, and then so the question was, okay, so for Franklin sending you -- except for Franklin sending you direct DocuSigns of contracts, you never spoke to Franklin directly in this process?

Answer, correct.

Okay.  So they're claiming false representations.  The testimony of Mr. Lubin is that he never even spoke with them.

Also, in Paragraph 8 of the motion for summary judgment, Franklin alleges that Excell, the debtor, made payments to Hi Bar, but the ruling of the Michigan court says that the payments went to Spin.  It says, quote, Spin took additional payments from Excell following the execution of the assignment agreement on November 1, 2021.  So there's a direct conflict between the Michigan ruling and the motion for summary judgment here.

And as I mentioned before, they can't argue that Spin was the alter ego of Hi Bar, because the Michigan court denied that claim.  That order denying that was attached to our motion for stay filed back on July 17th.

Judge, I also cited to the Oldsmar case, City of Oldsmar, collateral estoppel is a judicial

doctrine in which general terms prevent identical parties from re-litigating the same issues that have already been decided.  Under Florida law, collateral estoppel, or issue preclusion applies when the identical issue has been litigated between the same parties or their privies, and then here's what's important, in addition, the particular matter must be fully litigated and determined in a contest that results in a final decision of a court of competent jurisdiction.  We don't have that here.  We have a motion for summary judgment that was -- a motion for summary disposition that was granted by default, that's the subject of a motion for new trial because Mr. Lubin and Spin did not have adequate representation.  That alone should take it out of consideration for summary judgment. The parties are different.  The matter's not final.  The issues are different.  So none of that supports a motion for summary judgment, Judge.

We have issues that need to be decided in the Franklin counterclaim that were not decided by the Michigan court.  We're set for trial next month.  We won't have a final ruling from the Michigan court for many months.

THE COURT:  All right.  Any reply?

MR. DORSEY:  Yes, your Honor.

Your Honor, I can sense you're reluctant to

grant the motion, or maybe it's just you're tired at the end of a long day.

THE COURT:  No, it's -- so you throw that out there, it's different parties, different claims.

MR. DORSEY:  Well, that's exactly the two things I was going to focus on --

THE COURT:  All right.

MR. DORSEY:  -- different parties --

THE COURT:  I understand you might want to say that you have --

MR. DORSEY:  Privity.

THE COURT:  -- privity, but the issues are different.

What you have to prove in a breach of contract claim and a conversion claim is a lot different than a claim for fraud and tortious interference.

MR. DORSEY:  Of course it is.

So I think Mr. Langley is confusing concepts.  Res judicata is claim preclusion, I sue you for breach of contract, I can't sue you -- you know, I can's sue you for breach of contract in another case, that's claim preclusion.

Collateral estoppel does not decide, excuse me, legal issues.  It decides factual issues.  In fact, whenever people use collateral estoppel, almost by

Page 133

definition, the claim alleged in the second lawsuit is going to be different.

I'm not seeking a finding as a legal matter that Josh Lubin is liable for breach of contract. I'm seeking as a factual determination, a court has already determined that factually he lied to Franklin through the assignment, he caused companies to siphon off millions of dollars from Franklin's borrowers, and he damaged Franklin. Those are factual findings. Of course they're going to be cast in different claims. I'm not suing Lubin for breach of contract, but that's what collateral estoppel is.

THE COURT: Yeah, I'm not sure.

MR. DORSEY: Well, I have to --

THE COURT: Res judicia is typically identity of parties and issues. Claim -- collateral estoppel, I think, is usually claim preclusion, but regardless, I don't see how you have the same issues in either case, and so it's a different context.

MR. DORSEY: Well, Judge, I --

THE COURT: And so even if -- I know there's findings in there, in Michigan where they indicate they just didn't find Mr. Lubin credible, but at the end of the day, they could still say breach of contract is a lower standard, he breached a contract, he didn't disclose it.

Page 134

Fraud and tortious interference require more, it's a higher -- and I know you're saying the findings were the same, but he wasn't really defending against that in Michigan.

MR. DORSEY:  So what your Honor is saying is the factual findings were not necessary to the claims?

THE COURT:  Exactly, and so he was not defending against claims of fraud and --

MR. DORSEY:  Well, there was --

THE COURT:  I guess conversion is a little bit more, I guess you're keeping the money without any right to it.

MR. DORSEY:  There was conversion, Judge, yeah, right.

THE COURT:  But, I mean, the elements of fraud and the elements for tortious interference are much different than a breach of contract for sure, and even a conversion claim.

MR. DORSEY:  Well, the good news is, Judge, if you deny the motion, you're going to hear the full story in about 40 days, so be careful what you wish for.

THE COURT:  No, I understand.

MR. DORSEY:  But I do sense --

THE COURT:  I'm probably going to hear a lot of it anyway, because of select additional parties.

So I guess Mr. Lubin is behind, not just -- he's behind also Hi Bar, too, right?

MR. DORSEY:  Well, he's definitely behind Spin.  Whether he's behind Hi Bar, that's what your Honor adjudicated earlier in this hearing, whether that common interest agreement gives him an interest in Hi Bar.

THE COURT:  All right, and then there's --

MR. KASEN:  Your Honor, I just want to jump in and make sure that the record is clear, that I don't think that that's what your Honor ruled earlier --

THE COURT:  No.

MR. KASEN:  -- regarding Spin and Hi Bar.

I think that your Honor ruled that you weren't going to opine as to the advocacy of the common interest agreement, just that the settlement can be entered into, and if Mr. Lubin believes he has rights pursuant to the common interest agreement, he can pursue them elsewhere.

THE COURT:  He can definitely sue Hi Bar, but what I was ruling is that, basically at a settlement by Hi Bar, who was the one who filed the claims in the bankruptcy court and here, that there was nothing that gave Mr. Lubin a right to those proceeds.  I guess it --

MR. DORSEY:  I was -- your Honor, just to avoid kind of more talking in circles, I was paraphrasing

your Honor's opinion.

THE COURT:  Okay.

MR. DORSEY:  I was not attempting to attach another layer of gloss to it.

THE COURT:  All right, but, in any event, I'm going to deny the motion for summary judgment.  You do have different parties.  I don't know why you didn't just sue Mr. Lubin.  You're going through all that trouble to sue Slide, I'm not sure -- or Spin, I keep saying Slide, Spin, I don't know why they didn't try to sue Lubin there as well.

MR. DORSEY:  I'm not barred in Michigan, but I will pass the question along.

THE COURT:  It's just, and then they could have brought the fraud claims as well, but anyway, I'm going to deny it.  I don't think you have a similarity of issues or parties.

MR. DORSEY:  Your Honor, thank you for being very patient over the last three hours.

THE COURT:  I had set the whole afternoon aside.  I know there's a lot going on.

Yeah, I'm hopeful some of it gets -- more of it gets resolved, but I'm not sure if it will.  I think we're going to trial on a lot of these issues.

MR. DORSEY:  More likely than not.

Page 137

THE COURT:  We'll see.

MR. DORSEY:  But hope springs eternal, so we'll see.

THE COURT:  All right.  You all have a great day, and thanks for sticking it out.  I know you got pushed down.  That took a lot longer, the 1:30, so --

MR. DORSEY:  Yes.

MR. LANGLEY:  Pat, you're going to do the order?

MR. DORSEY:  I'll run it by Mr. Langley, it's just going to be very simple, for the reasons stated on the record.

THE COURT:  Exactly, and put that we had a court reporter here.

MR. DORSEY:  Yep.

THE COURT:  All right.

MR. DORSEY:  Thank you, Judge.

MR. KASEN:  Your Honor, I want to thank you as well, and thank you for allowing me to appear pending my pro hac vice motion.

THE COURT:  No worries, and you are showing up now, not your video.  For some reason your video is not working, but before when you were speaking, it showed up as a different name.  I don't know why that was, but in any event, you have a -- where are you located at,

Page 138

Mr. Kasen?

MR. KASEN:   New York.

THE COURT:   Okay.  All right.  Well, hopefully it's not too hot there.  It's probably hot everywhere.

MR. KASEN:   It's pretty hot today.

THE COURT:   All right.  Have a great day.

MR. KASEN:   Have a wonderful day.

THE COURT:   Yeah, you, too.

MR. DORSEY:   Thanks, Judge.

THE COURT:   All right.  Thank you.

MR. LANGLEY:   Thank you, Judge.

(Thereupon, the hearing was concluded.)

CERTIFICATION

STATE OF FLORIDA          :

COUNTY OF MIAMI-DADE   :


            I, Cheryl L. Jenkins, RPR, RMR, Shorthand Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the foregoing proceedings were taken before me at the date and place as stated in the caption hereto on page 1; that the foregoing computer-aided transcription is a true record of my stenographic notes taken at said proceedings.

            WITNESS my hand this 18th day of August, 2025.


                  _____

                  CHERYL L. JENKINS, RPR, RMR

                  Court Reporter and Notary Public
                in and for the State of Florida at Large
                       Commission #HH 170910
                       December 27, 2025