UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:

        Case No.: 22-12790-EPK

    EXCELL AUTO GROUP, INC.        Chapter 7

        Debtor.
-------------------------------------------------------------------- /
NICOLE TESTA MEHDIPOUR, as Chapter 7 Trustee
for Excell Auto Group, Inc.        Adv. Pro. No. 23-01132-EPK

        Plaintiff.

    -v-

HI BAR CAPITAL, LLC, SPIN CAPITAL LLC,
YISROEL HERBST, MORDECHAI DOV BER
HERBST a/k/a MORDI HERBST, AVRUMI LUBIN
a/k/a JOSH LUBIN, FRANKLIN CAPITAL
FUNDING, LLC and FRANKLIN CAPITAL GROUP,
LLC d/b/a WING LAKE CAPITAL,

        Defendants.
-------------------------------------------------------------------- /

## <u>HI-BAR DEFENDANTS' POST-TRIAL BRIEF</u>

    LETO LAW FIRM
    2875 NE 191st Street
    Suite 604
    Aventura, FL 33180
    Tel.    305-341-3155
    Fax:    305-397-1168

    MATTHEW P. LETO
    Florida Bar No.: 014504
    mleto@letolawfirm.com
    CHARLES P. GOURLIS
    Florida Bar No. 85924
    cgourlis@letolawfirm.com

**TABLE OF CONTENTS**

I.     The Trustee Failed to Prove any of Her RICO Claims Against any of the Hi Bar Defendants (Counts 6-8) ............................................................................................... 3

   A.     General RICO Principles Applicable to this Dispute. ................................................. 3

   B.     The Trustee Failed to Show the Hi Bar Agreement is Usurious. ............................. 4

      1.     The Hi Bar Agreement contains a mandatory reconciliation and adjustment provision. ....................................................................................................................... 9

      2.     The Hi Bar Agreement has no fixed term. .............................................................. 15

      3.     The Hi Bar Agreement provides no recourse should Excell declare bankruptcy... 17

      4.     Hi Bar Otherwise Bears the Risk of Non-Payment. ................................................ 18

      5.     The Totality of the Circumstances Shows that Excell had been Engaged in Usurious Loans and MCA Lending for Years. .............................................................. 19

   C.     The Trustee Failed to Show that the Two Hi Bar Settlement Agreements Violate RICO. 21

   D.     The Trustee Failed to Show that Hi Bar is in the Business of Lending Money at Usurious Rates. ...................................................................................................................... 23

   E.     The Trustee Failed to Prove the MCAs Proximately Caused the Harm to Excell. 36

   F.   Any RICO Damages Should be Discounted by the Monies Hi Bar Paid on Behalf of Excell. ...................................................................................................................................... 37

II.     The Substantive RICO Claims Against Mordechai Must be Dismissed Because the Trustee Failed to Show he Played any "Part in Directing the Operation or Management" of Hi Bar, or Knew of and Agreed to the Overall Conspiracy. ....................................................... 40

III.     The RICO Conspiracy Claim Against Mordechai Herbst (Count 7) Must be Dismissed Because the Trustee Failed to Show he "Knew What the Other Conspirators were up to" or Should Have Suspected he was part of a Larger Enterprise. .......................... 45

IV.     The Trustee Failed to Prove any of her Fraudulent Transfers Claims Against Hi Bar (Counts 18-21, 23-25). ..................................................................................................... 49

   A.     The Good Faith Defense Prevents a Finding that the Transfers were Fraudulent. 49

   B.     The Debtor Received Reasonably Equivalent Value. .............................................. 52

      1.     The Assignment of the Third Spin Contract to Hi Bar and the Hi Bar Agreement. 52

      2.     The "Hi Bar Transfers" of $2,200,000. ..................................................................... 53

      3.     The First and Second Hi Bar Settlement Agreements and the Releases Contained Therein. ........................................................................................................................ 54

   C.     The Debtor Made the Payments with Karma's Money. ........................................... 58

V.     The Trustee Failed to Prove any of her Preference Payments Claims Against Hi Bar (Counts 26-27) ................................................................................................................... 58

VI.     The Hi Bar Defendants Proved their Affirmative Defenses ...................................... 61

Defendants, Hi-Bar Capital, LLC ("Hi-Bar"), Mordechai Herbst, and Yisroel Herbst, (collectively, "Hi-Bar Defendants"), hereby submit their Post-Trial Brief.

### I. The Trustee Failed to Prove any of Her RICO Claims Against any of the Hi Bar Defendants (Counts 6-8)

#### A. General RICO Principles Applicable to this Dispute.

1. To establish a civil RICO claim, the plaintiff must demonstrate a substantive RICO violation under § 1962 which caused injury to the plaintiff's business or property. *Sykes v. Mel S. Harris & Associates LLC*, 780 F.3d 70, 83 (2d Cir. 2015). Plaintiff's RICO claims are brought under 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C § 1962(c). The elements of a RICO claim premised on the collection of an unlawful debt are that: (1) the debt was unenforceable in whole or in part because of state or federal laws relating to usury; (2) the debt was incurred in connection with 'the business of lending money at a usurious rate; and (3) the usurious rate was at least twice the enforceable rate." *Steel River Sys., LLC v. Variant Alternative Income Fund*, 803 F. Supp. 3d 290, 307 (S.D.N.Y. 2025) (cleaned up) (quoting *Dae Hyuk Kwon v. Santander Consumer USA*, 742 F. App'x 537, 539 (2d Cir. 2018).

2. To prove her RICO claims, the Trustee "must show (1) a substantive RICO violation under [18 U.S.C.] § 1962, (2) injury to the [Debtor's] business or property, and (3) that such injury was by reason of the substantive RICO violation." *Sykes v. Mel S. Harris & Associates LLC*, 780 F.3d 70, 83 (2d Cir. 2015). Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the

conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C.A. § 1962 (West) (underline supplied).

3. The Trustee failed to establish any of the three elements.

**B. The Trustee Failed to Show the Hi Bar Agreement is Usurious.**

4. The Hi Bar Agreement requires the application of New York law. Hi Bar Ex. 1 at ¶ 4.5. Therefore, whether the Hi Bar Agreement constitutes a loan is governed by New York law, *Viridis Corp. v. TCA Glob. Credit Master Fund, LP,* 721 Fed. Appx. 865, 873 (11th Cir. 2018), and New York law to determines whether Hi Bar charged a usurious interest rate and thereby violated RICO. *Steel River*, 803 F. Supp. 3d at 307 (citing *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp.3d 237, 246 (S.D.N.Y. 2022)).

5. Under New York law, a loan is criminally usurious when the lender "knowingly charges, takes or receives any money or other property as interest on the loan" money in excess of 25% per year or the equivalent rate for a longer or shorter period. N.Y. Penal Law § 190.40 (McKinney). "A loan is usurious if the lender intends to take and receive a rate of interest in excess of that allowed by law even though the lender has no specific intent to violate the usury laws." *In re Dimino*, 429 B.R. 408, 420 (Bankr. E.D.N.Y. 2010) (quoting *Hammond v. Marrano,* 88 A.D.2d 758, 451 N.Y.S.2d 484, 485 (App. Div. 4th Dep't 1982)); *In re Venture Mortgage Fund, L.P.*, 282 F.3d 185, 188 (2d Cir. 2002) (same). "Criminal usury requires proof that the lender (1) knowingly charged, took or received (2) annual interest exceeding 25% (3) on a loan or forbearance. "Accordingly, the borrower satisfies his *prima facie* burden of proving usury by showing that the note given to the lender evidences a loan and reserves an illegal rate of interest." *In re Venture Mortg. Fund, L.P.*, 245 B.R. 460, 474 (Bankr. S.D.N.Y. 2000), *aff'd,* 282 F.3d 185 (2d Cir. 2002).

6. Usurious intent is 'an essential element of usury' and 'where usury does not appear on the face of the note, usury is a question of fact'". *Adar Bays*, 37 N.Y.3d at 336

(quoting *Freitas v. Geddes Sav. and Loan Ass'n,* 63 N.Y.2d 254, 262 (1984). In this context, the moving party must prove "the *general intent* to charge a rate in excess of the legal rate rather than the *specific intent* to violate the usury statute." *In re Venture Mortg. Fund, L.P.*, 245 B.R. 460, 473 (Bankr. S.D.N.Y. 2000) (emphasis supplied). Therefore, "[t]he application of New York's usury statutes does not depend upon a finding of intent. 'A loan is usurious if the lender intends to take and receive a rate of interest in excess of that allowed by law even though the lender has no specific intent to violate the usury laws.'" *In re Venture Mortgage Fund, L.P.*, 282 F.3d 185, 188 (2d Cir. 2002) (quoting *Hammond v. Marrano,* 88 A.D.2d 758, 451 N.Y.S.2d 484, 485 (App. Div. 4th Dep't 1982)). In a RICO case, proof of intent is supplied by from the underlying conduct that forms the alleged RICO violation. *Lateral Recovery LLC v. Funderz.net, LLC*, No. 22-CV-2170 (LJL), 2024 WL 4350369, at *35 (S.D.N.Y. Sept. 27, 2024) (applying New York Penal Law § 190.40, which provides that "the intent required to establish usury is the general intent to act contrary to the statute, not a specific intent to commit usury."). As will be shown below, the Trustee failed to prove a substantive RICO violation because the Hi Bar Agreement and the two Settlement Agreements were not usurious loans and the Trustee failed to introduce any evidence that Hi Bar was in the business of transacting usurious loans.

7.     The Trustee kicks off her brief by arguing that "[t]here is no material difference between each of the Spin Contracts or First Hi Bar Contract as all are drafted using the same form document." Brief at ¶ 5.[1] That Hi Bar and Spin may be treated as interchangeable is a theme that repeats itself throughout the Trustee's arguments. However, while the provisions

---

[1] References to the Trustee's Brief will be cited as "Brief ¶ ___."

are highly similar, the parties to the contracts are different. Hi Bar and Spin are separate legal entities, and as explained below, Hi Bar should not be held liable for Spin's conduct.

8. As will also be explained below, the Hi Bar Agreement is not a loan. At the outset, two well-established principles of New York law preclude a finding of usury in this case. First, there is a strong presumption *against* usury. Contracts and transactions are not presumed to be illegal or criminal. *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 336, 179 N.E.3d 612, 623 (2021). The party seeking to void a contract on grounds it is usurious must prove each element of usury by clear and convincing evidence. *Adar Bays,* 37 N.Y.3d at 336 (party must prove usury); *In re Dimino*, 429 B.R. 408, 419 (Bankr. E.D.N.Y. 2010) ("The party asserting usury has the burden of proving the elements by clear and convincing evidence."); *Hillair Capital Investments, L.P. v Integrated Frgt. Corp.*, 963 F. Supp.2d 336, 339 (S.D.N.Y 2013) ("Usury is an affirmative defense and a heavy burden rests upon the party seeking to impeach a transaction for usury."); *Roopchand v Mohammed*, 154 AD3d 986, 988 (2d Dept. 2017) ("This harsh penalty has resulted in a presumption against a finding of usury, such that a person seeking to establish usury in a transaction bears the heavy burden of proving it by clear and convincing evidence."). "Case law is clear that courts are not inclined to find that a loan violates the civil usury statutes because the penalty of forfeiture of both principal and interest is so steep." *In re Dimino*, 429 B.R. 408, 419 (Bankr. E.D.N.Y. 2010) (citing *In re General American Commc'ns Corp.,* 73 B.R. 887, 891 (S.D.N.Y.1987) (*citing Freitas v. Geddes Sav. and Loan Ass'n,* 63 N.Y.2d 254, 481 N.Y.S.2d 665, 471 N.E.2d 437, 442–442 (1984)). Second, "[i]f the transaction is not a loan, there can be no usury, *however unconscionable the contract may be.*" *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 665 (2d Dept. 2020) (emphasis supplied).

9. The leading method[2] to determine whether an MCA is a valid transaction or a loan is to determine whether the plaintiff is absolutely entitled to repayment under all circumstances. *Bridge Funding Cap LLC v. SimonExpress Pizza, LLC*, 240 A.D.3d 1186, 1188, 239 N.Y.S.3d 840, 843 (4th Dept. 2025) (citing *Samson MCA LLC v. Joseph A. Russo M.D. P.C./IV Therapeutics PLLC*, 219 A.D.3d 1126, 1128, 196 N.Y.S.3d 256, 258 (4th Dept. 2023); *Principis Capital, LLC v. I Do, Inc.*, 201 A.D.3d 752, 754, 160 N.Y.S.3d 325, 326–27 (N.Y App. Div. 2022)); *Cash4Cases, Inc. v. Brunetti*, 167 A.D.3d 448, 449 (1st Dept. 2018); *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 248 (S.D.N.Y. 2022) (collecting cases). The answer to that question requires examination of three factors: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *Samson*, 219 A.D.3d at 1128; *Principis Capital, LLC v. I Do, Inc.*, 201 A.D.3d 752, 754, 160 N.Y.S.3d 325, 326–27 (2nd Dept. 2022). Where all three factors are present, an agreement is an MCA agreement not subject to usury laws. *Principis*, 201 A.D.3d at 754. (granting summary judgment in favor of funder). Some of New York's federal courts have emphasized that "while these three factors may be relevant to the analysis, they are far from dispositive." *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247-48 (S.D.N.Y. 2022) (explaining that other courts in the Southern District have determined "that the essential question was whether the purported MCA purchaser actually bears the risk of a revenue shortfall or if the agreement is structured to ensure an "absolute payment obligation." (collecting cases)). *See also Lateral Recovery LLC v. Funderz.net, LLC*, No. 22-

---

[2] At present, there is no universally-accepted test for usurious intent. *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247-48 (S.D.N.Y. 2022); *Reserve Funding Group LLC v. California Organic Fertilizers, Inc.*, No. 24-CV-1112 (ARR) (LB), 2024 WL 1604195, at *2 (E.D.N.Y. Apr. 12, 2024).

CV-2170 (LJL), 2024 WL 4350369, at \*25 (S.D.N.Y. Sept. 27, 2024) ("On the other hand, when repayment depends on the success or failure of the business, the transaction is not a loan because the creditor takes on the market risk" (citing *OriginClear Inc. v. GTR Source, LLC*, 2021 WL 5907878, at \*5 (W.D.N.Y. Dec. 14, 2021)).

10.     Regardless of a court's decision to consider other aspects of the transactions, the three factors examined in *Samson* and *Principis* continue to be relevant today. *See Spin Capital, LLC v. Bridgelink Eng'g, LLC*, --- N.Y.S. 3d ---, No. 2024–04928, 2026 WL 1017492, at \*2 (N.Y. App. Div. Apr. 15, 2026) (applying the *Principis* test and affirming summary judgment in favor of Spin Capital and stating: "Here, the plaintiff established, prima facie, that the merchant agreement contained a clause that provided for the adjustment of the defendants' remittances in response to fluctuations in the defendants' receipts. This clause rendered the term of the agreement indefinite. Moreover, no contractual provision existed establishing that a declaration of bankruptcy would constitute an event of default[.]" (internal citations omitted)); *Bridge Funding Cap LLC v. SimonExpress Pizza, LLC*, 240 A.D.3d 1186, 1188–89, 239 N.Y.S.3d 840, 843–44 (2025) (and affirming summary judgment in favor of lender based on application of the three factors discussed in *Samson* and *Principis*).

11.     The Hi Bar Agreement satisfies all three of the factors discussed in *Samson* and *Principis* such that it isn't a loan.[3]

---

[3] The Hi Bar Agreement explicitly provides that the parties intended the purchases of receivables as opposed to a loan. *See* Hi Bar Ex. 1 at p. 1, ¶ 1.10. This language is not insignificant. *See Colonial Funding Network, Inc. v. Davincitek Corp.*, 2021 WL 39591 (N.Y. Co. Sup. Ct. 2021) (finding MCA was not loan, in part where the parties expressly agreed "that they are entering into a purchase and sale of future receivables.").

1. <u>The Hi Bar Agreement contains a mandatory reconciliation and adjustment provision.</u>

12.     "The crucial question in evaluating a reconciliation provision is whether it shifts risk to the buyer." *Lateral Recovery LLC v. Funderz.net, LLC*, No. 22-CV-2170 (LJL), 2024 WL 4350369, at *26 (S.D.N.Y. Sept. 27, 2024). "Reconciliation will adjust the seller's repayment obligations according to the reality of changes in receipts, as opposed to the fixed payments characteristic of a loan." *US Info. Group LLC v. EBF Holdings, LLC*, No. 22-CV-6661, 2023 WL 6198803, at *8 (S.D.N.Y. Sept. 22, 2023). If the funder bears the risk of loss of nonpayment, this will be reflected in the merchant's ability to reduce its payments if it suffers a dip in revenues. *Lateral Recovery*, 2024 WL 4350369, at *26 (citations omitted). A mandatory reconciliation provision – one which provides that the lender has a contractual duty to modify the amount due – is a strong indication the transaction is not a loan. *Id.* (citing *OriginClear Inc. v. GTR Source, LLC*, 2021 WL 5907878, at *6 (W.D.N.Y. Dec. 14, 2021); *Power Up Lending Group, Ltd. v. Cardinal Energy Group, Inc.*, 2019 WL 1473090, at *5 (E.D.N.Y. Apr. 3, 2019)). *See also US Info.*, 2023 WL 6198803, at *8 (stating that a reconciliation provision "pursuant to which payment is to be adjusted according to the seller's actual receipts, is generally inconsistent with classification as a loan subject to the usury laws."); *Principis Capital, LLC v. I Do, Inc.*, 201 A.D.3d 752, 754 (2d Dep't 2022) ("The terms of the agreement specifically provided for adjustments to the monthly payments made by I Do to the plaintiff based on changes in I Do's monthly sales. Concomitantly, as the amount of the monthly payments could change, the term of the agreement was not finite."). By contrast, if the contract does not provide any opportunity for reconciliation, or if reconciliation is at the sole discretion of the lender, the lender bears no risk of nonpayment and the transaction is a loan. *Lateral Recovery*, 2024 WL 4350369, at *26. (citations omitted).

13.      The Hi Bar Agreement contains a mandatory reconciliation provision to true up total payments with receivables generated for the prior period and adjustment provision to make the regular remittance more closely reflect the receivables.[4] Those provisions state:

> 1.3 <u>Reconciliation</u>. As long as an Event of Default, or breach of this agreement, has not occurred, Merchant may request a **retroactive reconciliation** of the total Remittance Amount. All requests hereunder must be in writing to reconciliations@hibarcapital.com. Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding if applicable, from the date of this Agreement through and including the date the request is made. … Such reconciliation, if applicable, **shall be performed** by HBC within two (2) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by HBC shall equal the Specific Percentage of the Future Receipts that Merchant collected during the requested month. …
>
> 1.4 <u>Adjustments to the Remittance</u>. As long an Event of Default, or breach of this agreement, has not occurred, Merchant may give notice **to HBC to request a decrease in the Remittance, should they experience a decrease in its Future Receipts**. All requests hereunder must be in writing to reconciliations@hibarcapital.com and must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding from the date of this Agreement through and including the date the request is made. … The Remittance **shall be modified** to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks…At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph…

Hi Bar Ex. 1 at ¶¶ 1.3 and 1.4 (emphases supplied).

14.      The mandatory reconciliation and adjustment provisions demonstrate that Hi Bar was purchasing receivables, not providing a loan. Both provisions use the term "shall", making Hi Bar contractually obligated to provide reconciliation and adjustment. *Streamlined*

---

[4] "A reconciliation and an adjustment provision help ensure that, on a retrospective basis, the merchant has not paid an amount that is disproportionate to the receivables that the funder has actually acquired…" *Lateral Recovery, LLC v. Capital Merch. Services, LLC,* 632 F. Supp. 3d 402, 458 (S.D.N.Y. 2022) (determining form agreements that contain these provisions are "are agreements for the purchase of receivables when viewed in their totality").

*Consultants, Inc. v. EBF Holdings LLC,* 2022 WL 4368114, at *4 (S.D.N.Y. Sept. 20, 2022) (granting lender's motion to dismiss in part because of lender's mandatory obligation to reconcile); *US Info. Group LLC v. EBF Holdings, LLC,* 2023 WL 6198803, at *10 (S.D.N.Y. Sept. 22, 2023) (same).

15.   The Trustee goes to great lengths to argue that despite its mandatory language, the reconciliation provision is nevertheless illusory in practice. Brief at ¶¶ 46-66. Mehdipour's first argument is that Hi Bar's right to request additional information to verify that the merchant has indeed suffered a dip in revenue nullifies Hi Bar's *obligation* to reconcile. *Id.* at ¶ 48.[5] This argument should be summarily rejected because it is nonsensical. The lender needs to be able to confirm the veracity of the merchant's basis for reconciliation, and the language the Trustee attacks provides a simple mechanism for doing so (i.e., logging into the merchant's bank account). The Trustee failed to explain how this single sentence makes the provision discretionary in all circumstances and also failed to cite any legal authority supporting her position. It is axiomatic that "the onus is upon the parties to formulate arguments." *Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1239 (11th Cir. 2012). "Generally, a litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. The court will not do his research for him." *Canyes v. Carnival Corp.*, 700 F. Supp. 3d 1102, 1119 (S.D. Fla. 2023) (quoting *Melford v. Kahane & Assocs.*, 371 F. Supp. 3d 1116, 1126 n.4 (S.D. Fla. 2019)). The Trustee's failure to develop this argument or to support it with any legal authority mandates that the Court reject it.

---

[5] The language at issue provides: "HBC retains the right to request additional reasonable documentation including without limitation bank login or access to view Merchant's accounts using third party software, and Merchant's refusal to provide access shall be a breach of this Agreement and HBC shall have no obligation to reconcile." Hi Bar Ex. 1 at ¶ 1.3.

16.     Mehdipour's next argument should also be rejected because the Trustee fails to explain how Hi Bar's attempt to reconcile the monies paid by adjusting the payment "so that the total amount debited by HBC shall equal the Specific Percentage of the Future Receipts that Merchant collected during the requested month[ ]" is "at odds with" the weekly remittance required under the agreement. *See* Brief at ¶ 49. Like the previous argument, this is nonsensical, because the entire point of reconciliation is to ensure, retroactively, that the merchant did not overpay based on its most recent sales. What the Trustee erroneously characterizes as a "conflict" is a completely proper attempt to use a longer time horizon to credit the merchant for what are now "excess" payments due to the lower sales. This is completely proper. This argument also fails due to a lack of supporting legal authority.

17.     The Trustee's third argument is that Excell was always in default as soon as it signed the "First Spin Contract" and, therefore, the reconciliation provision was "illusory". *Id*. at ¶¶ 50-59. This argument is deficient for multiple reasons, the first of which is that under New York law, a merchant is prohibited from challenging whether a reconciliation provision is a sham, where the merchant never followed the provision and was denied a reconciliation. *See e.g.*, *Mazzoni Ctr. v. LCF Group, Inc.,* 2024 WL 4821475, at \*7 (E.D. Pa. Nov. 18, 2024) ("The Center never requested a reconciliation, so there is nothing to suggest that LCF would refuse to honor these terms."); *Spin Capital, LLC v. Golden Foothill Ins. Services, LLC,* 2023 N.Y. Slip Op. 30594(U), 8, 2023 WL 2265717, at \*3 (N.Y.Sup.) ("[I]t does not appear that there is any basis for the allegation that the reconciliation process was a sham and that the defendants would not have received an appropriate credit, because on the record before the Court, it does not appear that the Counterclaim Plaintiffs even allege that they requested a reconciliation or adjustment of the payments and that it was done improperly."); *US Info. Group LLC v. EBF Holdings, LLC,* 2023 WL 6198803, at \*8 (S.D.N.Y. Sept. 22, 2023) ("The reconciliation provision may have permitted plaintiffs to adjust their

payments to Everest, but plaintiffs do not allege that they invoked it or considered doing so."); *Streamlined Consultants, Inc. v. EBF Holdings LLC*, No. 21-CV-9528 (KMK), 2022 WL 4368114, at \*4 (S.D.N.Y. Sept. 20, 2022) (explaining that provision requiring reconciliation upon request "counsels against a finding that the Funding Agreement is a usurious loan, particularly where Plaintiffs have not alleged that reconciliation did not in actuality function as agreed (or, indeed, that Plaintiffs ever even requested reconciliation)."); *Pirs Capital, LLC v. D & M Truck, Tire & Trailer Repair Inc.*, 69 Misc. 3d 457, 462, 129 N.Y.S.3d 734, 740 (N.Y. Sup. Ct. 2020), *judgment entered sub nom. Pirs Capital, LLC v. D&M Truck, Tire & Trailer Repair Inc.* (N.Y. Sup. Ct. 2020) ("Defendants assert that no reconciliation ever occurred, and thus that the reconciliation provision was simply a sham to hide a usurious loan. But their only support for this assertion on this motion is an affirmation of counsel. And even that affirmation does not state whether, for example, D & M ever *requested* an adjustment of the amounts being collected in order to account for the actual amount of its daily receivables." (internal citation omitted)). The Trustee's reliance on *In re Shoot The Moon, LLC*, 635 B.R. 797 (Bankr. D. Mont. 2021) is misplaced because there is no indication reconciliation was ever requested in that case. In addition, because the case was decided under Montana law, the court never considered New York's prohibition on challenging a reconciliation provision without evidence that reconciliation was requested and denied. *Id.* at 825.

18. At trial, Zankl admitted he never followed the procedure in the Hi Bar Agreement (sending an email to reconciliations@hibarcapital.com) to request reconciliation from Hi Bar. Feb. 2 Tr. 433:6-434:21. Zankl testified he never read the Hi Bar Agreement, claimed "I didn't know that I needed to do that" (send an email), and sought to push the obligation to advise him of his contractual rights onto Lubin. *Id.* at 433:21-434:11. However, the signatory to a contract is assumed to have read, understood, and agreed to all terms in the contract he signed and cannot subsequently disclaim his knowledge or agreement to any

of the terms. *Sadiant, Inc. v. Penstock Consulting, LLC*, No. 23 CIV. 7872 (KPF), 2024 WL 2847195, at *9 (S.D.N.Y. May 30, 2024) (citations omitted). Since Zankl never followed the contract's reconciliation provision, the Court should reject the Trustee's argument that the reconciliation provision was illusory. Further, the only evidence in the record is that Hi Bar *actually* offered reconciliation to its other merchants when requested. Feb. 4 Tr. 902:21-904:5. *See also id*. at 924:24-926:1 (testifying that "payments were lowered all the time.").

19.     Next, the Trustee merely *saying* Excell was in default in the context of this litigation does not make it so. There is no record evidence that Spin or Hi Bar treated Excell as though it was in default until early December 2021, which led to Hi Bar and Excell entering into the First Hi Bar Settlement Agreement on December 19, 2021. Trustee Ex. 45. This after-the-fact analysis of facts played no bearing on how the parties treated each other and presents an academic question. The Trustee's reliance on *In re Greenwich Retail Group LLC*, No. 25-11295 (MEW), 2026 WL 482170, at *19 (Bankr. S.D.N.Y. Feb. 20, 2026) is misplaced because the court decided only whether the trustee pled sufficient facts to state a claim. Here, Zankl admitted he was never placed in default by Hi Bar for anything other than not paying. Feb. 2 Tr. 471:5-19.

20.     The Court should also reject Trustee's fourth argument that the reconciliation provision was illusory because it would require all of the Merchant's bank statements to be delivered each time reconciliation was requested. *See* Brief at ¶¶ 60-66. This argument wasn't pled and cannot be considered. *See* Fed. R. Civ. P. 15. Similarly, the Court should reject the Trustee's attempt to rely on *In Re Butler Trucking LLC*, No. 24-32443, 2025 WL 1934205 (Bankr. N.D. Ohio July 14, 2025) and *In re IVF Orlando, Inc.*, No. 6:24-BK-05475-TPG, 2025 WL 2831400 (Bankr. M.D. Fla. Oct. 3, 2025). See Brief at ¶ 63. Those cases argue that MCA contracts are not true sales agreements because they last indefinitely. That was not an issue

raised in the operative Complaint and should not be raised for the first time in post-trial briefs.

21.    Finally, the court should reject the argument that Zankl was unable to obtain reconciliation because Lubin refused to honor his request. Brief ¶ 65. Again, Zankl admittedly failed to follow the procedure in the contract (i.e., requesting reconciliation by email). Feb. 2 Tr. 433:6-434:21.

### 2.    The Hi Bar Agreement has no fixed term.

22.    The next factor considers whether the parties have contracted for repayment over a fixed term. Courts have determined that one of the hallmarks of a loan is that it has a definite term, while the sale of future receivables is contingent, so such a contract will generally have an indefinite term. *Fleetwood Services, LLC v. Ram Capital Funding, LLC*, No. 20-CV-5120 (LJL), 2022 WL 1997207, at *9 (S.D.N.Y. June 6, 2022); *Pirs Capital, LLC v. D & M Truck, Tire & Trailer Repair Inc.*, 69 Misc. 3d 457, 463 (N.Y. Sup. Ct. 2020). Here, the Hi Bar Agreement has no definite term because it expressly provides that it is "in full force an effect until the entire Purchased Amount and any other amounts due are received by HBC as per the terms of this Agreement." Hi Bar Ex. 1 at ¶ 1.2. It also provides that "there is no interest rate or payment schedule and no time period during which the Purchase Amount must be collected by HBC." *Id.* at p. 1.

23.    The ability to alter the payment terms through reconciliation means the repayment term is flexible, indicating that the transaction is not a loan. *Principis Capital, LLC v. I Do, Inc.*, 201 A.D.3d 752, 754 (2d Dep't 2022) ("The terms of the agreement specifically provided for adjustments to the monthly payments made by I Do to the plaintiff based on changes in I Do's monthly sales. Concomitantly, as the amount of the monthly payments could change, the term of the agreement was not finite."); *Fleetwood*, 2022 WL 1997207, at *9 ("Moreover, if the amount of monthly payments can change pursuant to

reconciliations, then the term of the agreement is necessarily not finite. And if the term is indefinite, then it is consistent with the contingent nature of each and every collection of future sales proceeds under the contract." (cleaned up) (quotations omitted)); *Newco Capital Group VI LLC v. La Rubia Rest. Inc.*, 81 Misc. 3d 1203(A), 198 N.Y.S.3d 917, at *3 (N.Y. Sup. Ct. 2023), *judgment entered sub nom. Newco Capital Group Vi LLC v. La Rubia Rest. Inc* (N.Y. Sup. Ct. 2024); *Streamlined Consultants, Inc. v. EBF Holdings LLC*, No. 21-CV-9528 (KMK), 2022 WL 4368114, at *5 (S.D.N.Y. Sept. 20, 2022); *Reserve Funding Group LLC v. California Organic Fertilizers, Inc.*, No. 24-CV-1112 (ARR) (LB), 2024 WL 1604195, at *5 (E.D.N.Y. Apr. 12, 2024). *See also IBIS Capital Group, LLC v. Four Paws Orlando LLC,* 2017 WL 1065071, *3 (Sup.Ct. Nassau Co. March 10, 2017) ("The existence of this uncertainty in the length of the Agreement is an express recognition by the parties of the wholly contingent nature of this Agreement.").

24.      In the Hi Bar Agreement, Hi Bar "acknowledges that it may *never* receive the Purchased Amount if the Merchant does not generate sufficient revenue." Hi Bar Ex. 1 at p. 1 (italics supplied). The *Newco* court cited this language as indicative of the absence of a fixed term. 198 N.Y.S.3d 917, at *3.[6]

25.      Finally, the Trustee argues that a merchant in financial decline categorically cannot utilize the reconciliation or adjustment provisions. Brief at ¶ 73. This is mere argument. Notably, the Trustee failed to elicit any concessions on this point from Lubin or the Herbsts. Further, Mehdipour ignores the contractual language that reconciliation is mandatory within two business days of a proper request. Hi Bar Ex. 1 at ¶ 1.3. The Court

---

[6] Hi Bar's response to the Trustee's arguments that the "Adjustments to the Remittance" are "illusory and unworkable" are the same as those made in the context of the reconciliation. *See* Brief ¶¶ 69-72; *supra* at ¶¶ 12-21.

should reject the Trustee's argument, because she is simply ignoring the plain language of the Hi Bar Agreement.

> 3. The Hi Bar Agreement provides no recourse should Excell declare bankruptcy.

26.     An MCA is not a loan where, like here, there is "no contractual provision existed establishing that a declaration of bankruptcy would constitute an event of default." *Principis Capital, LLC v. I Do, Inc*., 201 A.D.3d 752, 754, (2022); *see also Streamlined Consultants, Inc. v. EBF Holdings LLC,* 2022 WL 4368114, at \*5 (S.D.N.Y. Sept. 20, 2022). Not only is bankruptcy not listed as an "Event of Default" under ¶ 3.1 of the Hi Bar Agreement, but it specifically provides on the first page:

> Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself does not constitute a breach of this Agreement. HBC is entering this Agreement knowing the risks that Merchant's business may not perform as expected or fail, and HBC assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give HBC a reasonable and fair opportunity to receive the benefit of its bargain.

Hi Bar Ex. 1 at p. 1.

27.     These two factors satisfies the final prong. *See e.g. Mazzoni Ctr. v. LCF Group, Inc*., 2024 WL 4821475, at \*8 (E.D. Pa. Nov. 18, 2024) (finding provision that stating that bankruptcy was not event of default satisfied *Principis* factor); *Newco Capital Group VI LLC v. La Rubia Rest. Inc*., 81 Misc. 3d 1203(A), 198 N.Y.S.3d 917 (N.Y. Sup. Ct. 2023), *judgment entered sub nom. Newco Capital Group Vi LLC v. La Rubia Rest. Inc* (N.Y. Sup. Ct. 2024). *Contra Legend Advance Funding II, LLC v. Almeida's Auto Repair, Inc*., 2022 N.Y. Slip Op. 31003(U), 4–5, 2022 WL 885718, at \*3 (N.Y. Sup.) ("The provisions stating that bankruptcy is an event of default allowing plaintiff to seek payment of the full amount, or enforce the agreement against both defendants herein, however, 'suggest that the plaintiff did not

assume the risk that [Merchant] would have less-than-expected or no revenues."' (citations omitted)).

28.    The Trustee attempts to brush aside this language on the grounds that a declaration of bankruptcy would trigger a chain of defaults and remedies for Hi Bar. *See* Brief at ¶ 75. However, as Mehdipour points out, some of the remedies would be unenforceable in bankruptcy. *Id*. at ¶ 75(c). Furthermore, the analysis required by *Samson* and *Principis* and their progeny does not require (or contemplate) an examination of the effects on the parties' contract should the merchant declare bankruptcy; it simply asks if the funder would be entitled to full repayment. Plainly, Excell's bankruptcy does not ensure that Hi Bar "is absolutely entitled to repayment under all circumstances." *Bridge Funding Cap LLC v. SimonExpress Pizza, LLC*, 240 A.D.3d 1186, 1188, 239 N.Y.S.3d 840, 843 (4th Dept. 2025).

### 4.    Hi Bar Otherwise Bears the Risk of Non-Payment.

29.    Finally, the Trustee goes beyond the *Samson* and *Principis* tests and argues that the transaction was actually a loan. *See* Brief at ¶¶ 77-92. The Trustee's arguments amount to nitpicking the sufficiency of the Hi Bar Agreement, *id.* at ¶¶ 78-79; complaints that Hi Bar did not perform enough due diligence, *id.* at ¶¶80-82; and arguing that Hi Bar does not have enough control over Excell. *Id*. at ¶¶ 83-87.

30.    The Trustee cites *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063 (2d Cir. 1995) for the proposition that the Court should examine the substance of the transaction. *See* Brief at ¶ 79. However, *Endico Potatoes* is of limited utility because the case did not involve a merchant cash advance transaction. There, the court considered whether a secured lender constituted a bona fide purchaser of the merchant's accounts receivable whose rights were not subject to the Perishable Agricultural Commodities Act ("PACA"). The financing structure was completely different, as the lender was indisputably secured. *Id*. at

1068. The court's conclusion – that the lender did not actually purchase the receivables but merely held a security interest in them – depended on an analysis of PACA and a Restatement provision governing transfers of trust property. *Id.* at 1068-69. The case does not address the question of whether a transaction is an MCA or a loan. Furthermore, the more recent decision in *Principis Capital, LLC v. I Do, Inc.*, 201 A.D.3d 752 (N.Y. App. Div. 2022), which was again confirmed to be the correct test in *Spin Capital, LLC v. Bridgelink Eng'g, LLC*, --- N.Y.S. 3d ---, No. 2024–04928, 2026 WL 1017492, at \*2 (N.Y. App. Div. Apr. 15, 2026), and which did involve an MCA transaction, did not discuss any of these factors.

31.     None of these additional factors alters the fact that Hi Bar bears the risk of nonpayment, for if Excell declared bankruptcy, it did not cause default of the agreement. *See Lateral Recovery LLC v. Funderz.net, LLC*, No. 22-CV-2170 (LJL), 2024 WL 4350369, at \*25 (S.D.N.Y. Sept. 27, 2024) ("On the other hand, when repayment depends on the success or failure of the business, the transaction is not a loan because the creditor takes on the market risk" (citing *OriginClear Inc. v. GTR Source, LLC*, 2021 WL 5907878, at \*5 (W.D.N.Y. Dec. 14, 2021)).

5.   <u>The Totality of the Circumstances Shows that Excell had been Engaged in Usurious Loans and MCA Lending for Years.</u>

32.     Finally, the Court's totality of the circumstances analysis should account for the fact that the purpose of the New York usury statutes would not be served by negating the Hi Bar Agreement.

33.     The purpose of the usury statutes is to protect weak and unsophisticated parties from being taken advantage of by more sophisticated parties. *See Universal Credit Co. v. Lowell*, 166 Misc. 15, 18, 2 N.Y.S.2d 743, 746 (City Ct. 1938) ("The ostensible object of the statute is to protect the weak, the needy, and the unwary from the rapacity of the avaricious."); *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 331 (N.Y. 2021) ("The

legislative history of the 1980 amendment also evidences the legislature's judgment that borrowers of more than $2.5 million were 'capable of protecting their own interests' without the protection of the usury laws").

34. Here, the Court heard extensive testimony that Zankl engaged in borrowing money at usurious interest rates for years before he was ever introduced to Hi Bar. Zankl testified that prior to 2021, he knew about the 25% usury rate in Florida. Feb. 2 423:13-424:5. In fact, Zankl testified that he took extensive efforts to "hide" or "shelter the interest" for various lenders to avoid documenting usurious loans dating back to 2017. See generally Feb. 2 Tr. 413:10-426:4; Trustee Exs. 205, 208, 211, 212. This included fabricating transactions for the sale of cars that never occurred. Feb. 2 Tr. 420:4-421:10; Ex. 214. Zankl testified that "part of the loan agreement" for "investors" Mark Miller, Kenny Goodman, and Aaron Parkinson, was that Zankl would document the transaction in such a way that would allow them to hide the usurious interest. Feb. 2 Tr. 420:4-422:10. Zankl admitted he knowingly engaged in this outright fabrication and that he was a willing participant. *Id.* at 421:18-422:1. Zankl admitted that for "investor" Savannah Row, the promissory note from 2017 documented a lower, non-usurious interest rate but in reality, Zankl paid usurious rates. Feb. 2 Tr. 413:10-415:1; Trustee Ex. 212. Zankl further admitted that he knowingly participated in this scheme to help Gelb hide the usurious interest. Feb. 2 Tr. 414:13-415:1. Even the Trustee's expert, Mr. Barbee, admitted that Excell took out MCA debt starting in 2020. Feb. 4 Tr. 1029:9-19. Given Zankl's extensive history of knowingly and falsely documenting loans for multiple "investors" in which he "hid" usurious interest, Zankl was neither a weak nor an unsophisticated party who needs the Court's protection from Hi Bar.

**C. The Trustee Failed to Show that the Two Hi Bar Settlement Agreements Violate RICO.[7]**

35. The two Hi Bar Settlement Agreements cannot be usurious because the agreed-upon amount Excell owed in each agreement exceeds $2.5 million dollars. *See* Trustee Ex. 45 ($2,677,880.00) and Ex. 46 ($3,800,000.00). Usury laws do not apply to transactions greater than $2.5 million dollars. N.Y. Gen. Oblig. Law § 5-501(6)(b) (McKinney). Section 5-501(6)(b) provides:

> No law regulating the maximum rate of interest which may be charged, taken or received, including section 190.40 and section 190.42 of the penal law, shall apply to any loan or forbearance in the amount of two million five hundred thousand dollars or more. Loans or forbearances aggregating two million five hundred thousand dollars or more which are to be made or advanced to any one borrower in one or more installments pursuant to a written agreement by one or more lenders shall be deemed to be a single loan or forbearance for the total amount which the lender or lenders have agreed to advance or make pursuant to such agreement on the terms and conditions provided therein.

36. Where a lender purchases receivables for more than $2.5 million dollars, courts will enforce § 5-501(6)(b) and rule in favor of the lender. *Lateral Recovery LLC v. Funderz.net, LLC*, No. 22-CV-2170 (LJL), 2024 WL 4350369, at *33-34 (S.D.N.Y. Sept. 27, 2024) (granting summary judgment in favor of merchant cash advance company where lender purchased receivables for a purchase price of more than $2.5 million); *Hi Bar Capital, LLC v. Excell Auto Group, Inc.*, 2023 N.Y. Slip Op. 31593(U), 3–4, 2023 WL 3431299, at *2 (N.Y.Sup.) ("Here, the agreements at issue--the Purchase Agreement, Settlement Agreement and Stipulation--concern amounts greater than $2.5 million, As such, defendants' defense of criminal usury fails as a matter of law."). To be clear, the New York state court assigned to resolving the litigation between Hi Bar and Karma found that the Hi Bar Agreement and the two Hi Bar Settlement Agreements were not usurious because they exceeded $2.5 million dollars.

---

[7] The Trustee covered this issue at ¶¶ 333-38.

37. The Trustee argues that the focus of § 5-501(6)(b) "is clearly the available credit under the facility." Brief ¶ 334. However, this is incorrect because courts have "rejected attempts to look through the face amount to determine the amount actually advanced[,]" such as by subtracting fees and costs. *Lateral Recovery LLC v. Funderz.net, LLC*, No. 22-CV-2170 (LJL), 2024 WL 4350369, at *34 (collecting cases). The court in *Lateral Recovery* explained:

> Plaintiffs argue that the $2,250,000 of this loan which was used as repayment of the prior loan should not be counted, noting that the amount in fact paid to FTE (after fees) was only $300,000. This argument is not economically sound. A dollar of forgiven debt is equivalent to a dollar in hand. Funderz could have paid the full $2,750,000 into FTE's bank account and had FTE pay back $2,250,000 on the outstanding loan—this would not have changed the character of the transaction.

*Id.* (internal citations omitted).

38. Furthermore, by signing the First Settlement Agreement (dated October 27, 2021), Excell agreed that the "Agreement embodies the entire agreement between Seller and Purchaser and supersedes all prior agreements and understandings relating to the subject matter hereof." Ex. 45 at ¶ 22. Based on the merger clause in the First Settlement Agreement, the Trustee cannot continue to argue that the Hi Bar Agreement controls. *See Thales Alenia Space France v. Thermo Funding Co., LLC*, No. 13-CV-712 SAS, 2014 WL 3887711, at *4 (S.D.N.Y. Aug. 7, 2014) ("By their express terms, however, the Agreements extinguished the existing obligations under the Reimbursement Agreement and created new obligations for the Parties on the same subject, which the law permits them to do."). Thus, the Trustee's argument that the Hi Bar Agreement is usurious is erroneous because the First Settlement Agreement extinguished the parties' obligations thereunder. *See Greystone Capital Partners, Inc. v. Valcom, Inc.*, 2013 WL 6409972, at *4 (N.Y.Sup. Ct. Dec. 5, 2013) ("Therefore, a plain reading of the settlement agreement reveals that its purpose is to resolve the dispute on the defaulted note without the expense of litigation, not to function as a loan or a modification of

the note. As it did not take shape of a loan or forbearance, the settlement agreement is not, and cannot, be found usurious as a matter of law.").

39.     Based on Zankl's testimony that he created fake car sales in order to "shelter the interest" and knowingly engaged in usurious lending for years before he ever became involved with Hi Bar, the Court should summarily reject the Trustee's argument that Excell needs the protections of § 5-501(6)(b) because Zankl wasn't "capable" of protecting Excell's interest. Brief ¶ 337.

### D.   The Trustee Failed to Show that Hi Bar is in the Business of Lending Money at Usurious Rates.

40.     At trial, the Trustee completely failed to introduce evidence to support the second element of a RICO claim that is based on the collection of an unlawful debt: that Hi Bar was in the business of lending money at usurious rates.

41.     Instead. the Trustee relies on the principle that in order to prove a RICO violation based on the collection of an unlawful debt, the plaintiff need only show a single instance where an unlawful debt was collected. *See* Brief ¶ 180. *United States v. Grote*, 961 F.3d 105, 119 (2d Cir. 2020) ("RICO offenses may be predicated on a single instance of collection of unlawful debt, as well as on a pattern of racketeering activity."); *United States v. Pepe*, 747 F.2d 632, 645 (11th Cir. 1984) ("To establish a pattern of racketeering at least two predicate acts of racketeering activity must be shown; to establish the collection of unlawful debt only one act of collection must be shown." (footnote omitted)). However, Mehdipour ignores RICO's definition of "unlawful debt" as well as *Durante Bros. & Sons, Inc. v. Flushing Nat. Bank*, 755 F.2d 239 (2d Cir. 1985) and its progeny.

42.     Under the applicable law, the Trustee cannot merely show a single instance where an unlawful debt was collected; Mehdipour *also* had to prove that the Hi Bar

Defendants were *in the business of lending money at usurious rates*. This requirement is

derived straight from the statutory definition of "unlawful debt", which provides:

> (6) "unlawful debt" means a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, **and** (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate;"

18 U.S.C. § 1961(6) (emphasis supplied).

43.     This statutory requirement was emphasized in *Durante Brothers*, where the

Second Circuit explained:

> As discussed above, one of the impetuses for the enactment of RICO was the finding that organized crime, through the funds gained from such activities as loan sharking, was infiltrating legitimate businesses. The inclusion of "collection of unlawful debt" as a major predicate for RICO liability seems to have been an explicit recognition of the evils of loan sharking, and there is no indication that Congress was taking aim at legitimate banking institutions. Rather, the legislative history indicates that the purpose of requiring, in the definition of "unlawful debt," that the usurious rate be at least twice the enforceable rate was "to limit the effect of this definition to cases of clear 'loan-sharking,' " S.Rep. No. 91–617, 91st Cong., 1st Sess. 158 (1969), and to "eliminate[ ] the possibility of 'inadvertent' usury," *id.* at 159. The requirement that the loan have been incurred in connection with "the business of" making usurious loans seems aimed at the same goal, *i.e.,* the exclusion from the scope of the statute of occasional usurious transactions by one not in the business of loan sharking. As the legislative history indicates in discussing the concept of "pattern" of racketeering activity, "[t]he target of [RICO] is ... not sporadic activity." *Id.* at 158. *Cf. United States v. Salinas,* 564 F.2d 688, 691 (5th Cir.1977) (inferring that the reason Congress included "the business of" gambling in § 1961(6) "was that it sought to punish only large scale gambling operations involving 'organized crime' as contrasted with small time gambling."), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 800 (1978).
> …
> We would suggest that on remand, the district court be willing to entertain a new motion for summary judgment by defendants, focusing on the question of the engagement of the defendants in "the business of usury." If Durante cannot show that there is a genuine issue of material fact as to that question, counts 1, 3, and 5 should be dismissed. We leave for determination by the district court

in the first instance the precise parameters of "the business" of usury as intended by Congress in § 1961(6).

755 F.2d at 250.

44.      Mehidpour attacks the dicta[8] as an improper attempt to "expand the single act into something more." Brief ¶ 122. The Trustee argues that "[t]here is no requirement in the RICO statute or case law that plaintiff must allege or prove multiple usurious loans, longevity, or a pattern of usurious loans" in order to prove a RICO claim. Brief ¶ 124. This is erroneous because the Trustee's interpretation would read § 1961(B) out of the definition, which would be improper because of the use of the conjunctive "and" requires that both subsection (A) and (B) be satisfied before a debt can be said to be "unlawful". *Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 376 (S.D.N.Y. 2022). The court in *Wade Park* explained:

> "The first part of § 1961(6) requires that 'unlawful debt' either (1) be incurred or contracted in some form of illegal gambling activity or (2) be unenforceable by virtue of state or federal usury laws. The second part—subsection (B)— further narrows the definition, requiring, *inter alia*, that the 'unlawful debt' be incurred in connection with an illegal 'business.'"

*Id.* (quoting *United States v. Persico*, 2011 WL 2433728, at *2 (E.D.N.Y. June 14, 2011)). *See also In re Ballas*, No. 09-12545-EPK, 2012 WL 930259, at *3 (Bankr. S.D. Fla. Mar. 19, 2012) (Kimball, J.) ("The three requirements of Section 1141(d)(3) are stated in the conjunctive; all must be satisfied to deny discharge under this provision."); *VHV Jewelers, LLC v. Wolf*, 17 F.4th 109, 111 (11th Cir. 2021) (stating that where statutory definitions included list of elements stated in the conjunctive, the petitioner needed to prove each element of each

---

[8] Several courts have explained that the quoted language from *Durante* was dicta. *E.g., Weiss v. David Benrimon Fine Art LLC*, No. 20-CV-3842, 2021 WL 6128437, at *2 (2d Cir. Dec. 28, 2021) *VNUE, Inc. v. LG Capital Funding, LLC.*, No. 22-CV-3524-NRM-SJB, 2024 WL 1349228, at *3 n.3 (E.D.N.Y. Jan. 12, 2024). These statements don't alter the statutory definition of "unlawful debt" and Congress's focus on organized crime when it passed RICO.

definition in order to meet its burden and citing ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 12, at 116 (2012) ("With [a] conjunctive list, all [items] are required ....")).

45.    The RICO statute itself specifically predicates liability for unlawful debt collection on the defendant being *in the business* of lending money at usurious rates. Naturally, multiple courts have construed the plain text of the statute in such a way as to impose this requirement. *See Weisel v. Pischel*, 197 F.R.D. 231 (E.D. N.Y. 2000) (granting summary judgment in favor of defendants where the plaintiff was "unable to provide the Court with any evidence that Pischel loaned money to others at usurious rates" and therefore could not establish the defendants were engaged in the business of making usurious loans); *Lateral Recovery, LLC v. Capital Merch. Services, LLC*, 632 F. Supp. 3d 402, 451 (S.D.N.Y. 2022) ("Although violation of the unlawful-debt-collection provision of RICO may be predicated on a single instance of collection of unlawful debt, RICO does not reach the collection of a loan that is made occasionally and not as part of the business of lending money at a usurious rate." (cleaned up) (citations omitted)); *Fleetwood Services, LLC v. Ram Capital Funding, LLC*, No. 20-CV-5120 (LJL), 2022 WL 1997207, at *19 (S.D.N.Y. June 6, 2022) ("The inclusion of collection of unlawful debt as a major predicate for RICO liability was an explicit recognition of the evils of loan sharking. To that end, the statute requires that the loan have been incurred in connection with the business of making usurious loans and excludes from the definition of unlawful debt the occasional usurious transactions by one not in the business of loan sharking." (cleaned up) (citations omitted)). "A claim of unlawful debt collection will fail where the plaintiff does not allege that the 'defendants had engaged in any usurious dealing other than that described in the complaint.'" *Spig Indus., LLC v. Novac Equities LLC*, No. 23-CV-8667 (AT) (RFT), 2025 WL 3643955, at *18–19 (S.D.N.Y. Oct. 22, 2025), *report and recommendation adopted sub nom. Spig Indus., LLC v. Advantage Platform Services,*

*Inc.*, No. 23 CIV. 8667 (AT) (RFT), 2025 WL 3642396 (S.D.N.Y. Dec. 15, 2025) (quoting *Durante Bros. & Sons v. Flushing Nat'l Bank*, 755 F.2d 239, 250 (2d Cir. 1985)); *Steel River Sys., LLC v. Variant Alternative Income Fund*, 803 F. Supp. 3d 290, 309 (S.D.N.Y. 2025) ("Moreover, even if Steel River had sufficiently alleged that defendants engaged in the collection of unlawful debt, its complaint addresses only one lending transaction with one borrower and fails to allege the "'number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes that are the hallmark of both participants and victims, and the presence of separate schemes' that are the hallmark of a pattern of racketeering activity and that is necessary to make out a Section 1962(c) RICO claim.").

46.     Like the cases cited above, the court in *Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335 (S.D.N.Y. 2022) rejected the Trustee's argument that a single loan was sufficient to establish RICO liability, explaining:

> "RICO offenses may be predicated on a single instance of collection of an unlawful debt ...." *United States v. Grote*, 961 F.3d 105, 119 (2d Cir. 2020). At the same time, however, the statute does not reach the collection of a loan that is made occasionally and not as part of the "business of lending money" at a usurious rate. *See Malvar Egerique v. Chowaiki*, 2020 WL 1974228, at *19 (S.D.N.Y. Apr. 24, 2020), *vacated in part for other reasons sub nom. Weiss v. David Benrimon Fine Art LLC*, 2021 WL 6128437 (2d Cir. Dec. 28, 2021). "The inclusion of 'collection of unlawful debt' as a major predicate for RICO liability [was] an explicit recognition of the evils of loan sharking ...." *Durante*, 755 F.2d at 250. To that end, the statute requires "that the loan have been incurred in connection with 'the business of' making usurious loans" and excludes from the definition of unlawful debt the "occasional usurious transactions by one not in the business of loan sharking." *Id.* at 250.

*Id.* at 376.

47.     Mehdipour cites *Weiss v. David Benrimon Fine Art LLC*, 2021 WL 6128437 (2d Cir. Dec. 28, 2021) in support of her position. Brief ¶ 123. However, *Weiss* did not attempt to resolve the question of whether a single loan constituted being in the business of collecting unlawful debt. Instead, the court considered whether Rule 11 sanctions were appropriate,

stating that for several reasons "it was error to sanction Weiss for bringing Plaintiff's RICO unlawful debt collection claims while alleging only one usurious loan." *Weiss*, 2021 WL 6128437, at *3. *Weiss* does not stand for any broad proposition supporting the Trustee's position, such as the existence of a single usurious loan *can* constitute being in the business of lending money at usurious rates. Nor does *Weiss* undermine Hi Bar's position. Furthermore, as explained above, whether *Durante* is dicta (as *Weiss* noted and as the Trustee argues) is insignificant because the Court's duty in a RICO case is to apply the text of the statute. *Russello v. United States*, 464 U.S. 16, 20 (1983). And, as discussed above, the text predicates liability upon the defendant being in the business of lending money at usurious interest rates. 18 U.S.C. § 1961(6). Thus, the Trustee's statement that the RICO statute does not require that Mehdipour prove multiple usurious loans is simply incorrect. *See* Brief at ¶ 124.

48.     Rather than acknowledge the statute's text or the New York cases cited above, the Trustee reaches for inapplicable authorities. *See* Brief at ¶¶ 125-26. Mehdipour claims *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242–43 (1989) supports her contention that a single loan will do. Brief at ¶ 125. But, as Mehdipour acknowledges, *H.J. Inc.* did not bear on defining an "unlawful debt", so it is not determinative of any issue in this case. Moreover, the case supports the Hi Bar Defendants by emphasizing the fact that RICO was designed to address ongoing criminal activity, as opposed to one-off transactions. *H.J. Inc.*, 492 U.S. at 240 ("RICO's legislative history tells us, however, that the relatedness of racketeering activities is not alone enough to satisfy § 1962's pattern element. To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." (italics in original)). The Court made this point even more clearly through an example, stating:

Page 28 of 63

A RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit. Suppose a hoodlum were to sell "insurance" to a neighborhood's storekeepers to cover them against breakage of their windows, telling his victims he would be reappearing each month to collect the "premium" that would continue their "coverage." Though the number of related predicates involved may be small and they may occur close together in time, the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity. **In other cases, the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes.**

*Id.* at 242–43 (emphasis supplied).

49.     Since the decision in *H.J. Inc.*, numerous courts have confirmed that Congress enacted RICO to address *only* ongoing criminal conduct. *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1264 (11th Cir. 2004); *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 487 (2d Cir. 2014).

50.     Next, the Trustee cites *Middle States Knowlton Corp. v. Esic Capital, Inc.*, No. CIV.A. 82-1911, 1985 WL 7441, at *8 (D.D.C. Oct. 16, 1985) for the proposition that a single usurious loan is sufficient. However, the district court disregarded the plain language of the RICO statute under the guise of "liberally construing" RICO. *Id.* The court ignored the language of § 1961(6)(B) and concluded that the one loan was sufficient to constitute being "in the business of lending money *for profit*". *Id.*   The court's analysis was flawed because it deviated from the plain text of the statute and applied an expansive view of RICO. In any event, *Middle States* is an unreported decision, was decided on a motion to dismiss, and has been cited only three times. The more appropriate interpretation of "unlawful debt" is the one articulated in *Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 376 (S.D.N.Y. 2022). *See supra* at ¶¶45-47.

51. The Trustee also relies upon *United States v. Eufrasio*, 935 F.2d 553, 576 (3d Cir. 1991). That case was also wrongly decided for the same reason as *Middle States* as the court misread § 1961(6)(B). It is also distinguishable because the defendants were mobsters whose "RICO liability was predicated on attempted extortion, illegal video poker machine gambling and collecting unlawful debts. murdered one individual and sought to murder another." *Id.* at 558. The court explained that "even if it was plain error to fail to prove Eufrasio and his co-appellants engaged in a 'continuous' business of making unlawful loans and collecting unlawful debts, their RICO convictions would stand nonetheless on their conspiracy to participate, and participation in, the conduct of the affairs of the Scarfo enterprise through a pattern of illegal gambling and attempted extortion." *Id.* at 576 n.28.

52. The Court should disregard *People v. Valentzas*, 70 N.Y.2d 446 (N.Y. 1987) because that case wasn't brought under RICO but rather N.Y. Penal Law § 190.42.[9] The Trustee failed to plead any theory of liability sounding in § 190.42 and it would be unduly prejudicial to allow Mehdipour to prove her claim based on this statute. In any event, *Valentzas* is of little significance to New York courts, as it has only been cited twice, and then most "recently" in 1995. *See People v. Farrell*, 218 A.D.2d 749, 749 (2nd Dept. App. Div. 1995).

53. To be clear, Mehdipour's argument that "[a] single transaction, on a single day may be sufficient to establish being in the business of lending money at a usurious rate[,]" Brief ¶ 180, is not the law, and the balance of legal authority does not support this argument.

54. At trial, the Trustee absolutely failed to demonstrate that Hi Bar was in the business of lending money at usurious rates. In its Brief, Mehdipour attempted this analysis with Lubin. *See* Brief ¶¶ 120-29. However, Mehdipour spent a mere four paragraphs addressing the Hi Bar Defendants, only two of which actually cited evidence, and attempts

---

[9] The applicable New York statute is N.Y. Penal Law § 190.40.

to treat Hi Bar as indistinguishable from Spin. *See id*. at ¶¶ 179-82. This is improper because Hi Bar and Spin are legally distinct entities. *See* Feb. 4 Tr. 888:14-17; 1039:3-15 Moreover, with respect to Hi Bar, the Trustee did not admit into evidence any contracts other than the Hi Bar Agreement and the two settlement agreements. Trustee Exs. 1, 45, 46. The Court should reject the Trustee's argument that Hi Bar "entered into" the First, Second, or Third Spin Contracts because Hi Bar is not a party to any of those agreements. *See* Brief ¶ 181. Hi Bar was only a participant in the first and third Spin contracts through syndication, but did not participate in the second Spin contracts. Feb. 4 Tr. 1039:22-1040:16; 1043:20-1045:9.

55.    Nor did the Trustee present testimony from any customers of Hi Bar other than Zankl who testified to the existence of usurious loans entered into by Hi Bar. Instead, the Trustee: (a) sought to establish that the Spin and Hi Bar Contracts were themselves usurious; (b) obtained testimony from Lubin that Spin uses "template" contracts for its merchant cash advance agreements, and; (c) sought to rely on Mordechai Herbst's deposition testimony that Lubin had brought "numerous deals, and we had done quite a few deals together".[10] The Court should reject the Trustee's approach for several reasons.

56.    First, as explained above, the MCA transactions were not usurious loans. Next, the Trustee cannot establish that the "template contracts" were usurious because none of the "template contracts" were admitted into evidence, and there was no testimony about how these "template contracts" were similar to (or different than) the Excell MCA agreements. While Lubin admitted to Spin transacting on numerous deals, he testified that Spin only transacted "under a dozen" MCA deals with Hi Bar, some of which were "refis". Feb. 3 Tr.

---

[10] The Trustee claims the Defendants "engaged in additional MCA Loans" other than the ones at issue in this case, and cite as proof an MCA between Excell and Diverse Capital. Brief ¶ 182 (citing Trustee Ex. 15). However, none of the other MCA agreements were admitted into evidence, and there is no proof whatsoever that any of the other MCA agreements could be considered usurious loans.

698:24-699:9. Mehdipour seemingly argues that each and every one of Spin's "numerous" deals "was structured on the identical form contract used for the Spin Contracts here." Brief ¶ 127. However, the evidence does not support that argument. Lubin testified that he merely admitted that "MCAs are just templates", and that Spin used a template for the Excell contracts. Feb. 3 Tr 735:25-736:1; 829:10-15. However, Lubin also testified that "like 90% of my deals get redlined" – meaning from the template. Feb. 3 Tr. 754:14-755:2. There is zero evidence of the terms of any of these other MCA agreements. There is no competent evidence that any of Spin's contracts with any other merchants were also usurious. In fact, Lubin testified that multiple courts had determined that Spin MCA agreements were not usurious. Feb. 3 Tr. 861:2-9. Yisroel Herbst provided similar testimony with respect to lawsuits involving Hi Bar. Feb. 4 Tr. 1072:13-20. The Court should reject the Trustee's argument that "[t]here is no doubt Lubin, through Spin, as the "sole owner of Spin Capital since about 2019," entered many more MCA loans with others[,]" because without any evidence regarding the content of any of the MCA agreements, the Trustee's point is meaningless.

57.     However, the Trustee's reliance on template agreements cuts both ways, for New York courts have repeatedly determined that **identical forms are not loans** and therefore cannot be usurious. *See, e.g.*, *Spin Capital v. Texas Med. Ctr. Supply, LLC*, No. 130439-2021, 2022 WL 4004023 (N.Y. Sup. Ct. Aug. 29, 2022); *Hi Bar Capital, LLC v. Excell Auto Group, Inc.*, No. 502846/2022, 2023 WL 3431299, at *1 (N.Y. Sup. Ct. May 11, 2023)*; Barrier Grp. Inc. v. BMF Advance Ltd. Liab. Co.,* 2023 N.Y. Misc. LEXIS 1032, at *19-21 (Orang Co. Sup. Ct. Mar. 15, 2023); *Samson MCA LLC v. Joseph A. Russo MD PC*, 2022 N.Y. Misc. LEXIS 1127, at *7 (Ontario Co. Sup. Ct. Apr. 1, 2022). The Court should consider these decisions as strong persuasive authority that the agreements at issue in this case are not usurious. The court in New York found that *this very agreement* wasn't usurious. *Hi Bar Capital, LLC v. Excell Auto Group, Inc.*, No. 502846/2022, 2023 WL 3431299 (N.Y. Sup. Ct.

May 11, 2023) (finding MCA agreement enforceable and granting summary judgment in favor of Hi Bar).[11]

58.     Third, the Trustee is relying on her impeachment of Mordechai Herbst. At trial, Mordechai Herbst testified that "out of the many deals that Hi Bar did…it was…a very minor amount of deals that [Lubin] was involved in." Feb. 4 Tr. 895:5-16. That testimony is accurate. Both Mordechai Herbst and his father testified that Hi Bar entered into approximately 400 MCA agreements. Feb. 4 921:10-18; 1066:20-23; 916:1-13. Given Lubin's testimony that Spin and Hi Bar transacted approximately 12 deals together (which would be consistent with Mordechai Herbst's testimony that the two companies did "quite a few deals together"), only 3.0% of Hi Bar's total MCA deals were transacted with Spin. Thus, even if, *arguendo*, the Court were to assume that all of the Spin-Hi Bar MCAs were usurious, only 3% of Hi Bar's total MCAs could be considered usurious. Three percent of Hi Bar's total deals does not constitute proof that Hi Bar was in the business of lending money at usurious rates. However, the Trustee failed to present any evidence as to the terms of any of the other twelve deals between Spin and Hi Bar.

59.     In addition, the Trustee failed to rebut Yisroel Herbst's testimony that he founded and operated Hi Bar with the intent of earning money legitimately, without charging usurious interest or engaging in "strong arm" tactics. Yisroel Herbst testified that prior to getting into the MCA space, he was involved in "traditional" lending at reasonable (non-usurious) rates. Feb. 4 Tr. 1059:15-1060:6. Herbst explained that in 2016, his business partners presented the idea of becoming an MCA lender. *Id.* at 1058:16-1059:14. After meeting with lenders to educate himself about the opportunity, and learning about the use

---

[11] In response to the Trustee's argument that the Hi Bar Agreement was criminally usurious, see Brief at ¶ 275, Hi Bar incorporates by reference its arguments addressing the RICO claims.

of confessions of judgment to freeze the accounts of "mom-and-pop shops", he testified that he was not comfortable with these practices and testified, "I did not like what I saw at that time[,]" and passed on the opportunity to involve himself in the MCA industry. *Id*. at 1058:20-1059:9. When Covid struck, his capital partners in his traditional lending business pulled their funds. *Id*. at 1060:7-19. At this point, Herbst found the MCA industry was "a little more developed, meaning there was no immediate freezing of funds." *Id*. at 1060:21-23. Herbst then performed additional research, which included speaking to participants in the industry and attorneys. *Id*. at 1060:21-1061:11. Herbst concluded that the conditions existed for him to perform MCA funding in "a legitimate way". *Id*. at 1061:9-11. Herbst testified that he never intended that Hi Bar would charge interest and consulted with attorneys and "kept on following up" to ensure Hi Bar's MCA agreements were not considered loans. *Id*. at 1068:11-1070:1. Herbst also testified that he had a firm rule that Hi Bar would never "strong-arm" any of its merchants, and if he learned that anyone at Hi Bar did so, "they were immediately fired." *Id*. at 1063:25-1064:24.

60.     The evidence at trial established that Hi Bar (directly and through several DBAs) issued approximately 400 merchant cash advance contracts between January/February 2021 through October 2022. Feb. 4 921:10-18; 1066:20-23; 916:1-13. Herbst testified that he caused Hi Bar to exit the MCA industry because, after Joel Getter left Hi Bar, he had conversations with other participants and became "extremely uncomfortable with many of the brokers in the industry." *Id*. at 1071:6-1072:12. Herbst explained that he reached the point where he realized that despite his good intentions to make money legitimately, he no longer believed it could be done. *See id*. at 1071:169-

1072:12.[12] This evidence was undisputed. In fact, the Trustee asked Herbst only 16 pages of questions, none of which established that Hi Bar was in the business of lending money at a usurious rate. *See id*. at pp. 1037-53. On cross-examination, the Trustee asked Herbst if Hi Bar was going to be "a kinder and gentler business, MCA business, than others in the industry", to which he answered: "That was definitely the intent." *Id*. at 1087:24-1088:4.

61.    The Trustee failed to prove that Hi Bar's business was lending money at usurious interest rates. Mehdipour failed to overcome her "heavy burden" to establish the Hi Bar Agreement or settlement agreements were usurious because there's no evidence that Hi Bar knowingly charged a usurious interest rate. *Hillair Capital Investments, L.P. v Integrated Frgt. Corp.*, 963 F. Supp.2d 336, 339 (S.D.N.Y 2013) ("Usury is an affirmative defense and a heavy burden rests upon the party seeking to impeach a transaction for usury."); *In re Venture Mortg. Fund, L.P.*, 245 B.R. 460, 473 (Bankr. S.D.N.Y. 2000) (stating that to prove usury, the moving party must prove "the *general intent* to charge a rate in excess of the legal rate rather than the *specific intent* to violate the usury statute.") (emphasis supplied). In fact, the unrebutted evidence is that Yisroel Herbst affirmatively sought to avoid charging usurious interest. Because of the absence of any evidence on this point, the Trustee cannot establish a RICO violation. In the absence of any evidence of an intent to charge a usurious interest rate, Hi Bar is entitled to a presumption that the contracts would not violate the usury laws. *See, e.g., Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 336, 179 N.E.3d 612, 623 (2021) (stating that contracts and transactions are not presumed to be illegal or criminal).

---

[12] Herbst testified that he lost more than $15 million dollars in anticipated receivables from merchants who defaulted. *Id*. at 1064:12-16.

**E. The Trustee Failed to Prove the MCAs Proximately Caused the Harm to Excell.**

62.     As to the third and final RICO element, the Trustee failed to prove that Excell's damages were caused "by reason of the substantive RICO violation." *Sykes v. Mel S. Harris & Associates LLC*, 780 F.3d 70, 83 (2d Cir. 2015).

63.     Zankl testified that without funding from the MCAs, his business would have collapsed. *See* Jan. 29 Tr. 134:23-136:4 (Libertas), 153:19-154:15 (MCAs generally); Feb. 2 Tr. 465:11-466:3 (Alpine Business and TBT). The MCA loans gave the Debtor the liquidity to continue operating. Therefore, the Trustee cannot prove that the funding provided by Hi Bar proximately caused the Debtor's damages. *See In re World Vision Entm't, Inc.*, 275 B.R. 641, 658 (Bankr. M.D. Fla. 2002) (considering fraudulent transfer claim and finding the defendant brokers provided value by preventing the debtor's business from collapsing). In *World Vision*, the court explained:

> In this case, brokers also sold the debtor's notes and received a commission. Every time a broker sold a note, the defendants remitted the entire proceeds to the debtor. The debtor, in turn, paid the broker a commission based on the face amount of the note sold or renewed. The commission rate averaged 14 percent. Although this commission rate was high, the trustee does not assert that a lower rate was appropriate. Rather, the trustee argues the payment of any commission amount is constructively fraudulent because the debtor received no value for the brokers' services.
>
> The Court rejects the trustee's theory. The debtor received exactly what it wanted—the sale of more and more notes. The debtor paid high commission rates to the brokers to encourage the sales. **Without the new sales, the debtor's Ponzi scheme would have collapsed earlier. Therefore, the brokers, including the defendants in this adversary proceeding, performed a valuable service for the debtor.** The debtor paid proportionate commissions for these services, and the trustee failed to prove constructive fraud because the debtor received reasonably equivalent value.

*Id.*

64. The *World Vision* court's analysis is appropriate here, because Zankl's concession that he needed the MCA funding to continue operating shows that Hi Bar actually kept the Debtor afloat.

### F. Any RICO Damages Should be Discounted by the Monies Hi Bar Paid on Behalf of Excell.

65. The Trustee argues that, with respect to Count 6 (RICO against all Defendants through Spin and Hi Bar), the Debtor suffered a financial loss in the amount of $2,057,188.00, which Mehdipour seeks to treble, for total damages of $6,171,564.00. *See* Brief at ¶¶183-88. As set forth below in Paragraph 75, if the Court were to find in the Trustee's favor, the damages would only equal $85,667.50, which would then be trebled pursuant to the RICO statute.

66. In Count 8 (RICO against Lubin and the Herbsts, through Hi Bar), the Trustee argues the Debtor was harmed in the amount of $2,200,000.00, which she seeks to treble to $6,600,000.00. *Id.* at ¶¶ 189-91.

67. A RICO plaintiff's damages must take into account the funding provided by the MCA lender. *See, e.g., Global Merchant Cash Inc. v. Rome-Aire Services, Inc., et. Al.*, No. 24-CV-799, 2024 WL 4515654, at *9 (E.D.N.Y. Oct. 17, 2024) ("Thus, to state a claim, defendants must allege that they paid GMC more than they received from GMC."); *Spig Indus., LLC v. Novac Equities LLC*, No. 23-CV-8667, 2025 WL 3643955, at *20 (S.D.N.Y. Oct. 22, 2025), *report and recommendation adopted sub nom. Spig Indus., LLC v. Advantage Platform Services, Inc.*, No. 23 CIV. 8667, 2025 WL 3642396 (S.D.N.Y. Dec. 15, 2025) ("Where the alleged predicate acts are the collection of usurious loans, the plaintiff's financial injury must be reduced by the amount initially received as principal Accordingly, a RICO plaintiff suffers an injury if the monetary loss caused by a usurious loan is greater than the financial benefit received, if any, from the usurious lender." (internal citations omitted)).

68.    According to the Trustee's expert, Mr. Barbee, Hi Bar paid Excell $2.2 million dollars and holds a judgment worth $2.5 million dollars against Excell. Feb. 4 Tr. 1003:23-1004:8; 1026:7-11. Barbee admitted that Excell actually owes Hi Bar money:

> Q.    Was Hi Bar owed money at the end of this, when it all came crashing down, and the filing of bankruptcy?
> A.    That's my understanding, and my -- our rates of return -- we did rates of return two ways. One is looking at the contract itself and, two, is looking at what the actual -- what actually happened. And both ways it was over 50 percent.
> And what actually happened, Hi Bar had a judgment for 2.5 million, so that's what we used for their ending balance.
> …
> Q.    Well, at the time of the filing of the petition, he still -- his company still owed Hi Bar in excess of a million dollars, and he did not pay that despite receiving millions of dollars from loans?
> A.    That sounds correct.

Feb. 4 Tr. 1003:23-1004:8;1007:2-6.

69.    Further, Zankl admitted that he made numerous payments to Hi Bar owed by Excell from Karma's bank accounts. Feb. 2 Tr. 445:16-454:8; Trustee Ex. 52; Hi Bar Exs. 24, 28, 29, 30 (detailing payments of $300,000, $200,000, $100,000, $100,000, and other miscellaneous payments made to Hi Bar from Excell accounts but acknowledging that just prior to payment, these funds were transferred from Karma to Excell). In fact, all of the $2,200,000 the Trustee claims as its damages were payments Excell made to Hi Bar using Karma's monies. Excell made a total of eight payments to Hi Bar, which collectively comprise the $2,200,000.00.

70.    Payment 1 was made on November 15, 2021 in the amount of $300,000 from an Excell account ending in 6901. *See* Hi Bar Ex. 24 at p. 2. However, on November 12, 2021, $300,000 was deposited into that account from an account ending in 8711, which is a Karma account. *Id.* Payment 2 was made on December 17, 2021 in the amount of $200,000 from an Excell account ending in 6901. *See* Hi Bar Ex. 30 at p. 1. However, that same day, $200,000 was deposited into that account from an account ending in 6603, which is a Karma account.

*Id.* at p.2. Payment 3 was made on December 20, 2021 in the amount of $200,000 from an Excell account ending in 6901. *Id.* at p.1. However, that same day, $200,000 was deposited into that account from an account ending in 6603, which is a Karma account. *Id.* at p. 2. Payment 4 was made on January 10, 2022 in the amount of $100,000 from an Excell account ending in 6901. *See* Hi Bar Ex. 29 at p. 2. However, that same day, $100,000 was deposited into that account from an account ending in 6603, which is a Karma account. *Id.* at p. 1. Payment 5 was made on January 12, 2022 in the amount of $100,000 from an Excell account ending in 6901. *Id.* at p. 2. However, a day later, $100,000 was deposited into that account from an account ending in 3199, which received seven transfers between January 12 and January 14, 2022 totaling $138,775 from account ending in 8711, which is a Karma account. *See* Hi Bar Exs. 28 at p. 2, 29 at p. 1. Payment 6 was made on February 7, 2022 in the amount of $250,000 from an Excell account ending in 3181. *See* Hi Bar Ex. 27 at p. 4. However, on January 20, 2022, $108,000 was deposited into that account from an account ending in 8711, which is a Karma account. Hi Bar Ex. 26 at p. 2. Thereafter, on February 3, 2023, $156,000 was deposited into from an account ending in 6603, which is a Karma account. *Id.* at p. 1. Payment 7 was made on February 8, 2022 in the amount of $600,000 from an Excell account ending in 3199. *See* Hi Bar Ex. 25 at p. 3. Subsequent to that date, and on February 16, 17, and 22, 2022, transfers from Karma related accounts (8711, 7995, and 5966) totaling more than $650,000 were deposited to this account. *Id.* at p. 2. *See also* Hi Bar Exs. 22 at p. 4-5, 23 at p. 2. The final payment was made on February 9, 2022 in the amount of $450,000 from an Excell account ending in 3199. *See* Hi Bar Ex. 25 at p. 3. However, that same day, $450,000 was deposited into that account from an account ending in 5966, which is a Karma account. *Id.* at p. 2.

71.     Zankl testified that as a matter of course, payments to Hi Bar were paid with Karma monies:

Q. So really, if we go through all the payments on the schedule, if we look at the Karma accounts, it'll reflect that money was sent from Karma, and then paid through the Excell account to Hi Bar Capital?

A. Yes.

Q. Is that typically what you did?

A. Yes.

Q. Why'd you do it that way?

A. Because that's where the revenue was coming in, from Karma.

Q. Why didn't you just pay directly from the Karma accounts?

A. Because, once again, in my mind, this was an Excell debt, so I maintained it that way.

Q. So based upon your understanding of the document, right or wrong as it was, you made the payments directly from Excell, because you only believe they were the merchant that was responsible for the payment?

A. Yes.

*Id.* at 453:5-23. Zankl admitted that Excell couldn't have paid Hi Bar because it was no longer selling cars. *Id.* at 446:5-7.

72. The Court should account for the fact that Excell never repaid Hi Bar; Karma did. That would completely eliminate the Trustee's damages.

73. Further, Hi Bar agreed to pay off Excell's debt of $2,114,332.50. Feb. 4 Tr. 1073:3-1074:6. If the Court credits this as a legitimate transaction, then in order to determine the Trustee's proper measure of damages, the court must reconcile the money paid by Hi Bar to Spin on behalf of Excell against the monies repaid from Excell to Hi Bar. The Trustee does not account for this payment. Brief ¶¶ 189-191. Thus, on the Trustee's best day, her damages should be $2,200,000.00 - $2,114,332.50 = $85,667.50. *See Global Merchant*, 2024 WL 4515654, at *9; *Spig*, 2025 WL 3643955, at *20.

## II. The Substantive RICO Claims Against Mordechai Must be Dismissed Because the Trustee Failed to Show he Played any "Part in Directing the Operation or Management" of Hi Bar, or Knew of and Agreed to the Overall Conspiracy.

74. The Court should find in favor of Mordechai Herbst ("Mordi") on the RICO claims brought under § 1962(c) (Counts 6 and 8) because the Trustee failed to prove that he played "any part in directing the operating or management of Hi Bar". *Reves v. Ernst &*

*Young*, 507 U.S. 170, 183 (1993). "A defendant must be convicted on the basis of his own proven conduct, **association is not enough**. RICO does not punish 'mere association with conspirators or knowledge of illegal activity; its proscriptions are directed against conduct, not status.'" *United States v. Gonzalez*, 921 F.2d 1530, 1542–43 (11th Cir. 1991) (emphasis supplied) (quoting *United States v. Elliott,* 571 F.2d 880, 903 (5th Cir. 1978)). The Trustee is pursuing a guilt-by-association theory of liability as to Mordi, as Mehdipour argues Mordi was "associated with the Spin/Hi Bar AIF Enterprise." *See* Brief at p. 50 (Heading iii).

75.    In addition, the Trustee failed to show that Mordi knew of and agreed to participate in the overall RICO conspiracy to lend money at usurious rates. *See Gonzalez*, 921 F.2d at 1542-43 ("The government has simply not presented sufficient evidence concerning *Sweeton's agreement* to the *overall* conspiracy. It is not enough, as the government seeks to do, to argue that LeQuire closely ran his own operations and that, thus anyone involved in one importation would hear of, know of, and hence have agreed to the enterprise's other activities. In Sweeton's case, evidence to support this sort of theory is simply lacking.").

76.    Mordi is Yisroel Herbst's son. Feb. 4 Tr. 888:12-13. Mordi joined Hi Bar toward the end of 2021. *Id.* at 927:8-25; 1066:12-25. Prior to joining Hi Bar, Mordi had been studying and working in Israel. *Id.* at 914:9-915:16. When he joined Hi Bar, Mordi was only 21 years old. *Id.* at 914:5-8. Mordi began working in the accounting department under the supervision of Abe Gabioff performing data entry, such as performing daily bank reconciliations, and generally learning how the business operated. *Id.* at 917:9-25. Mordi was not employed by Hi Bar when any of the three "Spin Contracts" were negotiated, and he played no role in those negotiations. *Id.* at 927:4-25. Mordi also played no role in the decision to cause Hi Bar to enter into the "First Hi Bar Contract" with Excell on October 27, 2021. *Id.* at 918:7-24.

77.    Mordi never held any ownership in Hi Bar, never had any managerial authority, and never supervised anyone. *Id.* at 916:14-16; 917:1-5; 1067:1-15. Further, Mordi

Page 41 of 63

played no role in underwriting, *id*. at 894:16-20; did not work closely with Lubin, *id*. at 895:5-8; never worked with Lubin on collections on any MCA. *Id*. at 897:4-20; never spoke to Scott Zankl or anyone from Excell, *id*. at 923:22-924:2; and played no role in collecting from Excell. *Id*. at 919:7-14. Mordi had never even heard of Scott Zankl or Excell until litigation was underway. *Id*. at 924:3-9.

78.     In 2023, Mordi became involved in collections on behalf of Hi Bar, after Joel Getter left Hi Bar at the end of 2022 or the beginning of 2023. *Id*. at 926:8-12. His assistant, Francesca, was still employed at Hi Bar for a few months. *Id*. at 926:13-22. Francesca's role had been to help Getter with collections. *Id*. at 902:3-18. After Getter left, Francesca initially continued to handle collections. *Id*. at 902:12-20. However, once Francesca departed Hi Bar, no one was left to handle collections. *Id*. One day, Mordi received a file of all the payments due to Hi Bar that bounced that day and "figured like somebody has to take care of it." *Id*. He started contacting merchants and inquiring about the payments. *Id*. at 920:15-16. From that point on, he was involved in collections. *Id*. at 921:1-5. By this point, Hi Bar had stopped entering into new MCA deals. *Id*. *See also id*. at 916:9-13. Contrary to the Trustee's argument, there is no evidence that Mordi Herbst "participated in collecting the obligations created by the Spin Contracts and First Hi Bar Contract." Brief at ¶ 171.

79.     Despite Mordi Herbst's limited responsibilities at Hi Bar and the limited duration of his employment, the Trustee sued him for his alleged role in the RICO enterprise. However, Mehdipour failed to prove that Mordi's conduct rises to the level of RICO culpability, for the Trustee dedicated a lone paragraph to articulating Mordechai Herbst's role at Hi Bar. *See* Brief ¶ 170 (stating that he "worked in the accounts and collections department of Hi Bar" and was compensated based on collections). In order to hold a person liable under RICO, the person must "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of

unlawful debt." 18 U.S.C. § 1962(c). "In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). While "liability is not limited to those with primary responsibility for the enterprise's affairs,…*some* part in directing the enterprise's affairs is required." *Id*. (italics in original). The *Reves* court clearly articulated that "one is not liable under that provision unless one has participated in the operation or management of the enterprise itself." *Id*. at 183.[13] Mehdipour relies on *United States v. Browne*, , 1277 (11th Cir. 2007) for the proposition that even "foot soldiers" in a RICO enterprise can be held liable where they "knowingly implement" and "make decisions". *See, e.g.*, Brief ¶ 162. While the quoted language does inform the test for RICO liability, there was ample evidence to support the defendant's role in directing the affairs. *Browne*, 505 F.3d at 1275-77 (stating that as Browne's administrative assistant, Devaney *"*came to wield extraordinary control over the books, records, and finances of the union. With that authority, Devaney was able to enrich herself through her payroll scheme and by charging personal expenses to the union.").

80.     In addition, *Browne* illustrates the Trustee's obligation, and failure, to prove that Mordi knew of and agreed to the overall RICO conspiracy to lend money at usurious rates. *Browne* contrasted the facts supporting liability with those in *United States v. Gonzalez*, 921 F.2d 1530, 1542 (11th Cir. 1991), and that discussion actually shows why Mordi Herbst *should not* be held liable. *See Browne*, 505 F.3d at 1275-76. In *Gonzalez*, the government failed to prove that Sweeton, an alleged participant in a conspiracy to import cocaine, knew of and agreed to participate in the drug-smuggling conspiracy due to the lack of evidence of his involvement or even the other co-conspirators' familiarity with his name.

---

[13] The *Reves* test is the law in the Second and Eleventh Circuits. *See DeFalco v. Bernas*, 244 F.3d 286, 310 (2d Cir. 2001); *United States v. Browne*, 505 F.3d 1229, 1275–77 (11th Cir. 2007).

921 F.2d at 1542. The court succinctly noted that Sweeton "is not heard of prior to his appearance in Georgia on May 23, 1983 and, once he is shot and almost killed on May 23, Sweeton is neither seen nor heard about again." *Id*. By contrast, the defendant in *Browne* was the administrative assistant to a high-ranking union official, where "she came to wield extraordinary control over the books, records, and finances of the union." *Browne*, 505 F.3d at 1275. From that position, the evidence showed that she "was able to enrich herself through her payroll scheme and by charging personal expenses to the union[,] and "both facilitated Browne's fraudulent expenses and shielded them from view." *Id*. She also "admitted to fabricating the names of persons attending dinners and ascribing a union-related purpose to personal meals…[and] attended several expensive dinners that were not related to union business." *Id*. The court affirmed her conviction, concluding that based on this evidence that she knew of agreed to participate in the conspiracy. *Id*. at 1276. The Trustee failed to present any evidence that Mordi knew of and agreed to the overall RICO conspiracy to lend money at usurious rates. *See Gonzalez*, 921 F.2d at 1542-43.

81.     The evidence of Mordi's involvement with the Excell transactions is even more attenuated than Sweeton's participation in the cocaine smuggling ring.[14] Mordi wasn't employed by Hi Bar until the end of 2021. Prior to that, Mordi wasn't even living in the United States. And when he did join Hi Bar, he was a totally inexperienced 21-year-old learning the ropes of his father's business. The limited evidence of Mordi's involvement at Hi Bar does not demonstrate that he participated in the operation or management of the enterprise itself. Because Mordi's most significant role was in collections, which occurred

---

[14] After all, "Sweeton was a member of a ground crew deployed to a landing site in Sylvania, Georgia, whose job it was to scout the landing area and unload cocaine from an airplane arriving on May 23, 1983." *United States v. Browne*, 505 F.3d 1229, 1275 (11th Cir. 2007). There is no evidence of analogous conduct taken by Mordi.

after both Getter and Francesca left, and for which he had no prior experience and was just beginning to learn through on-the-job experience (without any formal training), the most that can be said about Mordi is that he performed some collections efforts for Hi Bar towards the very end of Hi Bar's existence as a merchant cash advance company. There is no evidence that any of the MCAs Mordi sought to collect on was, in fact, a usurious loan. No specific questions were asked about this point, and no other MCA agreements were admitted into evidence  If Sweeton's role in scouting a landing area for an airplane and unloading cocaine wasn't sufficient to hold him liable for knowledge and agreement to participate in a drug-smuggling conspiracy, surely the evidence of Mordi's limited role, late in the existence of Hi Bar, coupled with his inexperience and lack of any evidence that he receiving training from anyone in collecting on usurious loans, is insufficient to hold him liable for RICO violations under § 1962(c).

### III. The RICO Conspiracy Claim Against Mordechai Herbst (Count 7) Must be Dismissed Because the Trustee Failed to Show he "Knew What the Other Conspirators were up to" or Should Have Suspected he was part of a Larger Enterprise.

82.    The *Reves* "operation or management" test does not apply to RICO conspiracy. *United States v. Pizzonia*, 577 F.3d 455, 462 (2d Cir. 2009). The RICO conspiracy statute provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). "To be convicted as a conspirator, one must be shown to have possessed knowledge of only the general contours of the conspiracy." *United States v. Zichettello*, 208 F.3d 72, 100 (2d Cir. 2000). The evidence must establish "that the defendant[s] ... know the general nature of the conspiracy and that the conspiracy extends beyond [their] individual role[s]." *Id.* at 99 (quoting *United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir.1989)). "A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it

suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas v. United States*, 522 U.S. 52, 65 (1997). This can also be established by proof that "an alleged conspirator knew what the other conspirators 'were up to' or whether the situation would logically lead an alleged conspirator "to suspect he was part of a larger enterprise." *Zichettello*, 208 F.3d at 99 (quoting *United States v. Viola*, 35 F.3d 37, 44–45 (2d Cir. 1994)). Naturally, "agreeing to facilitate" some of the predicate acts requires that the defendant have knowledge about the scheme. *See United States v. Viola*, 35 F.3d 37, 44 (2d Cir. 1994) (*abrogated on other grounds* by *Salinas v. United States*, 522 U.S. 52 (1997) ("This requirement stems from the elementary principle of conspiracy law that a person cannot be convicted of agreeing to participate in a conspiracy if he has no knowledge that the conspiracy even exists."). "The required nexus between the defendant's acts and the RICO conspiracy thus protects the defendant from being found guilty based on incidental or tenuous association with the enterprise and its members." *Viola*, 35 F.3d 37, 44. These three cases – *Zichettello*, *Salinas*, and *White* – each demonstrate the quantum of evidence necessary to hold a RICO defendant liable for conspiracy. And, by contrast, Viola shows when a defendant should not be held liable.

83.     In *Zichettello*, former officers and attorneys representing a labor union used the union "as a piggy-bank available to enrich themselves almost at will" and also to assist another defendant's political campaign. 208 F.3d at 81. The government presented evidence of signed representation agreements between the law firm and the union vice president, testimony about meetings in which the union officers presented the law firm with checks in return for envelopes stuffed with cash, and bank records that corroborated these transactions. 208 F.3d at 81-85. The convictions for conspiracy were upheld because of the volume of evidence documenting each defendant's participation in the bribery and kickback scheme. *Id*. at 100 ("The evidence easily suffices to support the jury's finding that the

Page 46 of 63

appellants were aware of the general nature of the conspiracy. Hartman, Lysaght, and Kramer each knew that the kickback schemes extended beyond themselves individually and involved at least each other, Reale, Zichettello, Montoro, and A & G.").

84. In *Salinas v. United States*, 522 U.S. 52, 65 (1997), the Court upheld Salinas's conviction where the evidence "showed that Marmolejo committed at least two acts of racketeering activity when he accepted numerous bribes and that Salinas knew about and agreed to facilitate the scheme. This is sufficient to support a conviction under § 1962(d)."

85. Similarly, in *United States v. White*, 7 F.4th 90, 99 (2d Cir. 2021), the defendant's conviction was upheld where the evidence showed that defendant "knew of, and agreed to, his gang's "general criminal objective of committing acts of violence" against its rival gang. The evidence included defendant's Facebook messages and testimony that defendant "routinely told other MBG members about his desire to harm Killbrook members and his need to "put in work" – *i.e.*, "[p]romote violence [and] shootings" – for MBG[,]" as well as evidence that defendant actually shot three rival gang members. *Id*. The court concluded that this evidence permitted the reasonable inference that the defendant "agreed with other MBG members to function as a unit for the common purpose of committing acts of violence." *Id*. at 100.

86. By contrast, in *Viola*, the court reversed a conviction based on insufficient evidence of an agreement to conspire. The court explained:

> With respect to Formisano, the government's proof fails to support a finding of sufficient knowledge of the RICO conspiracy. The government established at trial that Formisano was employed by Viola to perform menial tasks and that on two occasions Formisano agreed to sell goods for Viola knowing they were stolen. The government asserts that this, coupled with the fact that Formisano was present when Viola ordered another employee to load the stolen goods on a delivery truck, was sufficient to show that Formisano voluntarily associated with the Viola enterprise, and knew the enterprise extended beyond his role. Although this evidence might be sufficient if the government's conclusion was consistent with other circumstances, the evidence contradicts the inference that Formisano was aware of the broader conspiracy.

In the wealth of evidence presented at trial to show the existence and scope of the Viola enterprise, Formisano is hardly even mentioned. This absence is telling because the evidence included accomplice testimony from participants in the conspiracy who never mentioned Formisano, much less indicated their familiarity with him. Further, in the numerous surveillance tapes canvassed at length at trial, only a few scant references were made to Formisano, and then only in the context of the two offenses charged against him and not in relation to the broader enterprise. The government's year-long electronic surveillance did not reveal a single instance where Formisano was overheard in conversation with any of the members of the Viola enterprise apart from Viola, his employer at Blue Chip Coffee. While Formisano need not have known each member of the conspiracy to be associated with it, *Rastelli,* 870 F.2d at 828, the lack of affiliation beyond Viola, while not dispositive, is relevant to whether Formisano actually was aware of the broader enterprise, *see id.* at 827 (degree of defendant's association with other conspirators and participation in activities that furthered enterprise's affairs relevant to whether defendant had requisite knowledge of RICO conspiracy).

The record is devoid of evidence that, apart from the discrete stolen property crimes he committed, Formisano knew what Viola and the other members of the conspiracy were up to. Additionally, there was nothing about the nature of the stolen goods or magnitude of the transactions involving Formisano that logically would lead him to suspect he was part of a larger enterprise, and the government points to no evidence of Formisano's direct knowledge of additional transactions. In sum, we conclude that there was insufficient evidence for a jury to conclude beyond a reasonable doubt that Formisano knew "the general nature of the enterprise and ... that the enterprise extend[ed] beyond his individual role." *Rastelli,* 870 F.2d at 828. Accordingly, his conviction under § 1962(d) must be reversed.

*United States v. Viola*, 35 F.3d 37, 44-45 (2d Cir. 1994).

87.     As these cases illustrate, the Trustee failed to prove that 21-year-old Mordi Herbst had any semblance of a notion that his father's company was lending money at usurious interest rates. Despite five days of testimony from six witnesses, Mordi Herbst's name is barely mentioned. The two primary witnesses, Scott Zankl and Josh Lubin, provided virtually no testimony about Mordi's role. Zankl never spoke to Mordi. Feb 2 Tr. 430:15-16. Lubin was asked several questions about his role, but those answers did not establish Mordi's knowledge of or agreement to participate in any conspiracy. Feb. 3 Tr. at 820:9-20; 821:17-822:17. The Trustee referenced Mordi five times in her 100-page post-trial brief. As in *Viola*,

there is no record evidence that other than performing the very limited role during the narrow time frame, Mordi "knew what the other members of the conspiracy were up to" or that the nature of his work at Hi Bar "logically would lead him to suspect he was part of a larger enterprise". *Viola*, 35 F.3d at 45. For these reasons, the Court should rule in Mordi Herbst's favor on the RICO conspiracy claim.

## IV.   The Trustee Failed to Prove any of her Fraudulent Transfers Claims Against Hi Bar (Counts 18-21, 23-25).

88.     The Trustee seeks to avoid and recover the $2,200,000.00 paid to Hi Bar through the eight payments made by Excell, using Karma's monies, between November 15, 2021 and February 9, 2022. The Trustee also seeks to avoid and recover the "Hi Bar Contract Transfers", which include the assignment of the Third Spin Contract to Hi Bar, the Hi Bar Agreement, the two Hi Bar Settlement Agreements, as well as the releases of claims therein. *See* Brief at ¶¶ 263-69. The Court should reject the Trustee's arguments for the reasons set out below.

### A.  The Good Faith Defense Prevents a Finding that the Transfers were Fraudulent.

89.     First, assuming the Court finds that Zankl perpetuated a Ponzi scheme through the Debtor, there is no evidence Hi Bar knew of its existence or had any duty to inquire further. Therefore, the Court should find these transfers are not avoidable on the basis of the good faith defense. 11 U.S.C. § 548(c).

90.     "A Ponzi scheme is 'an investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors.'" *In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th 171, 179 (2d Cir. 2021) (quoting *Picard v. Gettinger (In re BLMIS)*, 976 F.3d 184, 188 n.1 (2d Cir. 2020) (citation omitted). It is axiomatic that a Ponzi scheme requires *investors*. *See, e.g., In re Pearlman*, 440 B.R. 900, 904 (Bankr. M.D. Fla. 2010) ("With these guidelines in mind, the Court finds the Bank Fraud Scheme is not a

Ponzi scheme because bank loans are by any definition *not* investments and Mercantile was not an investor. The trustee's insistence that these bank loans should be considered investments ignores the many real differences between the two concepts, most notably the contractual interest rate on loans versus the unknown risk premium of equity investments." (emphasis in original). Here, Hi Bar was purchasing Excell's receivables, not investing. Therefore, the Trustee cannot show a Ponzi scheme or its entitlement to the Ponzi scheme presumption.

91.     Assuming the Court finds that Zankl perpetuated a Ponzi scheme through Excell, *some* of Excell's payments *could* be recoverable as fraudulent transfers. *In re World Vision Ent., Inc.*, 275 B.R. 641, 658 (Bankr. M.D. Fla. 2002) (stating that "all payments made by a debtor in furtherance of a Ponzi scheme are made with actual fraudulent intent. Some of these payments are properly avoidable; others are not. None are automatically avoidable."). Under appropriate circumstances, a transferor may assert the good faith defense articulated in § 548(c). The *World Vision* court explained the general contours of the defense's applicability:

> Courts will determine whether the good faith defense is established by looking at the actions and knowledge, both actual knowledge and imputed knowledge, of the recipient. Some recipients, such as insiders directly running the Ponzi scheme, obviously could not demonstrate good faith because of their involvement in the enterprise and their actual knowledge of the fraud. **Other recipients, such as third party vendors and landlords, probably can demonstrate good faith with relative ease. These types of recipients only deliver goods or rent buildings and have no reason and, more importantly, no duty to inquire into the nature of the debtor's business.** Many employees likely would fall into this category. However, in the event any of these normally disinterested recipients *did* have knowledge of the debtor's Ponzi scheme and was acting to further the fraud, they would forfeit the protection of the good faith defense.
>
> …
>
> A party can rebut the § 548(c) good faith defense by showing that the recipients of the avoidable transfer had knowledge or notice of the debtor's financial difficulties or fraudulent purpose. "Courts look to what the transferee

objectively 'knew or should have known' rather than examining what the transferee actually knew from a subjective standpoint." "If the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and *diligent* inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent." "A transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency." Further, "a transferee may not remain willfully ignorant of facts which would cause it to be on notice of a debtor's fraudulent purpose," and then "put on 'blinders' prior to entering into transactions with the debtor and claim the benefit of 548(c)."

*Id.* at 658–59 (first emphasis supplied) (cleaned up) (internal citations omitted).

92.     Here, Hi Bar was a third a party, not a Ponzi scheme insider or employee. The Hi Bar Agreement and the two Hi Bar Settlement Agreements were negotiated at arms' length with Zankl. *World Vision* does not impose (or even discuss) a freestanding duty to inquire into whether the debtor was running a Ponzi scheme, but leaves open the possibility of undertaking such an inquiry if the specific factual circumstances demand one. Here, the Trustee failed to cite any legal authority or any factual circumstances suggesting that Hi Bar had a duty to inquire into whether Zankl was running a Ponzi scheme. In fact, the evidence showed that Zankl never followed the procedure in the Hi Bar Agreement to request reconciliation from Hi Bar. Feb. 2 Tr. 433:6-434:21. And when Zankl spoke with Lubin about needing "help", he never told Lubin he couldn't make payments because he wasn't selling enough cars. *Id.* at 483:20-484:17. In addition, the evidence does not establish circumstances that would have place a reasonable person on inquiry of Excell's fraudulent purpose. *In re World Vision*, 275 B.R. at 658-59. The Trustee failed to cite any testimony or evidence that Hi Bar had "sufficient knowledge to place [it] on inquiry notice of the debtor's possible insolvency." *Id. See* Brief at ¶¶ 223-53, 307-14 (focusing only on Zankl's conduct). For these reasons, the Court should decline to find these transactions fraudulent. *In re Pearlman*, 440 B.R. 900, 907 (Bankr. M.D. Fla. 2010) (denying trustee's motion for summary judgment and stating: "In sum, the deposition testimony on record falls far short of establishing that

Mercantile was on inquiry notice of Pearlman's fraud or poor financial condition, let alone that Mercantile had actual knowledge of such facts.").

### B. The Debtor Received Reasonably Equivalent Value.

93.     Next, among the factors a trustee must prove in order to avoid a transaction as constructively fraudulent under 11 U.S.C. § 548(a)(1)(B) is that the debtor received less than a reasonably equivalent value in exchange for such transfer or obligation. The Trustee failed to make that showing with respect to the transactions she seeks to avoid, and therefore, the Court should reject the Trustee's attempt to recover these transfers. "'Reasonably equivalent value' does not mean dollar-for-dollar equivalence. Instead, courts make informed judgments as to asset valuation in light of the totality of the circumstances." *In re Fundamental Long Term Care, Inc.*, 873 F.3d 1325, 1344 (11th Cir. 2017) (citing *In re Northlake Foods, Inc.*, 715 F.3d 1251, 1257 (11th Cir. 2013)).

1.     The Assignment of the Third Spin Contract to Hi Bar and the Hi Bar Agreement.

94.     The Trustee's characterization of the assignment of the Third Spin Contract to Hi Bar as a "charade" is erroneous and not supported by the evidence at trial. *See* Brief at ¶¶ 272-73. Regardless of what Zankl and/or Lubin may have said (or omitted) from Wing Lake, Yisroel Herbst was clearly not "in" on any "charade." He testified credibly that he was excited to be able to get an Excell MCA into Hi Bar's portfolio because he understood Excell to be a legitimate merchant run by an "upstanding guy" who was well-known in the community, and he jumped at the opportunity to obtain the MCA from Spin, describing his own decision making as "hasty". Feb. 4 Tr. 1075:11-1076:5. There is no evidence that Hi Bar engaged in any "charade" that was designed to defraud anyone.

95.     Further, contrary to the Trustee's argument, Excell received reasonably equivalent value from Hi Bar paying off Excell's debt to Spin. *See* Brief ¶ 274. In *Lateral*

*Recovery LLC v. Funderz.net, LLC*, No. 22-CV-2170 (LJL), 2024 WL 4350369, at \*34, the court explained:

> Plaintiffs argue that the $2,250,000 of this loan which was used as repayment of the prior loan should not be counted, noting that the amount in fact paid to FTE (after fees) was only $300,000. This argument is not economically sound. A dollar of forgiven debt is equivalent to a dollar in hand. Funderz could have paid the full $2,750,000 into FTE's bank account and had FTE pay back $2,250,000 on the outstanding loan—this would not have changed the character of the transaction.

*Id.* (internal citations omitted).

96.     While the court's analysis applied in the context of a determination of whether the MCA agreement was a usurious loan, the same reasoning applies to a consideration of whether Excell received a reasonably equivalent value from the assignment of the Third Spin Contract, its payoff by Hi Bar, and the execution of the First Hi Bar Agreement.

97.     Further, the Third Spin Contract and the First Hi Bar Agreement allowed Zankl to continue operating his businesses. Excell therefore received reasonably equivalent value in return for the transfers Zankl caused Excell to provide in return for these agreements. *See In re Victory Med. Ctr. Mid-Cities, LP*, 601 B.R. 739, 748 (Bankr. N.D. Tex. 2019 ("In determining whether reasonably equivalent value was received, the Court may consider an economic benefit flowing from the "debtor's ability to keep his business in operation as a result of his entering into the challenged transaction.").

### 2.   The "Hi Bar Transfers" of $2,200,000.

98.     The payments Excell made to Hi Bar (besides being a legal obligation owed by Excell) enabled Zankl to continue operating his business, which constitutes reasonably equivalent value. *In re Victory Med. Ctr. Mid-Cities, LP*, 601 B.R. 739, 748 (Bankr. N.D. Tex. 2019 ("In determining whether reasonably equivalent value was received, the Court may consider an economic benefit flowing from the "debtor's ability to keep his business in operation as a result of his entering into the challenged transaction."). If the Court finds

Zankl perpetuated a Ponzi scheme, these payments allowed him to continue operating it, which also delivers reasonably equivalent value. *See* Brief ¶¶ 265-283. At least one court has held that payments made that perpetuate a Ponzi scheme may deliver reasonably equivalent value. *In re World Vision Ent., Inc.*, 275 B.R. 641, 657 (Bankr. M.D. Fla. 2002) ("The court holds that the debtor did receive reasonably equivalent value…"). In *World Vision*, the court explained:

> In this case, brokers also sold the debtor's notes and received a commission. Every time a broker sold a note, the defendants remitted the entire proceeds to the debtor. The debtor, in turn, paid the broker a commission based on the face amount of the note sold or renewed. The commission rate averaged 14 percent. Although this commission rate was high, the trustee does not assert that a lower rate was appropriate. Rather, the trustee argues the payment of *any* commission amount is constructively fraudulent because the debtor received no value for the brokers' services.

> The Court rejects the trustee's theory. The debtor received exactly what it wanted—the sale of more and more notes. The debtor paid high commission rates to the brokers to encourage the sales. Without the new sales, the debtor's Ponzi scheme would have collapsed earlier. Therefore, the brokers, including the defendants in this adversary proceeding, performed a valuable service for the debtor. The debtor paid proportionate commissions for these services, and the trustee failed to prove constructive fraud because the debtor received reasonably equivalent value.

*Id.* at 658.

99.    The same is true here. Excell received reasonably equivalent value from making the payments totaling $2,200,000 because it enabled him to continue operating Excell and running a Ponzi scheme (if that is the Court's determination). *See In re Victory*, 601 B.R. at 748. In any event, the Court should reject the Trustee's constructively fraudulent transfer analysis and refuse to permit the Trustee to recover these payments.

      3.  <u>The First and Second Hi Bar Settlement Agreements and the Releases Contained Therein.</u>

100.    The Court should find that Excell received reasonably equivalent value from

the First Hi Bar Settlement Agreement and the Second Hi Bar Settlement Agreement. As a general principle, courts often find reasonably equivalent value when the debtor enters into a settlement agreement to avoid continued litigation. *See, e.g.*, *In re Victory Medical Center*, 601 B.R. at 749-50 (granting defendant's motion for summary judgment upon finding that debtor received reasonably equivalent value when it entered into written settlement agreement to resolve billed charges to insurer of $22 million dollars for $3.3 million dollars); *In re Tower Env't, Inc.*, 260 B.R. 213, 224, 226 (Bankr. M.D. Fla. 1998) (holding that plea agreement by debtor to avoid criminal charges constituted reasonably equivalent value and stating: "In all of the cases which have been brought to the attention of the Court, resolution of civil litigation has uniformly constituted reasonably equivalent value.").

101.    When considering whether a settlement agreement delivers reasonably equivalent value, courts should evaluate the merits of the lawsuit. *See, e.g.*, *In re Advanced Telecomm. Network, Inc.,* 490 F.3d 1325, 1337 (11th Cir.2007) (stating that in evaluating a settlement, the value of contingent future liability should be discounted by probability of its occurrence). The court is not required to "conduct a 'mini-trial' of the merits of the claims being settled" but "need only canvass the settlement to determine whether it is within the accepted range of reasonableness." *In re Victory Medical Center*, 601 B.R. at 749 (citing *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994)). Whether a settlement constitutes reasonably equivalent value under depends upon the good faith of the parties, the difference between the amount paid and the fair market value of what is received, the existence of an arm's length transaction, and any indirect benefits. *In re Palisades at W. Paces Imaging Ctr., LLC*, No. 09-87600-WLH, 2011 WL 4459778, at *8 (Bankr. N.D. Ga. Sept. 13, 2011) (citing *In re Heilig–Meyers Co.,* 297 B.R. 46, 52 (Bankr. E.D.Va. 2003). The court must also weigh the strong public policy favoring settlement agreements. *Matter of Munford, Inc.*, 97 F.3d 449, 455 (11th Cir. 1996). "There is value in the resolution of disputed claims." *In re Victory*

*Medical Center*, 601 B.R. at 749-50.

102.    The Hi Bar Settlement Agreements were entered into at arms' length. *See* Black's Law Dictionary (12th ed. 2024) (defining "arms'-length transaction" as "a transaction between two unrelated and unaffiliated parties."). *See* Trustee Exs. 45 at p. 7, Ex. 46 at p. 7 (identifying parties' signatures). Both were entered into with good faith by the parties, as by signing, by parties agreed to be bound. *E.g.*, *Stoll v. JPMorgan Chase Bank, N.A.*, No. 23-CV-4149(CBA)(MMH), 2024 WL 4469174, at *4 (E.D.N.Y. July 16, 2024). Indeed, there was no evidence that Hi Bar had any information suggesting that Excell was insolvent or about to become insolvent, or engaged in any fraudulent purposes. *See In re Bayou Group, LLC*, 439 B.R. 284, 314 (S.D.N.Y. 2010) (stating that "the great weight of authority holds that it is information suggesting insolvency or a fraudulent purpose in making a transfer that triggers inquiry notice."). In fact, Zankl admitted he never spoke with Yisroel or Mordi Herbst. Feb 2 Tr. 430:15-16; 637:1-4. And both Hi Bar Settlement Agreements were for reasonable value given Hi Bar's precarious legal position. The evidence at trial showed that Excell owed Hi Bar the monies pursuant to the Hi Bar Agreement, never properly requested reconciliation, and could not repay. *See* Feb. 2 Tr. 433:6-434:21; 483:20-484:17. Zankl admitted Excell received multiple benefits by signing the two Hi Bar Settlement Agreements. Specifically, he testified that by signing the First Hi Bar Settlement Agreement, he was able to remove the UCC filing which allowed him to obtain a loan from FVP. Jan. 30 Tr. 284:22-285:10; Feb. 2 Tr. 484:18-485:3. He also admitted that each agreement modified and extended the payment terms. *See id.* at 468:7-12; 470:5-16. Zankl executed the Second Hi Bar Settlement Agreement to avoid having his bank accounts frozen. Jan. 30 Tr. 291:11-23. Had Excell not entered into either of the two Hi Bar Settlement Agreements, Excell was facing the shuttering of its business. By entering into those agreements, Excell preserved its ability to operate. In the

litigation that each settlement agreement resolved, Hi Bar had a meritorious position. This was partially evidenced by the fact that the court in New York actually ruled in favor of Hi Bar. *See Hi Bar Capital, LLC v. Excell Auto Group, Inc.*, No. 502846/2022, 2023 WL 3431299 (N.Y. Sup. Ct. May 11, 2023) (finding MCA agreement enforceable and granting summary judgment in favor of Hi Bar).[15] The Hi Bar Settlement Agreements included releases of Excell. *See* Trustee Ex. 45 at ¶ 3; Ex. 46 at ¶ 4.

103.    Individually and collectively, these factors demonstrate that both Hi Bar Settlement Agreements delivered reasonably equivalent value. *In re Tower Env't, Inc.*, 260 B.R. 213, 226 (Bankr. M.D. Fla. 1998) (reasonably equivalent value from criminal plea agreement included the resolution of substantial disputed debts, avoidance of significant attorneys' fees and costs, forbearance of facing more serious criminal charges, additional "time and opportunity to make financial arrangements for payment or to make payments from operations," which provided "some chance of a future economic benefit from the settlement."); *In re Victory Med. Ctr. Mid-Cities, LP*, 601 B.R. 739, 748 (Bankr. N.D. Tex. 2019 ("In determining whether reasonably equivalent value was received, the Court may consider an economic benefit flowing from the "debtor's ability to keep his business in operation as a result of his entering into the challenged transaction.") (quoting *In re Calvillo*, 263 B.R. 214, 220 (W.D. Tex. 2000)). *See also Sec. & Exch. Comm'n v. Alleca*, No. 21-13486, 2022 WL 16631325, at \*5 (11th Cir. Nov. 2, 2022) (stating that "constructive-fraud provisions generally "do not authorize voiding a transfer which confers an economic benefit upon the debtor, either directly or indirectly. In such a situation, the debtor's net worth has been preserved, and the interests of the creditors will not have been injured by the transfer."

---

[15] In response to the Trustee's argument that the Hi Bar Agreement was criminally usurious, see Brief at ¶ 275, Hi Bar incorporates by reference its arguments addressing the RICO claims.

(cleaned up) (quoting *In re Rodriguez*, 895 F.2d 725, 727 (11th Cir. 1990)).

104.    Further, the Court should find that Excell received reasonably equivalent value from the releases contained in each Settlement Agreement. *In re Hefner*, 262 B.R. 61, 65 (Bankr. M.D. Pa. 2001) ("I find that the release of claims against a debtor can be considered "reasonably equivalent value" under the dictates of § 548(A)(2)(a).").

### C.  The Debtor Made the Payments with Karma's Money.

105.    As stated above, Zankl admitted that he made numerous payments to Hi Bar owed by Excell from Karma's bank accounts. *See supra* at ¶¶ 70-72. Zankl testified that as a matter of course, payments to Hi Bar were paid with Karma monies. Feb. 2 Tr. at 453:5-23. Furthermore, Zankl admitted that Excell couldn't have paid Hi Bar because it was no longer selling cars. *Id.* at 446:5-7. The eight payments came from Karma's accounts and were in Excell's bank account for mere hours or days, specifically for the purpose of making these payments. Therefore, the monies were not the Debtor's property. *See In re McMillin*, 482 F. App'x 454, 457 (11th Cir. 2012) ("After hearing all testimony and evaluating the evidence and the credibility of key witnesses, the bankruptcy court concluded that neither the Debtor nor Debtor/VT had sufficient control of the funds. The bankruptcy court found that the $280,000 was only in Debtor/VT's bank account for a few hours, the time it took to obtain a cashier's check payable to SEG.").

### V.    The Trustee Failed to Prove any of her Preference Payments Claims Against Hi Bar (Counts 26-27).[16]

106.    Finally, the Trustee seeks to recover $1,500,000 paid to Hi Bar pursuant to the two Hi Bar Settlement Agreements as preference payments pursuant to 11 U.S.C. § 547(b).

---

[16] The Trustee's Brief refers to the preference payments she seeks to recover as being in the amount of $1,500,000. *See* Brief at ¶¶ 322-30. However, the Trustee only pled an alleged entitlement to recover $1,300,000. *See* Third Amended Complaint ¶¶ 498-509. The Trustee is constrained by her pleading. *See Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1194 (11th Cir. 2021).

The Court should rule in favor of Hi Bar on Counts 26 and 27 because the evidence establishes the ordinary course exception. 11 U.S.C. § 547(c)(2). To prove this defense, Hi Bar need only show that the transfers were made "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee," or "made according to ordinary business terms." 11 U.S.C. § 547(c)(2). Hi Bar must show that: (a) the "transfer was ordinary in relation to the 'other business dealings between *that* creditor and *that* debtor[];'" and (b) the payment is ordinary in relation to prevailing industry standards. *In re Globe Mfg. Corp.*, 567 F.3d 1291, 1298 (11th Cir. 2009) (quoting *In re Fred Hawes Org., Inc.,* 957 F.2d 239, 244 (6th Cir.1992) (italics in original). Hi Bar can easily make this showing.

107.    The first element can be proven by showing that the debt was created in the ordinary course of the Debtor's business and the debt was "normal" in the Debtor's business generally. *In re Hill*, 589 B.R. 614, 625–26 (Bankr. N.D. Ill. 2018). Here, Zankl testified that in addition to the three Spin Contracts and the Hi Bar Agreement, Excell entered into multiple MCA funding agreements between 2020 and the Petition Date of April 8, 2022. Specifically, Zankl caused Excell to obtain funding from MCA funders known as Libertas, Get Backed, Funders App, Alpine Business Capital, Vertex, TBF Funding, TVT Funding, and Diverse Capital. *See* Jan. 29 Tr. 146:19-150:2; 154:16-19; Jan. 30 Tr. 300:19-302:3. The Trustee's expert, Mr. Barbee, confirmed it had been Excell's practice to accept funding from MCA agreements since 2020. While Barbee refused to use the phrase "ordinary course of business", he did testify that Excell took MCA funding from 2020 through the Petition Date, April 8, 2022. Feb. 4 Tr. 1029:9-19.

108.    In addition, Zankl testified extensively that as far back as 2017, he borrowed money at usurious interest rates using doctored promissory notes and fabricated vehicle transactions, the purpose of which was to conceal the loans' usurious interest rates. *See*

*generally* Feb. 2 Tr. 413:10-426:4; Trustee Exs. 205 at p. 1-52, 208, 211 at p. 1-6, 212 at p. 5-49, 214. This included fabricating transactions for the sale of cars that never occurred, *see* Feb. 2 Tr. 420:4-421:10; Ex. 214 at p. 11-14, and also a scheme to help Gelb hide the usurious interest. Feb. 2 Tr. 414:13-415:1. Even the Trustee's expert, Mr. Barbee, admitted that Excell took out MCA debt starting in 2020. Feb. 4 Tr. 1029:9-19. Zankl also testified that even after agreeing he would no longer accept MCA funding as a condition of obtaining the financing from Wing Lake, he electronically signed the Hi Bar Agreement while he was on the golf course with the Wing Lake executives. Feb. 2 Tr. 454:24-456:23; 465:7-10. And, even after Zankl received the $6 million dollars from Wing Lake, he took out two more MCA agreements. *Id.* at 465:11-466:3. Based on this extensive, years-long borrowing practice, Excell clearly took out MCA funding in the ordinary course of its business. Therefore, the first element of the ordinary course exception is satisfied. *In re Hill*, 589 B.R. 614, 626 (Bankr. N.D. Ill. 2018) (reciting MCA transactions with 14 different MCA funders over a 3 year period, rejecting the trustee's argument "that it was not in the ordinary course of business for Network Salon to enter into this type of debt because the business was struggling financially and that its desperation for capital caused it to enter into these agreements[ ]" and concluding: "Due to the length of time and the consistency of Network Salon entering into these kinds of transactions, the court finds that entering into these types of transactions became a normal, ordinary part of Network Salon's business."). Furthermore, if the Trustee's argument is to be credited that Hi Bar "participated" in the First and Third Spin Contracts (in addition to executing the Hi Bar Agreement) with Excell, then it was in the ordinary course of business for Excell and Hi Bar to enter into MCA transactions.

109.   The second element of can be proven by showing that the transfers were made in the ordinary course of business between the parties or according to ordinary business terms. *In re Hill*, 589 B.R. 614, 626 (Bankr. N.D. Ill. 2018). The testimony of Yisroel and

Mordi Herbst showed that Hi Bar (directly and through several DBAs) issued approximately 400 merchant cash advance contracts between January/February 2021 through October 2022. Feb. 4 921:10-18; 1066:20-23; 916:1-13. Hi Bar was in the business of purchasing merchants' accounts receivables and receiving payments from the merchant until the funding was repaid. When a merchant defaulted, Hi Bar sought to work with the merchant, but when this was impossible, Hi Bar would file a lawsuit. Feb. 4 Tr. 898:2-21; 1070:2-1071:5. The $1,500,000 in payments were made pursuant to the two Hi Bar Settlement Agreements, which was an ordinary process followed by Hi Bar when merchants defaulted. Further, the payments, while made pursuant to Settlement Agreements, had their origins in MCA funding between the parties which itself was part of the ordinary course of the parties' dealings. This evidence satisfies the second element. *In re Hill*, 589 B.R. at 628–29 ("LG Funding operates in the MCA industry, entering into MCA agreements on a regular basis. Network Salon, through Ms. Hill, began obtaining capital through MCA agreements nearly two years prior to entering into the agreements with LG Funding. Once the Agreements were signed, they were performed, in large part, according to their terms over the span of a few months. The court finds that the transfers to LG Funding were made in the ordinary course of business of the Network Salon and LG Funding; the second element of this defense has been satisfied.").

110.    Finally, the Trustee did not advise that she was dropping Count 28 (promissory estoppel). However, Mehdipour also failed to address them in her Brief. Therefore, the Court should find in favor of the Defendants on those counts.

## VI.    **The Hi Bar Defendants Proved their Affirmative Defenses**

111.    The Hi Bar Defendants conclude by discussing the affirmative defenses that are still applicable.

112. There is evidence to support the sixth defense. Excell owes the balance on the Second Hi Bar Settlement Agreement, which is a simple mathematical calculation. Excell owes $3,800,000.00 - $1,300,000 = $2,500,000. *Compare* Trustee Ex. 46 at p. 1 *with* Trustee Ex. 52.

113. The thirteenth defense is proven by the Hi Bar Agreement, which gave Hi Bar a security interest and the right to file a UCC Financing Statement. See Hi Bar Ex.1 at p. 5. And Zankl testified that he signed the First Hi Bar Settlement Agreement to have it removed. Feb. 2 Tr. 484:18-23. "A debtor's payment to a secured creditor is not fraudulent even though its natural effect was to hinder or delay the non-preferred creditors." *Wiand v. Wells Fargo Bank, N.A.*, 86 F. Supp. 3d 1316, 1327 (M.D. Fla. 2015), *aff'd sub nom. Wiand v. Wells Fargo Bank, N.A., Inc.*, 677 Fed. Appx. 573 (11th Cir. 2017).

114. Contrary to the Trustee's argument, the seventh defense does not fail as a matter of law. In fact, a release bars claims of criminal usury under New York law provided that the settlement agreement itself is not usurious. *OriginClear Inc. v. GTR Source, LLC,* 2021 WL 5907878 (W.D.N.Y. Dec. 14, 2021). The releases are clearly documented in the two Settlement Agreements. *See* Trustee Ex. 45 at ¶ 6, Ex. 46 at ¶ 6. Zankl also admitted to releasing Hi Bar in the First Settlement Agreement. Feb. 2 Tr. 468:20-23. The release has been proven and is binding. *See Stevens v. Town of Chenango (Forks)*, 167 A.D.3d 1105, 1106 (3d Dept. 2018) ("[A]bsent fraud, duress, illegality, mutual mistake or other cause sufficient to invalidate a contract, the signing of a release that contains clear and unambiguous language is a jural act binding on the parties."). This defense applies to the RICO claims.

115. As to the twelfth defense, Zankl admitted Excell paid with Karma's monies and was an obligor under the MCA. *See supra* ¶¶ 69-71 & Hi Bar Ex. 1 at p.1.

Respectfully submitted,

LETO LAW FIRM
2875 NE 191st Street
Suite 604
Aventura, Florida 33180
Tel.    305-341-3155
Fax:    305-397-1168

*/s/ Charles P. Gourlis*
MATTHEW P. LETO
Florida Bar No.: 014504
mleto@letolawfirm.com
kzelaya@letolawfirm.com
pleadings@letolawfirm.com
CHARLES P. GOURLIS
Florida Bar No. 85924
cgourlis@letolawfirm.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 4, 2026, we electronically filed the foregoing document with the Clerk of the Court and provided service to all counsel of record using CM/ECF.

*/s/ Charles P. Gourlis*
CHARLES P. GOURLIS